IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| PREMPRO PRODUCTS LIABILITY | : | MDL Docket No. 4:03CV1507 WRW |
| LITIGATION | : | |
| _____ | : | |
| *April Krueger, et al.,* | : | This Pleading Relates to: |
| Plaintiffs, | : | |
| | : | |
| v. | : | Case No. 4:03CV00406 WRW |
| *Wyeth, et al.,* | : | |
| Defendants. | : | |
| _____ | : | |
| *Carol Sue Kuhn, et al.,* | : | West Virginia Consumer Class |
| Plaintiffs, | : | Case No. 4:03CV00329 WRW |
| | : | |
| v. | : | |
| *Wyeth, et al.,* | : | |
| Defendants. | : | |
| _____ | : | |

## 1. EXPERT REPORT OF MARVIN E. GOLDBERG, PHD

1.1     My name is Marvin E. Goldberg.   I reside in Boalsburg, Pennsylvania. I am the Irving & Irene Bard Professor of Marketing at the Pennsylvania State University. I have held this position since 1991. In 1998-99, I served as Interim Dean of the Smeal College of Business Administration at Penn State. From 1999 to the present, I have served as Chairman of the Marketing Department at Penn State. From 1970 to 1991, I was a professor at McGill University in Montreal, Canada.

I have been retained by the Consumer Class Plaintiffs in the above referenced action.  I have personal knowledge of the following facts, and my personal experience in the fields of marketing, advertising, consumer behavior and psychology are listed below. I have reviewed the materials listed in Appendix B.  Based on my review of these materials, and my professional experience, I have reached the opinions listed in the report below.

1.2     I received my Ph.D. in Marketing (minors in economics and psychology) from the University of Illinois in 1972. I received an M.A. in Sociology from Columbia University in 1967 and a B.A. (honors political behavior) from McGill University in 1965.

1.3     I am a past President of the Society for Consumer Psychology (Division 23 of the American Psychological Association). I am currently a member of the editorial board for the: *Journal of Consumer Research, Journal of Public Policy and Marketing, Journal of Social Marketing, International Quarterly Journal of Marketing.*

1.4     I am an expert in marketing and will testify regarding the field of marketing as it relates to advertising and promotion in the pharmaceutical industry.  I have been approved to testify as a trial witness regarding marketing and advertising and their effects on consumer behavior,r in federal court and state courts as listed in my C.V. in Appendix A.

1.5     My published research has focused on the effects of advertising on adults and youth. These include a co-edited book: "Social Marketing: Theoretical and Practical Perspectives (Erlbaum 1997) and articles in a wide variety of journals, including the: *Journal of Consumer Research*, *Journal of Consumer Psychology*, *Journal of Public Policy and Marketing*, *Psychology and Marketing*, *Journal of Advertising Research*, *Journal of Communication*, *Journal of Business Research*, *American Journal of Public Health*, *Nicotine and Tobacco Research.*

1.6     I have read the complaint with regard to the Prempro products liability litigation. Set forth below is a detailed discussion of my opinions and conclusions in this matter and my basis for them.  I have included a list of materials I reviewed and relied upon in preparing this report as Appendix B.

## OVERVIEW AND SUMMARY OF OPINIONS

1.8     Wyeth understood that women believed HRT increased their risk of breast cancer and that, as a result of this risk, women believed the drug's risks outweighed its benefits. Wyeth further understood this fear significantly limited its HRT sales.  Knowing this, Wyeth implemented a two pronged marketing campaign whose objective it was to exaggerate the drug's value with fictitious benefits to overcome women's breast cancer fear.  Wyeth's marketing campaign is a text-book example of how modern marketing techniques develop consumer demand (and product sales) through thematic repetition that de-emphasizes the individual advertisements.  In this case, Wyeth used these techniques to create consumer expectations that Hormone Replacement Therapy, including its Premarin Family of Products, protected them against the "consequences of estrogen loss," including heart disease and dementia.

1.9     Specifically, Wyeth conducted Direct to Consumer Advertising (DTCA)  that told women its Hormone Replacement Therapy products: (1) reduced their risks of heart disease and dementia, to distract them and overcome their fear that HRT would cause them breast cancer; (2) by doing so, it diluted the drug label's warning of potential breast cancer risk.  Wyeth's DTCA motivated menopausal women to seek out their doctors, and shaped their understanding and expectations with regard to the fictitious "bundle of benefits" they could ostensibly get through Prempro.  By playing on their concerns and fears, the DTCA motivated them to ask for HRT therapy in general and Prempro by name. As the brand with the dominant market share, Prempro stood to gain in either event.

1.10    Wyeth supplemented this consumer directed campaign with a similar effort intended to convince doctors of the drug's ability to reduce heart disease and dementia. Wyeth's advertising and promotional efforts targeting physicians led them to expect the same "bundle of benefits" from the drug.  By coordinating the perceptions and concerns regarding menopause, Wyeth ensured that the fictitious bundle of benefits would be the focus of the patient-doctor visit.  Wyeth's physician advertising and sales detailing efforts ensured the doctor was effectively primed for the prescription request which the DTCA led women to make.  In Section 2, I outline Wyeth's deceptive and misleading advertising and promotion strategies.

1.11    Wyeth made these claims intending to "leverage" the fears women had that were associated with heart disease and dementia, with the goal of overcoming their fear of breast cancer. Knowing heart disease is the number one risk factor women face and that people are very scared of dementia and Alzheimer's Disease, Wyeth understood these benefits were material to their target audience.  They were certainly material to Wyeth as a tool for overcoming women's reluctance to start and continue the therapy.

1.12    As measured by Wyeth's own research, its strategy and its campaign to falsely shape positive expectations and beliefs regarding the drug's benefits, worked. It convinced consumers and doctors that HRT reduced the risks of heart disease and dementia, and women relied on these false benefits believing they were true.

1.13    In Section 3, I document how and why the pharmaceutical industry spends billions on DTCA so as to influence the consumer/patient to seek out prescription drugs. The reason they spend this money is that it works.  In section 4, I document how and why, in a parallel effort, this industry influences physician behavior through advertising and in-person detailing promotions.

1.14    Therefore, it is my opinion, based on my education, experience, and review of the materials identified above, that as a result of Wyeth's advertising and marketing efforts, consumers expected HRT and Prempro to reduce their risks of heart disease and dementia. These were important benefits to women, prescribing physicians and to Wyeth because, if true, they outweighed the potential breast cancer risk the drugs caused.  It is my further opinion that women who bought and took the drugs, including April Krueger, and their prescribing doctors relied on these representations when they decided the drug's benefits outweighed its risks.  My opinions are supported by Wyeth's own marketing strategies, its research and the empirical consequences of Prempro's sales collapse when the Women's Health Initiative revealed the truth of Wyeth's false benefit claims.


