IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | |
|---|---|
| In re: | :   MDL Docket No. 4:03CV1507WRW |
| | : |
| | : |
| PREMPRO PRODUCTS LIABILITY | :   ALL CASES |
| LITIGATION | : |
| | : |
| UNNAMED PLAINTIFFS, | : |
| | : |
| v. | : |
| | :   **AMENDED MASTER COMPLAINT** |
| WYETH and its divisions | : |
| WYETH PHARMACEUTICALS, INC. | : |
| and ESI LEDERLE; | : |
| PFIZER INC., | : |
| PHARMACIA & UPJOHN COMPANY LLC, | : |
| PHARMACIA & UPJOHN LLC, | : |
| PHARMACIA CORPORATION, | : |
| GREENSTONE, LTD.; | : |
| BARR PHARMACEUTICALS, INC., | : |
| BARR LABORATORIES, | : |
| DURAMED PHARMACEUTICALS, INC.; | : |
| BRISTOL-MYERS SQUIBB COMPANY; | : |
| NOVARTIS PHARMACEUTICALS | : |
| CORPORATION; | : |
| SOLVAY PHARMACEUTICALS, INC., | : |
| formerly known as REID-ROWELL, INC. | : |
| SOLVAY AMERICA, INC., | : |
| SOLVAY, S.A.; | : |
| GALEN HOLDINGS, PLC; | : |
| WARNER CHILCOTT; | : |
| BERLEX LABORATORIES,INC; | : |
| SCHERING, AG, : | : |
| WATSON PHARMACEUTICALS, INC.:, | : |
| ABBOTT LABORATORIES:, | : |
| MYLAN  LABORATORIES, INC; and | : |
| ORTHO- MCNEIL | : |
| PHARMACEUTICAL, INC. | : |
| | : |
| Defendants. | : |
| | : |

COME NOW Plaintiffs to file this Master Complaint against the Defendants, WYETH and its Divisions WYETH PHARMACEUTICALS, INC. and ESI LEDERLE, PFIZER INC., PHARMACIA & UPJOHN COMPANY LLC, PHARMACIA & UPJOHN LLC, PHARMACIA CORPORATION, GREENSTONE LTD., BARR PHARMACEUTICALS, INC., BARR LABORATORIES, INC., DURAMED PHARMACEUTICALS, INC., NOVARTIS PHARMACEUTICALS CORPORATION, BRISTOL-MYERS SQUIBB COMPANY, SOLVAY PHARMACEUTICALS, INC., formerly known as REID-ROWELL, INC, SOLVAY AMERICA, INC., SOLVAY S.A., GALEN HOLDINGS, PLC, WARNER CHILCOTT, BERLEX LABORATORIES, INC., SCHERING, AG, WATSON PHARMACEUTICALS, INC., ABBOTT LABORATORIES, MYLAN LABORATORIES and ORTHO-MCNEIL PHARMACEUTICAL, INC. (hereinafter Defendants or Manufacturing Defendants) and in support thereof allege as follows:

## I.    PARTIES &  SERVICE OF PROCESS

**PLAINTIFFS**

1.    Plaintiffs consist of (a) women who consumed hormone therapy medication and suffered personal injuries as a result (hereafter "Plaintiff," when used in the singular, refers to each woman who was directly injured by hormone therapy drugs) and (b) their respective spouses (hereafter "Plaintiffs, when used in the plural, refers to all Plaintiffs, including both injured women and their spouses or other families members damaged as a result of the women's injuries).   Plaintiffs bring this action to recover damages for personal injuries against the identified manufacturers of hormone therapy medications for their design, manufacture, production, testing, study, research, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of the following described hormone therapy drugs.

**DEFENDANTS**

2.     Defendant **WYETH** and its divisions **WYETH PHARMACEUTICALS INC.** and **ESI LEDERLE** (hereinafter Wyeth) is a Delaware corporation with its headquarters in Madison, New Jersey and its principal place of business in Pennsylvania.  Wyeth is licensed to do business in all states of the United States of America. At all relevant times, WYETH was engaged in the design, manufacture, production, testing, study, research, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of pharmaceutical products, including hormone therapy medications such as generic estrogen, generic MPA, Premarin, Cycrin, Aygestin, Prempro and Premphase for ultimate sale and/or use in the United States of America as well as in various foreign jurisdictions.

3.     Defendant **PFIZER INC**. is a Delaware corporation with its principal place of business in New York.  Pfizer Inc. is licensed to do business in all states of the United States of America.  Upon information and belief, the current corporation,  "Pfizer Inc.," is the result of a merger between an American company then called "Pfizer, Inc." and a large European global pharmaceutical company, Pharmacia Corporation, which earlier had merged with Pharmacia & Upjohn Company LLC, and Pharmacia & Upjohn LLC. As a result, the new merged company, also called "Pfizer, Inc." is legally and factually responsible for all obligations, debts and liabilities of these three entities.  Pfizer, Inc. is the successor in interest (and therefore the real party in interest) to the three companies.  More specifically, Pfizer Inc. wholly owns Pharmacia Corporation, which is the sole member of the limited liability company Pharmacia & Upjohn LLC, which is the sole member of the limited liability company Pharmacia & Upjohn Company LLC. The company now called Pfizer has sold Provera since the merger took effect. The term "Pfizer," when used herein, refers to the current Pfizer Inc. and each of these related companies ("Pfizer Defendants").  At all times relevant hereto, Pfizer Defendants were

engaged, *inter alia*, in the business of designing, manufacturing, producing, testing, inspecting, mixing, labeling, marketing, advertising, selling, promoting and/or distributing hormone therapy drugs, including:  Provera generic medroxyprogesterone acetate (MPA); generic estrogen (including but not limited to Vagifem, an estradiol pill for the vagina); and combination HT products, including Activella, a combination pill with estradiol plus the progestin norethindrone acetate (NETA), and Femhrt, a combination pill with ethinyl estradiol and NETA, for ultimate sale and/or use in the United States of America.  For several years, Pfizer also produced micronized progesterone for sale to compounding pharmacies.

4.      Defendant **PHARMACIA & UPJOHN COMPANY LLC** is a limited liability company whose sole member is Pharmacia & Upjohn LLC, which is a limited liability company whose sole member is Pharmacia Corporation, which is a subsidiary of Pfizer Inc.  Pharmacia & Upjohn Company LLC is a Delaware company with its principal place of business in New York.  Pharmacia & Upjohn Company LLC, at all relevant times, was licensed to do business in all states of the United States of America.  At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including: Provera; generic medroxyprogesterone acetate (MPA); generic estrogen (including but not limited to Vagifem, an estradiol pill for the vagina); and combination HT products, including Activella, a combination pill with estradiol plus the progestin norethindrone acetate (NETA), and Femhrt, a combination pill with ethinyl estradiol and NETA, for ultimate sale and/or use in the United States. For several years, Pharmacia and Upjohn also produced micronized progesterone for sale to compounding pharmacies.

5.      Defendant **PHARMACIA & UPJOHN LLC** is a limited liability company whose sole member is Pharmacia Corporation, which is a subsidiary of Pfizer Inc. Pharmacia & Upjohn LLC is the sole member of the limited liability company Pharmacia

& Upjohn Company LLC.   Pharmacia & Upjohn LLC is a Delaware company with its principal place of business in New York.   Pharmacia & Upjohn LLC, at all relevant times, was licensed to do business in all states of the United States of America.   At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including: Provera; generic medroxyprogesterone acetate (MPA); generic estrogen (including but not limited to Vagifem, an estradiol pill for the vagina); and combination HT products, including Activella, a combination pill with estradiol plus the progestin norethindrone acetate (NETA), and Femhrt, a combination pill with ethinyl estradiol and NETA, for ultimate sale and/or use in the United States. For several years, Pharmacia and Upjohn also produced micronized progesterone for sale to compounding pharmacies.

6.      Defendant **PHARMACIA CORPORATION** is a wholly owned subsidiary of Pfizer, Inc., and is the sole member of the limited liability company Pharmacia & Upjohn LLC, which is the sole member of the limited liability company Pharmacia & Upjohn Company LLC.   Pharmacia Corporation is a New York corporation with its principal place of business in the state of New York.   Pharmacia Corporation, at all relevant times, was licensed to do business in all states of the United States of America. At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including: Provera; generic medroxyprogesterone acetate (MPA); generic estrogen (including but not limited to Vagifem, an estradiol pill for the vagina); and combination HT products, including Activella, a combination pill with estradiol plus the progestin norethindrone acetate (NETA), and Femhrt, a combination pill with ethinyl estradiol and NETA, for ultimate sale and/or use in the United States of America.   For several years, Pharmacia also produced micronized progesterone for sale to compounding pharmacies.

7.     Defendant **GREENSTONE LTD.**, at all relevant times, was licensed to do business in all states of the United States of America.   Upon information and belief, Greenstone, Ltd. is a Delaware corporation with its principal place of business in New Jersey.   Greenstone, Ltd., either is now or was during the relevant time frame, a subsidiary of one or more of the Pfizer Defendants, and such Defendants are responsible for all liabilities and obligations of Greenstone, Ltd.    At all relevant times, Greenstone Ltd. was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including a generic medroxyprogesterone acetate (MPA) for ultimate sale and/or use in the United States of America.

8.     Defendants Pfizer, Inc. Pharmacia & Upjohn Company LLC, Pharmacia and Upjohn LLC, Pharmacia Corporation and Greenstone are hereinafter collectively referred to as the "Pfizer Defendants."   During certain periods, the Pfizer Defendants sold the progestin MPA in bulk to other defendants for use in their menopausal hormone therapy drug products. At all times, the Pfizer Defendants knew the purpose for which these defendants purchased MPA in bulk – specifically, for use as the progestogen component in menopausal hormone therapy.   Moreover, Pfizer Defendants knew that these buyers were not doing any further study, testing, or investigation of the safety of MPA for use with estrogens in hormone therapy other than what may have been done by the Pfizer Defendants.

9.     Defendant **BARR PHARMACEUTICALS, INC.**, at all relevant times, was licensed to do business in all states of the United States of America.   Upon information and belief, Barr Pharmaceuticals, Inc. is a New Jersey corporation with its principal place of business in New Jersey.   Barr Pharmaceuticals is responsible for Barr Laboratories and Duramed Pharmaceuticals, Inc. (and is therefore the real party in interest).   At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales,

promotion and/or distribution of hormone therapy drugs including generic estrogen drugs (such as Estradiol and Cenestin) as well as generic medroxyprogesterone acetate (MPA) for ultimate sale and/or use in the United States of America.

10.     Defendant **BARR LABORATORIES**, at all relevant times, was licensed to do business in all states of the United States of America.  Upon information and belief, Barr Laboratories is a New Jersey corporation with its principal place of business in New Jersey.    Barr Laboratories is a wholly owned subsidiary of Barr Pharmaceuticals, Inc.  At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including generic estrogen drugs (such as Estradiol and Cenestin) as well as generic medroxyprogesterone acetate (MPA) for ultimate sale and/or use in the United States of America.

11.     Defendant **DURAMED PHARMACEUTICALS, INC**., at all relevant times, was licensed to do business in all states of the United States of America. Duramed Pharmaceuticals is an Ohio corporation with its principal place of business in Ohio. Upon information and belief, Duramed Pharmaceuticals is a wholly-owned subsidiary of Barr Pharmaceuticals, Inc. as a result of its acquisition by Barr Laboratories in 2001.  At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including generic estrogen (such as Estradiol) as well as generic medroxyprogesterone acetate (MPA) for ultimate sale and/or use in the United States of America.

12.     Defendant **NOVARTIS PHARMACEUTICALS CORPORATION**, at all relevant times, was licensed to do business in all states of the United States of America. Upon information and belief, Novartis Pharmaceuticals is a resident and citizen of the state of New Jersey.   At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising,

sales, promotion and/or distribution of hormone therapy drugs including generic MPA and estrogen therapies such as Estroderm and Vivelle as well as the combination drug CombiPatch (estradiol plus norethindrone acetate (NETA)) for ultimate sale and/or use in the United States of America.

13.     Defendant **BRISTOL-MYERS SQUIBB COMPANY**, at all relevant times, was licensed to do business in all states of the United States of America. Upon information and belief, Bristol Myers Squibb Company is a New York corporation with its principal place of business in New York.  At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including estrogen therapies (such as Estrace) for ultimate sale and/or use in the United States of America.

14.     Defendants **SOLVAY PHARMACEUTICALS, INC.** (SPI), formerly known as Reid Rowell, Inc., **SOLVAY AMERICA, INC.** (SAI) and **SOLVAY, S.A.**, at all relevant times, were licensed or able to do business in all states of the United States of America and, in fact, did business in the United States of America on a regular and continuous basis.  SPI is a Georgia corporation with its principal place of business in Georgia.  SAI is a Texas corporation with its principal place of business in Texas.  Solvay, S.A. is a foreign parent company of SAI and SPI with control over the Solvay Pharmaceutical Group that markets pharmaceuticals worldwide.  Solvay, S.A. directed, supervised and controlled the actions, decisions, misrepresentations and conduct of SAI and SPI.  At all relevant times, these Defendants, and each of them, were engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs, including Estratest and Estratab, for ultimate sale in the United States of America.

15.     Defendant **GALEN HOLDINGS, PLC** is an Irish corporation with its principal place of business in Craigavon, Ireland.  Defendant has conducted business in

all states of the United States of America.  At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including estrogen therapies such as FemHrt for ultimate sale and/or use in the United States of America.

16.     Defendant **WARNER CHILCOTT** is a Delaware corporation with its principal place of business in New Jersey.  Defendant has conducted business and was licensed to do business in all states of the United States of America. At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including estrogen therapies such as FemHrt for ultimate sale and/or use in the United States of America.

17.     Defendant **BERLEX LABORATORIES, INC.** is a wholly-owned subsidiary of Schering, AG with its principal place of business in New Jersey.  Defendant is licensed to do business in all states in the United States of America.  Defendant, **SCHERING, AG** is a foreign parent company of Berlex Laboratories, Inc. with control over the company.  Schering, AG directs, supervises and controls the actions, decisions, misrepresentations and conduct of Berlex Laboratories, Inc.  At all relevant times, these Defendants were engaged in the design, manufacture, production, testing, study, research, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs, including the drug Climara, for ultimate use and/or sales in the United States of America.

