FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 17 2009

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

In re:                              :        MDL Docket No. 4:03CV1507WRW
                                    :
PREMPRO PRODUCTS LIABILITY          :
LITIGATION                          :
                                    :
                                    :

## THE NEW YORK TIMES COMPANY'S

## MOTION FOR LEAVE TO INTERVENE

### and

## MOTION TO SET ASIDE DEFENDANT'S
## DESIGNATION OF CONFIDENTIALITY

The New York Times Company ("The Times") moves the Court for leave to intervene in these proceedings for the limited purpose of urging its motion for the Court to find that Wyeth documents regarding ghostwriting are not confidential. The Times moves the Court to find ghostwriting documents non-confidential, or in the alternative, to modify the protective order in this litigation to permit disclosure of these documents. A supporting memorandum accompanies this motion.

Respectfully Submitted,

J.G. "Gerry" Schulze
BAKER & SCHULZE
303 President Clinton Ave, Suite D
Little Rock, AR 72201
(501) 537-1000
gschulze@ebslawfirm.com

George Freeman
Vice-President & Assistant General Counsel
The New York Times Company Legal Department
620 8th Avenue
New York, NY 10018
212-556-1558

ATTORNEYS FOR THE NEW YORK TIMES
COMPANY

### CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of March 2009, a true and correct copy of the

foregoing document was electronically filed with the Clerk of Court using the CM/ECF system,

and a true and correct copy was forwarded by e-mail to the following parties:

F. Lane Heard, III:  lheard@wc.com
Stephen L. Urbanczyk:  surbanczyk@wc.com
Williams & Connolly LLP
725 12th Street, NW
Washington, DC 20005-5901

Lyn Peeples Pruitt:  lpruitt@mwsgw.com
Mitchell, Williams, Selig, Gates & Woodyard, PLLC
425 West Capitol Avenue, Suite 1800
Little Rock, AR 72201


J.G. "Gerry" Schulze



Welcome to TimesPeople    TimesPeople Lets You Share and Discover the Best of NY...    3:22 PM    Get Started  No, thanks
What's this?

HOME PAGE   MY TIMES   TODAY'S PAPER   VIDEO   MOST POPULAR   TIMES TOPICS

My Account | Welcome, gerrysch | Log Out | Help

The New York Times

# Business

Search All NYTimes.com    [Go]

WORLD | U.S. | N.Y. / REGION | BUSINESS | TECHNOLOGY | SCIENCE | HEALTH | SPORTS | OPINION | ARTS | STYLE | TRAVEL | JOBS | REAL ESTATE | AUTOS

Search Business [News, Stocks, Funds. Companies] [Go]   Financial Tools [Select a Financial Tool]   More in Business »   World Business | Markets | Economy | DealBook | Media & Advertising | Small Business | Your Money

## Drug Maker Said to Pay Ghostwriters for Journal Articles

By DUFF WILSON
Published: December 12, 2008

Wyeth, the pharmaceutical company, paid ghostwriters to produce medical journal articles favorable to its female hormone replacement therapy Prempro, according to Congressional letters seeking more information about the company's involvement in medical ghostwriting. At least one article was published even after a federal study found the drug raised the risk of breast cancer.

**Related**

**From Agenda Item to Published Medical Article**

*A sequence of documents showing how a medical writing firm hired by Wyeth developed an academic article about hormone therapy.*

**Add to Portfolio**

Wyeth

Go to your Portfolio »

**Readers' Comments**

Readers shared their thoughts on this article.
Read All Comments (27) »

The letters, sent electronically Friday by Senator Charles E. Grassley, ask Wyeth and DesignWrite, a medical writing firm, to disclose payments related to the preparation of journal articles and the activities of doctors who were recruited to put their names on them for publication.

The letters are part of a continuing investigation by Mr. Grassley, a member of the Senate Finance Committee, into drug industry influence on doctors.

"Any attempt to manipulate the scientific literature, that can in turn mislead doctors to prescribe drugs that may not work and/or cause harm to their patients, is very troubling," Mr. Grassley, an Iowa Republican, wrote Friday to Wyeth's chairman and chief executive, Bernard J. Poussot.

Phone calls and e-mail messages to Wyeth and DesignWrite were not immediately returned.

Mr. Grassley's staff on the Senate Finance Committee released dozens of pages of internal corporate documents gathered from lawsuits showing the central, previously undisclosed role of Wyeth and DesignWrite in creating articles promoting hormone therapy for menopausal women as far back as 1997.

One article was published as an "Editors' Choice" feature in May 2003 in The American Journal of Obstetrics and Gynecology, more than a year after a big federal study called the Women's Health Initiative linked Wyeth's Prempro, a combination of estrogen and progestin, to breast cancer. The May 2003 article said there was "no definitive evidence" that progestins cause breast cancer and added that hormone users had a better chance of surviving cancer.

At the peak of hormone therapy, in 2001, more than 126 million prescriptions for such drugs were written for women in the United States. Sales that year, primarily by Wyeth, were $3 billion. But after the federal finding, sales of the hormone drugs plummeted.

The drugs, which contain cancer warnings on the label, are still approved to treat severe symptoms of menopause, but their use is advised at only the lowest possible doses.

The documents show company executives came up with ideas for medical journal articles, titled them, drafted outlines, paid writers to draft the manuscripts, recruited academic authors and identified publications to run the articles — all without disclosing the

**More Articles in Business »**

**News for Legal Professionals**    What's This?
FROM FINDLAW.COM

Cravath, a Top Law Firm, to Pay New Hires to Delay Start

Edward Hanrahan, Prosecutor Tied to '69 Panthers Raid, Dies at 88

Corrections

A Supreme Court Nomination Stirs Up Bad Memories

A Study in Why Major Law Firms Are Shrinking

Powered by LinkedIn®

**Breaking News Alerts by E-Mail**

Sign up to be notified when important news breaks.
gerrysch@aol.com  [Sign Up]
Change E-mail Address | Privacy Policy

**MOST POPULAR - BUSINESS**

[E-MAILED] [BLOGGED]


EXHIBIT

companies' roles to journal editors or readers.

The issue of ghostwriting for medical journals has been raised in the past, involving various companies and drugs, including the Merck painkiller Vioxx, which was withdrawn in 2004 after it was linked to heart problems, and Wyeth's diet pills, Redux and Pomdimin, withdrawn in 1997 after being linked to heart and lung problems.

But the documents Mr. Grassley released Friday provide a detailed look at the practice — from the conception of ideas for journal articles through the distribution of reprints.

The articles all involve reviews of clinical studies and other research. While such reviews are common in medical publishing, what Mr. Grassley contends happened with the Wyeth-commissioned articles is that expert authors whose names appear on the articles became involved only after outlines or drafts of the articles were already written.

When accusations of ghostwriting have cropped up in patient lawsuits over its hormone drugs, Wyeth executives to date have insisted that their publication practices were legitimate and that the listed authors played significant roles in journal articles.

But the documents released Friday include a "publication plan tracking report" by Wyeth showing 10 articles in which manuscripts were completed by the company before they were sent to the putative author for review. Any revisions were subject to final approval from the company, according to the tracking report.

Such activities would seem to run afoul of medical journal guidelines. The International Committee of Medical Journal Editors says authorship means "substantive intellectual contributions" including conception or analysis of the subject and drafting or critical revision of the document. The World Association of Medical Editors says ghost authorship — which it defines as a substantial contribution not mentioned in the manuscript — is "dishonest and unacceptable."

Congressional investigators were given the documents about a month ago by James F. Szaller, a personal injury lawyer in Cleveland who has sued drug makers. Mr. Szaller collected the documents from court filings and made reference to some in an article he wrote last year for a law magazine, Trial.

"For the last three years, I've looked at ghostwriting at Wyeth," Mr. Szaller said in a telephone interview. "There is a mammoth amount of material. The problem is that almost all of it is still under seal."

In Friday's letter, Mr. Grassley asked Wyeth to list all scientific reports prepared for the company by DesignWrite since Jan. 1, 1995, to describe the named authors' "extent of involvement" and to disclose fees paid to DesignWrite, authors and others. He also requested "all internal and external correspondence, communications and meeting minutes regarding each of the DesignWrite-prepared studies."

The letter to DesignWrite requested all manuscripts prepared for Wyeth since 1995, along with information on related payments and a description of the author's involvement.

The May 2003 article supporting Prempro was signed by Dr. John Eden, an associate professor at the University of New South Wales and director of the Sydney Menopause Center in Australia. Wyeth executives suggested that Dr. Eden write such a paper in 2000, according to the documents, and had the outline and draft manuscript written for him. The Archives of Internal Medicine rejected the paper before it was published in The American Journal of Obstetrics and Gynecology -- with no mention of Wyeth or DesignWrite connections.

Dr. Eden did not respond to an e-mail request for comment.

In another case, documents show, Dr. Lila E. Nachtigall, a New York University professor and director of its Women's Wellness Center, was recruited by Wyeth as author of a 1999 journal article extolling hormone treatment after the manuscript had already been drafted.

Dr. Nachtigall, reached by telephone Friday afternoon, said she had written all of the approximately 1,000 articles and three books she has had published. Asked about the Wyeth documents, she said, "If they came up with the idea or gave me an outline or something, I don't remember that at all." Dr. Nachtigall, who is still practicing at age 75, added: "It kind of makes me laugh that with what goes on in the Senate, the senator's worried that something's ghostwritten. I mean, give me a break."

1. Credit Bailout: Issuers Slashing Card Balances
2. Economic Scene: Health Care Rationing Rhetoric Overlooks Reality
3. Stalking a Weaker Wall Street
4. Obama Sought a Range of Views on Finance Rules
5. You're the Boss: Introducing: You're the Boss
6. Eddie Bauer Files for Bankruptcy
7. Building a Portfolio That Will Stay Afloat When Inflation Returns
8. Synthes, Medical Device Maker, Accused of Improper Marketing
9. G.M. Sells Saab to Swedish Automaker
10. Green Inc.: The Energy Potential of Chicken Droppings
Go to Complete List »



**Quiet zone with bells & whistles**
ALSO IN AUTOS »
Motorcycle news roundup
Looking to buy a used car?

nytimes.com                          AUTOS

ADVERTISEMENTS



GET STARTED ▸
**GROW YOUR BUSINESS NOW.**

Ads by Google                    what's this?
**Download Google Chrome**
Searching is fast and easy with Google's new web browser!
www.google.com/chrome

Two months before the negative findings of the federal study were released, a May 2002 memo to DesignWrite employees said that Michael S. Dey, who was president of Wyeth's Women's Healthcare Business unit, asked a committee to increase the number of positive journal articles related to another of its hormone replacement drugs, Premarin. "Mike would like us to publish at least 1 study per month," the memo said.

**Sign In to Recommend**

**More Articles in Business »**



**Follow the Seven Habits of Highly Effective Business People:**
Get home delivery of The Times every day.

---

Ads by Google                                                                what's this?

**Bioidentical Hormone MDs**
Little Rock Physicians Specializing in Natural Bioidentical Hormones.
www.BodyLogicMD.com

**Little Rock, AR Law Firm**
Medical malpractice & negligence attorneys. Free consultations
www.PeterMillerLaw.com

**Do Not Self Publish-Wait**
Literary Agency will try to sell your work. Give us 90 days!
www.whritersagency.com

---

**Past Coverage**
Amgen Reports Jump in Profit, While Glaxo and Wyeth Fell Slightly (October 23, 2008)
Drug Label, Maimed Patient And Crucial Test for Justices (September 19, 2008)
Myriad Genetics Stops Work on an Alzheimer's Drug (July 1, 2008)
U.S. Allows Sale of Drug To Treat Constipation (April 25, 2008)

**Related Searches**

| | |
|---|---|
| Wyeth | Get E-Mail Alerts |
| Drugs (Pharmaceuticals) | Get E-Mail Alerts |
| Grassley, Charles E | Get E-Mail Alerts |

---

**INSIDE NYTIMES.COM**                                                        ◀ ▶

| THEATER » | U.S. » | GREAT HOMES » | OPINION » | DINING & WINE » | OPINION » |
|---|---|---|---|---|---|
|  | **Guns and the Supreme Court** The constitutionality of existing city and state gun laws may head back to the Supreme Court for clarification. |  |  |  |  |
| A Once Boyhood Outsider Reflects on His Tribe | | What You Get For... $400,000 | Op-Ed: Iran's Hidden Revolution | Urban Farming, a Bit Closer to the Sun | Room for Debate: Power Points in Iran |

---

Home | World | U.S. | N.Y. / Region | Business | Technology | Science | Health | Sports | Opinion | Arts | Style | Travel | Jobs | Real Estate | Automobiles | Back to Top

Copyright 2008 The New York Times Company | Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map



**boston.com**

7+6|6|72|5<|+$6|%|( 1 |)250$77(' |)25|($6<|35,|7,1'

# Journal: Drug firm paid MDs for bylines

*The Boston Globe*

## Merck denies studies were ghostwritten

**By Alice Dembner, Globe Staff | April 16, 2008**

Drug maker <u>Merck</u> & Co. manipulated public opinion on its blockbuster pain pill Vioxx by paying high-profile doctors to add their names to scientific reports drafted by others, according to a prominent medical journal.

Such ghostwriting is widely practiced by drug companies as part of their marketing efforts, the Journal of the American Medical Association said today, and some of the articles downplay the risk of drugs.

"This is a very serious transgression and the medical community needs to agree that it's wrong . . . and figure out a way to discourage it," said Dr. Joseph Ross, lead author of the study on ghostwriting and an instructor at Mount Sinai School of Medicine in New York City.

Merck took Vioxx off the market in 2004, after research revealed the drug increased patients' risk of heart attacks and strokes.

The ghostwriting study found that the former chief of cardiology at Tufts Medical Center was among dozens of prominent doctors whose names appear on research reports drafted by or for Merck. Although some of those doctors, including Tufts' Dr. Marvin Konstam, may have extensively edited or rewritten the documents before publication, other studies were printed with only minimal changes from the drafts.

A Merck legal spokesman said the company sometimes uses outside companies to draft articles that summarize research on its drugs. "That's a common evolving practice in the industry," said spokesman Kent Jarrell.

"We do not consider that ghostwriting," added Jim Fitzpatrick, lead counsel in Merck's defense against numerous lawsuits over Vioxx. He said the company expects that the person recruited to sign the article "would carefully review and make sure that the paper accurately reflected his or her scientific opinion."

Konstam, who is now senior adviser to the director of the National Heart, Lung, and Blood Institute, defended his role in articles about the cardiovascular effects of Vioxx.

"I stand behind every publication of which I am an author," he said in a statement. "I had full access to the data analyzed in the publications. In addition, I have fully disclosed my relationships with Merck and other pharmaceutical or corporate entities as is appropriate and ethical."

Mount Sinai's Ross and his colleagues studied ghostwriting by Merck by using about 250 court records from suits filed against the company. Ross and his three coauthors all have served as consultants for the plaintiffs.

They found that for 16 of 20 early clinical trials on Vioxx conducted by Merck, the lead published author is an academic, although an internal document lists a Merck employee as writing a first draft.

"Putting someone as the first author is saying this is the person most responsible for the study, who did the analysis, interpreted the data, and wrote the paper," Ross said. "It gives the appearance of sound, more rigorously conducted science. It's just . . . wrong."

But a Merck official said the academic authors were "intimately involved in the studies."

The JAMA researchers also found evidence that Merck had hired companies to draft 72 scientific review articles, in one case paying a firm nearly $24,000 for a 20-page draft. Other documents show that Merck paid some doctors between $750 and $2,500 to publish the articles under their own names.

"People would get a near complete copy of the paper," Ross said. "They would make some mild edits - not changing the analysis or interpretation - and send them back."



**EXHIBIT**

tabbies

**2**

Case 4:03-cv-01507-BRW   Document 2076   Filed 06/17/09   Page 7 of 38

When published, 50 of the 72 articles named only an academic researcher as author. Only half, including Konstam's, disclosed a financial relationship between Merck and the author.

A separate study, also published today in the journal, suggests that Merck minimized Vioxx's risks in articles on clinical trials involving patients with Alzheimer's disease. Merck denies that conclusion. Since 2004, Merck has been defending itself against allegations that it withheld or downplayed troubling data on the drug.

These studies "document how one company, Merck & Co. Inc., apparently manipulated dozens of publications to promote one of its own products," writes Dr. Catherine D. DeAngelis, JAMA editor in chief. "But make no mistake - the manipulation of study results, authors, editors, and reviewers is not the sole purview of one company."

A decade-old survey of six medical journals suggested that 13 percent of research articles were ghostwritten. Other studies have reported use of ghostwriting by individual drug companies, and several doctors have written critically about the practice after being asked to put their names on papers they did not write.

The content and authorship of medical articles is important because these articles typically influence decisions by doctors on what treatments to prescribe. Pharmaceutical company representatives also use the articles in direct marketing to doctors.

"It raises questions about the integrity of the industry and academic physicians who sign their names to things they don't do," said Dr. Jerome Kassirer, a professor at Tufts University School of Medicine and a former editor of the New England Journal of Medicine.

"If the information is biased, patients may be getting the wrong medication, or medication that's harmful, or medication that they don't necessarily need," he added. "Not only should patients worry, but the pharmaceutical industry should worry because the industry is already one of the least trusted."

The practice of ghostwriting can serve the financial interests of both doctors and drug companies. In addition to honorarium for assuming authorship, the doctors can accumulate publications that may be used to judge their professional success.

For drug companies, the prominent doctor's name on a paper may help get the article published in a more prestigious journal and may lead other doctors to pay more attention to the contents.

To guard against the problem, many medical journals have adopted policies defining authorship as making a substantial contribution to the content. Merck adopted similar guidelines in 2003.

In her editorial in JAMA, DeAngelis suggested additional steps, including disciplining doctors who claim work that isn't theirs and banning them from publishing future work. She also said journals should require an independent statistical analysis of clinical data, as JAMA already does.

*Alice Dembner can be reached at Dembner@globe.com.* ■

I I& RS\ LU KW I I I I7KH1 HZ I<RUN7LP HM& RP SDQ
I

■ SPECIAL COMMUNICATION

# Guest Authorship and Ghostwriting in Publications Related to Rofecoxib
## A Case Study of Industry Documents From Rofecoxib Litigation

Joseph S. Ross, MD, MHS

Kevin P. Hill, MD, MHS

David S. Egilman, MD, MPH

Harlan M. Krumholz, MD, SM

AUTHORSHIP IN BIOMEDICAL publication provides recognition while establishing accountability and responsibility. Guest authorship has been defined as the designation of an individual who does not meet authorship criteria as an author.[1,2] It was identified in 16% of research articles, 26% of review articles, and 21% of editorials in a survey of 6 peer-reviewed medical journals,[3] in addition to 41% of Cochrane reviews.[4] Ghostwriting has been defined as the failure to designate an individual (as an author) who has made a substantial contribution to the research or writing of a manuscript.[1] Ghostwriting was demonstrated in 13% of research articles, 10% of review articles, 6% of editorials, and 11% of Cochrane reviews[3,4]; other research has found similar rates.[5]

Two studies have characterized the practices of guest authorship and ghostwriting using industry documents, one examining practices related to gabapentin by Pfizer Inc and Parke-Davis, Division of Warner-Lambert Company,[6] the other sertraline by Pfizer Inc.[7] However, these studies were focused on how the research and publication strat-

**See also pp 1813 and 1833.**

**Context** Authorship in biomedical publication provides recognition and establishes accountability and responsibility. Recent litigation related to rofecoxib provided a unique opportunity to examine guest authorship and ghostwriting, practices that have been suspected in biomedical publication but for which there is little documentation.

