**FILED**
EASTERN U.S. DISTRICT COURT
DISTRICT ARKANSAS

JUN 17 2009

JAMES W. McCORMACK, CLERK
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

In re:                                    :        MDL Docket No. 4:03CV1507WRW
                                          :
PREMPRO PRODUCTS LIABILITY                :
LITIGATION                                :
                                          :

MEMORANDUM OF LAW IN SUPPORT OF

THE NEW YORK TIMES COMPANY'S

MOTION FOR LEAVE TO INTERVENE

and

MOTION TO SET ASIDE DEFENDANT'S
DESIGNATION OF CONFIDENTIALITY

The New York Times Company ("The Times") respectfully submits this memorandum of law in support of its motion for leave to intervene and to vacate or substantively modify the protective order in this litigation.  On behalf of the public, The Times seeks access to documents, exchanged in discovery, shedding public light on defendant's "ghostwriting" practices.  These documents will educate the public and allow them to better understand materials they use every day in making their often life-depending health care decisions.  If released, they will aid the public in comprehending that some of the articles they rely on, and believe objective, are, in fact, biased and essentially paid for by a drug company whose medicine the articles are promoting.

Moreover, not only is there – and should there be – great public interest in these documents, they do not come close to meeting the test for a valid protective order.  They do not contain proprietary or trade secret information, and certainly no showing has been made – let alone, with particularity and specificity – that secrecy is required under the strict test of Federal

1

Rules of Civil Procedure 26(c). To the contrary, the protective order here appears to have been entered for the convenience of the litigants, but without scrutiny under the "good cause" test and without any consideration that, at bottom, this litigation is being played out in a public judicial forum in which the interest of the public must be strongly considered. Particularly where these documents may have an effect on the public's health care needs and decisions, these are the last type of documents that should be shielded from public view.

## STATEMENT OF FACTS

The vast majority of documents establishing, explaining and evaluating defendant's ghostwriting remain sealed – excluded from public view – by order of this court. [1] Duff Wilson, *Drug Maker Said to Pay Ghost Writers for Journal Articles*, N.Y. Times (nytimes.com) (Dec. 12, 2008) (Exh. 1). [2] That neither The Times nor any other press entity opposed the entry of this order is not unusual. At the time it was entered, The Times was unaware of the importance of this litigation or of the pendency of the proposed protective order. This in no way prejudices the press' right to intervene and seek access to these documents now – particularly given that the good cause standard is not met now in 2009 any more than it was met five years ago, and particularly given the obvious public interest in them today.

Thus, Senator Charles Grassley, the ranking Republican of the Finance Committee of the United States Senate, is investigating defendant's ghostwriting of hormone therapy articles. Sen. Grassley has determined that a review of all documents relating to ghostwriting is essential to his committee's evaluation of Wyeth's conduct and has asked Wyeth to produce to his committee

---

[1]     The protective order that shields these documents from discovery is Document No. 700, *In re Prempro Products Liab. Litig.*, Case No. 03-1507 (July 6, 2005) (hereafter "Prot. Ord.").

[2]     http://www.nytimes.com/2008/12/12/business/13wyeth.html?_r=1.

the documents Wyeth has erroneously designated as confidential in this litigation. *Id.* Indeed, these are among the documents sought here.

Ghostwriting has become a common practice among the nation's pharmaceutical companies. There is certainly nothing unique or "proprietary" to Wyeth about the practice. And even if there was, this is hardly the kind of proprietary tactic that merits – or deserves – protection under Rule 26(c). In fact, this Court's order setting aside a punitive damages award to Donna Scroggin in the most recent MDL trial was based, in part, on this Court's conclusion that ghostwriting has become a "norm" in the industry.  (Post-Trial Order, Document No. 657, *Scroggin v. Wyeth*, Case No. 04-1169 (July 8, 2008) at 38 & n. 180).  The Journal of the American Medical Association likewise has concluded that "ghostwriting is widely practiced by drug companies as part of their marketing efforts." *See, e.g.,* Alice Dembner, *Drug Firm Paid MDs for Bylines*, BOSTON GLOBE (Apr. 16, 2008) (Exh. 2);[3] Joseph S. Ross, et al, *Guest Authorship and Ghostwriting in Publications Relating to Rofecoxib*, 299 JAMA 1800, 1800, 1809-10 (Apr. 16, 2008) (Exh. 3); *see also* Flanagin, et al, *Prevalence of Articles with Honorary Authors and Ghost Authors in Peer-Reviewed Medical Journals*, 280 JAMA 222, 224 (1998) (Exh. 4) ("A substantial proportion of articles in peer-reviewed medical journals demonstrate evidence of honorary authors or ghost authors.").  As University of Minnesota bioethicist, Carl Elliot noted, drug companies' use of ghostwriters has generated "a huge body of medical literature that society cannot trust."  Elizabeth Lapatto, et al, *Lilly "Ghostwrote" Articles to Market Drugs, Files Say*, BLOOMBERG NEWS (June 11, 2009) (Exh. 5).[4]

