**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | § | **MDL Docket No. 4:03CV1507WRW** |
| **PREMPRO PRODUCTS LIABILITY** | § | **ALL CASES** |
| **LITIGATION** | § | |
| | § | **&** |
| | § | |
| | § | ***Bryant v. Wyeth, et al.*** |
| | § | **(applies to Margaret Vone only)** |
| | § | **Cause # 4:05-cv-00167** |
| | § | |
| | § | ***Bonanno v. Wyeth, et al.*** |
| | § | **(applies to Dewey Parker only)** |
| | § | **Cause # 4:04-cv-00965** |
| | § | |
| | § | ***Darlene Lee v. Wyeth, et al.*** |
| | § | **Cause # 4:05-cv-00146** |
| _____ | § | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**RE: DEFENDANTS GREENSTONE'S AND BARR'S
AFFIRMATIVE DEFENSE OF FEDERAL PREEMPTION**

This motion is brought on behalf of Plaintiffs Margaret Vone, Dewey Parker and Darlene Lee, MDL plaintiffs who ingested estrogen along with generic medroxyprogesterone acetate (MPA) manufactured by drug manufacturers Greenstone[1] and / or Barr.[2]  Despite the clear ruling from the United States Supreme Court in *Wyeth v. Levine*, 129 S. Ct. 1987 (2009), the generic manufacturer defendants in this MDL continue to assert an affirmative defense of federal preemption.  Plaintiffs thus seek a ruling from the Court on this issue.

---

[1]     Defendants Greenstone LLC, f/k/a Greenstone LTD. hereby referred to as "Greenstone."
[2]     Defendants Barr Pharmaceuticals, LLC, f/k/a Barr Pharmaceuticals, Inc., and Barr Laboratories, Inc are hereby referred to as "Barr."

The United States Supreme Court's decision last year in *Wyeth v. Levine*, 129 S. Ct. 1987 (2009), detailed the lack of federal preemption under the Food, Drug & Cosmetics Act.   As the *Levine* court wrote:

> Of course, the FDA retains authority to reject labeling changes made pursuant to the CBE regulation in its review of the manufacturer's supplemental application, just as it retains such authority in reviewing all supplemental applications.   **But absent clear evidence that the FDA *would not have approved* a change to [the drug's] label, we will not conclude that it was impossible for [the manufacturer] to comply with both federal and state requirements.**

*Id.* at 1198 (emphasis added).

To prevail on their affirmative defense of federal preemption, Greenstone and Barr must thus prove that it was impossible for them to comply with both federal and state requirements in changing their MPA labeling.   In other words, these defendants must show that the FDA would have rejected a change in the MPA warning, if it had been proposed.   Greenstone and Barr must prove, as a matter of law, that it would have been impossible to comply with both state and federal requirements or that state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.   *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62 (2000). There is no such evidence.

Rather, despite mounting concern about a real risk of breast cancer for women who used combination hormone therapy, these defendants never proposed to the Food and Drug Administration (FDA) that the warnings on their generic MPA labels be changed to reveal that risk. On the contrary, as detailed below, the FDA actually sought a stronger breast cancer warning in the MPA labeling and that new warning was resisted by the drug companies.

Generic drug companies assert that they have a unique and different argument for preemption than Wyeth did in the *Wyeth v. Levine* case.   Generic manufacturers argue that conflict with the Hatch-Waxman Amendments ("Hatch-Waxman") to the FDCA creates preemption.   Pub. L. No. 98-417, 98 Stat. 1584 (1984).   But every court to take up this question since the *Levine* decision, including the Eight Circuit, has concluded that state failure-to-warn claims against generic drug companies are not preempted.  Nevertheless the generic drug companies continue to seek a special immunity from liability, an immunity that the name-brand drug companies (Wyeth and Pfizer) no longer even assert.[3]   Recently, Barr filed a motion for summary judgment on federal preemption in a hormone therapy case in West Virginia state court.   After full briefing, the trial judge denied Barr's motion just a few weeks ago.[4]

## STATEMENT OF FACTS[5]

Each of the named plaintiffs in this motion, Margaret Vone, Dewey Parker and Darlene Lee ingested generic MPA manufactured by defendants Greenstone and / or Barr in addition to estrogen.   Plaintiff Margaret Vone ingested estrogen along with MPA by Greenstone from 1995 to 1997 and Premarin with MPA manufactured by Barr from 1998 to 2000.[6]  Plaintiff Dewey Parker ingested Premarin along with MPA manufactured by Greenstone from 1995 to 1996 and again from 1997 to 1999.[7]   Plaintiff Darlene Lee

---

[3]      Wyeth has withdrawn its appeal on the grounds of federal preemption in every pending hormone therapy appeal since the U.S. Supreme Court decision in *Wyeth v Levine* came out.

[4]      Exhibit 1 - *Vance v. Wyeth* (5/5/10), Order Denying Barr's Motion Based on Federal Preemption.

[5]      A statement of undisputed facts is set forth, as required by Local Rule 56.1, as Exhibit 24.

[6]      Exhibit 2 - Prescription records for Margaret Vone.

[7]      Exhibit 3 - Prescription records for Dewey Parker.

ingested Premarin along with MPA manufactured by Barr from 1999 to 2000.[8]   Each

plaintiff developed breast cancer and filed suit against these defendants for their

injuries.[9]   Both defendants seek, through their affirmative defense of preemption, to

leave these women – and every other similarly situated MDL plaintiff who used a

generic hormone drugs - without a legal remedy.[10]

## I.   FDA's Initial Approval of Prescription Drugs for Marketing Is Based on a Minimum Showing of Safety and Efficacy

Congress passed the FDCA in 1938, mandating the FDA to protect public health

and welfare by overseeing the marketing of drugs and medical devices.  However, until

1962, the FDA was only permitted to review limited safety data on new drugs.  In 1962,

Congress passed the Kefauver-Harris Amendments to the FDCA, which authorized the

FDA to demand more rigorous scientific data regarding the safety and efficacy of new

drugs in submitting a New Drug Application ("NDA").   Under the Kefauver-Harris

Amendments, drugs already on the market prior to 1962 and after 1938 were also

required to submit evidence of safety and efficacy.  Overwhelmed, the FDA created an

easier review process for these older drugs that allowed the drugs' manufacturers to

submit evidence of efficacy to be reviewed by a scientific third party panel in order to

keep them on the market.  This review process was called the Drug Efficacy Study

Implementation, or "DESI."

---

[8]      Exhibit 4 - Prescription records for Darlene Lee.
[9]      *See* Exhibit 5 – *Bryant v. Wyeth, et al.*, Complaint for Margaret Vone; Exhibit 6 – *Bonanno v. Wyeth, et al.*, Complaint for Dewey Parker; and Exhibit 7 – *Lee v. Wyeth, et al.*, Complaint for Darlene Lee.
[10]     *See*  4:03-cv-1507 - Master Answer by Greenstone LTD. (Doc. No. 1936) at p. 41; Master Answer by Barr Laboratories, Inc. (Doc. No. 1937) at p. 46; and Master Answer by Barr Pharmaceuticals LLC (Doc. No.  1938) at p. 44.

