# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

| | | |
|---|---|---|
| In re: | : | MDL Docket No. 4:03-cv-01507 WRW |
| | : | |
| PREMPRO PRODUCTS LIABILITY LITIGATION | : | ALL CASES |
| | : | |
| | : | |

**MEMORANDUM IN SUPPORT OF WYETH'S:**
**(1) OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE***
**TO ADMIT PLAINTIFFS' GENERAL CAUSATION EVIDENCE**
**ON ESTROGEN-ONLY HORMONE THERAPY REGIMENS AND BREAST CANCER**
**AND**
**(2) CROSS-MOTION *IN LIMINE***
**TO EXCLUDE CERTAIN OPINIONS OFFERED BY PLAINTIFFS' EXPERTS**

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT .................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 5

I.      THE UNDERLYING SCIENCE ................................................................... 5

    A.      Premarin Is Just One of Many Different Types of Estrogen and Estrogen Hormone Therapies ............................................................................. 5

    B.      Before the WHI Clinical Trial, the Medical Community Believed That Premarin and Other Hormone Therapies Reduced Cardiovascular Risk .............. 8

    C.      WHI Showed No Evidence That Premarin Increases the Risk of Breast Cancer ................................................................................................ 10

    D.      In the Aftermath of WHI, the Medical Community Recognized That the Previous Body of Hormone Therapy Observational Data Was Unreliable ........ 11

II.     THE HORMONE THERAPY LITIGATION ................................................. 13

    A.      Since This Litigation Began, Plaintiffs Have Relied on the WHI Results .......... 13

    B.      Consistent with Their Reliance on WHI, Plaintiffs' Counsel and Experts Have Conceded That Premarin Does Not Increase the Risk of Breast Cancer ................................................................................................ 14

III.    PLAINTIFFS' CURRENT MOTION AND EXPERTS ................................. 16

    A.      Plaintiffs' New Experts Raise Methodological Red Flags Under Daubert .......... 16

    B.      Dr. Jasenka Demirovic .......................................................................... 18

        1.      Dr. Demirovic Never Has Evaluated the Safety of a Medication and She Has No Experience Related to Hormones or Breast Cancer ..... 18

        2.      Dr. Demirovic Disregards WHI and Other Clinical Trial Data ............... 20

        3.      Dr. Demirovic Cherry-Picks Data from Observational Studies and Ignores Critical Issues Such as Formulation, Dose, and Duration ......... 21

    C.      Dr. Marcelo Aldaz ............................................................................... 30

        1.      Dr. Aldaz Never Has Evaluated the Safety of a Medication and Has No Experience Related to Epidemiology. ........................................ 30

        2.      Dr. Aldaz Materially Changed His Methodology and Opinions in This Litigation in Just a Few Weeks ................................................... 32

        3.      Dr. Aldaz Admits No Method Exists for Determining the Cause of Any Individual Woman's Breast Cancer and Recognizes the Limitations of Biological Data ............................................................ 33

        4.      Dr. Aldaz Acknowledges That There Are Important Differences Between Estrogens, But That He Did Not Account for Those Differences in Forming His Opinion ................................................... 35

# TABLE OF CONTENTS
(continued)

**Page**

     5.     Dr. Aldaz Ignores Definitive Clinical Trial Data and Cherry-Picks the Observational Study Data, Which He Is Not Qualified to Interpret ................................................................................. 37

ARGUMENT .................................................................................................... 41

I.     THE COURT SHOULD PRECLUDE PLAINTIFFS' EXPERTS FROM TESTIFYING IN AREAS WHICH THEY ARE NOT QUALIFIED TO ADDRESS ................................................................................................ 42

II.     THE COURT SHOULD EXCLUDE PLAINTIFFS' EXPERTS' OPINIONS THAT PREMARIN INCREASES THE RISK OF BREAST CANCER BECAUSE THEIR OPINIONS ARE THE PRODUCT OF UNRELIABLE METHODS ............................................................................................... 43

    A.     The Court Should Exclude Plaintiffs' Experts' Opinions on the Basis of RCT and Observational Study Data Because The Experts Ignore Relevant Evidence and Cherry-Pick Data to Support Their Opinions ................................ 44

    B.     The Court Should Exclude Dr. Aldaz's Opinion on the Basis of Animal and Laboratory Studies Because Such Data Are Insufficient to Establish Causation in Humans as a Matter of Law ............................................................. 48

III.     THE COURT SHOULD EXCLUDE PLAINTIFFS' EXPERTS' OPINIONS THAT PREMARIN INCREASES THE RISK OF BREAST CANCER BECAUSE THEIR OPINIONS ARE NOT SUFFICIENTLY TIED TO THE FACTS OF ANY CASE ................................................................................. 49

    A.     Plaintiffs' Experts' Opinions Are Too General to Assist Any Trier of Fact ....... 49

    B.     Plaintiffs' Experts Do Not Opine That Taking Premarin More Than Doubles the Risk of Developing Breast Cancer, Which Renders Their Opinions Inadmissible ......................................................................... 50

CONCLUSION .................................................................................................. 51

APPENDIX ........................................................................................................ 53

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Cooper Indus. Inc.*,
    2007 WL 2219212 (E.D. Ky. July 30, 2007)........................................................................27

*Allen v. Pa. Eng'g Corp.*,
    102 F.3d 194 (5th Cir. 1996) ...........................................................................................33, 48

*Barber v. United Airlines, Inc.*,
    17 F. App'x 433 (7th Cir. 2001) .........................................................................................17

*Barrett v. Rhodia, Inc.*,
    606 F.3d 975 (8th Cir. 2010) .............................................................................................42

*Bland v. Verizon Wireless (VAW) L.L.C.*,
    538 F.3d 893 (8th Cir. 2008) .............................................................................................45

*Cano v. Everest Minerals Corp.*,
    362 F. Supp. 2d 814 (W.D. Tex. 2005)..............................................................17, 43, 44, 46

*Caraker v. Sandoz Pharms. Corp.*,
    188 F. Supp. 2d 1026 (S.D. Ill. 2001) ...........................................................................17, 46

*Ciomber v. Cooperative Plus, Inc.*,
    527 F.3d 635 (7th Cir. 2008) .............................................................................................22

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)...................................................................................................... passim

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997)..........................................................................................................47

*Glastetter v. Novartis Pharm. Corp.*,
    252 F.3d 986 (8th Cir. 2001) .............................................................................................45

*Happel v. Walmart Stores, Inc.*,
    602 F.3d 820 (7th Cir. 2010) .............................................................................................29

*In re Accutane Prod. Liab.*,
    511 F. Supp. 2d 1288 (M.D. Fla. 2007)..............................................................................49

*In re Bausch & Lomb, Inc. Contact Lens Solution Prods, Liab. Litig.*,
    Civil Action No. 2:06-MN-77777-DCN, 2009 WL 2750462 (D.S.C. Aug. 26, 2009) .....33, 49

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
  524 F. Supp. 2d 1166 (N.D. Cal. 2007) .......................................................... passim

*In re Diet Drugs Prods. Liab. Litig.*,
  MDL No. 1203, 2001 WL 454586 (E.D. Pa. Feb. 1, 2001) ................................49

*In re Neurontin Marketing, Sales Practices, & Prods. Liab. Litig.*,
  612 F. Supp. 2d (D. Mass. 2009) ............................................................................11

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004).......................................................16, 40, 43

*In re Rezulin Prods. Liab. Litig.*,
  369 F. Supp. 2d 398 (S.D.N.Y. 2005).........................................11, 16, 17, 46, 49

*In re Silica Gel Breast Implant Prods. Liab. Litig.*,
  950 F. Supp. 2d 879 (C.D. Cal. 2004) ..................................................................17

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
  318 F. Supp. 2d 879 (C.D. Cal. 2004) ..................................................................51

*In re TMI Litigation Cases Consol. II*,
  922 F. Supp. 997 (M.D. Pa. 1996).........................................................................44

*In re Viagra Prod. Liab. Litig.*,
  572 F. Supp. 2d 1071 (D. Minn. 2008)...........................................................11, 44

*In re Viagra Prods. Liab. Litig.*,
  658 F. Supp. 2d 950 (D. Minn. 2009).....................................................................42

*In re Zyprexa Prods. Liab. Litig.*,
  No. 04-MD-1596, 2009 WL 1357236 (E.D.N.Y. May 12, 2009) ..........................49

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)................................................................................................5

*McClain v. Metabolife Int'l, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) .............................................................................45

*Nat'l Bank of Commerce v. Dow Chem. Co.*,
  965 F. Supp. 1490 (E.D. Ark. 1996).......................................................................45

*Norris v. Baxter Healthcare Corp.*,
  397 F.3d 878 (10th Cir. 2005) .................................................................17, 43, 44

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Rosen v. Ciba-Geigy Corp.*,
   78 F.3d 316 (7th Cir. 1996) ..................................................................................5

*Sanderson v. Int'l Flavors & Fragrances, Inc.*,
   950 F. Supp. 981 (C.D. Cal. 1996) ......................................................................51

*Sorensen v. Shaklee Corp.*,
   31 F.3d 638 (8th Cir. 1994) ................................................................................45

*Soyring v. Fehr*,
   Civ. No. 05-1900 (PJS/RLE) 2006 WL 5159192 (D. Minn. July 5, 2006) ...........................42

*Viterbo v. Dow Chem. Co.*,
   826 F.2d 420 (5th Cir. 1987) ..............................................................................42

*Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*,
   254 F.3d 706 (8th Cir. 2001) ..............................................................................42

## SUMMARY OF ARGUMENT

Plaintiffs' motion is at odds with good science, the prior positions of the Plaintiffs' Steering Committee ("PSC"), and the longstanding and consistent testimony of the PSC's medical and scientific experts. In fact, the PSC's lead lawyers and experts have been telling judges and juries for years that Premarin does *not* cause breast cancer. For instance, in *Scroggin*, PSC counsel told the Court and jury in his opening that "after years of study, we know that *estrogen alone is not a cause of breast cancer*."[1] As recently as February of this year, PSC counsel told the Court and jury in Pennsylvania, "*We know that Premarin doesn't cause breast cancer*."[2] The PSC's lead experts have taken the same position. Dr. Donald Austin, the PSC's lead general causation and epidemiology expert, who has testified in more than ten hormone therapy trials, most recently told the Court and jury that "*estrogen alone does not increase the risk*" of breast cancer.[3]

The FDA approved Premarin nearly seventy years ago. Since then, millions of women have taken Premarin, and millions continue to take it. Premarin is distinct from other estrogen-only therapies and from Wyeth's other hormone therapy, Prempro, which contains estrogen and progestin. In 1991, after a series of observational studies raised questions about the potential cardiovascular benefits and breast cancer risks of hormone therapies, the National Institutes of Health ("NIH") started a series of the largest clinical trials ever conducted, the Women's Health

---

[1] Plaintiff's opening statement, *Scroggin v. Wyeth et al.*, Feb. 5, 2008 at 88:13-15 ("*Scroggin* Opening") (emphasis added) (excerpts attached as Ex. 1).

[2] Plaintiff's closing argument, *Foust v. Wyeth et al.*, Feb. 23, 2010 at 59:10-11 ("*Foust* Closing") (emphasis added) (excerpts attached as Ex. 2).

[3] Direct Examination of Dr. Donald Austin, *Foust v. Wyeth et al.,* Jan. 28, 2010 at 69:9-20 ("Austin Direct Exam") (attached as Ex. 3).

1

Initiative ("WHI"), which one Plaintiffs' expert called "the mother of all clinical trials."[4]  The

results showed a slightly increased risk of breast cancer with Prempro, but no increased risk with

Premarin.  In fact, after more than 5,000 women took standard approved doses of Premarin every

day for an average of seven years, the rate of breast cancers in women taking Premarin was

*twenty percent lower* than in women taking placebo.  Based on these results, the principal

investigators of WHI suggested that Premarin may *decrease* the risk of breast cancer in post-

menopausal women.

      After the NIH released the results from WHI, the medical, scientific, and regulatory

communities recognized the results as definitive, and as more reliable than previous

observational studies, a few of which suggested a possible relationship between exposure to

Premarin and an increased risk of breast cancer.  The National Cancer Institute ("NCI") called

the WHI trials the "best" and "most comprehensive" evidence on hormone therapy and breast

cancer risk.[5]  The NIH issued a press release stating, "*Estrogen-alone hormone therapy does not

increase the risk of breast cancer* in post-menopausal women."[6]  Other researchers continued to

raise the possibility that Premarin *decreases* the risk of breast cancer.  The current FDA-

approved label for Premarin reflects the WHI results, states that Premarin was *not* associated

---

[4] Deposition of Dr. Graham Colditz, Dec. 18, 2006, at 276:21-277:17 ("Colditz Dep.") (attached as Ex. 4).

[5] National Cancer Institute, Menopausal Hormone Replacement Therapy (HT) ("NCI Website"), http://www.cancer.gov/cancertopics/menopausal-hormone-use and http://www.cancer.gov/cancertopics/factsheet/risk/menopausal-hormones (last visited July 27, 2010) (attached as Ex. 5).

[6] National Institutes of Health, Press Release, *WHI Updated Analysis: No Increased Risk of Breast Cancer with Estrogen-Alone*, April 11, 2006 ("NIH WHI Press Release, April 2006"), http://www.nhlbi.nih.gov/new/press/06-04-11a.htm (last visited July 28, 2010) (emphasis added) (attached as Ex. 6).

with an increased risk of breast cancer, and notes that WHI is generally consistent with the totality of data from the observational studies.

To support their Prempro lawsuits – which make up the vast majority of the MDL docket – the PSC repeatedly has relied on WHI.  Their Master Complaint describes WHI as "one of the most definitive, far reaching clinical trials of women's health ever undertaken."[7]  Consistent with their reliance on the WHI results, the PSC and their experts have embraced the WHI findings showing that Premarin does *not* cause breast cancer.  But now, after eight years of litigation and three MDL bellwether trials, Plaintiffs' counsel here – who have little or no involvement in the extensive discovery conducted by the PSC to formulate a common position for all plaintiffs – are taking a contrary position that is not generally accepted in the scientific community, all in an effort to resuscitate the small portion of Premarin lawsuits that have sat dormant in the MDL until now.

Because of the PSC's prior positions, these Plaintiffs hired two new experts for this motion.  The first is Dr. Jasenka Demirovic, an epidemiologist who never has evaluated the safety of a medication in her entire career, never has prescribed hormone therapy, and has no meaningful experience with estrogens, Premarin, or breast cancer.  Plaintiffs' other expert is Dr. Marcelo Aldaz, a cell biologist who also has no prior experience evaluating the safety of a medication, has no training in epidemiology, and never conducted any study in living humans.

Both experts' methodologies suffer from a number of flaws, which individually and collectively render their opinions unreliable and inadmissible.  First, they disregard the WHI results, even though they both acknowledge that clinical trials like WHI are the "gold standard" of scientific research and the best evidence when evaluating drug safety.  Second, they rely on

---

[7] MDL Master Complaint, Docket No. 4:03-CV-01507 WRW, Document No. 81, Jan. 7, 2004, ¶ 45 ("MDL Master Compl.") (attached as Ex. 7).

observational studies, which are a less reliable form of evidence that suffers from a number of inherent biases and confounders.  Third, even as to those observational studies, they ignore the totality of the evidence and instead impermissibly cherry-pick statistical analyses within studies to support their opinions.  For example, the majority of the studies they cite involve other hormone therapy formulations, not Premarin.  Of the handful of studies that do involve Premarin, nearly all show no increased risk at standard approved doses – even though the issue in these cases is whether Premarin causes breast cancer at the doses for which the FDA approves it and doctors prescribe it.  Finally, Plaintiffs' experts cherry-pick a handful of laboratory experiments to support the hypothesis that Premarin stimulates the growth of breast cancer cells, but they ignore many studies showing that the estrogen compounds used in Premarin either have no effect or inhibit the growth of breast cancer.  Courts regularly exclude experts who cherry-pick data to support their conclusions while "rejecting or ignoring the great weight of the evidence that contradicts [their] conclusion," which is not "good science."  *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007).