## 2. WYETH'S ADVERTISING FOR PREMPRO WAS MISLEADING AND DECEPTIVE. IT WAS ALSO EXTENSIVE AND HIGHLY SOPHISTICATED.

**2.1    The basic building block in the advertiser's effort to win the consumer over to his/her brand is the *advertising campaign*.  Discrete ads are typically developed only in service of that goal. Wyeth's overall campaign was highly successful and memorable. Whether or not its individual ads were memorable was irrelevant to the company.**

2.2    Modern advertising theory teaches that it is marketing campaigns build consumer demand - not discrete ads or messages.  The campaign communicates value themes that build and shape the product's identity.  The modern campaign will express these core themes in different ways, at different times, and even through different media, throughout the promotion.  The campaign uses discrete advertisements deliver these themes, but these individual ads function as part of an integrated whole.  Research has proven this theory is the most effective means of developing consumer demand and, ultimately, product sales.

2.3    With rare exception, individual or isolated advertisements ads do not create consumer demand or consumer expectations in the product.  Several reasons explain why this is true.  First, modern consumers are bombarded with hundreds, if not thousands of messages every day.  This means advertisers compete for the audiences' attention and the competition limits their ability to grab consumers' attention.  Relatedly, consumers have very short attention spans.  It is the cumulative effect of a campaign that can stand out and influence consumers.

2.4     Modern marketing theory realizes that consumers are "_poor historians."  Most people do not recall what they ate for dinner two nights ago, and it is truly exceptional if someone recalls what they ate a week ago.  Eating, because it involves all of our senses and because the experience lasts so much longer, is a far more memorable experience than viewing an advertisement.  Modern advertising, therefore, responds by keeping the message simple and thematic.  Repetition re-enforces the product themes and develops the consumers' expectations of the product or brand.

2.5     With few notable exceptions such as Superbowl commercials, modern marketing campaigns are designed to re-enforce the general theme while de-emphasizing its constituent ads.  The advertising industry uses a number of psychological tools that homogenize the ads, blending them together.  These include color coordination, thematic repetition, use of recognized spokes-models, etc.  Advertisers use these tools so that consumers remember the thematic message, even though they will not usually recall the discrete ad. The primary (and often only) value of having different ads in the same campaign is that while they adhere to the overall theme, they work to ensure that consumers are not bored by the repetition that would be inherent in repeating a single message over and over (boredom as the consumer response is an ongoing problem for the advertiser). (Belch and Belch 2004; Batra, Myers and Aaker 1996; Assael 1995)


**Wyeth used a well-worn advertising strategy in selling HRT/Prempro: arouse concern and fear and offer your product to "eliminate" the problem.**

2.6     Wyeth knew one of the primary barriers to getting women to take HRT and to remain on the therapy was their fear that it would cause them breast cancer.  [Ex. 7 at 258, 259; Ex. 9 at 829-830; Ex.10 at 281, 288, 291; Ex. 12 at 835-838; Ex. 17 at 223; Ex. 18 at 889, 892-894, 896-898, 900, 927, 929, 932, 941; Ex. 19 at 185; Ex. 26 at 89; Ex. 38 at 73-74, 76].  "[O]vercoming the obstacle of breast cancer is largely a consumer issue."[Ex. 9 at 830].  Wyeth understood, from its own research, that:

2.7     Our participants indicated that the number one concern that women express involves breast cancer.  They are fearful, often profoundly so. [Ex. 12 at 833, accord 838; see, Ex. 20 at 245].

2.8     Wyeth's strategy, therefore, was to teach women that its HRT products prevented other conditions that posed greater risks to women's health, specifically heart disease and Alzheimer's Disease. [Ex. 7 at 258, 259; Ex. 18 at 892-899, 927; Ex. 34 at 179; Ex. 37 at 1292; Ex. 40 at 1096, 1099, 1100; Ex. 41 at 1130; Ex. 42 at 985, 988].  Wyeth then provided the "solution" to all of these maladies.  Doing so, Wyeth created a false "bundle of benefits."  While some women may focus on one component or another from this bundle, the message that induced consumer action (reliance) was the drug provided all these benefits: therefore, the drug's bundle of benefits outweighed the potential risks.

2.9     Wyeth's central selling point for Prempro was that the concerns and fears it raised about everything from tooth loss to macular degeneration could be alleviated or

eliminated simply by adopting HRT. The "theme" that Wyeth promoted was that women lost estrogen as a function of menopause and Hormone *Replacement* Therapy, would do just that—replace the lost estrogen. This intuitively simple "solution" may have been scientifically oversimple, incomplete or incorrect, but it was offered by the company as an intuitively comfortable solution to the very concern they chose to create.

**Wyeth downplayed concerns regarding the link between HRT/Prempro and breast cancer by raising unsubstantiated, off-label "benefits" related to dementia/alzheimer's disease; coronary disease, cataracts, macular degeneration and others. This strategy involved creating the perception of a "bundle of (fictitious) benefits" that distracted both women and doctors from their concern about breast cancer, which if left salient, would significantly slow Prempro sales.**

2.10   Wyeth's basic strategy was to distract women and doctors from the real link between Prempro and breast cancer by creating a "bundle of (fictitious) benefits."  [Ex17 at  235, 238, 239; Ex. 18 at 892; Ex. 19 at 147-148, 156-158, 159, 164; Ex. 24, *passim*; Ex. 34 at 2179, 2182, 2189; Ex. 35 at 100; Ex. 36 at 696; Ex. 37 at 1267, 1287, 1292, 1338; Ex. 38 at 01172-76; Ex. 40 at 1096, 1099, 1100; Ex. 41 at 1119,1130-33, 1136; Ex. 42 at 981, 982, 985-987, 988].

2.11   Wyeth's research showed that women were very fearful about heart disease and Alzheimer's Disease. [Ex.20 at 316, 317].  However, Wyeth also realized that women did not associate these conditions with menopause or "estrogen loss." [Ex. 18 at 890]. Therefore, Wyeth directed its advertising and promotional efforts at teaching women and doctors that menopause caused estrogen loss and estrogen loss caused heart disease, dementia and other conditions. [*Id*., see Ex. 19 at 170-175].

2.12   Even if the notion of breast cancer would come up, the goal was to suggest that even though the product may have some disadvantages (increased risk of breast cancer), given the large number of other benefits, *overall,* it was well worth adopting. The product's strengths compensated for its weaknesses. This was Prempro's basic advertising message/theme and was reflected in countless documents.

> Leverage emotional issue of Alzheimers with consumer to balance Breast Cancer Fears. [Ex. 13 at 294].

> Strategies: convince patients that the benefits of Premarin/Prempro/Premphase outweigh the possible risks. [Ex. 10 at 19].

> As with osteoporosis, Premarin maintains a standing positive image regarding cardiovascular benefits…The additional positive long-term benefits of Premarin (reduction/prevention of Alzheimer's disease, colon cancer, et.) add additional weight to the message. [Ex. 7 at 258].