18.     Defendant **WATSON PHARMACEUTICALS, INC.** is a Nevada corporation with its principal place of business in California.  Defendant is licensed to do business in all states in the United States of America.  At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, study, research, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or

distribution of hormone therapy drugs, including generic estrogen (such as Estradiol) and generic MPA for ultimate use and/or sales in the United States of America.

19.     Defendant **ABBOTT LABORATORIES** is an Illinois corporation with its principal place of business in Illinois.  Defendant is licensed to do business in all states of the United States of America.  At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, study, research, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs, including generic Ogen and Estropipate, both estrogen products, for ultimate use and/or sales in the United States of America.

20.     Defendant **MYLAN LABORATORIES, INC.** is a Pennsylvania corporation with its principal place of business in Pennsylvania.  Defendant is licensed to do business in all states of the United States of America.  At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, study, research, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs, including generic estrogen (Estradiol) and generic MPA, for ultimate use and/or sales in the United States of America.

21.     Defendant **ORTHO-MCNEIL PHARMACEUTICAL, INC.** is a wholly owned subsidiary of Johnson & Johnson, a New Jersey corporation, with its principal place of business in New Jersey.  Defendant is licensed to do business in all states of the United States of America.  At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, study, research, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs, including Ortho-tri-cyclen and Ortho-prefest, for ultimate use and/or sale in the United States of America.

22.     All of the Defendants identified above in paragraphs 2 through 21 are collectively referred to as "Manufacturing Defendants."

## II.     JURISDICTION

23.     This Court has jurisdiction over all Defendants because each has done substantial business in each state in the United States.  The Court has jurisdiction over the controversy because the damages are within jurisdictional limits.  Plaintiffs are diverse in citizenship from the defendants relevant to their cases.

## III.     FACTUAL BACKGROUND

24.     Plaintiffs ingested or absorbed through their skin menopausal hormone therapy drugs that include either estrogen alone or a combination of an estrogen and a synthetic progestogen, most commonly medroxyprogesterone acetate ("MPA"), as well as other types of synthetic progestogens, as further elaborated below.  "MPA," as used in this Complaint, refers to all MPA sold that was not the brand name Provera.  "Generic estrogen," as used in this Complaint, refers to all estrogen hormone therapy drugs (whether generic or branded, whether synthetic or human identical), that were not the branded product Premarin.  "Hormone therapy" refers to the combination of estrogen (whether human identical or not) plus synthetic, non-human identical progestins and/or a synthetic non-human identical form of testosterone.

25.     Hormone therapy medication is marketed to women who are approaching menopause or have become fully menopausal.  Menopause describes a time in the natural aging process of a woman when her ovaries stop ovulating, and her body's production of natural hormones such as progesterone and several types of human estrogens is dramatically reduced.  The physical symptoms of decreased levels of estrogen and progesterone include hot flashes, night sweats, vaginal atrophy, vaginal dryness, vaginal irritability, loss of bone density, depression, irritability, mood swings and forgetfulness.  These symptoms range from being severe and disabling for a minority of women to a minor inconvenience for the majority of women.

26.     In 1942, Ayerst, the predecessor to Wyeth and Wyeth Pharmaceuticals, (hereafter collectively referred to as "Wyeth") received approval for Premarin.  Premarin is a conjugated equine estrogen made from the urine of pregnant mares.  Premarin has remained chemically unchanged to this day.  To this date, Wyeth does not know all of the components of Premarin.  At all material times, Wyeth has marketed Premarin as a hormone "replacement" product, as it was intended to restore the natural human ovarian hormones, which include several forms of estrogen.

27.      Since 1942, Defendant Wyeth has vigorously promoted its menopausal hormone therapy products using a variety of marketing messages that emphasize long-term use of these medications.

28.     Wyeth aggressively promoted Premarin as a necessary drug for long-term use, even after women's menopausal symptoms ceased, because of Premarin's purported long term health benefits.

29.     Further, Defendants extensively represented to physicians and the public that the negative symptoms of menopause required pharmaceutical treatment and further represented that their hormone therapy drugs could prevent or treat life-changing and life-threatening conditions like cardiovascular problems, osteoporosis and dementia. Through a massive decades-long marketing and advertising campaign, Defendants convinced doctors and the public that menopause is a chronic disease requiring drug treatment rather than the natural process of aging.

30.     Defendant Wyeth's attempts to disguise menopause as a chronic disease started decades ago.  In the 1960s, Wyeth provided financial support for the writing and promotion of a booked called "Feminine Forever".  The book extolled the virtues of estrogen as a cure for menopause and encouraged menopausal women to start taking estrogen drugs.  "Feminine Forever" became a bestseller and caused Premarin sales to rise dramatically. By 1966, Premarin became the most widely prescribed drug in the United States.

31.    Throughout the 1970s, Defendant Wyeth launched advertising campaigns touting Premarin as a tranquilizer and cure for such conditions as depression, fatigue, irritability and insomnia.  However, there were no clinical studies or reliable science to support these claims.  By the mid-1970s, doctors in the United States wrote more than 30 million prescriptions per year

32.    In 1977, the Food & Drug Administration (FDA) issued a statement confirming that estrogen therapy should not be used to treat simple nervousness during menopause and that there was no scientific support for any representation that such therapy could keep a woman feeling young or keep her skin soft.

33.    In the 1970s, a hormone therapy health epidemic arose.  Studies showed a disproportionate increase in the incidence of a particular type of estrogen fed, hormone dependent uterine cancer in the United States, which corresponded to the rise in post-menopausal estrogen prescriptions. The uterine cancers associated with Premarin use were confined to the inner lining of the uterus, its endometrium, and were hormone dependent for growth.    Later, two epidemiologic case-control studies confirmed that estrogens used for menopausal hormone therapy were to blame for this new epidemic of endometrial cancer.  These studies were presented at a formal hearing to the FDA in December of 1975, which led the agency to require new class labeling to warn of the endometrial cancer risk.  As a result, unopposed Premarin's use (estrogen alone) was restricted to only women without a uterus, and only for treatment of hot flashes and vaginal dryness.  A follow-up study published in 1982 showed that immediately after the new labeling went into effect, the rates of hormone dependent uterine (endometrial) cancer in post-menopausal women fell dramatically, consistent with the drop in the number of Premarin prescriptions.  The study attributed the sudden decline in incidence of endometrial cancer to Premarin's drug effect as a rapid promoter of tumors.  The public health implications of this estrogen-induced cancer epidemic

prompted leading epidemiologists to urge drug companies to scrutinize cancer registries for signals of drug effect in order to avoid similar repeat epidemics.

34.     In December of 1975, Wyeth issued a dear doctor letter concerning the uterine cancer epidemic.  In that letter, Wyeth misrepresented the data to physicians and claimed that there was no real evidence that estrogen was to blame for causing this epidemic in menopausal women.  In January of 1976, the FDA told Wyeth that the dear doctor letter was intentionally misleading and inaccurate. The FDA also rebuked Wyeth for failing to live up the standards as a global pharmaceutical company and leader in the market and told Wyeth that it had a responsibility to study its drug for long-term side effects.

35.     In 1979, a published study reported that estrogen related uterine cancer could be avoided by adding a progestogen to the regimen.  The study showed only that the addition of a progestogen could reduce the risk of endometrial hyperplasia, not uterine cancer.  Moreover, the study did not compare the safety or efficacy of synthetic progestins such as MPA to human identical progesterone or other progestogens. However, Defendants Wyeth and Pfizer used the data to argue that a reduction in hormone-induced cellular proliferation (hyperplasia) was a valid biomarker for the reduction in the risk of uterine cancer.  Defendant Wyeth and the other drug manufacturers immediately started promoting estrogen for use in women who still had their uteri, by recommending addition of the synthetic progestin (MPA) or other progestins.

36.     Throughout the history of hormone therapy's marketing, defendants have used scientifically imprecise terminology to describe progestogens.  There is only one molecule called "progesterone", which is the natural human ovarian hormone. Unlike estrogen, which even in the human female comes in several chemical variations, there is only one progesterone. In addition, there are several synthetic hormone drugs that have progestational effects.  These synthetic imitations of progesterone are called

"progestins."   The term for any substance that has progestational effects, whether synthetic or natural, is "progestogen."   Thus, MPA is a progestogen and a progestin, but it is not progesterone.   Progesterone is a progestogen, but is not a progestin.

37.     Beginning in the late 1970s, sales of Premarin began to recover from the endometrial cancer epidemic, due to the sudden change in physicians' prescribing habits to combine estrogen and MPA for hormone therapy.   Now, the HT market for women with an intact uterus was available again, since the addition of a progestogen prevented overstimulation of the uterine lining and thus eliminated the risk of uterine cancer.   Wyeth hoped to capture the market for both Premarin and the necessary progestogen component.

38.     In 1976, Wyeth's physicians reviewed the scientific data concerning the use of estrogen and estrogen with progestin and its impact on breast cancer.   Wyeth acknowledged that, given the wide use of estrogen with or without progestins, there was a legitimate concern about their potential to cause breast cancer.   The scientists analyzed the relevance of hormone receptor positive breast cancers and further noted that the presence of both estrogen and progesterone receptors in a tumor meant that breast tumors respond to estrogen.   At that time, Wyeth acknowledged that there was a lack of studies quantifying the risk of breast cancer in users of this new combination of hormone drugs, that data was needed to answer the question of how much the hormone drugs increased the risk of breast cancer, what role progesterone played in the etiology of breast cancer, and whether the synthetic substitute progestogens such as MPA and NETA increased the risk of breast cancer or had any other harmful effect that natural progesterone did not have.

39.     In 1977, Wyeth admitted that although the use of combination hormone therapy was becoming widespread, there were no adequate studies on the safety of this regimen, particularly with respect to breast cancer.

40.     In 1982, a follow-up study on breast cancer databases found a sudden drop in uterine cancer rates in menopausal women, which coincided with a similar dramatic fall in estrogen prescriptions.   The study concluded that the decrease in uterine cancer rates was likely due to a drug effect on estrogen-sensitive tumors.   Thus, Wyeth learned from the uterine cancer epidemic caused by Premarin that the most feasible and precise way of measuring a drug's cancer risk was: a) to monitor the cancer registries to look for suspicious changes in cancer rates among targeted drug-targeted populations; and b) follow up on any signals from these cancer databases with observational epidemiological studies, such as case-control and cohort studies.   Such studies are relatively inexpensive to do and can be completed quickly.   In fact, during the 1970s, independent scientists had done case-control studies on estrogen alone and breast cancer.   Those studies showed that long-term use of estrogen in hormone therapy slightly increased the risk of breast cancer.   Wyeth resisted doing studies of its own on estrogen and the combination of estrogen plus progestin because it feared the study results could be disastrous for Premarin sales.

41.     Throughout the years it has marketed these drugs, Wyeth has used imprecise language to describe the types of studies scientists use to evaluate the risk of harms or the chance of benefits from a drug.   Clinical "trials", usually randomized, placebo controlled and blinded trials, are literally human experiments, where volunteers are given the drug or a placebo and monitored for outcomes.   It is unethical to conduct such studies when the risk of harm is suspected, and especially when the purpose of the study is to assess the degree of harm from a drug.   In this situation, scientists cannot use clinical trials, but instead use observational studies, where women are followed over time (forward or back in time, or both), and choose independently of the investigators whether to take the drug or not.  These are still "controlled" studies, in that they include women who are not exposed to the drug (the "controls") as well as those who are.  They are still "clinical" studies, in that they measure outcomes in the clinics

where the women go for care. But they are not "trials". Most drug trials are too small, too weak, to detect rare but serious harmful effects, because trials are much more expensive to do than observational studies, and usually have too few subjects on the drug for too little time to see rare but serious harms.

42.     Subsequent published medical literature put Manufacturing Defendants on further notice that more studies were needed of the adverse effects of the combination use of estrogen and progestin (E+P), that hormone receptor positive breast cancers were on the rise, notably among postmenopausal women, and that that hormone therapy drugs could be the culprit. This data also put the Manufacturing Defendants on notice that the same studies that led to the discovery of the uterine cancer epidemic were needed to confirm the link between E+P and hormone receptor positive breast cancers.

43.     Over the next several years, Defendant Wyeth sought to develop a two-pill regimen in a single package. First, Wyeth attempted to develop a combination product in a two-pill package under the name Prempak. Later, Wyeth successfully marketed a combination of Premarin and MPA in a two-pill package, and then in single-pill form under the name Prempro.

44.     Wyeth marketed a different version of combination hormone therapy in the UK. There, it sold "Prempak" with two pills, one with Premarin, and one with a progestin called "Norgestrel" or "levo-norgestrel"='LNG'. Wyeth never did any study comparing the relative safety of LNG to MPA or to any other progestogen.

45.     In 1983, Wyeth knew that a panel of experts recommended that a long-term, large scale randomized clinical trial was needed to answer questions about the hormone therapy drug's potential *beneficial* effects on the heart. Further, Wyeth understood that the FDA was asking for clinical studies to prove not only the efficacy of E+P, but also its safety. Instead, Wyeth decided to not conduct the necessary safety studies to look at risks because the results might be negative and could be

"embarrassing" to the company. Wyeth consistently conducted small, short- term trials to try to prove Premarin plus MPA or LNG was effective at preventing the stimulation of the uterine lining that had led to the endometrial cancer epidemic of the 1970's, but it never conducted, supported or funded any observational studies to assess breast cancer risk. The trials Wyeth conducted were too small in numbers of subjects and too short in duration to meaningfully assess the breast cancer risk.

46. By 1986, all Manufacturing Defendants knew from the published literature that physicians were calling for more studies. These articles noted that there were no adequately designed observational studies to determine the risk of harm, and no properly designed clinical trials to assess the chance of benefits of long-term use of E+P.

47. In 1989, the first published article concerning combination hormone therapy showed a relative risk of 4.4 for breast cancer in combination users. Manufacturing Defendants never followed up with case-control or cohort studies of their own, nor did they include this information in the warnings or labels for either estrogen, progestin or combination hormone therapy.

48. Indeed, several different physicians and research groups approached Defendant Wyeth in the 1980s and 1990s and offered to conduct various types of studies in order to help answer the breast cancer issue. Wyeth refused to fund any of those proposals. In fact, Wyeth specifically declined to support one study on the effect of hormone therapy and breast cancer, noting that it had a "company policy" against funding such studies.

49. Wyeth knew that the progestins used in its combination hormone therapy products around the world were suspected of increasing the cancer risk, and also that they diminished some of the purported cardiovascular benefits of Premarin, so it has constantly since the late 1980's been trying to acquire or develop an alternative progestational agent that would avoid these two dangerous side effects of the synthetic

progestins, MPA and  LNG.  For a short time, Wyeth, looked into using yet another synthetic progestin, norethindrone acetate (NETA) to replace MPA or LNG, but the early studies from Northern Europe, where NETA was the most popular progestogen used, showed that NETA also increased the risk of breast cancer.