**Objective** To characterize different types and the extent of guest authorship and ghostwriting in 1 case study.

**Data Sources** Court documents originally obtained during litigation related to rofecoxib against Merck & Co Inc. Documents were created predominantly between 1996 and 2004. In addition, publicly available articles related to rofecoxib identified via MEDLINE.

**Data Extraction** All documents were reviewed by one author, with selected review by coauthors, using an iterative process of review, discussion, and rereview of documents to identify information related to guest authorship or ghostwriting.

**Data Synthesis** Approximately 250 documents were relevant to our review. For the publication of clinical trials, documents were found describing Merck employees working either independently or in collaboration with medical publishing companies to prepare manuscripts and subsequently recruiting external, academically affiliated investigators to be authors. Recruited authors were frequently placed in the first and second positions of the authorship list. For the publication of scientific review papers, documents were found describing Merck marketing employees developing plans for manuscripts, contracting with medical publishing companies to ghostwrite manuscripts, and recruiting external, academically affiliated investigators to be authors. Recruited authors were commonly the sole author on the manuscript and offered honoraria for their participation. Among 96 relevant published articles, we found that 92% (22 of 24) of clinical trial articles published a disclosure of Merck's financial support, but only 50% (36 of 72) of review articles published either a disclosure of Merck sponsorship or a disclosure of whether the author had received any financial compensation from the company.

**Conclusions** This case-study review of industry documents demonstrates that clinical trial manuscripts related to rofecoxib were authored by sponsor employees but often attributed first authorship to academically affiliated investigators who did not always disclose industry financial support. Review manuscripts were often prepared by unacknowledged authors and subsequently attributed authorship to academically affiliated investigators who often did not disclose industry financial support.

*JAMA. 2008;299(15):1800-1812*                                    www.jama.com

**Author Affiliations:** Department of Geriatrics and Adult Development, Mount Sinai School of Medicine, New York, New York (Dr Ross); Department of Psychiatry, Harvard Medical School, Boston, Massachusetts, and McLean Hospital, Belmont, Massachusetts (Dr Hill); Department of Community Health, Brown University School of Medicine, Providence, Rhode Island (Dr Egilman); and Robert Wood Johnson Clinical Scholars Program and Section of Cardiovascular Medicine, Department of Medicine, Section of Health Policy and Administration, School of Public Health, Yale University School of Medicine, and Center for Outcomes Research and Evaluation, Yale-New Haven Hospital, New Haven, Connecticut (Dr Krumholz). **Corresponding Author:** Joseph S. Ross, MD, MHS, Mount Sinai School of Medicine, 1 Gustave L. Levy Pl, Box 1070, New York, NY 10029 (joseph.ross@mssm.edu).

   ©2008 American Medical Association. All rights reserved.



egy of the companies was used to promote and market the products. No studies have used internal documents to characterize the role of authorship in collaborations between industry and the medical profession.

Recent litigation against Merck & Co Inc related to rofecoxib provided a unique opportunity to examine the practice of guest authorship and ghostwriting related to the research and promotion of this medication. Our objective was to provide a review using a case-study exploration of court documents, in tandem with a review of the medical literature, to describe the practice of guest authorship and ghostwriting related to rofecoxib.

Documents used for this article are posted at http://dida.library.ucsf.edu.

## METHODS

In the course of the combined trials of *Cona vs Merck and Co, Inc* (No. ATL-L-3553-05, New Jersey Superior Court, Atlantic City) and *McDarby vs Merck and Co, Inc* (No. ATL-L-1296-05, New Jersey Superior Court, Atlantic City), millions of documents were made available to and archived in an integrated database maintained by the plaintiff's attorneys. These documents were created between 1996 and 2004 and included Merck internal and external correspondence, reports, and presentations. As consultants to attorneys on the behalf of plaintiffs, we had complete access to all archived documents. One investigator (J.S.R.) searched the database to extract a subset of documents related to authorship (FIGURE 1). The search was performed using the database keyword search function and included the following search terms: *clinical trial, author, authorship, review, manuscript,* and *publication,* along with terms encompassing the names of Merck scientists, the names of academically affiliated authors of clinical trials, the names and numbers of clinical trials, the names of medical publishing companies, and the names of journals. The search identified approximately 20 000 documents that included 1 or more of the keyword terms. Document numbers are an



**Figure 1.** Document and Manuscript Identification Flowchart

See the "Methods" section for detailed descriptions of the search terms and the number of documents searched and for the definition of "related to or discussed authorship."
[a] Identification of these manuscripts does not imply that each was guest authored or ghostwritten; we examined these manuscripts because we believed their discussion within internal documents (or the discussion of specific authors) suggested that Merck was aware of the publication and perhaps had provided support for the project.

approximation because information within one document may overlap with another, making it difficult to determine the exact number of distinct documents. For example, 1 document may include a string of 2 e-mails, whereas another document may include a string of 5 e-mails, including the prior 2.

One investigator (J.S.R.) searched the documents identified using the authorship keywords to determine if each was actually related to or discussed authorship, examining the document titles and the content within the database. "Related to or discussed authorship" refers specifically to examination for authorship of manuscripts describing nonpharmacological, human participant clinical trial results or scientific reviews (or journal supplements) that included an external, academically affiliated (non-Merck employee) author. Approximately 250 documents were identified, the majority of which were Merck internal correspondence and publication reports, along with ex-

ternal correspondence between Merck and medical publishing companies.

Two investigators (J.S.R. and K.P.H.) reviewed these 250 documents using the principles of grounded theory, an inductive approach in which source material was used to generate ideas rather than to test a preestablished hypothesis.[8] This method has been applied to study issues at the intersection of litigation and health, particularly with tobacco,[9,10] and more recently with pharmaceutical[6] products. We first reviewed the documents to identify broad themes reflecting the practice of ghostwriting and guest authorship. Next, pertinent documents were reviewed again by all of the authors, using a negotiated consensus process to reach our final interpretation. This process ultimately generated a single agreed-upon set of themes, as well as documents and quotations to illustrate each theme.

After determining themes, 2 investigators (J.S.R. and K.P.H.) again reviewed these 250 documents to iden-

©2008 American Medical Association. All rights reserved.

tify articles describing clinical trial results or scientific reviews (including journal supplements) discussed internally within Merck prior to publication that proposed an external, academically affiliated investigator as an author. No documents were excluded as part of this search; all documents were related to 1 or more of the identified manuscripts (most manuscripts were discussed within >1 document). The published articles were subsequently identified via MEDLINE. This search was supplemented with MEDLINE queries for other rofecoxib-related articles authored by academically affiliated investigators identified as first authors within documents, which were found by searching for the author's name and "rofecoxib" or "cyclooxygenase inhibitor." This search identified 96 published articles. Importantly, identification of these articles does not imply that each was guest authored or ghostwritten; we examined these articles because we believed their discussion within internal documents (or the discussion of specific authors) suggested that Merck was aware of the manuscript prior to publication and perhaps had provided support for the project.

All published articles were categorized as to whether a manuscript's co-author was affiliated with Merck (ie, a Merck employee), whether the published article included any financial disclosure, whether the published article included a financial disclosure of Merck support, and whether the published article included a financial disclosure of Merck support by at least 1 of the academic authors. For articles in which there was neither a published disclosure of Merck financial support nor a published disclosure of Merck financial support by 1 of the academic authors, other articles by the academic authors published within 2 years of the relevant article were examined to determine if they had disclosed Merck financial support.

This research was deemed exempt from normal review by the Yale University Human Investigation Committee.

## RESULTS

Review of internal documents and the published literature revealed 3 key findings related to guest authorship and ghostwriting: the first focused on the publication of clinical trials, the second focused on the publication of review papers, and the last was related to financial support disclosures.

### Clinical Trial Manuscripts

When publishing their own clinical trials (designed, conducted, and sponsored by Merck), documents were found describing Merck scientists often working to prepare manuscripts and subsequently recruiting external, academically affiliated investigators to collaborate on the manuscript as guest authors. For instance, trial 078 (a randomized, double-blind study to investigate whether rofecoxib could delay the onset of Alzheimer disease in patients with mild cognitive impairment) was designed and conducted principally by scientists at Merck. FIGURE 2 shows the title and author list both from draft[11] and published[12] versions of the manuscript describing the trial. Both the title and the authorship were modified to attribute authorship to 3 academically affiliated investigators (first, second, and third authors) on the published article, in addition to the 8 Merck scientists who are attributed authorship on both the draft and published versions of the manuscript (1 Merck scientist is attributed authorship on the draft but not the final manuscript). Of note, only 1 of the 3 academically affiliated investigators who are attributed authorship on the published article was acknowledged in the draft version as a participating investigator in the rofecoxib 078 study group. In an internal e-mail discussing where to publish trial 078 as the draft is circulated, one of the Merck scientists states, "I think you should be the first author since you have done virtually all of the writing."[13] Although there are minor differences in language and organization between the draft and final versions of the manuscript (particularly in the abstract, as opposed to the text), the results presented are almost identical,

reinforcing that the trial itself and the analyses were complete before the academically affiliated investigators were involved in the manuscript.

This same pattern occurred for the manuscript describing the Merck protocol 901 studies, which compared the efficacy of rofecoxib and naproxen in Asian and European populations. An e-mail written on behalf of members of Merck's publication committee to a Merck scientist states that the European study had been prepared as a manuscript and that a draft was shared with the European authors, in addition to describing 2 Merck employees who will prepare the manuscript describing the Asian study.[14] However, the final publication describes both trials in a single article and lists neither of them as authors.[15]

Documents were found describing other examples of Merck recruiting external, academically affiliated investigators to collaborate as guest authors on manuscripts prepared by Merck scientists. The first author of the Assessment of Differences Between Vioxx and Naproxen to Ascertain Gastrointestinal Tolerability and Effectiveness (ADVANTAGE) study[16] described to a New York Times reporter in 2005, "Merck designed the trial, paid for the trial, ran the trial . . . Merck came to me after the study was completed and said, 'We want your help to work on the paper.' The initial paper was written at Merck, and then was sent to me for editing."[17] The academically affiliated authors of the Vioxx GI Outcomes Research (VIGOR) study,[18] in response to an expression of concern by the New England Journal of Medicine,[19] make a point of asserting that no Merck employee or representative was involved in the drafting of their response, but do not discuss who drafted the manuscript and with respect to cardiovascular events allude to not developing the analysis plan, not having access to the data, and not performing the analyses.[20] Merck's performance of the analyses was confirmed by the Merck-affiliated authors.[21]

A Merck publications status report identifies several of the early clinical

   ©2008 American Medical Association. All rights reserved.

trials conducted by the company that were eventually published for which data were available (or would soon be available), including Merck protocols 010, 029, 033, 034, 035, 040, 041, 044, 045, 050, 058, 068, 072, 085, 088 (VIGOR), 090, 097, 098, 102 (ADVANTAGE), 103, 120, 121, 901, and 902.[22] For each of these study protocols, a Merck employee is designated within the report as the author of the first draft of the manuscript. Examining the published articles, the first author is an external, academically affiliated investigator for 16 of 20 articles (some protocols were combined into single articles),[15,16,18,23-35] with the exception of protocols 010, 029, 058, and 072,[36-39] 3 of which had external, academically affiliated investigators

listed as authors, but not in the first authorship position. Among these 16 articles, all had 2 or more external, academically affiliated investigators who were attributed authorship (median, 4.5; range, 2-10) and these authors occupied 77% of the first, second, and third authorship positions (37 of 48). Of note, the Merck employee designated to be first author in the Merck publications status report is attributed authorship in 14 of these 16 articles (88%), most often as the final author.

Not all manuscripts were prepared independently by Merck before inviting an academically affiliated author; documents also were found describing Merck contracting with medical publishing companies to have manu-

scripts prepared. For instance, FIGURE 3 displays a letter from representatives of Scientific Therapeutics Information to Merck employees presenting the completed draft of a contracted manuscript for rofecoxib protocol 116.[40] Scientific Therapeutics Information describes itself on its Web site as "a full-service medical publishing group specializing in the development of scientific literature and other resource media with direct application to clinical therapeutics that has been serving members of the pharmaceutical industry and medical associations since 1985."[41]

**Review Papers**

Documents were found describing Merck employees contracting with medical publishing companies to ghost-

---

**Figure 2.** Draft Version and Final Version of Article Describing the Results of Protocol 078

Rofecoxib does not delay the onset of Alzheimer's disease: results from a

randomized, double-blind, placebo-controlled study

External author?, W.H. Visser[1], E. Yuen[1], C. Assaid[1], M.L. Nessly[1], B.A. Norman[1], C.C.

Baranak[1], C.R. Lines[1], S.A. Reines[1], G.A. Block[1] on behalf of the Rofecoxib Protocol

078 study group

---

# A Randomized, Double-Blind, Study of Rofecoxib in Patients with Mild Cognitive Impairment

**Leon J Thal[1], Steven H Ferris[2], Louis Kirby[3], Gilbert A Block[4], Christopher R Lines\*[4], Eric Yuen[4], Christopher Assaid[4], Michael L Nessly[4], Barbara A Norman[4], Christine C Baranak[4] and Scott A Reines[4], on behalf of the Rofecoxib Protocol 078 study group[5]**

[1]University of California, San Diego, CA, USA; [2]New York University School of Medicine, New York, NY, USA; [3]Pivotal Research Centers, Peoria, AZ, USA; [4]Merck Research Laboratories, West Point, PA, USA

---

©2008 American Medical Association. All rights reserved.

GUEST AUTHORSHIP AND GHOSTWRITING IN ARTICLES ON ROFECOXIB

write review manuscripts focused on rofecoxib and subsequently recruiting external, academically affiliated investigators to be guest authors. For example, FIGURE 4 displays an e-mail from representatives of Scientific Therapeutics Information to Merck employees providing an update on the development and estimated delivery dates for

---

**Figure 3.** October 2000 Letter From Representatives of Scientific Therapeutics Information Inc (Grace E. Johnson, Una Kistner, John Romankiewicz) to Merck & Co Inc (Deborah Matzura-Wolfe, Greg Geba) Discussing the Completion of the First Draft of a Contracted Manuscript Related to Rofecoxib




SCIENTIFIC THERAPEUTICS
INFORMATION, INC

505 Morris Avenue
Springfield, New Jersey
07081

(973) 376-3835 telephone
(973) 376-0611 fax 1
(973) 376-3567 fax 2

http://www.semedinfo.com
E-mail: staff@semedinfo.com

October 9, 2000

Deborah Matzura-Wolfe
Medical Program Coordinator
Clinical Development
Merck US Human Health
PO Box 4, HM-202
West Point, PA  19486

RE:   VIOXX C-1 MANUSCRIPT (PROTOCOL 116)

Dear Deborah:

We are pleased to enclose Draft I of the "A Randomized, Placebo-Controlled, Parallel-Group, Double-Blind Study to Evaluate the Safety and Efficacy of Rofecoxib 25 mg and Celecoxib 200 mg in Patients with Osteoarthritis of the Knee or Hip" manuscript to be submitted to *JAMA Express*.

Please feel free to mark your revisions directly on the hard copy provided.

We look forward to receiving your comments by **October 23, 2000**. If you have any questions during your review, do not hesitate to contact me at (970) 204-4446.

Sincerely,

*Grace Johnson*

Grace E. Johnson, PharmD
Senior Editor

encl

cc:   J Romankiewicz, U Kistner, G Geba (MER), .1617

STI0023352

---

     ©2008 American Medical Association. All rights reserved.

8 manuscripts related to rofecoxib that the company was preparing, including intended titles, authors, and journals.[42] Review articles were identified by 7 of the 8 investigators listed in Figure 4, several with titles nearly exactly as proposed.[43-49] In addition, FIGURE 5 displays a contract for Health Science Communications Inc to provide a 20-page review manuscript with 6 figures or tables intended for a cardiology audience for Merck at a cost of $23 841.00.[50] Contracts also were identified between these 2 parties to provide review manuscripts intended for nephrology and primary care audiences,[51,52] as well as for other medical specialties. Health Science Communications Inc describes itself on its Web site as "a full-service health mar-

keting communications company committed to the highest quality of service . . . We're there pre-launch, preparing the market for a product's introduction. At launch, we establish the foundation for product uptake."[53]

Documents were found demonstrating that medical publishing companies provided near complete drafts of review manuscripts to authors for editing, in addition to managing submissions and revisions. For instance, in preparing one manuscript, representatives from Scientific Therapeutics Information indicate in a publications status report that the first draft was sent to Merck and the company was awaiting comments, but an author needed to be invited.[54] In another e-mail that discusses an article with which the com-

pany was involved, a Scientific Therapeutics Information representative states:

"The .1439 journal article that was submitted to Pharmacotherapy by Dr. William Garnett has been accepted (I believe) with revisions. He has faxed me only the reviewers' comments, but is mailing me the entire packet that they sent to him. He would like us to make the revisions, as he is too busy at the moment to make them himself. According to the proposal (Doc # 66468) there is no mention of whether revisions are included, or can be done for an additional fee."[55]

Documents also were found demonstrating that medical publishing companies played critical roles in overseeing the development, organization, and manuscript drafting of supplemental issues focused on rofecoxib for journals.[46,49,56-75]

**Figure 4.** October 1999 E-mail Between Representatives of Scientific Therapeutics Information Inc and Merck & Co Inc Discussing Contracted Publications Related to Rofecoxib



Review articles were identified by 7 of 8 investigators listed above, several with titles nearly exactly as proposed. Intended author names have been blacked out because articles were not identified by all named investigators.

©2008 American Medical Association. All rights reserved.

GUEST AUTHORSHIP AND GHOSTWRITING IN ARTICLES ON ROFECOXIB

**Figure 5.** Health Science Communications Inc Contract to Provide One 20-Page Review Manuscript With 6 Figures or Tables Intended for a Cardiology Audience for Merck & Co Inc at a Cost of $23 841.00



financial relationship between Merck and an academic author of the review article, and 1 (1%) published a disclosure that the author had no financial relationship with Merck. However, for 15 of the 35 review articles (43%) that published a disclosure of Merck support, the disclosure was provided either as part of an introductory editorial describing the supplement's contents or on a separate "disclosure" page; a disclosure statement was not identified when any of the articles were individually accessed electronically [accessed by the authors on February 27, 2008].