---

[3]

       http://www.boston.com/business/articles/2008/04/16/journal_drug_firm_paid_mds_for_b ylines/.

[4]      http://www.bloomberg.com/apps/news?pid=email_en&sid=a5OeWzHgCtFo.

Defendant has acknowledged in the popular press that its ghostwriting practices are commonly employed by other drug giants. Wyeth spokesman, Doug Petkus told the national media: "This is a common practice in the industry. It's not particular to us." (Exh. 6).[5] For precisely this reason, the documents revealing the practice are not proprietary to Wyeth and should not remain protected from public view.

## ARGUMENT AND AUTHORITY

**I.     The Times' Interest in this Matter Warrants Leave to Intervene to Challenge the Protective Order.**

The Times is the publisher of The New York Times. The newspaper's weekday circulation is the highest in the nation among metropolitan dailies at more than 1.07 million daily and 1.5 million on Sunday. The average number of monthly unique visitors to NYTimes.com has reached 14.7 million in the United States alone. The New York Times has published extensively on the pharmaceutical industry's purported manipulation of medical opinion through a variety of means, including ghostwriting. In fact, the New York Times has published on the ghostwriting revealed by these very proceedings.

Through this motion, The Times seeks to protect the public's historic right to access to materials related to judicial proceedings, a right that arises from the First Amendment as well as the common law. *See, e.g., Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982) (First Amendment right to proceedings); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980) (First Amendment right to proceedings); *Nixon v. Warner Communications*, 435 U.S.

---

[5]     http://www.premarin.org/fen-phen.html.

4

589, 597-98 (1978) (common law right to documents); *United States v. Suarez*, 880 F.2d 626, 630 (2d Cir. 1989) (First Amendment right to documents).  This right of access is an affirmative, enforceable public right.  The standing of the press to enforce the right is well-settled.  *See e.g., Globe Newspaper*, 457 U.S. at 609 n. 25; *In re Herald Co.*, 734 F.2d 93, 101-102 (2d Cir. 1984); *Westmoreland v. Columbia Broadcasting System, Inc.*, 752 F.2d 16, 23 (2d Cir. 1984); *United States v. Brooklier*, 685 F.2d 1162, 1168 (9th Cir. 1982); *United States v. Criden*, 675 F.2d 550, 552 n. 2 (3d Cir. 1982).

Courts consistently recognize a motion to intervene as the procedurally proper device to protect the public right of access by facilitating the lifting or modification of protective orders governing discovery.  *See, e.g., SEC v. TheStreet.com*, 273 F.3d. 222, 227 (2d Cir. 2001); *Schiller v. City of New York*, No. 04 Civ. 7922 KMK JCF, 2007 WL 136149, at *2 (S.D.N.Y. Jan. 19, 2007); *In Re Application of the Akron Beacon Journal*, No. 94 Civ. 1402, 1995 WL 234710, at *5 (S.D.N.Y. April 20, 1995); *In re Zyprexa Prod. Liab. Litig.*, No. 05-CV-4115, 2008 U.S. Dist. LEXIS 71037, at *67 (E.D.N.Y. Sept. 5, 2008).