Since 1962, sponsors of all new prescription drugs must submit an NDA to support both safety and efficacy. The NDA must include information about clinical trials that demonstrate the drug's safety and efficacy, as well as proposed labeling and other information, for the drug's "intended use," also referred to as its "indications." 21 U.S.C. § 355(b) and 21 U.S.C. § 355(d). However, the information on adverse side effects gathered from clinical studies is limited.[11] This is because the studies conducted by drug companies before approval are usually of short duration or include small numbers of people in better health than the average population that will be taking the drug. The lack of definitive safety data limits FDA's ability to evaluate the warning label proposed by manufacturers as part of the drug approval process. The labeling of approved drug products must thus be regularly updated to ensure that physicians and patients are able to accurately judge the risks and benefits of a particular drug therapy. This updating is crucial because post-marketing hazards emerge in large populations over longer periods. This process is sometimes known as "post marketing safety surveillance" or "Pharmacovigilance."[12]

The drug manufacturer drafts and submits a proposed initial label to FDA for approval as part of the NDA process. 21 C.F.R. § 314.105. The FDA either approves the label or requests changes. However, it is the drug company, not the FDA, which does the initial drafting. A drug's label must identify safety hazards in the following

---

[11] "Experience has shown that the full magnitude of some potential risks do not always emerge during the mandatory clinical trials conducted before approval to evaluate these products for safety and effectiveness. Occasionally, serious adverse effects are identified after approval either in post-marketing clinical trials or through spontaneous reporting of adverse events." Statement of S. Kweder, Deputy Director, Office of New Drugs, Center for Drug Evaluation and Research, U.S. Food and Drug Administration, before the Committee on Finance, United States Senate (Nov. 18, 2004) (available at http://www.fda.gov/ola/2004/vioxx1118.html).

[12] For a simple explanation, see *Wikipedia:* http://en.wikipedia.org/wiki/Pharmacovigilance.

descending order of severity: Contraindications, Warnings, Precautions, and Adverse Reactions.  21 C.F.R. §§ 201.56, 201.57.  The FDA approves drugs based on clinical trials with the understanding that the labeling will evolve as the company learns more about how the drug performs in the broader population.

## II.    Generic Drugs Are Subject to Many of the Same FDA Regulations as "Reference" Drugs.

When new prescription drugs come to market through the NDA process, they are protected by a patent, which means that the NDA sponsor has the exclusive right to make and sell its new drug for a specified period.  Eventually, most drugs lose their patent protection.  At that point, a competing company may seek permission to market a "generic" version of an NDA-approved drug by submitting an application, Amended New Drug Application ("ANDA") to the FDA. A generic drug is a drug product that is a "bioequivalent" to the brand name, or "reference listed drug" ("RLD") in dosage form, strength, route of administration, quality and performance characteristics, and intended use.[13]  Before 1984, the FDA required generic drug manufacturers to submit their own NDAs, which were subject to the same rigorous proof of safety and efficacy as the original, or RLD drug.   In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, more commonly known as the Hatch-Waxman Amendments ("Hatch-Waxman").  Pub. L. No. 98-417, 98 Stat. 1584 (1984).

The Hatch-Waxman provisions streamlined the approval process by allowing the generic drug manufacturer to submit an ANDA.  21 U.S.C. § 355(j).  Instead of providing independent evidence of safety and efficacy, the ANDA applicant must only establish, among other things, that: 1) the generic drug has the same active ingredient as the RLD

---

[13]      Exhibit 8 - Parisian Report (Aug. 23, 2008), at ¶ 20.

and is "bioequivalent" to it; and 2) the proposed label of the generic drug is "the same as" that of the RLD.  21 U.S.C. § 355(j) (2)(A)(ii), (iv); 21 U.S.C. § 355(j)(2)(A)(v).  To obtain ANDA *initial* approval, the generic drug manufacturer generally cannot deviate in any way from the RLD label.

Once an ANDA is approved, however, the generic drug manufacturer is subject to most of the same regulatory duties as manufacturers of NDA-approved drugs.  All drug manufacturers – both NDA holders and ANDA holders – must ensure that their product labels remain current.  If not, these drugs are deemed misbranded.  21 U.S.C. § 352(f)(2).  The Hatch-Waxman Act did not change or eliminate ANDA holders' post-approval duties to protect the public through adequate warnings; its reach was limited to generic drug testing and labeling requirements up to the time of approval.[14]  All drug manufacturers, under FDA and industry standards, have the same duty of pharmacovigilance.  The Hatch-Waxman Act contained nothing to change this duty of post marketing safety surveillance.

In addition, the FDA imposes upon both ANDA and NDA holders a duty to monitor their drugs for side effects after they are approved.  21 C.F.R. 314.80(b).  The FDA has not hesitated to enforce these regulations against generic drug companies.  For example, in 2004, the FDA issued a warning letter to Vintage Pharmaceuticals, a manufacturer of generic drugs, following an inspection.[15]  The FDA found that the manufacturer failed to submit periodic adverse drug event ("ADE") reports in violation of 21 C.F.R. 314.80(c)(2).  The FDA also cited the company for failing to develop

---

[14]    Exhibit 8 - Parisian Report (Aug. 23, 2008), at ¶ 76.
[15]    Exhibit 9 - Warning Letter from FDA to William Propst, Sr., President/CEO, Vintage Pharmaceuticals (May 26, 2004). (Emphasis added).

adequate written procedures for collecting, analyzing and reporting post-marketing ADE

reports, as required by 21 C.F.R. 314.80(b).  As the agency noted:

> You have failed to develop adequate written procedures for the
> surveillance, receipt, evaluation, and reporting of postmarketing adverse
> drug experiences to FDA, *as required by 21 C.F.R. 314.80(b)*. You have
> established no procedures for the prompt review and identification of all
> adverse drug experience information obtained. This information includes
> information obtained or otherwise received from any source, foreign or
> domestic, including information derived from commercial marketing
> experience, postmarketing clinical investigation, *postmarketing
> epidemiological/surveillance studies, reports in the scientific
> literature*, and unpublished scientific papers….
>
> The FDA expects drug manufacturers to establish reasonable
> mechanisms to assure that all adverse drug experiences are recorded,
> evaluated, and submitted to the FDA within established timeframes as
> required under 21 C.F.R. 314.80.[16]

The FDA sent a similar warning letter to Actavis Totowa, LLC, a generic drug

manufacturer in 2006.[17]  Besides failing to review, evaluate and report ADEs, Actavis

did not submit to the FDA published medical literature that identified serious and

unexpected cases, a violation of 21 C.F.R. 314.80(d) and 21 C.F.R. 314.98(a).[18]  These

warming letters make it clear that post-marketing requirements apply with equal force to

ANDA and NDA holders.  The FDA does not impose a lower standard for drug safety

surveillance on generic manufacturers than it does for RLD manufacturers.