Not only do the Plaintiffs' experts' opinions suffer from fatal methodological flaws, but their opinions will not assist any jury evaluating a Premarin claim.  Plaintiffs' experts concede that there are numerous factors affecting whether estrogen therapy increases the risk of breast cancer in an individual woman, so many that their opinion that estrogens are capable of causing breast cancer in at least some women cannot be tied to the facts of any individual case.  Further, because Dr. Aldaz admits that any breast cancer allegedly caused by Premarin would be biologically indistinguishable from one caused by other factors, and that no method exists for determining the cause of any given woman's breast cancer, a plaintiff would need to use

statistics alone to establish that it was more likely than not that taking Premarin caused her breast cancer, a burden Plaintiffs' experts cannot meet.

Expert opinions must reflect sound science, and courtroom methodologies must be as intellectually rigorous as those used by clinical researchers who investigate the safety of medications outside the courtroom. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). When they are not, the public health consequences are enormous, as millions of patients may shift irrationally from a safe and effective medication to ones that are less safe and less effective. The law instructs that jurors should not be permitted to reach conclusions that are contrary to what the most reliable body of science allows. "Law lags science; it does not lead it." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996). In light of the Plaintiffs' experts' lack of qualifications, the flaws in their methodologies, and the lack of fit between their opinions and any plaintiff in this litigation, the Court should exclude their opinions pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## STATEMENT OF FACTS

### I.     THE UNDERLYING SCIENCE.

####      A.     Premarin Is Just One of Many Different Types of Estrogen and Estrogen Hormone Therapies.

There are many different types of estrogen. While the word "estrogen" implies a single compound, Plaintiffs' experts concede there are "dozens."[8] Each is a different chemical compound with a different chemical structure, and each affects the body differently.[9] Of the

---

[8] Deposition of Dr. C. Marcelo Aldaz, July 23, 2010, at 69:3-19 ("Aldaz July 23, 2010 Dep.") (attached as Ex. 8).

[9] *Id.* at 43:13-44:11, 99:22-100:14; Memorandum from Janet Woodcock, M.D., Director, Center for Drug Evaluation and Research to Douglas L. Sporn, Director, Office of Generic Drugs, May 5, 1997, at 9-10 ("1997 FDA Mem.") ("Emerging scientific evidence demonstrates that all estrogens do not exert their effects in a uniform manner with respect to different target tissues. . .

many estrogens that occur naturally in women, each plays a different role in regulating a woman's reproductive system over the course of her life.[10]  Before menopause, the predominant estrogen in women is known as estradiol.[11]  Estradiol is the most potent form of estrogen.[12]

During menopause, a woman may experience symptoms such as the loss of bone density, headaches, insomnia, hot flashes, and vaginal dryness.[13]  To treat these symptoms, the FDA has approved various forms of hormone therapy, most of which fall into one of two broad categories: (1) estrogen-only, or (2) estrogen plus progestin.  Even within these categories, however, considerable differences remain.  For example, estrogen-only hormone therapy includes more than a dozen different products, which can be administered as pills, creams, vaginal rings, vaginal tablets, or patches worn on the skin.[14]  It is undisputed that these estrogen-only products are made of different estrogens, have different effects in the body, and are made by different manufacturers.[15]

---

. [O]ne estrogen can be more active than another in a specific tissue or organ such as breast, uterus, or bone.") (attached as Ex. 9).

[10] STEDMAN'S MEDICAL DICTIONARY 673 (28th ed. 2006) (excerpts attached as Ex. 10; THE BANTAM MEDICAL DICTIONARY 174 (3d ed. 2000) (excerpts attached as Ex. 11).

[11] *Sexuality and Vaginal Dryness*, Dr. Susan Love Research Foundation, http://www.dslrf.org/mwh/content.asp?CATID=33&L2=1&L3=9&L4=0&PID=&sid=132&cid=1251 (last visited July 21, 2010) (attached as Ex. 12).

[12] Wood et al., MENOPAUSE 2008;15:890-98 at 890 (attached as Ex. 13); *see also* Aldaz July 23, 2010 Dep. at 72:1-5.

[13] *Menopause*, National Institutes of Health, http://www.nichd.nih.gov/health/topics/menopause.cfm (last visited July 28, 2010) (attached as Ex. 14).

[14] Aldaz July 23, 2010 Dep. at 75:3-21; 63:3-19.

[15] Aldaz July 23, 2010 Dep. at 70:13-15 (admitting that estrone, estradiol and estriol are different types of estrogen); *id.* at 70:20-71:10 (admitting that different estrogens play different roles in a woman's body); *id.* at 75:22-76:17 (admitting that estrogens differ in the way they absorbed by

Premarin is one type of estrogen-only hormone therapy.  It consists of conjugated equine estrogens ("CEE"), a mixture of natural estrogens produced by pregnant horses.[16]  The primary types of estrogen in Premarin are estrone and equilin.[17]  Estradiol makes up less than one percent of the Premarin formulation.[18]

The FDA first approved Premarin in 1942, and women have been taking Premarin for nearly 70 years.  In 1972, the FDA reassessed the data on Premarin and determined that it was safe and effective in treating menopausal symptoms.[19]  Today, Premarin is available as a pill, as well as in topical creams and injectable vials.[20]  The most common dose of Premarin in pill form

---

the body); *see also id.* at 43:13-44:11, 99:3-20, 99:22-100:14; 1997 FDA Mem. at 9-10 (quoted *supra* note 9); O'Connell et al., J. CLIN. PHARMACOL. 1995;35:18S-24S at 19S (attached as Ex. 15); FDA, *Estrogen and Estrogen with Progestin Therapies for Postmenopausal Women*, http://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm135318.htm (last visited July 28, 2010 (attached as Ex. 16).  These manufacturers are not a part of these *Daubert* proceedings.  *In re Prempro Prod. Liab. Litig.*, Hr'g Tr., Docket No. 4:03-CV-01507-WRW, May 19, 2010, at 6:12-13 ("[T]his calendar need only involve at this stage Wyeth.") (attached as Ex. 17); *id.* at 9:16-17 ("We're going to put the other defendants on the back burner at this time.").

[16] Premarin Label, May 2010, at 1-2 ("Premarin Label") (attached as Ex. 18); 1997 FDA Mem. at 3.

[17] Premarin Label at 1-2; 1997 FDA Mem. at 13-14.

[18] 1997 FDA Mem. at 13-14; Aldaz July 23, 2010 Dep. at 81:1-6.

[19] 1997 FDA Mem. at 4-5.

[20] Premarin Overview, http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Overview& DrugName=PREMARIN (last visited July 27, 2010) (excerpts attached as Ex. 19).

is 0.625 mg per day.[21]  In addition to treating menopausal symptoms, the FDA also has approved

Premarin for the *treatment* of breast cancer in certain circumstances.[22]

> ### B.    Before the WHI Clinical Trial, the Medical Community Believed That Premarin and Other Hormone Therapies Reduced Cardiovascular Risk.

Before the results of the WHI clinical trial became available in 2002, the medical

community believed that Premarin and other types of hormone therapies potentially reduced

cardiovascular risk.[23]  This belief rested largely on observational studies, the same type of studies

on which Plaintiffs' experts rely here.  Prestigious journals such as JAMA reported that

"[o]bservational studies have found lower rates of coronary heart disease (CHD) in

postmenopausal women who take estrogen than in women who do not . . . ."[24]

In addition to evaluating cardiovascular risk, several early observational studies looked at

estrogen-only hormone therapy and breast cancer risk.  While most of those older studies found

that estrogen-only hormone therapy does *not* increase the risk of breast cancer, a small number

reported statistical differences suggesting a modest risk after long-term use.[25]  But many of these

---

[21] Deposition of Jasenka Demirovic, M.D., M.Sc., Ph.D., July 6, 2010, at 54:23-55:13, 70:10-22 ("Demirovic Dep.") (attached as Ex. 20).

[22] Premarin Label at 13; Aldaz July 23, 2010 Dep. at 137:13-139:11; Deposition of Dr. C. Marcelo Aldaz, May 20, 2010, at 212:9-213:1 ("Aldaz May 20, 2010 Dep.") (attached as Ex. 21).

[23] Demirovic Dep. at 158:16-23, 161:9-17; *id.*, Ex. 11 (Stampfer & Colditz, PREVENTIVE MEDICINE 1991;20:47-63) (attached as Ex. 22).

[24] Hulley et al., JAMA 1998;280:605-13 at 605 (attached as Ex. 23).

[25] Supplemental Deposition of Donald Austin, M.D., M.P.H., July 1, 2010, at 22:16-20 ("Austin Supp. Dep.") (attached as Ex. 24) (testifying that through the 1990s, "a majority of the studies did not see much of an elevated risk" with estrogen-only hormone therapy); Stefanick et al., JAMA 2006;295:1647-57 at 1652 ("Stefanick 2006") (attached as Ex. 25); Chen et al., ARCH. INTERN. MED. 2006;166:1027-32 at 1031 ("Chen 2006") (attached as Ex. 26).

observational studies did not study Premarin specifically, and they were "largely uncontrolled for mammography screening, and detection bias may have confounded the results."[26]

As Plaintiffs' experts concede, observational studies are fraught with limitations.[27]  In contrast to clinical trials, the researcher in an observational study does not prospectively and randomly assign subjects to one of two groups receiving medication or placebo, does not direct how physicians prescribe the medication, and does not control for pre-existing characteristics of the patients through randomization.  Instead, the researcher simply observes events occurring in patients treated in the real world, typically by collecting information from large databases, which may have incomplete data.[28]  As a result, observational studies are inherently limited in their ability to control for bias and confounding (factors other than the medication that could increase the rate of an adverse effect) and may report differences that are due to the pre-existing characteristics of the two groups rather than any effect of a medication.[29]  The structural weaknesses of observational studies are particularly acute in the context of evaluating the relationship between hormone therapy and breast cancer, which is influenced by numerous confounders that researchers must attempt to control.[30]

---

[26] Stefanick 2006 at 1652.

[27] Aldaz July 23, 2010 Dep. at 49:16-50:4, 212:10-213:21, 236:3-11; Report of Jasenka Demirovic, Nov. 30, 2005, at 11 ("Demirovic 2005 Rep.") (attached as Ex. 27).

[28] REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 339 (2d ed. 2000) ("REF. MAN.") (excerpts attached as Ex. 28); Stephen B. Hulley et al., DESIGNING CLINICAL RESEARCH 195 (3d ed. 2007) ("DESIGNING CLINICAL RESEARCH") (excerpts attached as Ex. 29).

[29] Demirovic Dep. at 121:14-18, 174:16-175:9; REF. MAN. at 93-94, 354-55, 369-71; DESIGNING CLINICAL RESEARCH at 156-58.  By contrast, randomized clinical trials ("RCTs") are designed to minimize bias and confounding.  See Aldaz July 23, 2010 Dep. at 212:21-213:13; see also Affidavit of Patricia A. Thompson-Carino, Ph.D., July 29, 2010, ("Thompson Aff.") at ¶ 30.

[30] Aldaz July 23, 2010 Dep. at 237:13-238:22.

**C.**   **WHI Showed No Evidence That Premarin Increases the Risk of Breast Cancer.**

In 1991, given the uncertainty of the results from observational studies, the NIH sponsored the WHI clinical trials.  WHI actually involved separate studies:  one studied Premarin, while the other studied Prempro, which consists of estrogen *and* progestin.[31]  The Premarin portion of the trial examined more than 10,000 women, with half receiving Premarin and half receiving placebo.[32]  The results showed that women taking Premarin were *not* at an increased risk of developing breast cancer.[33]  To the contrary, the rate of breast cancers in women taking Premarin every day for more than seven years was *twenty percent lower* than in women taking placebo.[34]

The WHI results were important because the medical community considers clinical trials to be the most reliable form of scientific evidence, and far superior to observational studies.[35]

---

[31] Stefanick 2006 at 1647.

[32] *Id.* at 1649.

[33] *Id.* at 1652; *see also* Aldaz July 23, 2010 Dep. at 284:21-285:4.

[34] Stefanick 2006 at 1647 1652 ("In the completed trial database, the invasive breast cancer incidence did not differ significantly between the CEE group and the placebo group (HR, 0.80; 95% CI, 0.62-1.04).  However, exploratory analyses suggested that CEE might decrease breast cancer incidence in certain subgroups."); *see also* NIH WHI Press Release 2006; *Hormone therapy: Is it right for you?,* MAYOCLINIC.COM, http://www.mayoclinic.com/health/hormone-therapy/WO00046 (last visited July 28, 2010) ("The study found no increased risk of breast cancer or heart disease among women taking estrogen without progestin.") (excerpts attached as Ex. 30); Premarin Label at 11 ("Final centrally adjudicated results for . . . invasive breast cancer incidence from the estrogen alone substudy, after an average follow-up of 7.1 years, reported no overall difference for . . . invasive breast cancer incidence in women receiving CE alone compared with placebo.").

[35] Demirovic Dep. at 173:15-174:6; 245:1-7; REF. MAN. at 338; DESIGNING CLINICAL RESEARCH at 157-58, 195; Piantadosi et al., EPIDEMIOLOGY 2003;14:6-7, 6-7 ("Piantadosi 2003") (attached as Ex. 31); Herrington & Howard, N. ENGL. J. MED. 2003;349:519-21, 519 ("Herrington & Howard 2003") (attached as Ex. 32).

Dr. Demirovic agrees and concedes that clinical trials are the "gold standard" of drug safety research.[36] As one commentator observed: "Observational studies are great for raising questions but not for answering them or, as some clever folk once put it, 'observational studies propose, RCTs dispose.'"[37] Notably, the results of the WHI clinical trial were consistent with all of the other clinical trials of Premarin or similar products containing conjugated estrogens, *none of which* shows an increase in breast cancer risk.[38]

> D.    **In the Aftermath of WHI, the Medical Community Recognized That the Previous Body of Hormone Therapy Observational Data Was Unreliable.**

In the aftermath of WHI, the medical community recognized that the observational data showing that hormone therapies reduce cardiovascular risk were not reliable. This recognition caused drug safety experts and other leaders in the field to reinforce the limitations of observational studies: "The WHI result requires that researchers and clinicians rethink their optimism about the lack of bias in observational inferences about treatment . . . . Observational studies are efficient and necessary, but they will *sometimes prove unreliable*."[39] Similarly, the NEW ENGLAND JOURNAL OF MEDICINE reported in the wake of WHI that "observational or mechanistic studies, animal models, and basic research have tremendous value for the generation

---

[36] Demirovic Dep. at 77:1-4, 118:15-21, 172:11-14; *see also* Aldaz July 23, 2010 Dep. at 52:20-53:4; REF. MAN. at 338-39; *In re Neurontin Marketing, Sales Practices, & Prods. Liab. Litig.*, 612 F. Supp. 2d, 116, 125 (D. Mass. 2009); *In re Viagra Prod. Liab. Litig.*, 572 F. Supp. 2d 1071, 1078 (D. Minn. 2008), *citing In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 406 (S.D.N.Y. 2005) ("*In re Rezulin II*"); *In re Bextra*, 524 F. Supp. 2d at 1173.

[37] Andrew Moore & Henry McQuay, BANDOLIER'S LITTLE BOOK OF MAKING SENSE OF THE MEDICAL EVIDENCE 160 (2006) ("Moore 2006") (excerpts attached as Ex. 33).