2.13   The "bundle of benefits" approach is conveyed to women in the brochure entitled "Taking Charge of your menopause; your patient action guide." [Ex. 37, *passim*.] Beyond

avoiding osteoporosis (for which Wyeth had the more directly targeted drug, Fosomax), a number of other false benefits were touted.  For each, it is suggested that HRT *might conceivably* reduce the risk associated with: tooth loss; heart disease, colon cancer, macular degeneration and others. When the risk of breast cancer is raised, it is only to be downplayed, either in its own right or relative to the risk of heart disease. Thus the message is: overall, as a bundle of benefits, HRT (and implicitly, brand share leader, Prempro) is well worth it. The positive (fictitious) benefits outweigh the risk of breast cancer.

2.15    Wyeth had the same goal in the messages it used to target physicians: get doctors to use the notion of a bundle of benefits to evaluate Prempro. [Ex.10 at  279; Ex. 13 at 285, 287; Ex. 18 at  898, 927; Ex. 34 at  2179, 2182, 2189); Ex. 38 at  1172, 75-76; Ex. 40 at  1096, 1099, 1100; Ex. 41 at  1130-1131, 1136; Ex. 42 at  981, 982, 985-987, 988]. Among the many messages that were crafted to achieve this goal, one example [Ex. 40, *passim*.] is represented in a series of pages, one of which was entitled "Consider the entire body of evidence." (Alongside of a sketch of a woman's body showing her internal organs, a series of points are raised associated with *possible* risks potentially ("research continues to explore…") associated with menopause. These include: "Brain…cognitive functioning, memory, Alzheimer's disease…;" "Eyes:…cataracts, macular degeneration…;" "Heart: lipids, heart attacks, overall mortality." "Colon: …cancer." The risk of breast cancer is not raised on this page. Where it is raised it is downplayed.

**Wyeth used unbranded advertising, also known as "primary-demand advertising," extensively as part of its overall advertising and promotion strategies. This was a very effective strategy for Wyeth.**

2.16    The goal of increasing market share as a function of Wyeth's unbranded advertising was acknowledged by JeanneMarie Durocher, "product director of the Premarin Family" and subsequently "assistant vice president global women's health care, communications and professional relations." [Exhibit 52 at 38, 44]:

> We felt it was appropriate to educate women to have a discussion with their physician and we did feel that as the market leader, a physician might appropriately choose our product for a given woman… (Ex. 52, at 329).

> [Q.] …Wyeth's expectation by doing an unbranded campaign was that it would get its market share from that campaign. Isn't that fair? [A] Yes. (Exhibit 52, at 331).

This view is confirmed in a 1996 Wyeth document:

> . . . promotional materials for the PREMARIN family include an unbranded campaign focused on the benefits of Hormone Replacement Therapy. The purpose of this campaign is to grow prescription volume by educating physicians to the benefits of HRT and overcoming resistance to initiating therapy.  I am working with Jeff Solomon on a plan that

> effectively communicates the brand strategy of growing the market and
> how this unbranded campaign supports that strategy.  I have spoken with
> Jeff, and he agrees that a coaching issue may exist to ensure effective
> delivery of the unbranded message with a smooth transition to a
> PREMARIN specific selling message. . . . [Ex. 50].

2.17    The main beneficiary of primary demand (unbranded) advertising is the market
share leader and this is especially true where there is a dominant market share leader.
Wyeth's Prempro is a textbook example; to whit, the textbook states:

> Primary demand [unbranded] advertising is designed to stimulate demand
> for the general product class or entire industry. Selective demand [branded]
> advertising focuses on creating demand for a specific company's
> brands….An advertiser might concentrate on stimulating primary demand
> when, for example, its brand dominates a market and will benefit most
> from overall market growth. (Belch and Belch 2004,  p. 19).

2.18    Since unbranded or "primary-demand advertising" (Belch and Belch 2004) does
not tout any particular brand, it is typically seen as less biased and more credible. As such
it is likely to be persuasive. Wyeth's extensive unbranded campaign for HRT fell on very
receptive ears and eyes.

**Using a combination of unbranded and branded messages to complement one
another, Wyeth was successful in communicating the basic "bundle of benefits"
theme to all, or virtually all, of those adopting the drug. This served the purpose of
distracting both doctors and menopausal women from their concern about the link
between breast cancer and HRT/Prempro.**

2.19    Rather than dealing with the true risk of breast cancer by admitting it, or even
getting their researchers to explore it, Wyeth chose to either leave it untouched or to
downplay it directly or indirectly via the "bundle of benefits" they falsely touted in their
advertising.

2.20    The branded advertising, clearly featuring the brand name Prempro, limited itself
to the FDA approved benefits of the drug—vasomotor symptom relief and osteoporosis.
The unbranded advertising from Wyeth focused on HRT, made no mention of Prempro
per se and promoted a long list of *possible but unproven* benefits, including as noted
above: lowering the risk of dementia, Alzheimer's disease, cataracts, macular
degeneration, heart attacks and colon cancer. Further still, Wyeth coordinated its print ads
in magazines to run adjacent to supportive and ostensibly independent editorial material.
The unknowing reader would be doubly persuaded by this coordinated effort.

2.21    Wyeth used an **extensive network of marketing channels** to reach its target
audiences. —a highly effective strategy known as "integrated marketing communications
(IMC)

- **Women** of menopausal age were targeted using mass media such as women's magazines, popular TV shows targeting these women, distributing videos through Walmart for those getting a prescription for Prempro, brochures in doctors offices, and "Seasons" magazine produced by Wyeth for women using Prempro.
- **Doctors** were reached through journal advertising, company sponsored speakers, continuing medical education seminars and symposia, direct mail pieces, sales representative providing information/sales pitches as well as samples.
- **Practitioner nurses** and nurses were also targeted through various marketing vehicles.

2.22    Wyeth knew that to the extent breast cancer remained salient for either patient, doctor or both, adoption would be unlikely. The careful **synchronization of the messages** targeting both females of menopausal age and physicians served to distract both from the risks of breast cancer that were associated with Prempro. The fictitious benefits of HRT and Prempro that were touted in the advertising directed both to women (in particular in the unbranded messages) and to doctors ensured that both would focus on these supposed benefits and be distracted from their initial concern regarding the real risk of breast cancer.

2.23    **An example of Wyeth's integrated/synchronized campaign** involved the use of celebrity spokeswomen Patti Labelle and Lauren Hutton. These targeted both menopausal women and doctors. Ads featuring Patti Labelle encouraged women to talk to their doctor about menopause and its risks:

> I said yes to learning more about menopause. Years ago I entered menopause. Like so many women I didn't know what was happening to my body…..I decided to talk to my doctor. I'm so glad I did… [Ex. 35]

Unbranded versions of this ad touted a long list of misleading, supposed benefits associated with HRT, with women urged to seek further information from their doctor.