50.    Beginning in the late 1980s, Defendant Wyeth attempted to develop a human bio-identical hormone therapy regimen containing estradiol and oral progesterone.

51.    In the early 1990s, Wyeth actively negotiated with the drug maker Schering to obtain the rights to market the human-identical progesterone called Prometrium, which had been approved for use in France and other countries since 1980.  Prometrium is as effective as MPA in preventing uterine cancer caused by estrogen, but it lacks the carcinogenic and cardiovascular side effects of MPA or LNG. However, Defendant Wyeth abandoned these negotiations and decided instead to develop its own combination human identical hormone therapy product.   Wyeth hoped to market this new hormone therapy as its own product because it recognized that progesterone would be safer for the breast than MPA or LNG.

52.    Defendant Wyeth scrapped this plan when its engineers were unable to make an effective time-release oral delivery version of progesterone to compete with Prometrium.  Meanwhile, Wyeth had lost its chance to acquire the North American rights to Prometrium, whose oral micronized delivery system worked well.  Unable to develop its own patented form of Prometrium, Wyeth chose to continue promoting Premarin with the synthetic progestin MPA rather than the much safer human identical progesterone.

53.    Knowing that MPA, LNG and NETA are unreasonably dangerous, Defendant Wyeth has developed, and continues to develop, prescription drugs to treat symptoms of menopause that do not contain MPA or any other synthetic progestin

known to raise breast cancer risk.  Such drugs include    Aprela (bazedoxifene with Premarin), Totelle (trimegestone with Premarin), and Pristiq (desvenlafaxine).

54.     As a result of the endometrial cancer epidemic, and because physicians were adding MPA to Premarin for treatment of menopause, Pfizer Defendants were able to position their drug Provera as a necessary component in hormone therapy treatment even though Provera was not approved for the treatment of menopause. Pfizer defendants developed MPA under the brand name Provera in 1959.  It was approved only for secondary amenorrhea (not menstrual bleeding), dysfunctional uterine bleeding, infertility and related conditions due to hormone imbalance in the absence of organic pathology.  MPA is a synthetic progestin.  MPA is not the same as the progesterone that a woman's body produces naturally.  Because it is not bio-identical, MPA has different actions in the body than natural progesterone, which cannot be patented.    In fact, MPA is far more potent than progesterone, and it produces substantially more serious side effects.   Defendants Pfizer and Wyeth knew that MPA had effects on cells not seen with progesterone, such as effects on androgen and other receptors present in breast tissue, but neither company did any animal or human studies to assess whether MPA could increase the risk of breast cancer.

55.     Manufacturing Defendants knew or should have known that MPA was unreasonably dangerous compared to human identical progesterone in two ways:  First, MPA interacts not only with the progesterone receptor in the breast tissue, but it also interacts with androgen receptor and other receptors, interfering with the body's normal mechanism of suppressing and controlling pre-malignant, pre-invasive lesions in the breast.  This interference in turn leads to the rapid promotion of premalignant lesions into invasive breast cancer, or the rapid promotion of microscopic and harmless malignant lesions into life-threatening large tumors.   Second, MPA is dangerous because it offsets many of the potential benefits to the cardiovascular system that estrogen supplements may provide.  That is, MPA counteracts the putative favorable

effects of estrogen on cholesterol, lipid levels, coronary artery reactivity, and other cardiovascular risk factors.

56.     Pfizer Defendants (and later generic MPA manufacturers) knew that Provera (and subsequent generic MPAs) did not have the same benefits as progesterone but potentially had greater risks.  Defendants Pfizer and Wyeth were both aware that there was no evidence of long-term safety of estrogen combined with MPA for the treatment of menopause.  Neither Pfizer nor Wyeth had monitored the cancer databases to look for signals that Premarin and Provera might be causing an increase in the incidence of breast cancers in older women who were the target market of hormone therapy. Neither company conducted or helped to fund any type of study at all, such as case control or cohort studies designed to assess the risks of breast cancer or blood clots with the new oral combination regimen, from which both companies profited. Manufacturing Defendants knew or should have known that there were safer alternatives to oral estrogen and MPA.  Transdermal human identical estradiol has been approved by the FDA since the mid 1980s.  This alternative is equally effective but much safer than oral estrogen.  Since the 1980s, Defendants Wyeth and Pfizer were aware that physicians in France were using primarily human identical combination therapy rather than synthetic progestins and horse estrogens.  Indeed, from the late 1980s until the mid-1990s, Defendant Wyeth attempted to secure rights in the U.S. and Canada to oral micronized progesterone.  Defendant Wyeth actively sought to develop its own human identical combination hormone therapy in the 1990s, fearing that Premarin and MPA would be withdrawn from the market because of their health risks. Studies published since 2002 have shown oral estrogens, such as Premarin, greatly increase the risk of blood clots, heart attacks, strokes, and gall bladder disease compared to transdermal estrogens, especially transdermal human identical estradiol. Defendants could have and should have done these studies in the 1980's and early 1990's.  Had they done so, the medical community and the target market of

menopausal women would have learned 15 years earlier about the higher risks of oral estrogen.

57.     Defendant Wyeth has been searching for a safer alternative to MPA since the late 1980s, first with oral progesterone, then with other newer progestins such as trimegestone, which was combined with estradiol in a product marketed by Wyeth in Euorope under the name Totelle.   Wyeth is also developing non-progestins such as bazedoxifene, a selective estrogen receptor modulater (SERM) which it licensed from Ligand Pharmaceuticals and now hopes to sell, in a combination pill with Premarin, as the replacement for Prempro under the brand name Aprela.

58.     Aprela is a combination of Premarin (estrogen) and bazedoxifene.  Unlike MPA, the progestogen component of Prempro, bazedoxifene ("BZA") is a selective estrogen receptor modulator or SERMS.   SERMS protect the uterus, but without the breast cancer risk of MPA.  In fact, evidence suggests that SERMS may protect against breast cancer.   While Aprela is not yet on the market, other SERMS have been available for many years and could have been taken with Premarin.  Evista (raloxifene), for example, was approved by the FDA in 1997.

59.     In its studies and press releases, Defendant Wyeth hails Aprela as safer than combination hormone therapy because it is "progestin free" and does not increase the risk of breast cancer.  Because it acknowledges that Aprela is a safe alternative to Prempro, Defendant Wyeth expects Aprela to become an enormously profitable blockbuster drug.

60.     In addition, Defendant Wyeth is currently seeking approval for "Pristiq," a "me too" drug derived from Wyeth's antidepressant Effexor, as a safer drug than Prempro to treat menopausal hot flashes.

61.     Defendant Wyeth also sells Totelle, a hormone therapy drug that was approved in Sweden in 2000.  Totelle is a combination of human identical estradiol and trimegestone, a newer generation progestin.   Although Wyeth sells this alternative

hormone therapy in Sweden and other European countries, it has never sought to make it available to women in the United States.  Wyeth was worried that Totelle would invite unfavorable comparisons to Prempro, particularly on the question of toxicity and breast cancer risk.

62.     Recently published human and animal and pre-clinical studies have definitively shown that the use of oral micronized progesterone in hormone therapy does not increase the risk of breast cancer in women, while MPA significantly increases breast cancer risk.   Clinical studies also demonstrate that the risk of blood clots increased four-fold in women taking oral estrogens, but no such increase in risk occurred in women taking transdermal estrogen.  It was feasible in the 1980s for Wyeth to conduct similar head-to-head studies comparing the relative safety of progesterone to MPA or LNG or NETA, the safety of bazedoxifene to MPA, and the safety of estradiol patches to oral estrogen.  Had Wyeth conducted these studies, it would have known years earlier what the medical community now knows:  there are substantially safer but equally effective alternatives to MPA and oral estrogen.

63.     By no later than 1992, Defendant Wyeth should have warned physicians that human identical progesterone was probably safer than MPA for newly menopausal women – the target of the hormone therapy market – because human identical progesterone had a lower risk of breast cancer and cardiovascular events and was just as effective as MPA in protecting the uterus from over-stimulation by estrogen.

64.     From the early 1980s until 1995, Manufacturing Defendants promoted, marketed and encouraged physicians to prescribe Premarin or other generic estrogens in combination with Provera or generic MPA, or other synthetic progestins.   For instance, in 1983, Pfizer Defendants began an advertising campaign promoting Provera as "the other half of estrogen replacement therapy."   Similarly, in later years Pfizer Defendants promoted Provera as "the other half of hormone replacement therapy."   Some of the advertisements featured color pictures of Premarin and other oral estrogen

products.   Pfizer Defendants engaged in these and similar off-label promotional campaigns without FDA approval for Provera's use in opposing estrogen in hormone therapy. The FDA repeatedly rebuked Pfizer for marketing Provera illegally for uses for which the drug was not approved.

65.   .Manufacturing Defendants created generic estrogen products as well as generic MPA and other synthetic progestin drug products for use in combination hormone therapy.   Despite having sufficient notice that combination hormone therapy exposed patients to even greater risks than either prescription drug alone, Manufacturing Defendants avoided fully studying these risks.   By maintaining their own ignorance, Manufacturing Defendants ensured there was never enough information to disclose these risks to doctors and the public in an accurate, truthful and complete manner.

66.   In 1985, Defendant Wyeth put a new spin on the marketing of hormone therapy drugs by claiming that they could help prevent bone loss.   Defendant Wyeth hired a public relations firm to create public awareness of osteoporosis.   After Defendant Wyeth learned that 77% of women had never heard of osteoporosis, the company launched a large-scale, public relations campaign to persuade women that osteoporosis is a devastating disease that could be prevented with Defendant Wyeth's drug, Premarin.

67.   Defendant Wyeth's public relations campaign created support for a National Osteoporosis Week and eventually for a National Osteoporosis Foundation (to which Defendant Wyeth financially contributed).

68.   Manufacturing Defendants represented to doctors, patients and the public that estrogen and combination hormone therapy drugs could prevent or reduce cardiovascular disease.   Manufacturing Defendants' sales representatives encouraged doctors to prescribe hormone therapy even to women without menopausal symptoms

because of the therapy's purported cardiac benefits.  In fact, reliable scientific evidence has never supported these supposed benefits.

69.     As a result of Defendant Wyeth's marketing efforts, between 1990 and 1995, Premarin became the most frequently prescribed drug in the United States.  All Manufacturing Defendants saw dramatic increases in sales and profits.  Increased sales arose from marketing efforts aimed at promoting combination use of hormone therapy drugs without ever adequately warning of the risks.

70.     When confronted with data that questioned the safety of hormone therapy, Manufacturing Defendants deliberately silenced these criticisms.  Specifically, Manufacturing Defendants took steps to suppress the publication of data showing that patients with a family history of breast cancer had more than a three-fold risk of developing breast cancer from combination hormone therapy.  None of the Manufacturing Defendants ever put a warning or contraindication in their hormone therapy drugs' labeling to advise doctors of this dramatically increased risk for their patients with a family history of breast cancer.  Instead, Manufacturing Defendants engaged in an aggressive marketing strategy that downplayed the risk of breast cancer and exaggerated the supposed benefits of hormone therapy.

71.     Defendant Wyeth began marketing its hormone therapy drugs in a single pill called "Prempro" in 1995.  Prempro combines the estrogenic compound CEE (conjugated equine estrogen made from horse urine) with the progestin MPA in a single pill taken once daily.  "Premphase" is the brand name for a similar Wyeth product containing the same combination of compounds.  Premphase delivers both CEE and MPA for part of the monthly regime, then CEE alone for the rest of the month.

72.     As a condition of Prempro's approval, the FDA told Defendant Wyeth to conduct follow-up case-control studies in geographic areas where hormone therapy was most heavily prescribed to definitively assess the risk of breast cancer for combination hormone therapy.  The FDA was concerned about the lack of long-term studies on

combination hormone therapy and breast cancer.  In particular, the FDA worried that even a small increased risk in breast cancer may have serious public health implications because of the large number of women using hormone therapy.

73.     Manufacturing Defendants have consistently downplayed studies that identified specific risks of hormone therapy.  For example, in 1996, European researchers found that women with vertebral fractures had a 4.6 times increased risk of developing breast cancer if they took combination hormone therapy.  These scientists believed that the risk of breast cancer associated with hormone replacement therapy had been substantially underestimated because osteoporosis is a primary indication for its use.  In response, Defendant Wyeth implemented a "dismissive strategy" to "dismiss and distract" the U.S. press from covering these findings and made concerted efforts to keep the study results isolated in Europe.  Manufacturing Defendants never informed physicians about this dramatically increased risk for patients with bone mass density problems, fractures or osteoporosis.  Instead, Manufacturing Defendants promoted hormone therapy as something that could prevent osteoporosis and encouraged doctors to prescribe the drugs to these high-risk patients.

74.     Soon after the introduction of Prempro, Defendant Wyeth agreed to fund a four-year heart disease prevention trial called "HERS: Heart and Estrogen/Progestin Replacement Study."  Defendant Wyeth touted the study as one that would show that Prempro prevents heart disease in women who are at high risk.  At the time, Defendant Wyeth sought FDA approval of Prempro to prevent or reduce the risk of heart disease. But in 1998, the HERS investigators reported that hormone therapy did not reduce the rate of coronary heart disease events in women with heart disease. In fact, the study demonstrated that hormone therapy increases the risk of heart disease and heart attacks in this population of women, especially during the first year.  Defendant Wyeth and its sales representatives responded by minimizing or ignoring the HERS results.

Sales of Prempro in the United States peaked in late 1998 to early 1999; the bad news from HERS gave many physicians and women pause about the safety of Prempro.

75.    With no reliable science to support its assertions, Defendant Wyeth continued its aggressive marketing campaign, expanding it to promote hormone therapy directly to women.  Wyeth used marketing brochures and other materials to convince women to take Premarin and Prempro for uses that had not been approved by the FDA, including Alzheimer's disease, vision problems, tooth loss, heart disease and colon cancer.

76.    Defendant Wyeth made similar claims in its promotional materials and magazine advertisements, including pieces featuring celebrities. These ads suggested that Wyeth's hormone therapy drugs were effective for treating or preventing, among other things, memory loss, colon cancer, and age-related vision loss.