Among the 36 of 72 review articles (50%) in which there was no published disclosure of Merck support or a financial relationship between Merck and the academic author, 24 of 36 articles (67%) were authored by at least 1 investigator who published a disclosure of a financial relationship between himself/herself and Merck within another article published within 2 years of the review article. Moreover, several others were authors of clinical trials sponsored by Merck, although no disclosure of a financial relationship between himself/herself and Merck was published. In addition, while none of the review articles from one journal's supplement disclosed financial relationships between Merck and the non-Merck employee authors of the review article, communication between representatives from Scientific Therapeutics Information describes an honorarium offered to the authors in payment for their service.[128]

## COMMENT

This case-study review of industry documents related to rofecoxib demonstrates that Merck used a systematic strategy to facilitate the publication of guest authored and ghost written medical literature. Articles related to rofecoxib were frequently authored by Merck employees but attributed first authorship to external, academically affiliated investigators who did not always disclose financial support from Merck, although financial support of the study was nearly always provided.

Documents were found describing Merck compensating investigators with honoraria for agreeing to serve as authors on review manuscripts ghostwritten on their behalf by medical publishing companies. Honoraria varied, ranging from $750 to $2500. One author refused his honorarium from Scientific Therapeutics Information stating, "I really do not feel it is appropriate to be paid for this type of effort."[76]

### Financial Support Disclosure

There were 96 relevant published articles including 24 clinical trials and 72 reviews (TABLE). Of the 24 clinical trials, 22 (92%) published a disclosure of Merck's financial support. Of the 72 reviews (38 of which published any financial disclosures, and 34 of which either did not require or did not publish financial disclosures), 36 (50%) published either a disclosure of Merck sponsorship or a disclosure of whether the author had received any

financial compensation from the company.

Among 24 nonpharmacological, human participant clinical articles, all 24 included at least one coauthor who was a Merck employee. Nearly all (n=22) published a disclosure that the trial was supported by Merck, including 7 that also published a disclosure of a financial relationship between Merck and an academic author of the article. No financial disclosure was published for the academic authors of the remaining 17 articles, which may indicate that they did not receive or that they did not disclose receiving financial compensation.

Among 72 scientific review articles, 50 (69%) were solo-authored by an academic physician and 2 (3%) included at least 1 coauthor who was a Merck employee. Of these 72, 21 (29%) published a disclosure that the review was supported by Merck, usually through an unrestricted educational grant, 14 (19%) published a disclosure of a

©2008 American Medical Association. All rights reserved.

GUEST AUTHORSHIP AND GHOSTWRITING IN ARTICLES ON ROFECOXIB

**Table.** Published Financial Disclosures Among Articles Describing Clinical Trial Results or Scientific Reviews (Including Journal Supplements) Discussed Internally Within Merck Prior to Publication That Proposed an External, Academically Affiliated Investigator as an Author[a]

| Type of Article and Reference No. | Coauthor Affiliated With Merck (ie, Employee) | Financial Disclosure | | Academic Author(s) Disclosed Financial Support From Merck | | Where Trial or Review Identified |
|---|---|---|---|---|---|---|
| | | Any[b] | From Merck[c] | Current Article | Another Article | |
| **Published in 1999** | | | | | | |
| Review[77] | No | No | NA | NA | No | Correspondence[d] |
| Trial[37] | Yes | Yes | Yes | No | Yes[18,78] | Merck publication status report[e] |
| Review[79] | No | Yes | No | Yes | NR | Merck publication status report[e] |
| Trial[23] | Yes | Yes | Yes | No | Yes[18,78] | Merck publication status report[e] |
| **Published in 2000** | | | | | | |
| Trial[18] | Yes | Yes | Yes | Yes | NR | Merck publication status report[e] |
| Trial[33] | Yes | Yes | Yes | No | No | Merck publication status report[e] |
| Review[80] | No | No | NA | NA | No | Correspondence[d] |
| Review[81] | No | No | NA | NA | No | Correspondence[d] |
| Trial[32] | Yes | Yes | Yes | No | Yes[18] | Merck publication status report[e] |
| Review[82] | No | No | NA | NA | Yes[18,79] | Merck publication status report[e] |
| Review[83] | No | Yes | No | No | No | Merck publication status report[e] |
| Trial[31] | Yes | No | NA | NA | Yes[18,79] | Merck publication status report[e] |
| Trial[27] | Yes | Yes | Yes | No | No | Merck publication status report[e] |
| Trial[29] | Yes | Yes | Yes | Yes | NR | Merck publication status report[e] |
| Trial[35] | Yes | Yes | Yes | No | No | Merck publication status report[e] |
| Trial[84] | Yes | Yes | Yes | Yes | NR | Correspondence[d] |
| **Published in 2001** | | | | | | |
| Review[85] | No | No | NA | NA | Yes[18,78] | Merck publication status report[e] |
| Review[96] | Yes | No | NA | NA | Yes[84] | Correspondence[d] |
| Review[87] | No | Yes | No | No | No | Correspondence[d] |
| Review[87] | No | Yes[f] | Yes[f] | No | No | Correspondence[d] |
| Review[68] | No | Yes[f] | Yes[f] | No | No | Correspondence[d] |
| Review[49] | No | Yes[f] | Yes[f] | No | No | Correspondence[d] |
| Review[88] | No | No | NA | NA | Yes[18] | Merck publication status report[e] |
| Trial[96] | Yes | Yes | Yes | All authors employed by Merck[g] | All authors employed by Merck[g] | Merck publication status report[e] |
| Review[99] | No | Yes | No | Yes | NR | Correspondence[d] |
| Review[44] | No | No | NA | NA | No | Merck publication status report[e] |
| Review[47] | No | No | NA | NA | No | Merck publication status report[e] |
| Review[90] | No | No | NA | NA | No | Correspondence[d] |
| Review[91] | No | No | NA | NA | Yes[84] | Correspondence[d] |
| Review[92] | No | Yes | No | No | No | Correspondence[d] |
| Trial[90] | Yes | Yes | Yes | Yes | NR | Merck publication status report[e] |
| Review[93] | Yes | No | NA | NA | Yes[18,79] | Merck publication status report[e] |
| Review[94] | No | No | NA | NA | Yes[18,79] | Merck publication status report[e] |
| Review[95] | No | No | NA | NA | Yes[18,79] | Merck publication status report[e] |
| Review[96] | No | No | NA | NA | Yes[18,79] | Merck publication status report[e] |
| Review[70] | No | Yes[f] | Yes[f] | No | No | Correspondence[d] |
| Review[97] | No | No | NA | NA | Yes[18,65] | Merck publication status report[e] |
| Review[71] | No | Yes | Yes | No | No | Correspondence[d] |
| Review[98] | No | No | NA | NA | Yes[89] | Correspondence[d] |
| Review[72] | No | Yes[f] | Yes[f] | No | Yes[84] | Correspondence[d] |
| Review[73] | No | Yes[f] | Yes[f] | No | No | Correspondence[d] |
| Trial[99] | Yes | Yes | Yes | No | No | Merck publication status report[e] |
| Review[99] | No | No | NA | NA | Yes[18,78] | Merck publication status report[e] |
| Review[48] | No | No | NA | NA | Yes[18,78] | Merck publication status report[e] |
| Review[74] | No | Yes[f] | Yes[f] | No | Yes[18,65] | Correspondence[d] |

(continued)

©2008 American Medical Association. All rights reserved.

GUEST AUTHORSHIP AND GHOSTWRITING IN ARTICLES ON ROFECOXIB

**Table.** Published Financial Disclosures Among Articles Describing Clinical Trial Results or Scientific Reviews (Including Journal Supplements) Discussed Internally Within Merck Prior to Publication That Proposed an External, Academically Affiliated Investigator as an Author[a] (cont)

| Type of Article and Reference No. | Coauthor Affiliated With Merck (ie, Employee) | Financial Disclosure | | Academic Author(s) Disclosed Financial Support From Merck | | Where Trial or Review Identified |
|---|---|---|---|---|---|---|
| | | Any[b] | From Merck[c] | Current Article | Another Article | |
| **Published in 2001** | | | | | | |
| Trial[38] | Yes | Yes | Yes | No | No | Merck publication status report[e] |
| Review[45] | No | Yes | Yes | No | Yes[78] | Merck publication status report[e] |
| Review[75] | No | Yes[f] | Yes[f] | No | No | Correspondence[d] |
| Trial[100] | Yes | Yes | Yes | No | Yes[18,79] | Merck publication status report[e] |
| **Published in 2002** | | | | | | |
| Review[101] | No | No | NA | NA | Yes[102] | Correspondence[d] |
| Review[57] | No | Yes | No | Yes | NR | Correspondence[d] |
| Review[103] | No | Yes | Yes | No | Yes[18] | Merck publication status report[e] |
| Review[104] | No | No | NA | NA | Yes[84] | Correspondence[d] |
| Review[105] | No | Yes | Yes | No | Yes[84] | Correspondence[d] |
| Review[58] | No | Yes | No | Yes | NR | Correspondence[d] |
| Review[59] | No | Yes | No | Yes | NR | Correspondence[d] |
| Review[49] | No | Yes[f] | No | Yes[f] | NR | Merck publication status report[e] |
| Review[106] | No | No | NA | NA | No | Merck publication status report[e] |
| Trial[78] | Yes | Yes | Yes | Yes | NR | Correspondence[d] |
| Trial[28] | Yes | Yes | Yes | No | No | Merck publication status report[e] |
| Review[107] | No | No | NA | NA | No | Correspondence[d] |
| Review[108] | No | No | NA | NA | Yes[18,79] | Merck publication status report[e] |
| Review[48] | No | Yes[f] | No | Yes[f] | NR | Merck publication status report[e] |
| Review[109] | No | Yes | Yes | No | Yes[18,65] | Merck publication status report[e] |
| Review[60] | No | Yes | No | Yes | NR | Correspondence[d] |
| Review[110] | No | No | NA | NA | Yes[60] | Correspondence[d] |
| Review[111] | No | Yes | Yes | No | Yes[34] | Merck publication status report[e] |
| Review[112] | No | No | NA | NA | Yes[34] | Merck publication status report[e] |
| Review[61] | No | Yes | No | Yes | NR | Correspondence[d] |
| Review[113] | No | Yes | Yes | No | Yes[18] | Correspondence[d] |
| Review[114] | No | No | NA | NA | Yes[18] | Correspondence[d] |
| Review[62] | No | Yes | No | Yes | NR | Correspondence[d] |
| Trial[15] | Yes | Yes | Yes | No | No | Merck publication status report[e] |
| Review[63] | No | Yes | No | Yes[h] | No | Correspondence[d] |
| Review[115] | No | No | NA | NA | No | Correspondence[d] |
| Review[116] | No | Yes | Yes | No | Yes[117] | Merck publication status report[e] |
| Review[64] | No | Yes | No | Yes | NR | Correspondence[d] |
| Review[66] | No | Yes[f] | No | Yes[f] | NR | Correspondence[d] |
| Review[118] | No | No | NA | NA | Yes[18,78] | Correspondence[d] |
| Review[65] | No | Yes | No | Yes | NR | Correspondence[d] |
| Review[96] | No | Yes | No | Yes | NR | Correspondence[d] |
| **Published in 2003** | | | | | | |
| Review[119] | No | No | NA | NA | No | Correspondence[d] |
| Review[120] | No | Yes[f] | Yes[f] | No | Yes[66] | Correspondence[d] |
| Review[43] | No | No | NA | NA | No | Merck publication status report[e] |
| Review[121] | No | No | NA | NA | No | Merck publication status report[e] |
| Trial[28] | Yes | No | NA | NA | Yes[18,79] | Merck publication status report[e] |
| Trial[94] | Yes | Yes | Yes | Yes | NR | Correspondence[d] |
| Review[122] | No | Yes[f] | Yes[f] | No | Yes[78] | Correspondence[d] |
| Review[123] | No | Yes[f] | Yes[f] | No | Yes[18] | Correspondence[d] |
| Trial[16] | Yes | Yes | Yes | Yes | NR | Merck publication status report[e] |
| Review[124] | No | Yes[f] | Yes[f] | No | Yes[62,117] | Correspondence[d] |
| Review[125] | No | No | NA | NA | Yes[94] | Correspondence[d] |

*(continued)*

 ©2008 American Medical Association. All rights reserved.

**Table.** Published Financial Disclosures Among Articles Describing Clinical Trial Results or Scientific Reviews (Including Journal Supplements) Discussed Internally Within Merck Prior to Publication That Proposed an External, Academically Affiliated Investigator as an Author[a] (cont)

| Type of Article and Reference No. | Coauthor Affiliated With Merck (ie, Employee) | Financial Disclosure | | Academic Author(s) Disclosed Financial Support From Merck | | Where Trial or Review Identified |
|---|---|---|---|---|---|---|
| | | Any[b] | From Merck[c] | Current Article | Another Article | |
| | | | Published in 2004 or Later | | | |
| Trial[24] | Yes | Yes | Yes | No | No | Merck publication status report[e] |
| Review[126] | No | No | NA | NA | No | Merck publication status report[e] |
| Trial[127] | Yes | Yes | Yes | No | Yes[18,78] | Correspondence[d] |
| Trial[25] | Yes | Yes | Yes | No | Yes[18,78] | Merck publication status report[g] |

Abbreviations: NA, not applicable, no disclosure was published; NR, not relevant, if a disclosure of the academic author's financial support from Merck was published within the article, it was not relevant whether there was a published disclosure of financial support from Merck of the author within a different, recently published article.

[a] The sample was supplemented with MEDLINE queries for rofecoxib-related articles authored by academic investigators named within internal documents. Identification of these articles does not imply that each was guest authored or ghostwritten. We examined these articles because we believed that their discussion within internal documents (or the discussion of specific authors) suggested that Merck was aware of the manuscript and perhaps had provided support for the project.

[b] No may indicate that the journal did not require or did not publish financial disclosures.

[c] No may indicate that the academic authors did not receive financial compensation or that the academic author did not disclose receiving financial compensation.

[d] Indicates either named within correspondence between Merck and a medical publishing company or written by an external, academically affiliated investigator named within the correspondence.

[e] Indicates either named within a rofecoxib publication status report or written by an external, academically affiliated investigator named within the publication status report.

[f] Financial disclosure provided in the journal's supplement overview or introduction, not in the individual article.

[g] An external, academically affiliated author was identified within internal documents but was not attributed authorship within published article.

[h] Disclosed that there was no financial relationship between Merck and the author.

Similarly, review articles related to rofecoxib were frequently prepared by unacknowledged authors employed by medical publishing companies and attributed authorship to investigators who often did not disclose financial support from Merck.

The limited nature of our source material for this case-study review prevented an exact determination of the contributions of recruited authors to the overall design and conduct of the clinical trial and/or the preparation of manuscripts. Although we reviewed in excess of 20 000 documents produced during the consolidated rofecoxib litigation, we were frequently unable to identify versions of manuscript drafts dated before and after external, academically affiliated authors had been recruited. In addition, we cannot exclude contributions by authors made by telephone or in person that would not be identified by reviewing documents obtained through litigation. However, the instances for which we did identify before and after manuscript drafts, such as for protocol 078, we found scant documentary evidence that the recruited authors were involved in the design or conduct of the study or made substantive contributions to the manuscript beyond minor editing. Participating only in minor editing does not

meet authorship criteria of the International Committee of Medical Journal Editors (ICMJE).[129] In addition, we could not determine how often ghostwriting and guest authorship actually occurred, whether the contracted manuscript drafts from medical publishing companies were used, or if the proposed payments (honoraria) were provided. Nevertheless, although we cannot conclude that each of the external, academically affiliated investigators attributed authorship for their respective trial or review article made no substantive contributions to the study design or manuscript preparation, the authorship pattern observed within these documents suggests there was a widespread practice of inappropriately attributing authorship to academic authors and a failure to disclose relevant financial relationships.

Several issues should be considered in evaluating this study. Although every effort was made to present this information objectively and fairly, it is important to note that all of the authors of this article have been compensated for their work as consultants/expert witnesses at the request of plaintiffs in litigation against Merck related to rofecoxib. In addition, relevant documents may not have been identified in our review, despite our use of a sys-

tematic method with a comprehensive and exhaustive search strategy to minimize missed documents. However, we believe that while our review may not be sensitive, it was specific. We do not think that we missed documents that would negate the totality of our findings.

Finally, this case-study review is based on documents from a single company related to a single medication. We cannot determine if the authorship pattern we observed for clinical trial and review articles related to rofecoxib also would be observed in articles describing other Merck products or the products of other pharmaceutical companies. However, given the reported prevalence of guest authorship and ghostwriting among the most prestigious medical journals[3-5] and that similar authorship patterns were identified using documents produced during litigation surrounding both gabapentin and sertraline,[6,7] it is reasonable to expect that the authorship practices observed in this case study may be used by other pharmaceutical companies as well. A recent press account seems to confirm as much,[130] as does the presence of an industry specializing in medical writing.[41,53] Because Merck has traditionally characterized itself and its conduct as among the most ethically ap-

©2008 American Medical Association. All rights reserved.

propriate of pharmaceutical companies,[131] perhaps the practices we observed are conservative in comparison with other companies within the industry. Nevertheless, access to industry documents through litigation presents a rare opportunity to explore the relationship between the medical profession and the pharmaceutical industry and has provided valuable insights and findings in the past.[132]

The medical profession must determine how to interpret and respond to these examples of guest authorship and ghostwriting, conduct that the World Association of Medical Editors has described as dishonest and unacceptable[133] and that erodes the ethical foundation of medicine and medical research.[134] Our case-study review suggests that the practice of inappropriately attributing authorship was common. However, we cannot be certain of the specific actions of individuals, both by those active in academic medicine and those employed by Merck. Perhaps academic authors just permitted themselves to be listed as authors, perhaps they did a substantial amount of editing and simply should have disclosed the actual writer as a coauthor. Moreover, we cannot be certain of the actions of journals. Each journal likely differs in its policies regarding authorship and financial disclosures; we assume that every journal expects that the primary author of an article makes substantive intellectual contributions to the paper, which may include conception of the project, design and conduct of the trial, responsibility for the data and analysis, or drafting of the manuscript, and discloses all other individuals who substantially contributed to the article.

We are hopeful that our findings encourage discussion of ways in which to improve the integrity of research. The medical profession and the pharmaceutical industry should agree that collaborations must be conducted with the highest standards.[135] We suggest that academic researchers consistently provide to the journals the author contributions for all manuscripts, including original research, meta-analyses, reviews, and commentaries, and disclose relationships and support from all industry sources, regardless of the journal's requirements. Authors who "sign-off" on or "edit" original manuscripts or reviews written explicitly by pharmaceutical industry employees or by medical publishing companies should offer full authorship disclosure, such as, "drafting of the manuscript was done by representatives from XYZ, Inc; the authors were responsible for critical revisions of the manuscript for important intellectual content." A coordinated oversight strategy involving academic physicians, journal editors, and industry representatives is necessary to discourage both guest authorship and ghostwriting and improve the integrity of the biomedical authorship system.