The Times has standing to challenge the protective order in this case.  Prior to their admission at trial, most documents obtained through pre-trial discovery are neither public records nor judicial documents and thus are not automatically subject to mandatory public disclosure.  *Seattle Times Co. v. Rhinehart* 467 U.S. 20 (1984).  But judicial secrecy is such anathema to our system of democracy that "pretrial discovery must take place in the public [eye] unless compelling reasons exist for denying the public access to the proceedings."  *Jepson, Inc. v. Makita Elec. Works, Ltd.* 30 F.3d 854, 858 (7th Cir. 1994)*, quoting American Tel. & Tel. Co. v. Grady,* 594 F.2d 594, 596 (7th Cir. 1978), *cert. denied,* 440 U.S. 971 (1979).  Litigants have "a constitutionally protected right to disseminate information gained by them through the

discovery process, absent a valid protective order." *Public Citizen v. Liggett Group, Inc.* 858 F.2d 775, 780 (1st Cir. 1988); *quoting Oklahoma Hospital Ass'n,* 748 F.2d 1421, 1424 (Okla. Civ. App. 1984); s*ee also San Jose Mercury News, Inc. v. U.S. Dist. Ct.,* 187 F.3d 1096, 1103 (9th Cir. 1999) ("It is well established that the fruits of pre-trial discovery are, in the absence of a court order to the contrary, presumptively public.")

In cases where valid protective orders do exist, "the press does have standing to challenge a protective order for abuse or impropriety." *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.,* 24 F.3d 893, 898 (7th Cir. 1994) (*citing In re Continental Illinois Securities Litigation,* 732 F.2d 1302, 1310 (7th Cir.1984)).[6] A litigant wishing to challenge a protective order in whole or in part should file a motion to vacate or modify the protective order.  Nonparties, such as the press, must go through an extra step.  Since at least 1979, federal courts have recognized that a nonparty wishing to challenge a protective order must first file a motion to intervene under Rule 24 of the Federal Rules of Civil Procedure. *Public Citizen v. Liggett Group, Inc.* 858 F.2d 775 (1st Cir. 1988), *cert denied,* 488 U.S. 1030, (1989) (*citing In re Beef Industry Antitrust Litigation,* 589 F.2d 786, 789 (5th Cir.1979); *accord S.E.C. v. TheStreet.Com* 273 F.3d 222 (2nd Cir. 2001).

Here, The Times moves to intervene to challenge the protective order in these proceedings to the extent that it prohibits litigants from disseminating documents relating to articles written by DesignWrite personnel or other Wyeth contractors on behalf of Wyeth regarding the safety and efficacy of hormone therapy.  The Times should be permitted to intervene for the limited purpose of challenging Wyeth's confidentiality designations to permit

---

[6]     *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.,* 24 F.3d 893, 898 (7th Cir. 1994) (*citing In re Continental Illinois Securities Litigation,* 732 F.2d 1302 (7th Cir.1984)).

the parties to share a limited category of discovery materials with the press, and ultimately, the public.

## II.   The Public Has a Right to Know of the Existence, Methods and Extent of Wyeth's Ghostwriting Activities.

In a democratic society, the public's right to know the full contents of judicial proceedings – including the documents generated – has longstanding roots.   In fact, it is grounded in part in the right to a "speedy and public trial."   That right is the product of the Founding Fathers' profound distrust of judicial secrecy.   This distrust can be attributed in part to "the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the lettre de cachet."   *In re Oliver,* 333 U.S. 257, 268-269 (1948).   While the right to a public trial protects primarily the rights of the accused, it also protects the "public's right to monitor the functioning of our courts, thereby insuring quality, honesty and respect for our legal system."   *Matter of Continental Illinois Securities Litigation* 732 F.2d 1302, 1309 (7th Cir. 1984).

The First Amendment also protects the public's right of access.   As former Supreme Court Chief Justice Warren Burger wrote: "In guaranteeing freedoms such as those of speech and press, the First Amendment can be read as protecting the right of everyone to attend trials so as to give meaning to those explicit guarantees."   *Richmond Newspapers, Inc. v. Virginia* 448 U.S. 555, 575 (1980).   But the public's right to an open judiciary extends further still, as "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."   *Nixon v. Warner Communications, Inc.* 435 U.S. 589, 597 (1978).

While the Supreme Court has never *specifically* held that the right of access extends to civil proceedings, other federal appellate courts that have addressed the issue have found that it does. For example, in *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893 (7th Cir. 1994), the Seventh Circuit explained:

> [T]hough its original inception was in the realm of criminal proceedings, the right of access has since been extended to civil proceedings because the contribution of publicity is just as important there. *Smith v. United States Dist. Court,* 956 F.2d 647, 650 (7th Cir.1992). In fact, mistakes in civil proceedings may be more likely to inflict costs upon third parties, therefore meriting even more scrutiny. *Richmond Newspapers,* 448 U.S. at 596, 100 S.Ct. at 2838 (Brennan, J., concurring).