In March, 2005, the FDA issued a Guidance for Industry Good

Pharmacovigilance Practices and Pharmacoepidemiologic Assessment.  The guidance

instructs <u>all</u> drug makers to be on the lookout for safety signals and evaluate them.  In

particular, the guidance encourages manufacturers to conduct epidemiological studies

---

[16] *Id.*

[17] Exhibit 10 - Warning Letter from FDA to Divya C. Patel, President, Actavis Totowa, LLC (Aug. 15, 2006).

[18] *Id.* at 2.

to quantify the risks of their drugs' side effects that emerge from safety signals.[19]  Post marketing safety surveillance is important because it provides information necessary to ensure that the drug labeling is current and accurate.

All manufacturers must revise their drug labels to include a warning of a clinically significant hazard as soon as there is reasonable evidence of an association; a causal relationship need not have been proved.   21 C.F.R. 201.57 (c)(6)(i); 21 C.F.R. 201.80(e).  The FDA makes no distinction in this regulation between the responsibilities of an approved NDA versus ANDA holder regarding the duty to update a drug label. The FDA's label requirements apply to all manufacturers, packers, and distributors of "drug products."[20]

Drug manufacturers may update their labels without prior permission from the FDA.   This process is known as a "Changes Being Effected" ("CBE") Supplement. Among other things, the provision allows drug manufacturers to "add or strengthen a contraindication, warning, precaution, or adverse reaction" and to "delete false, misleading, or unsupported indications for use or claims of effectiveness."  21 C.F.R. 314.70 (c)(6)(iii)(A)-(C) (2006).  The manufacturer must promptly notify the FDA of the change so that the agency can review it and, if acceptable, approve it after the fact.

Last year, the FDA proposed to amend its CBE regulations to give the agency more power to take enforcement action against false and misleading labels.   The proposal applies to holders of both approved NDAs and ANDAs.[21]

---

[19]    Exhibit 8 - Parisian Report (Aug. 23, 2008), at ¶¶ 36-37.
[20]    Exhibit 8 - Parisian Report (Aug. 23, 2008), at ¶ 47.
[21]    FDA Office of Policy, Proposed Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices, Docket No. 2008N-0021 (Jan. 16, 2008); Exhibit 8 - Parisian Report (Aug. 23, 2008), at ¶ 41.

Manufacturers of both RLD and generic drugs, not the FDA, have primary responsibility to monitor the performance, safety and efficacy of their drugs.  The CBE provision empowers all companies – whether their drugs are ANDA or NDA approved – to take immediate action to inform and protect the public. Indeed, the FDA expects generic manufacturers, like all pharmaceutical companies, to police themselves and comply with regulatory standards.[22]  This is especially true because the FDA has limited oversight after drugs are approved to monitor off-label promotional activity or undertake comprehensive enforcement actions.[23]   Furthermore, the FDA lacks authority from Congress to force companies to perform additional safety studies once their drugs are approved.[24]   Because of its limited resources and authority, the FDA expects manufacturers to monitor their approved drugs and update their labels on a regular basis.

Further, nothing in the FDA regulations prohibits NDA and ANDA holders from providing additional warnings to doctors and patients in other ways, such as "Dear Doctor" letters or advertising.  As soon as a manufacturer discovers risks that are not clearly addressed in the product label, it has the ability to update its label, either by a CBE, NDA or ANDA supplement, Dear Doctor letters, or by educating its sales representatives to pass along new information to health care professionals.[25]

---

[22]     Exhibit 8 - Parisian Report (Aug. 23, 2008), at ¶ 28.
[23]     Exhibit 11 - PX 8068, GAO Report on the FDA; Exhibit 8- Parisian Report (Aug. 23, 2008), at ¶¶ 29-32.
[24]     Exhibit 12 - PX 8421 - Institute of Medicine Report; Exhibit 8 - Parisian Report (Aug. 23, 2008), at ¶¶ 33-34.
[25]     Exhibit 8 - Parisian Report (Aug. 23, 2008), at ¶ 40.

### III.   Greenstone's and Barr's Inadequate Warnings and Off-Label Promotion of MPA for Unapproved Uses Violated FDA Regulations.

Greenstone started selling generic MPA in 1993.  Barr got FDA approval for its generic MPA on August 9, 1996.[26]  At that time, Provera, the branded drug, was FDA approved only for the short-term treatment of amenorrhea and abnormal bleeding. Recommended use was for five to ten days.  Neither Provera nor generic MPA were indicated for use with Premarin or other estrogens as combination hormone therapy to treat symptoms of menopause, nor were they approved to oppose the effects of such estrogen in the uterus of a postmenopausal women.[27]  Further, these drugs were not approved for long-term use of multiple weeks, months or years.

Greenstone sold its MPA as a generic alternative to Provera.  Greenstone was well aware that its product was being used – long-term – in combination with estrogen to treat menopausal symptoms, just like Provera.  Similarly, when Barr officially launched its generic MPA - on the same day its drug was approved by the FDA - Barr told the world that its MPA drug would be marketed as part of combination hormone therapy to treat menopause.  This use was unapproved and forbidden by the FDA.  Barr did not disclose in its ANDA application that it intended to market MPA for this unapproved indication.[28]  Defendants knew - or certainly should have known - that the FDA would have required defendants to submit additional clinical data to support such an indication.  Especially since the FDA repeatedly stated that it would not approve any marketing applications for the use of MPA as part of combination hormone therapy

---

[26]   Exhibit 8 - Parisian Report (Aug. 23, 2008), at ¶ 80.
[27]   *Id.* at ¶ 81.
[28]   *Id.* at ¶ 85.

without adequate clinical data on both benefits and risks, including breast cancer.[29]  Yet Barr continued to sell its generic MPA knowing that the vast majority of its sales occurred for combination use, an "off-label" use unapproved by the FDA.   Barr even used financial incentives to encourage pharmacies to fill prescriptions using Barr's MPA, rather than Provera.[30]  Defendants made no effort to study the combination use or warn doctors and patients of the risk associated with combination hormone therapy, particularly breast cancer.

Even after Provera and generic MPA received approval in 1998 for use with estrogen to reduce endometrial hyperplasia, the FDA limited this new indication for cyclic indications.  That is, MPA could only be prescribed in a dose of five or ten mg daily with estrogen for a course of 12 to 14 consecutive days per month.  MPA has, to this day, never been approved for continuous (every day) use with estrogen.[31]  But both Barr and Greenstone knew that their drug was being used daily in combination.