[38] Herrington et al., N. ENGL. J. MED. 2000;343:522-29, 528 (ERA Trial) (attached as Ex. 34); Waters et al., JAMA 2002;288:2432-40, 2437-38 (WAVE Trial) (attached as Ex. 35).

[39] Piantadosi 2003 at 6-7 (emphasis added).

of hypotheses but *should not be used to justify broad-based pharmacologic interventions*."[40]
Plaintiffs' expert in the first two bellwether trials, David Sackett, echoed this skepticism of
observational studies:  "[W]hen we talk about the hierarchy of evidence, the Women's Health
Initiative trial trumps the observational studies and is sufficient in and of itself, in my
professional opinion, to establish that relationship so that it trumps any observational studies."[41]

With regard to breast cancer risk, it is generally accepted in the medical community that
the WHI clinical trial was the most reliable evidence available and that it demonstrated that
Premarin does not increase the risk of breast cancer.  The Associate Chief for Research of the
Obstetrics, Gynecology, and Reproductive Sciences Department at Yale University noted:  "For
women with hysterectomy, the evidence is clear:  Estrogen is safe for them.  There is no breast
cancer risk for estrogen alone."[42]  A number of leading cancer and other health organizations
likewise recognized that the WHI trial is the most reliable evidence available, and that the WHI
data shows no evidence that Premarin increases the risk of breast cancer:

- National Institutes of Health – "Estrogen-alone hormone therapy *does not
  increase the risk of breast cancer* in post-menopausal women."[43]

- American Cancer Society – The alleged increased risk in combination
  hormone therapy "is thought to be due to progestin," not estrogens,[44] and

---

[40] Herrington & Howard 2003 at 519 (emphasis added).

[41] *Reeves v. Wyeth et al.*, Aug. 29, 2006, Trial Tr. at 1456:23-1457:2 (excerpts attached as Ex. 36); *see also Rush v. Wyeth et al.,* Feb. 5, 2007, Trial Tr. at 1748:10-12 ("[T]he most powerful information we could have about harm would come from a randomized trial.") (excerpts attached as Ex. 37).

[42] Daniel J. DeNoon, *Estrogen HT: No Breast Cancer Risk; No Added Breast Cancer Risk With Estrogen-Only Hormone Replacement Therapy After Hysterectomy*, WEBMD HEALTH NEWS, http://www.webmd.com/breast-cancer/news/20060411/estrogen-HT-breast-cancer (last visited July 27, 2010) (excerpts attached as Ex. 38).

[43] NIH WHI Press Release, April 2006 (emphasis added).

"[t]hose who were taking only estrogens *did not have an increased risk of breast cancer.*"[45]

- National Cancer Institute – The WHI is the "best" and "most comprehensive" evidence regarding the risks and benefits of hormone therapies, and showed that Premarin *did not increase the risk of breast cancer* in women.[46]

Following an exhaustive review of the data, the FDA concurred. The post-WHI FDA-approved label for Premarin states that WHI is the "most important randomized clinical trial providing information about this issue [breast cancer] in estrogen alone users."[47] The label goes on to report that WHI showed no overall difference in rates of breast cancer in women receiving estrogen alone compared to those taking placebo and that "the results from observational studies are generally consistent with those of the WHI clinical trial."[48]

## II.    THE HORMONE THERAPY LITIGATION.

### A.    Since This Litigation Began, Plaintiffs Have Relied on the WHI Results.

Since this litigation began – litigation in which the vast majority of the claims involve Prempro (or estrogen plus progestin) – the PSC has relied on the WHI results. The Master Complaint describes WHI as "one of the most definitive, far reaching clinical trials of women's health ever undertaken in the United States."[49] The Master Complaint also cites WHI as

---

[44] *Menopausal Hormone Replacement Therapy and Cancer Risk,* AMERICAN CANCER SOCIETY, *available at* http://www.cancer.org/Cancer/CancerCauses/OtherCarcinogens/MedicalTreatments/ menopausal-hormone-replacement-therapy-and-cancer-risk (last visited July 28, 2010) (emphasis added) (excerpts attached as Ex. 39).

[45] *Id.* (emphasis added).

[46] NCI Website.

[47]  Premarin Label at 16.

[48]  *Id.* at 16.

[49] MDL Master Compl. ¶ 45; *see also, e.g.*, Pl.'s Opp'n to Wyeth's Motion for Summ. J. re Statute of Limitations, *Mittelstadt v. Wyeth*, Docket No. 4:05-CV-1547, Document No. 9, Nov.

definitive evidence of increased risk, saying that WHI "proved" that Prempro "dangerously increased women's risk of invasive breast cancer."[50]  Plaintiffs also have argued that the announcement of the WHI results constitutes the first time Plaintiffs had notice that Prempro increased the risk of breast cancer to avoid statute-of-limitations dismissals.[51]

> **B.      Consistent with Their Reliance on WHI, Plaintiffs' Counsel and Experts Have Conceded That Premarin Does Not Increase the Risk of Breast Cancer.**

Consistent with their reliance on WHI, the PSC, which has conducted the discovery and formulated the scientific and legal theories on behalf of all plaintiffs, has told judges and juries repeatedly that Premarin does not cause breast cancer.  *Scroggin* may be the most notable example because of its bellwether status and the precedent it has created in the litigation.  In *Scroggin*, PSC counsel told the Court and jury in their opening that estrogen-only hormone therapy like Premarin "is not a cause of breast cancer":

---

15, 2007, at 8 ("Mittelstadt SOL Opp'n") (calling WHI the "biggest bombshell in the history of hormone replacement therapy") (attached as Ex. 40); Pl.'s Opp'n to Defs.' Mot. for Summ. J. (Statute of Limitations), *Rush v. Wyeth*, Docket No. 4:03-CV-1507-WRW, Document No. 61, May 9, 2006, at 1, 18–19  (describing WHI as a "landmark, paradigm-shifting" study and declaring that "[t]he WHI announcement was the equivalent of the Loch Ness monster surfacing during daylight") (attached as Ex. 41); Reply/Resp. Br. of Pl./Appellant/Cross-Appellee Donna Scroggin, *Scroggin v. Wyeth*, Case Nos. 08-2555, 08-2711, and 08-2713, Feb. 9, 2009, at 77 (calling WHI "the granddaddy of all studies that turned the menopausal market on its head") (excerpts attached as Ex. 42).

[50] MDL Master Compl. ¶ 5.

[51] *See, e.g.*, *Mittelstadt* SOL Opp'n at 8 ("Plaintiff could not know the cause of her cancer or maintain a suit before WHI."); *id.* at 21 ("Awareness was impossible before learning of the WHI results."); Pl.'s Opp'n to Wyeth's Mot. for Summ. J. re Statute of Limitations, *Hill v. Wyeth*, Docket No. 4:03-cv-1507-WRW, Document No. 139, Aug. 29, 2007, at 1 (excerpts attached as Ex. 43); Pls.' Proposal for MDL-1507 Resolution, Docket No. 4:03-CV-1507-WRW, Document No. 1765, May 19, 2008, at 1 (noting that July 2008 marked the six-year anniversary of the announcement of the termination of the WHI study) (attached as Ex. 44).

> Now, what we know about estrogen today, after years of study, we
> know that estrogen alone is not a cause of breast cancer. *Estrogen
> alone is not a cause of breast cancer.* It is the combination of
> estrogen and progesterone [sic] that causes breast cancer. [52]

PSC attorneys repeated this representation as recently as February of this year, when they told

the Court and jury in Pennsylvania, "*We know that Premarin doesn't cause cancer.*"[53]

      Underscoring these statements, the PSC's longstanding medical and scientific experts

also concede that Premarin does not cause or increase the risk of breast cancer. For instance,

Plaintiffs' leading epidemiologist and general causation expert, Dr. Austin, whom Plaintiffs have

named as an expert in more than twenty cases and who has testified in more than ten trials,

recently told the Court and jury that "*estrogen alone does not increase the risk*" of breast

cancer.[54] A number of Plaintiffs' other medical experts have testified similarly:

- <u>Dr. Graham Colditz</u> – A general causation expert, who testified that the majority of studies do not show an increased risk of breast cancer in women taking estrogen-only hormone therapy medications like Premarin.[55]

- <u>Dr. Paul Stolley</u> – A former breast surgeon, who testified that there is a "consensus" that estrogen-only hormone therapy like Premarin does not increase the risk of breast cancer.[56]

- <u>Dr. Nigel Bundred</u> – A surgical oncologist, who testified in deposition that he does not believe, based on the data, that "estrogen causes breast cancer . . . on its own."[57]

---

[52] *Scroggin* Opening at 88:13-17 (emphasis added).

[53] *Foust* Closing at 59:10-11 (emphasis added).

[54] Austin Direct Exam at 69:9-20 (emphasis added).

[55] Colditz Dep. at 259:3-7.

[56] Deposition of Paul D. Stolley, M.D., M.P.H., Mar. 15, 2007 at 279:16-280:1 ("Stolley Dep.") (excerpts attached as Ex. 45).

[57] Deposition of Nigel Bundred, M.D., F.P.C.S., Jan. 17, 2006 at 158:23-159:2 ("Bundred Dep.") (excerpts attached as Ex. 46).

Plaintiffs have conceded the lack of general causation in other ways.   The PSC did not oppose any of Wyeth's motions for summary judgment in Premarin lawsuits.[58]

## III.    PLAINTIFFS' CURRENT MOTION AND EXPERTS.

Notwithstanding the PSC's prior reliance on the WHI clinical trials, which show no increased breast cancer risk with Premarin, and despite a string of admissions by PSC counsel and their testifying experts that Premarin does *not* cause breast cancer, these Plaintiffs now have hired two new experts to take the opposite position – that Premarin causes breast cancer.

### A.    Plaintiffs' New Experts Raise Methodological Red Flags Under *Daubert*.

Emblematic of these two new experts, courts have identified certain red flags indicating that an expert has not employed a scientifically sound method.  For example, the law recognizes that an expert must consider all the available evidence, not selectively cite only data that support the expert's opinion while ignoring or failing to explain data that refutes it.[59]  "[A]ny theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect," and "courts have excluded expert testimony 'where the expert selectively chose his support from the scientific landscape.'"[60]  Where an expert "cherry-picked the facts he considered to render an expert opinion" and "merely accepted some of the . . . data that suited his theory and ignored other portions of it that did not . . . such a selective use of facts fails to satisfy

---

[58] *See* Pls.' Mem. In Opp'n to Mot. for Summ. J., *Beritiech v. Wyeth, Inc.*, Docket No. 4:03-CV-00925-WRW, Document No. 9, June 30, 2008, at 1 (conceding that the 24 cases were unopposed) (attached as Ex. 47).  The Court denied summary judgment in one recent Premarin case, noting that "[w]hile this case ultimately may be dismissed following *Daubert* motions," certain issues of fact prevented summary judgment at that time.  Order Denying Mot. For Summ. J., *Beritiech v. Wyeth, Inc.*, Docket No. 4:03-CV-00925-WRW, Document No. 20, Aug. 22, 2008, at 2 (attached as Ex. 48).

[59] *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004) ("*In re Rezulin I*").

[60] *In re Rezulin II*, 369 F. Supp. 2d at 425 & n.164 (citation omitted).

the scientific method and *Daubert*, and it thus fails to assist the trier of fact."[61]  Of particular

import here, "cherry-picking observational studies that support [a] conclusion and rejecting or

ignoring the great weight of the evidence that contradicts [the] conclusion . . . is not 'good

science.'"[62]

        In addition to being reliable, expert testimony also must be relevant.[63]  Under this

requirement, frequently referred to as "fit," expert testimony must be "sufficiently tied to the

facts of the case that it will aid the jury in resolving a factual dispute."[64]  Where a disease is

indistinguishable in patients who take a medication from the same disease in patients who do not,

researchers must use statistics to assess the probability that a patient developed the disease

because of the medication as opposed to other causes of the disease.  In such instances, "fit"

requires a plaintiff to demonstrate a statistically significant risk ratio greater than 2.0 (in other

words, a doubling of the risk) to prove that it is more likely than not that the medication caused

the disease in any individual patient.[65]  This rule, known as "the 2.0 rule," functions as "the

---

[61]  *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (internal quotations omitted).

[62]  *In re Bextra*, 524 F. Supp. 2d at 1176; *see also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 885 (10th Cir. 2005) (excluding experts' testimony because "both experts ignored or discounted without explanation the contrary epidemiological studies"); *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 851 (W.D. Tex. 2005) ("[F]ailure to consider both positive and negative associations in the literature is not reliable methodology."); *id.* at 850 (excluding expert who "sifted through the literature to pick and choose positive relative risks" that supported his causation opinion); *Caraker v. Sandoz Pharms. Corp.*, 188 F. Supp. 2d 1026, 1032, 1034 (S.D. Ill. 2001) (excluding "experts' opinions inasmuch as they rely on selective use of statistically insignificant data from epidemiological studies" they otherwise discounted).

[63]  *See Daubert*, 509 U.S. at 591.

[64]  *Id.* at 591-92.

[65]  *See In re Silica Gel Breast Implant Prods. Liab. Litig.*, 950 F. Supp. 2d 879, 893 (C.D. Cal. 2004).

equivalent of the required legal burden of proof – a showing of causation by the preponderance of the evidence or, in other words, a probability of greater than 50 percent."[66]

### B.    Dr. Jasenka Demirovic.

#### 1.    Dr. Demirovic Never Has Evaluated the Safety of a Medication and She Has No Experience Related to Hormones or Breast Cancer.

Dr. Demirovic has no drug safety experience.  Outside of this litigation, she never has assessed whether a medication is associated with a particular adverse event.  She never has authored a peer-reviewed article evaluating the risks or benefits of a medication in humans, nor has she had responsibility for performing a peer review of such articles.[67]  She never has been responsible for designing a clinical trial or an observational study intended to evaluate the risks or benefits of a medication,[68] nor has she ever been a principal investigator, served on a steering committee, or served on a data safety monitoring board for a trial that was intended to evaluate the risks or benefits of a medication.[69]  In fact, not a single government agency, academic institution, or pharmaceutical company ever has asked Dr. Demirovic for advice regarding the risks or benefits of a medication.[70]  Outside of her litigation work, her only current scientific work involves developing a book discussing the "healing powers of art."[71]

While Dr. Demirovic holds a medical degree from the University of Sarajevo in Bosnia and Herzegovina, she practiced medicine only during her residency, when she specialized in

---

[66] AM. L. PROD. LIAB. 3d § 4:54 (2006) (attached as Ex. 49); *see* REF. MAN. at 384.

[67] Demirovic Dep. at 29:5-18.

[68] *Id.* at 29:19-30:10, 35:7-11.

[69] *Id.* at 34:16-35:6.

[70] *Id.* at 28:16-29:4.

[71] *Id.* at 39:11-15.

internal medicine and cardiology.[72]  In short, she has not practiced medicine in at least twenty

years.[73]  As a result, Dr. Demirovic has almost no experience with – and never has prescribed –

hormone therapy generally or Premarin specifically.[74]  She does not know the typical clinical

dose of Premarin, could only identify a single one of its many ingredients, does not know the

functions that estrogens serve in the body, and does not understand the differences between

various forms of estrogen.[75]  Dr. Demirovic never has interacted with a regulatory agency or

published a paper in a peer-reviewed journal related to the subject of hormone therapy.[76]

Dr. Demirovic also has almost no research experience related to cancer.  She has no post-

graduate training in oncology or cell biology, and she is not an expert in the cellular mechanisms

that lead to cancer.[77]  In fact, she cannot even identify the stages of breast cancer and does not

know which type of breast cancer is most difficult to treat.[78]  In the one cancer-related study in

which she was a principal investigator, the study merely assessed the level of social support

among elderly women with breast cancer.[79]

---

[72] *Id.* at 51:11-15, 51:18-21.