2.24    At the same time, ads that featured Patti Labelle were also directed at doctors, priming them for visits from their patients who would be requesting information about these supposed benefits—all to distract from the true risk of breast cancer. One ad directed to physicians, prominently featuring Patti Labelle was headlined: "Patti Labelle is helping you to help your patients say yes to HRT." It went on to detail the ads targeting women in which Patti would be appearing:

> Patti says yes to HRT on TV: Beginning in March 2002, look for new TV ads starring Patti Labelle. Spots will air during major network programming and will be seen on cable networks such as lifetime, PAX and USA.

> Patti says yes to Prempro in print. Ad will start running in national magazines, many of which your patients will find in your waiting room.

> Publications include: USA Today, TV Guide, Ebony, Family Circle, Good Housekeeping, Health, Ladies Home Journal, Parade Prevention and Rosie.
>
> Patti pays you a visit. Wyeth is providing you with a CD-ROM, featuring Patti Labelle, that will contain: Messages from Patti Labelle; Television Spot; Magazine Advertisement; Menopause Action Kit [that women can request by calling an 800 number highlighted in the TV and print ads]. [Ex. 37, *passim*.]

The ad concludes with Patti pictured, saying: "…I hope you're able to help your patients get a new attitude towards menopause and, if it's right for them, to say yes to HRT." A related ad has Patti pictured next to the following words: "Your patients count on you for a recommendation. Your words are the single most important reason they start on Prempro." It assures doctors that "4 out of 5 patients are 'completely satisfied' or 'very satisfied' with the hormone combination in Prempro."  [Ex. 37, *passim*.]

**Wyeth's integrated campaign and synchronized strategy paid off because it caused consumers to expect Wyeth's HRT products, including Prempro, to provided this bundle of false benefits, including a reduced risk of heart and Alzheimer's diseases.**

2.25   Wyeth's advertising campaign was effective in its goal: Women may not have remembered individual ads, but they remembered the campaign's primary theme—the falsely touted "bundle of benefits" that justified adoption of Prempro, having distracted the women from their (appropriate) concern over Prempro and breast cancer.  Wyeth's marketing research data showed that after seeing the ad with either with Patti Labelle or Lauren Hutton**,** when women asked their doctor for HRT, 82-90% obliged with a prescription. [Ex. 26 at 122]..

2.26   Consumers cannot reasonably be expected to recall specific ads years later. They can hardly do that one day later. But more importantly, advertisers, including Wyeth *do not seek accurate recall of each ad* in a campaign. That would be counterproductive. What is sought, is recall of the overall campaign. The data Wyeth generated indicated they were effective in this regard. Women and doctors increasingly displayed concern about the various risks supposedly associated with menopause, to which the Wyeth HRT/Prempro campaign called attention. The great "strength" of the campaign theme from Wyeth's perspective, is that it led all, or virtually all, of those adopting the drug to believe that the main campaign theme: the (falsely touted) bundle of benefits was such that they would be better off with Prempro than without it. These "benefits" served to distract both patients and doctors from their initial concern over the real risk of breast cancer and Prempro. Thus, (as stated above) 93-95% of doctors believed that "the health benefits of ERT and HRT outweigh the risks." This campaign theme was what recalled years later, and what could be expected to be recalled years later, as opposed to any specific ad run at the time.

2.27    Indeed, Wyeth's quarterly surveys of doctors (labeled the "ERT/HRT Physician Awareness & Usage Tracking Study") did not study doctors' reactions to any specific journal ad or promotional materials. To the contrary, Wyeth's goal was to assess the cumulative effect of the campaign on the doctors' awareness, beliefs, attitudes and ultimately, prescribing behavior with respect to Prempro. In the same way, Wyeth had no real interest in women's attitudes towards any particular ad for HRT or Prempro. They were interested in the cumulative effect of the DTCA campaigns on women's beliefs, attitudes and behaviors (doctors visits, requests) with respect to Prempro. Thus Wyeth's survey measuring women's "Attitudes and Healthcare Practices" sought women's beliefs regarding the "long-term benefits of being on Prescription [Hormone] Drug Therapy" not in relation to any specific ad they had run, but generally, as a function of the broad campaign. [Ex. 20 *passim*, esp. at.299-315].

2.28    There are situations in which companies do wish to assess consumer's reactions to specific ads/commercials. For example, it might be at the development stage, where the advertiser seeks to identify the most effective ad execution among several that have been developed. The standard approach or metric used under these circumstances is typically referred to as the "day after recall" (DAR) test. A sample of TV viewers is recruited to watch a particular program and are called back a day later (DAR) and asked to recall which commercials they remember seeing. Over time and over many commercials, the norms established for various product categories are such that it is typically only a minority of viewers that can recall the commercial *just one day later.* Given this data, it is unrealistic to expect members of the class in the present case, of which Mrs. Krueger is one member, to recall *specific* print ads or TV commercials in the HRT/Prempro campaign. It is evident, however, that April Krueger did remember the overall campaign theme.

2.29    And yet, in her deposition, April Krueger's physician, Dr. Vyenielo claimed that ads involving Lauren Hutton were inconsequential:

> [A]I remember her having a toothy grin and having a toothy grin and a big smile…[Q] …you don't remember anything specific about the informational content; is that fair to say? [A] That's correct. (Ex. 4, at. 135, lines 15-16, 21-23.

2.30    The reality is that it is unrealistic to expect that the doctor would remember any details of the ad, nor to admit that they were influential. Yet Wyeth had clear evidence that these messages were part of a broader campaign that was highly effective.

**Wyeth's advertising pointing to the fictitious benefits of taking Prempro was highly successful:**

- 61% of the physicians believed that Prempro "helps improve memory/ability to think clearly."
- 58% believed that Prempro "reduces the risk of Alzheimer's Disease."

- 46% believed that Prempro "reduces the risk of heart disease." [Ex. 26 at 111).
- **93%-95% of doctors agreed that "the health benefits of ERT and HRT outweigh the risks."** [Ex. 26, at 060, 061].

2.31    April Krueger and her doctor were also persuaded by Wyeth's advertising and promotion:

> …the information I got…said that I was going to be less likely to have a heart attack, less likely to have deep vein thrombosis, less likely to have Alzheimer's.. (Exhibit 3).

> [Q] …I assume, then, that after the discussion, that you and Dr. Vyenielo together decided that the Premarin/Provera therapy, that the benefit would outweigh the risks and it was an appropriate thing to do? [A] Correct….[Q] …And would the same be true of Prempro?...[A] Yes. (Ex. 3)

2.32    The effect on Ms. Krueger is typical of the effect on consumer expectations generally.  Wyeth's target audience believed, and expected, HRT generally, and Prempro specifically, to reduce women's risks of heart disease and Alzheimer's disease.  [Ex.10 at 279; Ex. 13 at 285, 287; Ex. 14 at 1213; Ex. 18 at 898, 927; Ex. 30 at 001390; Ex. 33 at 629; Ex. 34 at 02179, 2182, 2189; Ex. 38 at 1172, 1175-1176; Ex. 40 at 1096, 1099, 1100; Ex. 41 at 1130-31, 1136; Ex. 42 at 981, 982, 985-987, 988].  Women believed HRT protected them against cardiovascular disease, and HRT users ranked cardiovascular disease protection as the second most important benefit of the therapy. [Ex.20 at 243, 244, 299-300, 301-303, 309-313].