77.    By the late 1990s and early in 2000, Manufacturing Defendants knew or should have known about studies showing a significantly increased risk of breast cancer for women using combination hormone therapy.  Indeed, these studies showed that hormone therapy was associated with a greater than four-fold increased risk of breast cancer.  Despite this knowledge, Manufacturing Defendants minimized the risk by all available means by reassuring doctors that the risk was slight at most, with the majority of studies showing no associated risk.  Manufacturing Defendants' representations were false and misleading and were intended to downplay the cancer risks associated with hormone therapy.

78.    Another cornerstone of Defendants' marketing program was the promotion of hormone therapy for long-term use of indefinite duration.  Defendants encouraged doctors to prescribe hormone therapy to prevent a range of chronic conditions, especially heart disease.

79.    Defendant Wyeth persistently pressed the FDA to approve the use of Prempro to prevent or reduce the progression of heart disease in post-menopausal

women.   The FDA denied Defendant Wyeth's request because there was insufficient scientific evidence to support such an indication/use of the drug, given the absence of reliable science from a clinical trial to support these claims.   Even though the FDA refused to approve the use of Prempro to prevent development of heart disease, Defendant Wyeth continued to promote Prempro for cardiovascular disease prevention and even represented to physicians that Prempro reduced cardiovascular mortality by 50%.   Such promotion was off-label and violated FDA regulations.

80.   Manufacturing Defendants knew that there were subgroup populations of users who were at an increased risk of developing breast cancer from their exposure to hormone therapy.   Yet Manufacturing Defendants never provided such warnings to the physicians or public.   The lack of such information made the warnings and labels that accompanied combination hormone therapy insufficient and inappropriate.

81.   To deliver Manufacturing Defendants' marketing message to patients and doctors about its hormone therapy drugs, Manufacturing Defendants have used some or all of the following marketing methods:

a.   Sponsoring medical journal articles;

b.   "Ghost writing" medical journal articles

c.   Having detailing/sales representatives call on physicians;

e.   Sponsoring continuing medical education programs;

f.   Hiring doctors to speak to other doctors one on one or in small group meetings;

g.   Issuing press releases;

h.   Advertising directly to consumers:

i.   Advertising to physicians in medical journals and materials; and

j.   Sponsoring medical and pseudo-medical organizations to make statements.

82.   In the early 1990s, the Women's Health Initiative ("WHI") Study began. Conducted by the National Institutes of Health (NIH) and supported by Defendant

Wyeth, two randomized arms of this study were undertaken to confirm Prempro's and Premarin's heart, osteoporosis and mental cognition benefits. These trials were neither designed nor adequately powered to assess risks of rare conditions such as breast cancer. Like all randomized controlled trials, the Prempro and Premarin arms of the WHI study were designed to investigate Prempro's benefits. Rather than doing the case-control studies requested by the FDA to measure the degree of Prempro-related breast cancer risk, Defendant Wyeth convinced the FDA that a single observational arm of the WHI study was adequate to address the agency's concerns about breast cancer risk. As of the date of this Amended Complaint, the WHI observational data on breast cancer have not been released or published. In fact, to this day, Defendant Wyeth itself has never performed or supported any observational study adequately designed to assess breast cancer risk with combination hormone therapy, including Prempro. The FDA had no legal authority to enforce Wyeth's promise to conduct post-marketing observational studies on Prempro.

83.     In 2006, Wyeth wrote the FDA to ask that the data on breast cancer risk from the WHI Prempro trial be considered as adequate for Wyeth to make good on its commitment to do this large observational study.   Plaintiffs have not seen the FDA's response to this improper request.

84.     As the WHI study researchers collected and analyzed their data, Defendant Wyeth's overzealous hormone therapy marketing effort continued unabated, until at least mid-2002.   Defendant Wyeth aggressively promoted Prempro for prevention of chronic diseases, while minimizing the risks.   Absent in these direct-to-consumer promotional materials were warnings about the risk of breast cancer and other side effects.

85.     Ultimately, Defendant Wyeth's decade-long marketing strategy succeeded in skewing perceptions about the risk/benefit profile of hormone therapy.   Defendant Wyeth's own marketing research studies boasted that during the 1980s, the medical

community and women believed that the risk of breast cancer outweighed hormone therapy's sole benefit of relieving hot flashes.   Thanks to Wyeth's unlawful marketing efforts, by the late 1990s, the "paradigm" had shifted so that doctors and patients believed that the breast cancer risk was minimal and far outweighed by a "bundle of benefits" including prevention of: vasomotor symptoms, osteoporosis, cardiovascular disease, central nervous system disease, Alzheimer's disease, colon cancer, macular degeneration, and osteoarthritis.   Most of these supposed benefits had little or no scientific support.  Wyeth acknowledged that the medical community's perception of the overall risk/benefit balance, and the informed consent of the patients on this balance, was the key to continued successful sales of Prempro.

86.     On July 9, 2002, the National Heart, Lung and Blood Institute ("NHLBI"), a federal agency and part of the National Institutes of Health ("NIH"), halted the Prempro randomized arm of the WHI study because the investigators concluded that, under the circumstances, the risks of taking Prempro outweighed its benefits.  Subsequently, the NHLBI also halted the Premarin randomized arm of the study because it found that the risks of Premarin also outweighed the benefits.

87.     Without help from Manufacturing Defendants, independent researchers also conducted a series of epidemiological studies specifically designed to investigate the risks of hormone therapy.   At least two-dozen studies found that combination hormone therapy increases the risk of breast cancer by more than two-fold, and the risk continues to rise with longer durations of use.   These studies more precisely measured the risk of breast cancer shown initially in the WHI study.

88.     In addition, several more recent ecological studies published since 2006 confirmed that hormone therapy caused a new epidemic of hormone-induced tumors – this time, breast cancer.  The studies compared new data from breast cancer registries and hormone therapy prescriptions.  The studies each analyzed different registries.  All of the studies found that the incidence of hormone-receptor positive breast cancer in

postmenopausal women increased steadily during the 1980s and 1990s. Beginning in 1999, the rise in this type of breast cancer leveled off and began to drop slightly as a result of the published HERS results. After July of 2002, the slowly declining rates suddenly dropped precipitously, when the results of the WHI Prempro experiment became public. The rise and fall of these hormone-sensitive breast cancers in postmenopausal women corresponded to a matching rise and fall in hormone therapy prescriptions. The authors of these studies all concluded that this dramatic and unprecedented decrease in a specific cancer subtype in postmenopausal women – the target of the hormone therapy market – was most likely due to use of hormone therapy. They also agreed that the evidence supported a cause-and effect relationship between hormone therapy and breast cancer. This pattern observed with estrogen/MPA is identical to the rise and fall of endometrial cancers and Premarin prescriptions seen in the 1970s with the estrogen-induced endometrial cancer epidemic.

89.    The results of the WHI study and numerous epidemiological studies contradict the scientific and medical assertions that all Manufacturing Defendants had made for decades about their products. Manufacturing Defendants told the medical community that the risks of hormone therapy are minimal compared to the drugs' numerous benefits, ranging from relief of menopausal symptoms to the prevention of life-threatening medical conditions like heart disease and osteoporosis.

90.    Although it studied a population of women who were older than the prime target market of newly menopausal women, the WHI Study found that, for the Prempro arm, when compared to placebo, there was an overall increased risk of several serious adverse events. The study underestimated these risks by counting women who had stopped taking Prempro as "users," and by counting as "non-users" many women who began taking Prempro in addition to placebo. The study also underestimated the true breast cancer risk because the women recruited for the study were, on average, several years past menopause, which means the number of their susceptible breast cells had

decreased.  In addition, most of the women in the study did not represent the target market of women who had menopausal symptoms and who needed therapy to relieve their symptoms.

91.     The WHI Study concluded that the overall health risks exceeded benefits from use of combined estrogen plus progestin" and the regimen should not be prescribed for the primary prevention of coronary heart disease.

92.     Synthetic hormone drug therapy poses substantial health risks with little or no corresponding benefit.  This is especially true of the use of estrogen combined with the synthetic progestins MPA, LNG, and NETA.  The Manufacturing Defendants that sold only one part of the combination therapy (either an estrogen drug or generic MPA) also promoted and marketed the combination regimen knowing there was no scientific evidence supporting the safety or efficacy of the combination.  Indeed, all Defendants knew (or should have known) of the significant risks associated with combination hormone therapy.  However, all Manufacturing Defendants intentionally and knowingly marketed, promoted and encouraged the combination use of these two synthetic hormone drugs.  No Defendant ever performed or supported a properly designed study to monitor or evaluate the risks of combination hormone therapy.  No Defendant ever adequately or competently studied the relative effectiveness versus the risk of safer alternatives to oral estrogens and MPA, lowering the recommended dose of the combination drugs or of encouraging such combination use only for short durations. Defendants that manufactured generic estrogen or MPA drugs failed to conduct their own studies or research to establish the safety or efficacy of these drugs and failed to provide complete and accurate information about their products.

93.     Throughout the time they marketed hormone therapy, Manufacturing Defendants have justified the safety and effectiveness of their products by deceptively confusing and conflating important differences between various forms of hormone therapy.  In their regulatory and marketing contexts, Defendants have indiscriminately

used the term "HRT" to mean *any* kind of hormone therapy, including estrogen replacement therapy as opposed to estrogen/MPA.  Defendants also deceptively refer to their animal and synthetic hormone regimen as hormone "replacement" therapy, which is untrue because neither horse estrogen metabolites nor MPA "replace" women's ovarian hormones.   In addition, Defendants have blurred the distinction between horse estrogens and human identical estradiol, and the difference between synthetic MPA and human ovarian progesterones.  Instead, Defendants have carelessly referred to all of these different compounds as "HRT."

94.    Manufacturing Defendants have also diluted and minimized the role hormone therapy plays in the development of breast cancer by failing to distinguish between the different subtypes of breast cancer, specifically, estrogen-receptor positive hormone-dependent breast tumors.   By lumping breast cancers specific to hormone therapy use with other types of non-hormone dependent breast cancers, Defendants have successfully persuaded prescribing doctors and patients that the causal relationship between breast cancer and combination hormone therapy was not as strong as it truly is.   Similarly, Defendants have deceptively defined carcinogenesis to include only initiation and not promotion and progression.  This definition is unscientific and contrary to well recognized mechanisms by which hormones cause invasive breast cancer.  By engaging in these distortions of terminology, Defendants have continued to mislead the medical community and the public about the risk/benefit profile of their hormone therapy drugs.   This manipulation of the "conventional wisdom" among physicians that hormone therapy is safe has allowed Defendants, specifically Wyeth, to continue profiting from the sales of Premarin and Prempro at the expense of patient safety.

95.    Manufacturing Defendants knew of the significant risks associated with combination therapy but failed to appropriately warn of such risks.  These risks include breast cancer, ovarian cancer, heart attacks, strokes, deep vein thromboembolisms,

pulmonary embolisms, gallbladder cancer, hearing loss, and non-Hodgkins hymphoma, among other side effects.

**Blood Clot Risks**

96.    Hormone therapy causes blood clots that, depending on where they occur or end up, result in strokes, heart attacks, thromboembolisms and pulmonary embolisms.   Manufacturing Defendants never adequately or appropriately warned physicians or users that oral estrogen therapy, especially when combined with synthetic progestins, could cause or contribute to this risk.

**Breast Cancer Risks**

97.    Substantial scientific evidence supports the link between hormone therapy and breast cancer.   Based on several recent studies, it is estimated that hormone therapy has caused more than 200,000 additional and unnecessary breast cancers in the United States of America alone since 1980.   This estimate is consistent with the findings of more recent studies of breast cancer databases.   The investigators of those studies have concluded that combination hormone therapy is responsible for at least 16,000 excess breast cancers in the U.S. per year. In assessing the epidemic of Premarin-induced uterine cancers in the 1970s, one published study estimated that that at least 15,000 excess uterine cancers were caused by Premarin, in the narrow timeframe between 1971 and 1975.   The study authors called it "one of the greatest epidemics of serious iatrogenic disease that has ever occurred in this country."  It is now apparent that the "cure" for this disease – adding synthetic progestins to the regimen – has caused an epidemic of drug-induced breast cancer that is 15 to 20 times greater than the uterine cancer disaster.

98.    In addition, more than 30 epidemiological studies published from 1999 to the present all found that combination hormone therapy using a non-human progestin, such as MPA, LNG, or NETA, more than doubles the risk of breast cancer, and the risk

34

increases steadily with longer use.  Most recently, several ecological studies comparing data from breast cancer registries and hormone therapy prescriptions concluded that the rise and fall in hormone-receptor positive breast cancers, which corresponded to a similar rise and fall in hormone therapy prescriptions during the same period, was most likely due to hormone therapy.  These ecological studies further support the evidence that hormone therapy promotes the development of breast cancer.  Had Manufacturing Defendants conducted these studies sooner, as was feasible and reasonable to do, they would have been obligated to warn doctors and the public that hormone therapy causes breast cancer, that no duration is safe, that longer durations of use are even more dangerous, and that other therapies, including human identical progesterone and SERMS are effective and safer alternatives because they do not increase breast cancer risk.

99.   Manufacturing Defendants never adequately or appropriately warned physicians or users that hormone therapy could cause or contribute to the risk of breast cancer.  To this day, Defendants have never warned or advised of the link between hormone therapy and specific types of breast cancer, including hormone receptor-positive cancer.

**Ovarian Cancer Risks**

100.   Significant scientific evidence establishes that both combination and estrogen hormone therapy causes ovarian cancer

101.   Manufacturing Defendants never adequately or appropriately warned physicians or users that estrogen therapy could cause or contribute to the development of ovarian cancer.

**Gallbladder Disease and Gallbladder Cancer Risks**

102.   Since 1997, Manufacturing Defendants knew (or should have known) that hormone therapy causes a statistically significant increased risk of gallbladder diseases,

including cancer, in users.   Human identical hormones are not as toxic to the gallbladder as oral estrogen and synthetic progestins.  Manufacturing Defendants never adequately warned physicians or users of this risk.  Moreover, even for women taking estrogen only, oral estrogens greatly increase the risk of gall bladder disease and surgery compared to transdermal estrogens.

**Asthma Risks**

103.   Manufacturing Defendants knew (or should have known) that hormone therapy causes an increased risk of newly diagnosed asthma. Manufacturing Defendants never warned physicians or users of this risk.