Author Contributions: Dr Ross had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
Study concept and design: Ross, Hill, Egilman, Krumholz.
Acquisition of data: Ross, Hill, Egilman, Krumholz.
Analysis and interpretation of data: Ross, Hill, Krumholz.
Drafting of the manuscript: Ross.
Critical revision of the manuscript for important intellectual content: Ross, Hill, Egilman, Krumholz.
Study supervision: Krumholz.
Financial Disclosures: All of the authors have been compensated for their work as consultants at the request of plaintiffs in litigation against Merck & Co Inc related to rofecoxib. Dr Krumholz reported serving on the advisory boards of Amgen and UnitedHealthcare and being a subject expert for VHA Inc.
Funding/Support: Dr Ross is currently supported by the Hartford Foundation. Dr Hill was a scholar in the Robert Wood Johnson Clinical Scholars Program at Yale University sponsored by the Robert Wood Johnson Foundation while working on this project. Dr Krumholz has research contracts with the American College of Cardiology and the Colorado Foundation for Medical Care and is the editor in chief of Journal Watch Cardiology of the Massachusetts Medical Society.
Role of the Sponsor: No outside source had any role in the design or conduct of the study; collection, management, analysis or interpretation of the data; preparation, review or approval of the manuscript, or in the decision to submit the manuscript for publication.
Additional Information: All legal documents used in this article are available at http://dida.library.ucsf.edu.

## REFERENCES

1. Rennie D, Flanagin A. Authorship! authorship! guests, ghosts, grafters, and the two-sided coin. JAMA. 1994;271(6):469-471.
2. Rennie D, Yank V, Emanuel L. When authorship fails: a proposal to make contributors accountable. JAMA. 1997;278(7):579-585.
3. Flanagin A, Carey LA, Fontanarosa PB, et al. Prevalence of articles with honorary authors and ghost authors in peer-reviewed medical journals. JAMA. 1998; 280(3):222-224.
4. Mowatt G, Shirran L, Grimshaw JM, et al. Prevalence of honorary and ghost authorship in Cochrane reviews. JAMA. 2002;287(21):2769-2771.
5. Shapiro DW, Wenger NS, Shapiro MF. The contributions of authors to multiauthored biomedical research papers. JAMA. 1994;271(6):438-442.
6. Steinman MA, Bero LA, Chren MM, Landefeld CS. Narrative review: the promotion of gabapentin: an analysis of internal industry documents. Ann Intern Med. 2006;145(4):284-293.
7. Healy D, Cattell D. Interface between authorship, industry and science in the domain of therapeutics. Br J Psychiatry. 2003;183:22-27.
8. Pope C, Ziebland S, Mays N. Qualitative research in health care: analysing qualitative data. BMJ. 2000; 320(7227):114-116.
9. Anderson SJ, Dewhirst T, Ling PM. Every document and picture tells a story: using internal corporate document reviews, semiotics, and content analysis to assess tobacco advertising. Tob Control. 2006; 15(3):254-261.
10. Wayne GF, Connolly GN. How cigarette design can affect youth initiation into smoking: Camel cigarettes 1983-93. Tob Control. 2002;11(suppl 1):I32-I39.
11. External author?, Visser WH, Yuen E, et al; Rofecoxib Protocol 078 Study Group. Draft version 2: rofecoxib does not delay the onset of Alzheimer's disease: results from a randomized, double-blind, placebo-controlled study. http://dida.library.ucsf.edu/tid /vio07x10. Accessed February 27, 2008. Bates Nos. MRK-AFV0431065 through MRK-AFV0431102.
12. Thal LJ, Ferris SH, Kirby L, et al. A randomized, double-blind, study of rofecoxib in patients with mild cognitive impairment. Neuropsychopharmacology. 2005;30(6):1204-1215.
13. Lines CR. Vioxx Prot 078 paper [e-mail to Eric Yuen, Alise Reicin, Barry Gertz, et al, on January 27, 2004]. http://dida.library.ucsf.edu/tid/vio01x10. Accessed February 27, 2008. Bates Nos. MRK-AAC0139936 through MRK-AAC0139937.
14. Moan A. Publication of 901 studies—Vioxx versus naproxen Asian and European study [e-mail to Barry J. Gertz, Martino Laurenzi, Diana Rogers, and Alexander M. Kostek on June 27, 2001]. http://dida.library.ucsf.edu/tid/vio08x10. Accessed February 27, 2008. Bates No. MRK-NJ0197070.
15. Myllykangas-Luosujärvi R, Lu HS, Chen SL, et al. Comparison of low-dose rofecoxib versus 1000 mg naproxen in patients with osteoarthritis: results of two randomized treatment trials of six weeks duration. Scand J Rheumatol. 2002;31(6):337-344.
16. Lisse JR, Perlman M, Johansson G, et al. Gastrointestinal tolerability and effectiveness of rofecoxib versus naproxen in the treatment of osteoarthritis: a randomized, controlled trial. Ann Intern Med. 2003; 139(7):539-546.
17. Berenson A. Evidence in Vioxx suits shows intervention by Merck officials. New York Times. April 24, 2005:A1.
18. Bombardier C, Laine L, Reicin A, et al; VIGOR Study Group. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med. 2000;343(21):1520-1528.
19. Curfman GD, Morrissey S, Drazen JM. Expression of concern: Bombardier et al: "Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis," N Engl J Med. 2000;343:1520-8. N Engl J Med. 2005;353(26): 2813-2814.
20. Bombardier C, Laine L, Burgos-Vargas R, et al. Response to expression of concern regarding VIGOR study. N Engl J Med. 2006;354(11):1196-1199.
21. Reicin A, Shapiro D. Response to expression of concern regarding VIGOR study. N Engl J Med. 2006; 354(11):1196-1199.
22. List of current article submissions and publica-

 ©2008 American Medical Association. All rights reserved.

tion plans on January 12, 2000. http://dida.library.ucsf.edu/tid/vio02x10. Accessed February 27, 2008. Bates Nos. MRK-ABK0098260 through MRK-ABK0098281.

23. Schnitzer TJ, Truitt K, Fleischmann R, et al. The safety profile, tolerability, and effective dose range of rofecoxib in the treatment of rheumatoid arthritis: Phase II Rofecoxib Rheumatoid Arthritis Study Group. Clin Ther. 1999;21(10):1688-1702.

24. Kivitz AJ, Greenwald MW, Cohen SB, et al. Efficacy and safety of rofecoxib 12.5 mg versus nabumetone 1,000 mg in patients with osteoarthritis of the knee: a randomized controlled trial. J Am Geriatr Soc. 2004;52(5):666-674.

25. Weaver AL, Messner RP, Storms WW, et al. Treatment of patients with osteoarthritis with rofecoxib compared with nabumetone. J Clin Rheumatol. 2006; 12(1):17-25.

26. Geusens PP, Truitt K, Sfikakis P, et al. A placebo and active comparator-controlled trial of rofecoxib for the treatment of rheumatoid arthritis. Scand J Rheumatol. 2002;31(4):230-238.

27. Hunt RH, Bowen B, Mortensen ER, et al. A randomized trial measuring fecal blood loss after treatment with rofecoxib, ibuprofen, or placebo in healthy subjects. Am J Med. 2000;109(3):201-206.

28. Hawkey CJ, Laine L, Simon T, Quan H, Shingo S, Evans J. Incidence of gastroduodenal ulcers in patients with rheumatoid arthritis after 12 weeks of rofecoxib, naproxen, or placebo: a multicentre, randomised, double blind study. Gut. 2003;52(6):820-826.

29. Saag K, van der Heijde D, Fisher C, et al; Osteoarthritis Studies Group. Rofecoxib, a new cyclooxygenase 2 inhibitor, shows sustained efficacy, comparable with other nonsteroidal anti-inflammatory drugs: a 6-week and a 1-year trial in patients with osteoarthritis. Arch Fam Med. 2000;9(10):1124-1134.

30. Hawkey CJ, Laine L, Harper SE, Quan HU, Bolognese JA, Mortensen E. Influence of risk factors on endoscopic and clinical ulcers in patients taking rofecoxib or ibuprofen in two randomized controlled trials. Aliment Pharmacol Ther. 2001;15(10):1593-1601.

31. Hawkey C, Laine L, Simon T, et al; Rofecoxib Osteoarthritis Endoscopy Multinational Study Group. Comparison of the effect of rofecoxib (a cyclooxygenase 2 inhibitor), ibuprofen, and placebo on the gastroduodenal mucosa of patients with osteoarthritis: a randomized, double-blind, placebo-controlled trial. Arthritis Rheum. 2000;43(2):370-377.

32. Day R, Morrison B, Luza A, et al; Rofecoxib/Ibuprofen Comparator Study Group. A randomized trial of the efficacy and tolerability of the COX-2 inhibitor rofecoxib vs ibuprofen in patients with osteoarthritis. Arch Intern Med. 2000;160(12):1781-1787.

33. Cannon GW, Caldwell JR, Holt P, et al; Rofecoxib Phase III Protocol 035 Study Group. Rofecoxib, a specific inhibitor of cyclooxygenase 2, with clinical efficacy comparable with that of diclofenac sodium: results of a one-year, randomized, clinical trial in patients with osteoarthritis of the knee and hip. Arthritis Rheum. 2000;43(5):978-987.

34. Katz N, Ju WD, Krupa DA, et al. Efficacy and safety of rofecoxib in patients with chronic low back pain: results from two 4-week, randomized, placebo-controlled, parallel-group, double-blind trials. Spine. 2003;28(9):851-859.

35. Sigthorsson G, Crane R, Simon T, et al. COX-2 inhibition with rofecoxib does not increase intestinal permeability in healthy subjects: a double blind crossover study comparing rofecoxib with placebo and indomethacin. Gut. 2000;47(4):527-532.

36. Ehrich EW, Bolognese JA, Watson DJ, Kong SX. Effect of rofecoxib therapy on measures of health-related quality of life in patients with osteoarthritis. Am J Manag Care. 2001;7(6):609-616.

37. Ehrich EW, Schnitzer TJ, McIlwain H, et al; Rofecoxib Osteoarthritis Pilot Study Group. Effect of specific COX-2 inhibition in osteoarthritis of the knee: a 6 week double blind, placebo controlled pilot study of rofecoxib. J Rheumatol. 1999;26(11):2438-2447.

38. Truitt KE, Sperling RS, Ettinger WH Jr, et al. A multicenter, randomized, controlled trial to evaluate the safety profile, tolerability, and efficacy of rofecoxib in advanced elderly patients with osteoarthritis. Aging (Milano). 2001;13(2):112-121.

39. Reicin A, Brown J, Jove M, et al. Efficacy of single-dose and multidose rofecoxib in the treatment of post-orthopedic surgery pain. Am J Orthop. 2001;30(1): 40-48.

40. Johnson GE. VIOXX C-1 manuscript (protocol 116) [letter to Deborah Matzura-Wolfe on October 9, 2000]. http://dida.library.ucsf.edu/tid/vio13x10. Accessed February 27, 2008. Bates No. STI0023352.

41. Scientific Therapeutics Information Inc Web site. http://www.stimedinfo.com/sti.htm. Accessed February 1, 2008.

42. Kistner U. Update on VIOXX manuscripts [e-mail to Susan Baumgartner, Sabrina Mauer, Judy Fallon, Virginia Schad, Peggy Protopapadakis, Merry Saba, and John Romankiewicz on October 8, 1999]. http://dida.library.ucsf.edu/tid/vio16x10. Accessed February 27, 2008. Bates Nos. STI0032791 through STI0032792.

43. Gajraj NM. Cyclooxygenase 2 inhibitors. Anesth Analg. 2003;96(6):1720-1738.

44. Garnett WR. Clinical implications of drug interactions with coxibs. Pharmacotherapy. 2001;21(10): 1223-1232.

45. Weaver AL. Rofecoxib: clinical pharmacology and clinical experience. Clin Ther. 2001;23(9):1323-1338.

46. Hochberg MC. Treatment of rheumatoid arthritis and osteoarthritis with COX-2-selective inhibitors: a managed care perspective. Am J Manag Care. 2002;8(17)(suppl):S502-S517.

47. Gloth FM III. Pain management in older adults: prevention and treatment. J Am Geriatr Soc. 2001; 49(2):188-199.

48. Schnitzer TJ. Osteoarthritis management: the role of cyclooxygenase-2-selective inhibitors. Clin Ther. 2001;23(3):313-326.

49. Fendrick AM. Cost-effective use of NSAIDs: issues pertinent to coxib use in managed care. Am J Manag Care. 2002;8(17)(suppl):S529-S541.

50. Broder M; Health Science Communications Inc. Invoice for review manuscript #1 for cardiology audience [attn: Susan Baumgartner, PhD, on September 25, 2001]. http://dida.library.ucsf.edu/tid/vio03x10. Accessed February 27, 2008. Bates Nos. MRK-ADF0003422 through MRK-ADF0003423.

51. Broder M; Health Science Communications Inc. Invoice for review manuscript #2 for nephrology audience [attn: Susan Baumgartner, PhD, on September 25, 2001]. http://dida.library.ucsf.edu/tid/vio04x10. Accessed February 27, 2008. Bates No. MRK-ADF0003424.

52. Broder M; Health Science Communications Inc. Invoice for review manuscript #4 for primary care audience [attn: Susan Baumgartner, PhD, on September 25, 2001]. http://dida.library.ucsf.edu/tid/vio05x10. Accessed February 27, 2008. Bates Nos. MRK-ADF0003428 through MRK-ADF0003429.

53. Health Sciences Communications Inc Web site. http://www.hsci.com/. Accessed February 27, 2008.

54. Scientific Therapeutic Communications Inc. VIOXX publications status report (November 15, 2000). http://dida.library.ucsf.edu/tid/vio06x10. Accessed February 27, 2008. Bates Nos. MRK-AFI0158301 through MRK-AFI0158303.

55. Schad V. 1439 journal article [e-mail to Marion Phillips on May 14, 2001]. http://dida.library.ucsf.edu/tid/vio17x10. Accessed February 27, 2008. Bates No. STI 0034921.

56. Scheiman JM. Gastrointestinal outcomes: evidence for risk reduction in patients using coxibs. Am J Manag Care. 2002;8(17)(suppl):S518-S528.

57. Bingham CO III. Development and clinical application of COX-2-selective inhibitors for the treatment of osteoarthritis and rheumatoid arthritis. Cleve Clin J Med. 2002;69(suppl 1):SI5-SI12.

58. Cronstein BN. Cyclooxygenase-2-selective inhibitors: translating pharmacology into clinical utility. Cleve Clin J Med. 2002;69(suppl 1):SI13-SI19.

59. Fendrick AM. Developing an economic rationale for the use of selective COX-2 inhibitors for patients at risk for NSAID gastropathy. Cleve Clin J Med. 2002; 69(suppl 1):SI59-SI64.

60. Katz WA. Cyclooxygenase-2-selective inhibitors in the management of acute and perioperative pain. Cleve Clin J Med. 2002;69(suppl 1):SI65-SI75.

61. Konstam MA, Weir MR. Current perspective on the cardiovascular effects of coxibs. Cleve Clin J Med. 2002;69(suppl 1):SI47-SI52.

62. Lema MJ. Emerging options with coxib therapy. Cleve Clin J Med. 2002;69(suppl 1):SI76-SI84.

63. Peura DA. Gastrointestinal safety and tolerability of nonselective nonsteroidal anti-inflammatory agents and cyclooxygenase-2-selective inhibitors. Cleve Clin J Med. 2002;69(suppl 1):SI31-SI39.

64. Scheiman JM. Outcomes studies of the gastrointestinal safety of cyclooxygenase-2 inhibitors. Cleve Clin J Med. 2002;69(suppl 1):SI40-SI46.

65. Schnitzer TJ, Hochberg MC. COX-2-selective inhibitors in the treatment of arthritis. Cleve Clin J Med. 2002;69(suppl 1):SI20-SI30.

66. Weir MR. Renal effects of nonselective NSAIDs and coxibs. Cleve Clin J Med. 2002;69(suppl 1): SI53-SI58.

67. Buttgereit F, Burmester GR, Simon LS. Gastrointestinal toxic side effects of nonsteroidal anti-inflammatory drugs and cyclooxygenase-2-specific inhibitors. Am J Med. 2001;110(suppl 3A):13S-19S.

68. Cannon GW, Breedveld FC. Efficacy of cyclooxygenase-2-specific inhibitors. Am J Med. 2001;110 (suppl 3A):6S-12S.

69. Catella-Lawson F, Crofford LJ. Cyclooxygenase inhibition and thrombogenicity. Am J Med. 2001; 110(suppl 3A):28S-32S.

70. Hernández-Díaz S, García-Rodríguez LA. Epidemiologic assessment of the safety of conventional nonsteroidal anti-inflammatory drugs. Am J Med. 2001;110(suppl 3A):20S-27S.

71. Lipsky PE. Recommendations for the clinical use of cyclooxygenase-2-specific inhibitors. Am J Med. 2001;110(suppl 3A):3S-5S.

72. Peloso PM, Scheiman JM. The economic implications of cyclooxygenase-2-specific inhibitors. Am J Med. 2001;110(suppl 3A):50S-54S.

73. Raisz LG. Potential impact of selective cyclooxygenase-2 inhibitors on bone metabolism in health and disease. Am J Med. 2001;110(suppl 3A):43S-45S.

74. Shamoon M, Hochberg MC. The role of acetaminophen in the management of patients with osteoarthritis. Am J Med. 2001;110(suppl 3A):46S-49S.

75. Whelton A. Renal aspects of treatment with conventional nonsteroidal anti-inflammatory drugs versus cyclooxygenase-2-specific inhibitors. Am J Med. 2001;110(suppl 3A):33S-42S.

76. Schnitzer TJ. Ads [discussion of honorarium for article: e-mail to Peggy Protopapadakis on August 9, 2000]. http://dida.library.ucsf.edu/tid/vio10x10. Accessed February 27, 2008. Bates No. STI 0013235.

77. Cannon GW. Cyclooxygenase 2 selective inhibitors. Drugs Today (Barc). 1999;35(7):487-496.

78. Geba GP, Weaver AL, Polis AB, Dixon ME, Schnitzer TJ. Efficacy of rofecoxib, celecoxib, and acetaminophen in osteoarthritis of the knee: a randomized trial. JAMA. 2002;287(1):64-71.

©2008 American Medical Association. All rights reserved.