*Id.* at 897; *see also Westmoreland v. CBS*, 752 F.2d 16, 23 (2nd Cir. 1984) ("the First Amendment does secure to the public and to the press a right of access to civil proceedings;" *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1178 (6th Cir. 1983) ("The Supreme Court's analysis of the justifications for access to the criminal courtroom apply as well to the civil trial.")

There is no serious debate over whether judicial proceedings and records are open to the public and to the press. Nor is there any serious dispute among scholars regarding whether the public, particularly physicians, have the right to know the existence, nature and extent of ghostwriting by drug firms like Wyeth. Undeniably, medical articles influence physician and patient prescription decisions. Dembner, *supra* (Exh. 2). The magnitude of the problem has only recently been coming to light as a direct result of litigation. Carl Elliot, *Pharma goes to the laundry* (The Hastings Center Report), MEDSCAPE (Nov. 11, 2004) (Exh. 7).[7] Thus, not only can the good cause standard to uphold the protective order not be met, it is clear that the origin and

---

[7]      http://www.medscape.com/viewarticle/492877_print.

objectivity – or lack thereof – of articles critical to key medical decisions are of the utmost public interest.

**III.    This Court Should Permit the Parties to Release Documents on Ghostwriting to the Media, Whether by a Finding of Non-Confidentiality or Modification of the Protective Order.**

The Times has learned that the protective order in this litigation was not the product of adversarial debate. Rather, the co-chairs of the Plaintiffs' Steering Committee ("PSC") at the inception of this litigation – neither of whom is involved in the litigation any longer[8] – consented to Wyeth's one-sided and improper protective order. The order allows Wyeth to designate <u>any</u> document as confidential without a showing of good cause. (Prot. Ord. at 1-2 § I). Regardless, The Times was not privy to the negotiations and certainly did not consent to the order. The Times thus has standing to challenge the order's propriety.

When a party seeks to shield particular documents from discovery, the party has the burden of establishing "good cause" for nondisclosure. The objecting party must justify the protective order's application in the particular instance. If a request is made for modification of the protective order, the objecting party has the burden of proving that modification is unwarranted. See, e.g., *Schiller v. City of New York*, No. 04 Civ. 7922 KMK JCF, 2007 WL 136149, at *2, *4 (S.D.N.Y. Jan. 19, 2007) (holding that the burden of showing good cause for issuance of a protective order or for ensuring it is not modified falls on the party seeking nondisclosure); *Daniels v. City of New York*, 200 F.R.D. 205, 207 (S.D.N.Y. 2001) (where an intervenor asserts a public interest, "the burden is on the party seeking to maintain the

---

[8]    The former co-chairs of the PSC are Michel Mills and Jan Helder. Neither remains a member of the PSC.

confidentiality order to show that there is 'good cause' for continued confidentiality"); *Havens v. Metropolitan Life Ins. Co.*, No. 94 Civ. 1402, 1995 U.S. Dist. Lexis 5183, \*28-\*29 (S.D.N.Y. April 20, 1995) (requiring defendant to show good cause for keeping discovery confidential when newspaper intervenes for modification of protective order).

The one exception to this rule arises when a party has "reasonably relied" on the protective order in producing discovery, and in that instance there is strong presumption against modification. *TheStreet.com*, 273 F.3d at 229.  However, the courts will not find such "reasonable reliance" in instances where the protective order allows parties unilateral discretion to designate discovery confidential and provides for such designation to be challenged and changed by motion to the court after production.  See, e.g., *Schiller*, 2007 WL 136149, at \*5; *Allen v. City of New York*, 420 F. Supp.2d 295, 300-01 (S.D.N.Y. 2006); *In re Iwasaki*, No. M19-82, 2005 U.S. Dist. Lexis 10185, at \*4 -\*5 (S.D.N.Y. May 26, 2005); *Fournier v. McCann Erickson*, 242 F. Supp.2d 318, 341 (S.D.N.Y. 2003); *see also TheStreet.com*, 273 F.3d at 230-31 ("some protective orders may not merit a strong presumption against modification [such as] protective orders that are on their face temporary or limited").  Absent reasonable reliance, the party in favor of sealing must demonstrate good cause as if the order is being sought for the first time.  *Allen*, 420 F. Supp.2d at 301 (because there was no reasonable reliance, "the Court will examine de novo whether the City has shown that the materials may be made confidential pursuant to Fed. R. Civ. P. 26(c)"); *Fournier*, 242 F. Supp.2d at 342-43 (where protective order did not require parties to demonstrate good cause before sealing, the court will not show deference to protective order on motion to modify).