As a generic drug manufacturer, Barr and Greenstone had a duty to monitor their MPA drugs and to conduct post marketing surveillance, gathering safety data, including pharmaco-epidemiology studies to follow up on safety signals.[32]  Nothing in the FDA regulations prevents a generic manufacturer from doing safety studies on its drug.  To the contrary, FDA regulations require both generic and RLD manufacturers to have

---

[29]     *Id.* at ¶ 84; Exhibit 13 - PX 10342 (1986: "the potential risks of combination therapy are not yet resolved); Exhibit 14 - PX 134A at p. 3 (1990: FDA Advisory Committee unanimously voted that there was insufficient data to answer the question whether adding progestin to estrogen altered the risk of breast cancer in postmenopausal women); Exhibit 15 - PX 10493 at pp. 3-4 (1992: "The FDA has deemed there to be insufficient long term data to evaluate the effects of HRT on breast cancer… FDA has repeatedly expressed the opinion that further clinical trials are required to demonstrate the long-term effects of progestin when administered to oppose the effects of an estrogen").

[30]     Exhibit 16 – Deposition of Timothy Sawyer (Sept. 28, 2004) at 54:2-12.

[31]     Exhibit 8 - Parisian Report (Aug. 23, 2008), at ¶ 108.

[32]     Exhibit 8 - Parisian Report (Aug. 23, 2008), at ¶ 79.

post-marketing surveillance systems in place to monitor and investigate the side effects of their drugs.[33]   And both defendants were on notice that studies were needed and necessary to answer the open questions about the risks of combination therapy.[34] Yet neither defendant conducted any studies.

Even worse, an FDA inspection of Barr in November 2002 revealed that Barr had no written procedures for even collecting or analyzing adverse drug events.   In the course of the inspection, Barr admitted to the FDA that it did not even review the scientific literature to determine if there were any reports of serious or unexpected post-marketing side effects involving its drugs.   These deficiencies were direct violations of FDA regulations.[35]   Barr's executives even admitted that it was Barr's policy <u>not</u> to take any proactive steps to amend its generic drug labels unless and until the FDA specifically told it to do so.[36]

By 1995 – when Plaintiff Vone first started taking estrogen and MPA – defendants were already on notice from studies published in the worldwide medical literature that the combination of synthetic progestins (such as MPA) and estrogen could increase the risk of hormone-dependent breast tumors in women.[37]   Barr should have been aware of the FDA's concern about the lack of studies on the long-term

---

[33]     Exhibit 8 - Parisian Report (Aug. 23, 2008), at ¶¶ 36-37.
[34]     Exhibit 17 - PX ML 3428 at p. 2 (1986: "There are no studies of adequate design, duration and sample size to determine the risks and benefits of prolonged combination use"); Exhibit 14 - PX 134A at p. 3 (1990: FDA Advisory Committee unanimously voted that there was insufficient data to answer the question whether adding progestin to estrogen altered the risk of breast cancer in postmenopausal women).
[35]     Exhibit 18 - FDA Inspection Report, Oct. 1 through Nov. 12, 2002.
[36]     Exhibit 19 - Deposition of Salvatore Peritore (Jan. 25, 2005) at 144:21-145:5.
[37]     Exhibit 8 - Parisian Declaration and Report, ¶¶135-149.

relationship between the Premarin/MPA regimen and breast cancer.[38]   A review of the medical literature would have revealed a real concern regarding the association of breast cancer with use of combination hormone therapy.   For instance, the Degge Group concluded in 1990, after a thorough review of the medical literature, that further studies were needed to determine the long-term risks of breast cancer and cardiovascular disease associated with estrogen and MPA combination therapy.[39]

Had Defendants bothered to even review the Prempro NDA, they would have seen that the FDA had serious concerns about approving Prempro because of a safety signal from clinical studies, which showed a breast cancer cluster in women on combination therapy after only one year.[40]   Had Barr or Greenstone embraced any concern for safety, they would have seen in this report that the FDA was worried about the public health impact of introducing a combination product that could increase the risk of breast cancer:

> Since many more years are still needed before the relationship between HRT and breast cancer can be definitively determined, the public health impact of this safety concern increases with the growing popularity of HRT usage by a rapidly expanding population of perimenopausal "baby boom" women.   As such, the true effect of HRT on breast cancer incidence and mortality must be considered the single most important safety issue concerning this class of drugs.   Given the increasing popularity of HRT usage "to prevent disease and prolong life" in virtually all postmenopausal women, prescribers and potential high risk users of HRT *must be clearly apprised of the limitations of the current safety database.*[41]

---

[38]     Exhibit 15 - PX 10493 at pp. 3-4 (1992: "The FDA has deemed there to be insufficient long term data to evaluate the effects of HRT on breast cancer… FDA has repeatedly expressed the opinion that further clinical trials are required to demonstrate the long-term effects of progestin when administered to oppose the effects of an estrogen").

[39]     Exhibit 20 - PX 10116, Degge Group Report.

[40]     Exhibit 21 - PX 288, Dr. Golden's Medical Officer's Review.

[41]     *Id.* at p. 7.

With this knowledge in hand, defendants could not sit idly and wait for Pfizer/Upjohn or other companies to do the studies necessary to clarify the risks of MPA.  At the very least, defendants were obligated to update their product label to warn physicians that not enough was known about the breast cancer risk of long-term use of MPA with estrogen.  Instead defendants offered up no new warning language.

And we know that the FDA would have approved such a warning because in August of 2000, the FDA sent Pfizer/Upjohn new class labeling guidelines for estrogen/progestin use. The class labeling included the following _new_ proposed warning for breast cancer:

> While some epidemiologic studies suggest a very modest increase in breast cancer risk for estrogen alone users versus non-users, other studies have not shown any increased risk.  The addition of progestin to estrogen may increase the risk for breast cancer over that noted in non-hormone users more significantly (by about 24-40%), although this is based solely on epidemiologic studies, and definitive conclusions await prospective, controlled clinical trials."[42]

Barr and Greenstone cannot seriously argue that the FDA would have prohibited it from changing its label when the FDA did its best to add a new and stronger warning in 2000.

## ARGUMENT

As the United States Supreme Court recognized in _Levine,_ "it has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times.  It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate."  129 S. Ct. at 1197-98.  This principle applies with equal force to both name-brand and generic drug companies.  All drug companies are under a statutory obligation to maintain adequate warnings on their

---

[42]     Exhibit 22 - PX 10424, 8/16/00 letter from FDA to Pharmacia and Upjohn.

labels.  21 U.S.C. §352(f)(2) ("A drug . . . shall be deemed to be misbranded . . . unless its labeling bears . . . such adequate warnings against use . . . where its use may be dangerous . . . as are necessary for the protection of users").  Both name-brand and generic drug manufacturers have an obligation to revise their labels "to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved."  21 C.F.R. §201.57(e) (2005).  And of specific relevance to manufacturers of generic drugs, "[a]fter approval of an ANDA, if an ANDA holder believes that new safety information should be added, it should provided adequate supporting information to FDA, and FDA will determine whether the labeling for the generic and listed drugs should be revised."  57 Fed. Reg. 17950, 17961 cmt. 40 (Apr. 28, 1992).