[73] *Id.* at 51:11-17; Report of Jasenka Demirovic, June 9, 2010, at 1 ("Demirovic Rep.") ("worked in academia for more than 20 years") (attached as Ex. 50).

[74] Demirovic Dep. at 53:21-54:6.

[75] *Id.* at 54:7-22, 57:8-22, 59:16-23, 60:6-61:1, 62:3-12, 66:21-67:8.

[76] *Id.* at 50:20-22, 292:16-19.

[77] *Id.* at 52:6-53:3.

[78] *Id.* at 150:10-151:1, 152:13-20.

[79] *Id.* at 327:24-328:3.

## 2.  Dr. Demirovic Disregards WHI and Other Clinical Trial Data.

Dr. Demirovic admits that clinical trials are the gold standard for determining whether a medication is associated with a particular adverse event.[80]  She also concedes that only clinical trials can be used to demonstrate causation, that clinical trials are more reliable than observational studies, and that clinical trials "provide[] the ultimate guidance regarding . . . prescribing practices."[81]  In her previous expert reports regarding hormone therapy, Dr. Demirovic relied on and emphasized the WHI clinical trial results to support her opinion in those cases that Prempro causes breast cancer and that hormone therapy generally does not reduce cardiovascular risks.[82]  Even here, Dr. Demirovic believes that the WHI clinical trial is definitive in showing that Premarin and Prempro do not reduce cardiovascular risk, and that observational studies suggesting otherwise are not reliable.[83]

But Dr. Demirovic picks and chooses the WHI conclusions that serve her purpose.  When it comes to Premarin and breast cancer risk, Dr. Demirovic improperly rejects the WHI results, calling them "inconclusive" and mere "speculation."[84]  Her criticisms of WHI suggest that she is not reading the results carefully.  For instance, her report says that "[o]ne of the major issues to be considered in interpreting the results of the WHI trial is the dilution of effects of [Premarin]

---

[80] Demirovic Rep. at 4, 27-28; Demirovic Dep. at 76:21-77:4, 172:3-14.

[81] *Id.* at 160:24-161:8, 168:18-169:7.

[82] Demirovic 2005 Rep. at 7-8; Report of Jasenka Demirovic, Feb. 10, 2006, at 8 ("Demirovic 2006 Rep.") (calling the WHI results "generally accepted" and noting that those results "have provided the basis for current recommendations and policies regarding [hormone therapy] use") (attached as Ex. 51); Demirovic Dep. at 306:7-23.

[83] Demirovic Dep. at 160:14-23, 165:16-166:1.

[84] *Id.* at 290:6-291:4, 141:17-142:8.

due to non-compliance."[85]  In other words, Dr. Demirovic speculates that some of the patients

assigned Premarin were not taking their medication, and that this may explain the results.  After

being shown the WHI publication at her deposition, however, she admitted that the WHI authors

did an analysis that addressed the issue, which shows even *stronger* results in favor of Premarin

– a statistically significant finding that Premarin *decreases* the risk of breast cancer.[86]  Aside

from her criticisms of WHI, Dr. Demirovic's report does not even address other clinical trial

data, which show no increased breast cancer risk with Premarin.[87]

### 3.     Dr. Demirovic Cherry-Picks Data from Observational Studies and Ignores Critical Issues Such as Formulation, Dose, and Duration.

To support her opinions, Dr. Demirovic cherry-picks data from observational studies,

while ignoring the totality of the evidence and critical issues such as formulation, dose, and

duration.  She engages in this unreliable process despite admitting that observational studies have

inherent methodological limitations and are not "as good as clinical trials"[88] because of bias and

confounding, a difference that is especially pronounced when assessing the effects of

medications such as hormone therapy.[89]

***Cherry-Picking Observational Studies.***  Dr. Demirovic acknowledges that more than 100

observational studies have been published on the relationship between estrogen therapies and

breast cancer, and that these 100 studies, in turn, include thousands of analyses (or statistical

---

[85] Demirovic Rep. at 21.

[86] Demirovic Dep. at 251:7-252:13; Stefanick 2006 at 1651.

[87] *See* note 38 *supra*.

[88] Demirovic Rep. at 27.

[89] Demirovic Dep. at 173:15-175:25, 245:1-19.

findings).[90]  Yet Dr. Demirovic bases her opinion on only a fraction of the available analyses,

relying on only 15 observational studies in her report.[91]  At her deposition, she improperly

presented – for the first time[92] – 16 additional observational studies collected by Plaintiffs'

counsel and provided to her after she had completed her report.[93]  In fact, while Dr. Demirovic

refers to a chart of 33 "studies" in her testimony, the chart includes 33 results from 19 studies,

three of which were included in her report and 16 of which were new.  She provides no real

explanation as to how she chose her original 15 studies (or how Plaintiffs' counsel chose their

16), other than saying that she performed a search for "estrogen and breast cancer" and chose

those analyses that she claims were "valid by all means in terms of sample size, study design, the

analytical approach, presentation of the results and interpretation of the results."[94]

 Notably, Dr. Demirovic admits that she *omitted* articles suggesting that estrogen may

decrease breast cancer risk and may have *anti*-cancer effects because she "was asked specifically

to address the issue of risk for this report."[95]  Dr. Demirovic's cherry-picking and turning a blind

eye toward contrary data present fatal methodological flaws that render her testimony unreliable.

Indeed, she recognizes that a few isolated statistical differences out of more than one thousand

---

[90] Demirovic Dep. at 142:22-143:14, 366:21-368:16.

[91] Demirovic Rep. at 10-20.

[92] A deficient Rule 26 report cannot be cured with later deposition testimony.  *See, e.g.*, *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008).

[93] Demirovic Dep. at 342:24-344:16, 347:16-348:15; *id.*, Ex. 31 (List of 33 "studies") (attached as Ex. 52).

[94] Demirovic Dep. at 23:4-24:3.  It is impossible to know how she applied this vague method to select 15 studies out of more than 32,000 abstracts that appear on PubMed when searching for the terms "estrogen and breast cancer."  Search performed at http://www.ncbi.nlm.nih.gov/sites/pubmed on July 13, 2010 (attached as Ex. 53).

[95] Demirovic Dep. at 124:24-125:5.

potential analyses are not enough to establish that a medication causes an adverse effect; rather, the results must be consistent across the relevant body of evidence before researchers accept that there may be a causal relationship.[96]

     ***Cherry-Picking Studies That Do Not Involve Premarin.***  Dr. Demirovic concedes that, if a researcher wants to study the effects of Premarin, he or she should look at studies involving Premarin, not other medications.[97]  Nonetheless, Dr. Demirovic made no effort to distinguish between studies of Premarin and those involving other estrogen-only hormone therapy products with different chemical formulations.  Only five of the 15 observational studies cited in her report actually examined Premarin or other products made from conjugated estrogen ("CE").  The other 10 studies relied on by Dr. Demirovic involve either estradiol – the most potent form of estrogen, and which is barely present in Premarin – or do not specify the type of estrogen studied and therefore provide no information about the effect of Premarin on breast cancer risk.[98]

---

[96] *Id.* at 108:9-15, 233:5-15; *see also* REF. MAN. at 348 ("An association does not necessarily mean that there is a cause-effect relationship."); *id.* at 377 ("It is important that a study be replicated in different populations and by different investigators before a causal relationship is accepted.").

[97] Demirovic Dep. at 65:15-66:1; *see also* Thompson Aff. at ¶ 7 ("[E]ven among medications considered to be in the same class, the medicines themselves are different chemical compounds with different chemical structures, and they generally exert different effects on the human body at different doses.  As a result, attempts to take the findings of a study involving one medication and to apply them to a different medication create the potential for misinterpretation.").

[98] Demirovic Rep. at 10-22; Demirovic Dep. at 199:11-22, 200:10-202:7, 203:11-204:14, 276:23-277:6; *id.*, Ex. 31 (List of 33 "studies").

### Figure 1: **STUDIES LISTED IN DR. DEMIROVIC'S REPORT**[99]

| Study | CE Specifically Analyzed? | CE Dose Analyzed? | Increased Breast Cancer Risk with CE? |
|---|---|---|---|
| Collaborative Group 1997 | NO | -- | -- |
| Kerlikowske 2003 | NO | -- | -- |
| Stahlberg 2004 | NO | -- | -- |
| Ewertz 2005 | NO | -- | -- |
| Fournier 2005 | NO | -- | -- |
| Rosenberg 2006 | NO | -- | -- |
| Lee 2006 | NO | -- | -- |
| Lyytinen 2006 | NO | -- | -- |
| Brinton 2008 | NO | -- | -- |
| Calle 2009 | NO | -- | -- |
| Bakken 2010 | YES | NO | -- |
| Chen 2006 | YES | NO | -- |
| Zhang 2007 | YES | YES | NO |
| Prentice 2008 | YES | YES | NO |
| Beral 2003 | YES | YES | YES |

---

[99] Collaborative Group on Hormonal Factors in Breast Cancer, LANCET 1997;350:1047-59 ("Collaborative Group 1997") (attached as Ex. 54); Kerlikowske et al., J. CLIN. ONCOL. 2003;21:4314-4321 ("Kerlikowske 2003") (attached as Ex. 55); Stahlberg et al., INT. J. CANCER 2004;109:721-727 ("Stahlberg 2004") (attached as Ex. 56); Ewertz et al., BR. J. CANCER 2005;92:1293-1297 ("Ewertz 2005") (attached as Ex. 57); Fournier et al., BR. J. CANCER 2005;114:448-454 ("Fournier 2005") (attached as Ex. 58); Rosenberg et al., ARCH. INTERN. MED. 2006;166:760-65 ("Rosenberg 2006") (attached as Ex. 59); Lee et al., INT. J. CANCER 2006;118:1285-1291 ("Lee 2006") (attached as Ex. 60); Lyytinen et al., OBSTET. GYNCOL. 2006;108:1354-60 ("Lyytinen 2006") (attached as Ex. 61); Brinton et al., CANCER EPIDEMIOL. BIOMARKERS PREV. 2008;17:3150-60 (attached as Ex. 62); Calle et al., CANCER 2009;115:936-45 ("Calle 2009") (attached as Ex. 63); Bakken et al. INT. J. CANCER 2010 [epub ahead of print] ("Bakken 2010") (attached as Ex. 64); Chen 2006; Zhang et al., AM. J. EPIDEMIOL. 2007;165:524:529 ("Zhang 2007") (attached as Ex. 65); and Prentice et al., AM. J. EPIDEMIOL. 2008;167:1407-1415 ("Prentice 2008") (attached as Ex. 66); Beral et al., LANCET 2003;362:419-27, 423, Fig. 4 ("Beral 2003") (attached as Ex. 67).

Likewise, only six of the 19 observational studies on the list provided to her by plaintiffs' counsel examined Premarin or other products made from conjugated estrogen, as opposed to estradiol or an unspecified estrogen.

**Figure 2:  STUDIES PROVIDED TO DRS. DEMIROVIC AND ALDAZ
BY PLAINTIFFS' COUNSEL[100]**

| Study | CE Specifically Analyzed? | CE Dose Analyzed? | Increased Breast Cancer Risk with CE? |
|---|---|---|---|
| La Vecchia 1986 | NO | -- | -- |
| Nomura 1986 | NO | -- | -- |
| Mills 1989 | NO | -- | -- |
| Steinberg 1991 | NO | -- | -- |
| Schairer 1994 | NO | -- | -- |
| Magnusson 1999 | NO | -- | -- |
| Chen 2002 | NO | -- | -- |
| Li 2002 | NO | -- | -- |
| Lumachi 2002 | NO | -- | -- |
| Rosenberg 2006 | NO | -- | -- |
| Kerlikowske 2003 | NO | -- | -- |

---

[100] La Vecchia et al., INT. J. CANCER 1986;38:853-858 ("La Vecchia 1986") (attached as Ex. 68); Nomura et al., INT. J. CANCER 1986;37:49-53 ("Nomura 1986") (attached as Ex. 69); Mills et al., CANCER 1989;64:591-597 ("Mills 1989") (attached as Ex. 70); Steinberg et al., JAMA 1991;265:1985-1990 ("Steinberg 1991") (attached as Ex. 71); Schairer et al., CANCER CASES AND CONTROL 1994;5:491-500 ("Schairer 1994") (attached as Ex. 72); Magnusson et al., INT. J. CANCER 1999;81:339-344 ("Magnusson 1999") (attached as Ex. 73); Chen et al., JAMA 2002;287:734-741 ("Chen 2002") (attached as Ex. 74); Li et al., CANCER 2002;95:960-968 ("Li 2002") (attached as Ex. 75); Lumachi et al., BIOMED. PHARMACOTHER. 2002;56:416-420 ("Lumachi 2002") (attached as Ex. 76); Rosenberg 2006; Kerlikowske 2003; Newcomer et al., CANCER CAUSES AND CONTROL 2003;14:225-33 ("Newcomer 2003") (attached as Ex. 77); Stahlberg 2004; Letter from Drs. Lee, Collins, and Nadelman to Dr. Brice regarding Estrogens and Breast Cancer Comment of Dr. Hulka's Report, (May 5, 1981) marked as Plaintiffs' Exhibit #0060 ("Hulka 1981 Letter") (attached as Ex. 78); Brinton et al., CANCER 1981;47:2517-22 ("Brinton 1981") (attached as Ex. 79); Hiatt et al., CANCER 1984;47:139-144 ("Hiatt 1984") (attached as Ex. 80); Colditz et al., JAMA 1990;264:2648-53 ("Colditz 1990") (attached as Ex. 81); Hoover et al., N. ENGL. J. MED. 1976;295:401-05 ("Hoover 1976") (attached as Ex. 82); Ross et al., JAMA 1980;243:1635-39 ("Ross 1980") (attached as Ex. 83).

| Study | CE Specifically Analyzed? | CE Dose Analyzed? | Increased Breast Cancer Risk with CE? |
|---|---|---|---|
| Newcomer 2003 | NO | -- | -- |
| Stahlberg 2004 | NO | -- | -- |
| Hulka 1981 Letter | YES | NO | -- |
| Brinton 1981 | YES | YES | NO |
| Hiatt 1984 | YES | YES | NO |
| Colditz 1990 | YES | YES | NO |
| Hoover 1976 | YES | YES | Only after ≥ 10 years at doses > 0.625 mg |
| Ross 1980 | YES | YES | Only at doses ≥ 1.25 mg |

Further, Dr. Demirovic admits that she does not know anything about the differences between estrogen formulations and ignored data confirming those differences.[101]   Indeed, she admits that she "didn't go into that much of [the] details" of the studies related to mechanism issues and merely defers to Dr. Aldaz, even though he disagrees with her claim that all estrogens are the same.[102]

   ***Cherry-Picking Studies Without Regard to Dose.***   All substances are toxic at some dose. The question that matters here is whether Premarin causes breast cancer at the doses for which the FDA approves it and doctors prescribe it.   Dr. Demirovic failed to account for dose even though she concedes that the dose taken and the absence of a dose-response relationship are highly relevant in assessing causation in general and for Premarin in particular.[103]   Here, even in

---

[101] *Id.* at 104:21-107:10.

[102] *Id.* at 105:23-106:3.