2.33    Wyeth's research confirmed that women who reported agreement that Premarin /Prempro: "Protects against heart disease"  (76% / 83%); "Has health benefits which outweigh the risks" (85% / 80%); and  "Protects against Alzheimer's disease"  (44% / 40%). [Ex. 22 at 406].  Premarin users expressed similar views and agreed that their drug: "Protects against heart disease" (80% / 83%);  "Has health benefits which outweigh the risks" (90% / 80%); and  "Protects against Alzheimer's disease"  (55% / 40%). [Ex. 22 at 407].

2.34    Doctors voiced similar beliefs.  Wyeth cited cardiovascular protection as the main reason its "high level prescribers" and "HRT/Premarin advocates" prescribed HRT. [Ex. 12 at 832-833].  Wyeth's research confirmed "[t]he large majority [of physicians] agreed that Premarin: . . .[r]educes the risk of Alzheimer's (70%)."[Ex. 21 at  402].

2.35    Likewise, Wyeth believed its campaign was effective in shaping consumer expectations and generating demand and was a profitable investment.  In 2000, **Wyeth spent $37.9 million on Prempro in DTCA**, not including any of the unbranded advertising that the company did for Hormone Replacement Therapy. The $37.9 million spent for Prempro on DTCA ranked it twentieth among pharmaceutical drugs advertised that year (National Institute for Health Care Management; NIHCM, 2000).

2.36    The branded and unbranded campaigns for Prempro blanketed their intended audience—primarily post menopausal women. Wyeth's spending for Prempro's compares favorably with a wide range of consumer goods products that are **household names**, including: Bounty Paper Towels ($38.5 million); Pamper diapers ($30.3 million); Lifesavers ($26.1 million); Doritos Snack Chips ($26.9 million); Dentyne Gum ($27.3 million) (Advertising Age 2001, p. S24). Just as consumers have a common understanding of these brands and their benefits, Wyeth's consumers developed common beliefs in Wyeth's misleading claims for Prempro.

2.37    However, Prempro sales dropped by 80% or more in 2002 after the findings of the Women's Health Initiative (WHI) challenged almost every off-label claim the company had made. [Exhibit 53 at 581]. Most particularly, WHI revealed that Wyeth's claims that Prempro reduced menopausal womens' risks related to coronary disease and dementia/alzheimer's were false and very important. HRT/Prempro actually *increased* these risks.  After the WHI, the concern regarding the link between Prempro and the risk of breast cancer could no longer be masked using the "bundle of benefits" approach. In fact, the scientific truth about some of the claimed potential health advantages of Prempro (e.g. reduced cardiovascular disease, improved cognitive functioning) proved to be just the opposite. And women ran from the product in droves.

2.38    **Wyeth distorted the use of SWOT analyses.** In their SWOT (Strengths, Weaknesses, Opportunities, Threats) analyses, Wyeth considered the data linking breast cancer and Premarin to be a "threat." Women's perception of breast cancer risk was a "weakness." These could be overcome, in part, by "strengths" that supposedly included "new clinical data [regarding] CVD [cardiovascular disease], alzheimer's, dental;" in other words, by encouraging women and their doctors to view Prempro from a "bundle of benefits" perspective.

2.39    With well over three decades of involvement with MBA programs, it is not surprising to me that SWOT analyses were used by executives at Wyeth. They are central to business case analyses. What is striking and so disconcerting, is that what Wyeth sold was not widgets but a drug with significant risks. Business schools also teach legal and ethical principals, which ought to have led Wyeth's executives (presumably, at least some of whom were MBA graduates) to consider the real "threat" to be the threat to the women's health and not the threat to Wyeth's bottom line.

2.40    Wyeth was not satisfied with the potential profits from any short term use of Prempro. Despite the clear risk of breast cancer and despite the availability of Fosomax as a targeted drug for (long term) osteoporosis, Wyeth did everything it could to convince women and physicians that long term usage was critical.

> Patients may not be aware of the reasons  why it is important for them to take their medication every day, and on a long term  basis….Strategies: :…Educate patients about the need to take their ERT/HRT mediation every day and long-term [Ex. 10 at 291].

Relatedly, in a document targeting Managed Care Organizations, and under the title "The Need for Effective Menopause and Osteoporosis Management" Wyeth reasoned:

> …*women are living one-third of their lives after menopause*. Concurrently, a number of managed care organizations are looking to create additional economic opportunities by seeking to attract older members. **With an effective management strategy for [long term] osteoporosis, there may be significant opportunity to improve both clinical and financial outcomes** [Ex. 33 at 621, italics and bold in the original].

### 3. DIRECT TO CONSUMER ADVERTISING (DTCA) OF PRESCRIPTION DRUGS SHAPES CONSUMER EXPECTATIONS AND GENERATES DRUG SALES

**Expenditures on Direct to Consumer Advertising (DTCA) were highly profitable for the pharmaceutical industry in generating prescriptions and aggregate sales. DTCA rose at a rapid pace in the late 1990's; from $257 million in 1995 to $2.3 billion in 2000. Wyeth benefited by targeting women with its deceptive advertising for supposed benefits that were associated with Prempro, which served to distract from the real risk of breast cancer.**

3.1     Wyeth documents indicate that the company tracked the results of its own DTCA very closely and that they concluded their expenditures were well worthwhile:

> Those aware of Premarin advertising have a better profile of the brand than those not aware….***The advertising works.*** It is noticed, it directly leads to positive action in the short run, and it is likely to lead to more in the future. [Ex. 19 at 183-184 emphasis added].

3.2     Advertising for Wyeth's Prempro was the 20th heaviest in the industry. From 1999 to 2000, the **sales** of the most heavily advertised drugs increased at 2.3 times the rate of all other drugs: the aggregate increase in sales of the 50 most heavily advertised drugs from 1999 to 2000 was 32%; the increase from all (almost 10,000) other drugs combined was 14% (NIHCM 2001].

3.3     DTCA is highly effective in **expanding demand** for prescription drugs:
> ***…every additional 28 dollars in DTCA is associated with one drug [related] visit* within 12 months.** This is a substantial market expanding effect, considering the fact that most prescription drugs cost much more that $28 per prescription, and one drug visit  for a chronic disease could generate a stream of drug use in the future. (Iizuka and Ginger 2005).

. Gallup and Robinson found that for women 45 and over (the target market for Prempro):

- 59% indicated that they "always" or "usually" *read* ads for  prescription medications for symptoms that they have or think they have.

- 54% agreed with the statement: "Prescription drug ads are more *believable* than regular advertising.
- Doctor's estimates are even higher: in a separate survey, 86% of doctors surveyed indicated that they felt their patients believed the claims made by the pharmaceutical companies in their drug ads; (Paul et al. 2002).
- 54% of women over 45 years of age indicated that they would be likely to *ask their doctor* about an advertised medicine (Mehta and Purvis 2003).