**No Real Benefit**

104.   Hormone therapy provides little real benefit beyond alleviating menopausal symptoms.   For even its approved indications, safer alternatives have provided better results with less risk.  Rather than providing any heart benefit or mental cognition benefit, synthetic hormone therapy actually dramatically increases the risk of heart attack and stroke, especially in the first year of use, and reduces mental functioning.  Hormone therapy is also linked to hearing loss and osteoarthritis.

**No Cardiac Benefits**

105.   A substantial body of scientific evidence demonstrates that combination hormone therapy is not an effective or appropriate drug to prevent heart attacks.

**No Unique Osteoporosis Benefits**

106.   Manufacturing Defendants knew (or should have known) that other therapies for osteoporosis, including human identical hormones or other non-hormonal drugs, provide better osteoporosis prevention and treatment benefits with less risk.

### No Mental Functioning Benefits

107.    Substantial scientific evidence shows that synthetic hormone therapy does not improve cognitive function.  In fact, the WHI and other recent studies have found that synthetic hormone therapy causes a decline in cognitive function. They disprove Manufacturing Defendants' claim that hormone therapy improves mental function.

### No Substantial Quality of Life Benefits

108.    Contrary to Manufacturing Defendants' claims that hormone therapy improved women's quality of life, recent studies show that synthetic hormone therapy provides little or no benefit to quality of life.

109.    For years, Manufacturing Defendants promoted combination hormone therapy as a safe and effective drug to prevent myriad age-related diseases.  The reality is that synthetic hormone therapy is dangerous and ineffective because it causes many of the diseases defendants claimed it prevents.

### Inadequate Warnings

110.    The warnings and labels provided by Manufacturing Defendants were inadequate, misleading, and inaccurate.   Manufacturing Defendants minimized the harms of these drugs to prescribing physicians and ultimate users while simultaneously exaggerating the purported benefits.  As a result, physicians and patients had no ability to conduct a realistic and well-informed risk versus benefit assessment.

111.    Manufacturing Defendants provided inadequate warnings concerning hormone therapy as to breast cancer.  For instance, the Prempro warning downplayed the risk of breast cancer by reassuring doctors and patients that the majority of studies showed no associated risk and that, with the addition of progestin, "the overall incidence of breast cancer does not exceed that expected in the general population."  Dozens of other studies plainly reveal that this warning is false, and Defendant Wyeth and all other Manufacturing Defendants knew or should have known it to be false for decades.  Sales

representatives or detailers for Manufacturing Defendants falsely represented there was no cancer risk or a minimal risk associated with synthetic hormone therapy drugs. The duplicitous statements in the Prempro label lulled doctors into believing that combination hormone therapy posed minimal or no risk of breast cancer.

112. Manufacturing Defendants provided inadequate warnings regarding the relationship between oral estrogen and synthetic progestin hormone therapy and blood clots. For example, the Prempro warnings expressly minimized the risks of thromboembolic disorders, pulmonary embolisms and venous blood clots with language such as "the increased risk [of venous thromboembolism] was found only in current ERT [i.e., Premarin only] users," "postmenopausal estrogen use does not increase the risk of stroke" and "embolic cerebrovascular events and myocardial infarctions have been reported," without disclosing the true nature of the risks. Furthermore, Manufacturing Defendants failed to warn that oral estrogen substantially increases the risk of dangerous, life-threatening blood clots compared to transdermal human identical estradiol, and also increases the risk of gallbladder disease and surgery.

113. Manufacturing Defendants provided inadequate warnings concerning combination hormone therapy and its link to cardiac damage. For example, under "Precautions," Defendant Wyeth's Prempro label acknowledged: "The effects of estrogen replacement therapy on the risk of cardiovascular disease have not been adequately studied." In addition, studies showed that the MPA component of hormone therapy could potentially increase the risk of heart disease. Nevertheless, Defendant Wyeth consistently and deceptively promoted the benefits of long-term hormone therapy for cardiovascular disease. This promotion was "off-label," was not supported or permitted by the FDA and was used by Wyeth to boost sales of its synthetic hormone therapy drugs.

114. Manufacturing Defendants represented that hormone therapy was safe for long-term use. Defendant Wyeth did not abandon this long-standing marketing strategy

until January 6, 2003 when it cautioned physicians in a "Dear Doctor" letter that estrogens and estrogens plus progestin should be prescribed for the shortest duration consistent with treatment goals.   Defendant Wyeth also launched a new public relations campaign recommending that hormone therapy should be taken at the lowest effective dose for the shortest duration.

115.   Manufacturing Defendants represented that hormone therapy was safe at the dosages recommended over the years even though Defendants knew lower doses of these medications are just as effective and less risky.   It was not until 2003 that Manufacturing Defendants, including Wyeth, cautioned physicians to prescribe the lowest possible dose.   Indeed, Wyeth built a new marketing strategy around the slogan "Go low with Prempro," and launched a new, lower dose combination treatment.

116.   Manufacturing Defendants represented that hormone therapy had benefits without support from reliable science.   They failed to conduct the necessary pre-approval research and post-approval surveillance to establish the safety of a long-term hormone therapy regimen.   Manufacturing Defendants abdicated their responsibility to perform and support adequate safety studies to investigate the serious known and suspected risks.  Manufacturing Defendants never told physicians or the public that they had not conducted any cancer studies on these drugs compared to alternative therapies, thereby deceptively inducing physicians to prescribe these products and patients to use them, with the false assumption that such drugs had been sufficiently tested.

117.   The manufacturers of generic MPA pills (including but not limited to Defendant Wyeth for Cycrin) as well as brand-name Provera were aware that MPA would be prescribed as a part of combination hormone therapy.  Indeed, Manufacturing Defendants marketed, promoted and sold their MPA for combination use. Manufacturing Defendants knew, or in the exercise of reasonable care should have known, that MPA was harmful, was defective in design, would exaggerate or accelerate

the harmful effects of estrogen and was unreasonably dangerous if used with estrogen as combination therapy. Manufacturing Defendants also knew or should have known that oral micronized human identical progesterone is equally effective in protecting the uterus and, unlike MPA, does not significantly increase the risk of breast cancer and does not offset any beneficial effects of estrogen. MPA, when used in combination hormone therapy, has deleterious effects, including but not limited to increasing the incidence of strokes, blood clots, heart attacks, and breast cancer. Even though Manufacturing Defendants knew of these risks, they did not warn consumers of the serious adverse side effects of MPA in combination hormone therapy in any of their labels or promotional materials.

118. Manufacturing Defendants, in their manufacture of generic equivalent and brand-name MPA, failed to conduct adequate pre-marketing clinical testing and research to determine the safety of MPA when used in combination with estrogenic compounds like Premarin.

119. Manufacturing Defendants failed to conduct adequate post-marketing surveillance to determine the safety of MPA when used in combination with estrogenic compounds.

120. Manufacturing Defendants failed to investigate safer alternatives to oral estrogen and MPA. Defendants knew that human identical transdermal estrogen and human identical progesterone were approved and widely used for combination hormone therapy in other countries. It was feasible and reasonable in the 1980s for Manufacturing Defendants to conduct head-to-head studies comparing oral estrogen/MPA to transdermal estradiol/micronized progesterone to determine the safety and efficacy of these regimens. In fact, the PEPI trial, which began in the 1980s, included a head-to-head comparison of estrogen/MPA to estrogen/micronized progesterone and found that estrogen with micronized progesterone was safer than Premarin/MPA for the heart. Specifically, the formulation with human identical

progesterone caused fewer cardiovascular side effects..  PEPI was too small and too short a trial to measure breast cancer risk.

121.    Manufacturing Defendants never disclosed to physicians and patients that they had not conducted post-market safety studies and investigations of safer alternatives, thereby inducing physicians to prescribe and patients to ingest the MPA drugs with the false belief that these drugs had been adequately and fully tested and that the risk questions about these drugs' effect on the heart and breast were answered.

## CAUSES OF ACTION

### COUNT I.        NEGLIGENCE

122.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further allege:

123.    At all relevant times, Manufacturing Defendants had and continue to have a duty to exercise reasonable care to properly prepare, design, research, develop, manufacture, inspect, label, market, promote and sell their hormone therapy drugs, that they introduced into the stream of commerce, including a duty to ensure their hormone therapy drugs do not cause users to suffer from unreasonably dangerous or untoward adverse side effects.

124.    At all relevant times, Manufacturing Defendants owed and continue to owe a duty to properly warn consumers of the risks, dangers and adverse side effects of their hormone therapy drugs.

125.    Manufacturing Defendants breached these duties by failing to exercise ordinary care in the preparation, design, research, development, manufacturing, inspection, monitoring, labeling, marketing, promotion and selling of their hormone therapy drugs, which they introduced into the stream of commerce, because

Manufacturing Defendants knew or should have known that their hormone therapy drugs created an unreasonable risk of harm for those who used the drugs.

126.   Manufacturing Defendants knew, or in the exercise of reasonable care, should have known that their hormone therapy drugs were of such a nature that, if not properly prepared, designed, researched, developed, manufactured, inspected, monitored, labeled, marketed, promoted and sold, they were likely to cause injury to those who took them.

127.   Manufacturing Defendants negligently provided inadequate and inaccurate warnings and information to the medical community and the public at large, including Plaintiff, by making false representations about the safety of their products. Manufacturing Defendants downplayed, understated and disregarded their knowledge – and their negligent lack of knowledge – of the serious and permanent side effects associated with the use of their hormone therapy drugs even though they knew or should have known that their products were likely to cause serious and sometimes fatal side effects to users.

128.   Manufacturing Defendants were negligent in the preparation, design, research, development, manufacturing, inspection, monitoring, labeling, marketing, promotion, and selling of their hormone therapy drugs, in that Manufacturing Defendants:

a)  Failed to use due care in the preparation of the hormone therapy drugs to prevent the risks to individuals when the drugs were ingested;

b)  Failed to use due care in the design of the hormone therapy drugs to prevent the risks to individuals when the drugs were ingested;

c)  Failed to conduct adequate pre-clinical testing and research to determine the safety of the hormone therapy drugs;

d)  Failed to conduct adequate post-marketing surveillance to determine the safety of the hormone therapy drugs;

e)  Failed to accompany the hormone therapy products with proper warnings regarding all possible adverse side effects associated with the use of such products and the comparative severity and duration of these adverse effects;

f)  Failed to use due care in the development of the hormone therapy drugs to prevent the risks to individuals when the drugs were ingested;

g)  Failed to use due care in the manufacture of the hormone therapy drugs to prevent the risks to individuals when the drugs were ingested;

h)  Failed to use due care in the inspection of the hormone therapy drugs to prevent the risks to individuals when the drugs were ingested;

i)  Failed to use due care in the monitoring women who used hormone therapy drugs to prevent the risks to individuals when the drugs were ingested;

j)  Failed to study and develop safer alternatives to the hormone therapy drugs to prevent the risks to individuals when the drugs were ingested;

k)  Failed to use due care in the labeling of the hormone therapy drugs to prevent the risks to individuals when the drugs were ingested;

l)  Failed to use due care in the marketing of the hormone therapy drugs to prevent the risks to individuals when the drugs were ingested;

m)  Failed to use due care in the promotion of the hormone therapy drugs to prevent the risks to individuals when the drugs were ingested;

n)  Failed to use due care in the selling of the hormone therapy drugs to prevent the risks to individuals when the drugs were ingested;

o)  Failed to provide adequate training and information to healthcare providers for the appropriate use of the hormone therapy drugs;

p)  Failed to warn Plaintiff and her healthcare providers, prior to, during and after actively encouraging and promoting the sale of the hormone therapy drugs, either directly or indirectly, orally or in writing, about the following:

- the need for comprehensive, regular medical monitoring to ensure early discovery of potentially fatal strokes, heart attacks, venous thromboembolism, pulmonary embolism, cardiovascular disease, breast cancer, ovarian cancer, gallbladder cancer, non-Hodgkins lymphoma and other adverse side effects;

- that safer, equally effective alternative hormone therapies are available and should be prescribed first, and that, based on the PEPI clinical trial, oral estrogen combined with MPA should be used only as a last resort for the shortest possible period.

- the possibility of becoming disabled as a result of the use of the drugs;

- the adverse side effects associated with the use of the drug, including, but not limited to, strokes, heart attacks, venous thromboembolism, cardiovascular disease, breast cancer, and ovarian cancer, gallbladder cancer, non-Hodgkins lymphoma and other adverse side effects.

- Premarin (estrogen replacement therapy) caused a substantial number of endometrial cancers during the 1960s and 1970s;

- Prempro (with MPA), Prempak (with LNG), and estrogen plus NETA, all cause breast cancer, regardless of length of use, but the risk increases significantly with longer durations

- That the pregnant mares whose urine was the active ingredient in Premarin and Prempro were treated inhumanely and that their foals were put to death.

q)  Failed to conduct any long-term animal studies in appropriate species to evaluate the risks of the new combination therapy in the 1970's and thereafter.

r)  Failed to conduct any long-term studies in women volunteers to evaluate the risks and claimed benefits of the new combination therapy in the 1970's and thereafter.

s)  Failed to monitor cancer registries for signals of new types of cancer appearing in post-menopausal women.

t)  Failed to refrain from engaging in off-label promotion of benefits the FDA did not approve for promotion; and

u)  Failed otherwise to act as a reasonably prudent pharmaceutical manufacturer and distributor would.

129.   Despite the fact that Manufacturing Defendants knew or should have known that their hormone therapy drugs caused unreasonable and dangerous side effects that many users would be unable to remedy by any means, Manufacturing Defendants continued to promote and market these products to consumers, including Plaintiff, when safer and more effective methods of countering any health effects of menopause were available.

130.   Manufacturing Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of their failure to exercise ordinary care as described herein.

131.   Manufacturing Defendants knew or should have known that the hormone therapy products caused serious side effects.  Nevertheless, Manufacturing Defendants continued to market such products by providing false and misleading information with regard to the safety and efficacy of the products.

132.   As a direct and proximate result of the negligent conduct of Manufacturing Defendants, Plaintiff has suffered the injuries and damages specified herein and is at an

increased risk of developing further injury. All of the Manufacturing Defendants are liable to the Plaintiff jointly and severally for all general, special and equitable relief to which Plaintiff is entitled by law.

133.   Manufacturing Defendants' actions, described above, were performed willfully, intentionally, with malice and/or with reckless disregard for the rights of Plaintiff and other post-menopausal women who took hormone therapy.  Defendants' failure to investigate the harms of their hormone therapy products beginning in 1980 has resulted in an excess of 200,000 unnecessary breast cancers in the United States alone. Further, Defendant Wyeth's conduct is continuing as long as the company keeps its drug Prempro on the market.  Wyeth and Pfizer should both take their hormone therapy products containing MPA and LNG off the market.   At a minimum, Manufacturing Defendants' acts and omissions, when viewed objectively from the standpoint of Defendants at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Manufacturing Defendants had actual and subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including Plaintiff.   As such, Plaintiff is entitled to punitive damages against Defendants.