GUEST AUTHORSHIP AND GHOSTWRITING IN ARTICLES ON ROFECOXIB

79. Hawkey CJ. COX-2 inhibitors. *Lancet*. 1999; 353(9149):307-314.

80. Cannon GW. Rofecoxib: a specific cyclooxygenase inhibitor. *Drugs Today (Barc)*. 2000;36(4):255-262.

81. Crofford LJ. Clinical experience with specific COX-2 inhibitors in arthritis. *Curr Pharm Des*. 2000;6(17):1725-1736.

82. Jackson LM, Hawkey CJ. COX-2 selective nonsteroidal anti-inflammatory drugs: do they really offer any advantages? *Drugs*. 2000;59(6):1207-1216.

83. Harris RC. Cyclooxygenase-2 in the kidney. *J Am Soc Nephrol*. 2000;11(12):2387-2394.

84. Swan SK, Rudy DW, Lasseter KC, et al. Effect of cyclooxygenase-2 inhibition on renal function in elderly persons receiving a low-salt diet: a randomized, controlled trial. *Ann Intern Med*. 2000;133 (1):1-9.

85. Bell GM, Schnitzer TJ. Cox-2 inhibitors and other nonsteroidal anti-inflammatory drugs in the treatment of pain in the elderly. *Clin Geriatr Med*. 2001; 17(3):489-502.

86. Brater DC, Harris C, Redfern JS, Gertz BJ. Renal effects of COX-2-selective inhibitors. *Am J Nephrol*. 2001;21(1):1-15.

87. Breyer MD, Harris RC. Cyclooxygenase 2 and the kidney. *Curr Opin Nephrol Hypertens*. 2001;10(1):89-98.

88. Day RO. Pharmacokinetic and pharmacodynamic aspects of the ideal COX-2 inhibitor: a rheumatologist's perspective. *Clin Exp Rheumatol*. 2001; 19(6)(suppl 25):S59-S62.

89. FitzGerald GA, Patrono C. The coxibs, selective inhibitors of cyclooxygenase-2. *N Engl J Med*. 2001; 345(6):433-442.

90. Gloth FM III. Principles of perioperative pain management in older adults. *Clin Geriatr Med*. 2001; 17(3):553-573.

91. Harris CJ, Brater DC. Renal effects of cyclooxygenase-2 selective inhibitors. *Curr Opin Nephrol Hypertens*. 2001;10(5):603-610.

92. Harris RC, Breyer MD. Physiological regulation of cyclooxygenase-2 in the kidney. *Am J Physiol Renal Physiol*. 2001;281(1):F1-F11.

93. Hawkey CJ, Jackson L, Harper SE, Simon TJ, Mortensen E, Lines CR. Review article: the gastrointestinal safety profile of rofecoxib, a highly selective inhibitor of cyclooxygenase-2, in humans. *Aliment Pharmacol Ther*. 2001;15(1):1-9.

94. Hawkey CJ. COX-1 and COX-2 inhibitors. *Best Pract Res Clin Gastroenterol*. 2001;15(5):801-820.

95. Hawkey CJ. NSAIDs and COX-2 inhibitors: what can we learn from large outcomes trials? the gastroenterologist's perspective. *Clin Exp Rheumatol*. 2001; 19(6)(suppl 25):S23-S30.

96. Hawkey CJ, Jones JI. Gastrointestinal safety of COX-2 specific inhibitors. *Gastroenterol Clin North Am*. 2001;30(4):921-936.

97. Hochberg MC. What have we learned from the large outcomes trials of COX-2 selective inhibitors? the rheumatologist's perspective. *Clin Exp Rheumatol*. 2001;19(6)(suppl 25):S15-S22.

98. Patrono C. Measurement of cyclooxygenase isozyme inhibition in humans: exploring the clinical relevance of biochemical selectivity. *Clin Exp Rheumatol*. 2001;19(6)(suppl 25):S45-S50.

99. Schnitzer TJ. Cyclooxygenase-2-specific inhibitors: are they safe? *Am J Med*. 2001;110(1A):46S-49S.

100. Wight NJ, Gottesdiener K, Garlick NM, et al. Rofecoxib, a COX-2 inhibitor, does not inhibit human gastric mucosal prostaglandin production. *Gastroenterology*. 2001;120(4):867-873.

101. Aisen PS. Evaluation of selective COX-2 inhibitors for the treatment of Alzheimer's disease. *J Pain Symptom Manage*. 2002;24(4)(suppl):S35-S40.

102. Aisen PS. The potential of anti-inflammatory drugs for the treatment of Alzheimer's disease. *Lancet Neurol*. 2002;1(5):279-284.

103. Bombardier C. An evidence-based evaluation of the gastrointestinal safety of coxibs. *Am J Cardiol*. 2002;89(6A):3D-9D.

104. Brater DC. Renal effects of cyclooxygenase-2-selective inhibitors. *J Pain Symptom Manage*. 2002; 23(4)(suppl):S15-S20.

105. Brater DC. Anti-inflammatory agents and renal function. *Semin Arthritis Rheum*. 2002;32(3)(suppl 1):33-42.

106. Fine PG. The role of rofecoxib, a cyclooxygenase-2-specific inhibitor, for the treatment of non-cancer pain: a review. *J Pain*. 2002;3(4):272-283.

107. Harris RC Jr. Cyclooxygenase-2 inhibition and renal physiology. *Am J Cardiol*. 2002;89(6A):10D-17D.

108. Hawkey CJ. Cyclooxygenase inhibition: between the devil and the deep blue sea. *Gut*. 2002; 50(suppl 3):iii25-iii30.

109. Hochberg MC. New directions in symptomatic therapy for patients with osteoarthritis and rheumatoid arthritis. *Semin Arthritis Rheum*. 2002;32(3) (suppl 1):4-14.

110. Katz WA. Use of nonopioid analgesics and adjunctive agents in the management of pain in rheumatic diseases. *Curr Opin Rheumatol*. 2002;14(1):63-71.

111. Katz N. Coxibs: evolving role in pain management. *Semin Arthritis Rheum*. 2002;32(3)(suppl 1):15-24.

112. Katz N. The impact of pain management on quality of life. *J Pain Symptom Manage*. 2002;24(1)(suppl):S38-S47.

113. Laine L. The gastrointestinal effects of nonselective NSAIDs and COX-2-selective inhibitors. *Semin Arthritis Rheum*. 2002;32(3)(suppl 1):25-32.

114. Laine L. Gastrointestinal safety of coxibs and outcomes studies: what's the verdict? *J Pain Symptom Manage*. 2002;23(4)(suppl):S5-S14.

115. Rex DK. Screening for colon cancer and evaluation of chemoprevention with coxibs. *J Pain Symptom Manage*. 2002;23(4)(suppl):S41-S50.

116. Ruoff GE. Challenges of managing chronic pain in the elderly. *Semin Arthritis Rheum*. 2002;32(3) (suppl 1):43-50.

117. Bingham CO III, Sebba AI, Rubin BR, et al. Efficacy and safety of etoricoxib 30 mg and celecoxib 200 mg in the treatment of osteoarthritis in two identically designed, randomized, placebo-controlled, non-inferiority studies. *Rheumatology (Oxford)*. 2007; 46(3):496-507.

118. Schnitzer TJ. Update of ACR guidelines for osteoarthritis: role of the coxibs. *J Pain Symptom Manage*. 2002;23(4)(suppl):S24-S31.

119. Cheng HF, Harris RC. Does cyclooxygenase-2 affect blood pressure? *Curr Hypertens Rep*. 2003; 5(1):87-92.

120. DeMaria AN, Weir MR. Coxibs–beyond the GI tract: renal and cardiovascular issues. *J Pain Symptom Manage*. 2003;25(2)(suppl):S41-S49.

121. Gajraj NM. The effect of cyclooxygenase-2 inhibitors on bone healing. *Reg Anesth Pain Med*. 2003; 28(5):456-465.

122. Kuritzky L, Weaver A. Advances in rheumatology: coxibs and beyond. *J Pain Symptom Manage*. 2003;25(2)(suppl):S6-S20.

123. Laine L. Gastrointestinal effects of NSAIDs and coxibs. *J Pain Symptom Manage*. 2003;25(2)(suppl):S32-S40.

124. Ruoff G, Lema M. Strategies in pain management: new and potential indications for COX-2 specific inhibitors. *J Pain Symptom Manage*. 2003;25 (2)(suppl):S21-S31.

125. Scheiman JM. Gastroduodenal safety of cyclooxygenase-2 inhibitors. *Curr Pharm Des*. 2003; 9(27):2197-2206.

126. Gajraj NM, Joshi GP. Role of cyclooxygenase-2 inhibitors in postoperative pain management. *Anesthesiol Clin North America*. 2005;23(1):49-72.

127. Schnitzer TJ, Weaver AL, Polis AB, Petruschke RA, Geba GP. Efficacy of rofecoxib, celecoxib, and acetaminophen in patients with osteoarthritis of the knee: a combined analysis of the VACT studies. *J Rheumatol*. 2005;32(6):1093-1105.

128. Schad V. 1607 journal supplement [e-mail to John Romankiewicz, Una Kistner, and Jessica Leber on May 14, 2001]. http://dida.library.ucsf.edu/tid /vio09x10. Accessed February 27, 2008. Bates No. STI 0006924.

129. International Committee of Medical Journal Editors. Uniform requirements for manuscripts submitted to biomedical journals: writing and editing for biomedical publication (October 2007). http://www .icmje.org/. Accessed February 21, 2008.

130. Armstrong D. Odd ghostwriting offer raises researcher's blood pressure. http://blogs.wsj.com /health/2007/11/21/odd-ghostwriting-offer-raises-researchers-blood-pressure/. Accessed Febuary 21, 2008.

131. Hirsch LJ. Conflicts of interest in drug development: the practices of Merck & Co, Inc. *Sci Eng Ethics*. 2002;8(3):429-442.

132. Kesselheim AS, Avorn J. The role of litigation in defining drug risks. *JAMA*. 2007;297(3):308-311.

133. World Association of Medical Editors. Ghost writing initiated by commercial companies. *J Gen Intern Med*. 2005;20(6):549.

134. Relman AS. Medical professionalism in a commercialized health care market. *JAMA*. 2007;298 (22):2668-2670.

135. Krumholz HM, Ross JS, Presler AH, Egilman DS. What have we learnt from Vioxx? *BMJ*. 2007;334 (7585):120-123.

©2008 American Medical Association. All rights reserved.



Online article and related content
current as of June 17, 2009.

# Prevalence of Articles With Honorary Authors and Ghost Authors in Peer-Reviewed Medical Journals

Annette Flanagin; Lisa A. Carey; Phil B. Fontanarosa; et al.

*JAMA*. 1998;280(3):222-224 (doi:10.1001/jama.280.3.222)

http://jama.ama-assn.org/cgi/content/full/280/3/222

| | |
|---|---|
| Correction | Contact me if this article is corrected. |
| Citations | This article has been cited 137 times.<br>Contact me when this article is cited. |
| Topic collections | Journalology/ Peer Review/ Authorship<br>Contact me when new articles are published in these topic areas. |
| Related Letters | In Reply:<br>et al. *JAMA*. ;300():905. |

Subscribe
http://jama.com/subscribe

Permissions
permissions@ama-assn.org
http://pubs.ama-assn.org/misc/permissions.dtl

Email Alerts
http://jamaarchives.com/alerts

Reprints/E-prints
reprints@ama-assn.org

Downloaded from www.jama.com by guest on June 17, 2009



EXHIBIT
4

# Prevalence of Articles With Honorary Authors and Ghost Authors in Peer-Reviewed Medical Journals

Annette Flanagin, RN, MA; Lisa A. Carey, PhD; Phil B. Fontanarosa, MD; Stephanie G. Phillips, MS, PhD; Brian P. Pace, MA; George D. Lundberg, MD; Drummond Rennie, MD

**Context.**—Authorship in biomedical publications establishes accountability, responsibility, and credit. Misappropriation of authorship undermines the integrity of the authorship system, but accurate data on its prevalence are limited.

**Objectives.**—To determine the prevalence of articles with honorary authors (named authors who have not met authorship criteria) and ghost authors (individuals not named as authors but who contributed substantially to the work) in peer-reviewed medical journals and to identify journal characteristics and article types associated with such authorship misappropriation.

**Design.**—Mailed, self-administered, confidential survey.

**Participants.**—A total of 809 corresponding authors (1179 surveyed, 69% response rate) of articles published in 1996 in 3 peer-reviewed, large-circulation general medical journals (*Annals of Internal Medicine, JAMA,* and *The New England Journal of Medicine*) and 3 peer-reviewed, smaller-circulation journals that publish supplements (*American Journal of Cardiology, American Journal of Medicine,* and *American Journal of Obstetrics and Gynecology*).

**Main Outcome Measures.**—Prevalence of articles with honorary authors and ghost authors, as reported by corresponding authors.

**Results.**—Of the 809 articles, 492 were original research reports, 240 were reviews and articles not reporting original data, and 77 were editorials. A total of 156 articles (19%) had evidence of honorary authors (range, 11%-25% among journals); 93 articles (11%) had evidence of ghost authors (range, 7%-16% among journals); and 13 articles (2%) had evidence of both. The prevalence of articles with honorary authors was greater among review articles than research articles (odds ratio [OR], 1.8; 95% confidence interval [CI], 1.2-2.6) but did not differ significantly between large-circulation and smaller-circulation journals (OR, 1.4; 95% CI, 0.96-2.03). Compared with similar-style articles in large-circulation journals, articles with ghost authors in smaller-circulation journals were more likely to be reviews (OR, 4.2; 95% CI, 1.5-13.5) and less likely to be research articles (OR, 0.49; 95% CI, 0.27-0.88).

**Conclusion.**—A substantial proportion of articles in peer-reviewed medical journals demonstrate evidence of honorary authors or ghost authors.

*JAMA.* 1998;280:222-224

USED APPROPRIATELY, authorship establishes accountability, responsibility, and credit for scientific information reported in biomedical publications. However, misappropriation of authorship undermines the integrity of the authorship system. Honorary authorship (guest or gift authorship) is defined as naming, as an author, an individual who does not meet authorship criteria.[12] Honorary authorship, for example, may be bestowed as a tribute to a department chair or to the person who acquired funding for the study.[1] Ghost authorship is defined as failure to name, as an author, an individual who has made substantial contributions to the research or writing of the article.[2]

Although the International Committee of Medical Journal Editors (ICMJE) established authorship criteria in 1985,[3] and many medical journals encourage their use,[4] authors often disregard or are unaware of these criteria.[5] A variety of misuses of the current authorship system have been described.[1,2,6] Although previous studies have examined the frequency of fulfillment of authorship criteria,[7-9] we know of no large-scale, multijournal study on the prevalence of articles with honorary authors and ghost authors or associated journal characteristics and article types.

In this study, we sought to determine the prevalence of articles with honorary authors and ghost authors in 6 peer-reviewed biomedical journals and to assess whether honorary authorship and ghost authorship correlated with specific types of journals or articles. We hypothesized that research articles in large-circulation, prestigious medical journals would be more likely to have honorary authors, whereas review articles in smaller-circulation journals that publish symposiums would be more likely to have ghost authors.

## METHODS

We selected the 3 large-circulation US general medical journals with the highest impact factors[10]: *Annals of Internal Medicine, JAMA,* and *The New England Journal of Medicine.* For comparison, we selected 3 smaller-circulation journals that previously were shown to publish symposiums[11,12]: *American Journal of Cardiology, American Journal of Medicine,* and *American Journal of Obstetrics and Gynecology.* All journals in this study follow ICMJE guidelines for authorship.

We classified all articles published in 1996 into 3 categories: original research reports (research), reviews and other articles not reporting original research (reviews), and editorials, commentaries, and opinion articles (editorials). We used a computer-generated random-number list to sample research articles from each journal to reflect the relative proportion of research articles published in that journal compared with that of all 6 journals in 1996. Because the 3 large-circulation journals published more reviews and editorials than the smaller-circulation journals, we sampled all reviews and editorials from the smaller-circulation journals and randomly selected a similar number of reviews and editorials from the large-circulation journals. We identified the corresponding author for each article.

From *JAMA,* Chicago, Ill (Ms Flanagin, Dr Fontanarosa, Mr Pace, Dr Lundberg, and Dr Rennie); Marymount Manhattan College, New York, NY (Dr Carey); and Project House Inc, Hackensack, NJ (Drs Carey and Phillips).

Project House Inc is a medical communications company that provides writing and editorial services.

Presented at the Third International Congress on Peer Review in Biomedical Publication, Prague, Czech Republic, September 18, 1997.

Corresponding author: Phil B. Fontanarosa, MD, *JAMA,* 515 N State St, Chicago, IL 60610.

©1998 American Medical Association. All rights reserved.
Downloaded from www.jama.com by guest on June 17, 2009

For individuals listed as corresponding author for more than 1 article, we randomly selected only 1 for inclusion. Articles with corresponding authors outside the United States were excluded.

We designed and pretested a 21-item, self-administered questionnaire to obtain the following information: data about the corresponding author (including demographic characteristics and experience with writing and publishing); data about individuals who provided writing assistance or made other contributions but were not authors; and data about the contributions and functions of coauthors. The questionnaire was mailed to corresponding authors in July 1996 with a cover letter signed by the editor of *JAMA* explaining that responses would be kept confidential and anonymous, a photocopy of the first page of the article, and a preaddressed, stamped return envelope. Data were abstracted, entered, and analyzed to maintain respondent anonymity.

Based on ICMJE criteria,[4] we defined an article as having an honorary author if the corresponding author (1) reported that he or she did not meet all of the following 3 criteria: (a) "conceiving and designing the work" or "analyzing and interpreting the data"; (b) "writing the manuscript or part of the manuscript" or "revising the manuscript to make important changes in content"; and (c) "approving the final version of the manuscript"; or (2) if the corresponding author indicated that he or she would not "feel comfortable explaining the major conclusions" of the article; or (3) if the corresponding author reported that a coauthor performed "only one function and nothing else" from a list of 17 activities (supervising work of coauthors; recruiting coauthors; recruiting study subjects; analyzing and interpreting data; conducting literature search; analyzing and interpreting literature; reviewing the manuscript; communicating with the journal editor; signing a copyright transfer statement; conceiving and designing the work; collecting data; obtaining funding or material support; performing statistical analysis; writing the manuscript or part of it; approving the manuscript before journal submission; revising the manuscript, making important content changes; and reviewing edited page proofs).

We defined an article as having a ghost author if the corresponding author reported that (1) an individual who was not listed as an author made contributions that merited authorship; or (2) an unnamed individual participated in writing the article. We also examined the acknowledgment section of articles meeting these criteria to determine if any individuals were acknowledged for writing or editing assistance.