Like the protective orders in *Schiller*, *Allen*, and *Fournier*, the order in this case allows Defendants to unilaterally designate documents as confidential with no showing of good cause

and expressly permits Plaintiffs to challenge the designations in court after production. (See Prot. Order at 1-2 § I; 4 § III).  Hence, the "reasonable reliance" exception does not apply, and Wyeth must show good cause to keep discovery materials secret.

The burden of showing good cause is not insignificant.  To show good cause under Rule 26(c), Defendants are required to make a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Havens*, 1995 U.S. Dist. Lexis 5183, at *29 (*quoting Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986)).  "This standard demands that the company prove that disclosure will result in a clearly defined and very serious injury to its business." *Gelb v. AT&T*, 813 F. Supp. 1022, 1034 (S.D.N.Y. 1993) (internal quotations and citations omitted).

Wyeth's burden is particularly high given the significance of information regarding ghostwriting to the public health.  In fact, "[w]here products are indeed hazardous, information concerning the dangers of the products and the corporations [sic] lack of action to prevent the dangers or its attempt to conceal the dangers should not be subject to protection under Rule 26(c)." *Culinary Foods, Inc. v. Raychem Corp.* 151 F.R.D. 297, 301 (N.D. Ill., 1993).

One would be hard-pressed to conjure up a reason documents on ghostwriting should be deemed proprietary.  Wyeth has told the world that its ghostwriting practice is no different than the practice employed by the rest of the pharmaceutical industry.  There are no trade secrets in ghostwritten articles.  Certainly, the documents revealing Wyeth's development of themes, Wyeth's retention of DesignWrite to draft articles based on those themes, DesignWrite's retention of English majors to draft the articles, DesignWrite's solicitation of doctors to sign off on the articles, cancelled checks showing payment to the doctors and cover letters to journals to

publish the articles cannot be deemed to contain anything proprietary to the company.[9] Wyeth cannot meet its burden of showing good cause for shielding these documents from the public eye.

**CONCLUSION**

For the foregoing reasons, The New York Times Company respectfully requests that the Court grant leave for the company to intervene in these proceedings. The Times further requests that the Court find that documents relating to Wyeth's ghostwriting practices are not confidential and are therefore not subject to the protective order of confidentiality in this litigation. In the alternative, The Times asks the Court to issue a superseding order or modification of the protective order that permits litigants to provide documents regarding Wyeth's ghostwriting practices to the public and/or press. The Times further requests all other relief to which it is entitled.

Respectfully Submitted,

J.G. "Gerry" Schulze
BAKER & SCHULZE
303 President Clinton Ave, Suite D
Little Rock, AR 72201
(501) 537-1000
gschulze@ebslawfirm.com

---

[9] These facts were established by Plaintiff's Exhibts 950A-J as introduced in the *Scroggin* trial.

12

George Freeman
Vice-President & Assistant General Counsel
The New York Times Company Legal Department
620 8th Avenue
New York, NY 10018
212-556-1558

ATTORNEYS FOR THE NEW YORK TIMES
COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of March 2009, a true and correct copy of the

foregoing document was electronically filed with the Clerk of Court using the CM/ECF system,

and a true and correct copy was forwarded by e-mail to the following parties:

F. Lane Heard, III: lheard@wc.com
Stephen L. Urbanczyk: surbanczyk@wc.com
Williams & Connolly LLP
725 12th Street, NW
Washington, DC 20005-5901

Lyn Peeples Pruitt: lpruitt@mwsgw.com
Mitchell, Williams, Selig, Gates & Woodyard, PLLC
425 West Capitol Avenue, Suite 1800
Little Rock, AR 72201

J.G. "Gerry" Schulze

13