As explained above, generic drug manufacturers can change their warnings in either of two ways: (1) with FDA approval, or (2) unilaterally, pursuant to the FDA's "changes being effected" regulation.  21 C.F.R. § 314.70(c)(6)(iii)(A).  Under this regulation as it existed before 2008, a manufacturer could "add or strengthen a contraindication, warning, precaution, or adverse reaction" for a drug at any time, without prior approval.  *Id.*  In fact, the manufacturer was obliged to revise its label "to include a warning as soon as there [was] reasonable evidence of an association of a serious hazard with [its] drug; *a causal relationship need not have been proved.*"  21 C.F.R. § 201.80 (e) (e*mphasis added*).  But even before a product label is revised, drug companies may always warn health care professionals by other means, such as a "Dear Doctor" letter, whenever possibly harmful adverse effects associated with use of the drug are discovered.  44 Fed. Reg. 37434, 37447 (June 26, 1979).

A drug's warnings are not fixed as of the date of FDA approval. Nor should they be; drugs receive initial approval based on limited clinical trials and new risks, complications, and contraindications are often identified or confirmed only after the drug has been prescribed more widely. *See* Lasser, et al., *Timing of New Black Box Warnings and Withdrawals for Prescription Medications*, 287 J. A.M.A. 2215, 2218 (May 1, 2002) ("Only half of newly discovered serious ADRs are detected and documented in the Physicians' Desk Reference within 7 years after drug approval." ). For this reason, a company's obligation to provide physicians and patients with up-to-date warnings and precautions continues as long as the product is being marketed and prescribed to patients. 21 U.S.C. §352(f)(2); 21 C.F.R. §§201.57(c)(6), 201.80(e) (2010).

Section 314.97 of the FDA regulations concerning generic drug applications actually <u>directs</u> generic manufacturers to comply with the requirements of section 314.70 "regarding the submission of supplemental applications and other changes to approved abbreviated application." 21 C.F.R. § 314.97. Nothing in the text of the regulation limits labeling changes to those adopted by a name brand company.

> [T]hroughout the entire life of the regulations governing generic drug labeling changes, § 314.97 has mandated, without any opposition or comment, that generic manufacturers "shall comply" with the CBE labeling change provisions of § 314.70(c)(6). As a result, generic manufacturers should be able to unilaterally change their labels after initial ANDA approval, albeit subject to FDA oversight and approval under § 314.60(c)(6).

*Demahy v. Wyeth Inc.*, 586 F. Supp. 2d 642, 651 (E.D. La. 2008).

The Northern District of Illinois provided perhaps the most succinct explanation in a decision that postdates *Levine*:

> The CBE regulations appear at 21 C.F.R. § 314.70(c)(6)(iii), which is located in Subpart B of Part 314. Subpart B is generally applicable to new

applications, whereas, Subpart C is applicable to generic (or "abbreviated") applications. *Compare* 314 C.F.R. Subpart B (titled "Applications") with Subpart C (titled "Abbreviated Applications"). However, section 314.97, which is located within Subpart C, states that "The applicant shall comply with the requirements of §§ 314.70 and 314.71 regarding the submission of supplemental applications and other changes to an approved abbreviated application." § 314.97. In other words, the regulations affecting generic drug applications state explicitly that the CBE provisions apply to generic drug manufacturers just as they do to name-brand manufacturers.

*Stacel v. Teva Pharms., USA*, No. 08 C 1143, 2009 WL 703274, at *5; 2009 U.S.Dist.LEXIS 21079 (N.D. Ill. Mar. 16, 2009); *see also Kellogg*, 612 F. Supp. 2d at 441 ("FDA's own regulations bear this out….21 C.F.R. § 314.97 requires an ANDA applicant to comply with the requirements of §§ 314.70 and 314.71 for NDAs. Section 314.70 includes the CBE provisions. The plain language of FDA's regulations communicates the obligation borne by name brand and generic manufacturers alike to revise a label to add or strengthen a warning in the light of newly acquired information.") (certification opinion); *Bell v. Lollar*, 791 N.E.2d 849, 854 (Ind. Ct. App. 2003) ("21 C.F.R. § 314.70(c)(2)(i)…provides that once an NDA or ANDA has been approved, the applicant may make changes to the label [to add or strengthen a warning] without FDA approval.").

Since *Levine*, two federal courts of appeals—the Eighth and Fifth Circuits—have joined the Fourth Circuit in rejecting preemption for generic drug companies. Each has concluded, without dissent, that the federal regulatory scheme applicable to generic drugs permits generic drug companies to strengthen label warnings and that such companies can be held liable under state law for inadequate warnings.

### (i)  Fourth Circuit

Long before *Levine,* the U.S. Court of Appeals for the Fourth Circuit concluded that "generic manufacturers …[are] permitted to add or strengthen warnings and delete misleading statements on labels, even without prior FDA approval."  *Foster v. American Home Products Corp.,* 29 F.3d 165, 169-170 (4th Cir. 1994). The court rejected the argument that the regulations governing generic manufacturers bar label changes.

> When a generic manufacturer adopts a name brand manufacturer's warnings and representations without independent investigation, it does so at the risk that such warnings and representations may be flawed. . . . The statutory scheme governing premarketing approval for drugs simply does not evidence Congressional intent to insulate generic drug manufacturers from liability for misrepresentations made regarding their products, or to otherwise alter state products liability law. Manufacturers of generic drugs, like all other manufacturers, are responsible for the representations they make regarding their products.

*Id.* at 169-70.

### (ii)     Eighth Circuit

Following *Levine*, the Eighth Circuit reversed a summary judgment ruling in favor of a generic manufacturer of the drug Reglan. *Mensing v. Wyeth*, 588 F.2d 603 (2009).[43]

The district court granted summary judgment (before the *Levine* decision) and concluded that the plaintiff's failure to warn claims created an impermissible conflict with federal law because they would require generic manufacturers to deviate from the name brand drug label.  In *Mensing v. Wyeth*, the Eighth Circuit reversed and refused "to assume that Congress intended to shield from tort liability the manufacturers of the

---

[43]     A petition for certiorari is currently pending in the *Mensing* case*,* and the U.S. Supreme Court recently invited the Solicitor General to file a brief in this matter.

majority of the prescription drugs consumed in this country and leave injured parties like Mensing no legal remedy."  588 F.2d 603, 612 (2009).

In facts remarkably similar to the case here, the Eighth circuit noted that the Reglan generic drug ANDAs were "approved based on the initial safety profile  of the name brand drug" and despite mounting evidence that long-term use increased the risk of movement disorders above that indicated by the label, "no manufacturer took any steps to enhance the warnings."  *Id.* at 607.  Further, the generic manufacturers promoted long term use of the drug even though the FDA approved the drug only for use up to 12 weeks.  *Id.*  Similarly, Greenstone and Barr were well aware that long-term use of combination estrogen and progestin had an increased risk of breast cancer yet never provided any human breast cancer warning at all.  Even worse, defendants never got approval for use of their MPA with estrogen for long-term treatment of menopausal symptoms.