[103] *Id.* at 80:9-81:5, 241:20-242:8; *see also* David L. Eaton, *Scientific Judgment and Toxic Torts—A Primer in Toxicology for Judges and Lawyers*, 12 J. L. & POL'Y 5, 11 (2003) (citing Curtis D. Klaassen ed., CASARETT AND DOULL'S TOXICOLOGY: THE BASIC SCIENCE OF POISONS, Chs. 1, 4 (McGraw Hill 6th ed. 2001)) (attached as Ex. 84) ("Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect.");

the few studies she cites that do involve Premarin or other products made of conjugated estrogens, Dr. Demirovic failed to take into account the dose of Premarin studied.  Her report does not contain any discussion of the dose at which she believes Premarin increases the risk of breast cancer, nor did she consider the dose administered in individual studies when she performed her literature review.[104]  Instead, she simply assumed – erroneously – that all the subjects in the studies were taking the "standardized" dose of 0.625 mg per day.[105]

Of the five – out of fifteen – studies cited in her report that involve conjugated estrogens four either do not show any statistical differences between patients taking Premarin at standard approved doses and patients not taking hormone therapy or do not specify the dose studied.  *See* Fig. 1, *supra* (showing that only the Beral 2003 study showed a statistical association at specific doses of conjugated estrogens).  Of the six – out of sixteen – studies Plaintiffs' counsel provided to her before her deposition that involve conjugated estrogens, none suggests any association between use of standard approved doses of Premarin (0.625 mg/day) and increased risk of breast cancer.  *See* Fig. 2, *supra*.

**Conceding No Risk Except for Very Long-Term Use of Ten or More Years.**  Like dose, Dr. Demirovic agrees that how long a woman takes Premarin is a key determinant of the actual

---

*id.* at 15 (noting that most substances do not have an effect below a certain dose or duration of use); REF. MAN. at 403 (noting that even water is toxic when consumed in excessive quantities); *Adams v. Cooper Indus. Inc.*, 2007 WL 2219212, Civil Action No. 03-476-JBC at *4 (E.D. Ky. July 30, 2007) (citing *Eaton*).

[104] Demirovic Rep., *passim*; Demirovic Dep. at 69:24-70:22, 83:3-9, 93:16-94:5, 242:9-243:21.

[105] In fact, a number of the studies on which Dr. Demirovic relies included a range of estrogen doses.  *See, e.g.*, Lyytinen 2006 at 1357, Table 3; Beral 2003 423, Fig. 4; Collaborative Group 1997 at 1056, Table 2; Colditz 1990 at 2651, Table 5; Hiatt 1984 at 142, Table 6; Brinton 1981 at 2519, Table 3; Ross 1980 at 1637, Table 3; Hoover 1976 at 403, Table 4.

exposure she has to estrogen therapy.[106]  Her report asserts that estrogen therapy of any kind is associated with breast cancer only when taken for a "very long duration" of "*ten or more years, as suggested in observational studies.*"[107]

Of the three – out of fifteen – studies in her report that involved conjugated estrogens and showed increased risk (irrespective of dose), one of those studies did not show increased risk until after twenty years of use, one study did not analyze duration, and only one showed increased risk before ten years.[108]  Of the four – out of sixteen – studies provided to her by Plaintiffs' counsel that involved conjugated equine estrogens and showed increased risk (irrespective of dose), one of those studies reported inconsistent results (Colditz), while the other three did not provide reliable estimates of risk by duration.[109]  *Daubert* requires Dr. Demirovic to explain these data, which are inconsistent with the opinion expressed in her report.  All that she could say in her deposition is that she is still "trying to explain" the observational study findings. At bottom, she opines that estrogen therapy of any kind does *not* increase the risk of breast cancer until *after* ten years of use.[110]

---

[106] Demirovic Dep. at 71:14-21 ("[D]uration of use is a very important component in assessing the risk."); *id.* at 241:13-242:8; *see also* REF. MAN. at 390, 419.

[107] Demirovic Rep. at 21 (emphasis added).

[108] *See* Chen 2006 at 1029 (showing no risk until 20 years of use); Bakken 2010 (failing to analyze duration); Beral 2003 at 422 (showing increased risk).

[109] *See* Colditz 1990 at 2651, Table 3 (reporting an increased risk at five to nine years of use but not at less than five years or ten or more years of use); *compare with* Hoover 1976 at 403, Table 4 (assessing follow-up but not duration of use); Ross 1980 at 1637 (failing to assess duration); and Brinton 1981 at 2519, Table 3 (reporting risk ratios without statistical testing).

[110] Demirovic Dep. at 264:4-265:13; 264:14-266:13.  While she testified that it "may be possible" that the duration is shorter for some subgroup of women, she admits that the subgroup analyses are "really missing" from available studies, and "in general, with cancer, it usually is a longer – longer-term before the disease becomes apparent."  *Id.* at 74:1-75:5.

**Cherry-Picking within Observational Studies.**   Finally, Dr. Demirovic did not rely on the conclusions reached by the authors of the studies she cited – and "[i]t is axiomatic that causation testimony is inadmissible if an expert relies upon studies [or] publications, the authors of which were themselves unwilling to conclude that causation had been proven."[111]   Rather, she selectively picks and chooses statistical findings *within* those studies.  For example:

- In discussing the 2006 Rosenberg study, Dr. Demirovic emphasizes that the study found a statistically significant difference for (1) African-American women, (2) with a body mass index ("BMI") of less than 25.0, (3) who took any type of estrogen for more than 10 years.[112]  But she fails to mention that this is the *only* analysis out of sixteen that shows an increased risk and ignores the overall finding of the study that, among the full study population, estrogen use did *not* increase the risk of breast cancer, *regardless of duration of use*.[113]  *See* App. Fig. 3.

- In the 2003 Newcomer study, she notes a statistically significant difference in the risk of tubular breast cancer with recent estrogen use.[114]  In fact she is wrong.  Out of 27 analyses in the study, *none* show a statistically significant increase in breast cancer risk with estrogen alone.  In fact, women who recently used estrogen have *lower* rates of breast cancer generally and *lower* rates of two of the most common types of breast cancer.[115]  *See* App. Fig. 4.

- In the 2006 Chen study, she cites a statistically significant difference for women who took conjugated estrogens for more than 20 years.[116]  But she fails to mention that this was the *only* group out of five that had an increased

---

[111] *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 826 (7th Cir. 2010) (quoting *Hess v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009)).

[112] Demirovic Rep. at 14-15.

[113] Rosenberg 2006 at 763, Table 2.

[114] Demirovic Dep., Ex. 31.

[115] Newcomer 2003 at 229, Table 3 (showing lower rates with ductal and mixed ductal/lobular carcinoma); Dr. Demirovic reports that the risk of tubular cancer with estrogen use is RR 3.3 (CI 1.9-12.1); however, the actual confidence interval is 0.9-12.1, indicating an absence of a statistically significant association. *Id.*

[116] Demirovic Rep. at 14.

risk.  Women who took estrogen for ten years or less had *lower* rates of breast cancer.[117]

- In discussing the 2009 Calle study, she notes a statistically significant difference in the occurrence of lobular cancer after 10 years of treatment and of ductal cancer in women with a BMI of less than 25.[118]  But she fails to mention that among all women taking estrogen alone, over a mean period of 15.7 years, there was no significant increase in the risk of either ductal or lobular breast cancer.  In fact, women who took estrogen for fewer than five years had a decreased risk (again non-significant) of developing both types of breast cancer.[119]

Thus, all told, even though Dr. Demirovic selected a fraction of the available data from the outset, only a small number of the thirty-one studies on which she or Plaintiffs' counsel relies shows any statistical association between breast cancer and the use of standard approved doses of Premarin, typically only in isolated subgroups and when used for long periods of time.  *See e.g.*, Figs. 1 & 2 *supra*; App., Figs. 3 - 4.  Moreover, even with her cherry-picking methodology, Dr. Demirovic concedes that any purported increased risk of breast cancer associated with Premarin use does not exceed a risk ratio of 2.0; rather, the risk ratio for Premarin use of five years or more likely falls somewhere between 1.35 and 1.99.[120]

## C.    Dr. Marcelo Aldaz.

### 1.    Dr. Aldaz Never Has Evaluated the Safety of a Medication and Has No Experience Related to Epidemiology.

Dr. Aldaz has no formal training in epidemiology, never has conducted a randomized clinical trial or observational study, and in fact, never has conducted any kind of study in living

---

[117] Chen 2006 at 1029, Table 2.

[118] Demirovic Rep. at 19.

[119] Calle 2009 at 940, Table 2.

[120] *See* Demirovic Rep. at 27; Demirovic Dep. at 237:10-21.

humans.[121]  He readily admits that he is not an epidemiologist and cannot and did not

meaningfully evaluate the design or results of epidemiological studies.[122]

> Q.    When you attempt to evaluate the true effects of a
>        medication, do you simply count studies that show an
>        increased risk and compare them to the number of studies
>        showing no increased risk, or do you weight the evidence
>        based on other criteria?
>
> A.    I'm not an epidemiologist, and I usually don't do that type
>        of analysis. . . .[123]

Like Dr. Demirovic, Dr. Aldaz is neither a drug safety expert nor a pharmacologist.[124]

He never has conducted research, authored a paper, or taught a class on drug safety in humans; in

fact, he never has written a single paper on the safety profile of any medication.[125]  Neither the

FDA nor any other government agency, academic institution, or pharmaceutical company ever

has sought his advice regarding drug safety issues.[126]  He never has studied the effects of any

hormone therapy in humans, nor has he published any papers or participated in any scientific

study that concluded that estrogen-only hormone therapy causes breast cancer.[127]

Dr. Aldaz is a basic scientist in the field of molecular carcinogenesis, and his research

primarily involves studying mice, rats and cell cultures.[128]  He has not practiced medicine in

---

[121]  Aldaz July 23, 2010 Dep. at 27:17-28:4, 29:3-6, 31:19-22.

[122]  *Id.* at 26:9-16, 34:10-18, 35:7-14, 235:12-236:1.

[123]  *Id.* at 283:12-19.

[124]  *Id.* at 27:13-16, 30:6-9, 76:18-24.

[125]  *See id.* at 26:19-27:2, 27:3-16, 42:12-43:3, 46:19-24.

[126]  *Id.* at 29:17-30:9.

[127]  *Id.* at 30:10-18; Aldaz May 20, 2010 Dep. at 95:1-5, 95:10-15.

[128]  Aldaz July 23, 2010 Dep. at 32:5-14; Aldaz May 20, 2010 Dep. at 302:2-9.

almost 30 years, he is not licensed to practice in the U.S., and he is not board certified in any specialty.[129]  He never has treated a woman with menopausal symptoms, never prescribed hormone therapy, never diagnosed a woman with breast cancer, and he is not an oncologist.[130]

> **2.   Dr. Aldaz Materially Changed His Methodology and Opinions in This Litigation in Just a Few Weeks.**

In early 2010, Plaintiffs retained Dr. Aldaz to serve as an expert in this litigation.[131] Although he was not able to review the literature thoroughly in the time available to him, Dr. Aldaz "covered what [he] could" and submitted an initial expert report *within 72 hours*.[132]

In June, three weeks after his first deposition in another hormone therapy matter, Dr. Aldaz submitted his current report.[133]  Over the course of those three weeks, he materially changed his methodology and opinions.  Although in May he testified that he would not offer any opinions related to epidemiology, which is outside his expertise,[134] his June report includes an extensive discussion of observational study data.[135]  Similarly, in May he stated that he was discussing risk factors and not offering an opinion on whether hormone therapy was a cause of breast cancer,[136] he now opines that the relationship is in fact causal.[137]  These major shifts are

---

[129] *See* Aldaz Rep. at 1; Aldaz July 23, 2010 Dep. at 35:15-20, 36:4-6; Aldaz May 20, 2010 Dep. at 15:17-19.

[130] Aldaz July 23, 2010 Dep. at 36:7-17, 36:18-37:4; Aldaz May 20, 2010 Dep. at 302:2-6.

[131] *See* Aldaz May 20, 2010 Dep. at 21:16-22:14.

[132] Aldaz May 20, 2010 Dep. at 242:10-18, 298:22-299:7, 338:22-339:15.  Tellingly, Dr. Aldaz concedes that he never has offered these opinions outside of litigation.  Aldaz July 23, 2010 Dep. at 263:24-264:15.

[133] *Compare* Aldaz May 20, 2010 Dep. at 1, 28:20-24, *with* Aldaz Rep. at 25.

[134] Aldaz May 20, 2010 Dep. at 58:16-18, 143:19-21, 345:20-346:2.

[135] Aldaz Rep. at 4-9.

[136] *See* Aldaz May 20, 2010 Dep. at 343:15-23.

not, however, based on a more thorough review of the data or on new data.  To the contrary, Dr.

Aldaz concedes that – like his original report – his current report is neither complete nor

exhaustive.[138]  Indeed, Dr. Aldaz emphasizes that his report is not as rigorous as a peer-reviewed

paper or a scientific review;[139] it is simply an opinion that continues to change to this very day.[140]

This approach, too, is yet another red flag under *Daubert*.[141]

> **3.     Dr. Aldaz Admits No Method Exists for Determining the Cause of Any Individual Woman's Breast Cancer and Recognizes the Limitations of Biological Data.**

Although Dr. Aldaz now purports to offer opinions on the basis of epidemiology, he did

not change his firm view that a causal relationship between a medication and a disease cannot be

established with mere statistical associations alone.  As he puts it in his report, "[e]pidemiology

without biology is meaningless."[142]  Further, he concedes that there is no way to determine the

---

[137] Aldaz July 23, 2010 Dep. at 25:19-26:7.

[138] Aldaz Rep at 4.

[139] Aldaz July 23, 2010 Dep. at 13:4-14.

[140] Aldaz July 23, 2010 Dep. at 61:3-63:8 (changing his opinion regarding the effect of Premarin on hormone-negative cancer); *id.* at 196:8-197:5 (changing his opinion regarding risk after stopping Premarin).

[141] *See Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996) (noting that an expert's testimony that "This is not a scientific study.  This is a legal opinion," is a "problem [for] this court" since "the goal of *Daubert* and this court's previous cases has been to bring more rigorous scientific study into the expression of legal opinions offered in court by scientific and medical professionals."); *In re Bausch & Lomb, Inc. Contact Lens Solution Prods. Liab. Litig.*, Civil Action No. 2:06-MN-77777-DCN, 2009 WL 2750462, at *12-13 (D.S.C. Aug. 26, 2009) (noting that where expert opinions reflect a "moving target" and "were in flux," it "undermines the reliability of [the] opinions").

[142] Aldaz Rep. at 4; *see also* Aldaz May 20, 2010 Dep. at 54:18-55:6; Aldaz July 23, 2010 Dep. at 22:13-23.

cause of breast cancer in an individual woman because there are multiple risk factors for breast cancer and no way to identify the specific cause of any tumor.[143]  As he testified:

> Q.   Do you agree that a breast tumor allegedly caused by Premarin is biologically indistinguishable from a breast cancer tumor caused by something else?
>
> A.   I agree.
>
> Q.   Are you aware of any methodology that would allow a physician to examine a woman's breast cancer and conclude that her breast cancer was caused by Premarin as opposed to some other risk factor or cause?
>
> A.   There is not such [sic] methodology.
>
> Q.   Is there any methodology which allows a researcher to identify hormone therapy as a cause or the cause of an individual woman's breast cancer?
>
> A.   There is not any methodology.
>
>      . . .
>
> Q.   In all of your years in the breast cancer field, have you ever heard or read of another doctor being able to review a patient's medical history and isolate hormone pills as a cause, in fact, of an individual woman's breast cancer?
>
> A.   No.[144]

He further concedes that hormone therapy confers a low risk of breast cancer compared to other known risk factors,[145] and that any breast cancer allegedly caused by Premarin would be biologically indistinguishable from one caused by other factors.[146]

---

[143]  Aldaz July 23, 2010 Dep. at 66:11-19, 67:20-68:9, 183:9-13.

[144] *Id.* at 66:21-68:16.

[145] Aldaz May 20, 2010 Dep. at 328:4-14; *see also* Aldaz July 23, 2010 Dep. at 321:13-322:12 (testifying that Premarin does not act alone to cause breast cancer, but rather that it can contribute to the development of breast cancer in combination with multiple other causes).