3.4     Wyeth's advertising was intended to get patients to visit their doctors and to ask for HRT and Prempro. It is clear that patients' requests have a profound effect on whether and what physicians prescribe.  Research proves this point: in a key study, Kravitz (2005) showed that, when an actor simulated major depression on a visit to a physician, the physician prescribed an antidepressant in:

- 53% of the instances in which a brand specific request was made;
- 76% of the instances in which a general request was made
- 31% of the instances in which no request was made.

    When the actor simulated a lesser adjustment disorder, the physician prescribed an antidepressant in:
- 55% of the instances in which a brand specific request was made;
- 39% of the instances in which a general request was made
- 10% of the instances in which no request was made.  (Kravitz  2005).

3.5     Corresponding to the figures in this study, a telephone survey (of 1222 people taken in 2000) found that 71% of those who asked for a prescription they saw advertised, successfully obtained one (Prevention magazine 2000). These figures represent an average. Of course, as a very heavy advertiser, Wyeth would have generated still higher percentages.


## 4. WYETH MISLED PHYSICIANS ABOUT PREMPRO THROUGH AN EXTENSIVE ADVERTISING AND PROMOTION CAMPAIGN

    **Wyeth's Prempro marketing campaign deceptively targeted physicians with tactics that included: medical journal advertising, direct mail to physicians, gift giving and, in particular, the extensive use of detailers or sales representatives. The promotional tactics Wyeth used are well known to generate prescriptions, sales and profits. Wyeth's share of market testifies as to how successful they were in their deceptive efforts for Prempro.**

4.1     In 2001, $16.4 billion was spent on promotional activities directed at physicians and $2.7 billion was spent on direct to consumer advertising (DTCA) for pharmaceutical drugs (Gahart et al. 2003). Research documents that when more is spent on advertising and promotions to reach doctors that effort generates more prescriptions. The investment in promoting drugs to physicians is well worthwhile for the pharmaceutical companies.

4.2    **Medical Journal advertising leads doctors to prescribe the drugs that are advertised.** . **Wyeth's advertised extensively in medical journals.** The higher the level of advertising in the *New England Journal of Medicine (NEJM)* and the *Journal of the American Medical Association (JAMA* the greater the sales for the advertised drugs. "There is little doubt that increased advertising [for example…Tagamet] was a factor involved in its increased sales" (Krupka and Vener, 1985, p. 195).

4.3    **Market share leaders like Wyeth's Prempro increase their market share through promotional efforts.** A study of 150 leading drugs showed that these leaders increase their share significantly by spending more on: (1) *detailing,* (2) *medical-journal advertising* targeting the physician, and (3*) direct-mail advertising* to the physician. Conversely, the leader's share diminishes with the aggregate outlay of competing generic sellers (Hurwitz and Caves 1988).

4.4.    **Heavy detailing, of the sort Wyeth conducted for Prempro, leads physicians not only to prescribe the drug more, but also to become less sensitive as to what the drug costs and to become more loyal to that brand** (Rizzo 1999). The OB/GYNs and Primary Care Providers (PCPs) who were the heaviest prescribers (labeled decile 10) of Prempro, were most important for Wyeth sales and were visited most often by Wyeth's detail staff. For example,

> 90% of Decile 10 OB/GYNs averaged 4.5 details in Mar-02. 87% of decile 10 PCPs averaged 3.3 details in March-02. Overall reach for OB/GYNs is 56% for Mar-02 and for PCPs reach is 21% (Exhibit 51, p. 0366).

4.5    **Monthly spending on detailing (for each of six anti-depressants) had a substantial impact on the physician's choice of antidepressant.** The researchers concluded: "Pharmaceutical sales representatives continue to be a major source of information and have substantial influence over physicians' prescribing behavior." (Donahue and Berndt 2004).

4.6    As was the case for April Krueger's doctor, Tonia Vyenielo, physicians generally believe they are influenced by scientific journal articles and not the company's advertising and promotion efforts. Research has generally found the opposite to be true**.**

4.7    A British panel of medical experts found that doctors who relied more on journal articles were more likely to order more generally appropriate prescriptions for their patients, while those who relied more on the detail personnel and the advertising in the medical journals were more likely to order less generally appropriate prescriptions. (Becker et al. 1972; p.123). Certainly physicians relying on Wyeth's representations about Prempro made the inappropriate decision to ignore breast cancer risks because of the supposed other benefits the company touted for the drug.

4.8    A similar U.S. study focused on two drug categories for which the consensus of expert medical opinion as stated in medical journals was at odds with the position taken

by pharmaceutical firms in their promotional efforts.  The contradiction allowed the researchers to trace which source—the scientific literature or promotion by the pharmaceutical industry was relied upon by the physicians. The researchers concluded:

> Although the vast majority of practitioners perceived themselves as paying little attention to drug advertisements and detail men, as compared with papers in the scientific literature, their beliefs about the effectiveness of the . . . drugs [in question] revealed quite the opposite pattern of influence…   . (Avorn et al. 1982, p.7).

4.9     Wyeth, like other pharmaceutical companies, provides doctors with a lot more than information. Outright gifts that they provide include: samples, paid meals, financial support of continuing medical education, paid luxury trips to symposia, honoraria for presentations and financial support of research. These gifts are effective in influencing the prescription decisions of physicians.

### "**Receiving gifts is associated with positive physician attitudes toward pharmaceutical representatives…**"

> The rate of drug prescriptions by physicians  increases substantially after they see sales representatives, attend company-supported symposia, or accept samples….An overwhelming majority of [doctor-company] interactions had negative results on clinical care (Brennan et al. 2006).

4.10    Doctors were more inclined to prescribe a particular drug, given receipt of the following favors
- Receiving gifts
- accepting samples
- receiving paid meals
- accepting funding to attend a symposium
- Sponsorship of continuing medical education
- Accepting honoraria to present data on a new therapy and receiving research support; (Wazana 2000).

4.11    The level of prescribing for two drugs rose significantly at a hospital after the pharmaceutical company in question paid for a number of the hospital's doctors to attend *all expenses paid symposia at luxurious resorts in attractive warm weather locations*. The level of prescribing for these two druges at the hospital in question rose at a much higher rate in the period following the all-expense-paid trips, relative to *national* prescribing data for the two drugs during the same time period  (Orlowski 1992).

4.12    Relative to physicians who had *not* made the same drug request, physicians who requested that a specific drug be added to the hospital formulary were:
- 13 times more likely to have met with the sales representative from the firm in question;
- 10 times more likely to have accepted money from a company to speak at symposia;

- 21 times as likely to have accepted money to perform research from the company in question (Chren and Landefeld 1994),

4.13    **Why Wyeth's gift giving was so effective, even as doctors didn't recognize its influence?** How is it that gifts can be so influential and yet the physician is generally unaware of that influence? For example, even with a gift as extensive as an all-expense-paid vacation to a luxury warm weather destination almost all the physicians denied any potential influence (Orlowski 1992).