### COUNT II.        STRICT PRODUCTS LIABILITY
#### (Defective Product)

134.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further allege:

135.   Defendants are liable under the theory of Strict Product Liability as set forth in the RESTATEMENT (SECOND) OF TORTS § 402A.  Defendants were, at all times relevant to this action, engaged in the business of manufacturing, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising,

warning about and otherwise distributing hormone therapy drugs in interstate commerce, products they sold and distributed throughout the United States.

136.   These hormone therapy drugs were expected to and did reach, and were ingested by, Plaintiff without substantial change in their condition as manufactured, created, designed, tested, labeled, sterilized, packaged, supplied, marketed, sold, advertised, labeled and otherwise distributed.

137.   Plaintiff used hormone therapy drugs in the manner for which the drugs were intended to be used or in a reasonably foreseeable manner.

138.   Manufacturing Defendants' hormone therapy caused increased risks of personal injury and harm upon consumption, and therefore constitute a product unreasonably dangerous for normal use due to their defective design and manufacture, and due to Defendants' misrepresentations and inadequate disclosure of facts to Plaintiff.

139.   Defendants are liable for Plaintiff's injuries, based not on their conduct, but based on hormone therapy's lack of utility given its risks, safer feasible alternatives, and the balance of harms versus benefits from hormone therapy, regardless of the date the hormone therapy products were used or sold.

140.   The hormone therapy drugs manufactured and/or supplied by Manufacturing Defendants were defective due to:

(a)   Defective design or formulation in that when the drugs left the hands of their manufacturers and/or suppliers, the foreseeable risks exceeded the benefits associated with their design or formulation;

(b)   Defective marketing in that Defendants made inappropriate, misleading, inaccurate and incomplete representations about this product in advertisements, news, commercials, and direct-to-consumer advertisements.   These deceptive marketing representations were made to the FDA, healthcare providers, pharmacists and the public. These deceptive marketing representations were made in order to induce sales and increase profits;

(c)   Defective design or formulation in that hormone therapy contains a synthetic progestin (MPA) as the agent to oppose estrogen's

stimulation of the uterine lining.  MPA is defective in design because it not only interacts with the progesterone receptor in the breast tissue, but it also interacts with the androgen receptor and other receptors, interfering with the body's normal mechanism of suppressing and controlling pre-malignant, pre-invasive lesions in the breast.  MPA is also defective because it stimulates tumor growth factors, while neither estrogen nor human identical progesterone has this dangerous effect.  These toxic effects lead to the rapid promotion of premalignant lesions into invasive breast cancer.  A much safer and equally effective alternative progestogen has been available since the early 1980s – specifically, oral micronized progesterone, a natural human ovarian hormone.  In addition, SERMS, which are similar to bezedoxifene (Aprela) and are progestin-free, have been on the market in the U.S. since 1997 for treatment of menopausal symptoms.  SERMS do not increase the risk of breast cancer.

(d)     Defective design or formulation in that the MPA in hormone therapy offsets many of the potential benefits to the cardiovascular system that estrogen supplements may provide.  Specifically, MPA counteracts the putative favorable effects of estrogen on cholesterol, lipid levels, coronary artery reactivity, and other cardiovascular risk factors.  Oral micronized progesterone does not counteract these effects.

(e)     Defective design or formulation in that Prempro and Premarin deliver the estrogen component of hormone therapy orally (by mouth) rather than transdermally (through the skin).  Oral estrogens significantly increase the risk of life-threatening blood clots compared to transdermal estrogens.  Transdermal human identical estradiol has been approved for use since the mid-1980s.  This alternative is equally effective but much safer than oral estrogen.

(f)     Defective design or formulation in that Prempro and Premarin contain multiple horse estrogen metabolites – many of which remain undefined – that are not familiar to the human body and can interact with human cells in unpredictable ways.

(g)     Defective design or formulation in that several studies have shown that intra uterine devices that deliver a progestogen directly to the endometrium, but not systemically, are at least as effective as oral progestins at protecting the uterus from estrogen induced cancers.

(h)     Defective design or formulation, in that when the drugs left the hands of their manufacturers and/or suppliers, they were unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than other hormone therapy medications;

(i)     Inadequate warnings or instructions because Defendants knew or should have known that the product created a risk of dangerous side effects and other related conditions and diseases but failed to warn of these effects;

(j)     Inadequate pre-marketing testing that, if conducted properly, would have revealed the serious problems with these drugs prior to the first sale;

(k)     Inadequate post-marketing surveillance to determine the safety of hormone therapy that, if conducted properly, would have revealed serious problems with the drug;

(l)     Inadequate investigation and development of safer alternatives to oral estrogen and synthetic progestins. These alternative therapies were approved and widely used in other countries. Head-to-head studies comparing oral estrogen/synthetic progestins to transdermal estradiol/micronized progesterone and estrogen combined with SERMS, including Aprela, and delivery of the progestin component directly to the uterus with an IUD, would have revealed that human identical estrogen/progesterone and estrogen/SERMS, and the use of progestin releasing IUDs, are equally as effective and substantially safer than oral estrogen/MPA.

(m)    Inadequate post-marketing warning or instruction because, after Defendants knew or should have known of the risk of dangerous side effects and other related conditions and diseases, they failed to provide adequate warnings to users or consumers of the product and continued to promote the product.

141.   Manufacturing Defendants, therefore, are strictly liable to Plaintiff.

142.   As a direct and proximate result of these Defendants' manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing hormone therapy drugs in interstate commerce, Plaintiff has suffered injury and is at an increased risk of developing further injuries and has suffered compensatory damages in an amount to be proved at trial.  The actions described above were a producing as well as proximate cause of Plaintiff's injuries.

143.   Manufacturing Defendants' actions, described above, were performed willfully, intentionally, with malice and/or with reckless disregard for the rights of Plaintiff and other post-menopausal women who took hormone therapy.  Defendants' failure to investigate the harms of their hormone therapy products beginning in 1980 has resulted in an excess of 200,000 unnecessary breast cancers in the United States alone. Furthermore, Defendant Wyeth's conduct is continuing as long as the company keeps its drug Prempro on the market.  At a minimum, Manufacturing Defendants' acts and omissions, when viewed objectively from the standpoint of Defendants at the time of

their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Manufacturing Defendants had actual and subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including Plaintiff.  Accordingly, Plaintiff is entitled to punitive damages against Manufacturing Defendants.

### COUNT III.    STRICT PRODUCTS LIABILITY
#### (Defective Marketing and Inadequate Warnings)

144.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

145.    Manufacturing Defendants are manufacturers and/or suppliers of hormone therapy using retail or sample distribution.  The hormone therapy drugs manufactured and/or supplied by Manufacturing Defendants were not accompanied by proper warnings regarding dangerous and potentially lethal side effects of the drugs. Any warnings accompanying these products did not accurately and adequately warn of the symptoms, scope or severity of these potential injuries and health risks, or that safer and equally effective alternative therapies were available and should be considered before prescribing hormone therapy containing estrogen and MPA.

146.    Manufacturing Defendants failed to effectively warn consumers, pharmacists, physicians and healthcare providers that even under close medical monitoring, the potential for serious health complications existed.  There was and is no way to know which patients would suffer such complications.

147.    Manufacturing Defendants failed to perform adequate testing that would have shown that hormone therapy drugs pose significant risks of serious health events. Based on what properly conducted testing would have shown, Manufacturing Defendants should have conveyed complete and accurate warnings to reflect the symptoms, scope and severity of these serious health events.

148.   Manufacturing Defendants knew, or should have known, that hormone therapy drugs were dangerously defective products that pose unacceptable risks unknown and unknowable to the consuming public.  The hormone therapy drugs were defective due to inadequate warnings because, after Defendants knew or should have known of the risks of dangerous side effects and potentially fatal health risks, they failed to provide adequate warnings to consumers of the products and continued to aggressively promote and market these dangerously defective drugs.

149.   As a direct and proximate result of Manufacturing Defendants' conduct, Plaintiff has suffered injury and is at an increased risk of developing further injuries and has suffered compensatory damages in an amount to be proven at trial.

150.   Manufacturing Defendants' actions, described above, were performed willfully, intentionally, with malice and/or with reckless disregard for the rights of Plaintiff and other post-menopausal women who took hormone therapy.  Defendants' failure to investigate the harms of their hormone therapy products beginning in 1980 has resulted in an excess of 200,000 unnecessary breast cancers in the United States alone. Furthermore, Defendant Wyeth's conduct is continuing as long as the company keeps its drug Prempro on the market. At a minimum, Manufacturing Defendants' acts and omissions, when viewed objectively from the standpoint of Defendants at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Manufacturing Defendants had actual and subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including Plaintiff.  Accordingly, Plaintiff is entitled to punitive damages against Manufacturing Defendants.

## COUNT IV.    NEGLIGENT MISREPRESENTATION

151.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

152.    At the time Manufacturing Defendants manufactured, designed, marketed, sold and distributed hormone therapy drugs for use by Plaintiff, Manufacturing Defendants knew or should have known of the use for which hormone therapy drugs were intended and the serious risks and dangers associated with such use of these products.

153.    Manufacturing Defendants owed a duty to prescribing physicians and ultimate end users of their products, including Plaintiff, to accurately and truthfully represent the risks and benefits of hormone therapy drugs.  Manufacturing Defendants breached that duty by misrepresenting and/or failing to adequately warn of the risks of, and lack or exaggerated benefits of, hormone therapy drugs – effects of which Defendants knew or in the exercise of diligence should have known -- to the prescribing physicians and ultimate users, including Plaintiff.

154.    As a direct and proximate result of Manufacturing Defendants' conduct, Plaintiff has suffered injury, and is at an increased risk of developing further injuries, and has suffered compensatory damages in an amount to be proven at trial.   Manufacturing Defendants are liable to Plaintiff jointly and severally for all general, special and equitable relief to which Plaintiff is entitled by law.

155.    Manufacturing Defendants' actions, described above, were performed willfully, intentionally, with malice and/or with reckless disregard for the rights of Plaintiff and other post-menopausal women who took hormone therapy.  Defendants' failure to investigate the harms of their hormone therapy products beginning in 1980 has resulted in an excess of 200,000 unnecessary breast cancers in the United States alone. Furthermore, Defendant Wyeth's conduct is continuing as long as the company keeps its drug Prempro on the market. At a minimum, Manufacturing Defendants' acts and omissions, when viewed objectively from the standpoint of Defendants at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Manufacturing Defendants had actual and

subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including Plaintiff.   Accordingly, Plaintiff is entitled to punitive damages against Defendants.

### COUNT V.      BREACH OF EXPRESS WARRANTY

156.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

157.   Manufacturing Defendants, through description, affirmation of fact and promise expressly warranted to the FDA, prescribing physicians and the general public, including Plaintiff, that their hormone therapy products were both efficacious and safe for the intended use.   These warranties came in the form of:

- Publicly-made written and verbal assurances of the safety and efficacy of hormone therapy drugs;

- Publicly-made written and verbal assurances downplaying the risks associated with hormone therapy drugs;

- Press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create an increased demand for hormone therapy drugs, that provided assurances of the safety and efficacy of hormone therapy drugs;

- Press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create and increase demand for hormone therapy drugs, that downplayed the risks associated with hormone therapy drugs;

- False and misleading written information, supplied by Manufacturing Defendants, and published in the *Physicians Desk Reference* on an annual basis, upon which physicians relied in prescribing hormone therapy drugs during the period of Plaintiff's ingestion of hormone therapy drugs, including, but not limited to information relating to the recommended dose, administration and duration of the use of the drugs;

- Promotional pamphlets and brochures published and distributed by Manufacturing Defendants and directed to consumers; and

- Advertisements.

The documents referred to in this paragraph were created by and at the direction of Manufacturing Defendants.

158.   At the time of these express warranties, Manufacturing Defendants knew of the intended uses of hormone therapy and, for these uses, warranted it to be in all aspects safe, effective and proper.   Manufacturing Defendants' hormone therapy drugs did not conform to these express representations in that they were neither safe nor effective, and use of such drugs produced serious adverse side effects.

159.   Thus, Manufacturing Defendants' products (a) failed to conform to the promises, descriptions or affirmations of fact made about these drugs and (b) were not adequately contained, packaged, labeled or fit for the ordinary purposes for which such goods are used.

160.   Manufacturing Defendants breached their express warranties to Plaintiff by:

a.   Manufacturing, marketing, packaging, labeling and selling hormone therapy drugs to Plaintiff and other users in such a way that misstated and/or downplayed the risks of injury, without warning or disclosing such risks by package or label to Plaintiff and/or her prescribing physician, or without so modifying or excluding such express warranties;

b.   Manufacturing, marketing, packaging, labeling and selling to Plaintiff hormone therapy drugs that failed to counteract the negative health effects of menopause in a safe and permanent manner and without injury;

c.   Manufacturing, marketing, packaging, labeling and selling hormone therapy drugs to Plaintiff in such as way as to promote long-term use at high dosage; and

d.   Manufacturing, marketing, packaging, labeling and selling hormone therapy drugs to Plaintiff and other users, thereby causing Plaintiff serious physical injury and pain and suffering.

161.   As a direct and proximate result of Manufacturing Defendants' conduct, Plaintiff has suffered injury and is at an increased risk of developing further injuries and has suffered compensatory and punitive damages in an amount to be proven at trial.

162.     Manufacturing Defendants' actions, described above were performed willfully, intentionally, with malice and/or with reckless disregard for the rights of Plaintiff and other post-menopausal women who took hormone therapy.  Defendants' failure to investigate the harms of their hormone therapy products beginning in 1980 has resulted in an excess of 200,000 unnecessary breast cancers in the United States alone. Furthermore, Defendant Wyeth's conduct is continuing as long as the company keeps its drug Prempro on the market. At a minimum, Manufacturing Defendants' acts and omissions, when viewed objectively from the standpoint of Defendants at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Manufacturing Defendants had actual and subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including Plaintiffs.   As such, Plaintiffs are entitled to punitive damages against Manufacturing Defendants.