The article served as the unit of analysis for determining the prevalence of honorary authors, ghost authors, or both and as a composite end point of articles with honorary authors, ghost authors, or both. Based on previously published reports of approximately 20% prevalence of honorary authors,[7,8] we estimated that 325 articles would be required in each group of journals to detect a 10% difference between groups with $\beta$ of .20 and 2-tailed $\alpha$ of .05. Frequencies were calculated using Statistical Program for the Social Sciences (SPSS) for Windows (6.1).[13] Differences in proportions between types of articles and groups of journals were compared with $\chi^2$ tests. Odds ratios (ORs) and 95% confidence intervals (CIs) were calculated using Epi Info (Version 6).[14]

## RESULTS

Usable questionnaires were returned by 809 (69%) of 1179 corresponding authors surveyed. The median age for respondents was 47 years (range, 29-77 years) and 654 (81%) were men. A total of 590 respondents (73%) described themselves as physicians and 318 (38%) reported an academic rank of professor. A total of 465 respondents (57%) rated their experience in writing medical articles as extensive, and 558 (69%) reported having published at least 10 articles in peer-reviewed journals during the previous 5 years.

Response rates by journal ranged from 57% for *American Journal of Cardiology* to 83% for *JAMA* (Table 1). The response rate for the group of large-circulation journals was greater than that for the group of smaller-circulation journals (76% vs 62%, $P<.001$). Of the 809 responses, 492 (60%) were from authors of research articles, 240 (30%) from authors of reviews, and 77 (10%) from authors of editorials. There were no statistically significant differences in response rates by article type (research, 67%; reviews, 69%; and editorials, 73%).

A total of 156 (19%) of 809 articles met our criteria for honorary authorship (Table 2), including 38 in which the corresponding author met the honorary authorship criteria. The prevalence of articles with honorary authors ranged from 11% to 25% among journals and was more common among reviews (26%) than research articles (16%) (OR, 1.8; 95% CI, 1.2-2.6). Prevalence of articles with honorary authors did not differ significantly between large-circulation journals (22%) and smaller-circulation journals (17%) (OR, 1.4; 95% CI, 0.96-2.03).

A total of 93 articles (11%) met our criteria for ghost authorship (Table 3), including 11 with an unidentified medical writer. Of these 93 articles, 82 had an individual who was not listed as an author but who made contributions that the corresponding author believed merited authorship, 7 had an unnamed individual who participated in writing the article, and 4 articles met both criteria. However, we do not have data on whether these individuals met the ICMJE authorship criteria. The prevalence of ghost authors ranged from 7% to 16% among journals, with no significant differences by type of

### Table 1.—Journal Circulation and Survey Response Rates

| Journal | Circulation* | No. of Surveys Sent | No. (%) of Surveys Returned |
|---|---|---|---|
| **Smaller-circulation Journals** | | | |
| *American Journal of Cardiology* | 32 000 | 242 | 137 (57) |
| *American Journal of Medicine* | 52 000 | 170 | 113 (66) |
| *American Journal of Obstetrics and Gynecology* | 16 000 | 194 | 125 (64) |
| **Large-circulation Journals** | | | |
| *Annals of Internal Medicine* | 96 000 | 134 | 104 (78) |
| *JAMA* | 334 000 | 235 | 194 (83) |
| *The New England Journal of Medicine* | 237 000 | 204 | 136 (67) |
| **Total** | 767 000 | 1179 | 809 (69) |

*Data from Standard Rate and Data Service.[15]

### Table 2.—Prevalence of Honorary Authors by Journal and Type of Article

| Journal | No. of Articles | Total Articles With Honorary Authors, No. (%) | Research Articles With Honorary Authors* | Review Articles With Honorary Authors* | Editorials With Honorary Authors* |
|---|---|---|---|---|---|
| *American Journal of Cardiology* | 137 | 22 (16) | 18/112 (16) | 4/15 (27) | 0/7 (0) |
| *American Journal of Medicine* | 113 | 26 (23) | 6/30 (20) | 18/73 (25) | 2/10 (20) |
| *American Journal of Obstetrics and Gynecology* | 125 | 14 (11) | 9/94 (10) | 3/16 (19) | 2/14 (14) |
| *Annals of Internal Medicine* | 104 | 26 (25) | 14/59 (24) | 8/29 (28) | 4/14 (28) |
| *JAMA* | 194 | 44 (23) | 20/114 (18) | 18/60 (30) | 6/19 (32) |
| *The New England Journal of Medicine* | 136 | 24 (18) | 12/76 (16) | 10/46 (22) | 2/13 (15) |
| **Total** | 809 | 156 (19) | 79/485 (16) | 61/239 (26) | 16/77 (21) |

*Data expressed as number of articles with honorary authors/number of surveys returned for each type of article for each journal, followed by percentage of articles with honorary authors.

©1998 American Medical Association. All rights reserved.
Downloaded from www.jama.com by guest on June 17, 2009

Table 3.—Prevalence of Ghost Authors by Journal and Type of Article

| Journal | No. of Articles | Total Articles With Ghost Authors, No. (%) | Research Articles With Ghost Authors* | Review Articles With Ghost Authors* | Editorials With Ghost Authors* |
|---|---|---|---|---|---|
| American Journal of Cardiology | 137 | 13 (9) | 10/112 (9) | 2/15 (13) | 1/7 (14) |
| American Journal of Medicine | 113 | 15 (13) | 3/30 (10) | 12/73 (16) | 0/10 (0) |
| American Journal of Obstetrics and Gynecology | 125 | 13 (10) | 9/94 (10) | 3/16 (19) | 1/14 (7) |
| Annals of Internal Medicine | 104 | 16 (15) | 12/59 (20) | 3/29 (10) | 1/14 (7) |
| JAMA | 194 | 14 (7) | 11/114 (10) | 2/60 (3) | 1/19 (5) |
| The New England Journal of Medicine | 136 | 22 (16) | 20/76 (26) | 1/46 (2) | 1/13 (7) |
| Total | 809 | 93 (11) | 65/485 (13) | 23/239 (10) | 5/77 (6) |

*Data expressed as number of articles with ghost authors/number of surveys returned for each type of article for each journal, followed by percentage of articles with ghost authors.

article (research, 13%; reviews, 10%; and editorials, 6%). Compared with the same type of articles in large-circulation journals, the prevalence of articles with ghost authors was higher for reviews in smaller-circulation journals (16% vs 4%; OR, 4.2; 95% CI, 1.5-13.5) and lower for research articles (9% vs 17%; OR, 0.49; 95% CI, 0.27-0.88). Of 93 articles that met criteria for ghost authorship, 79 had no acknowledgment section, 10 with acknowledgments did not mention writing or editing assistance, and 4 had incomplete data in our database.

Thirteen articles had both honorary authors and ghost authors. Using the composite end point, 236 articles (29%) were reported to have honorary authors, ghost authors, or both.

## COMMENT

Misappropriation of authorship (ie, awarding honorary authorship and concealing ghost authorship) is incompatible with the principles, duties, and ethical responsibilities involved in scientific publication. In this study, approximately 1 in 4 articles demonstrated misappropriation of authorship criteria and inappropriate assignment of authorship.

Our findings are similar to those of Shapiro et al[7] who surveyed authors of 184 multiauthored research articles from 10 journals and found that at least 26% (268/1014) of authors reportedly failed to make sufficient contributions to the research or writing to merit authorship. In an analysis of 12 articles published in a general medical journal, Goodman[8] found that approximately one third of 84 authors had not contributed substantially to the intellectual content of the article. Likewise, Sloan[9] reported that 17% (149/884) of authors in 193 articles published in a specialty journal did not merit authorship.

We found that honorary authorship was more common among review articles and editorials than research articles. It is possible that the ICMJE criteria for authorship, specifically the criterion that requires participation in "conception and design or analysis and interpretation of data," may be difficult to apply to review articles and editorials. In a post hoc analysis in which this criterion for authorship was removed, the prevalence of articles with honorary authorship (involving the corresponding author or coauthor) decreased from 19% to 17% overall. This prevalence was 16% (79/492) for research articles, 20% (48/240) for reviews, and 17% (13/77) for editorials, with no statistically significant differences by article type.

Despite the large sample size of our study, the results are subject to several limitations. First, the information in this study was based on self-report from corresponding authors only. Second, despite assurances of confidentiality, the response rate to our survey was 69%. We are uncertain if nonrespondents differed systematically from respondents by demographics or if their articles differed in rates of honorary or ghost authors, but we suspect that underreporting is more likely than overreporting. However, even assuming that none of the articles from nonrespondents had honorary authors or ghost authors, a conservative estimate for the entire sample (N = 1179 articles) would place the lower bound of the prevalence rate at 13% for honorary authors, 8% for ghost authors, and 20% for the composite end point.

Third, we selected the 3 large-circulation journals based on circulation and impact factor and the 3 smaller-circulation journals based on their more specialized nature and history of publishing symposiums and supplements.[11] In 1996, the 3 smaller-circulation journals published 19 symposiums and supplements (American Journal of Cardiology, 7; American Journal of Medicine, 10; and American Journal of Obstetrics and Gynecology, 2), but 1 of the large-circulation journals, Annals of Internal Medicine, also published 1 supplement.

Fourth, 2 journals in our study (ie, American Journal of Obstetrics and Gynecology[16] and The New England Journal of Medicine[17]) limited the number of authors listed in the article byline in 1996. We are uncertain about how these limits may have affected our findings, although

future analysis may explore the relationship between number of authors and evidence of authorship misappropriation.

Finally, we sampled only journals and corresponding authors from the United States and sent letters of invitation from a single journal. Somewhat different results might have been obtained if our study had included international authors and more diverse journals, if we had sent surveys from the editor of the journal in which the article appeared, or if we had sampled all named authors.

In conclusion, our study demonstrates that a substantial proportion of articles in peer-reviewed medical journals have honorary authors and ghost authors. The findings also suggest that the ICMJE authorship guidelines may not be well understood by all authors and may be difficult to apply to certain types of articles such as non–data-based reviews and editorials.

We thank Raul Serrato and Susan Collister for administrative support and Karen Jagassar, Sonalis Fernandez, and Dayra Soto for data abstraction and entry.

### References

1. Rennie D, Yank V, Emanuel L. When authorship fails: a proposal to make contributors accountable. JAMA. 1997;278:579-585.
2. Rennie D, Flanagin A. Authorship! authorship! guests, ghosts, grafters, and the two-sided coin. JAMA. 1994;271:469-471.
3. International Committee of Medical Journal Editors. Guidelines on authorship. BMJ. 1985; 291:722.
4. International Committee of Medical Journal Editors. Uniform Requirements for Manuscripts Submitted to Biomedical Journals. JAMA. 1993;269: 2282-2286.
5. Bhopal R, Rankin J, McColl E, et al. The vexed question of authorship: views of the researchers in British medical faculty. BMJ. 1997;314:1009-1012.
6. Smith J. Gift authorship: a poisoned chalice? BMJ. 1994;309:1456-1457.
7. Shapiro DW, Wenger NS, Shapiro MF. The contributions of authors of multiauthored biomedical research papers. JAMA. 1994;271:438-442.
8. Goodman NW. Survey of fulfillment of criteria for authorship in published medical research. BMJ. 1994;309:1482.
9. Sloan RM. Coauthors' contributions to major papers published in the AJR: frequency of undeserved authorship. AJR Am J Roentgenol. 1996;167:571-579.
10. Journal Citation Reports on CD-ROM, Science Edition. Philadelphia, Pa: Institute for Scientific Information; 1996.
11. Bero L, Galbraith A, Rennie D. The publication of sponsored symposiums in medical journals. N Engl J Med. 1992;327:1135-1140.
12. Rochon PA, Gurwitz JH, Cheung M, Hayes JA, Chalmers TC. Evaluating the quality of articles published in journal supplements compared with the quality of those published in the parent journal. JAMA. 1994;272:108-113.
13. SPSS Advanced Statistics [computer program]. Version 6.1. Chicago, Ill: SPSS Inc; 1994.
14. Epi Info [computer program]. Version 6. Atlanta, Ga: Centers for Disease Control and Prevention; 1994.
15. Standard Rate and Data Service Business Publication Advertising Source. Volume 80. Des Plaines, Ill: SRDS; 1998.
16. Information for authors. Am J Obstet Gynecol. 1995;173:23A-28A.
17. Information for authors. N Engl J Med. 1996; 334:1684.

Articles With Honorary Authors and Ghost Authors—Flanagin et al

©1998 American Medical Association. All rights reserved.
Downloaded from www.jama.com by guest on June 17, 2009

EXCLUSIVEWORLDWIDEREGIONSMARKETSINDUSTRIESECONOMYPOLITICSLAWENVIRONMENTSCIENCEOPINIONSPENDSPORTSARTS
AND
CULTUREEDITORS'
VIDEO
PICKSBLOOMBERG
MARKETS
 MAGAZINESPECIAL
REPORT

**BLOOMBERG.com**    Bloomberg    Bloomberg    About

Updated: New York, Jun 17 16:36
London, Jun 17 21:36

Tokyo, Jun 18 05:36

SEARCH News [          ] GO | Enter Symbol     QUOTE | CHART | NEWS          European Stocks Drop for Fourth

■ NEWS

LOG IN/REGISTER

**news**

Popular:
PoliticsExclusiveMadoffIndustriesCurrenciesETFsDine & DealC-Suite

Lilly 'Ghostwrote' Articles to Market Drug, Files Say (Update2)

Share | Email | Print | A A A

- Exclusive
- Worldwide
- Regions
- Markets
- Industries
- Economy
- Politics
- Law
- Environment
- Science
- Opinion
- Spend
- Sports
- Arts and Culture
- Editors' Video Picks
- Bloomberg Markets Magazine
- Special Report

**RESOURCES**

- Bloomberg TV
- Bloomberg Radio
- Bloomberg Podcasts
- Bloomberg Press

By Elizabeth Lopatto, Jef Feeley and Margaret Cronin Fisk

June 11 (Bloomberg) -- Eli Lilly & Co. officials wrote medical journal studies about the antipsychotic Zyprexa and then asked doctors to put their names on the articles, a practice called "ghostwriting," according to unsealed company files.

Lilly employees also compiled a guide to hiring scientists to write favorable articles, complained to journal editors when publication was delayed and submitted rejected articles to other outlets, according to documents filed in drug-overpricing suits against the Indianapolis-based company, the largest manufacturer of psychiatric medicines.

Drugmakers' use of ghostwriters has created "a huge body of medical literature that society can't trust," said Carl Elliott, a University of Minnesota bioethicist who has written about the practice.

Lilly sought to make Zyprexa "the number one selling psychotropic in history," according to a 2000 plan distributed to its product team. The memo was among more than 10,000 pages of internal documents unsealed last month in lawsuits by insurers and pension funds seeking to recoup money spent on the drug. They allege Lilly exaggerated Zyprexa's effectiveness.

"Plaintiffs are releasing one-sided, cherry-picked documents obtained in discovery to selected news media in an effort to try their cases" there, said Lilly spokeswoman Marni Lemons. "Lilly remains prepared to defend ourselves against all of these allegations in the appropriate venue, a court of law."

FDA Rules

The U.S. Food and Drug Administration doesn't have a guidance document or regulations specific to ghostwriting, said Karen Riley, an agency spokeswoman.

Lemons declined to answer specific questions about ghostwriting. There is no evidence in the unsealed documents that doctors were paid to sign off on the ghostwritten items.

"We believe these documents describe the marketing of a widely promoted and powerfully dangerous psychotropic medication," said Thomas Sobol, lead attorney for the insurance plans. "Transparency is critically important."

Lilly isn't the only drugmaker to use ghostwriters to win favorable play in medical journals. Merck & Co. and Pfizer Inc. also have faced claims they used ghostwriters as part of their marketing plans.

In May 2008, Whitehouse Station, New Jersey-based Merck agreed to pay $58 million to 29 states and to stop ghostwriting articles to resolve claims that its advertisements for the withdrawn painkiller Vioxx hid the drug's health risks.

Improper Marketing

Employees at Merck worked alone or with publishing firms to write manuscripts on Vioxx that were published under the names of academic medical experts, according to an analysis published in the Journal of the American Medical Association in April 2008. Merck pulled Vioxx from the market in 2004.


EXHIBIT
5

Pfizer paid $60 million to 33 states in October to settle claims it improperly marketed its Bextra and Celebrex pain relievers. New York-based Pfizer agreed to halt off-label marketing of the medicines and stop ghostwriting about them. It withdrew Bextra in April 2005. Celebrex is still on the market.

"Every company, to some degree, has probably engaged in ghostwriting," said Joseph Ross, an assistant professor at Mount Sinai School of Medicine in New York and the author of the JAMA paper on Merck's ghostwriting practices. "It's a challenging thing to discover without litigation, since it's mutually beneficial to physicians and people within the industry to keep it under wraps."

Untrustworthy

In 1996, Wyeth hired Excerpta Medica Inc., a New Jersey- based medical communications firm, to write 10 articles promoting drugs aimed at treating obesity, Elliott wrote in "Ghost Marketing: Pharmaceutical Companies and Ghostwritten Journal Articles," published in 2007 in the journal Perspectives in Biology and Medicine.

Wyeth, which at the time was touting its fen-phen diet combination for weight loss, agreed to pay Excerpta $20,000 per article, according to Elliott.

"Wyeth kept each article under tight control, scrubbing drafts of any material that could damage sales," he wrote. Pfizer is acquiring Madison, New Jersey-based Wyeth for $68 billion in cash and stock.

Doug Petkus, a spokesman for Wyeth, declined to immediately comment.

Antipsychotics have become the U.S.'s best-selling class of drugs, with 2008 sales of $14.6 billion, according to IMS Health, a health-care consulting firm.

The insurers suing Lilly contend it should pay as much as $6.8 billion in damages for downplaying Zyprexa's health risks and marketing the drug for unapproved uses to increase profits.

Top Selling

The antipsychotic is Lilly's top-selling drug, with $4.7 billion in sales last year, accounting for almost a quarter of the company's revenue. Lilly officials said in 2002 they sought to boost Zyprexa sales to $6 billion within four years, according to a document unsealed in the insurers' case.

Bloomberg News obtained the documents after U.S. District Judge Jack Weinstein in Brooklyn, New York, made them public on May 1. In September, Weinstein allowed insurers and other payers to sue Lilly as a group after finding "sufficient evidence of fraud" to let the case go to trial. Lilly appealed that ruling.

Lilly agreed in January to pay $1.42 billion to the U.S. government and more than 30 states to settle off-label marketing allegations over Zyprexa. The agreement included a $615 million penalty for a federal criminal charge of illegally marketing the drug to elderly patients for off-label uses.

The company also faces suits from 12 states over its Zyprexa marketing practices. Cases brought by South Carolina and Connecticut officials are set for trial later this year.

Positive Light

The unsealed documents support the claims of the insurers suing Lilly, said Sobol, of Seattle-based Hagens Berman Sobol Shapiro LLP. His firm provided Bloomberg News with copies of the internal papers. Bloomberg News filed a letter brief asking the court to unseal the documents.