The Eighth Circuit started its opinion by reiterating that "in considering a preemption defense we must be attuned to Congressional intent and the presumption against preemption."  *Id.* at 607.  In light of *Levine,* the Eighth Circuit felt that it needed to view "with a questioning mind the generic defendants' argument that Congress silently intended to grant the manufacturers of most prescription drugs blanket immunity from state tort liability when they market inadequately labeled products."  *Id.*  As characterized by the U.S. Supreme Court, impossibility pre-emption is "a demanding defense."  *Levine,* 129 S.Ct. at 1199.  To prevail on that defense, the generic defendants must show that compliance with both federal law and the state laws is not merely difficult, but "a physical impossibility."  *Id.* at 608, citing *Fid. Fed. Sav. & Loan*

*Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982).   A

hypothetical or potential conflict is insufficient.  *Id.* at 610.

The federal regulations (21 C.F.R. § 314.97) compel a generic manufacturer to

comply with the requirements of §314.70 which includes the ability to strengthen

warnings.   *Id.* at 608.  As the Eighth Circuit explained "the regulatory framework makes

clear that a generic manufacturer must take steps to warn its customers when it learns it

may be making an unsafe drug." *Id.* at 609.   The federal regulations do not permit

generic manufacturers to "passively accept the inadequacy of their drug's label as they

market and profit from it."   *Id.*   There is nothing in "FDA policy, let alone Congressional

intent, to prevent generic manufacturers from proposing changes to a label's warning."

*Id.* at 610.   At a minimum, generic manufacturers should alert the FDA to any new

safety hazard associated with its product or suggest that "the FDA send out a warning

letter to healthcare professionals."  *Id.* at 609, 610.  The Eighth Circuit found that federal

law did not forbid generic manufacturers from taking steps to warn their customers.

Since the Reglan generic manufacturers (as Greenstone and Barr here) could not

provide "clear evidence" that the FDA would have rejected a labeling change if

proposed, the Eighth Circuit found no preemption.

Additionally, state claims would not obstruct the purposes and objective of

federal law.  As the Eighth circuit explained, the Hatch-Waxman amendments "provided

for cheaper, expedited approval of generic drugs, not relief from the fundamental

requirement of the FDCA that all marketed drugs remain safe.  Congress and the FDA

have long viewed state tort law as complementing, not obstructing, the goals of the

FDCA."   *Id.* at 612, citing  *Levine*, 129 S.Ct. at 1199-1200 (Congress "determined that

widely available state rights of action provided appropriate relief for injured [drug] consumers" and that "state-law remedies further consumer protection by motivating manufacturers ... to give adequate warnings."); *Id.* at 1197 ("[T]he statute contemplates that federal juries will resolve most misbranding claims[.]").

    **(iii)    Fifth Circuit**

    A few months after the *Mensing* decision, in January of 2010, the Fifth Circuit also rejected a generic drug company's preemption defense.  In *Demahy v. Actavis, Inc.,* 593 F.3d 428 (5th 2010), the court of appeals applied the reasoning of *Levine* and concluded that the plaintiff's failure-to-warn claims were not preempted because the generic-drug-company defendant could have sought to strengthen its warnings through the CBE process or the prior approval process, or by warnings sent directly to health care providers.  *Id.* at 439-445.   The Fifth Circuit recognized that "[a] finding of preemption would require that all [three of these methods of strengthening warnings] be foreclosed to generic manufacturers."  *Id.* at 439.  The court rejected the argument that the responsibility for strengthening label warnings rested solely on the brand name drug company:

> The federal interest is in maintaining safe and effective labeling that is consistent across name brand and generic bioequivalent versions of the same drug.  *Who* prompts the FDA to consider necessary changes to that shared label is immaterial.

*Id.* at 445 (emphasis in original).

    The Fifth Circuit viewed its decision as following naturally from this Court's ruling in *Levine*:  "While not directing our result, it shadows our conclusion that the federal regulatory regime governing generics is also without preemptive effect."  *Id.* at 430.  In

*Demahy*, the Fifth Circuit refused to hold that Congress implicitly barred the plaintiff's recovery simply because she did not demand a name brand drug.  *Id.* at 449.

### (iv) District Courts & MDL judges

Even before *Wyeth v. Levine*, courts denied generic manufacturer preemption.[44] As Judge Martinez of the Western District of Washington explained "once the ANDA is approved, generic manufacturers have the same power and duty to add or strengthen their warnings, as do the manufacturers of pioneer drugs, and therefore, the same liability."  *Laisure-Radke v. Par Pharm. Inc.*, 426 F.Supp. 2d 1163, 1169 (W.D.Wash. 2006).  This is important because Plaintiff Margaret Vone is a resident of Washington and ingested combination hormone therapy in Washington.  In *Laisure-Radke*, the court denied summary judgment since "once a generic drug manufacturer holds an approved ANDA for a particular product, it can add or strengthen a contraindication, warning, precaution or adverse reaction at any time without prior FDA approval." *Id.*

Post *Levine*, court after court that addressed this question has reached the same conclusion.  Close to a dozen district courts concluded in the past year that the claims against generic manufacturers are not preempted.[45]  As detailed in *Couick v. Wyeth,*

---

[44]    *Laisure-Radke v. Par Pharm. Inc.*, 426 F.Supp. 2d 1163 (W.D.Wash. 2006); *See also Kellogg v. Wyeth,* 612 F.Supp.2d 421, 431-32 (D.Vt. 2008) (The regulation of drugs has never been a strictly federal operation. In fact, the FDA's regulatory scheme has consistently relied on a role for state tort law… FDA drug regulations have long been regarded as minimum standards of conduct).

[45]    *Weilbrenner v. Teva Pharmaceuticals USA, Inc.,* --- F.Supp.2d ---, 2010 WL 924915 at *7, No. 7:08-CV-23-HL (M.D.Ga. Mar. 10, 2010) (state law claims further, rather than inhibit, the goal of federal prescription drug laws – ensuring the public receives safe drugs); *Fulgenzi v. Wyeth, Inc.,* 2010 WL 649349 at *6, No. 5:09CV1767  (N.D.Ohio, Feb. 19, 2010) (Hatch Waxman amendments allowed generic drug makers to get their products to market quickly and cheaply, not engage in negligence); *See, also, Dorsett v. Sandoz, Inc.,* 2010 WL 1174204 (C.D. Cal., March 26, 2010); *Swicegood v. Pliva, Inc.*, 2010 WL 1138455 (N.D.Ga., March 15, 2010); *Vitatoe v. Mylan Pharmaceuticals, Inc.*, 2010 WL 1008788 (N.D.W.Va., March 5, 2010); *Munroe v. Barr Labs.,* 670 F.Supp.2d 1299, 1303 (N.D. Fla. 2009); *Bartlett v. Mutual Pharm. Co.,* 659 F.Supp.2d 279 (D.N.H. 2009); *Stacel v. Teva Pharmaceuticals, USA,* 620 F.Supp.2d 899, 907

*Inc.*, 2009 WL 4644394, No. 3:09-CV-210-RJC-DSC (W.D.N.C. Sept. 30, 2009), a decision from Plaintiff Dewey Parker's home federal district, it is not impossible for a generic manufacturer "to comply with both state and federal law." *Id.* at *3. Rather than present a conflict, a claimant's failure to warn claims "lend force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times." *Id.* at *4, citing *Levine,* 129 S.Ct. at 1202.