[146] *Id.* at 66:21-67:1, 67:20-68:9.

At the same time, Dr. Aldaz concedes that animal and *in vitro* studies test the effects of a medication in animals or cell cultures but may not reliably predict the effect of the medication when given to humans, who have very different physiologies.[147]  He also admits that a woman's risk of developing cancer depends on her specific physiological characteristics,[148] making any extrapolation from animals even more problematic.  Dr. Aldaz further agrees that extrapolating from cell culture to human breast cancer is "a leap."[149]  As a result, such studies are useful only for limited purposes.[150]

> **4.      Dr. Aldaz Acknowledges That There Are Important Differences Between Estrogens, But That He Did Not Account for Those Differences in Forming His Opinion.**

In forming his opinions, Dr. Aldaz ignored the significant chemical, biological, and physiological differences between estrogens.[151]  Dr. Aldaz admits that there are dozens of different estrogens, some of which are found naturally in women, some of which are obtained

---

[147] *See* Aldaz May 20, 2010 Dep. at 303:4-11, 306:17-307:8, 308:5-8; Aldaz July 23, 2010 Dep. at 112:9-14; *see also* REF. MAN. at 345-46; Thompson Aff. ¶ 17 ("These studies test the effects of a medication in animals or cell cultures but too often do not reliably predict the effect of the medication when given to humans.").

[148] Aldaz July 23, 2010 Dep. at 89:1-16 (agreeing that Premarin's risk would be dependent "on the age and other physiological characteristics of the women being studied"); *id* at 211:10-16 (agreeing that toxicity is dependent on the physiological characteristics of a woman).

[149] Aldaz May 20, 2010 Dep. at 175:2-17.

[150] Herrington & Howard 2003 at 519; Ellen W. Seely & Steven Grinspoon, *Patient-Oriented Research: Clinical Pathophysiology and Clinical Therapeutics*, *in* CLINICAL AND TRANSLATIONAL SCIENCE: PRINCIPLES OF HUMAN RESEARCH 3, 3 (2009) (excerpt attached as Ex. 85).

[151] Aldaz July 23, 2010 Dep. at 225:21-227:16 (admitting that his report refers to estrogens generally without looking at Premarin specifically and it was "not the intent of [his] report" to look exclusively at Premarin).

from horses, and some of which are synthesized in the laboratory.[152]  While these estrogens all share certain common properties, he concedes that each type of estrogen is chemically and biologically unique and may have entirely different effects on breast cancer risk.[153]

Dr. Aldaz also acknowledges that different estrogen *therapies* include different types of estrogen, have different chemical formulations, and exhibit different effects on a woman's body.[154]  Premarin differs from other estrogen therapies in that it is composed primarily of conjugated equine estrogens which, according to Dr. Aldaz, are relatively weak compared to endogenous estrogens (such as estradiol) that women are exposed to for thirty to forty years as part of their normal hormonal cycles.[155]  Therefore, as Dr. Aldaz concedes, Premarin may have a different effect on breast tissue and a different effect on breast cancer risk than endogenous estrogens or other estrogen therapies.[156]

Despite these concessions, Dr. Aldaz does not distinguish between estrogens – or between different types of estrogen therapies – in forming his opinion.  Instead, his expert opinion lumps together data on all types of estrogen without addressing the inherent biological and chemical differences.[157]  Not one of the three rat studies on which he relies involves

---

[152] *Id.* at 69:3-19.

[153] *Id.* at 99:22-100:14, *see also id.* at 43:23-44:11, 72:1-16 (conceding that different estrogen formulations, particularly the European form of estradiol, have different effects.

[154] *Id.* at 43:5-44:11, 144:5-9 (acknowledging that different estrogen therapy products produce different levels of estrogen in the bloodstream).

[155] *Id.* at 72:1-73:2, 104:1-4.

[156] Aldaz July 23, 2010 Dep. at 99:14-101:3; *see also* Austin Supp. Dep. at 99:15-100:14; Deposition of Donald F. Austin M.D., M.P.H., Mar. 13, 2007 at 186:20-187:6 (testifying that different formulations have different effects) (excerpts attached as Ex. 86).

[157] *See* Aldaz Rep. at 4, 10, 23; Aldaz July 23, 2010 Dep. at 262:21-263:5 ("[I]n some opinions I'm referring to estrogen in general; and in some opinions, I'm referring to in [sic] Premarin.").

Premarin; they all involve estradiol, by far the most potent estrogen, which Dr. Aldaz readily concedes cannot be extrapolated directly since estradiol differs from Premarin.[158]  Similarly, virtually all of the lab experiments he says indicate that Premarin can initiate breast cancer by causing DNA mutations or proliferation of breast tissue involve estradiol as well – not Premarin.[159]  Even the data he cites purportedly linking estrogen levels in the blood with breast cancer risk come from studies of estrogen levels conducted in women *not taking estrogen therapy* – in other words, women who were not taking Premarin.[160]  In fact, Dr. Aldaz left out of his analysis data showing that formulations like Premarin may *reduce* the risk of breast cancer in certain circumstances.[161]  Thus, the body of lab experiments that Dr. Aldaz relies on is neither complete nor focused on the effects of Premarin.

> **5.    Dr. Aldaz Ignores Definitive Clinical Trial Data and Cherry-Picks the Observational Study Data, Which He Is Not Qualified to Interpret.**

Like Dr. Demirovic, Dr. Aldaz largely ignored results of WHI and other clinical trials, even though he acknowledges that clinical trials are the gold standard for assessing the effect of a medication in a human and that the most confident conclusions [about the clinical effect of

---

[158] *See* Aldaz Rep. at 13-14; Aldaz July 23, 2010 Dep. at 110:10-111:17.  None of the studies that Dr. Aldaz cites actually showed an increase in breast tumors in rats exposed only to estrogen.  Shull et al., CARCINOGENESIS 1997;18:1595-1601 (attached as Ex. 87); Li et al., PROC. NAT'L ACAD. SCI. U.S.A. 2004;101:18123-18128 (attached as Ex. 88); Kovalchuk et al., CELL CYCLE 2007;6:2010-2018 (attached as Ex. 89).  In all of the studies, the rats had functioning ovaries, which produced natural levels of estrogen *and* progesterone.  *Id.* at 111:11-17, 118:8-119:8, 126:10-127:1.  Notably, a study that Dr. Aldaz did not include in his report found that rats who had their ovaries removed (and thus had no progesterone) did not develop breast tumors when treated with estrogen alone.  *Id.* at 127:23-129:14.

[159] *Id.* at 132:21-133:21, 147:17-148:6.

[160] *Id.* at 146:19-147:10.

[161] *See id.* at 137:13-139:11; Aldaz May 20, 2010 Dep. at 212:15-213:1.

Premarin] can be drawn from human clinical testing.[162]  Dr. Aldaz relies instead on a selective

fraction of the observational study data in an effort to bridge the gap between lab experiments

and humans, even though he states repeatedly that all epidemiological studies are inherently

flawed, that observational studies frequently report unreliable results, and that researchers must

look for consistency across study results to assess associations reliably.[163]  He also admits he did

not perform a complete review of the literature, has not identified all the relevant studies, does

not even know how many studies have been performed or how many showed no association, did

not evaluate the methodology and design of the studies, and did not account for the numerous

confounders he acknowledges are present in all of the observational studies.[164]

   In addition to ignoring the different effects of different formulations of estrogen-only

therapy, Dr. Aldaz also admits that he overlooked the role of dose and duration of exposure in

reviewing the observational study data.  While he acknowledges that Premarin may have no

adverse effects at low doses and actually may inhibit tumor growth at high doses, he did not even

consider dose in performing his analysis.[165]  Similarly, Dr. Aldaz has not offered any opinion

---

[162] *Id.* at 48:5-9; Aldaz July 23, 2010 Dep. at 318:24-319:3.

[163] *See* Aldaz May 20, 2010 Dep. at 54:13-55:6, 202:17-203:2; Aldaz July 23, 2010 Dep. at 19:19-24 ("[C]onsistency is the key to demonstrate or to refer causality."); *id.* at 20:3-21:4.

[164] Aldaz Rep. at 4, 7 (stating that the risk allegedly conferred by Premarin can vary significantly based upon other predisposing factors, such as age at which the woman begins taking estrogen, whether she has had her ovaries removed, how long she was estrogen deficient, her history of benign breast disease, her BMI, whether she has children, her baseline estrogen level, and prior use of oral contraceptives); Aldaz July 23, 2010 Dep. at 16:19-17:19, 58:4-10, 235:19-236:22, 245:18-246:3.

[165] Aldaz July 23, 2010 Dep. at 15:3-16:11 (admitting he did not consider dose); *id.* at 86:16-87:4 (conceding Premarin may have no adverse effects at low doses); *id.* at 137:13-138:4 (conceding Premarin may inhibit tumor growth at high doses); *id.* at 210:21-211:7 (stating that oral contraceptive pills may not increase breast cancer risk because they are at very low doses).  At the same time, Dr. Aldaz states that the characterization of the effects of a medication would not

-38-

with respect to how long a woman must take Premarin to be at increased risk of developing

breast cancer,[166] other than that he, like Dr. Demirovic, thinks the risk does not begin until at

least five and perhaps only after ten years of continuous daily use.[167]   Dr. Aldaz also concedes

that cumulative exposure to Premarin is a key factor in assessing any association with the risk of

breast cancer.[168]   In all, as reflected in Figure 5, only two of the twenty-two studies cited in Dr.

Aldaz's report showed an increased risk of breast cancer at approved doses of Premarin, with one

of those two only showing increased risk after ten years or more of continuous daily use.

---

be complete if a dose-response relationship had not been examined and defined.  Aldaz July 23, 2010 Dep. at 185:2-186:8.

[166] *See generally* Aldaz Rep.; *see also* Aldaz May 20, 2010 Dep. at 346:10-19 (testifying that "I don't have any data about duration of time" and agreeing that any opinion he would offer on duration would be speculative); *id.* at 344:8-18 (stating "I have no idea" how many tablets of combination hormone therapy a woman must take over what period of time to be at increased risk of breast cancer); *id.* at 345:14-346:2 (agreeing he cannot offer the opinion that combination hormone therapy increases the risk of breast cancer in relation to any specific duration); *id.* at 347:19-348:5 (admitting he cannot recall any study showing increased risk at less than five years of use).

[167] Aldaz July 23, 2010 Dep. at 38:1-39:13.

[168] *Id.* at 259:13-17.

**Figure 5:  STUDIES LISTED IN DR. ALDAZ'S REPORT[169]**

| Study | CE Specifically Analyzed? | CE Dose Analyzed? | Increased Breast Cancer Risk with CE? |
|---|---|---|---|
| Hulka 1982 | NO | -- | -- |
| Buring 1987 | NO | -- | -- |
| Wingo 1987 | NO | -- | -- |
| Mills 1989 | NO | -- | -- |
| Yang 1992 | NO | -- | -- |
| Collaborative (1997 | NO | -- | -- |
| Magnusson 1999 | NO | -- | -- |
| Chen 2002 | NO | -- | -- |
| Newcomb 2002 | NO | -- | -- |
| Stahlberg 2004 | NO | -- | -- |
| Brinton 2008 | NO | -- | -- |
| Fournier 2008 | NO | -- | -- |
| Bakken 2004 | NO | -- | -- |
| Bergkvist 1989 | YES | NO | -- |
| Colditz 1995 | YES | NO | -- |
| Schairer 2000 | YES | NO | -- |
| Brinton 1981 | YES | YES | NO |

[169] Hulka et al., AM. J. OBSTET. GYNECOL. 1982;143:638-644 ("Hulka 1982") (attached as Ex. 90); Buring et al., AM. J. EPIDEMIOL. 1987;125:939-947 ("Buring 1987") (attached as Ex. 91); Wingo et al., JAMA 1987;257:209-215 ("Wingo 1987") (attached as Ex. 92); Mills 1989; Yang et al., CANCER CAUSES AND CONTROL 1992;3:475-479 ("Yang 1992") (attached as Ex. 93); Newcomb et al., CANCER EPIDEMIOL., BIOMARKERS & PREVENTION 2002;11:593-600 ("Newcomb 2002") (attached as Ex. 94); Fournier et al., BREAST CANCER RES. TREAT. 2008;107:103-111 ("Fournier 2008") (attached as Ex. 95); Bakken et al., INT. J. CANCER 2004;112:130-134 ("Bakken 2004") (attached as Ex. 96); Bergkvist et al., N. ENGL. J. MED. 1989;321:293-297 ("Bergkvist 1989") (attached as Ex. 97); Colditz et al., N. ENGL. J. MED. 1995;332:1589-1593 ("Colditz 1995") (attached as Ex. 98); Schairer et al., JAMA 2000;283;485-491 ("Schairer 2000") (attached as Ex. 99); Hoover et al., JNCI 1981;67:815-820 ("Hoover 1981") (attached as Ex. 100); and Brinton et al., BR. J. CANCER 1986;54:825-832 ("Brinton 1986") (attached as Ex. 101); Hoover 1976; Ross 1980; Beral 2003.

| Study | CE Specifically Analyzed? | CE Dose Analyzed? | Increased Breast Cancer Risk with CE? |
|---|---|---|---|
| Hoover 1981 | YES | YES | NO |
| Brinton 1986 | YES | YES | Only after ≥ 10 years |
| Hoover 1976 | YES | YES | Only after ≥ 10 years at doses > 0.625 mg |
| Ross 1980 | YES | YES | Only at doses ≥ 1.25 mg |
| Beral 2003 | YES | YES | YES |

## ARGUMENT

Here, the Court should exclude Plaintiffs' experts' opinions in their entirety, for multiple reasons, which individually and collectively demonstrate that their opinions are inadmissible.

First, neither Dr. Demirovic nor Dr. Aldaz is qualified to opine that approved doses of Premarin are capable of causing breast cancer.

Second, even if they were qualified, their methodologies – ignoring and failing to explain gold standard clinical trial data and the totality of observational study data that are contrary to their opinions, while cherry-picking less meaningful observational data and animal experiments without regard to formulation, dose, duration, and the significant physiological characteristics of the study population – are unreliable.[170]  Though "[s]cientific methodology today is based on generating hypotheses and testing them to see if they can be falsified,"[171] Drs. Demirovic and Aldaz do not subject their hypotheses to rigorous scrutiny or contrary data, but merely pluck slivers of limited data in a misguided quest to somehow prove themselves right.  But experts are

---

[170] Thompson Aff. ¶¶ 1, 32 (outlining the many methodological flaws in Plaintiffs' experts' opinions and detailing the shortcomings of the evidence on which they rely).

[171] Daubert, 509 U.S. at 593.

not free to "simply pick[] the cause that is most advantageous to [plaintiff's] claim."[172]   Their

opinions are also at loggerheads with the generally accepted position in the medical and

scientific communities that Premarin does not increase the risk of breast cancer.

Third, their opinions are not relevant under *Daubert*'s "fit" requirement, as they cannot

assist any jury in any individual case.

**I.     THE COURT SHOULD PRECLUDE PLAINTIFFS' EXPERTS FROM TESTIFYING IN AREAS WHICH THEY ARE NOT QUALIFIED TO ADDRESS.**

Under Rule 702, an expert must be qualified by either training, experience or specialized

knowledge.  *See* Fed. Rule Evid. 702.  Even if an expert is qualified to discuss certain subjects,

however, she must not testify outside those areas.[173]   As a result, the Court should preclude

Dr. Demirovic from testifying at all, as she is unqualified to offer opinions relating to

epidemiology.  Because Dr. Aldaz disclaims any specialized knowledge regarding epidemiology,

and the opinions he offers relate solely to animal and cell biology, which are insufficient to meet

Plaintiffs' causation burden, the Court should exclude his testimony as well.