4.14    Even a small gift can subtly shape how products—including pharmaceutical drugs—are evaluated. Doctors who receive a gift or gifts from a particular pharmaceutical firm are likely to weigh the information associated with that firm's drug in subtly different and more positive ways (Dana and Lowenstein 2003). Yet doctors (as with people in general) are typically unable to accurately understand and report on the causes of their own behavior   **Doctors develop "theories" as to why they behave as they do and these theories are very often wrong.** For example, one theory doctors develop is that "medical journal articles guide prescription choices," even if they basically do not. (Typically, the theories that doctors and people in general develop are based on simpler, more proximate evidence as they tend not to notice the more subtle, complex and distal causes of their behavior; Dana and Lowenstein 2003; Nisbett and Ross 1980).

4.15    As with people in general, **doctors are subject to the 'myth of self-immunity:"** They come to believe that "other doctors may be subject to the influence of the pharmaceutical company's advertising and promotion efforts, but not me." Doctors repeatedly verbalize this myth. "Clearly it cannot both be true that most physicians are unbiased and that most other physicians are biased" (Pollay 1986; McKinney et al. 1990; Dana and Lowenstein 2003; p. 254).

4.16    A weekly lunch with the Wyeth doctors was one place where the sales representatives' "pitched" their wares. Just the simple process of relaxing over a meal typically makes someone more responsive to persuasive efforts (Janis and Kirschner 1965). This is the basis of the business lunch and the "deals" made in that setting.

4.17    **Wyeth influenced April Krueger's physician, Dr. Tonia Vyenielo, in ways that conform to industry practice.  Dr. Vyenielo denied that influence, much as doctors in general tend to do; (Exhibit 4).**

4.18    Dr. Vyenielo claims that the information which guides her practice comes from science and not the pharmaceutical companies. She received information from

> "a medical conference, every week at Scripps, and there was also grand rounds once a week…I was a faithful attendant at both of those conferences… (Exhibit 4, p. 27).

Further, Dr. Vyenielo points to the "*New England Journal [of Medicine*]' and *JAMA*, the *Journal of the American Medical Association* as significant sources in staying current with

scientific and medical developments. The doctor indicates that pharmaceutical sales representatives were not her "primary source" in getting educated about medications (Exhibit 4, p. 31, lines 20-25). She summarizes her views as follows:

> I don't let the sales representatives help me practice medicine and so whether they tell me it's [Prempro] beneficial or not or not [in terms of a cardio benefit], I'm more interested in what the literature states than what the sales rep states. So I'm not sure that I would have been impressed or not impressed by what the Wyeth representatives stated.  (Exhibit 4, p. 96, lines 17-23).

4.19    As with the research cited above, the "myth of self-immunity" serves as one of Dr. Vyenielo's rationales justifying her perception that the sales representatives do not influence her. True to the "myth" the doctor believes that she can "see through" the representatives and maintain a vigilance that protects her from influence:

> …they're salespeople….the information that they give me is designed for me to purchase more of their product. So it's not the whole picture. They're giving me what they want me to hear. (Exhibit 4, p. 110, lines 2-6).

4.20    The same was true for Dr. Vyenielo's belief about the capacity of (Wyeth's) advertising to influence her:

> [Q] Did you think that the Lauren Hutton ads that you originally saw were garbage? [A] Yes, because we're not all beautiful models. (Exhibit 4 p. 126, lines 23-25)…

4.21    As described in the research above, Dr. Vyenelio appears to have been subject to the pattern of recalling the influence of clear and proximate events—for example, the weekly medical conference and the ground rounds. These were events that clearly marked, for her, the days on which they occurred. By contrast, in her typically hectic day, receiving promotional materials from the pharmaceutical firms or even actual meetings with the sales representatives wouldn't necessarily register clearly and be recalled. Yet they might make an impact nevertheless. Thus, when asked:

> "Did you ever receive any…brochures or advertising or written materials from the Wyeth company about Prempro…? Dr. Vyenielo answers: "Not that I recall." (Exhibit 4, p. 75, lines 18-22).

When it was pointed out to her that the sales representative's recorded information stated otherwise:
> "Detail Dr. on Premarin family;"… "Prempro family left patient educational information on ERT/HRT,"

 the doctor responded:

"I don't recall the…meeting."  (Ex. 4, lines 16-18; 23).

4.22    Dr. Vyenielo confirmed that she attended "…Friday lunches where sales representatives might bring in lunch and make a representation while you were eating…" (Exhibit 4, p.137, line 25; p. 138, line 1.) One can see that the basic humanity of the sales representatives and the basic nature of these interactions over lunch between the doctor and the representatives naturally led to a sense of respect on the part of the doctor for them:

> I like them and I think they're really nice people… I don't think any of it was untrue. I think they were emphasizing what was positive about their drug. That was their job. (Ex. 4  at 110; lines 1, 12-14). …
>
> They're professional, articulate, and hard working and conscientious (Ex. 4, at 137, lines 8-9).

The doctor's reaction provides support for the research that suggests that getting people to relax over a meal is an effective way to persuade them.

4.23    In the final analysis, despite the doctor's poor memory for meetings with the sales representatives, despite her sense of "self-immunity" from Wyeth's solicitations, and likely because of the basic respect she had for the sales representatives, the doctor appears to have been influenced by them. The evidence is available in their recorded notes.

> Went over new WHI letter and CVD; says she warns her patients that the benefits may not be there anymore and gives them a choice to go off but I reminded her that the patients that have been on for long periods of time are beyond the two year mark where the increased risk was spotted (she agreed that most of her patients are beyond that date) and didn't realize that the rates were still lower than what is expected for the general pop of women that age (Exhibit 4, p. 119, lines 9-18).
>
> Her [the doctor's] concerns are of the potential CV risk. Told her it was under 1% with, which I think it is supposed to be which, is less than what that  population (sic) may have anyway.
>
> [Q] Were you ever informed by any of the Wyeth representatives who came to your office that Prempro had not been approved by the FDA to be advertised for cardio benefits? [A] No.

4.24    According to April Krueger, it took a new doctor, Dr. Kim, not Dr. Vyeniello to take her off of Prempro following the WHI of 2002. In her last visit with Dr. Vyeniello, in 2002, April Krueger recalls that the doctor advised her to stay on Prempro.

> [Q] Do you recall in June of 2002 having a discussion with your physician regarding whether or not to stay on Prempro? [A] Yes, I think we

discussed it. …[Q] And what was the nature of that discussion, meaning what did you talk about? [A] For…the time being, we would continue….[Q] And did you…decide that the benefits that you were receiving outweighed any risks? [A] Correct. [Q] Did Dr. Vyenielo discuss with you any new information that she had received regarding Prempro and its risks and benefits? [A] I don't believe so at the time….[Q] What prompted you to decide to stop? [A] …I discussed it with my doctor at the time [the following year] and…she really wanted me off of it. [A] And who was the doctor at that time? [A] Dr. Kim. [Ex. 3].