## COUNT VI.     BREACH OF IMPLIED WARRANTY

163.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

164.     At the time Manufacturing Defendants marketed, sold and distributed hormone therapy drugs for use by Plaintiff, Defendants knew of the use for which these hormone therapy drugs were intended and impliedly warranted the products to be of merchantable quality and safe and fit for their intended use.  Contrary to such implied warranty, the hormone therapy drugs were not of merchantable quality or safe or fit for their intended use, because the products were and are unreasonably dangerous and unfit for the ordinary purposes for which they were and are used, as described above.

165.     Plaintiff reasonably relied upon the skill and judgment of Manufacturing Defendants, and thus relied upon Defendants' implied warranty regarding their products.

166.    Plaintiff's physicians prescribed and Plaintiff purchased or made the decision to use hormone therapy drugs when Plaintiff purchased them as researched, developed, designed, testing, manufactured, inspected, labeled, distributed, marketed, promoted sold and/or otherwise released into the stream of commerce by Manufacturing Defendants.

167.    As the proximate, producing cause and legal result of the Defendants' breach of implied warranties, Plaintiff has been damaged as described herein.

168.    Manufacturing Defendants' actions, described above, were performed willfully, intentionally, with malice and/or with reckless disregard for the rights of Plaintiff and other post-menopausal women who took hormone therapy. Defendants' failure to investigate the harms of their hormone therapy products beginning in 1980 has resulted in an excess of 200,000 unnecessary breast cancers in the United States alone. Furthermore, Defendant Wyeth's conduct is continuing as long as the company keeps its drug Prempro on the market.  At a minimum, Manufacturing Defendants' acts and omissions, when viewed objectively from the standpoint of Defendants at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Manufacturing Defendants had actual and subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including Plaintiff.  Accordingly, Plaintiff is entitled to punitive damages against Manufacturing Defendants.

### COUNT VII.    INTENTIONAL MISREPRESENTATION AND FRAUD

169.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

170.    Manufacturing Defendants, having undertaken to prepare, design, research, develop, manufacture, inspect, label, market, promote and sell their hormone

therapy drugs, owed a duty to provide accurate and complete information regarding these products.

171.   Manufacturing Defendants' advertising program, by containing affirmative misrepresentations and omissions, falsely and deceptively sought to create the image and impression that their hormone therapy drugs were safe for human use, had no unacceptable side effects and would not interfere with daily life.

172.   Manufacturing   Defendants   intentionally   encouraged   prescribing physicians, consumers and Plaintiff to remain on hormone therapy for a longer duration than Defendants knew or should have known was safe and effective and at higher dosage levels than necessary.

173.   Manufacturing Defendants purposefully concealed, failed to disclose, misstated, downplayed and understated the health hazards and risks associated with the use of hormone therapy.  Manufacturing Defendants, through promotional practices as well as the publication of medical literature, deceived potential users and physicians prescribing the drugs by relaying only allegedly positive information, while concealing, misstating   and   downplaying   the   known   adverse   and   serious   health   effects. Manufacturing Defendants falsely and deceptively kept relevant information from potential hormone therapy users and minimized the concerns of prescribing physicians regarding the safety and efficacy of their drugs.

174.   Manufacturing Defendants expressly denied that their hormone therapy products created an increased risk of cancer or injury and took affirmative steps to prevent the discovery and dissemination of any evidence on the increased likelihood of injury from their hormone therapy products.

175.   Manufacturing Defendants did not properly study or accurately report the results of its human, animal and cell studies in terms of risks and benefits of their hormone therapy drugs.  Manufacturing Defendants also fraudulently and intentionally polluted the scientific literature related to hormone therapy in general and their hormone

drugs in particular.  Manufacturing Defendants hired physicians and scientists to write inaccurate and misleading scientific articles for the purpose of contaminating scientific and medical knowledge pertaining to hormone therapy and Defendants' particular products.  Manufacturing Defendants then used and relied on these inaccurate and fraudulently prepared scientific papers to defend and justify the marketing, promotion and labeling of their hormone products.  At all relevant times, Manufacturing Defendants knew these publications were inaccurate and would mislead those in the medical and scientific communities who were studying or prescribing the hormone drugs.

176.   Manufacturing Defendants effectively deceived and misled the scientific and medical communities regarding the risks and benefits of hormone therapy products.  The truth did not begin to emerge until publication of the WHI study results.  Even this publication, however, was inadequate, at least in the short-term, to overcome the effects of the misinformation Defendants have consistently and continually provided.

177.   The misconceptions as to the true risks and benefits of Manufacturing Defendants' hormone drugs were pervasive throughout the medical and scientific communities due to Defendants' marketing methods.   These methods included, but were not limited, to the following:

- Publishing papers in the scientific and medical literature that contained statements Defendants knew to be false;

- Knowingly providing false and misleading information to doctors during sales and detailing calls at the doctors' offices or at medical or scientific conferences and meetings;

- Funding third-party organizations to disseminate false and misleading scientific and medical information through their publications and members to physicians and patients;

- Funding continuing medical education to disseminate false and misleading information to doctors;

- Paying specialists in the hormone and menopause fields to meet with prescribing doctors for the purpose of disseminating false and misleading information about the risks and benefits of the drugs;

- Providing false and misleading information to the FDA to support inaccurate risk and benefit information contained in the product labeling;

- Disseminating direct-to-consumer advertising that was false and misleading and/or concealed the true risks and benefits of these drugs.

178.   Through the materials they disseminated, Manufacturing Defendants falsely and deceptively misrepresented or omitted a number of material facts regarding their hormone replacement drugs, including, but not limited to, the following:

- The lack of and inadequacy of the testing of hormone therapy drugs, both pre- and post-marketing;

- The lack of studies to investigate equally effective and safer alternatives to oral estrogens and MPA, which were approved and widely used in other countries;

- The severity and frequency of adverse health effects caused by hormone therapy drugs;

- The range of injuries caused by hormone therapy drugs; and

- The lack of any reliable science to support representations about the benefits of hormone therapy drugs.

179.   These efforts resulted in a risk/benefit profile for hormone therapy that was accepted by the medical and scientific communities even though it was proved false by independent studies such as the WHI study.

180.   Manufacturing Defendants possessed evidence demonstrating hormone therapy products cause serious adverse side effects.   Nevertheless, Manufacturing Defendants continued to market and represent that hormone therapy was safe by providing false and misleading information to Plaintiff and Plaintiff's treating physicians.

181.   Manufacturing Defendants engaged in all the acts and omissions described above with the intent that Plaintiff's physician and Plaintiff would rely on the misrepresentation, deception and concealment in deciding to prescribe and/or ingest Defendants' products.

182.   Plaintiff and Plaintiff's treating physician(s) justifiably relied to their detriment on Manufacturing Defendants' intentional and fraudulent misrepresentations

as set out above.  This reliance proximately caused the injuries as damages detailed herein.

183.    Manufacturing Defendants' actions, described above, were performed willfully, intentionally, with malice and/or with reckless disregard for the rights of Plaintiff and other post-menopausal women who took hormone therapy.  Defendants' failure to investigate the harms of their hormone therapy products beginning in 1980 has resulted in an excess of 200,000 unnecessary breast cancers in the United States alone. Furthermore, Defendant Wyeth's conduct is continuing as long as the company keeps its drug Prempro on the market. At a minimum, Manufacturing Defendants' acts and omissions were (a) specifically intended to cause substantial injury to Plaintiff and/or (b) when viewed objectively from the standpoint of Defendants at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Manufacturing Defendants had actual and subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including Plaintiff.   Accordingly, Plaintiff is entitled to punitive damages against Manufacturing Defendants.

## COUNT VIII.    VIOLATIONS OF STATE CONSUMER FRAUD ACT

184.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein and further allege:

185.    Plaintiff entered into consumer transactions with Manufacturing Defendants by purchasing hormone therapy medication.  Plaintiff suffered injuries due to Defendants' intentional misrepresentations in violation of the state consumer law applicable to this lawsuit.  Plaintiff and her prescribing physician had a legitimate expectation that Manufacturing Defendants would not provide inaccurate information concerning the benefits, risks and use of hormone therapy.

186.    Manufacturing Defendants' conduct alleged herein, which took place during the course of and leading up to these transactions, constitutes unfair or deceptive trade practices - including the manufacture, marketing and sale of hormone therapy by an unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation and the knowing concealment of material facts.

187.    Defendants' violations resulted in the withholding of material information to Plaintiff and her physician regarding the safety, efficacy and risk of hormone therapy drugs so Plaintiff and her physician could not make an informed decision as to whether to prescribe or purchase the drugs, select an alternative or choose nothing at all.

188.    Each of Defendants' violations was "knowing," that is, made with knowledge of the truth.

189.    Each of Defendant's violations was made "intentionally," that is, with knowledge of the falsity of the information provided and with the intent that the information be relied upon by Plaintiff and her physician.

190.    Defendant's violations were a producing and/or proximate cause of injury to Plaintiff, as discussed herein.  Plaintiff is therefore entitled to all damages authorized by statute, including compensatory damages, punitive damages, trebled damages, statutory penalties and/or reasonable attorney fees and expenses.

### COUNT IX.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

191.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further allege:

192.    The acts, omissions, and representations of Manufacturing Defendants regarding the manufacturing, distribution and marketing of hormone therapy drugs as described in this pleading was intentional and/or reckless.   The conduct was also extreme and outrageous.   As a proximate result of such conduct, Plaintiffs suffered severe emotional distress.

193.   Manufacturing Defendants' actions, described above, were performed willfully, intentionally, with malice and/or with reckless disregard for the rights of Plaintiff and other post-menopausal women who took hormone therapy.  Defendants' failure to investigate the harms of their hormone therapy products beginning in 1980 has resulted in an excess of 200,000 unnecessary breast cancers in the United States alone. Furthermore, Defendant Wyeth's conduct is continuing as long as the company keeps its drug Prempro on the market. At a minimum, Manufacturing Defendants' acts and omissions were (a) specifically intended to cause substantial injury to Plaintiff and/or (b) when viewed objectively from the standpoint of Defendants at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Manufacturing Defendants had actual and subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including Plaintiff.  Accordingly, Plaintiff is entitled to punitive damages against Manufacturing Defendants.

### COUNT X.   NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

194.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

195.   Manufacturing Defendants were negligent as described in Count I of this Complaint, each paragraph of which is fully incorporated herein by reference. Defendants' negligence proximately caused severe emotional distress to Plaintiff.

196.   Defendant's negligence was conducted with malice, as explained in Count I.  As such, Plaintiff is entitled to punitive damages against Defendants.

### COUNT XI.   GROSS NEGLIGENCE / MALICE

197.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges the following.

198.    The wrongs done by Defendants were aggravated by the kind of malice, fraud and reckless disregard for the rights of others, Plaintiff and other post-menopausal women who took hormone therapy, for which the law allows the imposition of exemplary damages, in that Defendants' conduct:

- was specifically intended to cause substantial injury to Plaintiff; or

- when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiff and other post-menopausal women who took hormone therapy; or

- included a material representation that was false, with Defendants knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation be acted on by Plaintiff.  Plaintiff relied on the representation and suffered injury as a proximate result of this reliance.

199.    Plaintiff therefore seeks exemplary damages in an amount within the jurisdictional limits of the court.  Plaintiff also alleges that the acts and omissions of named Manufacturing Defendants, whether taken singularly or in combination with others, constitutes gross negligence, which proximately caused the injuries to Plaintiff. Defendants' failure to investigate the harms of their hormone therapy products beginning in 1980 has resulted in an excess of 200,000 unnecessary breast cancers in the United States alone.  Furthermore, Defendant Wyeth's conduct is continuing as long as the company keeps its drug Prempro on the market. Accordingly, Plaintiff seeks exemplary damages in an amount that would punish Defendants for their conduct and would deter other manufacturers from engaging in such misconduct in the future.

## DAMAGES

## General Damages

200.    Plaintiff suffered serious injuries as a proximate result of Defendants' misconduct.

201.   As a result of Defendants' conduct, which caused Plaintiff to suffer or die from breast cancer, Plaintiff suffered in the past, and will likely suffer in the future, medical testing, breast biopsies, invasive exploratory surgeries, removal of breast tissue, lumpectomy or mastectomy surgeries, disfigurement, reconstruction surgeries, chemotherapy, radiation, chemical treatments, long-term cancer treatment using anti-estrogen or estrogen blocking drugs, continuing medical monitoring, physical and emotional pain, physical and emotional suffering, mental anguish (including but not limited to reasonable fear of additional injury), physical impairment, disfigurement, extreme embarrassment, medical bills and expenses as well as loss of wages and wage earning capacity.

202.   As a result of Defendants' conduct, which caused Plaintiff to suffer or die from blood clot-related injuries including heart attacks, strokes or thromboembolisms, Plaintiff suffered in the past, and will likely suffer in the future, medical testing, medical treatment, surgeries including amputations, physical and emotional pain, physical and emotional suffering, mental anguish (including but not limited to a reasonable fear of additional injury), physical impairment, disfigurement, paralysis, medical bills and expenses as well as loss of wages and wage earning capacity.

203.   As a result of Defendants' conduct, which caused Plaintiff to suffer or die from other cancers, Plaintiff suffered in the past, and will likely suffer in the future, medical testing, invasive exploratory surgeries, removal of tissue or tumors, disfigurement, reconstruction surgeries, chemotherapy, radiation, chemical treatments, long-term cancer treatment, continuing medical monitoring, physical and emotional pain, physical and emotional suffering, mental anguish (including but not limited to reasonable fear of additional injury), physical impairment, disfigurement, extreme embarrassment, medical bills and expenses as well as loss of wages and wage earning capacity.

**Loss of Consortium Damages**

204.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

205.   Family member Plaintiffs were at all times relevant hereto the spouses or family members of the Plaintiff.

206.   For the reasons set forth herein, Family Member Plaintiffs have necessarily paid and have become liable to pay for medical aid, treatment and for medications, and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

207.   For the reasons set forth herein, Family Member Plaintiffs have suffered and will continue to suffer the loss of their loved one's support, companionship, services, society, love and affection.

208.   Spouse Plaintiff alleges his marital relationship has been impaired and depreciated, and the marital association between husband and wife has been altered.

209.   Family Member Plaintiffs have suffered great emotional pain and mental anguish.

**Wrongful Death Damages**

210.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

211.   Decedent died following use of hormone therapy drugs and is survived by various family members, named and unnamed.

212.   The representative/administrator of Decedent's estate brings this claim on behalf of the decedents' lawful heirs.

213.   Defendants' wrongful conduct has proximately caused Decedent's heirs to suffer the loss of decedent's companionship, services, society, marital association, love and consortium.