Ensuring that medical journal articles presented Zyprexa study results in a positive light was one way for Lilly to reach its sales goal, company officials said in its plan, according to the documents.

To do that, Lilly officials hired ghostwriters to prepare submissions to journals such as Progress in Neurology and Psychiatry, according to the unsealed documents.

"The paper for the Progress in Neurology and Psychiatry supplement has been completed and sent to the journal for peer review," Kerrie Mitchell, an employee of the public relations agency Cohn & Wolfe, wrote in a Feb. 23, 2001, e-mail to Michael Sale, a Lilly marketing official. The message was among the unsealed files.

"We 'ghost' wrote this article and then worked with author Dr. Haddad to work up the final copy," Mitchell said in the e-mail. Eric Litchfield, a spokesman for Cohn & Wolfe, didn't immediately return a call seeking comment.

Draft Approved

Peter Haddad, a researcher at Greater Manchester West Mental Health NHS Foundation Trust in the U.K., was listed as the article's lead author. Haddad didn't respond to requests for comment.

The global Lilly team approved a draft of Haddad's ghost- written paper in 2000, according to the unsealed documents. Lilly's U.K. team had to give final approval to the article because Progress in Neurology and Psychiatry was based there, Mitchell said in the February 2001 e-mail.

Ghostwriter's Guide

To ensure that ghostwritten Zyprexa articles met Lilly's standards, company officials issued a guide to preparing them, according to the unsealed files.

The guide, "Medical Press: Pre-Launch Feature Outline," was undated. It's unclear from the documents which teams in Lilly's top 10 markets for the drug received it.

The primer provided a how-to for writing articles, such as instructing the author to use Zyprexa's generic name, olanzapine, instead of its brand moniker, according to the documents. Scientists in medical research traditionally refer to a drug's chemical name.

The guide also offered tips on how to find authors by identifying a "key opinion leader" and providing them either an outline of the article or a finished copy. Authors could include a study investigator, an advisory board member or "Lilly-friendly" doctor, according to the documents.

A sample article laid out how a Lilly employee may find a doctor to ghostwrite a submission that would "prepare the market" for the launch of an intramuscular injectable version of the drug. It also offered an outline for the contents of the article, beginning with background on another drug, droperidol, which had been withdrawn from several countries.

The Article

The article, with the suggested title "Filling the Droperidol Gap," noted that an anti-anxiety drug could be used, before going on to say, "more advanced IM treatments may soon be available to provide a superior alternative." The article explained that injectable Zyprexa had just received approval from the FDA, and recounted its clinical trial history.

"The anticipated forthcoming availability of atypical antipsychotics in an IM formulation could be a major step forward in the treatment of acute agitation associated with schizophrenia," the sample article concluded.

Lilly officials e-mailed journal editors to complain about delays in publishing favorable Zyprexa articles, according to the unsealed documents.

In one instance, Lilly employees contacted the Journal of Clinical Epidemiology about delays of an article criticizing a previously published piece linking Zyprexa, as well as the class of atypical antipsychotics, to diabetes.

E-Mail Exchange

After Suraja Roychowdhury, Lilly's senior scientific communications coordinator, wrote to the journal in November 2002, its editor, Andre Knottnerus, replied in an e-mail that it was "a bit strange to be contacted via the Lilly product team. "Dr. Buse and coauthors can contact us directly next time."

Knottnerus was referring to the manuscript's lead author, John Buse, a former president of the American Diabetes Association. A copy of the Nov. 22, 2002, e-mail was included in the unsealed documents.

Patrizia Cavazzoni, a Lilly staffer who co-wrote the article, e-mailed Buse on Jan. 9, 2003, seeking permission to send a separate e-mail asking to expedite publication. She also asked Buse if he would prefer "to send it in your name?"

It isn't clear from the e-mail chain whether the e-mail was sent by Buse or Cavazzoni. On Jan. 22, 2003, Buse e-mailed Cavazzoni to say he hadn't heard anything and to request Knottnerus's telephone number, according to the documents.

The Zyprexa article by Buse and Cavazzoni was a review of another submission that had previously appeared in the journal, according to the documents. That article summarized previous medical literature on atypical antipsychotics, and found Zyprexa had an increased risk of causing diabetes relative to the class.

Toned Down

Buse, a professor of medicine at the University of North Carolina, Chapel Hill, e-mailed his comments on the article to Cavazzoni for her review on Jan. 26, 2003.

Buse indicated in the e-mail that he was worried he had been "unduly harsh" in his review of the earlier piece. He told Cavazzoni: "If you think I should tone it down, suggest a way," according to the unsealed documents.

There was no response to the e-mail in the documents.

"I don't remember anybody at Lilly ever approaching me for ghostwriting," Buse said in a phone interview. Throughout his career, others had offered to put his name on papers, and he declined, Buse said. He said he couldn't recall the names of anyone involved.

"Ghostwriting used to be quite common," Buse said. "Now I think it's uncommon. I've been at meetings where clinical trials are being completed and there's a discussion of who's going to write which papers, and it's quite clear everyone's sensitive to this issue."

Long Period

Buse said in a Nov. 28, 2006, deposition that working with drugmakers over a long period of time can change the way doctors think about clinical problems.

"It's sort of like Stockholm Syndrome," Buse said in the deposition, referring to a psychological phenomenon in which kidnap victims begin to sympathize with their captors.

"I'm not saying that the pharmaceutical industry captures me," Buse said. "But to the extent that the relationship has something above and beyond medicine, science, you know, it could cloud one's judgment."

Buse added that many researchers develop emotional attachments to drugs they've discovered or studied extensively.

'Natural Tendency'

"There's this natural tendency for people to fall in love with your drug: it's like your child," Buse said. "So you have a hard time accepting criticism."

Barton Moffatt, a Mississippi State University bioethicist who has written about ghostwriting practices among drugmakers, said there's a growing consensus that doctors who lend their names to such articles are engaging in "academic misconduct."

"No one has been fired yet over this, but I think the trend is moving in that direction," Moffatt said. "I think over the last 15 to 20 years, putting your name on a ghostwritten article has come to be seen as plagiarism."

Lilly rose 47 cents, or 1.4 percent, to $34.38 in New York Stock Exchange composite trading today. The shares have fallen 15 percent this year.

The case is UFCW Local 1776 and Participating Employers Health and Welfare Fund v. Eli Lilly & Co., 05-04115, U.S. District Court, Eastern District of New York (Brooklyn).

To contact the reporters on this story: Elizabeth Lopatto in New York at elopatto@bloomberg.net; Margaret Cronin Fisk in Detroit at mcfisk@bloomberg.net; Jef Feeley in Wilmington, Delaware, at jfeeley@bloomberg.net.

*Last Updated: June 11, 2009 18:59 EDT*

Sponsored Links

**Check MD for Malpractice**
Check your doctor for malpractice, sanctions,
education and background
www.healthgrades.com

**Top Jury Verdict for 2007**
$109 Million for brain injured man Duffy & Duffy
Uniondale NY
www.ddandb.com

**Need CRNA Liability Ins.?**
Owned by a practicing CRNA Saving the CRNA a
lot of money!
www.InspecAgency.com

Bloomberg.com: News                                    http://www.bloomberg.com/apps/news?pid=email_en&sid=a5O...

Bloomberg.com   NEWS | MARKET DATA | PERSONAL FINANCE | TV AND RADIO | ABOUT BLOOMBERG | CAREERS | CONTACT US |
LOG IN/REGISTER
©2008 BLOOMBERG L.P. ALL RIGHTS RESERVED.   Terms of Service | Privacy Policy | Trademarks | Site Map | Help | Feedback | Advertising | 日本語サイト

# Drug Co. Accused of Funding Stories

*(Source: Associated Press)*

---

**DALLAS (AP)** A medical researcher says he would not have written an article promoting fen-phen had he known it was paid for and edited by the company that made half of the popular diet drug combination.

"It's really deceptive," said Dr. Albert Stunkard, whose article was published in the American Journal of Medicine in February 1996. "It sort of makes you uneasy."

A lawsuit claims that Wyeth-Ayerst Laboratories hired ghostwriters for articles promoting obesity treatment and then used prominent researchers such as Stunkard to publish the works under their names.

The suit accuses the company that made the "fen" half of the drug combination hid health risks associated with the drugs. The company allegedly tried to play down or remove descriptions of side effects from the articles, The Dallas Morning News reported Sunday.

Only two of the 10 articles paid for by Wyeth actually were published in medical journals before the company pulled the drugs from the market in September 1997, when studies linked the combo to heart valve damage and an often-fatal lung disease. Plans to publish the eight others were canceled.

Stunkard, of the University of Pennsylvania, said he had no idea that Wyeth financed or edited his article.

Officials at Wyeth, a division of American Home Products Corp., defended the articles.

"This is a common practice in the industry. It's not particular to us," Wyeth spokesman Doug Petkus said. "The companies have some input, it seems, in the initial development of the piece ... but the proposed author has the last say."

However, medical ethicists and editors of prominent medical journals criticized the practice.

"What they're doing here is clearly an advertisement, but it's couched in a scientifically valid paper," said Dr. Robert Tenery Jr., a Dallas ophthalmologist and chairman of the American Medical Association's council on ethical and judicial affairs.



The fen in fen-phen refers to Pondimin (fenfluramine) and Redux (dexfenfluramine), both sold by Wyeth. Phentermine, the other half of the combo, is not made by Wyeth and is still available.

Six million people in the United States took Pondimin or Redux. Individuals who took the weight-loss combo have filed thousands of lawsuits nationwide.

Wyeth and a company it acquired hired Excerpta Medica, Inc., to write the 10 articles, according to lawsuit documents cited by the Morning News.

Excerpta, based in Belle Mead, N.J., planned to submit most of the papers to medical journals owned by its parent company, Reed Elsevier Plc, the newspaper reported.

Wyeth officials reportedly said in depositions that the two published articles were reviewed for fairness by independent panels at the journals in which they appeared.

"The articles were not written with a slant toward selling the product," said Dr. Jo Alene Dolan, Wyeth's former associate director of clinical affairs, in a Jan. 15 deposition. "The articles are written with fair balance."

*AP-NY-05-24-99 0444EDT - Copyright 1999, The Associated Press.*

---

 Use your browser **BACK** button to go back

---

www.medscape.com

From The Hastings Center Report

# Pharma Goes to the Laundry

Carl Elliott

Published: 11/11/2004

## Introduction

What's the difference between medical education and pharmaceutical public relations? Not much, according to the people who do it. "(T)he broad distinction between healthcare PR and medical education is becoming obsolete," writes Neil Kendle, chief executive officer of Lowe Fusion Healthcare, in a recent issue of *Pharmaceutical Marketing* magazine. So slender is the difference between education and PR than that Kendle cannot even say for certain which business he is in. "Sometimes I describe Lowe Fusion as a 'PR consultancy', sometimes as a 'healthcare communications agency'. Sometimes I just cop out and list the things we do."[1]

Here's how the business works. The pharmaceutical industry puts up the money, usually in the form of an "unrestricted educational grant." The grant goes to a for-profit medical education and/or communications company (MECC), which, in consultation with its pharma sponsor, puts together an "educational program."[2] The company and the MECC recruit academic physicians to deliver the program in return for a small cut of the grant. If the MECC is accredited by the Accreditation Council for Continuing Medical Education, it can offer the educational program on its own. If not, it must go through the CME office of a medical school, which -- again for a cut of the grant -- accredits the program and certifies it free of commercial bias. Then doctors, nurses and other health care workers attend the "educational program" that pharma has funded in order to satisfy the CME requirements of their professional organizations.

It is, as the corporate manuals like to say, a win-win situation. The doctors and nurses get CME credits; universities get a new revenue stream; academic physicians get some extra pocket money; MECCs get a lucrative market niche (over a billion dollars a year, according to *The Lancet*), and the pharmaceutical industry gets to shape the minds of medical America.[3] By laundering its message through the MECCS, pharma gives up some control, but the pay-off is even better: advertisements with the appearance of objectivity. PR practitioners call this a "third-party" strategy. As Kendle puts it, "Third party sources of information, as long as they are perceived to have expertise in the area they are talking about, are much more credible sources of information than the pharmaceutical company itself." Pharma now funds over 60 percent of continuing medical education in the United States.[4]

Not bothered that your doctor's education comes from pharma? Have a look, then, at the "communications" arm of this lucrative business. Here the results are scientific articles, often in peer-reviewed medical journals. The money is laundered in much the same way. Pharma pays the MECC; the MECC puts together the articles; academic physicians are paid to sign onto the articles, and the MECC places the articles in medical journals. Some academics simply sign ghostwritten articles, while others work from a draft supplied by the company. Sticklers for honesty merely take the money and write the articles themselves. Fees vary. Some academics have signed on for as little as $1,000 or $1,500 per article, including the two faculty members at the Medical University of South Carolina who recently "authored" a ghostwritten article on Ritalin for Novartis.[5] Others command much higher fees. When the debate over second-hand smoke was heating up in the early 1990s, the tobacco industry paid a biostatistician $10,000 to write a single letter to the *Journal of the American Medical Association*.[6] Warner Lambert, the maker of Neurontin, a seizure drug, gave a professor at the University of Minnesota over $300,000 to write a textbook on epilepsy.[7]

None of this is exactly new. What is new is the magnitude of the phenomenon, which has only become evident through recent litigation. For years, nobody really knew how much of the medical literature was ghostwritten, or even how much had originated from pharma. (Ghosts take care to remain invisible.) The most widely cited article on ghostwriting, published in *JAMA* in 1998, found evidence of ghostwriting in 11 percent of articles published in six major American medical journals.[8] To the uninitiated that figure may sound alarmingly high. But according to a



EXHIBIT

7

recent study by David Healy and Dinah Cattell in the *British Journal of Psychiatry*, it may actually be unrealistically low.[9]

As Healy and Cattell explain, a lawsuit brought against Pfizer in 1999 turned up documents produced by a medical communications company called Current Medical Directions. Current Medical Directions was working on a publications strategy for Pfizer's antidepressant, Zoloft (sertraline). These documents listed all the Zoloft studies that Current Medical Directions was preparing for publication in 1999. The documents listed the journals where their papers had been submitted, the conferences where the papers had been presented, the authors of the articles, and so on. It was this last category -- authorship -- that was the most revealing. On a number of articles, the authors were listed as "TBD," or "to be determined." Apparently, Current Medical Directions had written the articles but was still searching for an academic to sign on.

Healy and Cattell decided to track down the articles on Zoloft that Current Medical Directions was working on in 1999 and see what had happened to them. They picked three years -- 1998, 1999, and 2000 -- and scanned the medical literature for all articles published on Zoloft during that time. What they found was stunning. First, the ghostwritten and agency-prepared articles outnumbered the articles written in the traditional way. Forty-one "traditionally authored" articles on Zoloft had been published, while fifty-five articles had come from Current Medical Directions. Second, the articles that came from Current Medical Directions had been published in far more prestigious journals than the traditionally authored articles (ranging from *JAMA* through *Archives of General Psychiatry* and the *American Journal of Psychiatry*.) In fact, the citation rate for the Current Medical Directions articles was over five times higher than the citation rate for the traditionally authored articles. Finally, the Current Medical Directions articles painted a much happier profile of Zoloft than did the traditionally authored articles. For example, the articles prepared by Current Medical Directions on pediatric psychopharmacology failed to mention five of the six children taking Zoloft who took action towards committing suicide.

Still not worried? Have a look at another piece of litigation. Readers of the business pages are becoming familiar with headlines like this one: "The cost of Wyeth's diet-drug disaster: $16.6 billion. And the claims keep coming."[10] That $16.6 billion is the latest price tag for litigation over Fen-Phen, the diet drug combination produced by Wyeth. Fen-Phen is a combination of fenfluramine and phentermine that was promoted as a weight loss drug in the mid-90s. Wyeth produced two versions of fenfluramine: Pondimin and a newer chemical cousin, Redux, or dexfenfluramine. The FDA approved Redux in 1996 despite worries that it might cause primary pulmonary hypertension. As many as seven million people used the drugs. In 1997, Fen-Phen was withdrawn from the market after being linked to valvular heart disease. By some estimates as many as 30 percent of the seven million users would contract valvular disease.[11] Soon the link to primary pulmonary hypertension became even clearer. By 2001, at least 365,000 users had joined a mass federal settlement and Wyeth had acknowledged that at least 45,000 patients had become ill as a result of using the drug. No uncontroversial figures exist as to how many Fen-Phen users have died, but it is safe to say that they number in the many hundreds.[12]

As Alicia Mundy has documented in her alarming book, *Dispensing with the Truth*, the behavior of Wyeth officials during the safety crisis was not exactly a model of corporate responsibility. In 1997, clinicians in Fargo, North Dakota, and the Mayo Clinic notified Wyeth that they had seen thirteen patients on Fen-Phen who had developed valvular disease. How did Wyeth respond? Their safety officer destroyed the data. She went to the files and "overwrote" them to avoid any mention of valvular disease.[13] Wyeth then sat on the information about valvular disease for several more months before notifying the FDA. Wyeth's approach to the worries about primary pulmonary hypertension was hardly better. Typical of its attitude was a memo from a company bureaucrat, later unearthed in litigation, that read, "Can I look forward to my waning years signing checks for fat people who are a little afraid of some silly lung problem?"[14]

The irony is that Fen-Phen was never an especially effective drug. Wyeth's own data showed only a 3 percent difference between Fen-Phen and placebo.[15] The average weight loss on the drug was less than 5 percent.[16] For this very reason, the success of Fen-Phen was enormously dependent on PR. At the center of Wyeth's PR campaign was the message that being overweight is not merely a matter of personal aesthetics. It is a health issue -- and thus a matter that doctors need to take very seriously. To a background chorus of slogans such as "Obesity -- The Public Health Crisis" and "Obesity -- A Chronic Disease," Wyeth pounded out a dubious statistical

message: obesity causes 300,000 deaths a year.[17] Wyeth needed to cast obesity as a dangerous medical problem in order to justify the potential risks of Fen-Phen.