Just last week, the MDL judge in *In re Budeprion XL Marketing & Sales Litigation*, MDL No. 2107 (Eastern District of PA), denied defendants' motion to dismiss the plaintiffs' claims on the basis of generic manufacturer preemption.[46] The *Budeprion* MDL court found that "the reasoning of *Levine* applies equally well to generic drugs." After all, "upon becoming aware of their drugs' shortcomings, Defendants could have offered warnings and submitted a CBE application to the FDA. Alternatively, Defendants could have removed their product from the market. Thus, simultaneous compliance with federal and state law is not impossible."[47] The MDL judge summarized that "Defendants have offered no compelling reason why Congress would have given generic drug makers favored status." *Id.*

## I.   The Hatch-Waxman Amendments Do Not Provide Preemption Protection

Plaintiffs anticipate that the generic manufacturer defendants will rely heavily on the Hatch-Waxman Amendments to the Food, Drug and Cosmetic Act ("FDCA") for protection. But there is nothing in the words or legislative intent of that regulation that

---

(N.D.Ill. 2009); *Schrock v. Wyeth,* 601 F.Supp.2d 1262, 1265 (W.D.Okla. 2009); *Couick v. Wyeth, Inc.*, 2009 WL 4644394, No. 3:09-CV-210-RJC-DSC (W.D.N.C. Sept. 30, 2009); *Pustejovsky v. Wyeth*, 2009 WL 3336032 , No. 4:07-CV-103-Y (N.D. Tex. Sept. 4, 2009), at *1 n.4.

[46]   Exhibit 23 - *In re Budeprion XL* MDL, Order denying Motion to Dismiss on basis of generic manufacturer preemption (5/26/10).

[47]   *Id.* at p. 21.

states or implies a preemptive shield for generic drug companies from state tort liability.

As this Court said in *Levine*:

> If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history.  But despite it 1976 enactment of an express pre-emption provision for medical devices, Congress has not enacted such a provision for prescription drugs.  Its silence on this issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness.  As Justice O'Connor explained in her opinion for a unanimous Court:  "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them."

*Levine,* 129 S. Ct. at 1200 (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 166-67 (1989)) (other citations omitted).

Hatch-Waxman merely provided that a company applying to market a generic drug via an ANDA need not conduct the clinical trials already performed by the name brand manufacturer when its drug was approved as a NDA.  Initially, the generic label must be the same as the brand name label.  But afterward, generic drug makers are required to monitor their products' safety and provide additional warnings when additional risks are uncovered, just as all manufacturers must do.  FDA regulations actually mandate the strengthening of warnings by generic drug makers.  This is why the majority of courts--and every court since the U.S. Supreme Court's *Levine* decision-- have found no preemptive effect to Hatch-Waxman. As the Eighth Circuit detailed in *Mensing*, the Hatch-Waxman Amendments "do not explicitly preempt suits against generic manufacturers. Congress could have crafted a preemption provision for generic

drugs in its 1984 amendments, having done so for medical devices less than 10 years earlier. It chose not to do that." *Mensing v. Wyeth*, 588F.3d 603, 607 (8th Cir. 2010).

The presumption against preemption is especially heightened in cases in which a finding of preemption would deprive injured parties of any remedy, as here.  In such circumstances, the party seeking preemption must "convince [the Court] that Congress intended that result."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 487 (1996).  This is especially true when the federal act does not provide an alternate form of relief.  "It is, to say the least, 'difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." *Id.* (*quoting Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984)); *see also Bates*, 544 U.S. at 449 ("If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly.").  After all, the generic manufacturers promote their drugs as being identical in every way to name brand drugs.  They do not claim the drugs are different in any respect except that the consumer injured by them will be denied the redress guaranteed to those purchasing the name brand products. As the Fifth Circuit observed in *Demahy*, it would be a "bizarre conclusion that Congress intended to implicitly deprive a plaintiff whose doctor prescribes a generic drug of *any* remedy, while under *Levine*, that same plaintiff would have a state-law claim had she only demanded a name brand drug instead."  593 F.3d at 449.  "If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly." *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449 (2005).

Further, the presumption is especially compelling, as here, where Congress was aware of state law when enacting the federal law at issue, but was silent as to any preemptive effect.  The case for federal preemption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to "stand by both concepts and to tolerate whatever tension there [is] between them."  *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989) (*quoting Silkwood*, 464 U.S. at 256).  State tort actions against pharmaceuticals for failure to warn have existed for over a century.  *See, e.g., Thomas v. Winchester*, 1852 WL 4748, at *1 (N.Y. App. July 1852) (acknowledging the availability of tort remedies to pharmaceutical victims).

When Congress passed Hatch-Waxman in 1984, it was well aware that the makers of pharmaceutical drugs had historically been sued for defective products and would continue to face such exposure.  Yet Congress did not expressly preempt such suits in the act, just as it had failed to preempt tort suits in the FDCA.  In the latter context, the Supreme Court speculated that Congress "determined that widely available state rights of action provided appropriate relief for consumers."  *Wyeth v. Levine*, 129 S. Ct. 1187, 1199 (U.S. Mar. 4, 2009).

Congress certainly knows how to preempt tort actions in the medical field when that is its intent.  In fact, Congress included a preemption provision for medical devices in the Medical Device Amendments of 1976 ("MDA").  21 U.S.C. § 360k(a).  The Supreme Court found preemption of certain medical device claims based solely on this express preemption mandate.  *Riegel v. Medtronic, Inc.*, 128 S. Ct. 999, 1009-10 (2008).  Yet, Congress included no such provision in the act at issue here.

Congress' conspicuous silence in Hatch-Waxman led the United States District Court for Vermont to conclude that the act does not preempt claims against generic manufacturers.

> Tort litigation against drug manufacturers has long coexisted with the FDCA and its numerous amendments.  It is unlikely that Congress by its silence intended the Hatch-Waxman Amendments to accord generic drug manufacturers virtual immunity from tort liability.