As outlined above, Dr. Demirovic is not sufficiently qualified to offer testimony

regarding epidemiology.  She has no experience evaluating the safety of a medication.  She never

has published or critically reviewed an article evaluating the risks or benefits of a medication,

---

[172] *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987).

[173] *See Barrett v. Rhodia, Inc.*, 606 F.3d 975, 982 (8th Cir. 2010) (holding that a psychologist with no training or experience in toxicology was not qualified to offer expert testimony on toxicology); *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (finding that a district court committed prejudicial error when allowing an expert to testify outside his expertise); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 960 (D. Minn. 2009) (excluding epidemiologist's opinion on specific causation because it fell outside his expertise); *Soyring v. Fehr*, Civ. No. 05-1900 (PJS/RLE), 2006 WL 5159192, at *4 (D. Minn. July 5, 2006) ("[B]oth the Eighth Circuit Court of Appeals and the Supreme Court have made clear that a person, although qualified as an expert in one area of expertise, may be precluded from offering opinions beyond that expertise . . .") (internal citations omitted).

nor has she consulted on such issues with any government agency, academic institution, or pharmaceutical company. Dr. Demirovic lacks even passing familiarity with hormone therapies, let alone Premarin specifically, nor does she know anything about different estrogens and their different effects. She also has virtually no background or training in the cancer research field, let alone breast cancer. It is hard to see how she can employ in this courtroom the same level of intellectual rigor that characterizes the practice of an expert in the field when she simply has no experience in the necessary areas outside of the courtroom.

Dr. Aldaz does not even profess to have any expertise in epidemiology. He too is not a drug safety expert and has not studied the effects of any hormone therapy in humans. Because data from animal studies and laboratory experiments are not sufficient to establish general causation, *see* Argument § II.B *infra*, Plaintiffs cannot meet their burden with his testimony, so the Court also should preclude him from giving any type of general causation opinion.

## II.   THE COURT SHOULD EXCLUDE PLAINTIFFS' EXPERTS' OPINIONS THAT PREMARIN INCREASES THE RISK OF BREAST CANCER BECAUSE THEIR OPINIONS ARE THE PRODUCT OF UNRELIABLE METHODS.

In fulfilling the gatekeeping role under *Daubert*, courts have identified certain red flags that suggest an expert has not employed sound scientific principles in arriving at an opinion. One such indicia of unreliability is cherry-picking evidence that supports an opinion while neglecting to consider or explain contrary evidence[174] – which both of Plaintiffs' experts do here. Because Plaintiffs' experts ignored definitive RCT data and cherry-picked the available observational study data (both across studies and within studies) while ignoring the importance of formulation, dose, duration, and other factors, their opinion that Premarin can cause breast cancer is not the product of reliable methods. To the extent either expert purports to proffer that

---

[174] *Norris*, 397 F.3d at 885; *In re Bextra*, 524 F. Supp. 2d at 1176; *Cano*, 362 F. Supp. 2d at 850-51; *In re Rezulin I*, 309 F. Supp. 2d at 563.

opinion on the basis of animal and cell culture studies alone, such data is equally unreliable to establish causation in humans.  As a result, the Court should exclude entirely Plaintiffs' experts' opinion that Premarin can cause breast cancer.

   A.   **The Court Should Exclude Plaintiffs' Experts' Opinions on the Basis of RCT and Observational Study Data Because The Experts Ignore Relevant Evidence and Cherry-Pick Data to Support Their Opinions.**

       In arriving at their conclusion that Premarin causes breast cancer, both Dr. Demirovic and Dr. Aldaz ignore the definitive clinical trial data from WHI and other RCTs, which show that Premarin does not increase the risk of breast cancer, even after long-term use.  Plaintiffs' experts ignore those trials even though scientific, medical and regulatory communities, *as well as Dr. Demirovic herself in the Prempro litigation*, recognize that RCTs are the gold standard of scientific evidence and the most reliable evidence to evaluate the risks of these medications.[175] An expert who fails to consider evidence contrary to her opinion – or shifts her methodology to reach a certain result – cannot pass muster under *Daubert*.[176]

       Rather than relying on the gold standard RCT data, Plaintiffs' experts instead rely on a select fragment of the observational study data, which in this context are plagued with well-recognized issues of bias and confounding.[177]  In addition to the problems of bias and confounding, the experts' analyses both improperly *include* data from other estrogen

---

[175] *See supra* notes 35-37, 80-83; *In re Viagra*, 572 F. Supp. 2d at 1078 (noting that observational study data should be used only "when research from a clinical trial is not available").

[176] *See Norris*, 397 F.3d at 885 (quoted *supra*); *Cano*, 362 F. Supp. 2d at 836 (excluding expert who failed to follow his own methodology for applying epidemiological data to assess causation); *In re TMI Litigation Cases Consol. II*, 922 F. Supp. 997, 1031 (M.D. Pa. 1996) (excluding testimony from an expert, in part, because he could not consistently articulate the same methodology).

[177] *See supra* notes 27, 89; *see also* Thompson Aff. ¶¶ 29-30.

formulations and *exclude* data that specifically involve Premarin.  While a class of medications may be similar in some ways, "molecules with [even] minor structural differences can produce very different biological effects."[178]  As a result, opinions that lump together medications in a class are unreliable.[179]  To use a coin analogy, this is no different than searching for runs of heads or tails in a much larger sample of coin flips, which show an even distribution of head and tails.  To take it a step further, Plaintiffs' experts here both rely on samples involving different coins and exclude many other samples involving the coin in question.

Moreover, most of the studies that Plaintiffs' experts cite that did evaluate the same formulation as Premarin often involved higher doses than are commonly prescribed.  Because dose is "the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect,"[180] a causation opinion that ignores the dose evaluated in a particular study is unreliable as well.[181]  Dr. Aldaz confirms the critical importance of dose in his

---

[178] *Sorensen v. Shaklee Corp.*, 31 F.3d 638, 646 n.12 (8th Cir. 1994) (quoting Joseph Sanders, *From Science to Evidence:  The Testimony on Causation in the Bendectin Cases*, 46 STANFORD L. REV. 1, 19 (Nov. 1993)).

[179] *See Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 990 (8th Cir. 2001) (noting that the "generic assumption" that a medication behaves like others in its class "carries little scientific value" because "[e]ven minor deviations in molecular structure can radically change a particular substance's properties and propensities"); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1246-47 (11th Cir. 2005) (finding expert's opinion that attempted to extrapolate the effects of one medication to the effects of another speculative and overreaching); *Nat'l Bank of Commerce v. Dow Chem. Co.*, 965 F. Supp. 1490, 1526 (E.D. Ark. 1996) (holding that an expert cannot rely on structural similarities between two medications to support a causation opinion when those medications have different effects).

[180] Eaton, *supra* note 103, at 11.

[181] *See Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893, 898 (8th Cir. 2008) (noting that the "magnitude or concentration of an exposure should be estimated"); *McClain*, 401 F.3d at 1241-42 (noting that a court "should pay careful attention" to testimony about the dose response relationship and that an expert "who avoids or neglects this principle of toxic torts without justification casts suspicion on the reliability of his methodology"); REF. MAN. at 377, 403.

testimony, indicating that Premarin may have no effect on breast cancer risk at some doses and

may actually *inhibit* tumor growth at others.[182]  Finally, with only one exception, the

observational studies Plaintiffs' experts cite that involve conjugated estrogen taken at standard

doses of 0.625 mg per day only showed a statistical association with breast cancer when patients

took it continuously for at least ten years.[183]

      Courts routinely exclude expert opinions that fail to consider the totality of the evidence

and instead cherry-pick only the data that support the expert's opinion, particularly without

regard to formulation or dose.[184]  For example, in *In re Bextra*, an expert ignored clinical trial

data that – like WHI – did not demonstrate any association between a specific dose of the

medication and the adverse event of interest.  *See* 524 F. Supp. 2d at 1175.  The expert also

"cherry-pick[ed] observational studies that support his conclusion and reject[ed] or ignor[ed] the

great weight of the evidence that contradicts his conclusion."  *Id.* at 1176; *see id.* at 1181.  That

expert's opinions – like those of Drs. Demirovic and Aldaz here – were not generally accepted,

even by plaintiffs' other experts.  *See id.* at 1175-76.  The Court also criticized the expert's

"fundamental misunderstanding" of one of the studies he cited, which consisted of mistakes

---

[182] Aldaz July 23, 2010 Dep. at 86:16-87:4 (conceding that taking a milligram of estrogen would not cause breast cancer); *id.* at 137:13-139:11 (admitting that high doses estrogen can inhibit tumor growth); *id.* at 210:21-211:7 (testifying that oral contraceptives may not cause breast cancer because they contain low doses of estrogen).

[183] *See* App., Figs. 1, 2 & 5.  The one exception is the Beral 2003 study which found a relative risk of 1.25 (1.11-1.41) in current users of conjugated estrogen therapy at doses of 0.625 mg per day.  Beral 2003 at 423, Fig. 5.

[184] *See, e.g.*, *In re Bextra*, 524 F. Supp. 2d at 1176 (quoted *supra*); *Cano*, 362 F. Supp. 2d at 850 (excluding expert who "sifted through the literature to pick and choose positive relative risks" that supported his causation opinion); *In re Rezulin I*, 309 F. Supp. 2d at 563 (quoted *supra*); *Caraker v. Sandoz Pharms. Corp.,* 188 F. Supp. 2d 1026, 1032, 1034 (S.D. Ill. 2001) (excluding "experts' opinions inasmuch as they rely on selective use of statistically insignificant data from epidemiological studies" they otherwise discounted).

much like those Dr. Demirovic made. *Id.* at 1177.  Finally, the Court rejected the expert's attempts to extrapolate from studies involving higher doses of the medication because "with nearly all compounds there is usually a threshold that must be met before there is any harm; for example, even water can be harmful if consumed at certain amounts even though there is no harm at smaller amounts." *See id.* at 1180.

Likewise, in *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), the Court held that a district court properly concluded that the four epidemiological studies on which the plaintiff's expert relied were not a sufficient basis for the experts' opinions under *Daubert*. *See* 522 U.S. at 145.  The plaintiffs' expert cited two studies in which the authors did not conclude that there was a causal association, just as Dr. Demirovic has done here. *See id.* at 145-46.  The expert also cited a study involving a different substance than the one to which the plaintiff was exposed, much like Dr. Demirovic and Dr. Aldaz rely on studies involving different formulations of estrogen. *See id.* at 146.  Finally, the expert relied on a study that failed to rule out other risk factors to which the subjects had been exposed, *see id.*, just as Drs. Demirovic and Aldaz concede that there are many risk factors for breast cancer other than exposure to estrogen.  In light of those weaknesses in the expert's methodology, the Court held, a district court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

Thus, because Plaintiffs' experts ignore authoritative clinical trial data, ignore the totality of the observational study data, and instead cherry-pick from observational studies without regard to formulation, dose, and duration, their broad opinion that Premarin can cause breast cancer is not the product of reliable methods, and the Court should exclude it.

**B.**     **The Court Should Exclude Dr. Aldaz's Opinion on the Basis of Animal and Laboratory Studies Because Such Data Are Insufficient to Establish Causation in Humans as a Matter of Law.**

To the extent Dr. Aldaz purports to opine that Premarin causes breast cancer on the basis of animal or laboratory studies, the Court should exclude that testimony as well, for four independent reasons.[185] *See* Statement of Facts ("SOF") § III.B.1 *supra*; Argument § I *supra*. First, although Dr. Aldaz acknowledges that different estrogen formulations and doses have different effects on breast cancer risk in different populations of women, he overlooked or disregarded those differences in order to reach an opinion about Premarin.[186] Second, he omitted from his analysis data contrary to his opinion, such as studies showing that estrogen may inhibit cell growth and thus have anti-cancer effects.[187] Third, he cherry-picked the lab experiments that supposedly support his opinion (such as studies in animals that were not taking estrogen therapy), focusing almost exclusively on forms of estrogen and physiologic conditions that are not relevant to post-menopausal women taking Premarin.[188] Finally, even if Dr. Aldaz had considered the relevant lab data, studies not performed in living humans cannot be used reliably to assess causation in humans, as Dr. Aldaz recognizes.[189]

---

[185] As discussed above, the Court should preclude Dr. Demirovic from testifying on such issues for the additional reason that she is not qualified to do so.

[186] Aldaz July 23, 2010 Dep. at 94:2-24 (admitting that he did not consider dose or duration or population when he performed his analysis) *see supra* note 174 (citing case law establishing that opinions that lump together different medications in a class are inadmissible).

[187] *See supra* note 179 (citing case law admonishing courts to exclude experts who ignore contrary data without explanation).

[188] *See supra* note 179 (citing case law establishing that cherry-picked opinions are unreliable and inadmissible).

[189] *See* notes 144, 146 and 147 *supra* (Dr. Aldaz conceding limitations of animal studies); *see also Allen*, 102 F.3d at 197-98 (noting "the very limited usefulness of animal studies when confronted with questions of toxicity," and that "cell biology data . . . is the beginning not the

III.   **THE COURT SHOULD EXCLUDE PLAINTIFFS' EXPERTS' OPINIONS THAT PREMARIN INCREASES THE RISK OF BREAST CANCER BECAUSE THEIR OPINIONS ARE NOT SUFFICIENTLY TIED TO THE FACTS OF ANY CASE.**

The *Daubert* "fit" requirement, which requires expert testimony to aid the jury in resolving a factual dispute, *see Daubert*, 509 U.S. at 591-92, is no less applicable to a general causation opinion offered in consolidated litigation on behalf of multiple plaintiffs as it is to one offered in an individual case.  *See, e.g., In re Zyprexa Prods. Liab. Litig.*, No. 04-MD-1596, 2009 WL 1357236, *3 (E.D.N.Y. May 12, 2009).  Here, Plaintiffs' experts' opinions fail the *Daubert* fit requirement in two ways:  (1) they are so general that it is impossible to tie them to the facts of any individual case, such that these opinions will not aid the jury in resolving any factual dispute; and (2) even if Plaintiffs meet their burden of establishing that some formulation of estrogen can cause some types of breast cancer, at some dose, when taken for some duration, in some types of women, such an opinion cannot assist the trier of fact unless Plaintiffs' experts also demonstrate that taking Premarin more than doubles the risk of breast cancer, which they cannot.  As a result, Plaintiffs cannot satisfy their causation burden for any plaintiff, and the Court should exclude their experts' opinions altogether.

A.   **Plaintiffs' Experts' Opinions Are Too General to Assist Any Trier of Fact.**

Plaintiffs' experts admit that the effects of estrogen on breast cancer – *including whether it has any increased risk or effect at all* – depend on a number of factors, such as the formulation

---

end of the scientific inquiry and proves nothing about causation without other scientific evidence"); *Bausch & Lomb*, 2009 WL 2750462 at *12 (noting that "[i]n vitro tests generate hypotheses but lack sufficient reliability, standing alone, to demonstrate causation in humans."); *In re Accutane Prod. Liab.*, 511 F. Supp. 2d 1288, 1291-95 (M.D. Fla. 2007) (noting difficulty in extrapolating animal and *in vitro* studies to humans and finding animal and cell culture studies were not a sufficiently reliable basis for expert opinion); *In re Rezulin II*, 369 F. Supp. 2d at 435 (finding no reliable basis to extrapolate from *in vitro* evidence to clinical effects in humans); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2001 WL 454586, at *15 (E.D. Pa. Feb. 1, 2001) (excluding testimony because animal results could not be applied reliably to humans).

of estrogen at issue, the dose a woman took, the length of time she took it, the types of breast

cancer in question, and the physiological characteristics of the woman.  *See* SOF §§ III.B.3 &

III.C.5 *supra*.  As a result, a bare opinion that estrogen is capable of causing breast cancer –

without tying that opinion to the particular estrogen formulation, dose, duration of use, and other

facts relevant to a specific Premarin user – cannot possibly assist any jury in any individual case.