## 5. CONCLUSION OF EXPERT OPINION

For the reasons explained above, it is my opinion, based on my education, experience, and review of the materials identified above, that as a result of Wyeth's advertising and marketing efforts, consumers expected HRT and Prempro to reduce their risks of heart disease and dementia. These were important benefits to women, prescribing physicians and to Wyeth because, if true, they outweighed the potential breast cancer risk the drugs caused. It is my further opinion that women who took the drugs, including April Krueger, and their prescribing doctors relied on these representations when they decided the drug's benefits outweighed its risks. Wyeth's own marketing strategies, its research and the empirical consequences of Prempro's sales collapse when the Women's Health Initiative revealed the truth of Wyeth's false benefit claims, in my view, substantiate my opinions.

I declare under penalty of perjury under the laws of the United States of America and the State of Pennsylvania the foregoing is a true and correct statement of my qualifications, materials reviewed and opinions in this matter.

Executed this day, May 17, 2006, at _BOALSBURG_ , Pennsylvania.

Marvin E. Goldberg

May 17, 2006

# REFERENCES

Advertising Age (2001), Leading National Advertisers Listing, *Advertising Age*, Sept. 24, p. S24.

Avorn, J. M Chen and R. Hartley (1982) "Scientific versus Commercial Sources of Influence on the Prescribing Behavior of Physicians," *The American Journal of Medicine* 73 (July) 4-8.

Assael, Henry (1995) *Consumer Behavior and Marketing Action*, 5th edition, Cincinnati OH: South-Western College Publishing

Batra, Rajeev, John G. Myers and David A. Aaker (1996) *Advertising Management* 5th edition, Upper Saddle River NJ: Prentice Hall

Becker, M. , P.D. Stolley, L. Lasagna, J.D. McEvilla  and L. Sloane (1972). "Differential Education Concerning Therapeutics and Resultant Physician Prescribing Patterns," *Journal of Medical Education* 47 (February); 118-126.

Belch, George E and Michael A. Belch (2004), *Advertising and Promotion: an Integrated Marketing Communications Perspective,* 6th ed., Boston: McGraw-Hill/Irwin.

Brennan, Troyen A. et al. (2006) "Health Industry Practices that Create Conflicts of Interest," *JAMA* 295 (4), 429-433.

Chren, Mary-Margaret and Seth Landefeld (1994), "Physicians' Behavior and Their Interactions with Drug Companies," *JAMA,* 684-689.

Dana, Jason and George Loewenstein (2003) "A Social Science Perspective on Gifts to Physicians from Industry," *JAMA,* 290 (2) 252-255.

Donahue, Julie M. and Ernst R. Berndt (2004), "Effects of Direct-to-Consumer Advertising Choice: The Case of Antidepressants," *Journal of Public Policy & Marketing* 23 (2) 115-127

Gahart,  M.T. , L.M. Duhamel, A. Dievler, R. Price (2003) "Examining the FDA's Oversight of Direct-to-Consumer Advertising." *Health Affairs,* (Jan-June) W3.

Hemminki, E. (1975) "Review of Literature on the Factors Affecting Drug Prescribing"   *Social Science and Medicine* 9 111-115.

Hurwitz, M. and R. Caves (1988) "Persuasion or Information? Promotion and the  Shares of Brand Name and Generic Pharmaceuticals" *Journal of Law and  Economics* XXXI (October) 299-320.

Janis, I.R. D. Kaye and P. Kirschner (1965) "Facilitating Effects of 'Eating-while-Reading' on Responsiveness to Persuasive Communications," *The Journal of Personality and Social Psychology 1(2): 1965.*

Krupka, L. R. and A.M. Vener (1985) Prescription Drug Advertising: Trends and Implications. *Social Science and Medicine* 20 (3) 191-197.

McKinney, W. D. Schiedermayer, N. Lurie, D. Simpson, J. Goodman, E.Rich    (1990), "Attitudes of Internal Medicine Faculty and Residents toward Professsional Interaction with Pharmaceutical sales representatives.

Peay, Marilyn Y. and Edmund R. Peay (1988), "The Role of Commercial Sources in the Adoption of a New Drug," *Social Science Medicine* 26 (12) 1183-1189.

Petroschius, S.M. , P.A. Titus, and KJ. Hatch (1995), "Physician Attitudes Toward Pharmaceutical Drug Advertising" *Journal of Advertising Research,* (Nov./Dec.) 1995.

Orlowski, James P. (1992), "The Effects of Pharmaceutical Firm Enticements on Physician Prescribing Patterns: There's No Such Thing as a Free Lunch," *Chest,* 102, 270-273.

Pollay, Richard W. (1986), "The Distorted Mirror: Reflections on the Unintended Consequences of Advertising," *Journal of Marketing*, Vol. 50 (Spring), 18-36.

Rizzo, J. (1999). "Advertising and Competition in the Ethical Pharmaceutical Industry: The Case of Antihypertensive Drugs." *Journal of Law and Economics,* XLII (April) 89-116.

Wazana, Ashley (2000) "Physician and the Pharmaceutical Industry; is a Gift Ever Just a Gift" *JAMA*, 283 (3) 373-380.

Respectfully Submitted,

/s/ Russell Marlin

_____

Russell Marlin
Bar Number 2000107
Attorney for Plaintiff
Gary Eubanks & Associates
708 West Second
Little Rock, Arkansas 72201
Telephone: (501) 372-0266
E-mail:marlinr@garyeubanks.com

**CO-LEAD COUNSEL ON BEHALF**

**OF CONSUMER CLASS PLAINTIFFS**

MICHEL F. MILLS
Gary Eubanks & Associates
708 West Second Street
Post Office Box 3887
Little Rock, Arkansas 72203-3887

<u>**Certificate of Service**</u>

I hereby certify that a copy of the foregoing document was served according to this Court's provisions for service as set forth in the pretrial orders and sent to the following counsel of record as indicated below on this 18th day of May, 2006.

/s/ Russell Marlin

_____
Russell Marlin
Plaintiff's Liaison Counsel

<u>**VIA ECF AND E-MAIL**</u>
<u>**FOR SERVICE ON ALL DEFENSE COUNSEL**</u>

Ms. Lynn Pruitt
Mitchell, Williams, Selig, Gates & Woodyard
425 W. Capital, Suite 1800
Little Rock, AR 72201
DEFENDANTS' LIAISON COUNSEL

<u>**VIA ECF AND SERVICE THROUGH DEFENSE LIAISON COUNSEL**</u>

Mr. Steven L. Urbanczyk
Mr. John W. Vardaman
Mr. F. Lane Heard, III
Williams & Connolly, LLP
725 12th Street N.W.
Washington, D.C. 20005
NATIONAL COUNSEL FOR WYETH DEFENDANTS