214.   Decedent's estate representative brings this claim on behalf of Decedent's lawful heirs for these damages and for all pecuniary losses sustained by the heirs.

215.   Decedent's estate representative further pleads all wrongful death damages allowed by statute in the state or states in which the causes of action accrued.

## Survival Damages

216.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

217.   As a direct and proximate result of the conduct of Manufacturing Defendants and/or the defective nature of the products as outlined above, Decedent suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses of hospitalization, medical and nursing care and treatment and loss of earnings as well as loss of ability to earn money and death.

218.   Decedent's estate representative brings this claim on behalf of Decedent's estate and Decedent's beneficiaries for damages.

219.   Decedent's estate representative further pleads all survival damages allowed by statute in the state or states in which the causes of action accrued.

## Exemplary/Punitive Damages

220.   Plaintiff incorporates all preceding paragraphs as if fully set forth herein and further allege as follows:

221.   As set forth in each and every claim of relief, Plaintiff alleges that the acts and omissions of Defendants, whether taken singularly or in combination with others, constitute fraud, reckless disregard for the safety of Plaintiff and other post-menopausal women who took hormone therapy, malice and/or gross neglect for which Defendants should each be assessed punitive damages in an amount large enough to discourage future acts of similar nature.

## APPLICATION OF THE DISCOVERY RULE

222.   At a minimum, before Defendants publicly disseminated information concerning the risks and lack of benefits of hormone therapy drugs in July, 2002, Plaintiff did not discover, Plaintiff could not have discovered and Plaintiff should not have discovered, through the exercise of reasonable care and due diligence, the causal connection between Plaintiff's injuries and the hormone therapy drugs she ingested. Indeed, at the present time the defendants have not acknowledged that the harms from using their hormone therapy products so outweigh the benefits given that there are equally effective but safer alternatives.   Consequently, many women have still not discovered the connection between Defendants' wrongdoing and their breast cancer or other injuries.  Women may think, as the defendants hope, that although there is a small risk of breast cancer with these drugs, the benefits still outweigh them. That perception is false, it is induced by the Defendants, and it leads to many women not realizing they have been wronged when they develop breast cancer. The current label for Defendants' hormone therapy drugs is inadequate to apprise a woman or her doctor of the safer alternatives. Accordingly, the applicable discovery rule has tolled the commencement of the statute of limitations.  Plaintiff's lawsuit is timely filed.

## FRAUDULENT CONCEALMENT

223.   Any applicable statutes of limitation have been tolled by the knowing and active concealment and denial of material facts known by Defendants when they had a duty to disclose those facts.  Defendants have kept Plaintiff ignorant of information essential to pursuit of her claims, without any fault or lack of diligence on Plaintiff's part, for the purpose of obtaining delay on Plaintiff's part in filing a complaint of her causes of action.  Defendants' fraudulent concealment resulted in the intended delay.  Plaintiff could not reasonably have discovered her claims until shortly before filing this Complaint.

## ALTER EGO / CORPORATE LIABILITY/ CIVIL CONSPIRACY?

224.   At all times herein mentioned, each of the "Manufacturing Defendants" was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of each of the other defendants herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other defendants, knowing that their collective conduct constituted a breach of duty owed to Plaintiff.

225.   Defendants entered into a civil conspiracy and agreements whereby they created an industry atmosphere of misrepresentations and deceit that allowed each Defendant to sell hormone therapy drugs without adequate warnings to the prescribing physicians and patients, including Plaintiff and her physician.

226.   There exists and, at all times herein mentioned, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased, and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants.   Adherence to the fiction of the separate existence of these certain defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

227.   Barr Pharmaceuticals is the alter ego of Barr Laboratories, Inc. and Duramed Pharmaceuticals in that Barr Pharmaceuticals assisted in all acts of liability, made decisions which created liability for the subsidiary companies and exerted control over the actions and conduct of Barr Laboratories, Inc. and Duramed Pharmaceuticals. These defendants are jointly and severally liable to Plaintiff for her damages.

228.   At all times herein mentioned, Defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the

business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling hormone therapy medications for use by Plaintiff and others.   As such, each Defendant is individually, as well as jointly and severally, liable to Plaintiff for Plaintiff's damages.

229.   At all times herein mentioned, the officers and/or directors of the corporate defendants named herein participated in, authorized and/or directed the production and promotion of hormone therapy when they knew, or with the exercise of reasonable care and diligence should have known, of the hazards and dangerous propensities of their hormone therapy products, and thereby actively participated in the tortious conduct that resulted in the injuries suffered by Plaintiff.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all issues set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, in an amount to compensate Plaintiff fully for her injuries, for exemplary, punitive and/or statutory damages, for prejudgment and post-judgment interest, for attorney's fees, if appropriate, for the costs of this action and for such other relief as the Court may deem just and equitable.

DATED this 24th day of November, 2008.


Respectfully submitted,


/s/ William Gary Holt
William Gary Holt
GARY EUBANKS & ASSOCIATES
708 West Second Street
Post Office Box 3887

Little Rock, Arkansas  72203-3887
(501) 372-0266
(501) 688-7741 Facsimile

Liaison Counsel for Plaintiffs
Co-Lead Counsel on Behalf
Of Personal Injury Plaintiffs

Zoe Littlepage
LITTLEPAGE BOOTH
408 Westheimer Street
Houston, TX  77006
(713) 529-8000
(713) 529-8044 Facsimile

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was served electronically via the Court's electronic filing system on the 24th day of November, 2008, according to this Court's provision for service as set forth in the pre trial orders and sent to the following counsel of record indicated below.

/s/ William Gary Holt
William Gary Holt
GARY EUBANKS & ASSOCIATES
708 West Second Street
Post Office Box 3887
Little Rock, Arkansas  72203-3887

VIA ECF AND E-MAIL
FOR SERVICE ON ALL DEFENSE COUNSEL TO
Lyn P. Pruitt, Esq.: lpruitt@mwsgw.com
Mitchell Williams Selig, Gates & Woodyard
425 West Capitol, Suite 1800
Little Rock, Arkansas 72201
DEFENDANTS' LIAISON COUNSEL

VIA SERVICE THROUGH DEFENDANTS'
LIAISON COUNSEL TO THE FOLLOWING COUNSEL

John W. Vardaman: jvardaman@wc.com
F. Lane Heard: lheard@wc.com
Williams & Connolly, LLP
725 12th Street NW
Washington, D.C. 20005
NATIONAL COUNSEL FOR WYETH
DEFENDANTS

Linda Svitak: lsvitak@faegre.com
John P. Borger: jborger@faegre.com
Amy R. Freestone:
afreestone@faegre.com
James A. O'Neal: joneal@faegre.com
Faegre & Benson LLP
2200 Wells Fargo Center
90 South Seventh St.
Minneapolis, MN 55402-3901
NATIONAL COUNSEL FOR NOVARTIS
DEFENDANTS

Jay P. Mayesh:
maoedar@kayescholer.com
Alan Rothman:
arothman@kayscholer.com
Steven J. Glickstein:
sglickstein@kayescholer.com
Kaye Scholer LLP
425 Park Avenue

Janet L. Pulliam:
jpulliam@williamsanderson.com
Clayborne S. Stone
cstone@williamsanderson.com
Williams & Anderson, PLC
111 Center Street, 22nd Floor
Little Rock, AR 72201
LOCAL COUNSEL FOR NOVARTIS

New York, NY 10022-3598
NATIONAL COUNSEL FOR PFIZER
DEFENDANTS

Elizabeth R. Murray: murray@fec.net
Friday Eldredge & Clark
400 West Capitol Avenue, Suite 2000
Little Rock, AR 72201-3493
LOCAL COUNSEL FOR PFIZER

Brian A. Troyer:
brian.troyer@thompsonhine.com
Robert F. Ware:
rob.ware@thompsonhine.com
James D. Robenalt:
jim.robenalt@thompsonhine.com
Michael L. Hardy:
Mike.hardy@thompsonhine.com
Thompson Hine LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114-1291
NATIONAL COUNSEL FOR SOLVAY
DEFENDANTS

John Moore:
John.moore@hmrmlaw.com
Sarah E. Greenwood:
sarah.greenwood@hmrmlaw.com
Huckaby, Munson, Rowlett & Moore
Regions Center, Suite 1900
400 West Capitol
Little Rock, AR 72201-3436
LOCAL COUNSEL FOR SOLVAY
DEFENDANTS

Matthew Brammer:
mbrammer@ulmer.com
Gina Saelinger: gsaelinger@ulmer.com
Joseph Thomas: jthomas@ulmer.com
Ulmer & Berne, LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202-2409
NATIONAL COUNSEL FOR BARR
DEFENDANTS

Jill M. Ondos: jill.ondos@mylanlabs.com
Jaime B. Lebo:
Jaime.Lebo@Mylanlabs.com
Mylan Laboratories, Inc.
1500 Corporate Drive, Suite 400
Canonsburg, PA 15317
COUNSEL FOR MYLAN

DEFENDANTS

Kerry C. Green: kc.green@dinslaw.com
DINSMORE & SHOHL LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, OH 45202
NATIONAL COUNSEL FOR WATSON

Robert W. Sparks:
Robert.sparks@dechert.com
Dechert
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793
NATIONAL COUNSEL FOR ORTHO
MCNEIL DEFENDANTS

James Andrew Vines: avines@wlj.com
C. Alston Jennings, Jr.:
ajenningsjr@wlj.com
Wright, Lindsey & Jennings, LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201-3699
LOCAL COUNSEL FOR ORTHO MCNEIL
AND AVENTIS DEFENDANTS

Daniel Donahue
Herzog Crebs
One City Center
515 N. Sixth St., 24th Floor
St. Louis, MO 63101
NATIONAL COUNSEL FOR MYLAN
PHARMACEUTICALS DEFENDANTS

Glenn W. Jones:
gjones@barberlawfirm.com
Barber, McCaskill, Jones & Hales, P.A.
400 West Capitol Avenue, Suite 2700
Little Rock, AR 72201
LOCAL COUNSEL FOR BARR AND
ELAN DEFENDANTS

LABORATORIES, INC.; AND MYLAN
PHARMACEUTICALS, INC.

Stuart Feinblatt:
sfeinblatt@sillscummis.com
Sills Cummins Epstein & Gross, P.C.
One Riverfront Plaza
Newark, NJ 07102-5400
NATIONAL COUNSEL FOR ORGANON
DEFENDANTS

John Winter: jwinter@pbwt.com
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036-6710
NATIONAL COUNSEL FOR GALEN
DEFENDANTS AND WARNER
CHILCOTT

Paul Wood: pwood@ggtb.com
Quattlebaum, Grooms, Tull & Burrow,
PLLC
111 Center Street, Suite 1900
Little Rock, AR 72201
LOCAL COUNSEL FOR GALEN
DEFENDANTS AND WARNER
CHILCOTT AND VALEANT
PHARMACEUTICALS AND MONARCH
AND KING AND AMARIN DEFENDANTS

David McDonald:
dmacdonald@macdonalddevin.com
Amy Harris: aharris@macdonalddevin.com
David Colley:
dcolley@macdonalddevin.com
McCauley, MacDonald & Devin
3800 Renaissance Tower
1201 Elm St.
Dallas, TX 75270-2084
NATIONAL COUNSEL FOR GALLIPOT
DEFENDANTS

Sam Berry Blair, Jr.:
sblair@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell &
Berkowitz, PC
First Tennessee Building
165 Madison Avenue, Suite 2000
Memphis, TN 38103
NATIONAL COUNSEL FOR MONARCH
AND KING PHARMACEUTICALS

Alan Vickery: alan.vickery@sdma.com
Sedgwick Detert Moran & Arnold, LLP
1717 Main Street, Suite 5400
Dallas, TX 75202
NATIONAL COUNSEL FOR BRISTOL-
MYERS DEFENDANTS

M. Samuel Jones, III:
sjones@mswgw.com
Wright, Lindsey & Jennings, LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201-3699
LOCAL COUNSEL FOR BRISTOL
MYERS DEFENDANTS

Alan Winchester:
awinchester@harrisbeach.com
Harris Beach
805 Third Avenue
New York, NY 10022
NATIONAL COUNSEL FOR ELAN
PHARMACEUTICALS

T. Scott Allen: sallen@crusescott.com
Cruse, Scott, Henderson & Allen
2777 Allen Parkway, 7th Floor
Houston, TX 77019
COUNSEL FOR PHYSICIAN
DEFENDANTS

M. King Hill, III: mkhil@venable.com
Venable, LLP
Two Hopkins Plaza, Suite 1800
210 Alegheny Avenue
Townson, MD 21285-5517
NATIONAL COUNSEL FOR ABBOT LABS

Joseph Babington: jpb@helmsinglaw.com
Russell Buffkin: rcb@helmsinglaw.com
Louisa Stockmann: lls@helmsinglaw.com
Helmsing, Leach, Herlong, Newman &
Rouse, P.C.
P.O. Box 2767

Russell Thornton
Stinnett Thiebaud & Remington, LLP
4800 Fountain Place
1445 Ross Avenue
Dallas, TX 75202-2701
COUNSEL FOR PHYSICIAN

Mobile, AL 36652
NATIONAL COUNSEL FOR SMITHLKINE
BEECHAM

Susan Sharko: susan.sharko@dbr.com
Drinker Biddle & Shanley LLP
500 Campus Drive
Florham Park, NJ 07932
NATIONAL COUNSEL FOR BERLEX

Sandra J. Wunderlich:
swunderlich@stinson.com
Stinson Morrison Hecker, LLP
100 S. Fourth Street, Suite 700
St. Louis, MO 63105
COUNSEL FOR DEFENDANTS BARR
LABORATORIS, INC, BARR
PHARMACEUTICALS, INC., AND
DURAMED PHARMACEUTICALS, INC.

DEFENDANTS

Jim Julian: jjulian@cnjlaw.com
Chisenhall, Nestrud & Julian, PA
400 West Capitol, Suite 2840
Little Rock, AR 72201
LOCAL COUNSEL FOR ABBOT LABS

Mychal Sommer Schulz, Esq.
Mychal.schulz@dinslaw.com
Julie A. Pence, Esq.
Julie.pence@dinslaw.com
Dinsmore & Shohl LLP
Huntington Square
900 Lee Street, Suite 600
Charleston, West Virginia 25301
ATTORNEYS FOR AMERICAN
COLLEGE OF PHYSICIANS