Wyeth's "medical education" campaign for Fen-Phen was a model of the genre. It included pay-outs to academic physicians, lavish conferences, and generous grants to professional medical societies. The $54 million set aside by Wyeth to launch the drug included grants to the American Academy of Family Physicians, the American Diabetes Association, the North American Society for the Study of Obesity, and the American Society of Bariatric Physicians. Wyeth budgeted $700,000 for C. Everett Koop's advocacy group, Shape Up America, $275,000 for a "State of Weight" teleseminar, $179,000 for "Dear Doctor" letters, and $50,000 for a Women's Health seminar.[18] Wyeth also maintained a stable of high-profile academic consultants -- known in the business as Key Opinion Leaders (KOLs) and "advisory board" members. These KOLs included JoAnn Manson of Harvard and Gerald Faich of the University of Pennsylvania, who wrote a complimentary editorial on Fen-Phen for the *New England Journal of Medicine* (without disclosing their ties) and George Blackburn, the chair of the Committee on Nutrition for the Massachussetts Medical Society, who was instrumental in getting Massachussetts to lift a ban on Fen-Phen.[19] When Redux was being considered for approval by the FDA, Wyeth also sent another KOL to testify on its behalf: Tufts University's Louis Lasagna, the noted expert on clinical trial methodology whose essays on research ethics appear in many standard bioethics textbooks, and whose revised version of the Hippocratic Oath is repeated every year by students at many American medical schools.[20]

One of the most ingenious pieces of the Fen-Phen public relations strategy was its ghostwriting scheme. In 1996 Wyeth hired Excerpta Medica Inc, a New Jersey-based medical communications firm, to write ten articles for medical journals promoting obesity treatment. Wyeth paid Excerpta Medica $20,000 per article. In turn, Excerpta Medica paid prominent university researchers $1,000 to $1,500 to edit drafts of their articles and put their names on the published product. Wyeth kept each article under tight control, scrubbing drafts of any material that could damage sales. One draft article included sentences that read: "Individual case reports also suggest a link between dexfenfluramine and primary pulmonary hypertension." Wyeth had Excerpta delete it.[21]

What made Excerpta Medica such an inspired choice is that it is a branch of the academic publisher, Reed Elsevier Plc., which publishes many of the world's most prestigious science journals. Excerpta Medica manages two journals itself: *Clinical Therapeutics* and *Current Therapeutic Research*. According to court documents, Excerpta Medica planned to submit most of the articles it produced to Elsevier journals. In the actual event, Excerpta managed to publish only two articles before Fen-Phen was withdrawn from the market in 1997. One appeared in *Clinical Therapeutics*, the other in the *American Journal of Medicine* (another Elsevier journal). In neither case did the authors of the articles disclose that they were paid by Excerpta Medica. So clean was the laundering operation, in fact, that many of the authors did not even realize that Wyeth was involved. Richard Atkinson of the University of Wisconsin wrote a letter to Excerpta Medica congratulating them on the thoroughness and clarity of their article. "Perhaps I can get you to write all my papers for me!" he wrote. He did have one reservation about the piece he was signing: "My only general comment is that this piece may make dexfenfluramine sound better than it really is."[22]

It wasn't until evidence had mounted that Fen-Phen was actually causing people to die that Wyeth put its PR machine into high gear. After Fen-Phen had been withdrawn from the market, Wyeth spent $100 million on public relations to convince the public that the response had been overblown.[23] It convened an "Expert Panel" of cardiologists and gave Arthur Weyman of Harvard an honorarium of $5,000 per day to chair it.[24] It put together a "Very Important Visiting Professor" (VIVP) program and flew the VIVPs to CME events at exotic resorts.[25] Most critically, Wyeth funded studies to discover evidence that would minimize the safety worries about Fen-Phen, and if the studies were favorable, it publicized those studies heavily. For example, Wyeth spent over $18 million on a study by Neil Weissman at Georgetown University examining valvular damage. When a preliminary analysis of the unpublished data looked somewhat favorable, it was presented at a conference, promoted by press release, and featured on the front page of *USA Today* with the headline, "Study: No Heart Damage from Diet Drug." (That analysis was later discredited.[26])

Of all the depressing features of the Fen-Phen saga, perhaps the most depressing is just how little positive change it has produced. Wyeth has been punished, but academic physicians are still taking paychecks from pharma to sign onto ghostwritten articles; medical schools are still bringing in pharma-funded speakers to deliver

lectures and Grand Rounds; and peer-reviewed medical journals are still publishing pharma-funded editorials, review articles, and journal supplements. What little action the professional bodies have taken has been purely cosmetic. Although the AMA developed clear, well-publicized guidelines governing gifts to physicians many years ago, the guidelines have been widely ignored, perhaps because the pharmaceutical industry funds the AMA itself. When the AMA's Council on Ethical and Judicial Affairs decided to launch a campaign to educate doctors on the ethics of industry gifts in 2000, it made the stunningly inept decision to have pharma fund the campaign.[27] In June 2004 the ACCME published its new guidelines for commercial support of medical education, but the guidelines are vague and toothless.[28] They do little to punish offenders, much less to cut off the flow of money from pharma.

The Fen-Phen case is by no means unique. A similar pattern of deception is emerging in the story of SSRIs and suicide.[29] Warner Lambert's off-label promotion of Neurontin has been, if anything, even more deceptive than Wyeth's Fen-Phen campaign -- and despite fraud sanctions, Neurontin is still a wildly profitable drug.[30] Many (if not most) MECCs are owned by advertising and marketing firms, some of which have begun conducting clinical research themselves.[31] What is especially striking about the testimony of the people involved in these promotions is just how matter-of-fact they are about their marketing practices. When asked about the way the industry cultivates "key opinion leaders" and "advisory board members" to lecture on behalf of pharma, Hugh Gosling, the editor of *Pharmaceutical Marketing*, replied that it was the industry norm. "I think it's exactly the same as it always has been," he said. "I don't feel that there has been a turning point in any way."[32] In the Fen-Phen case, Wyeth officials defended themselves against ghostwriting charges by pointing out just how widespread the practice was. "This is a common practice in the industry," said Wyeth spokesman Doug Petkus. "It's not particular to us."

Why is it so hard to bring about change? Partly because change is in nobody's financial interest. In the case of medical education, the funding operation is seamless. Not only does pharma fund the MECCS who organize the CME, the academics who deliver the CME, and the offices that certify the CME, it also funds the professional societies that require the CME. Specialty groups like the American Psychiatric Association and the American Academy of Family Physicians are heavily dependent on industry funds.[33] Pharma even helps write the accreditation guidelines. Nearly half of the membership of the task force which produced the original ACCME standards governing industry support of CME came from industry itself.[34]

Another reason is that responsibility for the harm is so diffuse. Most of the people involved in these operations do not see any harm in taking a piece of the industry money for themselves. The academic researcher says: what's the harm if I take money for signing onto a MECC-produced editorial as long as I agree with everything that is in it? The doctor says: what's the harm in attending an industry-funded symposium in Boca Raton as long as I look at the presentations with a skeptical eye? The department head says: what's wrong with taking money from Janssen or Merck to fund our Grand Rounds program if it means we can bring in more high-profile speakers? The journal editor says: what's wrong with publishing an industry-funded editorial or review article as long as it gets appropriate peer review? The ethicist says: what's wrong with funding our centers with industry money as long as the gifts are unrestricted and the funders are not issuing any orders? But it is only when all these cogs click together that the machinery is put into motion.

We have known for many years that pharma funding influences behavior. We know that when research is funded by pharma, it tends to favor pharma.[35] We know that when doctors take gifts and fees from pharma, they are much more likely to prescribe the drugs produced by the company that has given them the gift.[36] We know that researchers don't disclose their financial ties even when they are asked -- and usually, they are not asked.[37] Individually, the influence may be slight or even nonexistent; statistically, the result is a clinical and research agenda overwhelmingly shaped by pharma money. Still, we cling to the vast collective delusion that because we cannot see a provable causal link between funding and our own individual behavior, no real influence has been exerted. Nobody is willing to give up money or perks in order to combat a statistical problem.

One of the first ethicists to call attention to the problem of paid editorials was Troyan Brennan at Harvard, who addressed the issue over ten years ago. Writing in the *New England Journal of Medicine*, Brennan explained how he was offered $2,500 by Edelmann Communications on behalf of a pharmaceutical company in exchange for writing an editorial for a peer-reviewed journal. Brennan turned down the money, but he was not willing to

condemn paid editorials or pharma-funded CME. Instead, he called for transparency. "Rather than foreclose the participation of these physicians in such activities as editorial writing, we should consider improving disclosure," wrote Brennan. "Conflicts will remain with us. They must be better managed."[38]

It is time to admit that as a remedy for conflict of interest, disclosure has been an utter failure. Disclosure is an empty ritual designed to ease the consciences of academics unable to wean themselves from the industry payroll. Its only purpose is to serve as a warning signal, like a fire alarm in a burning building. Disclosure does nothing to fix the underlying problem of pharma funding, which is not secrecy but power. It does patients no good to be told that doctors, researchers, and regulators are all in pharma's pocket if there is nothing they can do about it.

If the right constituencies could be mobilized, the mess would not be that hard to clean up. Universities and journals could treat ghostwritten articles as cases of scientific fraud. Department heads could treat faculty who sign onto paid editorials the same way they treat students who sign their names to papers they buy on the Internet. Medical organizations could hold conferences without drug industry perks, just like other professional societies. Universities could pay their ethicists without the help of industry funds, in the same way that they pay their philosophers and sociologists. Journal editors could refuse to publish editorials, review articles, and ethics essays written by authors who are funded by the industry whose products they are addressing. Academic physicians could treat lectures and grand rounds as part of their duty as teachers, rather than as a way to generate extra income. But nobody will take action because nobody sees the problem as their own responsibility. It is hard to see any change taking place in the current climate unless litigators start going after the people who accept this money as well as those who offer it.

When Brennan was writing, bioethicists could have stepped into this debate. But we forfeited any credibility we may have had when we started taking pharma money ourselves. Pfizer may be commissioning ghostwritten Zoloft articles, fighting a lawsuit by parents of children who died in its Nigerian Trovan trials, and paying off a $430 million fraud penalty, but you can still hear ethics lectures in the Pfizer Hall for Medical Humanities at New York University medical school, attend classes taught by the Pfizer Lecturer in Medical Humanities at Royal Free and University College Medical School, and read Pfizer-funded disquisitions on conflict of interest in the *American Journal of Bioethics* -- which is housed at the Pfizer-funded Center for Bioethics at the University of Pennsylvania, whose director has served as a Pfizer consultant.[39] What should we make of the fact that the *Hastings Center Report*, which receives funding from Merck, one of many pharmaceutical companies undertaking clinical research in the developing world, has recently published an essay on the ethics of research in the developing world whose lead author is a paid speaker for Merck?[40]

The degree of dissembling and rationalization here might be funny if the stakes were not so high. "I take the money but it doesn't influence me." "I take the money from many different sources in order to keep my objectivity." "I take the money but I make sure that no more than forty percent of our center's funding comes from corporate sources." "I take the money but I always disclose." "I take the money but I say what I want." Or my favorite: "I take the money but I use it to advocate for social justice." The rationalizations always begin with the phrase: "I take the money." No one will just say no. In fact, only a few people in academic medicine will openly criticize those who won't say no. With the exception of a few watchdog groups and an outspoken group of critics, most of them journal editors or ex-editors, academic medicine treats the issue as an embarrassing peccadillo, like an unavoidable temptation best handled with a wink and a grin. At all costs we must avoid what ethicist and drug industry consultant Thomas Donaldson calls a "holier-than-thou stance."[41]

But this is no peccadillo. It represents an enormous betrayal of public trust. We count on doctors to make decisions based on what's best for us, we count on researchers to publish impartial data, and we count on educators to tell us the truth -- regardless of what the pharmaceutical industry says. Nobody who makes even a token effort to find out where their checks are coming from could conclude that consultancies, advisory board memberships, educational grants, and speaker's bureaus are anything but thinly disguised marketing tools.[42] Pharma needs to make a profit; that is part of its mission. But to surrender our impartiality to that mission is a betrayal of everything that universities are supposed to stand for. The cost of that betrayal is being paid in human lives.

Click here to subscribe.



## References

1. N. Kendle, "Life Without a Label," Pharmaceutical Marketing, June 1, 2001.
2. A.S. Relman, "Separating Continuing Medical Education from Pharmaceutical Marketing," JAMA 285 (2001): 2009-2012.
3. "Drug Company Influence on Medical Education in USA," Lancet 356 (2000): 781.
4. S. Hensley, "Drug Firms Shown Classroom Door: Continuing-Ed Programs For Doctors Aim to Reduce Influence of Big Companies," Wall Street Journal, January 14, 2003.
5. M. Petersen, "Madison Ave. Has Growing Role In the Business of Drug Research," New York Times, November 22, 2002.
6. D. Hanners, "Documents Indicate Tobacco Industry Paid Scientists to Write to Editors," St. Paul Pioneer Press, August 5, 1998.
7. M. Petersen, "Court Papers Suggest Scale of Drug's Use," New York Times, May 30, 2003.
8. A. Flanagin et al., "Honorary Authors and Ghost Authors in Peer-Reviewed Medical Journals," JAMA 280 (1998): 222-24.
9. D. Healy and D. Cattell, "Interface between Authorship, Industry and Science in the Domain of Therapeutics," British Journal of Psychiatry 183 (2003): 22-27.
10. A. Barrett, "The Class Action That Wouldn't Quit: The Cost of Wyeth's Diet-Drug Disaster: $16.6 Billion. And the Claims Keep Coming," Business Week, May 24, 2004.
11. Morbidity and Mortality Weekly Report 46, no. 45, November 14, 1997.
12. The FDSA linked Redux, which was only on the market for a year, to 123 deaths when it was withdrawn in 1997. Pondimin was marketed for a longer period, Mundy estimates the total number of deaths to be close to 1,000. See David Willmon, "The New FDA," Los Angeles Times, Dec 20, 2000, and Alica Mundy, personal correspondence, August 11, 2004.
13. A. Mundy, Dispensing with the Truth (New York: St. Martin's Press, 2001), 159, 181-82.
14. Ibid., 9.
15. J. Brown, "The Poison Pill," Salon, May 16, 2001.
16. M. Kaufman and A. Julien, "Scientists Helped Industry to Push Diet Drug," Hartford Courant, April 10, 2000.
17. Mundy, Dispensing with the Truth, 41.
18. Ibid., 79-80.
19. J.E. Manson and G.A. Faich, "Pharmacotherapy for Obesity: Do the Benefits Outweigh the Risks?" NEJM 335 (1996): 659-60; M. Angell and J. Kassirer, "Editorials and Conflicts of Interest," NEJM 335 (1996): 1055-1056; Mundy, Dispensing with the Truth, 81, 121-25.
20. Kauffman and Julien, "Scientists Helped Industry to Push Diet Drug."
21. C. Ornstein, "Maker of Diet-Drug Combo Accused to Funding Journal Articles," Dallas Morning News, May 23, 1999.
22. Ibid.; see also Mundy, Dispensing with the Truth, 164.
23. Ibid., 115.
24. Ibid., 119.
25. Ibid., 122-23.
26. Ibid., 116-19.
27. S. Okie, "AMA Criticized for Letting Drug Firms Pay for Ethics Campaign," Washington Post, August 30, 2001.
28. A. Relman, "Defending Professional Independence: ACCME's Prposed New Guidelines for Commerical Support of CME," JAMA 289 (2003): 2418-2420.
29. See C. Medawar and A. Hardon, Medicines Out of Control? Antidepressants and the Conspiracy of Goodwill (Amsterdam: Transaction Publishers, 2004); and David Healy, Let Them Eat Prozac (New York:

New York University Press, 2004).

30. J. Lenzer, "Pfizer Pleads Guilty but Drug Sales Continue to Soar," BMJ 328 (2004): 1217.

31. Petersen, "Madison Ave. Has Growing Role in Business of Drug Research."

32. T. Jackson, "Are You Being Duped? How Drug Companies Use Opinion Leaders," BMJ 322 (2001): 1312.

33. The Center for Science in the Public Interest maintains a searchable database on the financial ties of non-profit groups and scientists to corporate sources. It can be found at http://cspinet.org/integrity /nonprofits/.

34. Relman, "Separating Continuing Medical Education from Pharmaceutical Marketing."

35. B. Als-Nielsen et al., "Association of Funding and Conclusions in Randomized Drug Trials," JAMA 290 (2003): 921-28; R.A. Davidson, "Source of Funding and Outcome of Clinical Trials," Journal of General Internal Medicine 1, no. 3 (1986): 155-58.

36. See A. Wazana, "Physicians and the Pharmaceutical Industry: Is a Gift Ever Just a Gift?" JAMA 283 (2000): 373-80; M.M. Chren and C.S. Landefeld, "Physicians' Behavior and Their Interaction with Drug Companies," JAMA 271 (1994): 684-89; J.P. Orlowski and L. Wateska, "The Effects of Pharmaceutical Firm Enticements on Physician Prescribing Patterns," Chest 102 (1992): 270-73.

37. S. Krimsky and L. Rothenberg, "Conflict of Interest Policies in Science and Medical Journals: Editorial Practices and Author Disclosures," Science and Engineering Ethics 7, no. 2 (2001): 205-17.

38. T. Brennan, "Buying Editorials," NEJM 331 (1994): 673-75.

39. B. Tansey, "Huge Penalty in Drug Fraud; Pfizer Settles Felony Case in Neurontin Off-label Promotion," San Francisco Chronicle, May 14, 2004. For information about the Pfizer Foundation Hall for Humanism in Medicine, see R. Moynihan, "The Making of a Disease: Female Sexual Dysfunction," BMJ 326 (2003): 45-47. Information about Pfizer's New York University School of Medicine Master Scholars Program is available at http://tutorialspub.med.nyu.edu/Content/MSP/MSPBrochure.pdf. An announcement of the Pfizer Lecturer in Medical Humanities is reported in the Journal of Medical Ethics: Medical Humanities 27 (2001): 69. For the Nigerian Trovan trials, see A. Raufu, "Nigerians in Drug Trial Take Their Case to U.S. Court," BMJ 326 (2003): 899. The University of Pennsylvania Center for Bioethics discloses its funding sources at http://www.bioethics.upenn.edu/resources/. For the Pfizer-funded article on conflict of interest, see D. Katz, A. Caplan, and J. Merz, "All Gifts Large and Small: Toward an Understanding of the Ethics of Pharmaceutical Industry Gift-Giving," American Journal of Bioethics 3, no. 3 (2003): 39-46. On the director's Pfizer consultancy, see L. Weeks, "Viagra Debate Vigorous; Drug Sparks Questions of Sexual Politics," Washington Post, April 26, 1998.

40. The participants in the 2001 Conference on Ethical Aspects of Research in Developing Countries, "Moral Standards for Research in Developing Countries: From 'Reasonable Availability' to 'Fair Benefits,'" Hastings Center Report 34, no. 3 (2004):17-27.

41. T. Donaldson, "The Business Ethics of Bioethics Consulting," Hastings Center Report 31, no. 2 (2001): 13.

42. Petersen, "Madison Ave. Has Growing Role In the Business of Drug Research." See also the revealing account of a former drug representative: M.J. Oldani, "Tales from the 'Script': An Insider/Outside View of Pharmaceutical Sales Practices," Krober Anthropological Society 87 (2002): 146-76.

**Acknowledgments**

I am grateful to Arnold Relman and Alicia Mundy for speaking to me about their work.

The Hastings Center Report. 2004;34(5) © 2004 The Hastings Center