*Kellogg v. Wyeth*, 612 F. Supp. 2d 421, 429 (D. Vt. 2008).  In denying a motion to certify its holding for appeal, the court continued:

> Given that Congress could and did insert an express preemption provision when it amended the FDCA in 1976 to provide for the safety and effectiveness of medical devices, it is telling that Congress did not make any express preemption provision when it amended the FDCA in 1984 to authorize abbreviated new drug applications. Evidently, in the Congressional view, creating a streamlined process for generic drugs to reach the market did not preclude their manufacturers' duty to ensure the safety and effectiveness of their products.

*Kellogg v. Wyeth*, 612 F. Supp. 2d 437, 441 (D. Vt. 2008).

## II.   The FDA's Power to Revoke Approval of a Generic Drug Does Not Support a Preemption Claim.

Greenstone and Barr may also base their arguments upon a regulation stating the FDA has the power to withdraw its approval for a generic product if the product label does not remain consistent with the label for the name brand product.  21 C.F.R. § 314.150(b)(10).  What defendants ignore is that the purpose of this regulation is to ensure that generic manufacturers change their label to conform to changes in the name brand product's label.  In other words, if the innovator changes its label, the generic maker must change its label, too.  If it refuses to do so, the FDA may revoke product approval.  But this regulation was not designed to prevent the generic maker

from strengthening its warnings (which, if approved, would compel the innovator to strengthen its warnings as well).

> [T]he purpose of this regulation was not to prevent a generic manufacturer from improving or strengthening its warnings.  It was, instead, to ensure that the FDA could require a generic manufacturer to "modify its labeling to match labeling changes in the reference listed drug."

*Barnhill*, 2007 U.S. Dist. LEXIS 44718, at 12-*13 (*quoting* 57 FED. REG. at 17970).

## III.   The Recent Adoption of the FDAAA Puts to Rest Any Claim that a Generic Manufacturer Is Not Authorized to Strengthen the Warnings in Its Product Label.

In 2007, Congress enacted the Food and Drug Administration Amendments Act (FDAAA).  *See* 21 U.S.C. § 355 (effective June 22, 2009).  The act strengthens the FDA's ability to compel labeling changes when the agency becomes aware of information it believes should be included with the product label.  In light of the mistaken view of some courts that prior Congressional enactments established preemption, Congress made certain to establish that the act did not alter a drug company's obligation to strengthen the warnings in its labels pursuant to existing law.

> This paragraph shall not be construed to affect the responsibility of the responsible person or the owner of the approved application under subsection (j) of this section to maintain its label in accordance with existing requirements, including subpart B of part 201 and sections 314.70 and 601.12 of Title 21, Code of Federal Regulations (or any successor regulations).

21 U.S.C. § 355(o)(4)(I).   Subsection (j) of the new act deals exclusively with abbreviated drug applications by generic manufacturers.   Section 314.70 of the regulations encompasses the CBE procedures permitting manufacturers to change drug labels prior to FDA approval.  Thus, by its express terms, this law acknowledges that

generic manufacturers, like brand name manufacturers, are authorized to make CBE changes.  Further, had Congress intended to preempt such claims, it surely would have clarified that in this recent law which mandated that its effects will not alter generic makers' obligations under the CBE provisions.  *See Levine*, 129 S. Ct. at 1196 (in the FDAAA, Congress "adopted a rule of construction to make it clear that manufacturers remain responsible for updating their labels").

**IV.    Plaintiffs' Claims Are Not Preempted Because Defendants Promoted MPA for  Unapproved Uses.**

Hatch-Waxman does not preempt state law tort claims.  But this is academic because Greenstone and Barr cannot rely on the Act.  Defendants did not promote their MPA products equivalent to the name brand product the FDA approved.  Defendants promoted MPA to be used for far longer than five to ten days and for daily use in conjunction with estrogen for the treatment of menopausal symptoms.  Such use was unapproved.  Defendants cannot rely on a name brand product label that did not include combination therapy for the relief of menopausal symptoms when combination therapy for the relief of menopausal symptoms was precisely the use promoted.  To enjoy the benefit of not repeating clinical studies, defendants were obliged to limit their promotion to approved indications in the name brand label, which they did not.

## CONCLUSION

Greenstone's and Barr's preemption defense fails because these companies could have warned physicians of the risk of MPA in multiple ways consistent with federal law.  There is a strong presumption against preemption absent clear evidence

that Congress intended a statute to have a preemptive effect.  Hatch-Waxman is silent in this regard.   Nothing in the act or its legislative history suggests that Congress intended to preempt state tort law claims for failure to warn.   Moreover, other Congressional enactments establish that Congress intended no such effect and, in fact, intended for generic manufacturers to ensure product safety just as name brand manufacturers are required to do.

Further, Greenstone and Barr cannot hide behind Hatch-Waxman, even if the Act did preempt state tort claims (which it does not).  These companies knew that their products were being used off-label with estrogen as part of a long-term combination therapy to treat menopausal symptoms.  The FDA had not approved such an indication. The name brand product label did not contain such an indication.  Hatch-Waxman's protections apply only if the generic manufacturer adopts precisely the product and label that had already been approved.

Dated: June 2, 2010.

Respectfully submitted,

  /s/  Zoe B. Littlepage
Zoe B. Littlepage, # 12896
Littlepage Booth
2043A W. Main Street
Houston, Texas 77098
(713) 529-8000 – Telephone
(713) 529-8044 – Facsimile
zoe@littlepagebooth.com

Plaintiffs' Co-Lead Counsel

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of June 2010, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, and a true and correct copy was forwarded by e-mail to the following parties:

F. Lane Heard, III:  lheard@wc.com
Williams & Connolly LLP
725 12th Street, NW
Washington, DC 20005
NATIONAL COUNSEL FOR WYETH DEFENDANTS

Jay Phillip Mayesh :  maoedar@kayescholer.com
Kaye Scholer
425 Park Avenue
New York, NY 10022
NATIONAL COUNSEL FOR PFIZER DEFENDANTS

Lyn Peeples Pruitt:  lpruitt@mwsgw.com
Mitchell Williams Selig Gates & Woodyard, PLLC
425 West Capitol Avenue, Suite 1800
LITTLE ROCK, AR 72201
DEFENDANTS' LIAISON COUNSEL

Matthew V. Brammer**:**  mbrammer@ulmer.com
Gina Saelinger:  gsaelinger@ulmer.com
Ulmer & Berne LLP - Cincinnati
600 Vine Street
Suite 2800
Cincinnati, OH 45202-2409
NATIONAL COUNSEL FOR BARR DEFENDANTS

Brian A. Troyer:  brian.troyer@thompsonhine.com
Thompson Hine LLP - Cleveland
127 Public Square
Suite 3900
Cleveland, OH 44114-1216

John P. Borger:  jborger@faegre.com
Faegre & Benson LLP - Minneapolis
Wells Fargo Center
90 South Seventh Street
Suite 2200
Minneapolis, MN 55402-3901

/s/  Zoe B. Littlepage
Zoe B. Littlepage