Rather, a jury would have to evaluate formulation, dose, duration, and other factors in the

context of a specific plaintiff with no guidance from these experts, which makes any sweeping

opinion about estrogen they may offer unhelpful and therefore inadmissible under *Daubert*.  As a

practical matter, moreover, such a general opinion will do nothing to move this litigation

forward, as the parties still will have to litigate the impact of formulation, dose, duration, and

other factors in the context of each individual plaintiff's use of estrogen-only therapy in every

case.  Thus, the Court should find Plaintiffs' experts' opinions inadmissible, or at least should

limit their testimony to that which will assist the jury – at what dose (if any) and at what duration

(if any) Premarin can increase the risk of breast cancer.  *See Daubert*, 509 U.S. at 591-92.

> **B.**  **Plaintiffs' Experts Do Not Opine That Taking Premarin More Than Doubles the Risk of Developing Breast Cancer, Which Renders Their Opinions Inadmissible.**

Even if Plaintiffs' experts could establish with reliable scientific evidence that Premarin

increases the risk of breast cancer – which they cannot – they still cannot satisfy *Daubert*'s "fit"

requirement since they cannot show that Premarin more than doubles the risk of breast cancer.

Dr. Aldaz admits that there is no way to determine the cause of an individual woman's breast

cancer under any circumstances because:

- There are multiple other risk factors that can cause or contribute to breast cancer;

- A breast tumor allegedly caused by Premarin would be indistinguishable from a breast cancer tumor caused by some other risk factor;

- There is no methodology to allow a physician to examine a woman's breast cancer and conclude that it was caused by Premarin as opposed to some other risk factor or cause; and

- There is no way for a researcher to identify hormone therapy as a cause of an individual women's breast cancer.

*See* SOF § III.C.3 *supra*.  Because no methodology exists for determining the cause of any given woman's breast cancer, researchers must use statistics to determine the probability that a patient developed breast cancer because of Premarin as opposed to other causes.

Under the 2.0 rule, Plaintiffs must establish with reliable scientific evidence that the relative risk of developing breast cancer as a result of taking Premarin exceeds 2.0. Dr. Demirovic concedes, however, that even the relative risk from the studies she cherry-picked does not exceed 2.0; rather, the relative risk for Premarin use of five years or more likely falls somewhere between 1.35 and 1.99, even using her unreliable, cherry-picked selection of statistical analyses.[190]  As a result, no plaintiff can show that it is more likely than not that Premarin caused her breast cancer, as opposed to some other factor that causes breast cancer in people who do not take Premarin.  *See In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 893 (C.D. Cal. 2004); *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F. Supp. 981, 998-1000 (C.D. Cal. 1996).  While Plaintiffs contend in their motion that the 2.0 rule applies only to specific causation, rather than general causation, *see* Pls.' Br. at 2, any causation opinion that does not satisfy the 2.0 rule – whether denominated as relating to general causation or specific causation – cannot assist the jury and therefore is inadmissible.

---

[190] *See* Demirovic Rep. at 27; Demirovic Dep. at 237:10-21.

## **CONCLUSION**

For the foregoing reasons, Wyeth respectfully requests that the Court deny Plaintiffs'

motion *in limine* in its entirety and grant Wyeth's cross-motion *in limine* in its entirety.

Respectfully submitted,

/s/   F. Lane Heard III
John W. Vardaman, Jr. (D.C. Bar #13391)
F. Lane Heard III (D.C. Bar #291724)

WILLIAMS & CONNOLLY LLP
725 12th Street, NW
Washington, DC 20005-5901
(202) 434-5000

Lyn P. Pruitt (Ark. Bar No. 84121)

MITCHELL, WILLIAMS, SELIG, GATES &
WOODYARD, PLLC
425 West Capitol Avenue, Suite 1800
Little Rock, AR 72201-3525
(501) 688-8800
*lpruitt@mwsgw.com*

*Attorneys for Wyeth*

DATED:  July 29, 2010

## APPENDIX

## Figure 1:  STUDIES LISTED IN DR. DEMIROVIC'S REPORT

| Study | CEE Specifically Analyzed? | CEE Dose Analyzed? | Increased Breast Cancer Risk with CEE? |
|---|---|---|---|
| Collaborative Group 1997 | NO | -- | -- |
| Kerlikowske 2003 | NO | -- | -- |
| Stahlberg 2004 | NO | -- | -- |
| Ewertz 2005 | NO | -- | -- |
| Fournier 2005 | NO | -- | -- |
| Rosenberg 2006 | NO | -- | -- |
| Lee 2006 | NO | -- | -- |
| Lyytinen 2006 | NO | -- | -- |
| Brinton 2008 | NO | -- | -- |
| Calle 2009 | NO | -- | -- |
| Bakken 2010 | YES | NO | -- |
| Chen 2006 | YES | NO | -- |
| Zhang 2007 | YES | YES | NO |
| Prentice 2008 | YES | YES | NO |
| Beral 2003 | YES | YES | YES |

**Figure 2:  STUDIES PROVIDED TO DRS. DEMIROVIC AND ALDAZ
BY PLAINTIFFS' COUNSEL**

| Study | CEE Specifically Analyzed? | CEE Dose Analyzed? | Increased Breast Cancer Risk with CEE? |
|---|---|---|---|
| La Vecchia 1986 | NO | -- | -- |
| Nomura 1986 | NO | -- | -- |
| Mills 1989 | NO | -- | -- |
| Steinberg 1991 | NO | -- | -- |
| Schairer 1994 | NO | -- | -- |
| Magnusson 1999 | NO | -- | -- |
| Chen 2002 | NO | -- | -- |
| Li 2002 | NO | -- | -- |
| Lumachi 2002 | NO | -- | -- |
| Rosenberg 2006 | NO | -- | -- |
| Kerlikowske 2003 | NO | -- | -- |
| Newcomer 2003 | NO | -- | -- |
| Stahlberg 2004 | NO | -- | -- |
| Hulka 1981 Letter | YES | NO | -- |
| Brinton 1981 | YES | YES | NO |
| Hiatt 1984 | YES | YES | NO |
| Colditz 1990 | YES | YES | NO |
| Hoover 1976 | YES | YES | Only after ≥ 10 years at doses > 0.625 mg |
| Ross 1980 | YES | YES | Only at doses ≥ 1.25 mg |

**Figure 3:  COMPARISONS REPORTED IN ROSENBERG 2006 STUDY**

| COMPARISON | INCREASED RISK WITH CEE? | CITED BY DR. DEMIROVIC |
|---|---|---|
| | | |
| Any duration | NO | NO |
| <5 years use | NO | NO |
| 5-9 years use | NO | NO |
| ≥ 10 years use | NO | YES (non-significant) |
| | | |
| Any duration | NO | NO |
| <5 years use | NO | NO |
| 5-9 years use | NO | NO |
| ≥ 10 years use | YES | YES |
| | | |
| Any duration | NO | NO |
| <5 years use | NO | NO |
| 5-9 years use | NO | NO |
| ≥ 10 years use | NO | NO |
| | | |
| Any duration | NO | NO |
| <5 years use | NO | NO |
| 5-9 years use | NO | NO |
| ≥ 10 years use | NO | NO |

**Figure 4:  COMPARISONS REPORTED IN NEWCOMER 2003 STUDY**

| COMPARISON | INCREASED RISK WITH CEE? | CITED BY DR. DEMIROVIC? |
|---|---|---|
| | | |
| All cancers | NO | NO |
| Lobular | NO | NO |
| Ductal, NOS | NO | NO |
| Papillary | NO | NO |
| Medullary | NO | NO |
| Mucinous | NO | NO |
| Tubular | NO | YES (CI 1.0-7.5) |
| Comedo | NO | NO |
| Scirrhous | NO | NO |
| Mixed D/L | NO | NO |
| | | |
| All cancers | NO | NO |
| Lobular | NO | NO |
| Ductal, NOS | NO | NO |
| Papillary | NO | NO |
| Medullary | NO | NO |
| Mucinous | NO | NO |
| Tubular | NO | NO |
| Comedo | N/A | N/A |
| Scirrhous | NO | NO |
| Mixed D/L | NO | NO |
| | | |
| All cancers | NO | NO |
| Lobular | NO | NO |
| Ductal, NOS | NO | NO |
| Papillary | N/A | N/A |
| Medullary | NO | NO |
| Mucinous | NO | NO |
| Tubular | NO | YES (CI 0.9-12.1) |
| Comedo | NO | NO |
| Scirrhous | N/A | N/A |
| Mixed D/L | NO | NO |

**Figure 5:  STUDIES LISTED IN DR. ALDAZ'S REPORT**

| Study | CEE Specifically Analyzed? | CEE Dose Analyzed? | Increased Breast Cancer Risk with CEE? |
|---|---|---|---|
| Hulka 1982 | NO | -- | -- |
| Buring 1987 | NO | -- | -- |
| Wingo 1987 | NO | -- | -- |
| Mills 1989 | NO | -- | -- |
| Yang 1992 | NO | -- | -- |
| Collaborative Group 1997 | NO | -- | -- |
| Magnusson 1999 | NO | -- | -- |
| Chen 2002 | NO | -- | -- |
| Newcomb 2002 | NO | -- | -- |
| Stahlberg 2004 | NO | -- | -- |
| Brinton 2008 | NO | -- | -- |
| Fournier 2008 | NO | -- | -- |
| Bakken 2004 | NO | -- | -- |
| Bergkvist 1989 | YES | NO | -- |
| Colditz 1995 | YES | NO | -- |
| Schairer 2000 | YES | NO | -- |
| Brinton 1981 | YES | YES | NO |
| Hoover 1981 | YES | YES | NO |
| Brinton 1986 | YES | YES | Only after ≥ 10 years |
| Hoover 1976 | YES | YES | Only after ≥ 10 years at doses > 0.625 mg |
| Ross 1980 | YES | YES | Only at doses ≥ 1.25 mg |
| Beral 2003 | YES | YES | YES |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of July 2010 a true and correct copy of the foregoing

Memorandum in Support of Wyeth's:  (1) Opposition to Plaintiffs' Motion *in Limine* to Admit

Plaintiffs' General Causation Evidence on Estrogen-Only Hormone Therapy Regimens and

Breast Cancer and (2) Cross-Motion *in Limine* to Exclude Certain Opinions Offered by

Plaintiffs' Experts was electronically filed with the Clerk of Court using the CM/ECF system,

and a true and correct copy was forwarded by e-mail to the parties listed below and on the

attached Service List.

| | |
|---|---|
| The Calwell Practice, PLLC<br>500 Randolph St<br>Charleston, WV 25302 | scalwell@calwelllaw.com<br>areese@calwelllaw.com<br>mluce@calwelllaw.com<br>amclaughlin@calwelllaw.com<br>bwest@calwelllaw.com |
| Zimmerman Reed, PLLP<br>651 Nicollet Mall Ste 501<br>Mpls, MN 55402-4123 | rsg@zimmreed.com<br>stacy.hauer@zimmreed.com<br>csz@zimmreed.com<br>ann.hansen@zimmreed.com<br>tina.olson@zimmreed.com |
| Nilan Johnson Lewis PA<br>120 S 6th St Ste 400<br>Mpls, MN 55402 | jbernier@nilanjohnson.com<br>tvan@nilanjohnson.com |
| Leonard Street and Deinard, PA<br>150 S 5th St Ste 2300<br>Mpls, MN 55402 | frederick.morris@leonard.com<br>craig.bratsch@leonard.com<br>kathryn.engebrit@leonard.com<br>kristine.remjeske@leonard.com |
| Kaye Scholer LLP<br>901 15th St NW<br>Washington, DC 20005 | whoffman@kayescholer.com |

Bassford Remele, PA                          edwardf@bassford.com
33 S 6th St Ste 3800                         chund@bassford.com
Mpls, MN 55402-3707                          paulas@bassford.com
                                             ameys@bassford.com
                                             docket@bassford.com,
                                             jcastro@bassford.com
                                             kims@bassford.com
                                             lwurst@bassford.com
                                             ruthannp@bassford.com

Dorsey & Whitney LLP                         lindsay.michael@dorsey.com
50 S 6th St Ste 1500                         dieseth.paul@dorsey.com
Mpls, MN 55402-1498                          sipkins.peter@dorsey.com
                                             wright.elizabeth@dorsey.com
                                             fairbairn.mary@dorsey.com
                                             garcia.sara@dorsey.com
                                             kelly.laurie@dorsey.com
                                             roadfeldt.christi@dorsey.com
                                             skwiera.linda@dorsey.com

Thompson Hine LLP                            brian.troyer@thompsonhine.com
3900 Key Center
127 Public Square
Cleveland, OH 44114-1291

Larson King, LLP                             dadams@larsonking.com
30 E 7th St Ste 2800                         mweldon@larsonking.com
St Paul, MN 55101-4922                       jheglund@larsonking.com
                                             sleckie@larsonking.com

Grogan Graffam PC                            ldaly@grogangraffam.com
Four Gateway Center 12th Fl
Pittsburgh, PA 15222

Cronan Pearson Quinlivan PA                  michael.quinlivan@cpqlaw.com
1201 Marquette Ave S Ste 110                 linda.brickley@cpqlaw.com
Mpls, MN 55403

Sedgewick, Detert, Moran & Arnold LLP        alan.vickery@sdma.com
1717 Main St Ste 5400                        dawn.mccord@sdma.com
Dallas, TX 75201

                                   /s/     F. Lane Heard III
                                   F. Lane Heard III

                                      WILLIAMS & CONNOLLY LLP
                                      725 12th Street, NW
                                      Washington, DC 20005-5901
                                      (202) 434-5000
                                      *lheard@wc.com*

# SERVICE LIST

## STEERING COMMITTEE MEMBERS

Mr. Richard Lewis
HAUSFELD LLP
1700 K Street NW
Suite 650
Washington, D.C. 20005

Mr. Shawn Khorrami
KHORRAMI POLLARD & ABIR, LLP
444 S. Flower Street, 33rd Floor
Los Angeles, CA  90071

Christopher T. Kirchmer
PROVOST UMPHREY
490 Park Street
P.O. Box 4905
Beaumont, Texas  77704

James A. Morris, Jr.
MORRIS LAW FIRM
11614 Bee Caves Road, Suite 220
Austin, Texas 78738

Mr. Robert K. Jenner
JANET, JENNER & SUGGS
1829 Reisterstown Road, Suite 320
Baltimore, MD  21208

Mr. Tobias L. Millrood
POGUST BRASLOW MILLROOD
8 Tower Bridge, Suite 1520
161 Washington Street
Conshohocken, PA 19428

Mr. Ken Suggs
JANET, JENNER & SUGGS
500 Taylor Street
Columbia, SC  29201

Mr. Mike Williams
WILLIAMS DAILEY O'LEARY CRAINE
AND LOVE, P.C.
9755 SW Barnes Road, Suite 450
Portland, OR  97225-6681

Mr. Ralph M. Cloar Jr.
Suite 640
1501 N. University Avenue
Little Rock, AR  72201

Mr. Irwin B. Levin
COHEN & MALAD, LLP
One Indian Square, Suite 1400
Indianapolis, IN 46204

## LEAD AND LIAISON COUNSEL

Mr. Gary Holt
GARY EUBANKS & ASSOCIATES, LTD
708 West Second Street
P.O. Box 3887
Little Rock, Arkansas  72203-3887

Ms. Zoe Littlepage
LITTLEPAGE BOOTH
2043A W. Main Street
Houston, TX  77098