Exhibit 45

Page 1

1        IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF ARKANSAS
2               WESTERN DIVISION
   IN RE:
3  PREMPRO PRODUCTS    :  MDL DOCKET NO.
   LIABILITY LITIGATION :  4:03CV1507 WRW
4  -----------------------------------------
         IN THE COURT OF COMMON PLEAS
5   PHILADELPHIA COUNTY, PENNSYLVANIA

6  IN RE:  HORMONE    :  NOVEMBER TERM
   THERAPY LITIGATION  :  2003
7                      :  NO. 0001
   -----------------------------------------
8  CROSS NOTICED IN VARIOUS OTHER ACTIONS
   -----------------------------------------
9                   -  -  -
            C O N F I D E N T I A L
10       SUBJECT TO PROTECTIVE ORDER
                    -  -  -
11              March 15, 2007
                    -  -  -
12       Videotape deposition of PAUL D.

13  STOLLEY, M.D., M.P.H., held in the

14  Sheraton Columbia, 10207 Wincopin Circle,

15  Columbia, Maryland, commencing at 9:48

16  a.m., on the above date, before Constance

17  E. Perks, a Certified Shorthand Reporter

18  and Certified Realtime Reporter.

19

20                   -  -  -

21

22

            GOLKOW TECHNOLOGIES, INC.
23        1880 John F. Kennedy Boulevard
                   Suite 760
24        Philadelphia, Pennsylvania 19103

Confidential - Subject to Protective Order

---

Page 2

```
 1  A P P E A R A N C E S :
 2
 3      WILLIAMS CUKER BEREZOFSKY
        BY:  ESTHER BEREZOFSKY, ESQUIRE
 4          and
        KEVIN HAVERTY, ESQUIRE
 5      Suite 101
        210 Lake Drive East
 6      Cherry Hill, New Jersey 08002
        (856) 667-0500
 7      Counsel for Plaintiffs
 8
 9      JANET, JENNER, & SUGGS LLC
        BY:  DAVID J. DURHAM, ESQUIRE
10      Suite 320, Woodholme Center
        1829 Reisterstown Road
11      Baltimore, Maryland 21208
        (410) 653-3200
12      Counsel for Plaintiffs
        (Via Telephone)
13
14
        SHOOK, HARDY & BACON
15      BY:  MICHELLE M. FUJIMOTO, ESQUIRE
        Suite 1600
16      Orange County Jamboree Center
        5 Park Plaza
17      Irvine, California 92614
        (949) 475-1500
18      Counsel for Wyeth
19
20      REED SMITH LLP
        BY:  TRACY G. WEISS, ESQUIRE
21      2500 One Liberty Place
        Philadelphia, Pennsylvania 19103
22      (215) 851-8100
        Counsel for Wyeth
23
24          - - -
```

---

Page 4

```
 1  A P P E A R A N C E S :  (CONTINUED)
 2
 3      VENABLE, LLP
        BY:  JENNIFER A. LARRABEE, ESQUIRE
 4      1800 Merchant Bank Building
        Two Hopkins Plaza, Suite 1800
 5      Baltimore, Maryland 21202
        (410) 244-7400
 6      Counsel for Abbott Laboratories,
        Inc.
 7
 8
 9      BAKER STERCHI COWDEN & RICE, LLC
        BY:  MARCOS A. BARBOSA, ESQUIRE
10      Suite 500, Crown Center
        2400 Pershing Road
11      Kansas City, Missouri 64108
        (816) 471-2121
12      Counsel for Novo Nordisk
        Pharmaceuticals, Inc.
13
14      ULMER & BERNE, LLP
        BY:  SHARON GRONOTTE, ESQUIRE
15      Suite 2800
        600 Vine Street
16      Cincinnati, Ohio 45202
        (513) 698-5000
17      Counsel for Barr Laboratories,
        Inc., Barr Research, Inc. and
18      Duramed Pharmaceuticals, Inc.
        (Via Telephone)
19
20      SEDGWICK, DETERT, MORAN & ARNOLD
        BY:  JASON CLARK, ESQUIRE
21      1717 Main Street
        Suite 5400
22      Dallas, Texas 75201
        (469) 227-8200
23      Counsel for Bristol-Myers
        Squibb Co.
24      (Via Telephone)
```

---

Page 3

```
 1  A P P E A R A N C E S :  (CONTINUED)
 2
 3      CLARK, THOMAS & WINTERS
        BY:  DAVID C. BONNIN, ESQUIRE
 4      Suite 1500
        300 West Sixth Street
 5      Austin, Texas 78701
        (512) 472-8800
 6      Counsel for Wyeth
 7
 8      MCCARTER & ENGLISH
        BY:  NATHAN A. SCHACHTMAN, ESQUIRE
 9      Suite 700, Mellon Bank Center
        1735 Market Street
10      Philadelphia, Pennsylvania 19103
        (215) 979-3800
11      Counsel for Pfizer, Pharmacia
        & Upjohn
12
13
14      THOMPSON HINE LLP
        BY:  AMANDA A. KESSLER, ESQUIRE
15      3900 Key Center
        127 Public Square
16      Cleveland, Ohio 44114-1291
        (216) 566-5654
17      Counsel for Solvay Pharmaceuticals
18
19      DINSMORE & SHOHL LLP
        BY:  K.C. GREEN, ESQUIRE
20      1900 Chemed Center
        255 East Fifth Street
21      Cincinnati, Ohio 45202
        (513) 977-8200
22      Counsel for Aventis
        Pharmaceuticals and Watson
23      Laboratories
24          - - -
```

---

Page 5

```
 1          - - -
 2          I N D E X
 3  WITNESS                 PAGE NO.
 4  PAUL D. STOLLEY, M.D., M.P.H.
 5
 6      By Ms. Fujimoto         14
 7      By Mr. Schachtman      353
 8          - - -
 9          E X H I B I T S
10  NO.     DESCRIPTION     PAGE NO.
11
12  Stolley-1   Curriculum Vitae of  15
            Paul D. Stolley,
13          M.D., M.P.H.
            (28 pages)
14
15  Stolley-2   Report of Paul D.   15
            Stolley, M.D.,
16          M.P.H.
            (20 pages)
17
18  Stolley-3   "Faith, Evidence,   47
            and the
19          Epidemiologist"
            (Stolley) Journal
20          of Public Health
            Policy March 1985
21          37-42
22
23
24
```

Confidential - Subject to Protective Order

Page 6

| 1 | Stolley-4 | "Foundations of | 55 |
| 2 | | Epidemiology" | |
| | | (Lilienfeld/Stolley | |
| 3 | | ) Excerpts (cover | |
| | | pages: 12-13; | |
| | | 57-58; 151-153; | |
| 4 | | 155-157; 170-174; | |
| | | 198-201; 221-222; | |
| 5 | | 226-227' 245-248; | |
| | | 253; 255-257; | |
| 6 | | 260-268; 281 | |
| 7 | | | |
| | Stolley-5 | "A sharp decrease | 78 |
| 8 | | in breast cancer | |
| | | incidence in the | |
| 9 | | United States in | |
| | | 2003" (Ravdin, et | |
| 10 | | al) Abstract | |
| | | (1 page) | |
| 11 | | | |
| 12 | Stolley-6 | "Recent Declines in | 79 |
| | | Hormone Therapy | |
| 13 | | Utilization and | |
| | | Breast Cancer | |
| 14 | | Incidence: Clinical | |
| | | and | |
| 15 | | Population-Based | |
| | | Evidence" (Clarke, | |
| 16 | | et al) Journal of | |
| | | Clinical Oncology | |
| 17 | | Vol. 24, No. 33, | |
| | | November 20, 2006 | |
| 18 | | (2 pages) | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Page 8

| 1 | Stolley-11 | "Estrogen | 193 |
| 2 | | Replacement Therapy | |
| | | and the Risk of | |
| 3 | | Breast Cancer: | |
| | | Results from the | |
| 4 | | Case-Control | |
| | | Surveillance Study" | |
| 5 | | American Journal of | |
| | | Epidemiology, Vol. | |
| 6 | | 134 No. 12 | |
| | | 1375-1385 | |
| 7 | | | |
| 8 | Stolley-12 | "Hormone | 198 |
| | | Replacement Therapy | |
| 9 | | and Breast Cancer: | |
| | | A Qualitative | |
| 10 | | Review" (Bush, et | |
| | | al) Obstetrics & | |
| 11 | | Gynecology, Vol. | |
| | | 98, No. 3, | |
| 12 | | September 2001 | |
| | | 498-508 | |
| 13 | | | |
| 14 | Stolley-13 | "Breast Cancer and | 209 |
| | | the Consumption of | |
| 15 | | Coffee," | |
| | | (Rosenberg, et al), | |
| 16 | | American Journal of | |
| | | Epidemiology, Vol. | |
| 17 | | 122 No. 3, 1985, | |
| | | 391-399 | |
| 18 | | | |
| 19 | Stolley-14 | "Diazepam Use in | 212 |
| | | Relation to Breast | |
| 20 | | Cancer: Results | |
| | | from Two | |
| 21 | | Case-Control | |
| | | Studies," (Kaufman, | |
| 22 | | et al), American | |
| | | Journal of | |
| 23 | | Epidemiology, Vol. | |
| | | 131, No. 3, 1990 | |
| 24 | | 483-490 | |

Page 7

| 1 | Stolley-7 | "Risk of Localized | 136 |
| 2 | | and Widespread | |
| | | Endometrial Cancer | |
| 3 | | in Relation to | |
| | | Recent and | |
| 4 | | Discontinued Use of | |
| | | Conjugated | |
| 5 | | Estrogens" | |
| | | (Shapiro, et al) | |
| 6 | | New England Journal | |
| | | of Medicine, Vol. | |
| 7 | | 313, No. 16, | |
| | | 10-17-95 969-972 | |
| 8 | | BURKM208-000531 - | |
| | | BURKM208-000534 | |
| 9 | | | |
| 10 | Stolley-8 | "Oral | 148 |
| | | Contraceptives & | |
| 11 | | Breast Cancer" | |
| | | Institute of | |
| 12 | | Medicine, National | |
| | | Academy Press 1991 | |
| 13 | | (185 pages) | |
| 14 | Stolley-9 | "Investigating | 184 |
| | | Disease Patterns | |
| 15 | | The Science of | |
| | | Epidemiology" | |
| 16 | | (Stolley/Lasky) | |
| | | Excerpts | |
| 17 | | (Cover page, 65-66) | |
| 18 | | | |
| 19 | Stolley-10 | "Hormone | 192 |
| | | Replacement and | |
| 20 | | Menopausal Symptoms | |
| | | following | |
| 21 | | Hysterectomy" | |
| | | (Langenberg, et | |
| 22 | | al), American | |
| | | Journal of | |
| 23 | | Epidemiology Vol. | |
| | | 146, No. 10, 1997 | |
| 24 | | 870-880 | |

Page 9

| 1 | Stolley-15 | "Risk of Breast | 215 |
| 2 | | Cancer According to | |
| | | Use of | |
| 3 | | Antidepressants, | |
| | | Phenothiazines, and | |
| 4 | | Antihistamines" | |
| | | (Kelly, et al), | |
| 5 | | American Journal of | |
| | | Epidemiology, Vol. | |
| 6 | | 150, No. 8, 1999, | |
| | | 861-868 | |
| 7 | | | |
| 8 | Stolley-16 | "Nonhormonal Drugs | 218 |
| | | and Cancer" | |
| 9 | | (Stolley/Zahm) | |
| | | Environmental | |
| 10 | | Health | |
| | | Perspectives, Vol. | |
| 11 | | 203, Supplement 8, | |
| | | November 1995, | |
| 12 | | 191-196 | |
| 13 | Stolley-17 | "Noncontraceptive | 264 |
| | | Estrogen Use and | |
| 14 | | the Risk of Breast | |
| | | Cancer," (Kaufman, | |
| 15 | | et al), Journal of | |
| | | the American | |
| 16 | | Medical | |
| | | Association, 1984 | |
| 17 | | Vol. 252, No. 1, | |
| | | 63-67 | |
| 18 | | | |
| 19 | Stolley-18 | "Noncontraceptive | 278 |
| 20 | | Estrogen Use and | |
| | | Epithelial Ovarian | |
| | | Cancer," (Kaufman, | |
| 21 | | et al) American | |
| | | Journal of | |
| 22 | | Epidemiology, Vol. | |
| | | 130, No. 6, 1989, | |
| 23 | | 1142-1151 | |
| 24 | | | |

3 (Pages 6 to 9)

Confidential - Subject to Protective Order

Page 10

1   Stolley-19   "Amended Notice of   339
            Intention to Take
2           the Videotaped
            Deposition of Dr.
3           Paul D. Stolley"
            (5 pages)
4
5   Stolley-20   Box of materials   340
            reviewed and relied
6           upon
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 11

1       DEPOSITION SUPPORT INDEX
2
3
   Direction to Witness Not To Answer
4  Page Line Page Line
   (None)
5
6
7
8
   Request For Production of Documents
9  Page Line Page Line
   (None)
10
11
12
13
   Stipulations
14 Page Line Page Line
   (None)
15
16
17
18
   Questions Marked
19 Page Line Page Line
   (None)
20
21
22
23
24

Page 12

1           - - -
2           THE VIDEOGRAPHER:  Here
3   begins Videotape No. 1 in the
4   deposition of Dr. Paul Stolley in
5   the matter of Hormone Therapy
6   Litigation, in the Court of Common
7   Pleas, Philadelphia County, Case
8   No. 0001.  Today's date is March
9   15th, 2007.  Time on the video
10  monitor is 9:48 a.m.  Video
11  operator today is David Lane of
12  L.A.D. Reporting.  This video
13  deposition is taking place at the
14  Sheraton Columbia, 10207 Wincopin
15  Circle, Columbia, Maryland.
16          Counsel, please identify
17  yourselves and state whom you
18  represent.
19          MS. FUJIMOTO:  Michelle
20  Fujimoto, Shook, Hardy & Bacon on
21  behalf of Wyeth.
22          MS. BEREZOFSKY:  Esther
23  Berezofsky, Williams Cuker
24  Berezofsky, on behalf of the

Page 13

1   plaintiffs in the New Jersey
2   litigation, in the Philadelphia
3   litigation and the MDL.
4           MR. SCHACHTMAN:  Nathan
5   Schachtman from McCarter &
6   English, on behalf of the
7   Pfizer/Pharmacia/Upjohn defendants
8   in the Pennsylvania cases.
9           MR. BONNIN:  David Bonnin,
10  here for Wyeth.
11          MR. BARBOSA:  Marcos
12  Barbosa, here for Novo Nordisk,
13  Inc.
14          MS. KESSLER:  Amanda
15  Kessler, here for Solvay
16  Pharmaceuticals.
17          MS. LARRABEE:  Jennifer
18  Larrabee, here for Abbott Labs.
19          MS. WEISS:  Tracy Weiss, for
20  Wyeth.
21          MR. GREEN:  K.C. Green, on
22  behalf of Watson and Aventis.
23          MR. HAVERTY:  Kevin Haverty,
24  Williams Cuker Berezofsky, here

Confidential - Subject to Protective Order

Page 14

1    for the plaintiffs.
2         THE VIDEOGRAPHER:  The court
3    reporter today is Constance E.
4    Perks of Golkow Litigation
5    Technologies.
6         Would the reporter please
7    swear in the witness.
8    P A U L  M. S T O L L E Y, having been
9    first duly sworn, was examined and
10   testified as follows:
11        THE VIDEOGRAPHER:  You may
12   begin.
13        EXAMINATION
14   BY MS. FUJIMOTO:
15        Q.   Good morning, Dr. Stolley.
16        A.   Good morning.
17        Q.   Am I pronouncing it
18   correctly?  Is it Stolley or Stolley?
19        A.   Stolley.
20        Q.   Stolley.
21        So good morning.  My name is
22   Michelle Fujimoto, and I represent Wyeth
23   in the hormone therapy litigation.  I
24   understand that you have been designated

Page 15

1    as an expert witness and are here to
2    offer expert opinions regarding the
3    litigation.
4         Do you have that
5    understanding, as well?
6         A.   I do.
7              - - -
8         (Whereupon, Deposition
9    Exhibit Stolley-1, Curriculum
10   Vitae of Paul D. Stolley, M.D.,
11   M.P.H. (28 pages), was marked for
12   identification.)
13             - - -
14   BY MS. FUJIMOTO:
15        Q.   Just a couple of
16   housekeeping things to begin with.  I'll
17   ask you to identify for the record
18   Exhibit No. 1 and confirm that it is a
19   copy of your most current CV.
20        A.   It is.
21             - - -
22        (Whereupon, Deposition
23   Exhibit Stolley-2, Report of Paul
24   D. Stolley, M.D., M.P.H. (20

Page 16

1    pages), was marked for
2    identification.)
3             - - -
4    BY MS. FUJIMOTO:
5         Q.   And if you would take a look
6    at Exhibit No. 2.
7         A.   Would you like me to hand
8    this back to you?
9         Q.   Yes.  Thank you.
10        Take a look at that, and
11   would you confirm for me that that is a
12   written report by you summarizing the
13   expert opinions that you intend to offer
14   in the litigation.
15        A.   It is.
16        Q.   Dr. Stolley, you are an
17   M.D., correct?
18        A.   Correct.
19        Q.   But you are an
20   epidemiologist in terms of your
21   profession?
22        A.   That's correct.
23        Q.   What is epidemiology?
24        A.   Epidemiology is the science

Page 17

1    of the determinants and distribution of
2    disease, not just disease, other adverse
3    health effects.  For example, even
4    automobile accidents can be studied
5    epidemiologically or even frequent
6    admission to prisons and questions like
7    that.
8         We rely a lot on statistics,
9    survey methods and other tools that we
10   have.
11        Q.   So as a scientist, you are
12   looking at the incidence of disease or
13   events or things that occur on a
14   community or population-wide basis?
15        A.   Often we are, but sometimes
16   we will be looking at a much smaller
17   group, for example, an epidemic of food
18   poisoning that might involve only 30
19   people.  So it doesn't have to be
20   community wide.
21        Q.   What, in your opinion, is
22   the role or responsibility of an
23   epidemiologist in terms of public health?
24        A.   In my opinion, the job of

Confidential - Subject to Protective Order

Page 18

1  the epidemiologist is to try to
2  understand patterns of disease, why they
3  rise and fall, to search for etiology
4  that is cause of disease, and to
5  recommend with other colleagues, usually,
6  ways to improve the situation, and
7  additional investigations so as to
8  institute preventive measures, sometimes
9  screening, sometimes more powerful, to
10 reduce the disease burden.
11       Q.    And where do epidemiologists
12 or people in your discipline generally
13 work; do they work for the government or
14 academic institutions or both?
15       A.    More places than that. I
16 would say that the majority of
17 epidemiologists, or close to the
18 majority, probably work for public health
19 agencies; that is, usually, the
20 government.  But epidemiologists also
21 work in academic medical centers and
22 sometimes even private medical centers;
23 for example, keeping track of wound
24 infections, and what they call nosocomial

Page 19

1  disease; that is, hospital-related
2  diseases.  Some epidemiologists work for
3  industry, and they help to plan studies
4  and monitor adverse drug reactions and do
5  other kinds of studies.
6        Q.    Do you have any idea how
7  many epidemiologists there are currently
8  working in the United States?
9        A.    No, I don't.
10       Q.    Hundreds of thousands?
11       A.    I don't think it's probably
12 that many.  The definition of
13 epidemiology could be a little broad in
14 that there are some people who have, for
15 example, a master of public health, and
16 may call themselves epidemiologists, but
17 the bulk of the field would not recognize
18 them as such.  There are some
19 epidemiologists who are entirely self
20 taught and by the nature of their work
21 they are generally accepted as
22 epidemiologists even though they don't
23 have the usual credentials.
24       Q.    Would you agree that there

Page 20

1  are thousands of scientists in the
2  country whose job it is to assess and
3  look for and evaluate the incidence of
4  disease and its potential cause in this
5  country?
6        A.    Yes, probably thousands.
7        Q.    And you, yourself, have
8  spent your career, have you not, looking
9  and examining and analyzing data on
10 disease and its potential etiology?
11       A.    Yes.  Since I joined the
12 Public Health Service in 1964, my career
13 has been in epidemiology as well as
14 clinical practice.
15       Q.    You have an M.D., correct?
16       A.    Yes.
17       Q.    Describe for me what
18 clinical practice you've had over the
19 course of your career, and by that, I
20 mean, have you actually worked with the
21 care and treatment of patients?
22       A.    Not only have I, I continue
23 to.
24       MS. FUJIMOTO:  I guess we

Page 21

1  better go off the record.  I'm
2  sorry about that.
3        THE VIDEOGRAPHER:  Going off
4  the record.  The time is 9:56 a.m.
5        (Discussion off the video
6  and stenographic record.)
7        MS. FUJIMOTO:  Phone set
8  back up.
9        (Discussion off the video
10 and stenographic record.)
11       THE VIDEOGRAPHER:  We're
12 back on the record.  The time is
13 9:59 a.m.
14       THE WITNESS:  Could you
15 repeat the question.
16 BY MS. FUJIMOTO:
17       Q.    Yes, Doctor.
18       Could you describe,
19 throughout your career the nature and
20 extent of your clinical practice?
21       A.    Well, I, after my medical
22 school, I trained for two years at the
23 University of Wisconsin Medical School in
24 internal medicine, and, at that time, I

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 22

1   think the third year of residency
2   training could be a research or a
3   different kind of year. And I enlisted
4   in the United States Public Health
5   Service and spent two years at the --
6   what was then called the Center for
7   Disease Control as an epidemic
8   intelligence service officer, and there I
9   got training in epidemiology and went out
10  on a number of investigations and wrote
11  the Morbidity and Mortality Weekly
12  Report, which is still being produced.
13          I took a day a week to do
14  clinical medicine at the Emory Hospital
15  in Atlanta. My third year in Public
16  Health Service was in the Office of the
17  Surgeon General, and that year I did not
18  do any clinical work. And then I joined
19  the -- got an MPH at Hopkins, Master of
20  Public Health, and didn't do clinical
21  work then.
22          And beginning in 1975, after
23  having been way from clinical medicine
24  perhaps six or seven years, I decided

Page 23

1   that I wanted to continue in clinical
2   medicine and had took refresher courses
3   and had my work supervised in the walk-in
4   clinic at Hopkins.
5           In 1976, I was recruited to
6   the University of Pennsylvania as a full
7   professor of medicine and saw patients
8   one day a week, which I've done ever
9   since.
10          So since 1976, I've been
11  doing clinical medicine one day a week at
12  the University of Pennsylvania for 15
13  years, and at the University of Maryland
14  Medical School for, now, going on 16
15  years.
16      Q.   In what discipline or in --
17      A.   In internal medicine,
18  outpatient medicine, and I've also
19  volunteered in a clinic at Howard County
20  to service the uninsured. It's a
21  volunteer post for which I do not receive
22  pay; and I also, with the same
23  arrangement with the health department
24  see patients in the smoking cessation

Page 24

1   clinic. And I do volunteer clinical
2   work. And I continue to see my little
3   practice in Maryland, which after 16
4   years I have a list of perhaps 500
5   patients that I've been following, and I
6   get new ones. For example, on Monday, I
7   got two new patients, in addition to
8   returns.
9       Q.   And during the course of
10  your clinical practice, have you
11  prescribed hormone therapy?
12      A.   Very seldom. The issue does
13  not arise much in my practice because
14  most of -- I'm in a group practice,
15  faculty group practice, run by the
16  medical school, and so in addition to the
17  generalists like myself who do internal
18  medicine, primary care physicians, they
19  have easy access in the same building to
20  gynecologists, so gynecologists generally
21  handle those problems. And I would say
22  it's my practice, if a patient was having
23  menopausal problems, I would refer them
24  to a gynecologist.

Page 25

1       Q.   But you have, have you not,
2   prescribed Premarin in your practice?
3       A.   I probably prescribed
4   Premarin until I did my own -- up to --
5   to hysterectomized women, but when I did
6   my own study, which was the largest
7   case-control study looking at the
8   association of uterine cancer and hormone
9   replacement therapy, the results were so
10  striking in regard to uterine cancer,
11  17-fold increase after five years of
12  continuous use, for example, that I
13  stopped prescribing Premarin for women
14  who still had a uterus.
15      Q.   Doctor, but, in fact, you
16  have prescribed Premarin to patients,
17  correct, with or without a uterus,
18  correct?
19          THE WITNESS: I answered
20      that.
21  BY MS. FUJIMOTO:
22      Q.   And the answer is yes?
23      A.   The answer is yes, for a
24  short period of time, very short.

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 26

1      Q.    And in fact, you have
2   prescribed Premarin to women without a
3   uterus as recently as 2004?
4      A.    I'm not sure about that.
5      Q.    Okay.  Did you prescribe
6   Premarin in 2003?
7      A.    I can't remember.
8      Q.    What about 2002?
9      A.    I can't remember.  I so
10  seldom prescribed hormones for women,
11  because the gynecologists take over, that
12  I just can't remember.
13     Q.    Can you remember that for
14  those women to whom you prescribed
15  Premarin, women without a uterus, did you
16  have a discussion regarding the risks and
17  benefits of hormone therapy?
18     A.    I probably did, yes.
19     Q.    And under what circumstances
20  or for what indications did you prescribe
21  it?
22     A.    There were only two -- well,
23  really, one.  Premarin has been shown to
24  be effective in reducing hot flashes,

Page 27

1   both the frequency and severity, and I
2   probably prescribed Premarin to
3   hysterectomized women for that
4   indication, but for a short period of
5   time.
6      Q.    And --
7      A.    And the other indication
8   which was vaginal atrophy and failure to
9   lubricate while having sexual
10  intercourse, I did not prescribe it
11  because there's alternative treatments
12  that are as effective, possibly more
13  effective.
14     Q.    In the course of discussing
15  the risks and benefits of hormone
16  therapy, did you ever discuss the
17  potential risk of breast cancer with your
18  patients?
19     A.    I think I did, yes.
20     Q.    And would it be fair to say
21  that most women have a concern about the
22  potential risk of breast cancer?
23           MS. BEREZOFSKY:  Object to
24     form.  You can answer.

Page 28

1           THE WITNESS:  You mean most
2      women in my practice or most
3      women --
4   BY MS. FUJIMOTO:
5      Q.    Yes.
6      A.    I would say most women in my
7   practice do not.
8      Q.    Have you ever diagnosed a
9   woman with breast cancer?
10     A.    Yes.
11     Q.    Have you ever told a woman
12  or a patient what caused their breast
13  cancer?
14     A.    No.
15           MS. BEREZOFSKY:  Object to
16     form.  You can answer.
17           THE WITNESS:  No, I have
18     not.
19  BY MS. FUJIMOTO:
20     Q.    Is there any
21  generally-accepted method or formula by
22  which one can determine the specific
23  cause of an individual woman's breast
24  cancer?

Page 29

1      A.    I don't think there's a
2   generally-accepted algorithm for that.
3      Q.    Am I right that there's no
4   mark or pathologic feature to a tumor
5   that can tell a doctor that that
6   particular tumor has been influenced by
7   hormones?
8           MS. BEREZOFSKY:  Object to
9      form.  You can answer.
10          THE WITNESS:  There are
11     probably some suggestive findings,
12     such as increased breast density
13     that might lead you to suspect
14     that that was caused by hormone
15     replacement therapy, but the
16     histopathology of the tumor, to my
17     understanding, there is no
18     distinct pattern to a tumor that's
19     hormone-induced, in contrast to a
20     tumor that may have another cause,
21     such as ionizing radiation, where
22     somebody has gotten large amounts
23     of ionizing radiation to a breast.
24  BY MS. FUJIMOTO:

Confidential - Subject to Protective Order

Page 30

1    Q.    Let me boil it down.  I
2  think you've answered the question, but
3  let me make sure.
4        If a pathologist, for
5  example, had 100 -- specimens from 100
6  tumors to look at, there's no mark or
7  anything that that pathologist could see
8  that could tell him or her that a
9  particular tumor came from a woman who
10  had used exogenous hormones?
11        MS. BEREZOFSKY:  I'm going
12      to object.
13        MS. FUJIMOTO:  True?
14        MS. BEREZOFSKY:  I'm going
15      to object to the question.  He's
16      not being offered as a pathologist
17      and I think questions on pathology
18      are not appropriately directed at
19      this witness.
20  BY MS. FUJIMOTO:
21    Q.    Do you feel equipped to
22  answer, Doctor?
23        THE WITNESS:  Not really.
24      Breast pathology is an extremely

Page 31

1      complex field, and I'm not -- I'm
2      not an expert and I don't look at
3      the slides and so -- I'm probably
4      out of my area of expertise.
5  BY MS. FUJIMOTO:
6    Q.    Do you consider yourself an
7  expert in breast imaging?
8    A.    No.
9    Q.    So are you an expert in
10  breast density and its relationship to
11  either benign or cancerous conditions?
12    A.    I'm not an expert, but I'm
13  familiar with the literature.
14    Q.    Okay.  Are you aware of any
15  study that has directly linked women who
16  have -- the small percentage of women who
17  have experienced increase in mammographic
18  density following their use of hormone
19  therapy that has connected those women's
20  with an increase in breast cancer?
21        MS. BEREZOFSKY:  Object to
22      form.  You can answer.
23        THE WITNESS:  Please repeat
24      that.

Page 32

1  BY MS. FUJIMOTO:
2    Q.    Let me see if I can break it
3  down.
4        When you say breast density,
5  and I'm referencing one of your prior
6  answers, when you refer to breast density
7  and its potential implication with regard
8  to the cause of a woman's breast cancer,
9  are you talking about natural density or
10  mammographic density that may change in
11  some women who are on exogenous hormones?
12    A.    The latter.
13    Q.    And so my question to you,
14  is for that small percentage of women who
15  experience a change in mammographic
16  density were they're on hormone therapy,
17  are you aware of any study that directly
18  links those women with an increased risk
19  of breast cancer?
20        MS. BEREZOFSKY:  Again, I'm
21      going to object to form.  You can
22      answer the question.
23        THE WITNESS:  Well, the
24      literature suggests that hormone

Page 33

1      replacement therapy increases
2      breast density and, therefore,
3      making it harder to screen for
4      tumors in mammography.  I don't
5      know if it's a small percentage,
6      as you state.
7  BY MS. FUJIMOTO:
8    Q.    So you don't know that part
9  of the literature, what percentage of
10  women experience a change in mammographic
11  density?
12    A.    I don't.
13    Q.    Okay.  Do you know the
14  literature with respect to the degree to
15  which this small percentage of women
16  experience a change in mammographic
17  density?
18        MS. BEREZOFSKY:  Object to
19      form.  You can answer.
20        THE WITNESS:  I don't know
21      that.
22  BY MS. FUJIMOTO:
23    Q.    So you don't know whether it
24  ever makes a clinically significant

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 34

1 difference?
2      A.    I'm not sure I know what you
3 mean when you say clinically significant.
4      Q.    Is there any evidence to
5 suggest that hormone therapy use can move
6 a woman's breast density from one BIRAD
7 grade to another?
8           MS. BEREZOFSKY:  Object to
9 form.
10          THE WITNESS:  I have no
11 expertise in that.
12 BY MS. FUJIMOTO:
13     Q.    Am I correct, though,
14 Doctor, that the literature concerning
15 the increased risk of breast cancer, that
16 is related to breast density, that those
17 studies pertain to women who have
18 naturally dense breasts throughout their
19 lifetime; it's those women who are at an
20 increased risk of breast cancer, right?
21          MS. BEREZOFSKY:  Object to
22 form.  You can answer it.
23          THE WITNESS:  Well, it was
24 two parts to it.  If you could

Page 35

1      separate the question.
2 BY MS. FUJIMOTO:
3      Q.    Are you familiar with the
4 literature reporting an increased risk of
5 breast cancer in women who have dense
6 breasts?
7      A.    Yes.
8      Q.    Okay.  And am I correct that
9 those studies relate to women who have
10 naturally dense breasts throughout their
11 lifetime?
12     A.    I believe that some of the
13 reports dealt with women who did not have
14 naturally dense breasts, but density was
15 increased by the hormone replacement
16 therapy, particularly if it was of longer
17 duration.
18     Q.    Can you name those studies
19 for me?
20     A.    I can't, at this moment, no.
21     Q.    Are you planning to offer an
22 opinion at trial that increased breast
23 density that's related to hormone therapy
24 use increases a woman's risk of breast

Page 36

1 cancer?
2      A.    No.
3      Q.    Would you agree, Doctor,
4 that the influence -- strike that.
5           Would you agree that
6 endogenous hormones may play a role in
7 the development of breast cancer?
8      A.    I would agree with that.
9      Q.    Do you agree there are many
10 factors in the tumor environment, other
11 than hormones, that could play a role in
12 the development of breast cancer?
13     A.    I'm not sure what you mean
14 when you use the term "tumor
15 environment."
16     Q.    The environment in which the
17 tumor is growing in the breast.  Are
18 there insulin growth factors that may
19 influence the development of breast
20 cancer?
21          MS. BEREZOFSKY:  Object to
22 form.
23          THE WITNESS:  I think
24 you're -- if I could paraphrase

Page 37

1      your question, if you're asking is
2 breast cancer a multi-factorial
3 disease, and there are other
4 factors that either alone or in
5 combination increase a woman's
6 risk of breast cancer, I would
7 agree to that.
8 BY MS. FUJIMOTO:
9      Q.    Would you agree that breast
10 cancer is a heterogenous disease?
11     A.    By heterogenous do you mean
12 --
13          MS. BEREZOFSKY:  Go ahead.
14          THE WITNESS:  -- presents in
15 any -- in different cell types, or
16 do you mean it has a
17 multi-factorial causation?
18 BY MS. FUJIMOTO:
19     Q.    Either one.  Both.
20          MS. BEREZOFSKY:  I'm going
21 to object to the form of the
22 question.  You can answer.
23          THE WITNESS:  Well, there's
24 certainly different cell types in

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 38

1    breast cancer, and breast cancers
2    can behave differently.  Some are
3    aggressive, some are more
4    indolent, to the different sites
5    where it occurs.  There's also a
6    different level of aggressivity,
7    so that if you want to use the
8    word "heterogenous" for that, I
9    would agree.
10        In addition, there are at
11   least three pretty well-accepted
12   causes of breast cancer:
13   Hormones, alcohol, and ionizing
14   radiation, being the major three.
15   BY MS. FUJIMOTO:
16       Q.   And on what do you base your
17   statement that those are the three known
18   causes of breast cancer?
19       A.   A review by Dr. Brian
20   McMahon.
21       Q.   Anything else, besides the
22   McMahon article?
23       A.   No, I would cite that
24   article.

Page 39

1        Q.   Is there any way, any
2    method, any formula by which one can
3    distinguish the influence of endogenous
4    hormones from the influence of exogenous
5    hormones on a particular tumor?
6        A.   As you may know, my
7    testimony will not be concerning any
8    individual case.  And in fact, I have not
9    reviewed the records and don't know
10   anything about the cases that are being
11   represented in this litigation.
12        And so, I haven't really
13   given much thought to the question of
14   whether or not you could take a single
15   person who has a tumor and identify the
16   cause.
17       Q.   That's not something you
18   have ever done in your career?
19       A.   I have, but I've done it for
20   women who took diethylstilbestrol and got
21   vaginal or cervical cancer, and I've done
22   it for women who developed eosinophilia
23   myalgia syndrome due to contaminated
24   L-tryptophan, and there might have been

Page 40

1    one or two other instances in which I
2    did.
3        Q.   As I understand your
4    testimony, you never attempted to
5    identify the particular cause or causes
6    of an individual woman's breast cancer?
7        A.   Not breast cancer.
8        Q.   Doctor, I saw from your CV
9    that you worked -- and from your report
10   that you worked at the FDA for a brief
11   period of time; is that right?
12       A.   That's correct, I was a
13   visiting scientist during a sabbatical
14   year at FDA.
15       Q.   And what did you do while
16   you were there?
17       A.   I worked with the -- they
18   keep changing the names of the divisions
19   at FDA, about every two years, but I
20   worked at the part called CDER in the
21   group that was doing post marketing
22   surveillance drugs and designing studies,
23   looking at adverse drug reaction reports
24   that came in, and generally keeping track

Page 41

1    of, not all, but drugs they considered
2    problems.
3        Q.   Were you ever -- did you
4    ever deal with post marketing
5    surveillance of hormone therapy?
6        A.   During that year?
7        Q.   Yes.
8        A.   I think not.
9        Q.   Were you responsible for any
10   safety evaluations of hormone replacement
11   therapy?
12       A.   I don't believe so.
13       Q.   And while you were at the
14   FDA for that year, were you ever
15   responsible for any labeling decisions
16   pertaining to hormone therapy?
17       A.   I don't think so.
18       Q.   Doctor, I've looked at your
19   articles and studies and understand that
20   you have done quite a number of
21   case-controlled studies during the course
22   of your career; is that right?
23       A.   That's correct.
24       Q.   And have you ever received

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 42

1 funding from pharmaceutical industry for
2 those studies?
3    A.    Yes, I have.
4    Q.    And am I right that it's
5 your view that funding for research,
6 coming from either government or
7 industry, is an important part of the
8 development and evolution of scientific
9 research?
10    A.    I believe that well-designed
11 trials that are funded from either
12 industry, trade unions, because I do some
13 occupational work, or the government, if
14 the study is well designed, and any
15 influence over the results of the study
16 or the conduct of the study is removed
17 from the sponsor, so that the
18 investigator can perform independently
19 and with integrity, and not be pressured
20 into interpretations or decisions that
21 they feel are inappropriate, if those
22 conditions are met, they often contribute
23 valuable findings in the literature.
24    Q.    And so simply because a

Page 43

1 pharmaceutical company has funded a study
2 doesn't mean that that study either has
3 -- should be viewed as being biased or
4 somehow unreliable?
5        MS. BEREZOFSKY:  Object to
6    form.  You can answer it.
7        THE WITNESS:  I think that
8    all studies have to be examined
9    for possible biases no matter who
10    is the sponsor.  And I know I,
11    myself, have worked with companies
12    where I have made arrangements to
13    be completely independent and not
14    even give the results until the
15    study ended, and no -- have the
16    courtesy to read the paper and
17    make suggestions, but had no
18    editorial authority.  I've had
19    some very good relationships with
20    some industry sponsors, and felt
21    that my integrity and the
22    integrity of the study was not
23    compromised.  However, I must say
24    that the terms that I demand are

Page 44

1    so strict that in my experience,
2    nine out of ten companies walk
3    away from me.
4 BY MS. FUJIMOTO:
5    Q.    Have you worked with Wyeth?
6    A.    Personally, I don't think I
7 have.
8    Q.    You don't recall ever being
9 on any advisory committee for Wyeth?
10        MS. BEREZOFSKY:  Object to
11    form.  You can answer.
12        THE WITNESS:  I don't recall
13    it, but in a 40-year -- in a
14    40-year career, I may -- I may be
15    forgetting.
16 BY MS. FUJIMOTO:
17    Q.    So you don't have a memory
18 of -- do you ever go and request funding
19 for any study by Wyeth?
20    A.    I never have, but when I
21 chaired the Department of Epidemiology
22 and Preventive Medicine, which I did for
23 eight or nine years at the University of
24 Maryland, investigators in the

Page 45

1 department, faculty members who reported
2 to me did receive funds from Wyeth.
3    Q.    And were those honest
4 scientists?
5        MS. BEREZOFSKY:  Object to
6    form.  You can answer.
7        THE WITNESS:  In a sense,
8    there's no way for me to know how
9    honest almost any scientist is
10    because, you know, you don't quiz
11    them.  Even if you're department
12    chairman, you don't do
13    investigations.  I would say that
14    they were reputable scientists.
15 BY MS. FUJIMOTO:
16    Q.    Doctor, in the 1980s, was
17 there skepticism among research
18 scientists about working with industry
19 and being funded by pharmaceutical
20 industry?
21    A.    I think that that skepticism
22 or concern goes away back to the 1950s
23 where articles were written, especially
24 by pediatricians on the attempts to

Confidential - Subject to Protective Order

Page 46

1  influence research design results, and
2  that concern is probably 60 years old,
3  and has been raised as recently as last
4  couple of years.  In fact, the American
5  Medical Association has tried to set down
6  guidelines about how academic
7  investigators should relate to industry
8  sponsorship.
9      Q.   But you don't share that
10 concern, do you?
11     A.   I do share it.  While I've
12 stated and will affirm the statement that
13 one can do very good research with
14 industry sponsorship, it is also possible
15 that some industries and sponsors -- and
16 not just -- not just industry, this would
17 apply to -- apply also to sponsorship by
18 other interested parties, like unions, or
19 owners of businesses where there may be
20 occupational health hazards, and the
21 government, one must always be alert to
22 attempts to compromise the integrity of
23 the study, and I think that's true about
24 industry as a whole.  So in a way, it's

Page 47

1  up to the scientists who make the
2  contracts to assure that they have
3  arrangements that guarantee their
4  independence, their integrity, and
5  freedom to report.
6          - - -
7      (Whereupon, Deposition
8      Exhibit Stolley-3, "Faith,
9      Evidence, and the Epidemiologist"
10     (Stolley) Journal of Public Health
11     Policy March 1985 37-42, was
12     marked for identification.)
13         - - -
14 BY MS. FUJIMOTO:
15     Q.   Doctor, I've marked as
16 Exhibit 3 to the deposition an article
17 that you wrote back in, I believe, 1985,
18 "Faith, Evidence, and the
19 Epidemiologist."  Do you remember that?
20     A.   Yes.  This is actually my
21 presidential address when I was president
22 of the American Epidemiological Society,
23 and I arranged to have it published.  So
24 it was a speech.

Page 48

1      Q.   Okay.  And in that speech,
2  and I'm looking particularly at page 41,
3  you said:  "There are some scientists,
4  particularly consumer advocates, who
5  believe that every academician is
6  compromised if he or she works with
7  industry, but I do not share this view."
8          Do you see that?
9      A.   I don't see it now, but I
10 saw it last night when I was reviewing
11 this.
12     Q.   Okay.  And that's a view
13 that you expressed back in 1985; is that
14 right?
15     A.   That's right.
16     Q.   Do you still agree with it?
17     A.   Yes, I do.
18     Q.   Doctor, I also had a chance
19 to look through your book, Foundations of
20 Epidemiology.  That's a book that you
21 edited or wrote with Dr. Lilienfeld; is
22 that right?
23     A.   We co-wrote it.  We're
24 co-authors.  It's not an edited book.

Page 49

1  We're the authors.
2      Q.   That was published in 1994?
3      A.   That's right.
4      Q.   Let me see if I can make
5  sure I understood some of the complicated
6  things that I read in the book.
7      A.   We strove -- we strove for
8  simplicity.
9      Q.   Actually, you achieved it,
10 which doesn't mean that I fully
11 understood it.  But I certainly thought
12 that it was user friendly, which is very
13 helpful.  Let me make sure I understand a
14 few things.
15         And from looking at the
16 chapters that dealt with scientific
17 research and how an epidemiologist
18 approaches research, am I right that
19 generally you start with a hypothesis?
20     A.   Generally.
21     Q.   And are these, is there a
22 natural evolution of the scientific
23 research, meaning, as I understood it
24 from the book, laboratory data, things

Confidential - Subject to Protective Order

Page 50

1   like laboratory data and animal studies
2   are done, and the results of those
3   studies serve to form hypotheses that
4   scientists will then want to explore in
5   humans?
6        A.   I think what we were
7   describing in a sense was an ideal
8   progression, but in actual fact, most
9   science and even epidemiology does not
10  work that way.  Sometimes a hypothesis is
11  generated that will lead to further
12  investigation.  There are other times
13  where events will occur which practically
14  answer the question itself.
15       Q.   So let me start with one
16  scenario.  There can be -- or hopefully
17  be laboratory or animal data regarding a
18  particular drug, and the results of those
19  are evaluated before scientists decide to
20  test them in humans?
21       A.   Yes, if we're talking about
22  --
23            MS. BEREZOFSKY:  I'm going
24       to object to the form of the

Page 51

1        question.  I didn't hear a
2        question.
3   BY MS. FUJIMOTO:
4        Q.   Do you understand what I was
5   asking you?
6        A.   If you could repeat the --
7        Q.   All right.
8        A.   -- the question.
9        Q.   All right.  Is one scenario
10  of scientific research that a drug is
11  tested in a laboratory and in animals,
12  and the results of those form hypotheses
13  that can be tested then in humans?
14       A.   I think what you're talking
15  about now is drug development.  The
16  epidemiologist is usually not involved in
17  drug development, where you start with a
18  laboratory and so on.  An epidemiologist
19  is usually presented with an unusual
20  phenomena, increase in disease, suspicion
21  that a disease may be linked to a drug,
22  reports that people who take this drug
23  are having -- seem to be having a higher
24  incidence of a particular disease, like

Page 52

1   oral contraceptives and deep vein
2   thrombosis.
3            Alternatively, or on the
4   other side, sometimes an epidemiologist
5   investigates an unexpected benefit.  The
6   drug is out there and it turns out that
7   -- for example, amantadine was used to
8   treat influenza, and it was noticed when
9   it's given to elderly people, their
10  Parkinson's disease improved.  And so
11  epidemiologists and drug development
12  specialists investigated this, and now
13  amantadine is one of the standard drugs
14  for Parkinson's.
15       Q.   So then epidemiologists
16  design studies in humans -- strike that.
17            So epidemiologists can start
18  with a hypothesis that may be based on
19  case reports?
20       A.   Yes.
21       Q.   So that's reports of
22  isolated incidence in the population,
23  right?
24       A.   Right.

Page 53

1        Q.   Do you research hypotheses
2   that are generated from broader
3   population studies, like studies in
4   particular communities where you see some
5   trend or increasing incidence of some
6   disease or problem?
7        A.   Yes, that's led to some
8   important developments and findings.
9        Q.   And do you call those in
10  your book "demographic" or "secular trend
11  studies"?
12       A.   We use those -- we use those
13  terms, and some people use the term
14  "ecologic studies."
15       Q.   And --
16       A.   I think we tried to avoid
17  using that term, so as not to confuse it
18  with the ecological movement.
19       Q.   Okay.  So what do you call
20  those types of studies?
21            MS. BEREZOFSKY:  Object to
22       the form.  You can answer.
23            THE WITNESS:  I don't use a
24       particular term for those usually

Confidential - Subject to Protective Order

Page 54

1    -- because they -- they can vary.
2    For example, I might call them
3    international comparative studies,
4    or I might call them time trends,
5    secular trend studies. I use a
6    variety of terms, trying to convey
7    what they do, which -- the term
8    ecologic studies doesn't really
9    tell the listener or the novice of
10   what kind of a study it is.
11   BY MS. FUJIMOTO:
12       Q.    And so in these studies,
13   we're talking about looking at the
14   occurrence of a disease in a population,
15   not in an individual?
16       A.    That's usually the case, and
17   we usually look at not just the incidence
18   of disease, we may also have a hypothesis
19   concerning the cause of the rise and
20   fall. And we might correlate the rise
21   and fall of a disease with the rise in,
22   say, prescriptions and the fall of
23   prescriptions of a drug that we suspect
24   may contribute to the disease.

Page 55

1        Q.    And when you look at those
2    correlations, you're looking at it to
3    develop a hypothesis about a potential
4    cause?
5        A.    Not necessarily. Sometimes
6    we'll do those studies after we've done
7    case-control and cohort studies because
8    it -- it just depends. If the findings
9    suggest the relationship with an exposure
10   and removal of exposure shows a decline
11   in the disease, and so on, these studies
12   can strengthen our interpretation. And
13   if we don't find it, it makes us
14   reexamine what we're finding in the other
15   studies. In other words, we usually
16   expect it to be confirmatory of our
17   hypothesis, but if it's not confirmatory,
18   or it goes in another direction, we say,
19   well, wait a minute, what's going on
20   here, and we rethink, we rethink that
21   information.
22                    - - -
23       (Whereupon, Deposition
24   Exhibit Stolley-4, "Foundations of

Page 56

1    Epidemiology" (Lilienfeld/Stolley)
2    Excerpts (cover pages; 12-13;
3    57-58; 151-153; 155-157; 170-174;
4    198-201; 221-222; 226-227'
5    245-248; 253; 255-257; 260-268;
6    281, was marked for
7    identification.)
8                    - - -
9    BY MS. FUJIMOTO:
10       Q.    Let me show you, Doctor, a
11   portion of your textbook from Foundations
12   of Epidemiology. I have attached as
13   Exhibit No. 4, a series of portions from
14   the book that I wanted to ask you about.
15       (Discussion off the
16   stenographic record.)
17   BY MS. FUJIMOTO:
18       Q.    Doctor, if you would take a
19   look at Exhibit No. 4, and, in
20   particular, if you leaf through the first
21   few pages you will come to page 57, which
22   is the first page of the chapter called
23   Demographic Studies.
24       MS. BEREZOFSKY: Do you have

Page 57

1    another copy of that?
2        MS. FUJIMOTO: I don't. I'm
3    sorry.
4        THE WITNESS: I'm at page
5    57.
6    BY MS. FUJIMOTO:
7        Q.    And again, demographic
8    studies are the -- these secular trend or
9    ecologic studies that you've been talking
10   about, correct?
11       A.    Yeah. Trying to avoid the
12   word "ecologic." It's confusing, but --
13   I'm not sure we were successful doing
14   that, but I don't like that term.
15       Q.    Okay. And here you say that
16   "Since demographic studies often can be
17   conducted using readily available vital
18   and health statistics, they are often
19   inexpensive and may be used as the first
20   test of an etiologic hypothesis."
21       Do you see that?
22       MS. BEREZOFSKY: Why don't
23   you point him to where --
24       THE WITNESS: I have it.

15 (Pages 54 to 57)

Confidential - Subject to Protective Order

Page 58

1      MS. FUJIMOTO:  He's got it.
2      THE WITNESS:  I see it.
3  BY MS. FUJIMOTO:
4      Q.   Okay.  And so, as a first
5  test of a hypothesis, that's basically a
6  first step or building block, right?
7      MS. BEREZOFSKY:  Object to
8      form.  You can answer.
9      THE WITNESS:  Not
10     necessarily.  What we say is --
11     it's often the first step, but
12     sometimes it's the last step.  I
13     mean, it all depends on the
14     situation.  If you're faced with a
15     big epidemic or sudden epidemic,
16     again I use eosinophilia myalgia
17     syndrome as an example, the most
18     appropriate thing to do there
19     would be a case-control study, and
20     that's what they did do and they
21     answered the -- they found the
22     cause within about 48 hours.
23  BY MS. FUJIMOTO:
24     Q.   Okay.  If you would turn the

Page 59

1  page, Doctor, then, to page 58 and the
2  last part of the last paragraph, if
3  you'll look at the last paragraph there;
4  and I'm looking at the sentence midway
5  down that starts:  "Even when examining
6  the occurrence of clusters, however, the
7  epidemiologist must remember that
8  demographic studies may only suggest a
9  hypothesis regarding the cause of a
10  disease or provide an initial test of a
11  hypothesis.  For a more definitive
12  assessment of a hypothesis, an
13  epidemiologic study (discussed in Part
14  III), in which the association between
15  disease occurrence and exposure to a
16  possible agent is assessed in
17  individuals, is necessary."
18     A.   Yeah.  I don't think I would
19  agree with that now.  We wrote that --
20  published in '94, we wrote that in '93.
21  And since then, I've had 14 or 15 years
22  more experience, including the
23  involvement with the eosinophilia myalgia
24  syndrome.  I actual saw in my practice

Page 60

1  the very first case.
2      And I would say that there
3  are situations where a -- where a secular
4  trend study can be so powerful that it
5  would lead to regulatory action.  And the
6  example I would give to you would be the
7  warnings and not removal but put on --
8  switched to prescription status of the
9  isoprenaline nebulizers in the United
10  Kingdom in the 1960s, where the death
11  rate among asthmatic children increased
12  sevenfold and was the seventh cause of
13  death in ages 10 to 14, whereas
14  previously it had never even appeared on
15  that list.  And there just on the basis
16  of correlating prescriptions of this new
17  drug, the initiation of the epidemic of
18  death, they felt so strongly that this
19  was the probable cause and could think of
20  no other, that they put warnings out --
21  this is in the United Kingdom, shifted
22  the over-the-counter to prescription
23  status and the epidemic declined, as drug
24  utilization declined.  So sometimes an

Page 61

1  ecologic study alone can answer a
2  question, and it would have been very
3  imprudent of the medicine safety
4  commission not to have put out those
5  warnings and taken the actions they had.
6      MS. FUJIMOTO:  I move to
7      strike the portion that is
8      nonresponsive.
9  BY MS. FUJIMOTO:
10     Q.   Doctor, have you --
11     MR. HAVERTY:  I thought it
12     was responsive.
13  BY MS. FUJIMOTO:
14     Q.   -- done a fourth edition?
15  Have you done --
16     A.   No.
17     Q.   Have you revised this book
18  since 1994 --
19     A.   No.
20     Q.   -- to reflect your changing
21  attitudes or opinions?
22     A.   No.  We decided not to put
23  out any more editions.
24     Q.   If you would -- actually,

Golkow Technologies, Inc. - 1-877-370-DEPS

Page 62
1 the third page of Exhibit 4 is page 12 of
2 your book, and you describe there
3 something called the "ecological
4 fallacy," if you can find that.
5       A.    If you could --
6       Q.    It's the third page of
7 Exhibit 4.
8       A.    This is Exhibit 4?
9       Q.    Yes.
10      A.    Third page?
11      Q.    There it is.  That's page 12
12 of your book.
13      A.    Page 12.
14      Q.    And right in the middle
15 there you talk about demographic studies
16 or ecological studies that we're
17 discussing.
18      A.    Yes.
19      Q.    And you say:  "Usually, the
20 results of such studies provide clues to
21 etiological hypotheses and serve as a
22 basis for more detailed investigations.
23 Such an observed relationship, generally
24 termed an 'ecological correlation,' may

Page 63
1 suffer from an 'ecological fallacy.'"
2        Do you see that.
3      A.    Yes.
4      Q.    And the terms there when you
5 say "ecological correlation" you're
6 talking about what you just described,
7 where you see a trend of maybe a disease
8 increase or decrease, and then you have,
9 also, a correlating trend of something
10 else, like prescriptions for example?
11      A.    The part you thought was
12 nonresponsive?
13      Q.    No.  I'm talking about the
14 part, the two trend lines.
15      A.    Okay.
16      Q.    I'm asking you questions now
17 about page 12.
18      A.    Right.
19      Q.    All right?  Is the
20 ecological correlation, the reference to
21 correlating a trend line about a disease
22 incidence and a trend line about some
23 other factor, for example, prescriptions
24 of a drug?

Page 64
1        MS. BEREZOFSKY:  Objection
2 to form.
3        THE WITNESS:  Or some other
4 exposure.
5 BY MS. FUJIMOTO:
6      Q.    Okay.
7      A.    Yes, that is --
8      Q.    All right.
9      A.    That is the correlation.
10      Q.    All right.  And the problem
11 is this correlation can suffer from an
12 ecological fallacy, right?
13      A.    That is a possible hazard
14 and has to be thought about.
15      Q.    And why is that?
16      A.    Well, you could think of
17 false correlations.  For example, one
18 sunny, humorous example of that in
19 discussing an ecological fallacy, the
20 number of storks that are nesting in an
21 area and the rise in birth rate; that for
22 the increased drinking of milk over the
23 century and certain diseases,
24 correlations, or the -- or the sale of

Page 65
1 radios and maybe the rise of certain
2 cancers.
3        On the other hand, you have
4 correlations that are fantastically
5 helpful, like cigarette consumption and
6 incidence of lung cancer, but a 20-year
7 lag.
8      Q.    So the basic -- one basic
9 point then is that the occurrence of a
10 disease in a population can be influenced
11 by many factors?
12        MS. BEREZOFSKY:  Object to
13 form.
14        THE WITNESS:  Well, that's
15 not what the ecological fallacy is
16 saying.  It could be one factor.
17 It doesn't necessarily mean
18 there's more than one factor.  It
19 simply means that you picked the
20 wrong correlation.
21 BY MS. FUJIMOTO:
22      Q.    Right.
23        Because there could be
24 something else influencing or correlating

17 (Pages 62 to 65)

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 66

1   with the disease incidence?
2       A.   Well, what I was thinking of
3   is that you just may -- made a total
4   mistake in trying to correlate, say,
5   increasing intake of milk with lung
6   cancer. But that doesn't necessarily
7   mean that it's multi-factorial. That
8   doesn't follow logic.
9       Q.   But the problem is that it
10  can be, and, therefore, you cannot draw a
11  causal conclusion based on an ecological
12  correlation because of the concern about
13  this fallacy, the fact that it could be
14  just wrong?
15      MS. BEREZOFSKY: Object to
16      form. You can answer.
17      THE WITNESS: I gave you
18      examples where correlate --
19      correlative studies required
20      public health action turned out to
21      be correct before any other
22      studies were done. Public health
23      action was mandatory; and there
24      are a number of examples on the

Page 67

1       list.
2   BY MS. FUJIMOTO:
3       Q.   That's not my question.
4       A.   Well, I think it is your
5   question, because while the majority of
6   correlative studies over time tend to be
7   confirmatory of a hypothesis that has
8   been examined with case-control, cohort
9   or maybe some other method, there are
10  still occasions where it can be decisive,
11  alone.
12      Q.   Okay. If you would turn the
13  page, let's see what you had said in your
14  epidemiological -- or epidemiology
15  textbook. On Page 13, up at the top,
16  okay, do you see where it says "Such
17  associations are established in
18  epidemiological studies." Do you see
19  that?
20      A.   Yes.
21      Q.   So cohort or case-control,
22  randomized controlled trials, those are
23  epidemiological studies; right?
24      A.   That's right.

Page 68

1       Q.   And that's separate and
2   apart from these demographic or
3   ecological studies, right?
4       A.   Different design.
5       Q.   And so then on page 13 you
6   say: "These two general methods of
7   determining statistical associations -
8   those between groups," that would be the
9   ecological studies, "and those among
10  individuals" -- that's the epidemiology
11  studies, right?
12      A.   Yes.
13      Q.   -- "must be distinguished
14  since a relationship derived from a study
15  of individuals is less likely to result
16  from an ecological fallacy, and is,
17  therefore, more likely to be biologically
18  significant than one derived from a study
19  of group characteristics."
20      Still agree with that?
21      A.   Yeah. As a general
22  statement.
23      Q.   And let me just finish here,
24  and then you say: "Conversely, an

Page 69

1   association derived from studies of
2   groups has a greater likelihood of being
3   the result of a third common factor."
4       Right?
5       A.   Yes, I agree with that.
6       Q.   Now, for the secular trend,
7   demographic ecological studies, when you
8   look at a trend line for the incidence of
9   disease in a population, you know nothing
10  about the exposures of the individuals
11  who were diagnosed with the diseases or
12  the disease, correct?
13      A.   That's -- that's correct.
14      Q.   Because that's just
15  population data, right, and you can't
16  draw any conclusions based on that data
17  about individual causation. Would you
18  agree with that?
19      A.   About individual causation?
20      Q.   Yeah.
21      A.   Correct.
22      Q.   Okay. In interpreting the
23  potential reason for a change in the
24  occurrence of a disease in a population,

Confidential - Subject to Protective Order

Page 70

1  would you agree that you need to consider
2  all possible things that could influence
3  the disease occurrence?
4       A.   No, I wouldn't agree with
5  that.  I think that if you are examining
6  a particular hypothesis, it's legitimate
7  to look at the correlation between the
8  thing that you can measure, which is
9  sometimes prescriptions, and the things
10 that you can't measure because,
11 essentially what you would want to do, at
12 that stage is see -- oh, that's why it
13 keeps moving -- what you -- what you want
14 to do is to see if the trends fit your
15 hypothesis or do not.  And if they fit
16 the hypothesis, that strengthens the
17 hypothesis, and if it doesn't, suppose
18 they go in the opposite direction, you
19 see more prescriptions and the disease is
20 dropping, then you have to reexamine your
21 hypothesis.  It's -- and open your mind
22 to the possibility that you are
23 incorrect.
24      Q.   Well, even if it fits within

Page 71

1  your hypothesis, don't you, as a
2  scientist, then need to consider whether
3  other measurable factors also correlate
4  with the disease?
5       A.   It depends on whether there
6  is other evidence to suggest that, you
7  know, from case-control studies, and
8  other studies.  They may have measured
9  these other contributory causes and found
10 that they were not related to the problem
11 they're investigating, in which case you
12 wouldn't want to pursue it.
13      Q.   Well, of course, you
14 wouldn't want to pursue possible risk
15 factors where there's evidence that it
16 can influence the disease?
17      A.   If there's reason to think
18 that there's a change in the
19 distribution.  If there's no reason to
20 think that there's any change in the
21 distribution, and it's very hard to get
22 the data, then you might decide it would
23 not be a useful investigation, and I
24 could find that acceptable.

Page 72

1       Q.   Could changes in screening
2  behavior in a population affect the
3  incidence of disease in a population?
4       A.   It can.
5            MS. BEREZOFSKY:  I would
6       like to just -- I would like to
7       take a few minute break.
8            MS. FUJIMOTO:  Couple more
9       minutes and I'll be done with this
10      kind of segment.
11           MS. BEREZOFSKY:  That's
12      fine.
13 BY MS. FUJIMOTO:
14      Q.   Can changes in the
15 population, actual general population
16 shifts affect the incidence of the
17 diagnosis of a disease?
18           MS. BEREZOFSKY:  Object to
19      form.  You can answer it.
20           THE WITNESS:  I'm not sure I
21      understand what you mean.
22 BY MS. FUJIMOTO:
23      Q.   Well, what if in a given
24 population where you're looking at a

Page 73

1  disease incidence, if there is a change
2  in the number of susceptibles within that
3  population, won't that influence or
4  change the diagnosis or incidence of
5  disease in the population?
6            MS. BEREZOFSKY:  Object to
7       form.  You can answer it.
8            THE WITNESS:  I'm not sure
9       how that can happen, except by,
10      in-migration or out-migration,
11      which can easily be corrected for
12      in analysis.
13 BY MS. FUJIMOTO:
14      Q.   What about shifts in
15 demographics?  If you're looking at a
16 particular population and the disease
17 incidence in a population, can changes in
18 the ethnicity, say, for example, of that
19 population, affect disease incidence?
20      A.   Probably a lot less than
21 people think.  Ethnic differences in
22 disease, important ethnic differences in
23 disease are largely overblown in my
24 opinion, and, in addition, the definition

Confidential - Subject to Protective Order

Page 74

1  of ethnicity and race has been called
2  into great question by most
3  epidemiologists.  I've written on this,
4  in particular about race, so -- but
5  except maybe for the example of Katrina
6  with the mass movement of poor black
7  people out of New Orleans, it's -- you
8  don't -- or ethnic cleansing in Bosnia or
9  genocide in Rwanda, you don't generally
10  see these big changes in demographics.
11  BY MS. FUJIMOTO:
12      Q.    Do you think that current
13  research activities that are looking at
14  the differential impact of disease on
15  people of color, do you think those are
16  just worthless?
17          MS. BEREZOFSKY:  Object to
18  form.
19          THE WITNESS:  I think some
20  of that research is worthless, but
21  there are some diseases that are
22  still more common in people who
23  have black skin, despite of the
24  fact that only six percent of the

Page 75

1  general determiner is related to
2  skin color.  I think a lot of the
3  research, trying to look at
4  differences in ethnicity and color
5  is misguided, especially when you
6  don't take socioeconomic
7  differences into play as probably
8  being more important than the
9  genetic influence on disease.
10         MS. BEREZOFSKY:  Excuse me.
11  Can we --
12         MS. FUJIMOTO:  One more
13  question.
14         MS. BEREZOFSKY:  Okay.
15  BY MS. FUJIMOTO:
16      Q.    So studies that show, for
17  example, women from South America or
18  Central America showing a two-thirds less
19  rate of breast cancer than women in the
20  United States, is that -- do you think
21  that's more socioeconomic as opposed to
22  ethnic related?
23         MS. BEREZOFSKY:  Object to
24  form.  You can answer.

Page 76

1          THE WITNESS:  I think it's
2  probably related to environmental
3  influences more than genetic
4  influences.
5  BY MS. FUJIMOTO:
6      Q.    So to the extent there's a
7  great change in the population in the
8  United States in terms of an increasing
9  percentage of population, from South or
10  Central America, that's not of
11  significance to you?
12         MS. BEREZOFSKY:  Object to
13  form.  Wait a second.  Go ahead.
14         THE WITNESS:  No.  The
15  classic studies of the movement of
16  Japanese, native Japanese, to the
17  United States have shown that the
18  low rates of breast cancer of
19  Japanese women within one or two
20  generations, they begin to equal
21  American rates.  You can't see
22  that kind of change and attribute
23  it to genetics.  It's just not
24  possible.  However, often, there

Page 77

1  are genetic interpretations.  The
2  fact that a Japanese woman, who,
3  the more time she spends living in
4  the United States, the higher her
5  risk of breast cancer, and if she
6  immigrates at an older age, is
7  more likely to have a Japanese
8  risk, suggests that environmental
9  influences are key.
10  BY MS. FUJIMOTO:
11      Q.    And that's a change, though,
12  that occurs over one to two generations?
13      A.    You can see it in one
14  generation.  You can see it in -- in
15  infants who are born in Japan of Japanese
16  parents and they move to the United
17  States, and those children will begin to
18  get the breast cancer risk that we see in
19  people who live in the United States.
20  So, the only hypothesis that can really
21  explain that is an environmental one, but
22  often these things are attributed to
23  genetics.
24         MS. BEREZOFSKY:  I'm going

Confidential - Subject to Protective Order

Page 78

1    to take a break.
2         MS. FUJIMOTO:  Off the
3    record.
4         THE VIDEOGRAPHER:  Off the
5    record.  The time is 11:02 a.m.
6         (A recess was taken.)
7         THE VIDEOGRAPHER:  We're
8    back on the record.  The time is
9    11:18 a.m.
10   BY MS. FUJIMOTO:
11        Q.   Welcome back, Dr. Stolley.
12   I noticed in your report that we marked
13   as Exhibit No. 2 that you reference a
14   couple of studies, one by -- or
15   publications by a Dr. Ravdin and one by
16   Dr. Clarke.  Do you remember that?
17        A.   I do.
18        Q.   Okay.
19        MS. FUJIMOTO:  And I'll mark
20   as Exhibit No. 5 an abstract of
21   lead author Ravdin --
22        - - -
23        (Whereupon, Deposition
24   Exhibit Stolley-5, "A sharp

Page 79

1    decrease in breast cancer
2    incidence in the United States in
3    2003" (Ravdin, et al) Abstract (1
4    page), was marked for
5    identification.)
6         - - -
7    BY MS. FUJIMOTO:
8         Q.   -- and ask you whether or
9    not what I've marked as Exhibit No. 5 is
10   the abstract to which you refer when you
11   referenced Ravdin in your expert report.
12        A.   Yes.
13        Q.   Okay.
14        MS. FUJIMOTO:  Mark as
15   Exhibit No. 6 to the deposition a
16   publication by Clarke.
17        - - -
18        (Whereupon, Deposition
19   Exhibit Stolley-6, "Recent
20   Declines in Hormone Therapy
21   Utilization and Breast Cancer
22   Incidence: Clinical and
23   Population-Based Evidence"
24   (Clarke, et al) Journal of

Page 80

1    Clinical Oncology Vol. 24, No. 33,
2    November 20, 2006 (2 pages), was
3    marked for identification.)
4         - - -
5    BY MS. FUJIMOTO:
6         Q.   Is that the Clarke to which
7    you refer in your expert report?
8         A.   Yes.
9         Q.   Are these studies ecological
10   or demographic studies, similar to what
11   we were talking about before the break?
12        MS. BEREZOFSKY:  Object to
13   form.  Which one are you asking
14   about?
15        MS. FUJIMOTO:  Both.
16        THE WITNESS:  They're both
17   this kind of correlative study of
18   time trends comparing prescribing
19   patterns to diseases.
20   BY MS. FUJIMOTO:
21        Q.   Okay.  And so when
22   Dr. Ravdin and Dr. Clarke are reporting
23   changes in the incidence of breast cancer
24   during a specific period of time, am I

Page 81

1    correct that those incidents are based on
2    population data?
3         A.   That is correct.
4         Q.   And Dr. Ravdin bases his on
5    SEER data?
6         A.   Yes.
7         Q.   And that's the acronym
8    S-E-E-R?
9         A.   Yes.
10        Q.   And Dr. Clarke bases hers on
11   a particular Kaiser database?
12        A.   That's correct.
13        Q.   Is it correct that in both
14   the Ravdin and the Clarke paper, that
15   when they speak of the changes in the
16   incidence of breast cancer, that there is
17   no information available to know, for
18   example, the weight of the women who were
19   diagnosed with breast cancer?
20        A.   That's correct.
21        Q.   And you don't know anything
22   about how many babies any of these women
23   had, or when, during their lifetime?
24        A.   That's also correct.

Confidential - Subject to Protective Order

Page 82

1      Q.    And you don't know anything
2  about their alcohol use?
3      A.    That's correct.
4      Q.    We don't know anything about
5  their smoking history?
6      A.    Right.
7      Q.    We don't know their age at
8  the time of diagnosis?
9      A.    Correct.
10     Q.    We don't know anything about
11  their family history of breast cancer, if
12  any?
13     A.    That's right.
14     Q.    We don't know anything about
15  their genetic profile?
16     A.    I'm not sure I know what you
17  mean by "genetic profile."
18     Q.    If they are carriers of the
19  BRCA1 or 2 gene.
20     A.    That's right.
21     Q.    We don't know anything about
22  whether these women had regular
23  mammograms, right?
24     A.    That's correct.

Page 83

1      Q.    And we don't know whether
2  their breast cancers were diagnosed by
3  mammogram or on exam, correct?
4      A.    That's correct.
5      Q.    And in fact, we don't know
6  any -- we don't even know if these women
7  who were diagnosed with breast cancer
8  ever used hormone therapy, right?
9      A.    That's correct.
10     Q.    Does the SEER database track
11  or keep data on any other risk factors
12  for breast cancer?
13        MS. BEREZOFSKY:  Object to
14     form.  You can answer.
15        THE WITNESS:  I believe that
16     they do.
17  BY MS. FUJIMOTO:
18     Q.    What risk factors were
19  tracked?
20     A.    I'm not sure what risk
21  factors were -- what -- in the SEER data
22  they collected a lot more information
23  than -- but I'm not aware of the form
24  that they used.

Page 84

1      Q.    Do you know whether they
2  track alcohol -- trends in alcohol use in
3  the population?
4      A.    You mean in the SEER
5  population?
6      Q.    Yes.
7      A.    I don't know if they do it
8  or if they have the capability of doing
9  it.
10     Q.    And do they track -- do you
11  know if they track, for example, BMI or
12  weight trends in a population?
13        MS. BEREZOFSKY:  Object to
14     form.  You can answer.
15        THE WITNESS:  Once again, I
16     don't know if they do that, but
17     they may have the capability of
18     doing that.
19  BY MS. FUJIMOTO:
20     Q.    Do you know whether they
21  track mammography?
22     A.    I don't know, but I suspect
23  they do.
24     Q.    Okay.  Now, SEER doesn't

Page 85

1  track trends in hormone therapy use or
2  prescriptions, right?
3      A.    I'm not sure.
4      Q.    Okay.  But the prescription
5  trend line that was used by Dr. Ravdin
6  didn't come from the SEER database, did
7  it?
8      A.    I don't think so.
9      Q.    So it came from a separate
10  database than the trend incidence for the
11  disease, right?
12        MS. BEREZOFSKY:  Object to
13     form.  You can answer.
14        THE WITNESS:  I believe so,
15     yeah.
16  BY MS. FUJIMOTO:
17     Q.    And so he's comparing two
18  different things that come from two
19  disparate databases, right?
20     A.    He's comparing two trends,
21  one from the SEER database and the other
22  from another database.  I can't recall if
23  he was using marketing data for the
24  prescriptions or not.

Confidential - Subject to Protective Order

Page 86

1     Q.    Do you know whether
2  Dr. Ravdin looked at any other trends of
3  other breast cancer risk factors?
4     A.    I don't know.
5     Q.    And so would it be fair to
6  say that when you are trying to correlate
7  two trend lines that are derived from two
8  different databases, disparate databases,
9  that it's more susceptible to this
10 ecological fallacy that we talked about
11 earlier?
12        MS. BEREZOFSKY:  Object to
13    form.  You can answer.
14        THE WITNESS:  I'm not sure
15    if it would be more susceptible.
16    It's -- what he has done is really
17    common practice in epidemiology,
18    to get the best estimates you can
19    of prescribing, which is hard to
20    do, and is often available only
21    from large HMO's like Kaiser or
22    from marketing data, such as IMS,
23    has a pretty much monopoly on it,
24    and then comparing it to the

Page 87

1     trends of disease that they're
2     finding in their population.  And
3     these kinds of studies have been
4     very valuable in the past.  And,
5     once again, if they had gone in
6     opposite directions, that would
7     have -- that would have given no
8     support to a hypothesis of the
9     role of -- the combination of
10    hormone replacement therapy --
11    shall we wait.
12        MS. FUJIMOTO:  Yes.  I
13    apologize.
14        THE VIDEOGRAPHER:  We're
15    going off the record.  The time is
16    11:27 a.m.
17        (There was a brief
18    interruption.)
19        THE VIDEOGRAPHER:  We're
20    back on the record.  Time is 11:28
21    a.m.
22 BY MS. FUJIMOTO:
23    Q.    Let me see if I can ask it a
24 little more concisely.  Would you agree

Page 88

1  that comparing the trend line from one
2  database to the rough estimate as you
3  called the trend line from another
4  database makes this study subject to the
5  ecological fallacy?
6         MS. BEREZOFSKY:  Object to
7     form.  You can answer.
8         THE WITNESS:  I think that
9     all of these types of studies are
10    subject to the ecological fallacy,
11    but I would like to -- I would
12    like to explain that the current
13    style in scientific investigation
14    would be to do studies like this
15    not to confirm the hypothesis, but
16    to look for disconfirmation.  In
17    other words, the scientist is
18    looking for -- imagining what
19    study could I do that would
20    challenge my hypothesis.  And this
21    is the kind of study that if it
22    went in a totally different
23    direction, would challenge it.  So
24    what you're looking for, what

Page 89

1     you're really examining in doing
2     additional studies is not for
3     additional studies, although,
4     in this case, it occurred, but for
5     disconfirmation.
6  BY MS. FUJIMOTO:
7     Q.    Well, so if you --
8     A.    You are probe -- probing for
9  weaknesses in your hypothesis.
10    Q.    So this type of study, if
11 it's consistent with your hypothesis,
12 that is what you call confirmatory?
13        MS. BEREZOFSKY:  Object to
14    form.
15        THE WITNESS:  I would say it
16    -- it conforms with and supports
17    the hypothesis.  I'm not sure I
18    would say it confirms the
19    hypothesis.
20 BY MS. FUJIMOTO:
21    Q.    Right.
22        It doesn't establish a
23 causal relationship between the disease
24 that you're looking at and the other

23 (Pages 86 to 89)

Confidential - Subject to Protective Order

Page 90

1  factor that you're trying to correlate,
2  right?
3      A.   It adds to the body of
4  evidence that you're trying to develop
5  concerning causation.
6      Q.   It's one of many things to
7  look at?
8      A.   Exactly.
9      Q.   And like any other
10 epidemiologic study, when you look at it,
11 you have to consider how much weight to
12 give to it by looking at its strengths
13 and its limitations; fair?
14     A.   Fair enough.
15     Q.   Now, what I marked as
16 Exhibit No. -- I guess it's 5,
17 Dr. Ravdin's abstract, do you still have
18 that in front of you?
19     A.   Yes, I find it hard --
20     Q.   I'm sorry.  Is that No. 5?
21     A.   Yes.  I find this hard to
22 read.  I thought I brought my reading
23 glasses with me.
24     Q.   There they are around your

Page 91

1  neck, sir.
2      A.   No.  These are my distance
3  glasses.
4      Q.   You know what?  I'm going to
5  ask you to read that really fine print
6  for me.  No, I'm not.
7      A.   I think I can read it.  It's
8  just very difficult.
9      Q.   I'm just going to ask you,
10 Dr. Ravdin's paper was an abstract of a
11 poster presentation that was made at a
12 meeting, correct?
13     A.   Yes.
14     Q.   The San Antonio Breast
15 Symposium?
16     A.   Yes.
17     Q.   Were you there?
18     A.   No.
19     Q.   Have you watched the
20 presentation online --
21     A.   No.
22     Q.   -- or in any other format?
23     A.   No.
24     Q.   Read a transcript?

Page 92

1      A.   No.
2      Q.   And this abstract or poster
3  presentation wasn't published in any peer
4  review journal, correct?
5      A.   It hasn't been published
6  yet.  I suspect it will be.
7      Q.   Do you know whether when
8  Dr. Ravdin gave his presentation on that
9  abstract that he said that he and his
10 team were speculating about the cause of
11 the drop in breast cancer incidence in
12 2003?
13         MS. BEREZOFSKY:  Are you
14     referring to something that is in
15     this abstract?
16         MS. FUJIMOTO:  No, I want to
17     know if he knows that is what
18     Dr. Ravdin said in his
19     presentation.
20         THE WITNESS:  I didn't -- I
21     don't know what he said in his
22     presentation.
23 BY MS. FUJIMOTO:
24     Q.   Would you agree that the

Page 93

1  most that one can do, based on that study
2  is speculate about the cause of the
3  decrease in breast cancer incidence in
4  one isolated year, 2003?
5      A.   I would use the word -- I
6  wouldn't use the word speculate.  I would
7  use the word hypothesize.  And I see this
8  as more adding to the body of evidence
9  concerning the relationship between
10 hormone replacement therapy, combined
11 hormone replacement therapy and the rise
12 and fall of breast cancer incidence, and
13 I would look at it differently.  I think
14 I would have said -- I would have started
15 out by saying, "this study was done to
16 see if we could disconfirm the
17 hypothesis."  I would have presented it
18 that way.
19     Q.   And do you know if that's
20 presented differently than how Dr. Ravdin
21 presented it?
22     A.   No.  If he qualified it the
23 way you said, I think he probably is
24 looking at it as it didn't disconfirm.

Confidential - Subject to Protective Order

Page 94

1    It conformed with the hypothesis, and it
2    adds some weight to the hypothesis.
3        Q.    Okay.  In determining what
4    weight to give Dr. Ravdin's paper,
5    observations, did you do anything to
6    explore, investigate other possible
7    explanations for the drop of breast
8    cancer incidence in 2003?
9        A.    I did not.
10       Q.    Okay.  Did you go and look
11   at any of the SEER database for trends or
12   data on other breast cancer risk factors?
13       A.    I didn't obtain the SEER
14   database.
15       Q.    Did you look at any other
16   databases?
17       A.    No.
18       Q.    Did you look at any data
19   regarding other population shifts that
20   may have occurred during this same time
21   frame?
22           MS. BEREZOFSKY:  Object to
23       the form.
24           THE WITNESS:  I'm not sure

Page 95

1        what you mean by population shift.
2    BY MS. FUJIMOTO:
3        Q.    Changes in the demographics
4    of the US population.
5            MS. BEREZOFSKY:  Object to
6        form.
7            THE WITNESS:  I didn't, and
8        I probably wouldn't have done it
9        if it was suggested to me.
10   BY MS. FUJIMOTO:
11       Q.    Dr. Stolley, have you
12   published in the past regarding the
13   impact of surveillance on disease?
14       A.    Yes, I have.
15       Q.    And can the -- can a
16   differential impact in surveillance
17   affect how a study -- the reliability of
18   a study?
19           MS. BEREZOFSKY:  Object to
20       form.  You can answer it.
21   BY MS. FUJIMOTO:
22       Q.    Do you understand or is that
23   just a terrible, terrible question?
24       A.    It is not a terrible

Page 96

1    question, but it's not quite clear to me.
2        Q.    Thank you.  I appreciate
3    your grace.
4            For example, if you do a
5    case-control study and you're comparing
6    two groups, if you have differential
7    surveillance of the two groups, can that
8    impact the validity or reliability of
9    your study results?
10           MS. BEREZOFSKY:  Object to
11       form.  You can answer.
12           THE WITNESS:  It can, yes.
13   BY MS. FUJIMOTO:
14       Q.    Would you agree with me that
15   there have been dramatic advances in our
16   ability to detect breast cancer, say, in
17   the last decade or so?
18       A.    Yes.  I think mammography
19   and needle biopsy have led to
20   improvements.  I wouldn't say they're
21   dramatic.
22       Q.    Do you know when routine
23   mammography became standardized?
24           MS. BEREZOFSKY:  Object to

Page 97

1        form.  You can answer.
2            THE WITNESS:  Well, I'm not
3        sure it is even now standardized
4        across the country, but
5        mammography began to gain in
6        popularity after the health
7        insurance plan study by Shapiro,
8        which was a randomized control
9        trial which showed about a 30
10       percent improvement in mortality
11       among the screened group.
12   BY MS. FUJIMOTO:
13       Q.    So -- I'm sorry, Shapiro
14   showed that women who were screened had a
15   better breast cancer mortality, since
16   they were diagnosed?
17           MS. BEREZOFSKY:  Object to
18       form.
19           THE WITNESS:  I think
20       eventually he showed that -- I
21       think his first papers had to do
22       with detection rates, and then I
23       think he -- if I'm remembering
24       correctly, he did follow-up

25 (Pages 94 to 97)

Confidential - Subject to Protective Order

Page 98

1    studies showing improved
2    mortality, survivorship, increased
3    survivorship.
4  BY MS. FUJIMOTO:
5    Q.    And was the hypothesis or
6  theory that screening led to earlier
7  detection, which led to better survival?
8    A.    I think that was the -- that
9  was the theory behind it, yes.
10   Q.    And do you believe that that
11 theory has been confirmed or proven over
12 time?
13   A.    The -- most of the
14 statistics from the United States and
15 Europe tend to support that, yes.
16   Q.    And so would you agree that
17 screening practices can influence trends
18 in disease in a population?
19   A.    Not in the long run, only in
20 the short run.
21   Q.    Okay.  So in the short run,
22 changes that occur in screening practices
23 can affect the incidence of disease --
24 diagnosis of disease?

Page 99

1    A.    That's correct.  When you
2  screen, you pick up the tumors at an
3  earlier stage, but if the tumor is not
4  screened for, they're ordinarily --
5  they're ordinarily picked up at a later
6  stage or by the woman, her consort or her
7  physician.
8    Q.    Okay.  So if you're looking
9  at a population of women who are getting
10 screening mammograms regularly, and that
11 should then -- you will see an increase
12 in detection of the disease in that
13 population.
14        MS. BEREZOFSKY:  Object to
15   form.
16        THE WITNESS:  You may.
17 BY MS. FUJIMOTO:
18   Q.    And if you see that increase
19 in the diagnosis of disease, if you
20 continue to watch over time, would you
21 expect to decline after you've kind of
22 removed or, you know, removed the
23 susceptibles from the population you're
24 looking at --

Page 100

1        MS. BEREZOFSKY:  Object to
2   form.
3  BY MS. FUJIMOTO:
4    Q.    -- by earlier detection?
5    A.    That is a possibility.  I'm
6  not sure that's what they've found in
7  screened populations.
8    Q.    Okay.  Do you know whether
9  the number of mammograms in this country
10 went down after the WHI was published in
11 2002?
12   A.    I don't know.  I would doubt
13 it.
14   Q.    Why?
15   A.    Because more and more
16 insurance companies are covering it.  It
17 used to be they would only do a mammogram
18 if the doctor said they felt a nodule,
19 and so the incidence of reported nodules
20 went way up as doctors gamed the
21 insurance companies.  And then I think
22 Congress passed a law saying that the
23 HMOs had to provide annual mammograms;
24 and I'm not sure that there's been a

Page 101

1  decline in the rate of mammography in
2  most populations.
3    Q.    You mentioned earlier that
4  you had written the Morbidity and
5  Mortality Weekly Report at some point in
6  time?
7    A.    Yes.  I wrote it from 1964
8  to '65.
9    Q.    Do you still follow it?
10   A.    No, I don't follow it much
11 anymore.
12   Q.    Do you know whether a recent
13 Morbidity and Mortality Weekly Report
14 reported a substantial decline in
15 mammogram use in women older than 40
16 between the 2000 to 2005 time frame?
17   A.    I haven't seen that report.
18   Q.    Is MMWR relatively reliable?
19   A.    When I edited it, it was.
20   Q.    Any reason to believe that
21 it's not anymore?
22   A.    No.  I would think it's
23 continued its high standard.
24   Q.    Are you aware of data

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 102

1  showing that women who use hormone
2  therapy are more likely to see their
3  physicians regularly and get regular
4  mammograms?
5      A.   Yes.
6      Q.   Why is that?
7      A.   Well, they're under --
8  they're under the care of a gynecologist,
9  and the gynecologists tend to follow them
10  more closely.  And one of the things that
11  they would recommend would be PAP smears
12  and mammograms, and, in addition, women
13  on hormone replacement therapy have risks
14  that a gynecologist want to pick up,
15  particularly if they're going to have
16  them on it for more than a few months.
17  They're worried about breast cancer.
18      Q.   So actually the standard is
19  to require a mammogram for renewal of
20  hormone therapy prescriptions, right?
21          MS. BEREZOFSKY:  Object to
22      the form.
23          THE WITNESS:  I wasn't aware
24      that it was a requirement for

Page 103

1      renewal, but I know reading the
2      label, the latest label that it
3      suggested, I don't know if it's
4      required.
5  BY MS. FUJIMOTO:
6      Q.   So as a population, women
7  who use HRT are better screened in terms
8  of their breast health; is that a fair
9  statement?
10      A.   In general, yes.
11      Q.   And better screening,
12  generally, results in earlier diagnosis
13  of disease, correct?
14      A.   That's correct.
15      Q.   And earlier diagnosis of
16  disease should, or we hope, lead to
17  better mortality?
18      A.   We hope.
19      Q.   And are you aware of the
20  many epidemiologic studies that show that
21  women who are on hormone therapy when
22  they are diagnosed with breast cancer
23  have better breast cancer survival or
24  mortality than women not on HRT?

Page 104

1          MS. BEREZOFSKY:  Object to
2      form.
3          THE WITNESS:  I am not
4      familiar with that.
5  BY MS. FUJIMOTO:
6      Q.   Okay.  But that would be
7  consistent, wouldn't it, with the better
8  screening of that population?
9      A.   It would be.  Unless hormone
10  replacement therapy led to more
11  aggressive tumors.
12      Q.   Are you aware of any data to
13  suggest that?
14      A.   Not that I can recall.
15      Q.   In fact, isn't the weight,
16  great weight of data from studies on HRT
17  use and breast cancer, don't those data
18  show that the tumors diagnosed on women
19  on HRT tend to be smaller and better
20  differentiated at the time of diagnosis?
21      A.   Smaller, I knew; better
22  differentiated, I wasn't -- I wasn't
23  aware of that.
24      Q.   But if that's the case,

Page 105

1  that's certainly consistent with better
2  breast cancer mortality, isn't it?
3      A.   Yes.
4      Q.   Going back to Dr. Ravdin's
5  abstract, do you know what happened to
6  the rates of other cancers that are
7  routinely screened -- screened for in
8  postmenopausal women during this same
9  time frame?
10          MS. BEREZOFSKY:  Objection.
11      You can answer.
12          THE WITNESS:  The only other
13      -- the only other tumor I think
14      that is screened for is cervical
15      cancer.
16  BY MS. FUJIMOTO:
17      Q.   Do you know what happened to
18  the rates of cervical cancer?
19      A.   The rates of cervical cancer
20  have dropped nationally, and the
21  mortality has dropped since the
22  introduction of the PAP smear, going back
23  to probably the 1950s, this has been seen
24  in most countries, most populations

27 (Pages 102 to 105)

Confidential - Subject to Protective Order

Page 106

1  studied.
2       Q.    And has the incidence of
3  other cancers also declined in recent
4  years in the United States?
5            MS. BEREZOFSKY:  Objection.
6            THE WITNESS:  Of other
7       female cancers, or --
8  BY MS. FUJIMOTO:
9       Q.    Other cancers, generally?
10      A.    Some cancers yes; other
11 cancers, no.  The incidence of lung
12 cancer has gone up in women considerably,
13 and non-Hodgkin's lymphoma has risen,
14 malignant melanoma has risen.  There's
15 been a decline beginning in the 1940s of
16 stomach cancer, which used to be one of
17 the leading cancers.
18      Q.    Colon cancer?
19      A.    Colon cancer is a -- mild
20 decline.
21      Q.    Why do you think there's
22 been an increase in lung cancer in women?
23      A.    Cigarette smoking.  There's
24 also been an increase in cell type that

Page 107

1  is not related to cigarette smoking, and
2  that is unexplained.
3       Q.    Have there been -- has there
4  been an increase in other diseases that
5  are related to smoking?
6       A.    In women?
7       Q.    Yes?
8       A.    Yes.
9       Q.    Cardiovascular disease?
10      A.    Cardiovascular disease, yes.
11 The other cigarette related cancers, such
12 as cancer of the larynx has increased,
13 oral cancers, and chronic obstructive
14 pulmonary disease.
15      Q.    And I probably asked you
16 this.  I apologize if I did, but has the
17 incidence of alcohol use in women
18 increased over the last decade?
19      A.    I'm not sure I know the
20 answer to that question.
21      Q.    Okay.  Do you know how many
22 women per one thousand screening
23 mammograms are diagnosed with breast
24 cancer?

Page 108

1       A.    No, I don't know that
2  offhand.
3       Q.    Do you know if it's
4  different depending upon the age group of
5  the women?
6       A.    The age group?
7       Q.    Yes.
8       A.    I'm pretty sure it's
9  different in age groups.
10      Q.    In what way?
11      A.    Well, since the incidence of
12 breast cancer generally increases with
13 age, depending that you would -- you
14 would pick up more in older women, if
15 they continue to get mammography into a
16 very old age.
17      Q.    Going back to the decline in
18 breast cancer incidence that Dr. Ravdin
19 observed, and that decline occurred in
20 2003, right?
21      A.    I think so, yeah.
22      Q.    Was there also a decline in
23 the incidence of hormone receptor
24 negative tumors?

Page 109

1       A.    I'm not sure about that.
2       Q.    If that were the case, do
3  you know what would explain that decline?
4       A.    The decline in ER --
5       Q.    ER negative tumors?
6       A.    -- negative tumors?  I don't
7  know if any explanation has been put
8  forth.  If -- no.
9       Q.    Hormone therapy wouldn't be
10 the explanation, would it?
11      A.    It possibly could, if
12 hormone therapy is related to an
13 increased incidence of mainly ER positive
14 tumors, that is possible.
15      Q.    How would that relate to a
16 decline in ER negative?
17      A.    It's a proportion.
18      Q.    And how would it affect the
19 proportion?
20      A.    It would be a greater
21 proportion of ER positive than ER
22 negative.
23      Q.    Well, I'm talking about an
24 absolute decline in ER negative tumors.

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 110

1  Not just proportional, not absolute?
2       MS. BEREZOFSKY:  Objection.
3       THE WITNESS:  What is the
4    question?
5  BY MS. FUJIMOTO:
6    Q.   My question is hormone
7  therapy can't explain an absolute decline
8  in the incidence of ER negative tumors,
9  can it?
10      MS. BEREZOFSKY:  I'm going
11   to object.  Are you asking him
12   about Ravdin or are you asking him
13   just generally speaking.
14      MS. FUJIMOTO:  Well, it's
15   connected to Ravdin.  Ravdin
16   reported an absolute decline in ER
17   negative tumors; and my question
18   to you is whether hormone therapy
19   can explain it.
20      THE WITNESS:  Can explain
21   the decline?
22  BY MS. FUJIMOTO:
23    Q.   The decline in hormone
24  receptor negative tumors, or can it be

Page 111

1  something else?
2    A.   Are you really asking
3  whether the declining use of hormone
4  therapy --
5    Q.   Yes.
6    A.   -- would explain it?
7    Q.   Yes.  Thank you, yes.
8    A.   I don't know if it could or
9  not.
10    Q.   Do you know whether a
11  similar trend, meaning decline in breast
12  cancer diagnoses in 2003, whether a
13  similar trend was seen in the UK?
14    A.   I don't know.  But hormone
15  replacement therapy is used much less in
16  the UK than it is here, and it's also a
17  different formulation.  They tend to use
18  a different progestin than -- than is
19  used in the United States.
20    Q.   And when looking at data,
21  it's important, is it not, to look at
22  data pertaining to a particular therapy
23  or preparation, as you call it?
24    A.   It depends upon the study

Page 112

1  you're doing.  In a -- in a study like
2  this, where they don't have the
3  capability of doing it, you have to take
4  what you get, and you can't demand
5  something that is not possible to get,
6  and factor in limitations in your
7  interpretation of the data.
8    Q.   So in epidemiologic studies,
9  it's important to be looking at data
10  regarding the same preparations when
11  you're evaluating the weight of the data
12  in relation to your hypothesis, correct?
13    A.   Not necessarily.  Once
14  again, the emphasis was on
15  disconfirmation, and the fact that they
16  didn't find data, disconfirmation of the
17  hypothesis, but, rather, it conformed
18  with the hypothesis, even given the
19  limitations of the data, is what
20  contributes to the body of evidence.
21    Q.   I must have misunderstood
22  then.  I was trying to follow up on your
23  reference to the fact that hormone
24  therapy use and the type and dose of

Page 113

1  hormone therapy used in the UK is
2  different.  So I guess my question needs
3  to be, what difference does that make
4  when you're looking at epidemiologic data
5  and weighing it?
6       MS. BEREZOFSKY:  Objection.
7    You can answer.
8       THE WITNESS:  Well, the data
9    from the UK -- there are two
10   differences that might be very
11   important.  One is lower rate of
12   use, considerable lower rate of
13   use of hormone replacement
14   therapy, which is historical and
15   goes back decades, and the second
16   is a different -- different
17   formulation.  So looking at UK
18   data might not be a useful way to
19   try to disconfirm the hypothesis.
20  BY MS. FUJIMOTO:
21    Q.   In Europe, they have
22  different screening methods, do they not?
23    A.   They have different
24  screening schedules.  I don't know if the

29 (Pages 110 to 113)

Confidential - Subject to Protective Order

Page 114

1 method is different, but they don't do it
2 as frequently.
3     Q.    Doctor, going back to the
4 Ravdin abstract and the SEER database,
5 how much of the US population is
6 "captured" by the SEER database?
7     A.    Of the entire United States
8 population?
9     Q.    Yes.
10     A.    I don't know the percentage,
11 but the SEER areas involve some major
12 metropolitan areas and urban areas, and
13 it does not cover the entire population.
14     Q.    Do you know whether Arkansas
15 is covered?
16     A.    I don't.
17     Q.    What about Pennsylvania?
18     A.    I don't know.
19     Q.    New Jersey?
20     A.    I don't know.
21     Q.    So I take it then we don't
22 know whether the areas covered by the
23 SEER database have higher or lower rates
24 of HRT use than in the general

Page 115

1 population?
2     A.    Well, I don't know it, but
3 it is probably knowable.
4     Q.    Is the SEER data from 19 --
5 strike that.
6          Is the SEER data from 2003
7 complete, at this point in time?
8     A.    I'm not sure.
9     Q.    It's probably -- it takes
10 some time, does it not, for SEER to
11 gather its data, collect it, get it in
12 its database, and then have it --
13     A.    That's true, but they've
14 been at it a long time, and they have a
15 very efficient operation, and SEER
16 databases have been very useful in the
17 past not just for epidemiological studies
18 but for the main purpose for which it was
19 established, which was for clinical and
20 therapeutic studies.
21     Q.    Sure.  But there is a lag
22 time, is there not, between reporting and
23 the accessibility of the data for
24 studying purposes?

Page 116

1     A.    There would have to be a lag
2 time, yes.
3     Q.    So you don't know whether
4 the 2003 data are incomplete?
5     A.    I don't.
6     Q.    But if they are incomplete,
7 that would affect the weight or validity
8 of Dr. Ravdin's numbers, wouldn't it?
9     A.    Not necessarily.  If it were
10 incomplete in a way that was more or less
11 random, then you could think of this as
12 a -- say, a 90 percent sample and not
13 necessarily a biased sample.
14     Q.    Dr. Ravdin notes that the
15 decline that occurred after the WHI, the
16 decline that was seen in breast cancer
17 incidence in 2003 was pretty quick.
18 That's a quick decline.  Do you agree
19 with that?
20     A.    Do I agree with that's what
21 he found.
22     Q.    Yes.
23     A.    Yes.
24     Q.    Do you agree that the

Page 117

1 decline, itself, was quick?
2     A.    Yes -- yes.
3     Q.    Meaning, just so that we're
4 clear for the record, the WHI was
5 published in the summer of 2002, right?
6     A.    Yes.
7     Q.    Okay.  And he's talking
8 about a decline in breast cancer
9 incidence within six months to a year of
10 that, correct?
11     A.    Yes.
12     Q.    Do have an opinion as to
13 what that says regarding the biological
14 plausibility of the relationship between
15 the two, HRT use and breast cancer
16 incidence?
17          MS. BEREZOFSKY:  Objection.
18          THE WITNESS:  I think it's
19          not inconsistent with the
20          relation.  We saw a decline in
21          endometrial cancer with a decline
22          in prescriptions, and that was
23          fairly rapid, as well.
24 BY MS. FUJIMOTO:

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 118

1    Q.   But the -- strike that.
2         Do you know Dr. Christina
3  Clarke?
4    A.   No, I've never met her.
5    Q.   Do you know who she is?
6    A.   I know her just the title.
7    Q.   You don't know her by
8  reputation in the epidemiology community?
9    A.   No, I don't.  I see she's
10 from the Northern California Cancer
11 Center, and I know they have done
12 excellent work in the past.
13   Q.   And what does Dr. Clarke say
14 in her letter to the editor about the
15 biologic mechanism for the role of HRT in
16 breast cancer?
17   A.   Do you want to point me to
18 the -- do you want to point me to the --
19   Q.   I will in a second.  I'm
20 getting my sheet here.  Okay.  It is on
21 the right-hand column, Dr. Stolley.
22   A.   Yeah.  No. 2.
23   Q.   Right there.
24   A.   No. 2.

Page 119

1    Q.   Okay.  That's right.  Where
2  she says the patterns -- "These patterns
3  are consistent with (1) reports from
4  observational studies," and then "(2)
5  proposed biologic mechanisms for the role
6  of HT in breast carcinogenesis whereby HT
7  acts as a promoter of already initiated
8  breast tumors."
9         Do you see that?
10   A.   Yes.
11   Q.   Do you agree with her?
12   A.   That's not my field,
13 carcinogenesis, but I find that
14 explanation very reasonable.
15   Q.   Do you intend to offer an
16 opinion in this litigation as to the
17 mechanism or the precise role that HRT
18 plays in breast cancer?
19   A.   I think not.
20   Q.   Dr. Clarke, in her letter to
21 the editor, cites footnote No. 6, which
22 is to a paper by Dr. -- I don't know if
23 it's Dietel or Dietel, D-I-E-T-E-L.
24        Do you see that reference?

Page 120

1    A.   Yes.
2    Q.   Did you read that paper?
3    A.   I skimmed it.
4    Q.   Uh-huh.  Did you see where
5  Doctor -- do you know the correct
6  pronunciation, is it Dietel or Dietel?
7    A.   I don't know him.  I know
8  the third author very well.
9    Q.   Dr. Shapiro?
10   A.   Yes.
11   Q.   I'll say Dietel.  Does
12 Dr. Dietel, in his paper, offer the same
13 theory regarding the proposed biological
14 mechanism of HT and breast cancer?
15   A.   As I recall, he does not.
16   Q.   He does not?
17   A.   As I recall.
18   Q.   Okay.
19   A.   I'd have to -- I'd have to
20 check it, because I read it quite a while
21 ago.
22   Q.   When was the first time you
23 read the Dietel paper?
24   A.   I'm not sure.

Page 121

1    Q.   Am I correct that in her
2  letter to the editor, Dr. Clarke states
3  that due to the ecological nature of her
4  data, a causal interpretation of the
5  associations is prohibited?
6    A.   I note it, yes.
7    Q.   Do you agree with that?
8    A.   I probably would have --
9  would have worded it differently, and so
10 -- I have some qualifications about the
11 way she stated it.  I would have
12 emphasized that the reason to look at
13 these correlations, again, was to look
14 for disconfirming evidence for the breast
15 cancer hypothesis, breast cancer and
16 hormone replacement therapy hypothesis.
17 And, yet, we found confirmatory evidence,
18 which alone, if considered alone, would
19 then not be considered causal, but adds
20 to the body of evidence concerning the
21 relation.
22        MS. FUJIMOTO:  We're out of
23     tape.  We'll go off the record.
24        THE VIDEOGRAPHER:  This

31 (Pages 118 to 121)

Confidential - Subject to Protective Order

Page 122

1    marks the end of Volume 1 of Tape
2    1 in the deposition of Dr. Paul
3    Stolley.  We're going off the
4    record.  The time 12:07 p.m.
5        (A recess was taken.)
6        THE VIDEOGRAPHER:  We're
7    back on the record.  Time is 1:15
8    p.m.
9    BY MS. FUJIMOTO:
10       Q.   Welcome back, Doctor.  Have
11   you ever worked or done work using data
12   from the Kaiser database?
13       A.   I don't recall.  I know I
14   met with them some years ago when Gary
15   Friedman was the leader of that group, to
16   do a study, but I don't think I've ever
17   published it.  But I was familiar with it
18   20 years ago, when Dr. Friedman was
19   running it.
20       Q.   Do you know whether Kaiser
21   has any prohibitions against using its
22   data for litigation purposes?
23       A.   I don't know that, no.
24       Q.   Okay.  Do you know what the

Page 123

1    California Cancer Registry is?
2        A.   Yes.
3        Q.   Okay.  Do you know whether
4    there's a prohibition on using that data
5    for litigation purposes?
6        A.   I don't know, but do you
7    mean they try to prohibit the use of
8    published public domain data, litigation,
9    or do you mean doing a study specifically
10   for litigation?
11       Q.   Using the data, yes,
12   specifically for litigation.
13       A.   That is organized in a
14   study?
15       Q.   Right.
16       A.   I don't know the answer to
17   that.
18       Q.   Referring back to Exhibit
19   No. 6, the Clarke letter to the editor,
20   and that's Dr. Clarke's letter regarding
21   her analysis of data from the Kaiser
22   database, correct?
23       A.   Yes.
24       Q.   Okay.  And do you see at the

Page 124

1    bottom of page 2 of Exhibit No. 6, if you
2    would look there, there is a disclosure
3    of potential conflicts of interest; do
4    you see that?
5        A.   Yes.
6        Q.   And there is a reference
7    to -- under testimony to Williams, Love,
8    O'Leary, Craine & Powers.  Do you see
9    that?
10       A.   I -- where are you at?
11       Q.   Over in the box here,
12   Doctor.
13       A.   Yeah, over to the right.
14   Uh-huh.
15       Q.   Do you know the law firm of
16   Williams, Love?
17       A.   Is that the one in Oregon?
18       Q.   Yes.
19       A.   I know the firm.  I know
20   Mr. Williams.
21       Q.   And you understand that they
22   are representing plaintiffs in this
23   litigation?
24       A.   Yes.

Page 125

1        Q.   And that Dr. Clarke is
2    acting as an expert in working with
3    Williams Love in litigation?
4        A.   I didn't know that.
5        Q.   Okay.  Does that give you
6    any concern regarding the objectivity of
7    Dr. Clarke and her work?
8        MS. BEREZOFSKY:  Objection.
9    You can answer.
10       THE WITNESS:  No, it
11   doesn't.
12   BY MS. FUJIMOTO:
13       Q.   Doctor, were --
14       A.   It's analogous with
15   industry-sponsored studies, that these
16   kinds of connections can -- can lead to
17   bias, but not necessarily.  And just as
18   the industry might sponsor a study, I can
19   see a law firm sponsoring a study.  But
20   if the proper protections are -- and
21   integrity is carried out by the
22   investigator, then it would not give me a
23   problem.
24       Q.   And so in your view the

32 (Pages 122 to 125)

Confidential - Subject to Protective Order

Page 126

1 analysis is the same whether the study is
2 done for purposes of litigation versus
3 done to be published in peer-reviewed
4 literature?
5       A.   Could be.
6       Q.   Doctor, did you review any
7 of the expert reports in this litigation
8 of Dr. Austin?
9       A.   Yes, I did.
10      Q.   Okay.  Were those listed on
11 your disclosure of materials reviewed?
12      A.   I don't know.
13      Q.   I take it they should have
14 been?
15           MS. BEREZOFSKY:  I think
16      they were.  I think you got them.
17      And I think if you want to show
18      him the document which identifies,
19      you know, the things that he
20      reviewed, I think you'll find that
21      they're on there.  So rather than
22      asking him a question about a
23      multitude of things that he
24      reviewed, why don't you just show

Page 127

1 him.
2 BY MS. FUJIMOTO:
3       Q.   What reports or materials by
4 Dr. Austin did you review?
5       A.   You'd have to give me a list
6 and show me and then I would know.  I
7 can't -- there were so much material I
8 reviewed that I just couldn't answer your
9 question.
10      Q.   Okay.  Well, that's really
11 the point of my question.  That's why I'm
12 not showing you something asking you
13 particulars about it.  So I guess let me
14 back up.
15           Do you recall which reports
16 or materials you reviewed that were by
17 Dr. Austin?
18      A.   I couldn't name the titles
19 of them for you, no.  But I did review
20 some papers and reports by Dr. Austin,
21 yes.
22      Q.   Thank you.
23           And that would be reports in
24 this litigation, as opposed to published

Page 128

1 articles?
2       A.   Well, I reviewed both.
3       Q.   Doctor, if you would go back
4 to your report, which I've marked as
5 Exhibit No. 2.
6       A.   Thank you.
7       Q.   If you will turn to page 3,
8 and in particular paragraph 4 under
9 "Summary of Opinions"?
10      A.   Page 2.
11      Q.   Page 3, paragraph 4, under
12 "Summary of Opinions."
13      A.   Yes.  Right.
14      Q.   And you say:  "It is my
15 opinion that the reduction in breast
16 cancer recently reported and correlated
17 with the decline in HRT use adds to the
18 argument that HRT is one of the causes of
19 breast cancer."
20           Do you see that?
21      A.   Yes.
22      Q.   And are you referring to
23 Ravdin and Clarke there, the data from
24 those two authors?

Page 129

1       A.   Yes, Ravdin and Clarke.
2       Q.   Okay.
3       A.   And -- yes.
4       Q.   Okay.  And what did you mean
5 "adds to the argument"?
6       A.   My point that I've been
7 trying to make with your previous
8 questions is that this kind of
9 correlative study is usually done -- or
10 if I would have done it, I would have
11 been thinking about disconfirming the
12 hypothesis of an association between
13 hormone replacement therapy and breast
14 cancer, but it adds -- it turned out in a
15 way that it adds to supporting that
16 hypothesis.
17      Q.   So it adds to the hypothesis
18 that there's a relationship between HRT
19 use and breast cancer?
20           MS. BEREZOFSKY:  Object to
21      form.
22           THE WITNESS:  Correct.
23 BY MS. FUJIMOTO:
24      Q.   What in your view, in

33 (Pages 126 to 129)

Confidential - Subject to Protective Order

Page 130

1 anything, does it say about the nature of
2 that relationship?
3      A.    It suggests that the risk
4 probably starts very shortly after
5 starting the hormone replacement therapy,
6 and ends fairly quickly after stopping.
7      Q.    And do you know whether that
8 is consistent or inconsistent with
9 epidemiologic data?
10      MS. BEREZOFSKY:  Objection.
11 You can answer.
12      THE WITNESS:  Which
13      epidemiological data are you
14      referring to?
15 BY MS. FUJIMOTO:
16      Q.    Any of it, the body of
17 evidence out there.
18      MS. BEREZOFSKY:  Objection.
19 You can answer.
20      THE WITNESS:  I feel it is
21      not inconsistent with the body of
22      evidence.
23 BY MS. FUJIMOTO:
24      Q.    And is this correlation

Page 131

1 between HRT use and a specific type of
2 breast cancer?
3      A.    Yes.  Mostly epidemiological
4 data suggests that the risk is for
5 estrogen receptor positive, and also
6 lobular cancer.
7      Q.    And what is your opinion
8 about the mechanism by which there is
9 that relationship, or are you not
10 offering a mechanism opinion?
11      A.    I'm not going to offer a
12 mechanism opinion.
13      Q.    Okay.  Do you know who
14 Dr. Christopher Li is?  L-I.
15      A.    L-I.  I've never met him.
16      Q.    Have you reviewed his
17 publications?
18      A.    I have.
19      Q.    Is he a well-respected
20 epidemiologist?
21      A.    You know, I couldn't answer
22 that question.
23      Q.    Are you familiar with his
24 article in 2006 where he evaluated six

Page 132

1 studies and observed that five of them
2 did not show an increased risk of ductal
3 cancer with HRT use?
4      MS. BEREZOFSKY:  I'm going
5      to object to the form.  Which
6      article are you referring to?
7      MS. FUJIMOTO:  If he doesn't
8      know, he can ask me.  He may know.
9      He seems to know quite a bit about
10      the epi studies.
11      THE WITNESS:  I would like
12      you to show me the article.
13 BY MS. FUJIMOTO:
14      Q.    Are you familiar with it, or
15 you can't think of it right now?
16      A.    I read it.  But I read so
17 many, that if it's not in front of me, I
18 can't give the most accurate answer.  And
19 I know you want me to do that, so that my
20 -- your discovery is complete and we're
21 both comfortable that I'm telling you
22 everything that I might use in court.
23      Q.    Do you know whether the
24 incidence of invasive ductal breast

Page 133

1 cancer went down, remained constant, or
2 went up between 1987 and 1999?
3      A.    I'm not familiar with that.
4      Q.    Are you familiar with
5 whether combination hormone therapy use
6 went down, went up, or remained constant
7 during that same period of time?
8      A.    I believe it went up.
9      Q.    If you go back to your
10 report on page 7, paragraph 6; and,
11 again, you reference the Clarke and
12 Ravdin papers in paragraph 6; is that
13 correct?
14      A.    That is correct.
15      Q.    Are you relying at all for
16 that statement, are you relying at all on
17 anything published by Dr. Austin or
18 Dr. Li?
19      MS. BEREZOFSKY:  Objection.
20      What statement are you referring
21      to?
22 BY MS. FUJIMOTO:
23      Q.    "Most recently, studies of
24 large breast cancer databases have found

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 134

1  that after the publication of the WHI
2  study, the incidence of breast cancer in
3  postmenopausal women dropped
4  substantially."
5       A.   I'm relying on the two that
6  I referenced.
7       Q.   And then you say at the end
8  of that paragraph:  "This pattern closely
9  matches the fall in the rate of
10 endometrial cancer after doctors stopped
11 prescribing estrogen replacement therapy
12 to women with intact uteri in response to
13 case-control studies showing that
14 estrogen increased the risk of
15 endometrial cancer."
16      Do you see that?
17      A.   Yes.
18      Q.   Was there a precipitous drop
19 in endometrial cancer rates that
20 correlated with prescriptions of
21 estrogen?
22      A.   It wasn't precipitous
23 because the decline in the abandonment of
24 unopposed estrogen in women who had not

Page 135

1  been hysterectomized did not drop
2  precipitously.  It fell off more
3  gradually.
4       Q.   So it's not similar in that
5  way, right?
6       A.   It's not similar because --
7  probably because the drug utilization
8  pattern, the abandonment of the unopposed
9  estrogen was a more gradual falloff.
10      Q.   And so the decline in the
11 incidence of endometrial cancer did not
12 drop off as precipitously as what was
13 shown by Ravdin and Clarke; is that what
14 you're saying?
15      MS. BEREZOFSKY:  Objection.
16 You can answer.
17      THE WITNESS:  Yes, that's
18 true.  And there's another
19 difference, and that is that the
20 risk of endometrial cancer
21 persists -- it persisted as long
22 as five years after stopping.
23 BY MS. FUJIMOTO:
24      Q.   Did you publish an article

Page 136

1  in 1985 that actually showed that the
2  risk persisted up to ten years after
3  discontinuation of estrogen use?
4       A.   Please, I need to see the
5  article.
6       Q.   Sure.
7       MS. FUJIMOTO:  I'll mark as
8  Exhibit No. 7 to the deposition an
9  article in the New England Journal
10 of Medicine dated October 17,
11 1985.
12          - - -
13      (Whereupon, Deposition
14 Exhibit Stolley-7, "Risk of
15 Localized and Widespread
16 Endometrial Cancer in Relation to
17 Recent and Discontinued Use of
18 Conjugated Estrogens" (Shapiro, et
19 al) New England Journal of
20 Medicine, Vol. 313, No. 16,
21 10-17-95 969-972 BURKM208-000531 -
22 BURKM208-000534, was marked for
23 identification.)
24          - - -

Page 137

1
2  BY MS. FUJIMOTO:
3       Q.   And Doctor, you are one of
4  the authors, correct?
5       A.   That's correct.
6       Q.   And this is assessing the
7  risk of endometrial cancer in relation to
8  recent and discontinued use of conjugated
9  estrogens?
10      A.   That's correct.
11      Q.   Okay.  And in the abstract
12 portion towards the end, you say:  "The
13 data also suggest that women who have
14 taken conjugated estrogen for one or more
15 years remain at increased risk for at
16 least 10 years after they discontinue
17 use," correct?
18      A.   That's correct.
19      Q.   And so in that way, the
20 endometrial and estrogen relationship
21 differed from what you're saying is the
22 relationship between HRT and breast
23 cancer?
24      MS. BEREZOFSKY:  Objection.

35 (Pages 134 to 137)

Confidential - Subject to Protective Order

Page 138

1       THE WITNESS:  Yes.
2   Different compounds.
3   BY MS. FUJIMOTO:
4       Q.    And different tissue, right,
5   organ?
6       A.    Well, different organ, as
7   well.
8       Q.    Okay.  If you would go back,
9   Doctor, to your report marked as Exhibit
10  No. 2 and look at paragraph 7 on page 7,
11  and you state that "Alternative
12  explanations to account for the results
13  of the ecological, case-control and
14  longitudinal randomized results have
15  lacked explanatory power and
16  plausibility."
17       Do you see that?
18      A.    Yes.
19      Q.    What do you mean by "lack of
20  power and plausibility"?
21      A.    The contrary studies have
22  been small and lack explanatory power,
23  often conjecture.
24      Q.    Have there been studies of

Page 139

1   alternative explanations?
2       A.    No.  I don't know of any
3   particular study, but there have been
4   commentaries and letters.
5       Q.    Have you done any studies to
6   consider or investigate other alternative
7   explanations?
8       A.    No, I haven't.
9       Q.    And in formulating your
10  opinions in this litigation, did you
11  consider potential alternative
12  explanations?
13      A.    I did.
14      Q.    Which ones?
15      A.    Ones concerning the possible
16  increased incidence and decreased
17  incidence followed by a decrease due to
18  screening was probably the major one I
19  considered.
20      Q.    Okay.  And what did you do
21  to investigate whether screening or
22  changes in screening behavior could be
23  the -- as reasonable an explanation for
24  this -- these trend correlations?

Page 140

1       MS. BEREZOFSKY:  Objection.
2   Mischaracterizes the witness'
3   testimony.  You can answer it.
4       THE WITNESS:  I looked for
5   literature to support that
6   alternative explanation, and I
7   couldn't find any with data
8   addressing it.
9   BY MS. FUJIMOTO:
10      Q.    Okay.  What kind of data did
11  you look for?
12      A.    Epidemiologic studies.
13      Q.    Pertaining to what?
14      A.    Pertaining to trying to
15  explain the rise and fall of breast
16  cancer as correlated with the rise and
17  fall of the use of combination hormone
18  replacement therapy.
19      Q.    Okay.  Well, we know from
20  your prior testimony that there are data
21  and studies out there showing the changes
22  in screening behavior influence rates or
23  incidence of diagnosis of disease, right?
24      A.    True.

Page 141

1       Q.    Yes.  And we've also
2   discussed the fact that you're familiar
3   with the studies that show that women on
4   HRT, while they're on it, have better
5   screening behaviors or screen more often,
6   right?
7       A.    That's true.
8       Q.    And that that influences
9   breast cancer diagnosis and, in fact,
10  positively influences mortality, right?
11      A.    Probably.
12      Q.    And we also know that you
13  didn't go and look for data regarding
14  mammography rates or use during this
15  period of time, right?
16      MS. BEREZOFSKY:  Objection.
17      THE WITNESS:  You're asking
18  me if I did any independent
19  investigations, and the answer is
20  no.
21  BY MS. FUJIMOTO:
22      Q.    Did you go and look --
23      A.    I looked in the literature.
24      Q.    Okay.  Did you look in the

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 142

1  literature for data pertaining to rates
2  of mammography use over the last five
3  years?
4        A.    As I said, I didn't do an
5  independent investigation, but I looked
6  to see if any had been published.
7        Q.    Okay.  And you didn't see
8  any?
9        A.    Not directly saying as an
10  alternative explanation.
11        Q.    Did you check the Morbidity
12  and Mortality Weekly Report?
13        A.    No.
14        Q.    Did you check any of the,
15  you know, SEER database, or any other
16  statements from other organizations that
17  might report on population data?
18        A.    I tried to find data that
19  was -- which gave alternative
20  explanations, and I was unable to find
21  articles specifically addressing that.
22        Q.    Did you check the CDC, any
23  publications by the CDC?
24        A.    I don't know what you mean

Page 143

1  by "check."  I tried to search for other
2  explanations, and I didn't find -- I
3  didn't find any addressing this
4  specifically.
5        Q.    Okay.  And I guess what I'm
6  -- you went on line and did a search with
7  keyword searches?
8        A.    No.  I -- no, I didn't do
9  that.
10        Q.    Okay.  How did you go and
11  look for data regarding mammography, or
12  screening, to assess whether that could
13  be a reasonable alternative explanation
14  for the Ravdin and Clarke findings?
15        A.    I didn't do -- once again, I
16  didn't do independent analysis, but I
17  used my -- my main source was up-to-date,
18  which is a large data source which is
19  revised every three months, and did a
20  search under breast cancer and they
21  listed hormone replacement therapy as one
22  of the risk factors, and they had a list
23  of references at the end, and they had no
24  reference to other explanations.

Page 144

1        Q.    Okay.  Did you, when you did
2  this up-to-date search, did you plug in
3  key words to look for data on screening
4  and mammography and breast cancer?
5        A.    I didn't have to.  It came
6  up.
7        Q.    Okay.
8        A.    It came up under the breast
9  cancer article.
10        Q.    Okay.  Are you saying there
11  were no publications regarding the rates
12  of mammography in this country?
13        A.    No.
14        Q.    Over the last five years?
15        A.    No.  I'm not saying that.
16  I'm saying nobody applied it to try to
17  explain the rise and fall of breast
18  cancer incidence.
19        Q.    Are you -- have you seen any
20  publications from the North American
21  Menopause Society regarding the Ravdin
22  and Clarke data?
23        A.    No.
24        Q.    And possible alternative

Page 145

1  explanations?
2        A.    No.
3        Q.    What about International
4  Menopause Society?
5        A.    No.
6        Q.    What about the National
7  Cancer Institute?
8        A.    I'm pretty well hooked into
9  National Cancer Institute by computer,
10  and didn't see any reports that they had
11  providing an alternative explanation.
12        Q.    And did you consider any
13  other potential alternative explanations
14  to look for other than screening?
15        A.    It was hard for me to think
16  of anything other than screening as an
17  explanation.
18        Q.    So you agreed --
19        A.    As a possible explanation.
20        Q.    Okay.  So you agreed that it
21  is a possible explanation?
22        A.    It's possible, but there's a
23  lot of evidence making it implausible.
24        Q.    I guess my question is:  How

Golkow Technologies, Inc. - 1-877-370-DEPS

Page 146

1  can you say that when you weren't able to
2  assess screening behavior in the same
3  population over the same period of time
4  and determine whether there was a
5  correlation there?
6       A.   Well, I don't think -- I
7  don't think anybody could have done that.
8  You said -- I didn't have access to that
9  data in these two populations that were
10  used, SEER and Kaiser.
11      Q.   Doctor, were you a member of
12  the Institute of Medicine Committee on
13  the Relationship Between Oral
14  Contraceptives and Breast Cancer between
15  1989 and 1991?  It's on page --
16      A.   I think I listed it.
17      Q.   Page 4 of your CV --
18      A.   I don't think I have my CV,
19  although I remember you gave it to me.
20      Q.   There you go.  I'm sorry.  I
21  have it turned to the page.
22      A.   It's not paginated.  It
23  should be paginated.
24           Yes, I was.

Page 147

1       Q.   And was that Institute of
2  Medicine Committee, was that a gathering
3  of scientists in different fields of
4  expertise to look at a particular
5  scientific question?
6       A.   It was.
7       Q.   Okay.  And am I right that
8  the purpose of the collection of these
9  scientists was to gather and assess all
10  of the data regarding oral contraceptives
11  and breast cancer, up to that point in
12  time?
13      A.   That's correct.
14      Q.   Okay.  And you also included
15  hormone therapy in your evaluation
16  assessment, when you worked on that
17  committee; did you not?
18      A.   I can't recall.
19      Q.   You can't recall.  And was a
20  book published by the committee?
21      A.   A monograph was probably
22  published.
23      Q.   Okay.  And I'll probably end
24  up marking this because I don't have a

Page 148

1  whole copy of the book?
2       A.   That is not the whole copy?
3       Q.   Pardon me?
4       A.   That's not the whole copy.
5       Q.   It is.  I mean, I don't have
6  a hard copy to just give you rather than
7  the book, but I guess we can mark the
8  book.
9           MS. BEREZOFSKY:  Is the book
10          going to become part of the
11          record?
12          MS. FUJIMOTO:  Yes.  We'll
13          do Exhibit No. 8, and I'll ask the
14          court reporter to make copies and
15          so forth.
16               - - -
17          (Whereupon, Deposition
18      Exhibit Stolley-8, "Oral
19      Contraceptives & Breast Cancer"
20      Institute of Medicine, National
21      Academy Press 1991 (185 pages),
22      was marked for identification.)
23               - - -
24  BY MS. FUJIMOTO:

Page 149

1       Q.   What I marked as Exhibit No.
2  8 is a book called "Oral Contraceptives &
3  Breast Cancer," Institute of Medicine.
4  And, Doctor, if you could take a quick
5  look at that and tell me whether that is
6  a book prepared by the committee on which
7  you sat for the Institute of Medicine.
8       A.   Yes, as I recall.
9       Q.   I think you are listed there
10  as on the committee?
11      A.   I recall the book.  I'm on
12  the committee.
13      Q.   Okay.
14      A.   I'm on the committee.  And
15  they have an asterisk next to my name --
16      Q.   Okay.
17      A.   -- because I'm a member of
18  this.
19      Q.   Okay.
20          MS. BEREZOFSKY:  Before you
21  question him about it --
22          MS. FUJIMOTO:  Sure.
23          MS. BEREZOFSKY:  -- I don't
24  believe this was part of the

38 (Pages 146 to 149)

Confidential - Subject to Protective Order

Page 150

1    48-hour disclosure.
2         MS. FUJIMOTO:  I don't know
3    if it was or not, but he clearly
4    couldn't remember whether or not,
5    it was published in a book or not
6    so I'm using it to refresh his
7    memory.
8         MR. HAVERTY:  He said the
9    monograph was published.  That's a
10   monograph.
11        MS. FUJIMOTO:  Well, I got
12   the book.  I'm showing it to him
13   now.  Do you not want me to show
14   it.
15        MS. BEREZOFSKY:  I reserve
16   my right to object.
17        MS. FUJIMOTO:  I can do it a
18   better way.  We can do it as an
19   impeachment document.  We can do
20   it that way.
21        Can you give me the book
22   back, Doctor.
23        THE WITNESS:  Oh, yes.
24   BY MS. FUJIMOTO:

Page 151

1         Q.   All right.  When you sat on
2    this committee for the Institute Of
3    Medicine, did the committee go back and
4    review all of the laboratory animal,
5    ecological and epidemiologic studies that
6    were available up to 1989?
7         A.   I believe we did, but that's
8    17 years ago you're asking me about, so I
9    don't remember much about the details of
10   our search, but the book wouldn't show
11   it.
12        Q.   Right.
13        And is the book a
14   culmination or a summary of the
15   conclusions that were reached by the
16   committee?
17        A.   Well, no.  I think the book
18   isn't just conclusions.  It's also
19   analysis of evidence, and at the end, or
20   in the executive summary, they usually
21   list conclusions.
22        Q.   And the committee -- so the
23   book was published in 1991, correct?
24        A.   I can't see the --

Page 152

1         Q.   Okay.  Well, I'll represent
2    to you that it's 1991.
3         A.   Okay.
4         Q.   And so as of 1991, am I
5    correct that the committee observed that
6    "Ecological studies correlating trends in
7    breast cancer incidence rates with trends
8    in oral contraceptive use have not been
9    informative in the past and are unlikely
10   to be so in the future"?
11        A.   You have to show me that
12   statement.
13        Q.   Bottom of page 28.
14        A.   Yeah.  They say "except
15   possibly in developing countries where
16   the underlying breast cancer rates are
17   low."
18        Q.   Because in developed
19   countries where the breast cancer rates
20   are high, that makes ecological data even
21   of less utility, right?
22        A.   Well, it shouldn't,
23   actually.  I'm not sure I agree with
24   this.

Page 153

1         Q.   Okay.  If you turn to page
2    19.
3         A.   Yes.
4         Q.   In fact, let me do it so we
5    can do it a little more quickly.  Top of
6    the page there, it's the first full
7    paragraph.  Your committee, the Institute
8    of Medicine Committee, says:  "Ecological
9    data describing breast cancer incidence
10   and mortality...are sparse, and they are
11   likely to be of limited utility in
12   countries with high rates of breast
13   cancer."
14        Do you see that?
15        A.   Yes.
16        Q.   Okay.  You're telling me you
17   disagree with that now?
18        A.   Yeah, I do.
19        Q.   Do you agree that as of
20   1991, that there was a virtual absence of
21   definitive information about the
22   pathological processes of breast
23   carcinoma?
24        A.   No, I'm not going to be

Confidential - Subject to Protective Order

Page 154

1  testifying on pathology, so I'm not -- I
2  know a lot of work was done on the
3  pathology of breast cancer going way back
4  to the 1920s, but that's not my area of
5  expertise.
6      Q.    A case --
7      A.    I know there were thousands
8  of publications.  So to say it was sparse
9  is -- sounds very unlikely to me, but,
10  again, I'm not an expert.
11      Q.    Do you agree or disagree
12  with the statement that "the reason for
13  the probable lack of utility of
14  ecological data is that in developed
15  countries, it is unlikely that any
16  influence on breast cancer rates would be
17  large and clear enough to be
18  distinguished from other influences"?
19      A.    Well, that's conjecture, and
20  I guess I don't agree with it.
21      Q.    Did you agree or disagree
22  with the statement that "case-control
23  studies have been proven reliable guides
24  when the detected relative risks are

Page 155

1  moderate or large, but a problem emerges
2  when the relative risks are small or
3  marginal"?
4      A.    I think that the problem of
5  small relative risks and marginal
6  relative risks haunts all case-control
7  studies of anything that they're
8  studying, not just in this case.
9      Q.    Do you agree or disagree
10  that by 1991, "The effect of various sex
11  steroid hormones on the occurrence of
12  mammary cancer had been studied in a
13  variety of species" of animals, including
14  "mice, rats, and beagle dogs"?
15      A.    I agree with that.
16      Q.    Do you agree or disagree
17  that the complexity of regulation of
18  breast physiology may exceed that of any
19  other hormonal target tissue?
20      A.    I don't know if that's true.
21  My guess is it's probably not.  It's just
22  that they looked harder at the physiology
23  of the breast and have found it -- found
24  it to be complex.  My guess is that if

Page 156

1  you look at the physiology of the
2  pituitary gland or the adrenal gland or
3  various other processes, you will find
4  them, especially as we develop new
5  technologies and new methods, probably
6  also are very complex.
7      Q.    Do you agree or disagree
8  that by 1991, the effects of both
9  classical hormones and a variety of
10  growth hormones on growth and function of
11  breast tissue and cells had been
12  extensively studied?
13      A.    I'm not sure what that
14  statement means.  Does that mean
15  epidemiologically, or physiologically, or
16  toxicologically?  I'm not sure.  It's
17  such a broad statement.
18      Q.    Do you believe that by 1991,
19  the effects of hormones in breast tissue
20  had been extensively studied in animals?
21      A.    Yes and no.  In the
22  International Agency Against Cancer, the
23  WHO branch devoted to cancer known as
24  IARC and their review of -- when they

Page 157

1  call -- they decide that the combination
2  of estrogen and progestin is a definite
3  human carcinogen, when they get to the
4  animal studies, they say they're
5  remarkably sparse.  So there are definite
6  gaps in the knowledge.
7      Q.    So is your answer no, it
8  wasn't extensive by 1991?
9      A.    My answer is not -- some
10  hormones have been extensively studied,
11  but others, for example, combinations of
12  hormones, had not been.
13      Q.    Do you know how many studies
14  on combination -- exogenous combination
15  hormone use had been done by 1990?
16      A.    Do you mean in animals or
17  humans?
18      Q.    Let's break it up.
19          Do you know how many animal
20  studies had been done relating to
21  hormones and breast cancer, exogenous
22  hormones?
23      A.    I know from my service on
24  the Depo Provera board of inquiry that

Confidential - Subject to Protective Order

Page 158

1 there was considerable animal toxicology,
2 single agents, but very little on
3 combination agents.
4     Q.   Do you know by 1990, how
5 many epidemiologic studies had been done
6 regarding exogenous combination hormone
7 use and breast cancer?
8     A.   You mean oral
9 contraceptives?
10     Q.   Yes.
11     A.   Combinations?
12     Q.   We can go with -- if you
13 want to break up oral contraceptives and
14 hormone therapy, we can do that.
15     A.   There were a lot of
16 epidemiological studies on oral
17 contraceptives and I did quite a few
18 myself.  I think there were very few on
19 the combination as hormone replacement
20 therapy because it was not a licensed
21 drug, at that time, as I recall, and
22 there was a lot of off-label use.  But
23 the IARC statement remarks on the paucity
24 of animal toxicological studies.  In

Page 159

1 fact, in declaring it a human carcinogen,
2 they rely on the human epidemiological
3 studies.
4     Q.   Okay.  So does that mean
5 there were human epi studies on exogenous
6 hormone therapy use by 1990?
7     A.   There had been, for estrogen
8 alone, yes.
9     Q.   No, I'm talking combination.
10     A.   No.  Combination studies, I
11 think, were not frequent before 1990.
12     Q.   Do you have an idea of how
13 many there were?
14     A.   I don't.
15     Q.   Have you gone back and
16 looked?
17     A.   I have.  I have been sent by
18 the lawyers involved in this case with
19 what I think is a fairly complete list of
20 epidemiological studies, both supporting
21 the relationship and those contesting it.
22     Q.   And so the epidemiologic
23 studies that you reviewed in forming your
24 opinion were based on a list sent by the

Page 160

1 plaintiffs' lawyers?
2     A.   And also my own following of
3 the problem.  You have to know that my
4 first published epidemiological papers
5 dealt with oral contraceptives, and I
6 published over the next 25 years, I
7 guess, on oral contraceptives, and so
8 it's literature I try to follow.
9     Q.   Okay.  We'll go over some of
10 that in a minute here.  And so, at least
11 by 1990, there was quite a number of
12 studies on oral contraceptives and breast
13 cancer risk?
14     A.   Yes.
15     Q.   And oral contraceptives are
16 exogenous hormones that involve the
17 combination use of an estrogen and a
18 progestin, correct?
19     A.   That's correct.  Used to
20 prevent fertility, rather than to relieve
21 symptoms of menopausal women.
22     Q.   They're used by women in
23 their reproductive years?
24     A.   Yes.

Page 161

1     Q.   Younger women?
2     A.   Yes.
3     Q.   Doctor, going back to some
4 basics, before we start talking about
5 your studies, some basic epidemiologic
6 principles, we've talked about these
7 ecological or demographic studies.  The
8 other type of studies are epidemiologic
9 studies, which we mentioned earlier would
10 be cohort studies, case-control studies
11 and controlled trials, randomized
12 controlled trials; is that right?
13     A.   Yes.  And also case reports.
14     Q.   Is the randomized controlled
15 trial the highest form of epidemiologic
16 study?
17         MS. BEREZOFSKY:  Object to
18     form.
19 BY MS. FUJIMOTO:
20     Q.   The experiment?
21     A.   It is usually considered, if
22 it can be done, the most powerful
23 evidence and has the greatest explanatory
24 power.

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 162

1    Q.   And is that because the
2  investigator can control the environment
3  and has more control over things like
4  confounding and bias and that type of
5  thing?
6    A.   No.  I would say the main
7  reason has to do with the randomization,
8  which, in a typical experiment, assures
9  comparability of the groups being
10  compared with the exception of the drug
11  being tested, if you're doing a drug
12  trial.  And, therefore, alternative
13  explanations of the findings become less
14  likely because baseline characteristics
15  that might affect prognosis or etiology
16  are approximately equal in both groups.
17    Q.   Okay.  So then, the other
18  type of study, the observational study,
19  which would include cohort or
20  case-control studies, those, by their
21  nature, are -- you don't have control
22  over the drug exposure or assignment or
23  anything like that, right?
24       MS. BEREZOFSKY:  Objection.

Page 163

1       You can answer.
2       THE WITNESS:  That's
3       correct.  And so to try to assure
4       comparability, adjustment
5       techniques, statistical
6       techniques, to deal with
7       postulated, confounding variables
8       are commonly used.
9  BY MS. FUJIMOTO:
10    Q.   Okay.  So although by design
11  a case-control or cohort study can be
12  subject to confounding or bias, the
13  investigators have some tools they can
14  use, right, to try to adjust for those
15  things?
16    A.   That's correct.
17    Q.   Okay.  And you would hope
18  that a good investigator that ends up
19  getting published in a peer review
20  journal has done that type of adjustment?
21    A.   Well, they usually present
22  it.
23    Q.   Okay.  And the results of a
24  study are often expressed by either a

Page 164

1  relative risk or an odds ratio; is that
2  right?
3    A.   Yes, I think you can think
4  of them synonymously.
5    Q.   The odds ratio is kind of an
6  estimate?
7    A.   Of the relative --
8    Q.   Of the relative risks?
9    A.   To simplify things, I like
10  to just say relative risk, even though it
11  upsets some purist statisticians.
12    Q.   I like to use that term,
13  too.  So I'll use relative risk, as well.
14  What does it mean for a relative risk to
15  be statistically significant?
16    A.   I'm not sure.  It's such a
17  broad question, how I could answer that.
18  I would have to start by talking about
19  the concept of the statistical
20  significance generally and then how it
21  applies to relative risk, I think.
22    Q.   Do investigators test for
23  statistical significant to determine
24  whether or not there is sufficient

Page 165

1  confidence that the number is real and
2  not likely due to chance?
3    A.   They do.  The contribution
4  of statistical significance especially at
5  the .05 level is quite arbitrary.  It was
6  chosen by R. A. Fisher because he thought
7  it sounded okay, and there's no
8  theoretical justification for it.  So
9  that we can't say that's something is
10  proven because it's statistically
11  significant, and it's not true if it's
12  not statistically significant.  We can
13  only say that the role of chance
14  explaining the finding is greater if you
15  don't achieve statistical significance.
16    Q.   And so -- but statistical
17  significance is a generally-accepted
18  epidemiologic method that is always
19  reported in the peer reviewed literature
20  when study data are reported, right?
21    A.   That's true, but it's only a
22  guide.  There's nothing magical about
23  .05.
24    Q.   And the confidence interval

Confidential - Subject to Protective Order

Page 166

1    that is reported with a relative risk,
2    which I guess drives statistical
3    significance, is that the range within
4    which the study investigator thinks the
5    true number may fall?
6            MS. BEREZOFSKY:  Objection.
7    Go ahead.
8            THE WITNESS:  That -- not
9    just a study investigator.  That's
10   a pretty good explanation of what
11   it means.  If the confidence
12   interval includes 1, then
13   statistical significance at the
14   .05 level, if that's what they're
15   using, has not been achieved.  If
16   it's greater than 1, excludes 1,
17   then it -- it will be
18   statistically significant at the
19   .05 level if that's what they're
20   using, .01.  And the exact -- and
21   the exact p-value can be
22   calculated in a case-control
23   study.
24   BY MS. FUJIMOTO:

Page 167

1        Q.    And the number 1 is used to
2    reflect whether or not there is a
3    difference between the two groups that
4    are being studied, right?
5        A.    That's correct.
6        Q.    And so if the relative risk
7    touches 1 or is 1, that means there
8    really wasn't a difference between the
9    two groups that are being studied?
10       A.    No, that's not true.  There
11   could be a difference, but the difference
12   may not achieve .05; it might be .07.
13   And if there's other evidence, that could
14   be interpreted as a -- as supportive,
15   because, once again, .05 is not a magic
16   number.  There's no theoretical
17   justification for using it.  And there
18   are some situations where you might be
19   looking at a drug where the consequences
20   of making a mistake and declaring the
21   drug innocent are so dire that you would
22   set your confidence interval less strict,
23   and that would be considered entirely
24   reasonable by most epidemiologists and

Page 168

1    statisticians.
2        Q.    But you --
3        A.    You are accepting the role
4    of chance as being the alternative
5    explanation.  You're willing to have more
6    leeway because they are so afraid of
7    making an error of comission and allowing
8    something on the market or to be taken.
9        Q.    But if you look at the
10   peer-reviewed literature, Doctor --
11       A.    Yeah.
12       Q.    -- isn't the .05 level used
13   in 99 percent of the studies that are
14   published?
15       A.    It's used, but the
16   interpretation of it is -- can be quite
17   variable.
18       Q.    That's fair.
19           But it's a standard method
20   that's used?
21       A.    It's a convention with no
22   supporting theoretical rationale, but it
23   is a convention, and it's misunderstood,
24   the misunderstanding being that if you

Page 169

1    achieve statistical significance, then
2    this is a true thing, and if you don't,
3    even if you're at .06, you're close, then
4    it's false and can be dismissed.  And I
5    could give you a number of examples where
6    that error has led to a lot of trouble,
7    but I'm not going to do it.
8        Q.    Okay.  And by convention in
9    published epidemiological studies if the
10   relevant risk is 1 or the confidence
11   interval includes 1, that is considered
12   to show no effect?
13       A.    No.  Once again, I can't
14   agree with that.  It depends on the
15   situation and if the relative risk is
16   very high and the bottom of a confidence
17   interval is .99, a lot of people will
18   say, well, it's very close; and we have
19   this, this, and this, all of which point
20   to this being a culprit, and so we're not
21   going to throw this out.
22       Q.    So even with scientific
23   data, there can be reasonable differences
24   of opinion or subjective evaluations of

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 170

1 what the data means?
2     A.    That's the nature of
3 science, and it is by dissent and
4 challenge that science evolves, and
5 dissent and challenge should be welcomed.
6     Q.    If you go to what I marked
7 Exhibit No. 4, which is your "Foundations
8 of Epidemiology" text --
9     A.    What page is that?
10     Q.    Let's look at page 267,
11 please, towards the end and down at the
12 bottom of the summary.
13     A.    The last paragraph?
14     Q.    Uh-huh.
15     A.    Uh-huh.
16     Q.    Okay.  And basically the
17 statement -- second to the last statement
18 where you say:  "Unfortunately, it is not
19 yet possible to quantitate the degree of
20 probability achieved by all the evidence
21 for a specific hypothesis about the cause
22 of a disease, so an element of
23 subjectivity remains."
24        Is that what you were

Page 171

1 talking about when you wrote that --
2        MS. BEREZOFSKY:  Object to
3     form.
4 BY MS. FUJIMOTO:
5     Q.    -- this idea of
6 subjectivity?
7     A.    It touches on that.  I
8 think, when we wrote this sentence, we
9 meant to include the totality of
10 evidence, and not just a single study.
11     Q.    Right.
12        And when you're looking at
13 the totality of evidence in evaluating
14 its meaning, there is subjectivity
15 involved, and scientists, reasonable
16 scientists, can have different opinions;
17 is that fair?
18     A.    Yes.  Subjectivity should
19 not mean that it's kind of idiosyncratic
20 or opinion -- opinionated, but, rather,
21 interpretation of the data can be open --
22 sometimes be open to varying
23 interpretations and explanations.
24     Q.    And all of those varying or

Page 172

1 different interpretations can be credible
2 and worth -- or reliable?
3     A.    No.  Usually if there's
4 three or four explanations, one of them
5 is going to be correct, eventually be
6 shown to be correct, or none of them will
7 be correct; or it could be that all of
8 them will be correct.
9     Q.    So you have to give weight
10 to all of them and test it out?
11     A.    You have to consider all
12 alternative explanations and welcome
13 them.
14     Q.    Do you remember giving a
15 keynote address called "Generations of
16 Misplaced Confidence"?
17     A.    Yes.
18     Q.    That was a really funny
19 piece, I'll have to tell you.
20     A.    I know.
21     Q.    And in that I notice you --
22     A.    It was a confused audience
23 the way I started off.
24     Q.    It was really funny, but

Page 173

1 you, towards the end, you reference or
2 quote Bertrand Russell.  Do you remember
3 that?
4     A.    I do.
5     Q.    And you quote him when he
6 says:  "When experts are not agreed, no
7 opinion can be regarded as certain by a
8 non-expert."
9     A.    Yeah, it was a bit sardonic.
10     Q.    Okay.  Still agree with
11 that?
12     A.    Yes, I think I do.
13     Q.    Okay.  If you go back to
14 Exhibit No. 4, page 200, if you would,
15 I'm going back to our discussion about
16 relative risk.
17        Is it correct that "The
18 magnitude of the relative risk reflects
19 the strength of" an "association"?  And
20 I'm looking at page 200, down at the
21 bottom.
22     A.    Yes.  I wrote -- I wrote --
23     Q.    You --
24     A.    I and my -- my co-author

Confidential - Subject to Protective Order

Page 174

1  wrote:  "The magnitude of the relative
2  risk reflects the strength of the
3  association," that is, "the greater the
4  relative risk, the stronger the
5  association."
6      Q.   Okay.  And then you go on to
7  kind of grade them and say:  "A relative
8  risk of 3.0 or more indicates a strong
9  association," and you talk about
10  cigarette smoking and lung cancer, right?
11      A.   Right.
12      Q.   Those relative risks,
13  though, were far higher than 3, were they
14  not?
15      A.   10, 12.
16      Q.   Okay.  And a relative risk
17  of 2, or, I guess, between 2 and 3, is
18  considered a moderate risk and you give
19  the example of a woman having a family
20  history of breast cancer, correct?
21      A.   Correct.
22      Q.   And so if you have a family
23  history of breast cancer, your increased
24  risk of between 2 and 3 is considered a

Page 175

1  moderate increase?
2      A.   Right.
3      Q.   And then "A relative risk,"
4  you say, "between 1.0 and 1.5 indicates a
5  weak association," correct?
6      A.   Yes.
7      Q.   And to be clear,
8  statistically-significant association
9  doesn't mean a causal relationship,
10  right?
11      A.   A statistic -- it doesn't --
12  it asks the weight of evidence, but just
13  because something is statistically
14  significant, you can't say it's causal
15  without other supporting evidence.
16      Q.   Okay.  And simply because
17  something has been designated as a risk
18  factor because there have been
19  associations reported, that doesn't
20  necessarily mean that there's a causal
21  relationship, correct?
22      A.   Well, it may.  It may mean
23  that there is a causal association, but
24  it's not necessarily the case.  Again,

Page 176

1  you need other kinds of supporting
2  evidence.
3      Q.   Okay.  And I think you
4  discuss that here.  If you go to page 255
5  of your book marked Exhibit No. 4, see
6  that?
7      A.   Yes.
8      Q.   And you say that "The
9  demonstration of a statistical
10  relationship between a disease and
11  biological or psychosocial characteristic
12  is but the first step in the
13  epidemiologic analysis of its etiology or
14  natural history."
15      Right?
16      A.   That's what it says.
17      Q.   And the second step then is
18  to try to find other data to explain the
19  meaning of the relationship; is that
20  right?
21      A.   "The second step is to
22  ascertain the meaning of the
23  relationship."
24      Q.   And you ascertain it by

Page 177

1  finding other types of data, right?
2      A.   You -- or the data may be
3  there.
4      Q.   And you go on to talk about
5  the things that can explain a statistical
6  association, correct?
7      A.   Correct.
8      Q.   You talk about artifact, and
9  does that just mean the relationship is
10  wrong or spurious?
11      A.   Yeah.  It's some sort of
12  artifact like change in nomenclature, or
13  something like that, might be confused,
14  and so the association is really
15  spurious, and there are better examples
16  of the spurious relationships.
17      Q.   Okay.  So if there are
18  errors in the conduct or design of the
19  study, that can introduce artifactual
20  errors?
21      A.   That's right.
22      Q.   Okay.  And if a study is
23  poorly designed or poorly conducted, it
24  doesn't matter how big it is, right, you

45 (Pages 174 to 177)

Confidential - Subject to Protective Order

Page 178

1    still can get a spurious result?
2        A.   It depends on how poor --
3    poor it is.  All studies have flaws.
4    Perfect studies don't exist in this
5    cosmos, but if the errors -- if the
6    errors are not crucial, then the study
7    can still be very informative.
8        Q.   What if the error results in
9    substantial confounding?
10       A.   With substantial
11   confounding, you would wind up with a
12   confused analysis.
13       Q.   Just because a study is
14   bigger doesn't make it better, if it
15   suffers from that problem, right?
16       A.   A large study, which means
17   it has considerable power, can have flaws
18   similar to small studies.
19       Q.   So some of the other
20   explanations for a statistical
21   association are it's artifactual; could
22   be an association of "interrelated but
23   non-causal variables," right?
24       A.   Correct.

Page 179

1        Q.   There can be "uncontrolled
2    confounding" that can explain it?
3        A.   Correct.
4        Q.   And then your last part is
5    that there really is "a causal or
6    etiological relationship," right?
7        A.   Correct.
8        Q.   And do you -- I have seen in
9    some of your prior testimony and in your
10   book you discuss it at length, but do you
11   still adhere to the Bradford Hill
12   criteria or at least use it as a guide in
13   determining causation?
14       A.   I use it as a guide, but I
15   would say that I probably rely more on
16   the revision of them as proposed by
17   Albert Evans in an article probably
18   written around 1989, which modernizes
19   them using -- especially in regard to
20   infectious diseases.
21       Q.   Okay.  And I think you -- do
22   you talk about that in your book --
23       A.   I think we did.
24       Q.   -- in '94?

Page 180

1        A.   I think we did.  Yeah, I
2    think we --
3        Q.   I think you do.
4        A.   I think we do.
5        Q.   Yes.  Evans, 1976?
6        A.   '76, Causation and Disease.
7        Q.   Okay.  All right.
8        A.   Well, that's the Henle-Koch
9    postulates revisited.  And he then wrote,
10   I think, an article on the Bradford Hill
11   criteria.
12       Q.   But in using the Bradford
13   Hill criteria, do you still agree that
14   one of the things you should look at is
15   strength of association?
16       A.   I do.
17            MS. BEREZOFSKY:  Object to
18       form.
19   BY MS. FUJIMOTO:
20       Q.   Consistency of the
21   association?
22       A.   Yeah.  By consistency,
23   Bradford Hill is a little vague.  What I
24   mean by consistency is that the finding

Page 181

1    can be replicated in different studies
2    and different populations and different
3    groups.
4        Q.   So the idea is looking at
5    the relationship in different ways with
6    different methods?
7        A.   And seeing if it's
8    consistent.
9        Q.   Okay.  And if there's a true
10   causal relationship, then when you look
11   at it in different ways and using
12   different techniques, you ought to be
13   able to see that association
14   consistently?
15       A.   Much of the time, yeah.
16       Q.   And so if there is a mix,
17   meaning some studies show a decrease,
18   some show no effect, some show an
19   increase, a mix of data, that means
20   there's an inconsistency, right?
21       A.   Yes, but if the
22   inconsistencies can be explained by study
23   design, then sometimes the inconsistency
24   can be disregarded because the study

Confidential - Subject to Protective Order

Page 182

1  design may be inadequate.  So even when
2  you look at consistency, you have to make
3  judgments about divergent results.
4      Q.   And then the other --
5  another component is specificity of the
6  association?
7      A.   Yes.  That is one that I no
8  longer adhere to because of the examples
9  of ionizing radiation and cigarette
10  smoking, which can produce diseases in
11  almost every organ system and tissue.
12  And so specificity -- if you accepted
13  specificity, then you wouldn't believe
14  ionizing radiation can cause cancer.
15      Q.   Okay.  When you use it,
16  then, or when it's listed and it's here
17  in your book --
18      A.   Right.
19      Q.   -- but when it's referenced
20  to specificity, is it more a question of
21  whether, you know, when you have the
22  cause -- when you have a disease, the
23  cause is usually present, and vise-versa?
24      A.   No.  I don't think that's

Page 183

1  what they mean by specificity.  If you
2  read -- if you read the article Bradford
3  Hill wrote, what he's saying is that if
4  the agent or suspected agent or cause is
5  found connected to 10 or 15 or 20 other
6  things and fails the specificity test, I
7  think he probably -- he lived a long
8  time, he died at age 91, but I think that
9  after seeing all that cigarettes could
10  produce, which is mainly his work, he
11  probably would abandon that, as well.
12      Q.   Okay.  Did you -- do you
13  recall your book "Investigating Disease
14  Patterns"?
15      A.   I certainly do.  It's
16  been remaindered in many book stores.
17      Q.   Okay.
18          MR. SCHACHTMAN:  $1.95.
19          THE WITNESS:  You're
20  breaking my heart.
21          MS. FUJIMOTO:  Is that all?
22          Are we on 9?  We are.  Here,
23  let me do this.
24          All right.  I'll just mark

Page 184

1  as Exhibit 9 to the deposition
2  just a couple of pages from your
3  text, "Investigating Disease
4  Patterns  The Science of
5  Epidemiology."
6          - - -
7          (Whereupon, Deposition
8  Exhibit Stolley-9, "Investigating
9  Disease Patterns The Science of
10  Epidemiology" (Stolley/Lasky)
11  Excerpts (cover page, 65-66), was
12  marked for identification.)
13          - - -
14  BY MS. FUJIMOTO:
15      Q.   And I'll ask you to look at
16  page 65 where you define specificity.  I
17  guess my question is:  Is that how you
18  still define it, or has it changed?
19      A.   This is the way we would
20  define it, but I think in the original
21  Bradford Hill paper, he didn't define it
22  quite that way.
23      Q.   Okay.  So you define it
24  as -- if the disease is present, the

Page 185

1  cause is usually present, or when, you
2  know, you're using -- when the cause is
3  there, you often find the disease
4  resulting?
5      A.   Right.
6      Q.   Okay.
7      A.   In a sense, the association
8  is usually found in different situations,
9  but where the disease is present and
10  there's a possibility of exposure to the
11  cause.
12      Q.   Okay.  And other causation
13  criteria include temporal sequence of
14  events, right?
15      A.   Right.
16      Q.   A dose-response
17  relationship?
18      A.   That, again, has to be
19  modified.  It's not always present.  But
20  it's often present, that is, the more
21  you're exposed to a toxic agent and the
22  higher the dose, then the more likely the
23  disease, especially if you see a
24  gradient.  But we now have examples where

47 (Pages 182 to 185)

Confidential - Subject to Protective Order

Page 186

1  that's not necessarily true.
2      Q.   Okay.  And another criteria
3  is biological plausibility?
4      A.   Yes.
5      Q.   The data taken together
6  should be consistent or make sense in a
7  way that's biologically plausible?
8      A.   Yes.  But, once again, there
9  have been strong associations and
10 diseases definitely related to agents
11 where the biology has fallen behind the
12 epidemiology, and sometimes it's still
13 not explained, and sometimes it's
14 explained ten years later, when the
15 biology and physiology catches up.
16          An example of that would be
17 the eosinophilia myalgia syndrome and
18 L-tryptophan where we know it was
19 contaminated and we know you had to have
20 the exposure, but they haven't been able
21 to find the toxin.
22     Q.   Okay.  Let me now ask you,
23 then, about your knowledge or familiarity
24 with the hormone therapy and breast

Page 187

1  cancer literature.  Okay?
2          Are you familiar with the
3  Trudy Bush review article that was
4  published in 2001?
5      A.   Yeah.  I haven't reviewed it
6  recently, but, Dr. Bush was in my
7  department.
8      Q.   Okay.  In fact, you
9  recommended that she be hired at your
10 institution, did you not?
11     A.   The way the department was
12 run, people were proposed for recruitment
13 and a vote was taken as to whether or not
14 that person should be recruited.  And
15 running a recruitment and promotion in as
16 democratic a fashion, the vote -- the
17 vote turned out in favor of recruiting
18 her, and I, therefore, represented the
19 department by recruiting her.
20     Q.   Okay.
21     A.   I should -- what I'm trying
22 to say is that I did not initiate that
23 recruitment.
24     Q.   Do you consider her a highly

Page 188

1  qualified or respected epidemiologist?
2      A.   She certainly is highly
3  qualified, and she is respected in some
4  quarters.  The observational studies that
5  she did have not tended to be confirmed,
6  so I don't think you lose respect for a
7  person for, you know, maybe going in the
8  wrong direction and then coming up with
9  things that other people can't confirm.
10 I have a high regard for her as a teacher
11 and a mentor of students.
12     Q.   Are you familiar with the
13 publication by the collaborative group on
14 hormonal factors and their meta analysis
15 of the collection of data from 51
16 epidemiologic studies looking at HRT and
17 breast cancer?
18     A.   You've have to show it to me
19 and I'll let you know.
20     Q.   Okay.  Let me ask you this
21 first, because I want to explore your
22 knowledge.  Looking at the body of
23 epidemiologic evidence on HRT and breast
24 cancer, would you agree that there were

Page 189

1  some studies reporting a decrease in risk
2  of breast cancer?
3      A.   Now you're talking about
4  both estrogen alone and combined?  Can we
5  separate the two?
6      Q.   Studies involving and
7  analyzing both.  Studies that included
8  combination data.
9          MS. BEREZOFSKY:  Object to
10 the form.  It's not clear if
11 you're asking for estrogen only or
12 asking about combination.
13         MS. FUJIMOTO:  Both.
14 Studies that include both data.
15         THE WITNESS:  Well, see the
16 answer -- when I answer that, you
17 wouldn't know which one I'm
18 referring to.
19 BY MS. FUJIMOTO:
20     Q.   Okay.  So were there -- are
21 there studies showing a decreased risk of
22 breast cancer with estrogen only use?
23     A.   Yes.
24     Q.   Are you aware of studies

48 (Pages 186 to 189)

Page 190

1  showing a decreased risk of breast cancer
2  with combination therapy use?
3      A.   No.
4      Q.   Are you aware of studies
5  showing no effect, no
6  statistically-significant increase or
7  decrease with E-alone use?
8      A.   Yes.
9      Q.   Are you aware of studies
10  that show no effect with combination use?
11      A.   Yes.
12      Q.   Okay.  And are you aware of
13  studies that show an increased risk of
14  breast cancer with estrogen alone use?
15      A.   Yeah, there are.  There are
16  some studies showing that.
17      Q.   And are you aware of studies
18  that show an association or an increased
19  risk with combination therapy use?
20      A.   Yes.
21      Q.   And for those studies that
22  report an increased relative risk with
23  combination therapy use, would you agree
24  that the majority of studies report an

Page 191

1  overall relative risk less than 2?
2      A.   Most of them, yes.
3      Q.   And that according to your
4  textbook is considered a weak
5  association, right?
6      A.   Yes.  Our classification, of
7  course, is very arbitrary, but I should
8  say that even though it's a weak
9  association, if it turns out to be true,
10  there could be a doubling of risk of the
11  most commonly-diagnosed cancer in women
12  in the United States.
13      Q.   So you would agree that the
14  relative risk of 1.24 seen in the WHI the
15  randomized control trial is, under your
16  definition, a weak association?
17      A.   That is -- in a randomized
18  control trial, you're not talking about
19  association anymore.  You're talking
20  about a different design, and we wouldn't
21  use -- we wouldn't use the term that
22  they're associated.  We would use the
23  term that -- that this risk is found.
24      Q.   All right.

Page 192

1      MS. FUJIMOTO:  Let me mark
2  as Exhibit No. 10 to the
3  deposition a copy of an article
4  from 1997 in the American Journal
5  of Epidemiology entitled "Hormone
6  Replacement and Menopausal
7  Symptoms Following Hysterectomy."
8          - - -
9      (Whereupon, Deposition
10  Exhibit Stolley-10, "Hormone
11  Replacement and Menopausal
12  Symptoms following Hysterectomy"
13  (Langenberg, et al), American
14  Journal of Epidemiology Vol. 146,
15  No. 10, 1997 870-880, was marked
16  for identification.)
17          - - -
18      MS. FUJIMOTO:  And give me
19  one minute, because I want to have
20  you look at another article, as
21  well.
22      (Discussion off the
23  stenographic record.)
24      MS. FUJIMOTO:  And I'll mark

Page 193

1  as Exhibit --
2      MS. BEREZOFSKY:  You know
3  what, it's been about an hour and
4  a half.  I want to take a quick
5  restroom break so we'll take about
6  a five-minute break.
7      MS. FUJIMOTO:  Okay.  Sure.
8      THE VIDEOGRAPHER:  Going off
9  the record.  This marks the end of
10  Volume 1, Tape No. 2 in the
11  deposition of Dr. Paul Stolley.
12  We're going off the record.  The
13  time is 2:34 p.m.
14      (A recess was taken.)
15          - - -
16      (Whereupon, Deposition
17  Exhibit Stolley-11, "Estrogen
18  Replacement Therapy and the Risk
19  of Breast Cancer: Results from the
20  Case-Control Surveillance Study"
21  American Journal of Epidemiology,
22  Vol. 134 No. 12 1375-1385, was
23  marked for identification.)
24          - - -

49 (Pages 190 to 193)

Confidential - Subject to Protective Order

Page 194

1    THE VIDEOGRAPHER:  We're
2  back on the record.  Here marks
3  the beginning of Volume 1, Tape
4  No. 3 in the deposition of Dr.
5  Paul Stolley.  The time is 2:45
6  p.m.
7  BY MS. FUJIMOTO:
8    Q.    Welcome back, Dr. Stolley.
9  I've actually in the break marked another
10  article marked as Exhibit No. 11, and I'm
11  going to ask you questions about that
12  first so that we can stay more in order.
13    Marked as Exhibit No. 11 is
14  an article from 1991 in the American
15  Journal of Epidemiology titled "Estrogen
16  Replacement Therapy and the Risk of
17  Breast Cancer:  Results from the
18  Case-Control Surveillance Study."
19    Do you see that, Doctor?
20    A.    I do.
21    Q.    And you are one of the
22  authors of that study?
23    A.    I am.
24    Q.    And if you look at the

Page 195

1  bottom of page 1, you wrote:  Since 1976,
2  the relation between estrogen replacement
3  therapy and the risk of breast cancer has
4  been the subject of numerous
5  epidemiologic studies," correct?
6    A.    Let me check.  I should say
7  "we wrote."  As you can see --
8    Q.    Okay.
9    A.    -- there are about eight
10  authors.
11    Q.    I'm sorry, right-hand
12  column, down --
13    A.    Oh, here?
14    Q.    Down -- there you go.
15    A.    Right.
16    Q.    And you cite in the
17  reference list to reference Nos. 1
18  through 29, so you've cited to 29
19  articles, correct?
20    A.    That's correct.
21    Q.    Okay.  So by 1991, there had
22  been at least 29 studies on estrogen,
23  correct?
24    A.    Yes.

Page 196

1    Q.    And breast cancer.  Okay.
2  And you report what you said:  "Most have
3  shown no overall increase in risk,
4  although in three...there was a modest
5  overall association" and there have been
6  "inconsistent elevations...in various
7  subgroups."  Do you see that?
8    A.    Yes.
9    Q.    So would you agree at least
10  at this point in time the information on
11  estrogen alone was, at best, mixed?
12    A.    I agree with that.
13    Q.    Okay.  And then you go down
14  further to say that "two other studies
15  have shown no elevation for 10 or more
16  years of use."  Do you see that?
17    A.    Yes.
18    Q.    So there wasn't, at least in
19  the studies that you reference, these did
20  not suggest a duration relationship.
21  There were some that showed a duration
22  relationship and some that did not,
23  correct?
24    A.    Yes.

Page 197

1    Q.    Okay.  And then you go
2  further and you say:  "Two reports
3  further suggested that the risk may be
4  increased among women who had received
5  estrogens opposed with progestogens,
6  although two others suggested that it may
7  be reduced."
8    So at this point in time, we
9  have a mix of the combo studies, as well,
10  correct?
11    A.    Correct.
12    Q.    And if you look, Doctor,
13  when you talk about estrogen alone in the
14  breast cancer studies and you reference 1
15  through 29; and I went back, if you go to
16  your reference list, would you agree with
17  me that at least five of the studies that
18  you cited actually had information or
19  data on combination therapy use?
20    A.    I haven't looked at this in
21  17 years, 16 years, and so I can't answer
22  that question.
23    Q.    Okay.
24    MS. FUJIMOTO:  While we're

Confidential - Subject to Protective Order

Page 198

1  talking about this mix of data,
2  I'll mark as Exhibit No. 12 to the
3  deposition a copy of the Trudy
4  Bush article that we referenced
5  earlier.
6              - - -
7      (Whereupon, Deposition
8  Exhibit Stolley-12, "Hormone
9  Replacement Therapy and Breast
10  Cancer: A Qualitative Review"
11  (Bush, et al) Obstetrics &
12  Gynecology, Vol. 98, No. 3,
13  September 2001 498-508, was marked
14  for identification.)
15             - - -
16  BY MS. FUJIMOTO:
17      Q.   Doctor, would you confirm
18  for me that this is the article by Trudy
19  Bush published in 2001?
20      A.   Yes.
21      Q.   And as a qualitative review
22  what Dr. Bush did is she gathered all the
23  epidemiological studies on hormone
24  therapy and breast cancer and simply

Page 199

1  reported what those studies as a group
2  found.  Is that a fair assessment?
3      A.   Yes.
4      Q.   She didn't reanalyze the
5  data, correct?
6      A.   I don't believe so.
7      Q.   And this isn't the study
8  that you referenced earlier when you said
9  that there were some observational
10  studies that she had done that didn't
11  bear out?
12      A.   No.  This is not the one I
13  meant.  I was talking about studies
14  concerning benefit to the heart.
15      Q.   Okay.  All right.  If you go
16  to page 501 of the Bush review article,
17  you'll see Figures 1 and 2.  Do you see
18  that?
19      A.   Yes.
20      Q.   And Figure 1 reports the
21  relative risk estimates for all of the
22  estrogen alone studies, right?
23      A.   Yes, she compares ever users
24  compared with never users.

Page 200

1      Q.   Of estrogen?
2      A.   Yes, which is a problem
3  because I'm an ever smoker.  I smoked two
4  cigarettes when I was 13.  And so it's
5  such a broad categorization that it
6  creates difficulties in interpretation.
7      Q.   Okay.  Now, certainly, in
8  all of these studies on Figure 1 of
9  estrogen alone, many, many
10  investigators reported overall relative
11  risks, comparing ever users and never
12  users, right; that's where she got these
13  numbers?
14      A.   Yes.
15      Q.   All right.  And in Figure 2,
16  she's reporting the relative risk
17  estimates for combination therapy users,
18  right?
19      A.   That's right.
20      Q.   And both of these figures
21  demonstrate what you and I have talked
22  about, correct; and that is, that there
23  was a mix of study results?
24      A.   Correct.

Page 201

1      Q.   Okay.  Doctor, would you
2  agree with me that most women who are
3  diagnosed with breast cancer have never
4  used HRT?
5      A.   I think that's probably
6  true, yes.
7      Q.   And based on epidemiologic
8  studies, including those that we've just
9  talked about, we know that most women who
10  use HRT are never diagnosed with breast
11  cancer, right?
12      A.   That's correct.
13      Q.   Now, so, and then that would
14  suggest, then, that there isn't
15  specificity that you talk about in your
16  epidemiology textbook?
17          MS. BEREZOFSKY:  Object to
18  form.
19  BY MS. FUJIMOTO:
20      Q.   Correct?
21      A.   No, I don't think so.
22      Q.   All right.
23          Let's talk about biological
24  plausibility, all right.  After menopause

51 (Pages 198 to 201)

Confidential - Subject to Protective Order

Page 202

1  a woman's hormone levels decline,
2  correct?
3       A.   Yes.
4       Q.   But as you've said before,
5  as a woman ages, particularly after
6  menopause, her risk of breast cancer
7  increases, correct?
8       A.   That's right.
9       Q.   And I think we mentioned
10 this before, but let me go over these.
11 The more pregnancies a woman has, the
12 lower -- or there is a decrease in her
13 risk of breast cancer, right?
14      A.   That's correct.
15      Q.   And during pregnancy, a
16 woman's endogenous levels of estrogen and
17 progesterone are at their highest,
18 correct?
19      A.   That's right.
20      Q.   Oral contraceptives, thus
21 far, have not shown to increase risk of
22 breast cancer, correct?
23      A.   Correct.
24      Q.   And that's based in large

Page 203

1  part on some of your own studies, right?
2       A.   We made a minor contribution
3  to that.
4       Q.   Are you aware of literature
5  that shows that even high-risk women,
6  like BRCA1 carriers, do not further
7  increase their risk of breast cancer when
8  they use oral contraceptives?
9       A.   Yes.  Of course, BRCA
10 carriers tend to have estrogen negative
11 -- receptor negative tumors.
12      Q.   And high-risk women who have
13 a family history of breast cancer, they
14 don't further increase their risk of
15 breast cancer by using HRT, correct?
16      A.   Correct.
17      Q.   High doses of estrogen and
18 high doses of progesterone used to be and
19 still are in many instances used
20 effectively in treating breast cancer,
21 correct?
22      A.   I don't know much about the
23 treatment of breast cancer, I couldn't
24 answer that.  Especially the modern

Page 204

1  treatment.
2       Q.   Men get breast cancer, don't
3  they?
4       A.   They do.  About one percent
5  the rate of women.
6       Q.   And with the recognition of
7  all these findings based on decades of
8  epidemiology, none of these things line
9  up as biologically plausible, do they?
10      MS. BEREZOFSKY:  Object to
11 form.
12      MS. FUJIMOTO:  Estrogen, or
13 progesterone, driving breast
14 cancer.
15      MS. BEREZOFSKY:  Object to
16 form.
17      THE WITNESS:  That's not
18 what the international agency for
19 research against cancer thought.
20 BY MS. FUJIMOTO:
21      Q.   I'm asking what you think.
22      A.   I think that there is --
23 there is biological plausibility in terms
24 of monkey studies showing increased

Page 205

1  proliferation when given the combination
2  and while the toxicology is deficient and
3  inadequate -- while the toxicology is
4  deficient and inadequate, some of it
5  supports the biological plausibility
6  theory.
7       Q.   Okay.  That's one thing.
8  I'm not talking about animal studies.
9  I'm asking about these points:  After
10 menopause hormone levels go down but
11 breast cancer risk go up, multiple
12 pregnancies decrease breast cancer risk,
13 oral contraceptives don't increase the
14 risk of high -- in normal or high-risk
15 women, men get breast cancer, all of
16 those, none of those things is consistent
17 with the hypothesis, a
18 biologically-plausible hypothesis, that
19 hormones drive breast cancer or cause
20 breast cancer, are they, Doctor?  And I'm
21 not asking if there are other things that
22 might be consistent with it.  I'm talking
23 about these things.
24      A.   Men produce estrogen and --

52 (Pages 202 to 205)

Page 206

1      Q.    Do they have progesterone?
2      A.    I'm not sure about that.
3  But they produce estrogen and --
4      Q.    But the E-alone studies in
5  women have not shown an increased risk of
6  breast cancer?
7      A.    Beg your pardon?
8      Q.    Estrogen alone have not
9  shown an increased risk of breast cancer?
10      A.    Let's talk about male breast
11  cancer and why you're citing it, doesn't
12  necessarily disprove the hypothesis.  The
13  hypothesis is that estrogen-deficient
14  women, when additional estrogen is added
15  in the form of hormone replacement
16  therapy, can get cancer.  We know they
17  can get endometrial cancer, and there
18  is -- there is toxicological data that
19  create biological plausibility.
20          Now, there are exceptions to
21  the biological plausibility theory, but
22  there is also some support, and, again, I
23  would stress that biologic plausibility
24  often falls behind epidemiologic

Page 207

1  findings, and it can be revealed later.
2      Q.    And the -- and the
3  biologically-plausible data you're
4  talking about are toxicology studies and
5  animal studies?
6      A.    Yes.  And I think -- I think
7  there's a nipple aspirate study that show
8  that women who are given the combination
9  oral contraceptives showed more estrogen
10  in the aspirate than women who did not.
11      Q.    Are you aware of any studies
12  that correlate the level of nipple
13  aspirate fluid or the level of hormones
14  in nipple aspirate fluid to breast
15  cancer, had correlated those things?
16      A.    I don't think so.
17      Q.    Are you aware of any studies
18  that confirm any clinical significance to
19  the measurement of hormones in nipple
20  aspirate fluid?
21      A.    By "clinical significance,"
22  you mean connected with --
23      Q.    Shown to have any meaning,
24  at all, in terms of disease or problems

Page 208

1  in the women.
2          MS. BEREZOFSKY:  Object to
3  form.
4          THE WITNESS:  I'm not aware
5  of any.
6  BY MS. FUJIMOTO:
7      Q.    Okay.  Do you know how many
8  women were -- made up the data in the
9  nipple aspirate study that you're talking
10  about?
11      A.    I'm sure it was a small
12  number, because I'm sure a lot of women
13  would not agree to that procedure.
14      Q.    On the biological
15  plausibility, are you saying that if
16  animal studies show carcinogenicity that
17  that will always play out in humans?
18      A.    Almost always, yes.  If
19  you're post-Darwinian, you have to
20  believe that in addition where it can be
21  examined, because there's enough numbers,
22  it's almost always been shown to be true.
23  Looking at the reverse way, there is no
24  human carcinogen that has not shown to be

Page 209

1  an animal carcinogen, that I'm aware of.
2      Q.    We'll get back to Exhibit
3  10, I promise, but this would be a good
4  time to talk about some other things,
5  then.
6          MS. FUJIMOTO:  Okay.  We'll
7  mark as Exhibit No. 13 to the
8  deposition an article in the
9  American Journal of Epidemiology
10  in 1985 entitled "Breast Cancer
11  and the Consumption of Coffee."
12              - - -
13          (Whereupon, Deposition
14  Exhibit Stolley-13, "Breast Cancer
15  and the Consumption of Coffee,"
16  (Rosenberg, et al) American
17  Journal of Epidemiology, Vol. 122
18  No. 3, 1985, 391-399, was marked
19  for identification.)
20              - - -
21  BY MS. FUJIMOTO:
22      Q.    You were one the
23  investigators and authors on the study,
24  right, Dr. Stolley?

Confidential - Subject to Protective Order

Page 210

1    A.   Yes.
2    Q.   And you see on the first
3  page you start the -- you and the other
4  authors start the article by saying:
5  "There has been considerable interest in
6  the potential role of coffee as a
7  carcinogen" because "it is widely
8  consumed."  Experiments -- "Evidence from
9  experiments in animals suggests that
10  coffee and caffeine are not carcinogens
11  by themselves, but...in some instances,
12  they increase tumor incidence in animals
13  already exposed to carcinogens."
14       Do you see that?
15    A.   Yes.
16    Q.   That was what drove -- that
17  was the hypothesis or what drove your
18  hypothesis to study cancer and coffee,
19  right?
20    A.   That's right.
21    Q.   And in this study --
22    A.   Also, I must say, if you go
23  to the next page, we refer to the article
24  by Philip Cole, who reported an

Page 211

1  association between bladder cancer and
2  recent coffee consumption.
3    Q.   So there was animal studies
4  and this Cole study looking at cancers
5  and the relationship to coffee, right?
6    A.   No another kind of cancer,
7  but a human cancer.
8    Q.   And you saw no -- you did
9  this controlled case study based on this
10  hypothesis, and you find that there was
11  no increase in breast cancer risk,
12  correct?
13    A.   Correct.
14    Q.   And so that is one example
15  of animal studies not playing out once
16  they're tested in humans, right?
17    A.   The animal studies actually
18  didn't show cancer.
19    Q.   Well, they showed increase
20  in incidence of tumors.
21    A.   Benign tumors.
22    Q.   In animals that had already
23  been exposed to carcinogens, right?
24    A.   Yeah, but I think benign

Page 212

1  tumors, and the animal toxicology was
2  weak.
3    Q.   Okay.
4    A.   And I'm not ever claiming
5  that all animal toxicology is going to be
6  replicated in humans, but the track
7  record for carcinogens is pretty good.
8         -  -  -
9         (Whereupon, Deposition
10    Exhibit Stolley-14, "Diazepam Use
11    in Relation to Breast Cancer:
12    Results from Two Case-Control
13    Studies," (Kaufman, et al)
14    American Journal of Epidemiology,
15    Vol. 131, No. 3, 1990 483-490, was
16    marked for identification.)
17         -  -  -
18  BY MS. FUJIMOTO:
19    Q.   Okay.  Let me ask you then
20  about what I've marked as Exhibit No. 14,
21  which is an article in 1990, the American
22  Journal of Epidemiology, "Diazepam Use in
23  Relation to Breast Cancer:  Results From
24  Two Case-Control Studies" and you were an

Page 213

1  investigator and author on that article,
2  correct?
3    A.   Correct.
4    Q.   And you state in the first
5  paragraph:  "Several years ago, it was
6  proposed that diazepam may promote the
7  growth of breast tumors.  The hypothesis
8  was based on laboratory studies in rats."
9  Right?
10    A.   Yes.
11    Q.   And so you have rat data
12  showing carcinogenicity.  You do this two
13  case-control studies, and both studies
14  show no increased risk of breast cancer
15  with diazepam use, right?
16    A.   Yes.  I'm not sure the rat
17  studies showed carcinogenicity.  The
18  references for the rat studies, 3 to 5.
19  One has modulation of thromboxane-A2
20  synthesis, which is not the same as
21  cancer incidence.  The fourth is really
22  having to do with the promotion of growth
23  of the cancer and I think in this fifth,
24  also, they used a proxy for cancer.  So

54 (Pages 210 to 213)

Confidential - Subject to Protective Order

Page 214

1    there were -- there were not
2    overwhelmingly convincing carcinogenicity
3    studies in --
4        Q.    But these were animal
5    studies --
6        A.    Yes.
7        Q.    -- that generated a
8    hypothesis that diazepam could cause
9    breast cancer in humans.
10        A.    Yeah.  I --
11        Q.    And you studied it, and you
12    didn't see an increase, correct?
13        A.    Yeah.  We studied it and did
14    not see an increase, correct.
15        MS. FUJIMOTO:  Mark as
16    Exhibit No. 15 to the deposition
17    another article from 1999 American
18    Journal of Epidemiology.  It's
19    entitled "Risk of Breast Cancer
20    According to Use of
21    Antidepressants, Phenothiazines
22    and Antihistamines."
23            - - -
24        (Whereupon, Deposition

Page 215

1        Exhibit Stolley-15, "Risk of
2        Breast Cancer According to Use of
3        Antidepressants, Phenothiazines,
4        and Antihistamines" (Kelly, et
5        al), American Journal of
6        Epidemiology, Vol. 150, No. 8,
7        1999, 861-868, was marked for
8        identification.)
9            - - -
10    BY MS. FUJIMOTO:
11        Q.    And you were an investigator
12    and author on that article, study
13    article, as well, correct?
14        A.    Yes.
15        Q.    And you say in the first
16    paragraph:  "Experimental studies in mice
17    and rats have demonstrated accelerated
18    growth of mammary tumors in animals
19    exposed to some antidepressants."
20        Do you see that?
21        A.    Yes.
22        Q.    Okay.  And then there were
23    some studies that suggested that these
24    agents acted as "promoters of malignant

Page 216

1    growth," right?
2        A.    Yes.
3        Q.    And so you studied -- you
4    did a case-control study based on this
5    hypothesis, and again you proved that
6    hypothesis wrong, correct?  You didn't
7    find an increase in risk of breast cancer
8    with these agents?
9        A.    That's correct.
10        Q.    In any of these three
11    studies, Doctor -- strike that.
12        In each of the three studies
13    that we just talked about that we've
14    marked as exhibits, because you were
15    looking at breast cancer since they were
16    case-control studies, you adjusted for
17    the presence of other breast cancer risk
18    factors, right?
19        A.    Yes.
20        Q.    You didn't --
21        A.    The case-control design
22    permits that.
23        Q.    Right.
24        Okay.  And you controlled

Page 217

1    for things like age, age at menarche,
2    menopausal status, history of breast
3    cancer, benign breast disease, BMI,
4    alcohol use, correct?
5        A.    Yes.
6        Q.    But you didn't consider HRT
7    a significant-enough risk factor to
8    control for that, did you?
9        A.    It is -- let's see, what's
10    the years when we're doing this?  1985
11    and 1989.  It's possible that we weren't
12    able to get that data to adjust.
13        Q.    But you didn't adjust for
14    them?
15        A.    Well, you can't adjust if
16    you don't have the data.
17        Q.    Right.
18        My question, though, is:
19    You didn't, right?
20        A.    We didn't.
21        Q.    Okay.  And what you adjusted
22    for were -- by your own language in these
23    articles, was that you adjusted for the
24    major risk factors of breast cancer.

Confidential - Subject to Protective Order

Page 218

1    MS. FUJIMOTO:  Let me mark
2    as Exhibit No. 16 to the
3    deposition an article "Nonhormonal
4    Drugs and Cancer."
5        - - -
6        (Whereupon, Deposition
7    Exhibit Stolley-16, "Nonhormonal
8    Drugs and Cancer" (Stolley/Zahm)
9    Environmental Health Perspectives,
10   Vol. 203, Supplement 8, November
11   1995, 191-196, was marked for
12   identification.)
13       - - -
14   BY MS. FUJIMOTO:
15   Q.    And you are the lead author
16   with Dr. Zahm, correct?
17   A.    Correct.
18   Q.    And I direct your attention,
19   Doctor, to your conclusion on page 193
20   and you say that "Animal and microbial
21   screening tests for mutagenicity and
22   carcinogenicity must continue and can
23   help set priorities for epidemiologic
24   research, but they must be interpreted

Page 219

1    cautiously, particularly with reference
2    to dose extrapolations."
3        Is that still correct, in
4    your view?
5    A.    Yes.  And after I say that,
6    I say:  "The Food and Drug Administration
7    should be given legal authority to
8    require postmarketing surveillance as
9    part of the approval value process for
10   new drugs."
11   Q.    And they do that, right?
12   A.    No, there's no enabling
13   legislation for that.
14   Q.    There's not post-marketing
15   surveillance of drugs that are on the
16   market?
17       MS. BEREZOFSKY:  Object to
18   the characterization.  Misstates
19   his testimony.  Go ahead.
20       THE WITNESS:  That's not --
21   may I?
22       MS. BEREZOFSKY:  Yeah, go
23   ahead.
24       THE WITNESS:  There is

Page 220

1    post-marketing surveillance, but
2    there's no enabling legislation to
3    require it, and a recent report by
4    the Government Accounting Office,
5    it was found that the vast
6    majority of promised studies in
7    postmarketing surveillance by the
8    industry were never done.  And so
9    that's become a big issue in
10   recent months since that report
11   was issued, the Institute Of
12   Medicine report.  The FDA also
13   brings that issue.
14   BY MS. FUJIMOTO:
15   Q.    Is the Institute Of Medicine
16   the same one that published the book we
17   were talking about?
18   A.    Yes.
19   Q.    Thank you.
20       And are you talking about
21   something separate and apart from all of
22   these studies that we've been talking
23   about that were in, say, for example, the
24   Bush article and your own studies that

Page 221

1    you've referenced, looking at the post
2    marketing experience of women using HRT?
3        MS. BEREZOFSKY:  Object to
4    the form of the question.
5        THE WITNESS:  No.  What I'm
6    saying is that -- and what we said
7    in the article, was that the FDA
8    ought to have enabling legislation
9    so it had the authority to require
10   post-marketing studies.  What they
11   do now is they ask for them to be
12   done.  Industry says yes, we're
13   going to do them.  Sometimes they
14   submit very inadequate studies
15   that lack appropriate power or
16   look at the wrong things, but, in
17   any case, the vast majority are
18   never finished or even started.
19   So that's a big gap in our drug
20   safety system.
21   BY MS. FUJIMOTO:
22   Q.    Are those what you call
23   Phase IV studies?
24   A.    They're usually called Phase

56 (Pages 218 to 221)

Confidential - Subject to Protective Order

Page 222

1 IV studies.
2 Q. Okay. And do you know
3 whether Wyeth has met its obligations to
4 complete Phase IV studies on Prempro?
5 A. I don't know the answer to
6 that, but the -- there is the issue of
7 what the company should do without having
8 the FDA initiate it, and what they could
9 have done years ago.
10 Q. Do you know when the Phase
11 IV studies were done and completed?
12 MS. BEREZOFSKY: Object to
13 the form.
14 THE WITNESS: No.
15 BY MS. FUJIMOTO:
16 Q. Do you know whether any
17 other organizations have seen the Phase
18 IV study data, other than the FDA?
19 A. I don't.
20 Q. Doctor, your epidemiologic
21 -- or your epidemiology textbooks were --
22 laid out various kind of
23 generally-accepted ways in which
24 scientists can conduct research on

Page 223

1 disease. And was one of the ideas of a
2 textbook like that to lay out principles
3 of epidemiology that are generally
4 accepted in the scientific community?
5 A. The textbook, Foundations,
6 was aimed at students of public health
7 and medical students, and it was an
8 attempt to cover the entire field of
9 epidemiology. It was a revision of a
10 book by Abraham Lilienfeld, who was a
11 very famous epidemiologist at Hopkins.
12 And his son and I did the second and
13 third editions. And so that was an
14 attempt to describe epidemiologic methods
15 for that -- for that audience.
16 The other book that I did
17 with Dr. Lasky was different. It was
18 commissioned by Scientific American, and
19 it was an attempt to popularize and
20 explain epidemiology to a
21 scientifically-sophisticated audience who
22 belonged to their subscription library;
23 and it was a popularization, essentially,
24 but at a high level. It turned out that

Page 224

1 it was regarded by some as a history
2 book, and it received an American Medical
3 Writer's Association award for the best
4 medical history book of 1996, even though
5 we didn't consider it a history book.
6 Q. Is there anything in either
7 of your books that describes a method by
8 which an epidemiology is followed where
9 they can look back retrospectively at
10 studies that were done on disease and a
11 particular agent and decide whether or
12 not different or better or more studies
13 should have been done and when?
14 A. No, not as such.
15 Q. Is there any method by
16 which, generally-accepted method or
17 formula by which one can look back and
18 decide that had other studies been done
19 that the result would be different?
20 A. I've seen attempts to do
21 that, but I would say that there's no
22 generally-accepted method probably
23 because it's such a complex issue;
24 however, it's commonly done.

Page 225

1 Q. Have you ever written an
2 article laying out a method or
3 generally-accepted criteria by which one
4 could follow to do that type of thing?
5 MS. BEREZOFSKY: I object to
6 the form.
7 THE WITNESS: That type of
8 thing being?
9 BY MS. FUJIMOTO:
10 Q. Okay. Let me do this. That
11 was an open-ended question. Let me have
12 you go back to your report that was
13 marked as Exhibit No. 2.
14 A. Right.
15 MS. BEREZOFSKY: It's a
16 little easier on the eyes if you
17 want to look at this one. It's
18 just an easier copy to read.
19 BY MS. FUJIMOTO:
20 Q. If you would go to page 3,
21 your summary of opinions.
22 A. Yeah.
23 Q. And your first summary of
24 opinion relates to your opinion that

57 (Pages 222 to 225)

Confidential - Subject to Protective Order

Page 226

1 exogenous combination hormone replacement
2 therapy use increases the risk of breast
3 cancer in women who use it, correct?
4       A.   Correct.
5       Q.   And you followed, as I
6 understand it, or would follow, for that
7 opinion, the generally-accepted method of
8 Bradford Hill or use those guidelines for
9 assessing that type of thing?
10          MS. BEREZOFSKY:  Objection.
11      I think that mischaracterizes his
12      testimony.
13 BY MS. FUJIMOTO:
14      Q.   Do you not use that?
15      A.   I relied -- I relied
16 principally on the International Agency
17 for Research Against Cancer report where
18 they point out that there are, I think it
19 is two randomized control trials, several
20 case-control studies, and ten cohort
21 studies showing that risk, and they point
22 out the deficiency in the animal
23 toxicology.
24      Q.   Okay.  And so let me be

Page 227

1 clear then.  You did not, yourself, in
2 arriving at opinion number 1, you didn't
3 employ a generally-accepted method in
4 arriving at that opinion?
5          MS. BEREZOFSKY:  Objection.
6 BY MS. FUJIMOTO:
7       Q.   Is that right?  You simply
8 read something by IARC and said "I agree
9 with that"?
10      A.   No.  I thought about the
11 consistency and the other -- in the other
12 -- the other criteria, Bradford Hill.
13      Q.   Okay.  So that is what I'm
14 talking about when I'm asking you about
15 methodologies or principles that are
16 generally accepted and used by other
17 scientists like you?
18          MS. BEREZOFSKY:  Objection.
19 BY MS. FUJIMOTO:
20      Q.   That's what I'm talking
21 about.  So if you go to your next two
22 opinions, Opinion Number 2 is that the
23 "drug manufacturers of hormone therapy
24 drugs could have, and should have

Page 228

1 initiated various research studies when
2 it was apparent that the progestin and
3 estrogen combination was increasingly
4 used (though not yet approved as a single
5 combined pill) by women as HRT - an
6 off-label use."
7          Did I read that correctly?
8       A.   Yeah.  I think we have a
9 typo there, but yeah.
10      Q.   Okay.  So what you've done
11 is gone -- is doing kind of a hindsight
12 opinion; you're looking back on things
13 that were done and saying, it's my
14 opinion that something different should
15 have been done or something -- something
16 should have been done earlier, right?
17      A.   That's correct.
18      Q.   Okay.  And then in paragraph
19 3, you're saying, and had they done
20 something differently, it would have made
21 a difference.  Is that fair?
22      A.   Fair.
23      Q.   Okay.  And so my question
24 for you:  Is there any generally-accepted

Page 229

1 epidemiologic principle or method by
2 which someone can do this hindsight
3 analysis?
4       A.   No.
5          MS. BEREZOFSKY:  Objection
6      to form.
7          THE WITNESS:  I haven't seen
8      anything written about that.
9 BY MS. FUJIMOTO:
10      Q.   Okay.  So you can't identify
11 for me any textbooks, articles, or
12 anything else in the peer-reviewed
13 literature that describes a method by
14 which someone else could do this
15 analysis?
16      A.   That's correct.
17      Q.   So if I wanted to do it or
18 some other scientist wanted to go back
19 and retrospectively decide whether other
20 or different studies should have been
21 done in a different time, there's no
22 place they could go to find it?
23      A.   No.  I think it's something
24 one would have to work out by yourself.

58 (Pages 226 to 229)

Confidential - Subject to Protective Order

Page 230

1    Q.    And would it be very likely,
2  as we talked about earlier, with the
3  issue of subjectivity, with your
4  definition, that for five scientists did
5  that, it very well could be that five
6  would come to a different conclusion,
7  because there's no standard or objective
8  method to follow?
9    A.    That could also happen if
10 there were a standard and an objective
11 method to follow.
12   Q.    Okay.  All right.
13        Let me be clear of your
14 opinions then.  Exactly -- you say it's
15 my opinion that drug manufacturers should
16 have initiated various research studies.
17 Exactly what studies or tests should have
18 been done and when?
19   A.    Well, when the off-labeled
20 use of a combination of a progestin and
21 estrogen began, before there was any
22 combination approved, I think the
23 companies who manufactured these drugs
24 would know of the off-label use, and the

Page 231

1  increasing amount of off-label use and
2  they should have realized that this was
3  going to pose a problem, a potential
4  problem, because they had not been
5  adequately tested, and they had not
6  gotten FDA approval.
7    Q.    So was that --
8        MS. BEREZOFSKY:  Excuse me.
9    Please let him finish his answer.
10   He was still speaking when you
11   started talking.
12       MS. FUJIMOTO:  Okay.  Keep
13   going.
14       THE WITNESS:  So at that
15   point, it would seem to me that
16   the responsible manufacturers
17   should have either tried to
18   inhibit this kind of prescribing
19   because the drugs were not
20   approved or studied them further
21   as -- if their plan is to try to
22   get them approved.  And that would
23   mean since we knew about estrogens
24   and uterine cancer -- and you have

Page 232

1  to remember that Premarin was used
2  for many years and -- in 1968, for
3  example, it was among the five
4  leading drugs prescribed for women
5  over age 50, and there was this
6  wide use, which, for benign
7  conditions, the only thing really
8  shown to affect is menopausal
9  flashes and vaginal lubrication,
10 vaginal lubrication there are
11 alternative treatments that are
12 safer, but it led to this epidemic
13 of uterine cancer, and it's
14 estimated that at the height of
15 Premarin use in the '70s one-third
16 of all uterine cancer cases could
17 be attributed to hormone
18 replacement therapy.
19       MS. FUJIMOTO:  I'm sorry,
20   Doctor, I've got to object as
21   nonresponsive.
22 BY MS. FUJIMOTO:
23   Q.    Maybe you lost my question.
24 I'm not asking about estrogen alone and

Page 233

1  endometrial cancer.  I asked you:  What
2  studies are you saying that Wyeth or
3  hormone therapy manufacturers should have
4  done when it was apparent that the
5  combination was being used.  Paragraph 2.
6  That's all I'm asking.  What studies?
7        MS. BEREZOFSKY:  Excuse me.
8    You asked him a question.  He's
9    giving you the background for his
10   answer, and I'm going to ask him,
11   for the sake of completion, to
12   finish his answer.  If he's
13   finished, fine; he can answer your
14   next questions.  If he's not, I'm
15   going to ask him to respond fully.
16       MS. FUJIMOTO:  It's
17   completely nonresponsive to my
18   question.  It didn't even touch
19   upon it.
20       THE WITNESS:  I was -- I was
21   going to --
22 BY MS. FUJIMOTO:
23   Q.    You --
24       MS. BEREZOFSKY:  I disa --

59 (Pages 230 to 233)

Confidential - Subject to Protective Order

Page 234

1     MS. FUJIMOTO:  Okay.
2     MS. BEREZOFSKY:  Please let
3  me finish.  Okay?  I disagree with
4  you.  You can always move to
5  strike if you feel that his answer
6  is nonresponsive, but I will ask
7  him to complete his response if
8  he's not done.
9     MS. FUJIMOTO:  And that's
10  what I meant by my objection.
11  Objection, nonresponsive.  Move to
12  strike.
13     MS. BEREZOFSKY:  That's
14  fine.  Were you finished with your
15  answer?
16     THE WITNESS:  Yes.  I think
17  the history of Premarin use is
18  very important because the
19  company, in a sense, was
20  responsible for an epidemic of
21  uterine cancer, and it was only
22  discovered after the rates of
23  uterine cancer went up, and then
24  they correlated it with hormone

Page 235

1  replacement therapy and then we
2  had 15 or more case-control
3  studies, including mine, which was
4  the largest, and cohort studies,
5  and international studies showing
6  that, in countries that didn't --
7  didn't use Premarin to treat
8  menopausal symptoms, they did not
9  have the epidemic.  So a special
10  burden of responsibility is on the
11  company that is going to, again,
12  after the big decline in Premarin
13  use, and its use is mainly
14  restricted to hysterectomized
15  women -- there's a special
16  responsibility, given that
17  history, for them to do extensive
18  studies of the combination drug,
19  which is being advocated for the
20  same indications.  And because
21  this epidemic was a serious public
22  health problem, and New York State
23  health department had a whole
24  campaign just to reduce the

Page 236

1  prescribing of Premarin when Peter
2  Greenwald was the commissioner.
3     This special responsibility
4  should have been recognized, and
5  there should have been
6  toxicological studies in a variety
7  of animals, which is considered
8  sparse by IARC.  Non-human
9  primates should have been
10  investigated and see how they
11  respond.  The toxicology should
12  have been beefed up, and then
13  case-control and cohort studies
14  should have been established, at
15  that time, because there were --
16  there were signals about breast
17  cancer, but more importantly,
18  there was a history of uterine
19  cancer.  And while it was
20  speculated that adding progestin
21  to the estrogen so that it
22  wouldn't be unopposed would reduce
23  the uterine cancer risk, the
24  studies actually proving that were

Page 237

1  slow to arrive.  So that's the
2  background for my concern.
3     MS. FUJIMOTO:  Okay.  I
4  object as nonresponsive.  Move to
5  strike.
6  BY MS. FUJIMOTO:
7     Q.   Doctor, at what point in
8  time, give me a year, or an estimate,
9  what point in time do you think Wyeth or
10  the other drug manufacturers should have
11  initiated these various research studies?
12     A.   I think as soon as it was
13  clear that the off-label use was
14  occurring.
15     Q.   And when was that?
16     A.   Right about 1977, right
17  after the initial -- the most convincing
18  studies concerning uterine cancer and
19  unopposed estrogens had come out; and
20  gynecologists began to shift to the
21  combination because of the theoretical
22  proposition that progestin would block
23  the receptors, and that was just
24  speculation.  At that point, since the

Confidential - Subject to Protective Order

Page 238

1  drug was being used in combination with
2  another, I think they had responsibility
3  to investigate what that effect would be;
4  would it be harmful, would it be helpful.
5      Q.    Okay.  So you're saying in
6  1977?
7      A.    Yes.
8      Q.    And what should they have
9  done in 1977, which of these studies?
10     A.    They should have established
11 a cohort, and then a cohort study of
12 users versus non-users, or commissioned
13 academic investigators or HMOs to do
14 equivalent studies, and as the use grew
15 over the '70s and early '80s,
16 case-control studies should have been
17 initiated and funded.
18     Q.    And --
19     A.    And the animal toxicology.
20     Q.    Okay.  And do you have any
21 knowledge of what studies, if any, Wyeth
22 did prior to, say, 1980?
23     A.    I have a little bit of
24 knowledge that they -- concerning

Page 239

1  financial contributions that were made by
2  Wyeth to ongoing studies, where they
3  provided the drug.  That was after
4  approval, though.  I don't -- I've seen
5  some Wyeth documents including a document
6  where one of the Wyeth administrators
7  admits that there's an association
8  between the combination HRT and breast
9  cancer, and says, you know, what are we
10 going to do about it?  How are we going
11 to follow through on this?
12         So -- but I don't know
13 specifically what -- what Wyeth did do.
14     Q.    Okay.  And that's where I
15 want.
16         MS. FUJIMOTO:  I want to
17 move to strike the portion that's
18 nonresponsive.
19 BY MS. FUJIMOTO:
20     Q.    My only question, Doctor,
21 was whether or not you know what, if any,
22 studies Wyeth conducted prior to 1980
23 regarding combination hormone use?
24     A.    I don't have a list of them,

Page 240

1  no.
2      Q.    And did you seek to find
3  out?
4      A.    I did.
5      Q.    And who did you ask or how
6  did you try to find out what studies
7  Wyeth did?
8      A.    I discussed it with
9  Mrs. Berezofsky, and --
10     Q.    What did she tell you?
11     A.    I can't recall.
12     Q.    Do you have any information
13 regarding the nature, or type, or timing
14 of any of these studies that were funded
15 or conducted by Wyeth, since 1977?
16     A.    No.
17     Q.    On what do you base your
18 predicate opinion that off-label use of
19 the combination became prevalent in 1977?
20     A.    Marketing research data and
21 also statements in some of the
22 case-control studies that I've seen.
23     Q.    Marketing research data
24 that's in your file?

Page 241

1      A.    No.
2      Q.    Oh, what marketing research
3  data are you referring to?
4      A.    I think -- I think it was
5  IMS data.
6      Q.    And is the IMS data in your
7  file?
8      A.    No.
9      Q.    That you've produced today?
10     A.    No.
11     Q.    Do you know where it is?
12     A.    No, I don't.
13     Q.    Did you review and rely upon
14 it for your opinions?
15     A.    No.  I relied more on the
16 statements in the articles by the people
17 who did the case-control studies.
18     Q.    And is there a particular
19 article that said, it became prevalent in
20 1977?
21     A.    Yeah.  I think Dr. Austin
22 had it in one of his papers.
23     Q.    Okay.  And what do you mean
24 by "prevalent"?  Can you quantify it?

Confidential - Subject to Protective Order

Page 242

1      A.   I can't quantify it now, but
2  I know that gynecologists began to use
3  the combination in an off-label way, and
4  that it was recommended by a number of
5  authorities that there was a shift away
6  from unopposed estrogen in women who
7  still had their uterus, to the
8  combination.
9      Q.   Am I correct that the reason
10  doctors began prescribing progestin with
11  an estrogen in women with a uterus was to
12  minimize or ameliorate the potential risk
13  of endometrial cancer?
14      A.   That's correct, but that
15  was, at that time, based on speculation
16  and not evidence.
17      Q.   Okay.  And who made that
18  decision, or do you know -- have any idea
19  why doctors started doing that?
20      A.   There were a number of
21  articles recommending it, and it was
22  based on a theory propounded by a very
23  distinguished physiologist, Satiri, and
24  he was often cited.

Page 243

1      Q.   And have the studies --
2      MS. BEREZOFSKY:  Excuse me.
3  Excuse me.  I really would
4  appreciate if you would allow
5  Dr. Stolley to complete his answer
6  before beginning a new question.
7      MS. FUJIMOTO:  I'm doing my
8  best.
9      MS. BEREZOFSKY:  Thank you.
10  Go ahead.
11      THE WITNESS:  And so there
12  was -- there were recommendations
13  at meetings and in journals to do
14  that and I know from my practice
15  that it certainly became more
16  common.
17  BY MS. FUJIMOTO:
18      Q.   Okay.  And you're an M.D.,
19  so I presume know this.  Do doctors only
20  prescribe medications based on what's in
21  the label?
22      MS. BEREZOFSKY:  Object to
23  the form.
24      THE WITNESS:  I'm not sure I

Page 244

1  know what you mean by that.
2  BY MS. FUJIMOTO:
3      Q.   Well, are you saying that it
4  falls below the standard of care for a
5  doctor to prescribe a medication off
6  label?
7      A.   I think most of the time,
8  yes.  Most of the time, it's a mistake in
9  practice, even though it's legal, and
10  it's created recently tremendous havoc.
11  For example, the drug Neurontin is in the
12  top 50 most frequently prescribed drugs,
13  but if you look at the indications
14  approved by the FDA, it shouldn't be
15  there.
16      Once off-label use starts,
17  it's not in the company's interest to
18  test the drug and get FDA approval often
19  since it's being used that way, and in
20  addition, it violates the principle of
21  evidence-based medicine, where you want a
22  certain amount of evidence before you
23  will prescribe a drug.
24      MS. FUJIMOTO:  Move --

Page 245

1      object and move to strike the
2      nonresponsive portion.
3  BY MS. FUJIMOTO:
4      Q.   Doctor, are you aware of any
5  medical or professional sets of
6  guidelines by ACOG or any other
7  organization that prohibits the
8  prescription of drugs off label?
9      A.   No.  There's no prohibition,
10  but there have been a number of articles
11  pointing out the dangers of off-label
12  prescribing, and warning of the effect
13  that we're going back to a pre-scientific
14  era, a pre-keyfob legislation era where
15  drugs are now being used and often
16  prescribed in -- to great numbers of
17  people and are not adequately tested to
18  prove the claim or to -- and not approved
19  for that particular usage.  Is it legal?
20  Yes.  Is it prudent?  Often, no.  Is
21  it -- does it strengthen the move towards
22  evidence-based medicine?  No, it takes us
23  backward.
24      Q.   Have you ever prescribed a

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 246

1 drug off label?
2     A.    I have very rarely, and I
3 couldn't even give you an instance.
4     Q.    You think you have?
5     A.    I may have, but I can't
6 remember any.  I almost never do.
7     Q.    Have you ever studied the
8 potential risks of off-label uses of
9 drugs?
10     A.    I haven't studied it, but
11 others have, and they've published on it.
12     Q.    Is cardiovascular benefit an
13 indicated use for oral contraceptives?
14     A.    Indicated; you mean
15 approved?
16     Q.    Yes.  On label, as you're
17 using off label?
18     A.    I don't know.
19     Q.    Well, then what do you mean
20 when you say off-label use for the
21 combination therapy?  Let's make sure we
22 agree on that.
23     A.    The off-label use was giving
24 the combination to treat postmenopausal

Page 247

1 women who had a uterus in order to --
2 thinking it's safe because it nullified
3 -- the theory was it nullified the
4 estrogenic -- unopposed estrogen effect
5 on uterine cancer.  And my own study
6 showed five years of continued use of
7 unopposed estrogen increased risk of
8 uterine cancer in an astounding 17 fold.
9     Q.    In fact, later studies
10 confirmed that opposing estrogen with
11 progestin, in fact, was effective in
12 reducing endometrial cancer risk?
13     A.    That's correct.
14     Q.    Okay.  And so the off-label
15 use that you're talking about in your
16 report is the use of estrogen with a
17 separate pill of progestin; is that what
18 you're talking about --
19     A.    Yes.
20     Q.    -- when you say "off label"?
21     A.    Yes.
22     Q.    Okay.  All right.  Have you
23 gone back, Doctor, and looked through the
24 world literature to try to identify what

Page 248

1 toxicology studies were done and when on
2 combination therapy use?
3     A.    No, I haven't.
4     Q.    Have you gone back through
5 the worldwide literature and tried to
6 determine the number of animal studies
7 that were done looking at hormones and
8 breast cancer?
9     A.    Hormones, combination?
10     Q.    Yes.
11     A.    No.
12     Q.    Okay.  Have you gone back to
13 look and count up how many case-control
14 studies were done, and when, on
15 combination hormone therapy use and
16 breast cancer?
17     A.    Yes, that I've done.
18     Q.    And what did you do or what
19 did you come up with with that review?
20     A.    I came up with something
21 like 10 or 15 case-control studies.
22     Q.    And did you document what
23 years those studies were conducted, and
24 then what years they were published?

Page 249

1     A.    No.
2     Q.    Would you agree with me,
3 though, that there were, in fact, a
4 number of case-control studies done in
5 the 1980s regarding combination hormone
6 therapy use?
7     A.    Yes.
8     Q.    And in fact, there were
9 cohort studies done in the '80s that
10 looked at breast cancer risk with hormone
11 use, right?
12     A.    Correct.
13     Q.    Okay.  And there were animal
14 studies, too, weren't there?
15     A.    Not many.
16     Q.    Okay.  But there were some?
17     A.    Yes.
18     Q.    Okay.  And how should, in
19 your opinion, Wyeth or the hormone
20 therapy manufacturers -- what kind of
21 different studies should have been done
22 that wasn't done?
23     A.    Well, I think, the first
24 order of studies would have been

Confidential - Subject to Protective Order

Page 250

1    toxicological studies, especially looking
2    for breast and uterine cancer in
3    non-human primates. And then there
4    should have been -- so monkey -- maybe
5    monkey studies. And then there should
6    have been more rodent studies that would
7    look specifically at breast cancer and
8    uterine cancer, and also the beagle dog
9    which is a very good model for breast
10   cancer, a large study, a large amount of
11   dosing, that is how you pick up
12   carcinogens with very large doses.
13        Q.   But we know at least as of
14   1991 the Institute Of Medicine and the
15   committee on which you sat felt that
16   there had been extensive animal studies
17   on sex steroid hormone and mammary
18   cancer?
19        A.   But not the combination.
20        Q.   Okay. So you're saying
21   they're talking about only estrogen?
22        A.   They're also talking about
23   progestins, but not the combination.
24        Q.   And if Wyeth or another

Page 251

1    hormone therapy company had done some
2    different studies at a different time,
3    what difference would it have made? What
4    would we have known, and when?
5        A.   Well, if we had known that
6    it increased the risk of breast cancer,
7    which is pretty well established,
8    recognized fact by certainly
9    epidemiologists and most authoritative
10   scientific bodies that have looked at
11   it -- if we had known that, I don't think
12   we would have seen the widespread use of
13   Prempro in postmenopausal women.
14        Q.   When did we know it?
15        A.   Probably back around '85, I
16   think the Colditz study.
17        Q.   You're saying that's when we
18   knew there was an increased risk of
19   breast cancer with combination therapy
20   use?
21        A.   Well, I think the first
22   positive study was around that time.
23        Q.   Okay. So you're saying that
24   the medical community knew in 1985. Are

Page 252

1    you thinking about the Colditz -- the
2    Colditz article?
3        A.   Yeah. Maybe I have a date
4    wrong.
5        Q.   Well, I need to know what
6    date you think the medical community knew
7    there was an increased risk of breast
8    cancer with combination therapy use?
9             MS. BEREZOFSKY: And you
10   should feel free to look at
11   materials that you need to look
12   at --
13   BY MS. FUJIMOTO:
14        Q.   Yes.
15             MS. BEREZOFSKY:  -- before
16   committing to a date.
17             THE WITNESS:  What I need
18   is --
19             MS. BEREZOFSKY:  Want to
20   take a five minute break?
21             MS. FUJIMOTO:  Sure.
22             THE VIDEOGRAPHER:  We're
23   going off the record. The time is
24   3:48 p.m.

Page 253

1             (A recess was taken.)
2             THE VIDEOGRAPHER:  We're
3    back on the record. The time is 4
4    o'clock p.m.
5    BY MS. FUJIMOTO:
6        Q.   Welcome back, Dr. Stolley.
7    I saw during the break you had a chance
8    to meet with plaintiff's counsel
9    Mrs. Berezofsky. Did you have a cancer
10   to chat with her?
11        A.   Yes.
12        Q.   What did you discuss?
13        A.   We discussed the upcoming
14   trial.
15        Q.   Did you discuss your
16   testimony today?
17        A.   No.
18        Q.   Not at all?
19        A.   She said I was doing a great
20   job.
21        Q.   Okay. Did you find what you
22   were looking for?
23        A.   No, probably not. But I did
24   find -- I did find some supportive

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 254

1 evidence by going through some
2 references. In 1983, Hoover published a
3 paper on the increase of estrogen
4 positive breast cancer and speculated
5 that there might be some hormonal
6 influence. I think the Colditz study was
7 '91 first, and then I think 1995. And my
8 own papers, ones that you sent me, I said
9 in 1979 in a paper that given the effect
10 of estrogen on uterine cancer, this drug
11 needs much more extensive study. And so
12 in '79, I was sounding an alarm, which
13 probably didn't reach too many people.
14      Q.   Go ahead.
15      A.   If your question is when the
16 -- when did the general medical community
17 get concerned about this, it was probably
18 in the early '90s.
19      Q.   Well, that wasn't my
20 question.
21      A.   Oh.
22      Q.   Okay. So let us back up
23 here. I had asked you, had we done, had
24 Wyeth or another hormone therapy company

Page 255

1 done different or earlier studies, what
2 would they have found out differently;
3 and you said we would have find -- found
4 out what we know now, which is there's an
5 increased risk of breast cancer with
6 combination therapy use. So I said,
7 well, when did we know that? And you
8 said 1985.
9      A.   Right.
10      Q.   So what I'm trying to find
11 out from you is -- what we know now, that
12 there's an increased risk, when was that
13 first known?
14      A.   I think it was '91 was the
15 first report, and then more convincingly
16 it was the '95 Colditz report. And I
17 think that's -- the Women's Health
18 Initiative was the coup de grace, because
19 it was a randomized controlled trial.
20      Q.   And during the break I know
21 you were looking through your box and so
22 forth. Did you pull out any articles to
23 show me?
24      A.   No.

Page 256

1      Q.   And is it your testimony,
2 Doctor, that you did not discuss with
3 Mrs. Berezofsky the 1991 Colditz or 1995
4 articles?
5      A.   No.
6      Q.   These just came to you?
7      A.   It came -- it didn't come to
8 me. It was -- as I was looking through
9 these papers, I -- they had
10 bibliographies, and that was what I was
11 looking for. And so I got it from the
12 bibliographies. All --
13      Q.   Okay. So when is the -- so
14 you're saying that studies should have
15 been done when starting about 1979 or
16 '77?
17      A.   At the end of the '70s and
18 through the '80s, yes, while the -- while
19 the drug was being used in combination in
20 an off-label fashion.
21      Q.   But, Doctor, haven't we
22 already discussed the fact throughout
23 today that through the '80s, there were
24 quite a number of studies done, animal

Page 257

1 studies, case-control studies, cohort
2 studies, right?
3           MS. BEREZOFSKY: Objection.
4           THE WITNESS: There -- I
5      don't think there were a lot of
6      animal studies done, particularly
7      speaking to breast cancer in
8      non-human primates.
9 BY MS. FUJIMOTO:
10      Q.   And, Doctor, do you have any
11 idea how many studies had been done on
12 oral contraceptives and breast cancer in
13 the 1980s and in the 1970s?
14      A.   Many. I did some myself.
15      Q.   More than 50?
16      A.   Oh, probably -- probably
17 more than a hundred. I think I did two.
18      Q.   Right.
19           And oral contraceptives are
20 exogenous hormones utilizing the
21 combination of estrogen and progestins,
22 right?
23      A.   In a different population.
24 In an estrogen-producing population.

65 (Pages 254 to 257)

Confidential - Subject to Protective Order

Page 258

1    Q.   Right.
2        My question is:  Do oral
3 contraceptives involve exogenous hormones
4 estrogen and progestin?
5    A.   Yes.
6    Q.   Okay.  And we know they're
7 used in women who are younger and in
8 their reproductive years, correct?
9    A.   Yes.
10    Q.   Did you read Dr. Colditz's
11 testimony?
12    A.   No.
13    Q.   In the litigation?
14    A.   No.
15    Q.   Do you have any
16 understanding of what he's testified to
17 as to when he thinks breast cancer
18 actually starts in women?
19        MS. BEREZOFSKY:  Objection.
20        He just said he hadn't read his
21        testimony.
22 BY MS. FUJIMOTO:
23    Q.   I'm asking if he has an
24 understanding of what he testified to, if

Page 259

1 anyone told --
2        MS. BEREZOFSKY:  How would
3        he if he hasn't read his
4        testimony?
5        MS. FUJIMOTO:  Someone could
6        tell him.
7        THE WITNESS:  That's true,
8        but they didn't.
9        MS. FUJIMOTO:  All right.
10        THE WITNESS:  I don't know
11        what Graham's theory is.
12 BY MS. FUJIMOTO:
13    Q.   Have you read any published
14 articles where scientists have offered
15 the opinion that breast cancer likely
16 starts very early in a woman's life
17 during her reproductive years?
18    A.   Probably have, years ago,
19 but not recently.
20    Q.   You mentioned a Hoover
21 article in 1983?
22    A.   Yeah.  I think it was '83,
23 and it was on the increase in
24 estrogen-positive tumors.

Page 260

1    Q.   And so that was reported in
2 1983, right?
3    A.   I think it was '83.
4    Q.   And in fact, you were one of
5 the scientists and investigators who
6 responded to that and actually looked
7 into the question of estrogen alone and
8 breast cancer, right?
9    A.   I'm not sure if we responded
10 to that particularly, but the group that
11 I was collaborating with had the ability
12 to examine that question and there were
13 other -- other reasons than the change in
14 receptor status of mainly the realization
15 that estrogen could produce uterine
16 cancer.  So we wanted to look at other
17 organs and tissues where estrogen had a
18 strong effect, and that was probably what
19 led to the hypothesis.  We cited in the
20 article some animal studies, but there
21 was concern among many scientists as --
22 after the uterine cancer problem was
23 revealed that estrogen might be causing
24 cancer at other sites.

Page 261

1    Q.   Right.
2    A.   Also, the -- the DES story
3 showed that estrogens could cause cancers
4 of the vagina and cervix.
5    Q.   So in the --
6        MS. FUJIMOTO:  And I'll move
7        to strike as nonresponsive.
8        MS. BEREZOFSKY:  I'm going
9        to ask once again, please allow
10        the witness to answer the
11        question.  You're free to move to
12        strike the testimony and let the
13        Court will decide to decide
14        whether it will be heard or not.
15        So please have the courtesy to try
16        to let him finish.
17        MS. FUJIMOTO:  I will try to
18        be as courteous as possible, but
19        when we have a seven-hour limit
20        that you're adhering to quite
21        strictly, I'm sure, I would,
22        likewise, appreciate it if Dr.
23        Stolley would try to respond to my
24        question and not add statements

66 (Pages 258 to 261)

Confidential - Subject to Protective Order

Page 262

1    that --
2        THE WITNESS:  Well, I don't
3    think I'm adding.  I'm trying to
4    give the historical background for
5    why we did the study and why
6    scientists were concerned.  I just
7    can't remove history from my way
8    of framing an answer.
9  BY MS. FUJIMOTO:
10       Q.    And we know from history
11   then, and from your testimony about
12   history, is that in the late '70s in
13   response to what was found out about
14   estrogen and endometrial cancer,
15   scientists were concerned that there
16   might be a cancer risk in other areas
17   like the breast, right?
18       A.    Yes, but I want to point out
19   it wasn't just the endometrial cancer.
20   It was also the DES vaginal cancer mini
21   epidemic that got people concerned about
22   all estrogens, synthetic and natural, and
23   their ability to cause cancer.
24       Q.    Okay.  And so in the late

Page 263

1    '70s, scientists began looking --
2    including you, looking at this question,
3    right?
4        A.    Yes.
5        Q.    And they did studies
6    including case-control and cohort
7    studies, right?
8        A.    Yes.
9        Q.    And in fact, ultimately,
10   there was a randomized control trial done
11   on this question, right, the WHI?
12       A.    That was one of their main,
13   perhaps their most important, endpoint,
14   but they also wanted to look at the
15   claims for cardiovascular benefit,
16   benefit in osteoporosis, benefit for
17   preventing dementia and so on.
18       Q.    Following the comment
19   regarding the Hoover study in 1983, you
20   did a study on non contraceptive estrogen
21   use, that's hormone therapy, right, and
22   the risk of breast cancer in 1984.
23       MS. FUJIMOTO:  I'll mark
24   that as Exhibit No. 17.

Page 264

1        - - -
2        (Whereupon, Deposition
3    Exhibit Stolley-17,
4    "Noncontraceptive Estrogen Use and
5    the Risk of Breast Cancer,"
6    (Kaufman, et al), Journal of the
7    American Medical Association, 1984
8    Vol. 252, No. 1, 63-67, was marked
9    for identification.)
10       - - -
11       THE WITNESS:  Yes.
12  BY MS. FUJIMOTO:
13       Q.    And that was published in
14   JAMA, the Journal of the American Medical
15   Association?
16       A.    That's correct.
17       Q.    Okay.  And it was a
18   case-control study?
19       A.    Yes.  It was a particular
20   kind of case-control study.
21       Q.    And you were covering the
22   period 1976 to 1981?
23       A.    Yes.
24       Q.    Okay.  And on page 63, if

Page 265

1    you'll take a look at the very beginning
2    of the article, you say:  "The effect of
3    non contraceptive exogenous estrogens on
4    the risk of breast cancer has been
5    examined in numerous studies," correct?
6        A.    Yes.  We meant here mainly
7    unopposed estrogen.
8        Q.    Right.
9            So you were looking at
10   estrogen use and the relationship to
11   breast cancer, right?
12       A.    That's right.  And during a
13   period when unopposed estrogen was mainly
14   used.
15       Q.    Right.  Okay.
16       A.    1976 to '81.  So we had --
17   we really had nothing to say about the
18   combination.
19       Q.    Right.
20           And you didn't find an
21   increase in risk, did you?
22       A.    We did not.
23       Q.    Okay.  So that was
24   inconsistent with Dr. Hoover, right?

67 (Pages 262 to 265)

Confidential - Subject to Protective Order

Page 266

1     A.   That's right.
2     Q.   And in fact, in the Comment
3  on page 66 you say, "In 1976,
4  Hoover...reported the results of a
5  follow-up study in which the incidence of
6  breast cancer was estimated to be doubled
7  in women who had used conjugated
8  estrogens."  Do you see that?
9     A.   Which page?
10    Q.   66, under "Comment"?
11    A.   Yeah.
12    Q.   So you reference Hoover,
13 which you referenced today and you go on
14 to say:  "Since then, numerous studies
15 have been published with inconsistent
16 results," right?
17    A.   Correct.
18    Q.   And in, fact, you go on in
19 the next paragraph:  Studies reported in
20 1977 and '81 suggested that estrogens do
21 not increase the risk of breast cancer,
22 right?
23    A.   That's right.
24    Q.   Okay.

Page 267

1     A.   Estrogens alone.
2     Q.   Right.  I understand.
3          You say "The divergent
4  results cannot be explained entirely by
5  methodological differences or flaws."
6          What did you mean by that?
7     A.   I'm not sure we meant
8  anything.
9     Q.   Maybe that Hoover was wrong
10 and you were right?
11    A.   No.  I think we just
12 couldn't explain how our results
13 diverged, and -- couldn't explain it.
14    Q.   Okay.  So you were looking
15 at the time frame '76 to '81, and tell me
16 again why you didn't look at combination
17 therapy?
18    A.   We didn't have enough users
19 -- I said this was an unusual
20 case-control study.  It's based on a
21 continuous rolling database, where as
22 people come out of the hospital, they get
23 a standardized interview, and we collect
24 all medications, cigarette history,

Page 268

1  alcohol, and above all, drugs.  And so we
2  were able to probably get enough subjects
3  by merging the five years of data, and
4  there just weren't enough users for us to
5  analyze it.
6     Q.   Okay.  And so when did the
7  use become prevalent enough for an
8  investigator to be able to get enough
9  cases of combination therapy use to
10 adequately study it?
11    A.   Because we couldn't, doesn't
12 mean other databases or cohort studies or
13 case-control studies could not have been
14 initiated, and a rolling -- a rolling
15 case-control study might have been
16 useful.  A cohort study.
17    Q.   Longitudinal cohort study?
18    A.   Yes.
19    Q.   Like the nurse's health
20 study?
21    A.   Like the -- yes, like the
22 nurse's health study.
23    Q.   Do you know when the nurse's
24 health study initiated or started?

Page 269

1     A.   They started 25 years ago,
2  maybe more.
3     Q.   So there was one of those
4  being done?
5     A.   Well --
6     Q.   Looking at the question,
7  right?
8     A.   Well, no, they were looking
9  at all kinds of questions.
10    Q.   Including breast cancer?
11    A.   Yes.  But I think their
12 initial funding had to do with diet.
13    Q.   They followed women and
14 looked, and evaluated --
15    A.   Yes.
16    Q.   -- and reported on breast
17 cancer risk related to --
18    A.   All kinds of reports.  They
19 must have 70, 80 publications on
20 different things.
21    Q.   So when do you think it was
22 possible to do a case-control study?
23 When would there have been enough
24 combination use to do a good case-control

68 (Pages 266 to 269)

Confidential - Subject to Protective Order

Page 270

1 study on it?
2      A.     Probably -- probably around
3 1980, '81.  You might have to do a very
4 large study, depending on the prevalence
5 of use.  And the main thing driving the study
6 size would be the prevalence of use in a
7 control population.  There are four
8 things that go into estimating,
9 synthesized in a case-control study, and
10 the other three were all doable.  The
11 prevalence of use would be the main
12 determinant of the size of the study.
13      Q.     And we know from the studies
14 that are listed in the Trudy Bush article
15 and we know from the studies that were
16 looked at by the collaborative group,
17 that there were case-control studies done
18 in the early -- starting in the early
19 '80s, right?
20      A.     Yeah.  I don't -- I don't
21 know how much -- how much they included
22 the combination contraceptives, though.
23      Q.     That's what I'm talking
24 about combination studies?

Page 271

1      A.     Designed just for that or...
2      Q.     Collecting enough data on
3 combination hormone therapy use to
4 actually analyze it and report on a
5 relative risk.
6           MS. BEREZOFSKY:  Object to
7      the form.
8 BY MS. FUJIMOTO:
9      Q.     If you go back, Doctor, to
10 your -- what I -- your article --
11           MS. FUJIMOTO:  You're right,
12      thank you, David.
13 BY MS. FUJIMOTO:
14      Q.     -- that I have marked as
15 Exhibit No. 11.  That is your Estrogen
16 Replacement Therapy and the Risk of
17 Breast Cancer article in '91.  I think
18 that's it.
19           And this, too, Doctor, was a
20 case-control study, right?
21      A.     Yes.  Using --
22      Q.     Relatively robust?
23      A.     Using the same population I
24 told you about.

Page 272

1      Q.     You had 1,686 cases and
2 2,077 controls?
3      A.     Correct.
4      Q.     And you state in the
5 abstract -- and this was -- let's see,
6 you -- this involved data between --
7 collected between 1980 and 1986, correct?
8      A.     Correct.
9      Q.     So that's data collected
10 over a six-year period in the '80s.
11           And we've already said this,
12 but you found no increase with estrogen
13 alone use, correct?
14      A.     Yes.
15      Q.     Okay.  And then you say:
16 "There --" and this is the bottom of the
17 abstract.  Okay?  "There was little use
18 of estrogens opposed by progestogens."
19 And you report a relative risk that's not
20 statistically significant, correct?
21      A.     It's not, but it's pretty
22 close to being statistically significant,
23 .0 -- .9, but you're right.  It wasn't
24 statistically significant, but it's a red

Page 273

1 flag, isn't it?
2      Q.     Okay.  And you were one of
3 the ones looking at it, right?
4      A.     Yes.
5      Q.     Okay.  But then in the
6 abstract you say:  "There were
7 insufficient data to evaluate the effects
8 of nonconjugated estrogens and of
9 combined estrogen and progestogen
10 therapy"?
11      A.     That's right.
12      Q.     So it was a red flag based
13 on insufficient data?
14      A.     No, relative risk being 1.7
15 is a red flag.
16      Q.     And when you talk about
17 insufficient data, when you look at Table
18 2 on 1379, we see that you only had 22
19 cases and 16 controls, right?
20      A.     That's correct.
21      Q.     And as a scientist who
22 clearly, through the years, has -- had
23 been looking at the question of breast
24 cancer and hormones and believing that

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 274

1 people need to look at combination
2 therapy, why is it that you didn't get
3 more data on combination therapy use?
4      A.   Well, we couldn't at the
5 time.  That was what we had in the
6 database.  And our main hypothesis
7 probably was not -- not that conjugate --
8 combination use was causal, but we wanted
9 to examine it.  But we just didn't have
10 enough numbers to come up with a
11 convincing result, but, certainly, a
12 seven percent increase, even not
13 statistically significant but almost
14 statistically significant, is a warning
15 sign.  So it's a red flag, and it
16 concerned us.
17      Q.   Well, why is it that you
18 didn't have more?  Why weren't there more
19 in the database?
20      A.   Well, because in our
21 database we were collecting from '80 to
22 '86, and the use of the combination
23 historically was not great enough.  You
24 have -- see we collected from '80 to '86,

Page 275

1 but we would go back and get the history
2 for ten years.  And so, in 1980, most
3 cases came from '80 and '81, that was
4 mainly from a use the ten years before.
5      Q.   And that's a reality of a
6 case-control study, right.  It wasn't a
7 deficiency on your part.  There's a lag
8 time between when you do a study and when
9 you go back and look at records; you have
10 to look at historical records, right?
11      A.   That's correct.
12      Q.   So the case-control -- why
13 isn't it that when you were looking at
14 this question of hormones and breast
15 cancer as late as 1991, why wasn't the
16 combination use your main hypothesis?
17      MS. BEREZOFSKY:  Objection.
18 You can answer.
19      THE WITNESS:  We were
20 interested in it, but, you know,
21 we were a big group of
22 investigators, and the study
23 objectives were really set by the
24 Sloan epidemiology unit.  I had a

Page 276

1 role -- I had a role in it, and
2 since I sounded a warning in 1979
3 that we ought to look more
4 carefully at the combination, not
5 just assume it's safe, I wanted it
6 included, but there just wasn't
7 enough notice.
8 BY MS. FUJIMOTO:
9      Q.   Okay.  And after this study
10 in 1991 where you find this not
11 statistically significant, but a warning
12 signal, in your view, did you then start
13 work on a case-control study looking at
14 combination therapy use?
15      A.   I did not, because beginning
16 in 1991, I became chairman of the
17 department, and my research efforts
18 became diminished by my administrative
19 responsibilities, and so -- and so I
20 couldn't -- I couldn't do that, although
21 I did suggest to the Sloan group that
22 this would be an area to look at when
23 they have enough data.
24      Q.   Do you know whether they did

Page 277

1 that?
2      A.   I don't know.
3      Q.   Do you know when design and
4 planning for the WHI, the randomized
5 control trial, was done?
6      A.   It must have begun 10 or 15
7 years ago, when the NIH director, whose
8 name escapes me now, but it was a woman
9 -- when she put forward the idea, and
10 that probably goes back at least 15
11 years, maybe more.
12      Q.   Do you think maybe it was
13 going on in '91?
14      A.   The planning?
15      Q.   Yes.  Planning and protocol
16 development?
17      A.   I don't really know.
18      Q.   Do you know when they
19 started enrolling women?
20      A.   It's in their papers, but I
21 can't remember the date.
22      Q.   Doctor, did you look at --
23 do you have an article in 1989 that
24 looked at this same issue, hormone

Confidential - Subject to Protective Order

Page 278

1    therapy use and breast cancer?
2        A.    An article by --
3        Q.    You.
4        A.    If you didn't send it, I
5    don't have it.
6        Q.    Did you look at hormones and
7    ovarian cancer risks?
8        A.    Our group did, yes.  If it's
9    in my CV, I could find the '89 article,
10    but I probably don't have a copy.  I
11    didn't keep an archive of my articles.
12        Q.    And when you looked at
13    estrogen use and ovarian cancer in your
14    article in 1989 --
15            MS. FUJIMOTO:  And I'll mark
16        this as Exhibit No. 20 (sic).
17                - - -
18            (Whereupon, Deposition
19        Exhibit Stolley-18,
20        "Noncontraceptive Estrogen Use and
21        Epithelial Ovarian Cancer,"
22        (Kaufman, et al), American Journal
23        of Epidemiology, Vol. 130, No. 6,
24        1989, 1142-1151, was marked for

Page 279

1        identification.)
2                - - -
3    BY MS. FUJIMOTO:
4        Q.    -- did you find an increased
5    risk of ovarian cancer with estrogen use?
6            MS. BEREZOFSKY:  You said
7        ovarian cancer use, did you say?
8    BY MS. FUJIMOTO:
9        Q.    Ovarian cancer with
10    hormone -- estrogen use, I'm sorry.
11        A.    We did not find a -- we did
12    not find an increased risk and we did
13    -- we did not support -- our data did not
14    support the hypothesis that estrogens
15    increase their risk of ovarian cancer.
16        Q.    And so just based on your
17    own data, we have studies that show that
18    unopposed estrogen causes endometrial
19    cancer, but doesn't increase the risk of
20    breast cancer, and doesn't increase the
21    risk of ovarian cancer, right?
22            MS. BEREZOFSKY:  Objection.
23            THE WITNESS:  I think that's
24        probably a consensus that most

Page 280

1        people would accept.
2    BY MS. FUJIMOTO:
3        Q.    So you would agree with me
4    then that if an agent or drug has one
5    effect in one tissue or organ, it doesn't
6    necessarily mean that it's going to have
7    the same effect in other tissue or
8    organs, true?
9        A.    I agree with that, yes.
10        Q.    In your 1991 -- or strike
11    that, I'm sorry.
12            Before I move on, taking a
13    look at the estrogen use in ovarian
14    cancer that we just marked Exhibit 20
15    (sic), did you look at the effects of
16    combination therapy?  I think the numbers
17    are on Table 2, page 1145?
18        A.    We had so few using
19    combination therapy that I'm not sure if
20    we did analysis -- yeah, we had
21    combination therapy, but we had very few
22    cases.
23        Q.    Okay.  And you were looking
24    at a period '76 to '85, correct?

Page 281

1        A.    I have to check.
2        Q.    It's referenced on that same
3    table.
4        A.    Yes, we had cases from
5    Israel and Canada, too, yeah, subjects, I
6    should say.
7        Q.    Now, in your studies on
8    hormone therapy, estrogen therapy and
9    breast cancer, did you ever report the
10    relative risk based on histology, meaning
11    a separate number for lobular cancers?
12        A.    I don't think so.
13        Q.    Why not?
14        A.    I don't think we could get
15    that data from our database.
16        Q.    Do you know when data on
17    lobular cancer became routinely
18    available, meaning when pathology labs
19    began histologically differentiating
20    between lobular and ductal cancers?
21        A.    I don't know.
22        Q.    Do you have any information
23    as to how that method of characterization
24    has evolved over time?

71 (Pages 278 to 281)

Confidential - Subject to Protective Order

Page 282

1    A.   No, I really don't have the
2  details of that.
3    Q.   In any of your three -- or
4  any of your studies on hormone therapy
5  use and breast cancer, did you ever once
6  report on a relative risk based on
7  hormone receptor status?
8    A.   No, we couldn't obtain that.
9    Q.   And do you have any
10 information as to when that type of
11 information became available?
12   A.   I don't know the exact year,
13 but I think it's fairly recent.
14   Q.   I'm running short on time
15 here, so I may not be able to go through
16 all of them like I had hoped, but let me
17 ask you this:  You have done quite a
18 number of studies on oral contraceptives,
19 correct?
20   A.   Yes.
21   Q.   And you have looked at oral
22 contraceptives in breast cancer, right?
23   A.   Yes.
24   Q.   And oral contraceptives in

Page 283

1  ovarian cancer?
2    A.   Yes.
3    Q.   And in fact, oral
4  contraceptives have been shown to
5  dramatically reduce the risk of ovarian
6  cancer, right?
7    A.   Yes.  I wouldn't say
8  dramatically.
9    Q.   Significantly?
10   A.   No, that would confuse it
11 with statistics.
12   Q.   40 percent?
13   A.   I would -- modestly.
14   Q.   I've got to go over this.
15      And would you agree with me
16 that prior to 1991, that there were
17 scores of studies looking at oral
18 contraceptives and breast cancer?
19      MS. BEREZOFSKY:  I think
20      you've asked; and that's been
21      answered.
22 BY MS. FUJIMOTO:
23   Q.   The answer was yes?
24   A.   I don't know what -- I

Page 284

1  forget what a score is.
2    Q.   Lots.  Hundreds is what I
3  think you said.  Can I go with hundreds?
4      MS. BEREZOFSKY:  I don't
5      think he said hundreds.
6      THE WITNESS:  Let's go with
7      a lot.  I don't know the number.
8  BY MS. FUJIMOTO:
9    Q.   Okay.  Many in -- there were
10 studies done in foreign countries, too,
11 right, on oral contraceptives?
12   A.   Yes.  I was including them
13 in my estimate.
14   Q.   You studied the
15 cardiovascular effects of oral
16 contraceptives; is that right?
17   A.   Yes, and specifically in
18 relation to cigarette smoking.
19   Q.   In 1980, you did -- you
20 published a study regarding oral
21 contraceptives and endometrial cancer,
22 correct?
23   A.   Yeah, I think so.
24   Q.   And it found that oral

Page 285

1  contraceptives basically reduced the risk
2  of endometrial cancer by half?
3    A.   I would have to see the
4  paper to agree with you, or disagree with
5  you.
6    Q.   Okay.
7    A.   It was 27 years ago.
8    Q.   Did you publish an article
9  on oral contraceptives and melanoma?
10   A.   Yes.
11   Q.   And they were shown not to
12 increase the risk of that cancer; right?
13   A.   That's correct.
14   Q.   Of all of the worldwide
15 literature on oral contraceptives and
16 breast cancer, are you aware of any that
17 reported the risk of breast cancer by
18 histology?  And I mean lobular cancer.
19      MS. BEREZOFSKY:  Objection.
20      Go ahead.
21      THE WITNESS:  I don't -- I
22      just don't recall.
23 BY MS. FUJIMOTO:
24   Q.   Okay.  Do you recall whether

72 (Pages 282 to 285)

Confidential - Subject to Protective Order

Page 286

1 any of the oral contraceptives and breast
2 cancer studies reported based on
3 receptor -- hormone receptor status?
4     A.   I don't recall that, either.
5     Q.   Okay.  Doctor, could you
6 take a look back at Exhibit No. 10,
7 please.
8     A.   Yeah.
9     Q.   Do you have it?
10    A.   Yeah.
11    Q.   Okay.  And that is a study
12 in 1997 published in the American Journal
13 of Epidemiology in 1997, and you are an
14 investigator and author, correct?
15    A.   Yeah.  It's a study between
16 1988 and '90.
17    Q.   It's published -- we'll go
18 over the details.  It's "Hormone
19 Replacement and Menopausal Symptoms
20 Following Hysterectomy," right?
21    A.   Correct.
22    Q.   And if you would go to the
23 first page, right-hand column, towards
24 the bottom, you state:  "There is

Page 287

1 increasing evidence of the benefits of
2 HRT in prolonging life among
3 postmenopausal women," right?
4     A.   Right.
5     Q.   Okay.  And you cite to
6 studies.  In fact, you cite to one study
7 that "estimated a 46 percent reduction in
8 all-cause mortality for estrogen users,"
9 right?
10    A.   Right.
11    Q.   Okay.  And you report an
12 estimated long-term -- that estimated
13 long-term therapy will result in a "net
14 increase in life expectancy"?
15    A.   That's right.
16    Q.   Okay.  In you go on to the
17 next page, following that same column, am
18 I correct that you and the other author
19 said:  "The principal benefit of HRT in
20 the prolongation of life appears to be
21 reductions in coronary heart disease and
22 other cardiovascular diseases."  Correct?
23    A.   Yeah.  Were we wrong.
24    Q.   And you -- and you

Page 288

1 referenced the PEPI clinical trial,
2 right?
3     A.   Right.
4     Q.   Do you remember when the
5 PEPI trial was going on?
6     A.   I think they reported in
7 '93, '95.  I can't remember.
8     Q.   Okay.  And you go on to
9 state that the PEPI trial results were
10 confirmed with observational studies,
11 right?
12    A.   Yes.
13    Q.   Okay.  And then you go on to
14 say that "HRT had highly significant
15 positive effects on metabolic risk
16 factors on cardiovascular disease, with
17 little difference being seen between
18 estrogen only and estrogen plus
19 progestin," correct?
20    A.   Correct.
21    Q.   And next paragraph you go on
22 to talk about "HRT has long been
23 documented to reduce bone loss following
24 menopause" and "oophorectomy."  Right?

Page 289

1     A.   Yes.
2     Q.   And in fact, an indication
3 for hormone therapy is osteoporosis,
4 correct?
5     A.   That is one indication.
6     Q.   The next paragraph you say:
7 "Studies have reported beneficial effects
8 of estrogen therapy on cognition,"
9 correct?
10    A.   Yeah.
11    Q.   "And a decreased risk of
12 Alzheimer's disease," right?
13    A.   Right.
14    Q.   And so you're reporting here
15 in 1997 based on your review of the data
16 at the time on the benefits of HRT,
17 correct?
18    A.   On the -- our assessment of
19 the benefits from the literature.
20    Q.   Okay.  And you go on to say
21 that "Breast cancer risk has been shown
22 in some studies to be associated with
23 HRT," right?
24    A.   Yes.

Confidential - Subject to Protective Order

Page 290

1    Q.    So that was pretty evident
2  from the literature at that point,
3  correct?
4    A.    It was reported.  I'm not
5  sure -- I'm not sure if it was believed
6  by many.
7    Q.    It was believed by you,
8  right?
9    A.    No.  We say -- we say it's
10 been shown.
11   Q.    Okay.  And you go on to
12 report the conflicting results, right?
13 You say:  "All of these studies were
14 observational...and results ranged from
15 little or no evidence of risk to a 32
16 percent increased risk."
17       Do you see that?
18   A.    Yes.
19   Q.    And you report, Doctor, do
20 you not, in this study that -- or one of
21 the things that you found was that
22 hormone therapy was, in fact, effective
23 in relieving hormonal or menopausal
24 systems?

Page 291

1    A.    That's two of them, flashes,
2  hot flashes and vaginal dryness.
3    Q.    And if you go then to your
4  report -- and before you do that, do you
5  still agree today that the evidence shows
6  that hormone therapy is the most
7  effective therapy for relief of these
8  hormonal -- menopausal symptoms?
9    A.    Only one of them, hot
10 flashes.  I don't believe it's most
11 effective for vaginal dryness.
12   Q.    And go to your report,
13 please, which we marked as Exhibit No. 2.
14   A.    Different one now?
15   Q.    Exhibit 2, your report, not
16 your article.
17       There it is.  And go to page
18 4.  If you go to the last paragraph,
19 middle of the paragraph you say:  "Many
20 unproven claims of efficacy were
21 advertised by the manufacturer:
22 irritability, anxiety, fatigue among the
23 more legitimate claim of 'hot flashes'
24 and failure to 'lubricate' during sexual

Page 292

1  intercourse."
2       Do you see that?
3    A.    No, which paragraph is that?
4    Q.    Bottom paragraph in the
5  middle.
6    A.    Right.
7    Q.    Okay.  So are you telling
8  us -- are you saying that you think the
9  true claims of relief or the legitimate
10 ones are hot flashes and failure to
11 lubricate?
12   A.    Yes.
13   Q.    Okay.  And irritability,
14 anxiety and fatigue were unproven?
15   A.    They were unproven, but they
16 were advertised.  I have copies of the
17 ads that were issued in the late '60s and
18 '70s.
19   Q.    And do you know whether hot
20 flashes and vaginal dryness during
21 intercourse can make a woman irritable
22 and anxious?
23   A.    The attempt to -- the
24 attempt on the advertisements was to

Page 293

1  expand the indications, so that anxiety,
2  which might be treated with a
3  tranquilizer, was -- the implication was,
4  especially using pictorial
5  representations, the implication was that
6  first-line treatment would be estrogen
7  supplementation.
8       MS. FUJIMOTO:  Move to
9       strike as nonresponsive.
10 BY MS. FUJIMOTO:
11   Q.    My question to you was:
12 Whether hot flashes and vaginal dryness
13 can cause a woman to be irritable and
14 anxious?
15   A.    I don't think vaginal
16 dryness would make a woman irritable and
17 anxious.  There's a simple solution,
18 using a lubricant.
19   Q.    On what do you base that?
20   A.    I would rather not say.
21   Q.    Do you think that vaginal
22 dryness particularly during this period
23 of time that you're talking about --
24       MS. BEREZOFSKY:  What are

74 (Pages 290 to 293)

Confidential - Subject to Protective Order

Page 294

1  you referring to, this period of
2  time?
3       MS. FUJIMOTO:  In his
4  report.  I presume he knows what
5  period of time he's talking about.
6       Are you saying that vaginal
7  dryness was not something that
8  disrupted sexual relations with
9  women and their partners?
10      MS. BEREZOFSKY:  Object to
11 form.
12      THE WITNESS:  No.  I'm
13 saying that there were easily
14 obtainable ways, alternative ways
15 to take care of that problem.  And
16 that most women would discover it.
17 BY MS. FUJIMOTO:
18      Q.   Did you ever treat women for
19 vaginal atrophy following menopause?
20      A.   Well, I'm not a
21 gynecologist, so I don't usually, but I
22 have suggested lubricants for women who
23 report failure to lubricate in
24 intercourse, and the results have been

Page 295

1  very good.
2       Q.   I'm talking about vaginal
3  atrophy.  Not just dryness, literal
4  atrophy of tissue, have you ever treated
5  a woman for that?
6       A.   No.
7       Q.   Do you know whether oral
8  lubrication helps that?
9       A.   Not oral.  Topical.
10      Q.   Topical.  I'm sorry.
11      Do hot flashes disrupt
12 sleep?
13      A.   It can.
14      Q.   And does disrupted sleep
15 also result in irritability?
16      MS. BEREZOFSKY:  Objection,
17 I think this is beyond his area.
18 BY MS. FUJIMOTO:
19      Q.   It's in his report.
20      MS. BEREZOFSKY:  Go ahead.
21      THE WITNESS:  The
22 advertisements didn't say about
23 the anxiety and irritability were
24 secondary to hot flashes and

Page 296

1  vaginal atrophy.  They just said
2  anxiety in postmenopausal women.
3  The advertisement didn't make that
4  connection, so it didn't restrict
5  the indication to irritability or
6  anxiety due to vaginal atrophy and
7  hot flashes.
8       MS. FUJIMOTO:  Okay.  Move
9  to strike nonresponsive.
10      MR. HAVERTY:  I think it was
11 totally responsive.
12 BY MS. FUJIMOTO:
13      Q.   My question was -- I didn't
14 ask you anything about advertisements.
15 My question is:  Do you think that
16 disrupted sleep can cause irritability?
17      A.   Sleep deprivation can cause
18 irritability, yes.
19      Q.   And can things that affect a
20 woman's sex life, can that cause anxiety?
21      A.   In both men and women, yes.
22      Q.   Probably more in men, yeah?
23 Okay.
24      MS. BEREZOFSKY:  That was

Page 297

1  gratuitous, but --
2       THE WITNESS:  It's true.
3  I'll do a study.  I'll prove it.
4  BY MS. FUJIMOTO:
5       Q.   All right.  Okay.  Doctor, I
6  need to --
7       MS. FUJIMOTO:  Don't worry,
8  Nathan, I'll move on here.
9  BY MS. FUJIMOTO:
10      Q.   Let me -- if you go to your
11 report, Doctor, marked as Exhibit No. 2,
12 and basically the last page of the text
13 of your report, page 9, paragraph 7.  You
14 say, "Had the drug companies conducted
15 such studies, the true risk of breast
16 cancer from combination HRT would have
17 been obvious by the early 1990s at the
18 latest."
19      Do you see that?
20      A.   Yes.
21      Q.   So what, in your opinion, is
22 the true risk of breast cancer from
23 combination hormone therapy use?
24      A.   It's probably in between

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 298

1    about 1.24 and 3, relative risk.
2        Q.    Okay. And is it your
3    opinion or testimony then that relative
4    risks in that range were not reported in
5    the 1990s?
6        A.    I think in the -- maybe in
7    the late '90s. Well, the Women's Health
8    Initiative reported, I guess, in 2003.
9        Q.    Right.
10        A.    And that's probably the most
11    convincing study.
12        Q.    Okay. And so that's what we
13    would have known, the results from the
14    WHI would have been known earlier?
15        A.    Results from a randomized
16    controlled trial would have been known
17    earlier, yes. A randomized control trial
18    has the advantage of being less open to
19    alternative interpretations, and also
20    could have been done, probably feasible
21    in the early '90s.
22        Q.    But when you talk about the
23    true risk then, what would have been
24    known earlier, you're talking about the

Page 299

1    data that was reported in the WHI in
2    2002?
3        A.    Not just the WHI, also the
4    Million Women Study, Beral and Colditz
5    studies, the nurses. They all had
6    different estimates, but they were
7    elevated and significant and they all --
8    that could have been known earlier.
9        Q.    So I take it what you're
10    saying is it wasn't known earlier?
11        A.    That it was -- wasn't --
12    there were reports, but it wasn't
13    convincingly accepted that it would
14    change prescribing patterns, that the
15    WHI, after it was published, changed
16    prescribing patterns.
17        Q.    In fact, just real quickly,
18    you actually published a report on
19    patterns and determinants of conjugated
20    estrogen use, right?
21        A.    Yes.
22        Q.    You studied patterns of use
23    before?
24        A.    Yes.

Page 300

1        Q.    And am I correct in your
2    study what you found is that hormone
3    therapy was actually prescribed for the
4    things it was indicated for, relief of
5    hot flashes?
6        A.    And osteoporosis.
7        Q.    The on label indications?
8        A.    Yeah.
9        MS. FUJIMOTO: Why don't we
10    -- you want to change the tape,
11    because I'm going on to a new
12    section.
13        THE VIDEOGRAPHER: This
14    marks the end of Volume 1, Tape
15    No. 3 in the deposition of
16    Dr. Paul Stolley. Going off the
17    record. The time is 4:53 p.m.
18        (A recess was taken.)
19        THE VIDEOGRAPHER: We're
20    back on the record. Here marks
21    the beginning of Volume 1, Tape
22    No. 4 in the deposition of
23    Dr. Paul Stolley. The time is
24    5:01 p.m.

Page 301

1    BY MS. FUJIMOTO:
2        Q.    Dr. Stolley, when were you
3    first contacted by plaintiff's counsel
4    regarding this litigation?
5        A.    I think it was around
6    December of 2006, but I'm not -- I'm not
7    absolutely certain of that.
8        Q.    Okay. And who contacted
9    you?
10        A.    Miss Berezofsky.
11        Q.    And what did she tell you or
12    ask you?
13        A.    She told me that she had
14    some litigation involving hormone
15    replacement therapy, and she asked me if
16    I would consider participating in terms
17    of looking at what studies were done and
18    what studies could have been done and,
19    also, a bit about the FDA and how it
20    operated from my experience, my year
21    there, and also on causation in a general
22    sense.
23        Q.    Okay. And did you agree, at
24    that point in time, to work on those

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 302

1  issues?
2      A.    No.  I wanted to learn more
3  about the case, and I think we met and we
4  got into more detail about the nature of
5  the litigation.
6      Q.    And what were you told about
7  the nature of the litigation?
8      A.    Only that she had specific
9  cases where there were -- where the
10  plaintiff was claiming tumor was due to
11  hormone replacement therapy, and I think
12  -- I'm not sure if she mentioned a class,
13  a class action or not.
14      Q.    I take it that you did not
15  agree or decide to get involved on an
16  individual case basis?
17      A.    That's correct.
18      Q.    And why was that?
19      A.    I don't like to do that
20  generally.
21      Q.    And so at what point did you
22  agree to be retained to work on this
23  litigation?
24      A.    Probably after Christmas

Page 303

1  sometime.
2      Q.    And what did you then do in
3  preparation for your opinions?
4      A.    I should say there was also
5  a conversation, telephone conversation,
6  with Mr. Williams from Seattle.
7      Q.    And what was that
8  conversation about?
9      A.    It was about what I would --
10  what they would ask me to consider
11  testifying about in this litigation.
12      Q.    And did he suggest the same
13  things you just told me Miss Berezofsky
14  talked to you about?
15      A.    I think he -- he didn't say
16  anything different.
17      Q.    Did he ask you to consider
18  other issues that you then decided not to
19  offer opinions about?
20      A.    Yeah.  There was one issue
21  that I felt that I didn't have the
22  expertise to testify about, but I can't
23  recall what it was now.  But I felt -- I
24  felt that it was something that I didn't

Page 304

1  want to do.
2      Q.    And during the course of
3  this conversation, or your conversations
4  or meetings with any of the plaintiffs'
5  lawyers, did you take notes?
6      A.    No.
7      Q.    Did you ever exchange emails
8  with counsel for plaintiffs?
9      A.    Yes.
10      Q.    And did you maintain copies
11  of those emails?
12      A.    No, I never retain copies of
13  any emails unless they're from my
14  children.
15      Q.    Did you ask whether or not
16  you had any obligation to maintain
17  emails?
18      A.    No, I never asked.  It's
19  just been my practice because my computer
20  doesn't have a lot of memory, so I just
21  delete, delete, delete.
22      Q.    And would you -- did you
23  correspond by email with plaintiffs'
24  counsel regarding your opinions in the

Page 305

1  case?
2      A.    Yeah.
3      Q.    And were there email
4  communications discussing your report?
5      A.    I think we did that on the
6  phone.  Our email communications were
7  more like I can meet on such a date, and
8  that sort of thing.
9      Q.    When did you first -- or
10  strike that.
11          What did you do to prepare
12  for your opinions in the litigation?
13      A.    Well, Mr. Williams sent me
14  four volumes of literature, which I have
15  with me, and some of it included
16  testimony by other witnesses and I went
17  through most of that and tried to pick
18  out what I thought was important to form
19  the basis of my opinion.  And then I
20  wrote, I wrote my report, and sent it to
21  Mrs. Berezofsky.
22      Q.    And so the box that you
23  brought with you today, and at some point
24  we'll mark it as an exhibit, but the box

77 (Pages 302 to 305)

Confidential - Subject to Protective Order

Page 306

1  that you brought, does that contain
2  everything that you reviewed and relied
3  upon in formulating your opinions?
4       A.   Well, I didn't rely on
5  everything in the box, but...
6       Q.   Did you review everything in
7  the box?
8       A.   No, not everything.  There
9  were some things I did not review.
10      Q.   Is there a way, by looking
11 at the materials, to know what you
12 reviewed and what you did not?
13      A.   Only partially.  You can see
14 some underlinings and maybe a marginal
15 note here or there.  But we listed what I
16 was -- attached to the report.
17      Q.   So are you saying that the
18 reference list that is attached to your
19 report includes everything that you
20 reviewed and relied upon in forming your
21 opinions?
22      A.   Well, it's probably more
23 than I relied upon for my opinion, and I
24 reviewed most of it.  There were some

Page 307

1  things that I didn't -- didn't want to
2  review.
3       Q.   Okay.  So -- so what's
4  attached is references to your report?
5       A.   It's everything I received,
6  yeah.
7       Q.   Okay.  So this is a listing
8  of everything you received?
9       A.   I think so.
10      Q.   Okay.  And you didn't review
11 everything, and you didn't rely on
12 everything?
13      A.   That's correct.
14      Q.   Is there any way for you, if
15 we went through the box, for you to be
16 able to -- or the list, for you to be
17 able to tell me what did review and rely
18 upon and what you didn't?
19      A.   I think what would be better
20 if I create such a list.  Not today.  It
21 would take too much time.
22      Q.   Did you have an
23 understanding that you needed to do that
24 before the deposition so we would know

Page 308

1  today what you reviewed and relied upon?
2       A.   No.
3       Q.   So who prepared this
4  reference list that is attached to your
5  report?
6       A.   I'm not sure.  I think it
7  might have been Mr. Williams.
8       Q.   So it was given to you by
9  counsel?
10      A.   Yeah.  And it's a list of
11 references, but -- which I -- I was
12 supposed to review all of it, but I
13 couldn't.
14      Q.   Did you review any of it?
15      A.   Oh, yes, a good deal of it.
16      Q.   And so what you're saying is
17 this reference list should correlate with
18 what's in the box?
19      A.   Yeah.
20      Q.   Okay.  And did you review
21 and rely upon anything that's not on this
22 list?
23      A.   I think I would be better
24 able to tell you that when I compile the

Page 309

1  list of what I did rely on, and I check
2  it against this.
3       Q.   Do you have everything that
4  you reviewed and relied upon in the box?
5       A.   That's what I'm saying.  I'm
6  not certain, but I think so.
7       Q.   Do you have a file or box of
8  things or materials somewhere else, not
9  with you today, that you think you might
10 have reviewed and relied upon?
11      A.   No, I don't.
12      Q.   So if there are things that
13 you relied -- reviewed and relied upon
14 that are not in the box, where would they
15 be?  Where could we find them?
16      A.   Well, I think everything is
17 in the box, yeah.
18      Q.   And when did you start
19 preparing, or when did you prepare this
20 report?
21      A.   I prepared this report in
22 January sometime.
23      Q.   Okay.  And do you know how
24 much time was spent reviewing materials

78 (Pages 306 to 309)

Confidential - Subject to Protective Order

Page 310

1  before you did the report?
2      A.    I haven't tallied up the
3  time.  I haven't sent an invoice to
4  Mrs. Berezofsky, and I'm -- but I have
5  a -- I have a diary listing the time, and
6  I have to tally it.  It's probably in the
7  order of 30 or 40 hours.
8      Q.    30 or 40 hours reviewing
9  materials?
10      A.    No.
11      Q.    Total?
12      A.    Total time.
13      Q.    And can you give me an
14  estimate of the number of hours or
15  percentage of time reviewing materials,
16  versus meetings, versus preparing the
17  report?
18          MS. BEREZOFSKY:  Just ask
19  you not to guess.
20          THE WITNESS:  I'm sorry.
21          MS. BEREZOFSKY:  I would
22  just ask you not to guess.
23  Certainly, answer if you know.
24          THE WITNESS:  Well, we had

Page 311

1          -- we had a meeting on Tuesday,
2          and on Wednesday I re-reviewed
3          material.  And then I -- I think
4          we had another meeting earlier on
5          before I prepared the report.
6  BY MS. FUJIMOTO:
7      Q.    Okay.
8      A.    But most of the time -- most
9  of the time I was reviewing all of this
10  material.
11      Q.    All right.  So how many
12  meetings have you had with counsel?
13      A.    I think we've had two
14  in-person meetings, and then we've talked
15  on the phone.
16      Q.    And the first meeting was
17  when you were first retained, after the
18  initial phone call?
19      A.    I think so.
20      Q.    Okay.  And then the second
21  meeting was after you prepared your
22  report?
23      A.    Yeah.
24      Q.    Okay.  Tell me how you

Page 312

1  prepared your report.
2          MS. BEREZOFSKY:  I object to
3          the form.  What do you mean, how
4          did he prepare his report.
5  BY MS. FUJIMOTO:
6      Q.    How did do you it?
7      A.    I reviewed the materials and
8  then I created an outline, and then I
9  expanded the outline into paragraphs, and
10  that's how I prepared the report.
11      Q.    And did you create the
12  outline on your own computer?
13      A.    Yeah.
14      Q.    Okay.  And was anyone with
15  you when you created the outline?
16      A.    My dog.  He keeps bumping --
17      Q.    Did he have any contribution
18  -- no?
19      A.    Yeah.
20      Q.    He was upset about your
21  position on Beagle dogs?
22      A.    He's a pit bull.
23      Q.    Did you print out a copy, a
24  hard copy, at any point in time of your

Page 313

1  outline?
2      A.    I think I did, but I think I
3  sent the report, not hard copy, by email.
4      Q.    Did you send the outline by
5  email?
6      A.    No.
7      Q.    Is the outline -- the hard
8  copy the outline in the box?
9      A.    No.
10      Q.    Do you still have it?
11      A.    No.  I mean, the outline is
12  really pretty much the headings.  That's
13  what I meant by outline.
14      Q.    But did you throw away the
15  hard copy?
16      A.    Yeah.
17      Q.    Okay.
18      A.    I had no reason -- and I
19  didn't see any reason to keep it.
20      Q.    Had anyone reviewed or
21  commented on the outline?
22      A.    Not on the outline.
23  Comments on the report.
24          MS. BEREZOFSKY:  I'm going

Confidential - Subject to Protective Order

Page 314

1  to -- excuse me. I need to
2  object, because I want to make a
3  statement on the record; and that
4  is that I understand that -- while
5  Dr. Stolley is being produced for
6  Pennsylvania litigation, he's also
7  being produced in New Jersey, and
8  New Jersey rules do not require
9  him to produce any drafts, and
10 you're not entitled to any work
11 product. I'm going to put on the
12 record now, you can certainly ask
13 him these questions, but I will
14 object to any use of that
15 information in the New Jersey
16 litigation, pursuant to the rules,
17 appropriate rules.
18     MR. SCHACHTMAN: If I could
19 respond. This is Nathan
20 Schachtman on behalf of
21 Pharmacia/Upjohn. We absolutely
22 object to this deposition being
23 treated as a New Jersey
24 deposition. It was noticed

Page 315

1  pursuant to Pennsylvania Rules of
2  Civil Procedure and case
3  management orders entered in the
4  Philadelphia county litigation.
5  There was an attempt to cross
6  notice it by plaintiff's counsel,
7  which was legally ineffective
8  because of lack of notice, and
9  because we haven't even finished
10 discovery in the New Jersey case.
11 This is not our deposition notice
12 of Dr. Stolley in the New Jersey
13 case. I'm not prepared to take
14 Dr. Stolley's deposition in the
15 New Jersey cases, and I don't
16 regard myself in any way limited
17 by counsel's statement that this
18 is a New Jersey deposition. We
19 are not regarding this as a New
20 Jersey deposition. If need be,
21 we'll take that up with Judge
22 Garruto in Middlesex County.
23     MS. BEREZOFSKY: I will add
24 to that we do view this and you

Page 316

1  have been properly noticed, cross
2  noticed that this is to be used in
3  the New Jersey litigation, and
4  pursuant to the way things have
5  been handled in this litigation,
6  unless you want to produce your
7  experts repeatedly in the various
8  litigation, we will take the
9  position that and we do take the
10 position that this is for both
11 Pennsylvania and the New Jersey
12 litigation.
13 BY MS. FUJIMOTO:
14     Q.   Dr. Stolley, did you show or
15 get comments upon your outline? Did you
16 show anyone your outline and get comments
17 upon them?
18     A.   I sent -- I sent it to
19 Mrs. Berezofsky and --
20     Q.   Did she send back comments?
21     MS. BEREZOFSKY: Excuse me
22 one second.
23     MS. FUJIMOTO: All right.
24 Go off the record, please.

Page 317

1      THE VIDEOGRAPHER: The time
2  is 5:18 p.m.
3      (A recess was taken.)
4      THE VIDEOGRAPHER: We're
5  back on the record. Time is 5:23
6  p.m.
7  BY MS. FUJIMOTO:
8      Q.   Dr. Stolley, you said you
9  sent the outline that you prepared
10 electronically to plaintiff's counsel,
11 correct?
12     A.   No, not the outline.
13     MS. BEREZOFSKY: You're
14 mischaracterizing the witness'
15 testimony.
16     MS. FUJIMOTO: I'm not
17 characterizing it at all. I'm
18 asking him.
19     MS. BEREZOFSKY: That's not
20 what he said.
21     MS. FUJIMOTO: Well, the
22 record will speak for itself.
23 BY MS. FUJIMOTO:
24     Q.   Did you send an electronic

80 (Pages 314 to 317)

Confidential - Subject to Protective Order

Page 318

1    version of your outline to Counsel?
2        A.    No.
3        Q.    Did you speak with
4    plaintiff's counsel about the outline
5    before you began preparing your report?
6        A.    I don't think so.  I think I
7    sent the draft of the report.
8        Q.    Okay.  So you, after your
9    outline, you then prepared a draft of the
10   report, correct?
11       A.    Right.
12       Q.    And did plaintiff's counsel
13   talk to you or have any input as to what
14   should be in the report?
15       A.    Mainly what she did was to
16   put it in legal form, change the format,
17   and nothing substantive was changed or
18   suggested.
19       MS. BEREZOFSKY:  Again --
20   I'm going to object to any
21   questions for the New Jersey
22   litigation, on this line.
23       MS. FUJIMOTO:  Well, this is
24   Pennsylvania so I'm going to ask.

Page 319

1        MS. BEREZOFSKY:  No.  Excuse
2    me.  It's also cross noticed in
3    New Jersey.
4        MS. FUJIMOTO:  You guys can
5    fight all you want about the
6    validity of that.  We served a
7    notice in Pennsylvania litigation
8    and we're taking testimony in the
9    Pennsylvania litigation.
10       MS. BEREZOFSKY:  You may
11   well be doing it, and I also cross
12   noticed it for New Jersey.
13       MS. FUJIMOTO:  We're not
14   taking all this testimony time.
15       MS. BEREZOFSKY:  I'm
16   reserving it for the New Jersey
17   litigation.
18   BY MS. FUJIMOTO:
19       Q.    Did you, Dr. Stolley, speak
20   with anyone about what should go in your
21   report before you prepared it?
22       A.    Well, in a general way --
23   yeah, the topics I would cover.
24       Q.    And who told you what topics

Page 320

1    to cover?
2        A.    Nobody told what topics to
3    cover.  They told me what areas they
4    would like me to cover as an expert, and
5    what area I wasn't an expert and they had
6    other experts and not to get involved in,
7    but they didn't tell me what to say.
8        Q.    And when you prepared your
9    report, then, did you send that
10   electronically to plaintiff's counsel?
11       A.    I did, yes.
12       Q.    Did you copy -- print a hard
13   copy of it?
14       A.    I did, but I didn't keep it.
15   I printed it mainly because to find
16   errors and typos, because I find it hard
17   to do it on a computer, and then I put
18   the changes in on the computer, and then
19   I threw away the hard copy, I think.
20       Q.    Did you receive any comments
21   back on the -- your report from
22   plaintiff's counsel?
23       A.    Not really.  Mainly they put
24   it in a legal format, which I didn't

Page 321

1    have.
2        Q.    So plaintiff's counsel took
3    your first draft, reformatted it or, did
4    you maintain a copy of your original
5    draft?
6        A.    No.
7        Q.    What about the draft that
8    came back from plaintiff's counsel?
9        A.    I think this is it.  I might
10   have made some other changes and sent it
11   back, but we didn't go through a lot of
12   drafts.
13       Q.    Do you recall what changes?
14       A.    Yeah.  I think there were --
15   it was mainly epidemiological terms and
16   preference for certain word usage or
17   grammar, that sort of thing.  It was
18   nothing substantive as I recall.
19       Q.    So once it came back from
20   plaintiff's counsel, you're saying that
21   you just made some minor changes and then
22   that's the final draft --
23       A.    Yeah.
24       Q.    -- that we have?

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 322

1    A.   Yeah.
2    Q.   Approximately how many hours
3  or how much time did you spend preparing
4  the report?
5    A.   I have that in a diary, but
6  I can't remember exactly, but I would say
7  it was probably in the order of 12 hours
8  or less -- and in the actual writing,
9  changing the report.
10    Q.   And would that -- does that
11  time include discussions with counsel
12  about the information in the report?
13    A.   No, I was mainly thinking
14  about me sitting at the computer, and
15  drafting it.
16    Q.   Did you -- you indicated
17  that one of the things that you were
18  asked about was your one year, the time
19  you spent at the FDA.  Are you offering
20  any opinions regarding regulatory issues
21  or FDA issues?
22    A.   I don't have them in the
23  report, but if I'm asked questions about
24  FDA, during the trial, I'm prepared to

Page 323

1  answer it.  Not about -- not so much
2  about regulatory issues, but more about
3  how the FDA worked during the year I was
4  there, and post marketing surveillance,
5  and how they interacted with the
6  companies.
7    Q.   And are you planning, as you
8  sit here today, to offer affirmative
9  opinions on that subject area?
10    A.   What do you mean by
11  "affirmative"?
12    Q.   Planning to offer it
13  affirmatively as opposed to being asked
14  questions about it by opposing counsel.
15    A.   I'm not sure what you mean.
16  If in direct examination Mrs. Berezofsky
17  or one of her colleagues asks me
18  questions about that, I'm willing to
19  answer them, but -- some of them, but
20  since it's not in my report, I don't
21  anticipate that happening.
22    Q.   And you understand that, as
23  you sit here, today, I'm entitled to know
24  what opinions you plan to come to trial

Page 324

1  with and affirmatively offer against my
2  client.  Do you understand that?
3    A.   Yes, I understand the
4  discovery, and I'm trying to cooperate
5  with it, and not conceal anything.
6    Q.   Okay.  And are all of the
7  opinions that, as you sit here today,
8  that you plan to come to trial and offer
9  opinions about, are they all set forth in
10  your report?
11    A.   Yes, that's my
12  understanding.
13    Q.   If you go to page 3 of your
14  report?
15    MS. BEREZOFSKY:  The copy.
16    THE WITNESS:  Oh, the bigger
17  one.  I have one here for you.
18    MS. BEREZOFSKY:  There it
19  is.  Thanks.
20    THE WITNESS:  I'll take that
21  one and I'll give you the eye
22  strainer.
23    I'm sorry.
24  BY MS. FUJIMOTO:

Page 325

1    Q.   Page 3, kind of the middle
2  paragraph there?
3    A.   Yes.
4    Q.   "I offer the following
5  opinions to reasonable degree."  Do you
6  see that?
7    A.   Yes.
8    Q.   And did you compose that
9  piece, that paragraph?
10    A.   No.  I think probably,
11  putting it in legal form, that was put
12  in.
13    Q.   Any other parts put in by
14  plaintiff's counsel?
15    A.   Actually, I don't think so.
16    Q.   Since you destroyed your
17  draft, right, there's no way for us to
18  tell what was inserted or what wasn't?
19    A.   I don't know what you're
20  looking for, but there are no drafts on
21  my computer.
22    Q.   There are drafts on your
23  computer?
24    A.   No, there are none.

82 (Pages 322 to 325)

Confidential - Subject to Protective Order

Page 326

1 　　　MS. FUJIMOTO:  Off the
2 record.
3 　　　THE VIDEOGRAPHER:  Going off
4 the record.  The time is 5:33 p.m.
5 　　　(A recess was taken.)
6 　　　MR. SCHACHTMAN:  In the
7 interest of full disclosure, I
8 believe we can finish the
9 Pennsylvania dep where we have
10 seven hours of time with the
11 witness.  The New Jersey
12 deposition, which we don't believe
13 has been effectively noticed, it
14 would be for us to notice the
15 deposition, but let's assume for
16 the sake of discussion you are
17 correct, that deposition has no
18 time limits, so, I'm not prepared
19 to close any deposition that is
20 being purportedly taken in the New
21 Jersey case.
22 　　　MS. BEREZOFSKY:  Then I want
23 to put on the record that it's our
24 position that it's properly cross

Page 327

1 noticed and the seven hours are
2 the seven hours.  And you don't
3 get to come back and reask the
4 same questions or even have
5 another deposition, unless there
6 is a new report or new opinions
7 that are authored by this
8 particular expert.  So that's --
9 　　　MR. SCHACHTMAN:  I
10 understand your position.  I
11 disagree with it.
12 　　　MS. FUJIMOTO:  All right.
13 Well, you know, we --
14 　　　MS. BEREZOFSKY:  All right.
15 I'm actually thinking --
16 　　　(Discussion off the
17 stenographic record.)
18 　　　MS. FUJIMOTO:  Let me go on
19 the record and state this; that we
20 have noticed the deposition, we
21 accommodated a request for a start
22 time.  We have at least, at least
23 under Pennsylvania rules, seven
24 hours of time.  We have a

Page 328

1 videographer who has taken an
2 official elapsed time of the
3 record of the time.  Let me ask
4 you, we have an hour and 20
5 minutes left?
6 　　　THE VIDEOGRAPHER:  Elapsed
7 you have five hours and 40
8 minutes.
9 　　　MS. FUJIMOTO:  Perfect.  So
10 we have an hour and 20 left.  We
11 are having to break down
12 everything because plaintiff's
13 counsel did not reserve the
14 conference room for sufficient
15 time, but our position is that our
16 clients should not bear the burden
17 of having to do a second day
18 because of that, having to fly
19 people back out to Baltimore to
20 complete the deposition.  We're
21 going to break it down, and start
22 again and we have an hour and 20
23 minutes of testimony time.
24 　　　MS. BEREZOFSKY:  My response

Page 329

1 to that is that you never
2 accommodated anything.  You asked
3 for a specific start time, which I
4 never agreed to, made very clear
5 early on that is not agreeable.
6 Typically a deposition starts at
7 ten o'clock.  I accommodated your
8 request to start early at 9:30.
9 So our position is that, and the
10 -- with respect to the room, in
11 fact, we did order it for plenty
12 of time.  There was a glitch, and
13 you're right, it's my
14 responsibility because I made
15 the arrangements, but your tenor
16 and your tone about it somehow
17 being intentional I find
18 offensive.
19 　　　MS. FUJIMOTO:  Not
20 intentional, at all.
21 　　　MS. BEREZOFSKY:  I'm not
22 finished now.
23 　　　MS. FUJIMOTO:  Well, I can
24 tell by your tone --

83 (Pages 326 to 329)

Confidential - Subject to Protective Order

Page 330

1        MS. BEREZOFSKY:  Well --
2        MS. FUJIMOTO:  -- I bet
3   you're not finished.
4        MS. BEREZOFSKY:  Well, I'm
5   not --
6        MS. FUJIMOTO:  And we're
7   going to stay here until midnight
8   probably because you're not
9   finished.
10       MS. BEREZOFSKY:  I'm not --
11  I'm not finished.  We're going to
12  put this on the record.
13       MS. FUJIMOTO:  Keep going.
14       MS. BEREZOFSKY:  You can
15  have -- I'd like to see a record,
16  some sort of printed thing that
17  indicates, because my calculations
18  are that you don't have an hour
19  and 40 minutes.  If the
20  videographer represents on the
21  record that that's, in fact, the
22  case and I have some sort of a
23  printout that indicates that, we
24  will proceed, I will find another

Page 331

1   room for us to move to and we can
2   continue.
3        MS. FUJIMOTO:  Well, I think
4   he just represented that, didn't
5   you?  Five hours and 40 minutes is
6   our elapsed time.
7        MS. BEREZOFSKY:  It wasn't
8   on the record.
9        MR. SCHACHTMAN:  It was on
10  the record.  And if there's any
11  issue that we don't have a
12  sufficient record, I'd ask the
13  videographer, who's already, I
14  believe, an officer of the Court
15  to be sworn and to testify about
16  this matter.
17       MS. BEREZOFSKY:  Well, in
18  the meantime, I'm going to try to
19  get -- before you do that, I'm
20  going to try to find somebody to
21  move us.
22       MR. SCHACHTMAN:  Thank you.
23       (Discussion off the
24  stenographic record.)

Page 332

1        MS. FUJIMOTO:  Before we
2   break it down -- get back on the
3   record.  Before we break this
4   down, I just want to make sure the
5   record's clear, whether we need to
6   swear -- do I need to swear him
7   in?  Do I need to have the court
8   reporter swear him under oath?
9        MS. BEREZOFSKY:  No.  I will
10  accept his representations without
11  being under oath.
12       MS. FUJIMOTO:  Okay.
13       MS. BEREZOFSKY:  I just
14  wanted -- verbally I would like it
15  on the record.  I'd like a
16  transcript.
17       MS. FUJIMOTO:  Would you go
18  ahead and state the total
19  testimony time up to this point.
20       THE VIDEOGRAPHER:  Elapsed
21  is five hours and 40 minutes.
22       MS. FUJIMOTO:  Thank you.
23  Okay.  We can go off now and we'll
24  go set up.

Page 333

1        (A recess was taken.)
2        THE VIDEOGRAPHER:  We're
3   back on the record.  The time is
4   6:25 p.m.
5   BY MS. FUJIMOTO:
6   Q.    Welcome back, Dr. Stolley.
7   I think when we broke -- boy, it's hard
8   to remember, but I think we were talking
9   about your report, and I had asked you to
10  turn to page 3, the middle paragraph, and
11  that's the paragraph that was provided by
12  plaintiff's counsel.
13       Do you see it?
14       MS. BEREZOFSKY:  Objection.
15       THE WITNESS:  Well, that
16  was -- there was some reporting,
17  yeah.
18  BY MS. FUJIMOTO:
19  Q.    Down in the middle of the
20  paragraph you say, in reading the -- "In
21  reaching the opinions set forth, I have
22  reviewed, in addition to the relevant
23  publications, the report of Dr. Parisian
24  with whose opinions and conclusions I

84 (Pages 330 to 333)

Confidential - Subject to Protective Order

Page 334

1  concur."
2       You see that?
3     A.   Yes.
4     Q.   Okay.  And which opinions
5  and conclusions in that report do you
6  concur with?
7     A.   I'd have to see the report
8  again, but I did read it and did agree
9  with it, but I can't remember without
10  having it produced.
11    Q.   Okay.  So do you have a
12  memory of whether you agreed with all of
13  it or just parts of it?
14    A.   I think all of it.
15    Q.   Did you review the materials
16  cited by and relied upon by Dr. Parisian
17  in forming her opinions?
18    A.   I did -- didn't specifically
19  do that, but some of them were sent to me
20  in the four volumes by Mr. Williams.
21    Q.   Okay.  So we need to talk
22  up.  The air conditioning just came on.
23       So let me understand.  You
24  didn't go back and review the materials

Page 335

1  that Dr. Parisian reviewed and relied
2  upon in forming your opinions; is that
3  correct?
4     A.   Not specifically, that's
5  correct.
6     Q.   Do you know what she
7  reviewed and relied upon in forming her
8  opinions?
9     A.   I think she has listed what
10  she relied on in the report.
11    Q.   And did you review the list?
12    A.   I reviewed it, yes, but I
13  didn't read all of them.
14    Q.   And did you -- so how do you
15  know that some of the materials that you
16  were sent that were in the box were part
17  of what was relied upon by Dr. Parisian?
18    A.   I think that I checked some
19  of the citations she had with the list
20  that I received.
21    Q.   And then did you go and look
22  at the document or just the list?
23    A.   I think I -- I think I -- I
24  looked at some of the documents.  I'm not

Page 336

1  sure I looked at all of them.
2     Q.   Are you able to tell which
3  ones you looked at and which ones you
4  didn't?
5     A.   At this point, no.
6     Q.   And when you say you concur
7  with Dr. Parisian's opinions, are you --
8  was it a matter of you just reading the
9  report and saying, "Oh, yeah, I agree
10  with that," as opposed to using it as a
11  basis for your own opinions?
12       MS. BEREZOFSKY:  Objection.
13  You can answer.
14       THE WITNESS:  I don't
15  understand the difference.
16  BY MS. FUJIMOTO:
17    Q.   Well, the difference is if
18  you review something, look at the
19  underlying data, assess it and bring it
20  in as part of your opinion, versus
21  reading someone else's opinions and
22  saying, "Yeah, I generally agree with
23  that."
24    A.   It was mostly the latter.  I

Page 337

1  agreed with her opinions and relied on
2  her report.
3     Q.   Do you intend at the time of
4  trial to offer any opinions that are
5  offered by Dr. Parisian in her report
6  that aren't otherwise in your report?
7     A.   Well, when I say I agree
8  with Dr. Parisian's report, I will
9  probably state what I agree with if I'm
10  questioned on it.
11    Q.   Okay.  Well, we'll have to
12  pull that report then.  I take it her
13  report is in the box?
14    A.   It should be.
15    Q.   Okay.  Let me ask you the
16  same question regarding your review of
17  the report of Dr. Colditz.  Do you know
18  which report that is?
19    A.   It was the report that he
20  gave in testimony.
21    Q.   Was it trial testimony, a
22  transcript, or a report like your report?
23    A.   A report like my report.
24    Q.   Okay.  And, again, did you

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 338

1  just review it and kind of agree with the
2  opinions, or did you go back and look at
3  the data that he analyzed and use that?
4       A.   Well, some of the things
5  that he referenced I had already read,
6  but I didn't go back and reanalyze it.
7       Q.   And what about the report of
8  Cheryl Blume, which opinions and
9  conclusions in her report do you agree
10  with?
11       A.   Again, I'd have to see the
12  report to remember.
13       Q.   Okay.  We'll pull that out,
14  as well.
15       Let me, for the record,
16  though, before I forget, do a couple of
17  housekeeping things and then we -- we may
18  need to go -- go through those reports.
19       MS. FUJIMOTO:  I'll mark as
20  Exhibit No. 9 to the deposition --
21  or 19 to the deposition the
22  amended notice of intention to
23  take the videotape deposition of
24  Dr. Stolley.

Page 339

1            - - -
2       (Whereupon, Deposition
3  Exhibit Stolley-19, "Amended
4  Notice of Intention to Take the
5  Videotaped Deposition of Dr. Paul
6  D. Stolley" (5 pages), was marked
7  for identification.)
8            - - -
9  BY MS. FUJIMOTO:
10       Q.   Doctor, did you -- have you
11  seen that notice before?
12       A.   Yes.
13       Q.   And you reviewed it before
14  the deposition?
15       A.   Yes.
16       Q.   Okay.  I don't have an extra
17  copy.  Let me take that for a second.
18       And so we have your current
19  CV, and I take it you brought with you
20  the materials that you reviewed or
21  considered and relied upon?
22       A.   Yeah.
23       Q.   And would those be in that
24  box?

Page 340

1       A.   Yes.
2       Q.   Okay.
3       A.   And other materials.
4       Q.   All right.
5       MS. FUJIMOTO:  I'm going to
6  mark the box of materials reviewed
7  and relied upon as Exhibit No. 20.
8            - - -
9       (Whereupon, Deposition
10  Exhibit Stolley-20, Box of
11  materials reviewed and relied
12  upon, was marked for
13  identification.)
14            - - -
15  BY MS. FUJIMOTO:
16       Q.   And we've already covered
17  the fact that you do not have --
18       MS. BEREZOFSKY:  I just want
19  to --
20  BY MS. FUJIMOTO:
21       Q.   -- that you've destroyed the
22  copies of drafts of your report, correct?
23       A.   Right.  I don't save any
24  emails.

Page 341

1       Q.   Okay.
2       MS. BEREZOFSKY:  And I want
3  to just state for the record that
4  what you said on the record a
5  moment ago about the box
6  containing everything he reviewed
7  and relied upon, I think what he
8  testified to is it was everything
9  he received.  There were things
10  there that he relied upon; there
11  were some things that he didn't.
12  And I want to clarify that.
13       MS. FUJIMOTO:  Absolutely.
14  BY MS. FUJIMOTO:
15       Q.   And we did cover that
16  earlier today?
17       A.   Yeah.
18       Q.   You were also asked to bring
19  invoices and bills for work performed
20  today.  Did you do that?
21       A.   I haven't sent any invoices
22  or bills, so there were none to bring.
23       Q.   Also, copies of any and all
24  notes concerning the topic of your

Confidential - Subject to Protective Order

Page 342

1  report.  Were there any notes?
2      A.   No, no notes.
3      Q.   And so in reviewing all of
4  your materials, you didn't take any notes
5  about what you were reading?
6      A.   There are marginal notes on
7  some of the materials.
8      Q.   Okay.  And we also asked for
9  any and all communications from counsel
10 regarding the substance or topic of your
11 report.  Did you bring any of those?
12     A.   If they were sent in email,
13 I destroyed them.  I deleted them and I'm
14 not sure that -- I don't think I got
15 anything in the mail.
16     Q.   Have you had any
17 communications with any other experts
18 that are working with the plaintiffs in
19 this litigation?
20     A.   No.
21     Q.   And the literature
22 references that support or were relied
23 upon by you in forming your opinions,
24 that's in Box 20, Exhibit No. 20?

Page 343

1      A.   That's right, along with
2  some that I didn't rely on.
3      Q.   Right.
4           Okay.  Doctor, you have
5  testified as an expert witness on quite a
6  number of occasions in the past; is that
7  correct?
8      A.   Depends on what you mean by
9  "quite a number."
10     Q.   More than 15?
11     A.   Not -- not in Court.
12     Q.   No, I'm talking about --
13 let's break it down.  I apologize.
14          Give me an estimate of how
15 many litigation cases that you have
16 consulted on in your career.
17     A.   Yeah.  The first -- the
18 first time I did was, I think, in 1977,
19 the Axler versus Squibb DES case, and for
20 the next ten years I was one of the
21 principal causation witnesses in DES
22 litigation, and I was deposed many times,
23 maybe 15 times, 12 times over that
24 ten-year period, and we went to Court on,

Page 344

1  I think, three cases.
2           Then in the next decade, I
3  was involved for the plaintiffs in
4  Bendectin litigation and, also, for
5  Nonoxynol-9 for Johnson & Johnson.  And
6  then I was involved with a federal case
7  that actually went to Court concerning
8  false advertisements and I was -- I was
9  the witness for the company that makes
10 Jergens hand lotion.  I forget the name
11 of the company.
12          I've been a witness in a --
13 for the FDA when they wanted to withdraw
14 a diabetes drug that caused lactic --
15 lactic acidosis.  And so there was an
16 administrative drug -- judge at FDA who
17 heard that case, and the drug was
18 eventually withdrawn.  So I was a witness
19 for the FDA.
20          And then cigarette
21 litigation, attempt to get a class
22 certified in, I think, New Jersey and
23 Pennsylvania.  I participated in that.
24          And I participated in

Page 345

1  fenfluramine litigation as an expert
2  witness --
3      Q.   Fen-phen?
4      A.   -- as to causation.
5           Both fenfluramine and
6  phentermine, yeah, and some fenfluramine
7  alone, also.
8      Q.   So do you have an estimate
9  as to the number of depositions you've
10 given in the past?
11     A.   Over a 30-year period, '77,
12 '87, '97 -- '87, '97, 2007 -- yeah.  Over
13 a 30-year period, I was probably deposed
14 between 20 and 30 times.
15     Q.   And how many times have you
16 testified at trial?
17     A.   Well, there was the
18 Bendectin.  That went to trial.  I think
19 two of the DESs went to trial.  That
20 would be three.  The hand lotion thing
21 went in front of Federal Court.  That's
22 four.  Johnson & Johnson's trial, that
23 was also in Federal Court.  I testified
24 in the Court there.  So I would say it's

87 (Pages 342 to 345)

Confidential - Subject to Protective Order

Page 346

1  at least five that come to mind that I
2  was actually in Court, and there might
3  have been more.  I don't keep a list.
4      Q.   Do you have plans to testify
5  in the HRT trials?
6      A.   If I'm asked to testify, I'm
7  willing to testify.
8      Q.   Have you been asked yet?
9      A.   I guess so.
10     Q.   When were you asked?
11     A.   At the time I was asked to
12 prepare an expert report.
13     Q.   Do you know when the next
14 trial or trials are and which one you
15 intend to appear at?
16     A.   I'm not certain, but I think
17 in April there's a trial that I may or
18 may not be asked to testify.
19     Q.   Have you blocked out any
20 dates?
21     A.   No.
22     Q.   Did you discuss trial
23 testimony during your break today?
24     A.   No.

Page 347

1      Q.   Dr. Stolley, you previously
2  mentioned Dr. -- a Dr. Shapiro.  Is that
3  Sam Shapiro?
4      A.   Samuel Shapiro is his legal
5  name, but his friends all call him Sid.
6  Yes.
7      Q.   Okay.  And do you consider
8  him a well-respected epidemiologist?
9      A.   I do.  And we've been
10 collaborators on many studies.  He's also
11 a good personal friend.
12     Q.   Are you aware of his views
13 or criticisms that he has publicly
14 expressed about the Million Women Study?
15     A.   I read it quickly, and I
16 know he's been a critic of that study.
17     Q.   Do you agree with his
18 criticisms?
19     A.   I didn't read it carefully
20 enough to be able to answer that.
21     Q.   One of the things mentioned,
22 and I think we talked a little bit
23 earlier about this fact, that there can
24 be bias introduced into a study if people

Page 348

1  are recruited as part of a screening
2  program.
3      A.   Uh-huh.
4      Q.   I think you had expressed
5  that opinion as to a study done by
6  Brinton, that even though it was large,
7  it suffered from bias because they
8  recruited from a screening program.
9          Do you remember publishing
10 an article with that comment on it?
11     A.   I don't, actually.
12     Q.   Okay.  Do you agree that if
13 you recruit people from a screening
14 program that you're probably going to
15 introduce some bias into a study?
16     A.   Yes, there would be
17 selection bias.  Whether or not it would
18 be so serious as to lead one to question
19 the results or it couldn't be handled by
20 some sort of adjustment is another issue.
21     Q.   Would you agree that if a
22 study is conducted and during the time
23 it's being conducted it changes how -- or
24 I should say diverts away from the

Page 349

1  protocol or changes the protocol, is that
2  something that might concern you about
3  the reliability of the data?
4      MS. BEREZOFSKY:  Object.
5  Excuse me.  Object to form.
6      THE WITNESS:  Not
7  necessarily.  One tries to avoid
8  changes in protocol mid study or
9  after it starts, but there are
10 times when it's necessary,
11 and sometimes the best thing to
12 do, especially if an unexpected
13 toxicity pops up and you need to
14 close down that arm of a trial, as
15 happened with a coronary drug
16 project back in the early '70s and
17 they had to close down the
18 estrogen arm because the men had
19 an excess of pulmonary embolism
20 and deep vein thrombosis and
21 coronary heart disease.  So is
22 that study less unreliable because
23 it stopped?  I think the ethical
24 thing was to stop and not put the

88 (Pages 346 to 349)

Confidential - Subject to Protective Order

Page 350

1 participants at risk. So changes
2 in protocol have to be examined,
3 but it doesn't necessarily weaken
4 a study.
5 BY MS. FUJIMOTO:
6 Q. Do you know what Dr. Shapiro
7 thinks about that?
8 A. No.
9 Q. Let me ask you, sir, we had
10 talked earlier about your expertise in
11 epidemiology, and you said you're not an
12 expert in pathology, correct?
13 A. Right.
14 Q. Not an expert in radiology
15 or breast imaging, right?
16 A. Correct.
17 Q. You're not an OB/GYN?
18 A. That's correct.
19 Q. Okay. Do you have any
20 expertise in -- let me strike that.
21 You're not an oncologist,
22 right?
23 A. That's right.
24 Q. You don't treat breast

Page 351

1 cancer?
2 A. No. I diagnose it
3 sometimes, but I don't treat it.
4 Q. And in terms of your
5 expertise based on your year at the FDA,
6 do you have any expertise in the
7 background or history of FDA regulations?
8 A. I have a -- I have
9 background in and taught a course in
10 adverse drug reactions where I reviewed
11 the history of regulation, but I'm not an
12 expert -- I'm not a regulatory expert.
13 Q. Okay. Are you an expert on
14 the regulations that govern the FDA's
15 review of NDAs?
16 A. Well, I'm pretty familiar
17 with the process, having spent the year
18 there, and even though I wasn't in the --
19 in the new drug approval part, I got
20 quite familiar with how they do it.
21 Q. Do you consider yourself an
22 expert?
23 A. I would not consider myself
24 an expert.

Page 352

1 Q. Okay. Have you ever seen or
2 reviewed Wyeth's NDA for Prempro?
3 A. No.
4 MS. FUJIMOTO: Let me just
5 take a few minutes. Could we get
6 from his box the Parisian report
7 and the Blume report? Okay. Can
8 we show it to him?
9 MR. BONNIN: Blume is tab 3
10 and Parisian is tab 8.
11 THE WITNESS: Parisian is
12 tab 8?
13 BY MS. FUJIMOTO:
14 Q. Yes.
15 If you would, take a look
16 at -- I guess look at Parisian first at
17 tab 8. Are you able, by looking through
18 that, to tell me now which opinions you
19 agree or concur with and which ones you
20 do not?
21 A. I agree with her discussion
22 on causation and her assessment of the
23 literature. And her summary of opinions
24 on 78 to 81 I agree with.

Page 353

1 Q. What about Dr. Blume's
2 report?
3 A. What tab was that?
4 MR. BONNIN: 3.
5 THE WITNESS: Probably the
6 last paragraph on 102, which is a
7 summary, I would agree with that.
8 MS. FUJIMOTO: Okay. All
9 right. I am going to pass the
10 witness.
11 THE VIDEOGRAPHER: We're
12 going off the record. The time is
13 6:51 p.m.
14 (A recess was taken.)
15 THE VIDEOGRAPHER: We're
16 back on the record. The time is
17 6:58 p.m.
18 EXAMINATION
19 BY MR. SCHACHTMAN:
20 Q. Dr. Stolley, good evening.
21 My name is Nathan Schachtman. I
22 represent Pfizer/Upjohn/Pharmacia.
23 Are you ready to resume your
24 deposition?

Confidential - Subject to Protective Order

Page 354

1    A.    I am.
2    Q.    During the examination by
3  Miss Fujimoto, you were asked about the
4  box, and you described with some
5  specificity what's in the box, and you
6  described it as things that you had
7  either received from plaintiff's counsel
8  or pulled yourself for your reliance in
9  this case; is that right?
10    A.    Yes.
11    Q.    I just want to call your
12  attention to -- there was a stack of
13  articles that appear to be articles that
14  were sent by Counsel --
15    A.    Yeah.
16    Q.    -- in anticipation of this
17  deposition.
18    A.    No, these were sent by --
19    MS. FUJIMOTO:  Miss
20  Fujimoto.
21    THE WITNESS:  -- Miss
22  Fujimoto -- thank you.  Sorry that
23  I forgot your name -- and then
24  passed on to me.

Page 355

1  BY MR. SCHACHTMAN:
2    Q.    All right.  So I just want
3  to make clear that these are not things
4  that are encompassed within that
5  description you gave Miss Fujimoto --
6    A.    No.
7    Q.    -- about materials that were
8  either sent to you by plaintiff's counsel
9  or things that you had culled for your
10  reliance; is that right?
11    A.    That's correct.  And I thank
12  you for identifying them.
13    Q.    Miss Fujimoto asked you
14  about your -- the scope of your
15  expertise.  She asked you about pathology
16  and things like that.
17    Do you consider yourself to
18  be an expert in experimental toxicology?
19    A.    No, not an expert, but
20  epidemiologists learn to integrate data
21  from other fields in trying to reach an
22  opinion, especially on causation; and so
23  while I'm not an expert, I've spent a lot
24  of time reviewing toxicology, both as

Page 356

1  part of the studies that I get involved
2  in, but, more importantly, as a member of
3  several FDA committees where toxicology
4  was a very important part.  I was a
5  member of the Over-The-Counter
6  Antimicrobial Review Committee, which was
7  an attempt to review over-the-counter
8  drugs, and we were presented with a lot
9  of toxicological data; and we had three
10  toxicologists on the committee, so I
11  learned a lot from them and several other
12  committees that I served on either for
13  the Institute of Medicine or the Food and
14  Drug Administration.
15    Q.    All right.  So if I
16  understand what you're saying, is you
17  talk to toxicologists, you listen to
18  them, and you integrate their views with
19  yours in coming to assessments of safety
20  and efficacy?
21    MS. BEREZOFSKY:  Objection
22  to the characterization of his
23  testimony.
24    THE WITNESS:  No.  I also

Page 357

1    can read toxicological papers and
2    evaluate --
3  BY MR. SCHACHTMAN:
4    Q.    Have you ever done any
5  toxicology yourself?
6    A.    No.
7    Q.    All right.  Have you
8  specifically sought out the views of any
9  toxicologists with respect to the animal
10  testing that you're recommending should
11  have been done?  Have you consulted with
12  any toxicologists in this case?
13    A.    No.
14    Q.    Have you sought any -- have
15  you reviewed any toxicology textbooks or
16  articles specifically for this case?
17    A.    No.
18    Q.    Is it your opinion today,
19  year 2007, that the Beagle dog is the
20  animal of choice for carcinogenicity
21  testing of sex steroid hormones, whether
22  they be estrogen alone, progesterone
23  alone, or a combination of the two?
24    MS. BEREZOFSKY:  I object to

90 (Pages 354 to 357)

Confidential - Subject to Protective Order

Page 358

1    the form.  You can answer.
2         THE WITNESS:  When I was a
3    member of the Public Board of
4    Inquiry --
5    BY MR. SCHACHTMAN:
6    Q.    Today.  Today.  I know what
7    your views were back then.  I asked about
8    today.
9    A.    I don't know if they're the
10   animal of choice, but I think they're a
11   good model.
12   Q.    Do you know Dr. Sobel,
13   S-O-B-E-L, at the FDA?
14   A.    Yes.  I was at meetings with
15   him when I was on committees, and then,
16   also, the year I was there I think might
17   have been his last year.  I saw him at a
18   number of meetings.  I do know him.
19   Q.    Did you get to know him?
20   A.    I got to know him pretty
21   well, yeah.
22   Q.    Do you view him as somebody
23   who was a conscientious public servant
24   while he was at the FDA?

Page 359

1    A.    I do.
2    Q.    Does the FDA currently
3    require Beagle dog testing for sex
4    hormone medications?
5    A.    I don't know.
6    Q.    Did the FDA's position on
7    Beagle dog testing with respect to sex
8    steroid -- steroidal sex hormones ever
9    change?
10   A.    I'm not sure.
11   Q.    Are you familiar with a
12   pronouncement by Dr. Sobel in 1991
13   rescinding a requirement that the Beagle
14   dog be used for the testing of sex
15   steroidal hormones?
16   A.    No, I'm not familiar with
17   that.
18   Q.    Does the World Health
19   Organization currently have a position on
20   the appropriateness of the Beagle dog
21   model for the testing of steroidal sex
22   hormones?
23   A.    I don't know.
24   Q.    Now, back in 1991, you,

Page 360

1    sir -- the IOM came out with a report on
2    oral contraceptives and breast cancer,
3    and you were asked some questions about
4    that, correct, about the 1991 report?
5    A.    Yeah.
6    Q.    Earlier today.
7    A.    Right.
8    Q.    All right.  Was there -- and
9    you had hearings that led up to the
10   issuing of that monograph, correct?
11   A.    Well, not hearings, we had
12   meetings.
13   Q.    Meetings.
14        All right.  And these were
15   some public, some private meetings?
16   A.    I think we invited guests,
17   and we had some closed meetings.  I don't
18   think any were really open to the public
19   in the sense of observers being present.
20   Q.    Was the appropriateness of
21   the Beagle dog model discussed at that --
22   at any of those meetings?
23   A.    Oh, that was -- that was 16
24   years ago, so I don't remember.

Page 361

1    Q.    Do you remember the
2    discussions that took place back in the
3    1980s that led up to the report of the
4    Public Board of Inquiry on Depo-Provera?
5    A.    I remember a little bit
6    about that, yes.
7    Q.    And we have your views
8    because they were stated in that report,
9    correct?
10   A.    They were, I guess, the
11   views of all three members of the Public
12   Board of Inquiry.
13   Q.    Well, there was a concurring
14   and dissenting member, as well, correct?
15   A.    Yes.  The representative
16   from NIH was a -- dissented on some parts
17   of the report.
18   Q.    But with respect to what
19   happened after that report of the Public
20   Board of Inquiry, in 1992, the FDA
21   approved an indication for Depo-Provera,
22   correct?
23   A.    That's right, the Public
24   Board of Inquiry was not -- was only

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 362

1 advisory.
2      Q.    Well, not only was it --
3 it's not that it was advisory; it was
4 Upjohn's only attempt to undo, at the
5 time, the NDA that was submitted for
6 Depo-Provera, correct?
7           MS. BEREZOFSKY:  Object to
8 form.
9 BY MR. SCHACHTMAN:
10      Q.    Are you familiar with the
11 FDA procedure?
12      A.    Of a public board?
13      Q.    Yes.
14      A.    Yeah.  They had two options.
15 One was to go to Court and the other was
16 the Public Board of Inquiry.
17      Q.    And basically, that was an
18 expert panel?
19      A.    Right.
20      Q.    And were you aware that
21 after that report came out, Upjohn
22 ultimately withdrew its NDA and
23 resubmitted it some years later, and it
24 was approved as resubmitted?

Page 363

1      A.    I knew that, yes.
2      Q.    So you knew that
3 Depo-Provera had received an indication
4 in the United States; it was licensed for
5 hormonal contraception in the United
6 States in 1992, you knew that?
7      A.    I didn't know what year, but
8 I knew it was licensed, yes.
9      Q.    Now, is it true that in
10 dogs, progesterones -- I should say
11 progestogens, right?  That's the broader
12 category of anything that can act like
13 a -- like progesterone; is that right?
14      A.    Yeah.  It's like a term for
15 progesterone.  Progestins is the term I
16 use.
17      Q.    Okay.  So is it true that in
18 dogs, progestins stimulate pituitary
19 secretion of growth hormone?
20      A.    I believe that's true, yes.
21      Q.    And is it true that in
22 Beagle dogs in particular, growth
23 hormones have a pronounced effect on the
24 development, growth, and function of

Page 364

1 their mammary tissue?
2      A.    I didn't know that.
3      Q.    Is it true that in humans,
4 progestins at pharmacologic doses do not
5 increase circulating or plasma levels of
6 growth hormones; is that true?
7      A.    I'm not aware of that.
8      Q.    Is it true, today, that
9 there is no general consensus that
10 progesterones or progestins, alone,
11 increase the risk of breast cancer in
12 human females?
13      A.    I believe that is a
14 consensus view.
15      Q.    And that issue has certainly
16 been studied in several contexts, not the
17 least of which is long-term use of
18 Depo-Provera in women of reproductive
19 age, correct?
20      A.    Yes.  The WHO had a big
21 study in Thailand.
22      Q.    And Dr. Strom's case-control
23 study that came out just a couple years
24 ago, as well; is that right?

Page 365

1      A.    Yeah.
2      Q.    Are you familiar with that
3 study?
4      A.    Not very, but, of course,
5 Dr. Strom and I were colleagues for 13
6 years.
7      Q.    Let me ask you some
8 questions about Dr. Parisian.  Miss
9 Fujimoto already entered the waters here.
10           Do you know Suzanne
11 Parisian?
12      A.    No, I've never met her.
13      Q.    Do you know anything about
14 her qualifications?
15      A.    I know what she states in
16 her --
17      Q.    Had you ever known her
18 before you read the report?
19      A.    No.
20      Q.    Have you ever read any
21 publications by Dr. Parisian, fiction or
22 nonfiction?
23      A.    No, I haven't.
24      Q.    Do you disagree with any of

Confidential - Subject to Protective Order

Page 366

1  the opinions that she put into her
2  report?
3      A.   I didn't find anything
4  specifically that I disagreed with.
5      Q.   Was it clear to you that
6  Dr. Parisian appeared to have had access
7  to company files, FDA files, in coming to
8  her report?
9      A.   I think when you read the
10 report, you come to that assumption,
11 right.
12     Q.   Did you have access to any
13 of those sorts of materials, such as the
14 supplemental NDA submitted for Provera
15 for combined estrogen and progestin
16 hormonal therapy?
17     A.   No.
18     Q.   Did you review the
19 transcripts of any of the advisory
20 committee meetings that dealt with
21 estrogen or estrogen plus progestin
22 postmenopausal hormone therapy?
23     A.   No.
24     Q.   Did you review any of the

Page 367

1  advertising that Dr. Parisian claims
2  Upjohn engaged in?
3      A.   No.
4      Q.   Dr. Parisian says in her
5  report, and I can't in the limited time I
6  have go through all of it, it's an
7  80-plus page report, but she says that
8  the company "aggressively promoted
9  Provera to physicians and patients as
10 suitable for use in combination hormone
11 therapy without first having obtained
12 scientific support."
13          Are you aware of any
14 promotion by the company of Provera to
15 patients?  Personally, do you have any
16 awareness of such -- of evidence to
17 support that opinion?
18     A.   No, I don't.
19     Q.   And do you know whether
20 Upjohn ever advertised to patients about
21 Provera and its use in combination
22 hormone therapy?
23     A.   I don't know.
24     Q.   I'm a little flummoxed.  I

Page 368

1  can't understand how you can agree with
2  all the opinions in this report when you
3  don't know whether Dr. Parisian has or
4  doesn't have a basis for what she has
5  concluded in her report.
6      A.   Well, there's a summary that
7  I indicated I agreed with, the last
8  paragraph.
9      Q.   The last paragraph?
10     A.   Yeah.
11     Q.   So that's the paragraph
12 right above her name?  Now, talking about
13 Blume it was the last paragraph --
14     A.   Oh, no.  I think I --
15     Q.   You told me pages 7 -- you
16 told Miss Fujimoto pages 78 through 81.
17     A.   Yeah.
18     Q.   And what I just pointed out
19 to you about the -- aggressively
20 promoting Provera to patients was on page
21 78.  It's in the summary of opinions.
22     A.   Right.
23     Q.   So it appears to have been
24 something that you were referencing in

Page 369

1  response to Miss Fujimoto's question; am
2  I right?
3      A.   Correct.
4      Q.   So let me go back to my
5  question, which is:  Explain to me how
6  you can agree or disagree with
7  Dr. Parisian when she reaches opinions
8  and conclusions that are based upon her
9  assessment of facts when you've never
10 seen the record on which she has relied,
11 apparently, and which she is summarizing.
12     A.   I assumed that she was
13 giving a correct appraisal.
14     Q.   Okay.  But you have no
15 personal experience with Dr. Parisian to
16 know that she is a reliable summarizer
17 and presenter of such summaries in Court,
18 do you?
19     A.   I've not met her.
20     Q.   In reviewing -- you gave me
21 the courtesy of looking in your box, and
22 I saw that you had some transcripts and
23 some articles, and we're going to have
24 that reproduced and distributed.

93 (Pages 366 to 369)

Confidential - Subject to Protective Order

Page 370

1          I did notice that the
2 transcripts appear to have been only from
3 expert witnesses retained by the
4 plaintiff.  Was that your impression,
5 that you only received transcripts of
6 witnesses for the plaintiff?
7          A.    I think I received
8 transcripts of one or two witnesses for
9 the defendants, but I can't recall what
10 they -- what they were.
11          Q.    All right.  Well, let's --
12 let's go back to regulatory issues.  And
13 did you see a report of Upjohn's
14 regulatory expert witness submitted
15 really to traverse many of the things
16 that Dr. Parisian said?  That's the
17 report of Dr. Heidi Jolson.  Did you see
18 that report?
19          A.    No.  I knew that there was
20 that report, but I didn't see it.
21          Q.    Do you know Heidi Jolson?
22          A.    She was at the FDA when I
23 was there, heading the antimicrobial
24 section, and then she got a higher

Page 371

1 administrative post and then left.
2          Q.    Do you know her as a -- when
3 she was at the FDA, as a conscientious
4 public servant?
5          A.    I never met her, actually.
6 I just -- I couldn't comment on that.
7          Q.    Now, earlier today, I
8 thought I heard you, and correct me if
9 I'm wrong, that you thought that the
10 administration -- that the prescription
11 of estrogen plus progestin for
12 postmenopausal hormone therapy fell below
13 the standard of care for physicians in
14 the United States.
15          A.    No, I don't think I said
16 that.
17          Q.    Well, let me build up to it,
18 then.  You did say that physicians,
19 without an evidentiary basis, prescribed
20 progestins in opposition to estrogen for
21 postmenopausal therapy, correct?
22          MS. BEREZOFSKY:  Objection
23          to form.
24          THE WITNESS:  I was

Page 372

1 referring back to --
2 BY MR. SCHACHTMAN:
3          Q.    The late 1970s?
4          A.    Yes.  And '80s, before it
5 was approved.
6          Q.    All right.  And there's
7 certain -- and you said that there was --
8 that was done on the basis of some
9 speculation from some fellow from
10 Harvard, correct?
11          A.    I don't know where
12 Dr. Satiri worked, but he was the one who
13 proposed the theory.
14          Q.    All right.  And it was
15 tested, at least in observational
16 studies, throughout the 1980s and into
17 the early 1990s, correct --
18          MS. BEREZOFSKY:  Object to
19          form.
20 BY MR. SCHACHTMAN:
21          Q.    -- the theory being that the
22 co-administration of progestin, either
23 cyclically or sequentially, did oppose
24 and block the effect that estrogen had in

Page 373

1 inducing hyperplasia in the endometrium?
2          MS. BEREZOFSKY:  Object to
3          form.
4          THE WITNESS:  That's right.
5          There were studies done and I
6          think it's now pretty well
7          accepted that endometrial
8          hyperplasia and endometrial cancer
9          from unopposed estrogen is, by and
10          large, blocked by the addition of
11          a progestin.
12 BY MR. SCHACHTMAN:
13          Q.    And the clinical trials that
14 took place in the mid to late 1990s and
15 into the 2000s demonstrated that the
16 co-administration of progestin with
17 estrogen did not result in excess
18 hyperplasia or endometrial cancer,
19 correct?
20          A.    That's right, but it
21 revealed all other kinds of problems with
22 the combination.
23          Q.    My question was just about
24 the endometrial -- hyperplasia and

94 (Pages 370 to 373)

Confidential - Subject to Protective Order

Page 374

1    endometrial cancer.  Is that right?  I
2    mean, the circle was closed on that
3    speculation that you described back in
4    the early 1970s.  By 2002, when the
5    Women's Health Initiative study was
6    published in the -- in JAMA, it was quite
7    clear that that speculation was
8    absolutely correct?
9        A.    Yes.
10       Q.    By the way, did you review
11   reports by some other doctors?  Let me
12   just run through these names.  Dr. Arias,
13   does that name sound familiar?
14       A.    It sounds familiar, but I
15   don't know if I did.
16       Q.    Dr. Langer?
17       A.    I don't think this will be
18   helpful.  I think if you show me the
19   article --
20       Q.    Show you the report?
21       A.    Yeah.  Then -- because I
22   went through a lot of material, and I may
23   have reviewed them.
24       Q.    These are -- I'm going to

Page 375

1    tell you names that are not in -- the
2    reports are not in the box, which is why
3    I'm asking.
4        A.    Ah.
5        Q.    All right.  So if I tell you
6    these names, Drs. Harry S. Langer, Page,
7    Kopans, Blooming, Chodosh and Montgomery
8    Rice, and they're not in the box, you
9    didn't review them, fair?
10       A.    That's right.
11       Q.    You were asked about the
12   Women's Health Initiative, and you were
13   groping for a name of the director of the
14   NIH who has really championed it.
15          MS. BEREZOFSKY:  Object to
16       the form.
17   BY MR. SCHACHTMAN:
18       Q.    That was Dr. Bernadette
19   Healy, correct?
20          THE WITNESS:  That's right,
21       Dr. Healy.
22   BY MR. SCHACHTMAN:
23       Q.    Okay.  And Dr. Healy took
24   office in 1991 or thereabouts?

Page 376

1        A.    Yeah.  She left Hopkins and
2    went to the NIH about the time I arrived
3    back in Baltimore.  So I guess it's about
4    '91.
5        Q.    Even before Dr. Healy went
6    to the NIH, there were meetings and
7    discussions and planning with respect to
8    the conducting of a large clinical trial
9    to test estrogen and progestins together,
10   correct?
11       A.    I believe so, but the
12   studies weren't -- the funds weren't
13   allocated.  It was a very expensive study
14   and there was debate about whether or not
15   to perform it.
16       Q.    Absolutely.
17          And the IOM, the Institute
18   Of Medicine, actually got involved
19   because there was -- it was such a big
20   study and there was such a concern that
21   if it's going to be done, it be done
22   right, that they wanted the IOM's
23   input --
24       A.    To review the protocol.

Page 377

1        Q.    -- is that right?
2        A.    I think so.  I wasn't part
3    of it.
4        Q.    Okay.  But have you reviewed
5    the IOM monograph that deals with the WHI
6    proposal?
7        A.    No.
8        Q.    Let me ask you about -- a
9    very general epidemiology question, back
10   to 101.  It may even be covered in your
11   book with Dr. Lilienfeld.  Risk and
12   cause.  Is risk the same thing as cause?
13       A.    Do you mean relative risk or
14   other measures of risk, attributable
15   risk?
16       Q.    If we're not talking about
17   relative risk, and I know you've already
18   gone through relative risk and described
19   it and discussed it, but if you just talk
20   about risk as a concept, it's a
21   probability that something may happen,
22   correct?
23       A.    An increased probability in
24   relation to --

Confidential - Subject to Protective Order

Page 378

1     Q.    To a baseline?
2     A.    Or to other factors.
3     Q.    All right.  And is risk
4 different from cause?
5     A.    Yes.
6     Q.    When you say that somebody
7 had a constellation of risk factors and
8 they ultimately developed the outcome for
9 which they had these risks, you don't
10 necessarily know which of those risks
11 participated in being factual causes of
12 the harm, correct?
13     A.    Well, presumption is that
14 they all did if it's multifactorial and
15 the risks have been well established.
16     Q.    So let me ask you, if a
17 woman drank alcohol, one or two glasses
18 of wine a day, and she had no other risk
19 factors and developed breast cancer,
20 would you say that her breast cancer was
21 caused by her drinking one or two glasses
22 of alcohol a day?
23     A.    I wouldn't -- I wouldn't
24 make a comment on cause.

Page 379

1     Q.    Everybody is exposed to
2 ionizing radiation; you and I and Miss
3 Berezofsky, as we sit here, are being
4 bombarded with cosmic rays, correct?
5     A.    Oh, that's so depressing.
6     Q.    I wanted to cheer everybody
7 up.  True?
8     A.    Yes.
9     Q.    And you wouldn't say that
10 somebody's cancer was caused by their
11 exposure to cosmic radiation, background
12 levels that everybody has?
13     A.    I'm very careful not to make
14 attributions about cause, and so, no, I
15 wouldn't say that.
16     Q.    Do you ever go back to
17 Philadelphia?
18     A.    Yes, frequently.
19     Q.    Okay.  Do you remember the
20 Schuylkill Expressway?
21     A.    Yes, and --
22     Q.    It's a scary road?
23     A.    It's -- it's a crowded,
24 dangerous road, yes.

Page 380

1     Q.    And when you're driving on
2 the Schuylkill, every car around you
3 represents a risk of an accident
4 happening, correct?
5     A.    No, it's the drivers who are
6 talking on their cell phones.
7     Q.    But every car around you is
8 a potential risk of a collision?
9     A.    You could -- you could say
10 that, yeah.
11     Q.    But if you actually got into
12 an accident, you couldn't sue everybody
13 driving on the Schuylkill that day
14 saying, "Well, they were all on the
15 road," you would look to the car that hit
16 you, correct?
17     A.    Correct.  Or, perhaps, the
18 car --
19     Q.    Ahead where the person was
20 on the cell phone.  You would look for
21 something that was specific and tied to
22 your situation and you wouldn't just
23 blame everyone who had been previously a
24 potential risk.  That's my point.

Page 381

1     A.    Okay.
2     Q.    You would agree with that in
3 principle?
4     A.    I'm not sure what I'm
5 agreeing to if I agree to that.
6     Q.    Well, risk is different from
7 cause and that when something --
8     A.    I've already -- I've already
9 conceded that.
10     Q.    Right.
11          And when a bad outcome has
12 occurred, you don't necessarily know that
13 every risk materially participated in
14 bringing that cause about?
15     A.    The problem I have with your
16 analogy is that the cause may be poor
17 road engineering and things like that.
18     Q.    Absolutely.
19     A.    And so I don't -- I don't
20 like the analogy, but I do agree that
21 risk and cause are not -- well, in order
22 to have cause, you have to have risk, but
23 having risk doesn't necessarily mean that
24 you have cause.

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 382

1    Q.    And when you have cause, you
2  don't necessarily know that everything
3  that had been a risk factor before the
4  bad outcome actually participated in
5  bringing that outcome about?
6    A.    No, but you can make
7  presumptions, as they do in the
8  Framingham system, scoring system, where
9  they assess your risk of coronary heart
10  disease, depending on the number and
11  strength of the risk factors, and can
12  actually predict what your risk will be
13  over, say, a ten or 20-year period; and
14  it holds up pretty well when you look
15  back and test it.
16    Q.    That's a prediction about
17  the future, correct?
18    A.    Based on a model developed
19  from past data, though.
20    Q.    Right.
21         And my point is that when
22  the bad outcome has occurred, you can't
23  go back, necessarily, and implicate
24  everything that had been a risk factor as

Page 383

1  actually participating in bringing about
2  that effect?
3         MS. BEREZOFSKY:  Object to
4    form.
5  BY MR. SCHACHTMAN:
6    Q.    Let me give you another
7  example to make it clear, what I'm
8  talking about, because you look puzzled.
9         You mentioned that an
10  accident could result because of a
11  mechanical deficiency in the car.  So --
12         MS. BEREZOFSKY:  Objection.
13  He said --
14         THE WITNESS:  Well, I said
15  highway engineering.
16  BY MR. SCHACHTMAN:
17    Q.    Okay.  Or it could be a
18  pothole or something wrong with the road.
19  So if you are on the Schuylkill and, God
20  forbid, you had an accident, you -- and
21  if people didn't know the particular
22  circumstances of your accident, they
23  might say, "Well, there are a lot of
24  potholes on the Schuylkill.  That could

Page 384

1  have caused -- that was a risk."  They
2  might say, "You were driving an old car.
3  That was a risk."  They might say, "There
4  are a lot of crazy drivers listening to
5  cell -- you know, talking on cell phones.
6  That was a risk."  But the mere fact that
7  you had an accident would not allow them
8  to -- unless they had more information,
9  to go back and say which of those risks
10  had actually participated as a factual
11  cause of your accident, true?
12    A.    Yes.
13    Q.    Okay.  And in terms of
14  biological or medical outcomes, health
15  outcomes, it's very similar.  Unless the
16  relative risks are very, very large, it's
17  very difficult to know that a risk factor
18  actually participated in the production
19  of a bad outcome?
20    A.    Well, that's not always the
21  case.  For example, with DES and vaginal
22  cancer, while one could postulate a
23  number of different risks, there were
24  pathognomonic, histological

Page 385

1  peculiarities.
2    Q.    And for DES and clear cell
3  adenocarcinoma, the risks were very, very
4  high in the case-control studies,
5  correct?  And the --
6    A.    There was actually only one,
7  and it was -- there were no cases in
8  the --
9    Q.    In the control --
10    A.    -- unexposed -- the control
11  group.  So the risk was infinitely large.
12    Q.    Right.
13         But there are statistical
14  ways to deal with that situation?
15    A.    Yes.  You can plug 1 into
16  each cell.
17    Q.    Or a half, correct?
18    A.    Right.
19    Q.    But the risks were very
20  high?
21    A.    Very high.
22    Q.    Very high.
23         And we were dealing with a
24  tumor that was very unusual in young

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 386

1    women, correct?
2         A.    That's correct.
3         Q.    So when we look at breast
4    cancer, we're dealing with,
5    unfortunately, an all-too-common tumor in
6    women, especially postmenopausally,
7    correct?
8              MS. BEREZOFSKY:  Object to
9    form.
10             THE WITNESS:  It's a common
11        tumor in women, especially in the
12        postmenopausal period, correct.
13   BY MR. SCHACHTMAN:
14        Q.    And there are a lot of
15   described risks factors for breast
16   cancer?
17        A.    Really -- I wouldn't say
18   it's a lot.
19        Q.    Well, you said there were
20   three known causes --
21        A.    Yeah.
22        Q.    -- right?
23             And you were basing that on
24   Dr. McMahon's paper?

Page 387

1         A.    Yes.
2         Q.    Are there other risk factors
3    that have been described?
4         A.    They have been described,
5    but many of them are explained by --
6         Q.    By the three?
7         A.    -- the causes, the three
8    causes, yes.
9         Q.    So you explain -- for
10   instance, is obesity a risk factor for
11   breast cancer?
12        A.    Yes.
13        Q.    Early menarche and late
14   menopause?
15        A.    Right.  They all relate to
16   estrogen exposure.
17        Q.    Okay.  Let me shift gears a
18   little bit, Dr. Stolley.
19             You did a paper on smoking
20   and breast cancer.  Do you think that's
21   panned out?
22        A.    No.
23        Q.    So that's an example of a
24   study you did that wasn't confirmed?

Page 388

1         A.    It was -- it was not
2    confirmed, and the group spent a lot of
3    time trying to figure out how we came up
4    with what was, in essence, a wrong
5    answer.  I'm not sure we ever explained
6    it satisfactorily; and I don't know if
7    the group wrote a letter disavowing it,
8    but they may have.
9         Q.    Let me shift gears a little
10   bit now.
11             I want to talk about
12   progestin, particularly
13   medroxyprogesterone acetate, MPA.  All
14   right?
15             Is MPA used or has it been
16   used historically to treat metastatic
17   breast cancer?
18        A.    Miss Fujimoto asked me that,
19   and I'm not aware of the historical
20   treatments for breast cancer.
21        Q.    The reason I reask the
22   question is since we were talking a
23   little bit about your involvement in the
24   Public Board of Inquiry, I had a vague

Page 389

1    recollection of a discussion about the
2    "paradoxical effects" of progestins or
3    that particular progestin, MPA, and one
4    of them was its ability to treat
5    metastatic breast cancer.
6         A.    Yeah, well --
7         Q.    I realize it's 23 years ago.
8         A.    Yeah.
9         Q.    Is it fair --
10        A.    You were there.
11        Q.    I just haven't aged.  I have
12   a photograph in the closet that gets
13   older, but --
14             MS. BEREZOFSKY:  Wait a
15        minute, I'm not sure.  What is the
16        question here?
17             THE WITNESS:  Well, I don't
18        know.
19   BY MR. SCHACHTMAN:
20        Q.    The question is:  Have you
21   read the report of the Public Board of
22   Inquiry?
23        A.    Recently?
24        Q.    Recently.

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 390
1     A.    No.
2     Q.    And it's not something you
3  were intending to rely upon for this
4  case --
5     A.    No.
6     Q.    -- these hormone therapy
7  cases, correct?
8     A.    That's correct.
9     Q.    Is it true that progestins
10  in some studies increase DNA synthesis,
11  and in other studies have no effect, and
12  in some actually decrease DNA synthesis?
13     A.    I don't know the answer to
14  that.
15     Q.    Are women who are
16  progesterone deficient at increased risk
17  of breast cancer?
18     A.    I don't know the answer to
19  that.
20     Q.    In premenopausal women, are
21  circulating progesterone levels, serum
22  levels, inversely associated with breast
23  cancer risk?
24     A.    In pre --

Page 391
1     Q.    Premenopausal women.
2     A.    I'm not aware of that.
3     Q.    In postmenopausal women, are
4  serum progesterone levels associated with
5  breast cancer risk?
6     A.    That's -- given alone.
7     Q.    Given alone -- yeah -- no.
8  Well, no, no, just looking at that as a
9  factor, are the levels of circulating
10  progesterone in the serum associated with
11  increased risk of breast cancer?
12     MS. BEREZOFSKY:  Object to
13     form.
14     THE WITNESS:  I don't know.
15  BY MR. SCHACHTMAN:
16     Q.    Does hormone therapy use
17  after breast cancer affect rate of
18  recurrence?
19     MS. BEREZOFSKY:  Object to
20     the form.  Recurrence of what?
21     MR. SCHACHTMAN:  I'll
22     restate the question.
23  BY MR. SCHACHTMAN:
24     Q.    Dr. Stolley, does the use of

Page 392
1  hormone therapy, and by that I mean
2  estrogen and progestin combined therapy,
3  after a woman has had breast cancer, been
4  treated for it, affect the rate of
5  recurrence?
6     A.    I don't know, but I know
7  it's a contraindication in the label.
8     Q.    For current breast cancer.
9     A.    For --
10     Q.    If a woman has breast
11  cancer.
12     A.    I thought also a history of
13  breast cancer, also.
14     Q.    All right.  But as we
15  discussed earlier or you and Miss
16  Fujimoto discussed, physicians are
17  entitled to prescribe drugs off label in
18  this country --
19     MS. BEREZOFSKY:  Object to
20     the form.
21  BY MR. SCHACHTMAN:
22     Q.    -- true?
23     A.    It's legal.  It may not be
24  prudent, but it's legal.

Page 393
1     Q.    And the question is:  On the
2  basis of that practice, whether drug
3  companies encouraged it or not or advised
4  against it, is there a data set that
5  shows that the use of estrogen plus
6  progestin as hormonal therapy in women
7  post breast cancer reduces the rate of
8  recurrence?
9     MS. BEREZOFSKY:  Asked and
10     answered.
11     THE WITNESS:  I don't know
12     the answer to that.
13  BY MR. SCHACHTMAN:
14     Q.    You were asked about Sam,
15  "Sid," Shapiro?
16     A.    Yes.
17     Q.    Okay.  Let me ask you about
18  David Grimes.  Do you know David Grimes?
19     A.    I think I met him at some
20  IOM committee, but I couldn't picture
21  him.
22     Q.    All right.  Has he been
23  someone who's been active and who has
24  published in the area of women's health

Confidential - Subject to Protective Order

Page 394

1  issues?
2      A.    Yeah, I'm not too familiar
3  with his work.
4      Q.    You were asked some
5  questions earlier about secular trends.
6  I'd like to go back to that area and ask
7  some follow-up questions.
8            Is it true that for -- in
9  female cases, about eight out of ten
10 breast cancers are -- postmenopausally
11 are estrogen receptor/progesterone
12 receptor positive?
13     A.    I think that's true.
14     Q.    Is it true that for male
15 cases, obviously menopause isn't an
16 issue, that the majority of cases are
17 estrogen and progesterone receptor
18 positive?
19     A.    I don't -- I don't actually
20 know.
21     Q.    Is it true that tumor cells
22 can make their own sex steroid hormones?
23     A.    I believe that's true, yes.
24     Q.    In terms of things that

Page 395

1  might affect secular trends of estrogen
2  receptor-positive tumors, let me ask you
3  about the following:  Is that
4  histochemical staining, in terms of the
5  prevalence of it, of all tumors,
6  increasing, in your view?
7      A.    The reports that I've read
8  suggest that they are increasing.
9      Q.    Is prevalence of that marker
10 increasing also as a function or as a --
11 in correlation with delayed child
12 bearing?  In other words, do women who
13 have children later in life, in their
14 late thirties or early forties, and who
15 develop breast cancer, are they more
16 likely to have estrogen receptor-positive
17 tumors?
18     A.    I think I saw a report very
19 recently suggesting that.
20     Q.    All right.  Do you know
21 whether there's a trend in the United
22 States for women to have children later
23 in life?
24     A.    Well, there is a trend.

Page 396

1      Q.    Is there a trend in the
2  United States for women not to have
3  children, at all; in other words --
4      A.    Yes.
5      Q.    Okay.  And is -- and that's
6  called nulliparity?
7      A.    Means never pregnant, yeah.
8      Q.    Is nulliparity associated
9  with an increased risk of estrogen
10 receptor-positive tumors?
11     A.    I don't know that, but
12 nulliparity is listed as a risk factor
13 for breast cancer.
14     Q.    We already mentioned early
15 menarche.  Is early menarche associated
16 not just with breast cancer but with
17 estrogen receptor-positive breast cancer?
18     A.    I don't know that.
19     Q.    Is there a secular trend in
20 the United States for women to have
21 earlier onset of menstruation?
22     A.    Yes, there has been since
23 World War II.
24     Q.    Similar questions with

Page 397

1  respect to trends that might apply to
2  lobular cancer.  Is obesity associated
3  with an increased risk of lobular cancer
4  as opposed to ductal?
5      A.    I don't know the answer to
6  that.
7      Q.    Is there a secular trend in
8  terms of increasing prevalence of obesity
9  in this country?
10     A.    Yes, there is.
11     Q.    Is there an increasing trend
12 in terms of increasing prevalence of
13 diabetes, and I'm talking about Type 2
14 diabetes, adult-onset diabetes, in this
15 country?
16     A.    Yes, there has been an
17 increase.
18     Q.    Is diabetes independently
19 associated with an increased risk of
20 lobular breast cancer?
21     A.    I don't know.
22          MS. BEREZOFSKY:  Can we stop
23     for half a second?  I don't know
24     where we are time-wise, but I

Confidential - Subject to Protective Order

Page 398

1 think we're getting close.
2 THE VIDEOGRAPHER:  Going off
3 the record.  The time is 7:41 p.m.
4 MS. BEREZOFSKY:  Can you
5 tell me where we are in terms of
6 the actual time?
7 MR. SCHACHTMAN:  I'm
8 assuming I have about ten minutes
9 left.
10 MS. BEREZOFSKY:  Yeah, I'm
11 assuming that, too, but I just
12 wanted to check.
13 THE VIDEOGRAPHER:  Elapsed
14 is six hours and 49 minutes.
15 (A recess was taken.)
16 THE VIDEOGRAPHER:  We're
17 back on the record.  The time is
18 7:44 p.m.
19 BY MR. SCHACHTMAN:
20 Q.   Dr. Stolley, are you ready
21 to resume?
22 A.   Yes.
23 Q.   Earlier today you were asked
24 about Dr. Austin's report, and you were

Page 399

1 asked about the risk, and I think you
2 said something -- I'm going to paraphrase
3 it, but you tell me if you think I've
4 gotten it wrong.
5 I believe you said that what
6 Dr. Austin has shown is that the risks
7 start up -- and we're talking about the
8 risks of combined hormone therapy and the
9 risk of breast cancer -- start up pretty
10 quickly after initiating the drug, and
11 they go away pretty quickly after
12 discontinuing the drug.
13 Is that a fair paraphrase of
14 what you said earlier?
15 A.   I think so.
16 Q.   And then I think Miss
17 Fujimoto asked you whether that was
18 consistent with published studies, and I
19 think you said it was not inconsistent.
20 Do you recall saying that?
21 A.   Yes.
22 Q.   All right.  I'd like to ask
23 you just about a couple of studies in
24 particular.  We've already talked a

Page 400

1 little bit about the Women's Health
2 Initiative, and Dr. Anderson recently
3 published a paper in Maturitas
4 specifically on the observational element
5 of the trial; in other words, many of the
6 women had taken hormone therapy before
7 ever being enrolled in the trial, and so
8 there was some information and some
9 adjustments that had to be made for their
10 risk factors for their pre-trial use of
11 hormone therapy and their pre-trial
12 exposure to risk factors.
13 Is that a fair
14 characterization of that piece of paper?
15 A.   I think you have to give me
16 the paper.
17 Q.   All right.  I'm not going to
18 do that only in the interest of time.
19 I'm really going to focus on one thing,
20 which I don't think you'll need the paper
21 for, but if you do, you'll tell me.
22 Okay?
23 One of the things that
24 Dr. Anderson broke out was it looked --

Page 401

1 she looked at the women who had taken
2 hormone therapy, combined hormone
3 therapy, before enrollment in the trial
4 and then were randomized and put on
5 placebo in the trial?
6 And is it true that those
7 women who'd been on hormone therapy,
8 enrolled in the trial, and then go on a
9 sugar pill actually had a lower risk of
10 breast cancer than women who had never
11 been on hormone therapy in their lives?
12 A.   You'll have to show me the
13 paper.
14 Q.   Okay.  That doesn't sound
15 familiar to you?
16 A.   No.
17 Q.   Do you recall the WHI
18 authors describing what I just described
19 to you as a "puzzling finding"?
20 A.   Once again, you'd have to
21 show me the paper.
22 Q.   Okay.  Then I will move on.
23 In the Nurse's Health Study,
24 did the phenomenon of the risk

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 402

1  essentially abating or going away pretty
2  quickly after discontinuing hormone
3  therapy show itself and can you document
4  it through the Nurses' Health Study?
5      A.   I'd have to see the paper.
6      Q.   Well, when you were asked
7  about whether there were studies that
8  supported the notion that you referred to
9  as the risk starting fairly quickly and
10  going away fairly quickly, what studies
11  were you thinking about?
12      A.   I was thinking about the
13  secular -- the secular trend study, but I
14  can't remember the name of the author.
15  That might have been -- might have been
16  Austin, but I'm not sure.
17      Q.   Have you reviewed any of
18  Dr. Colditz's publications for this case,
19  for the hormone therapy cases?
20      A.   Yes, I have.
21      Q.   He had a textbook chapter in
22  Harris's Diseases of the Breast in year
23  2000?
24      A.   I didn't review that.

Page 403

1      Q.   He has a -- he's had
2  chapters in Schottenfeld's and Fraumeni
3  textbook, Cancer Epidemiology and
4  Prevention. Are you familiar with those?
5      A.   No.
6      Q.   Are you familiar with the
7  text?
8      A.   I contributed a chapter to
9  the first edition.
10      Q.   It's now in its fifth or
11  sixth edition?
12      A.   Yes, and it costs about a
13  thousand dollars.
14      Q.   Now, that's exaggerated,
15  isn't it, Dr. Stolley?
16      A.   Yeah.  It's about $300.
17      Q.   And you can afford it, can't
18  you?
19          MS. BEREZOFSKY:  Objection.
20          THE WITNESS:  No, no.
21  BY MR. SCHACHTMAN:
22      Q.   If Dr. -- and Dr. Colditz
23  has been an astute student of the issues
24  that we've been talking about today, that

Page 404

1  is, the role, if any, of estrogen and
2  progestin in causing or increasing the
3  risk of breast cancer in postmenopausal
4  women, true?  He's done it for some time?
5      A.   Yes.
6      Q.   Is it true that as recently
7  as his year 2000 textbook chapter, Dr.
8  Colditz described the role of
9  progesterone in combined hormone therapy
10  in causing breast cancer or increasing
11  the risk of breast cancer to be
12  controversial?  Would you disagree?
13      A.   I'm not aware -- I'm not
14  aware of that statement.
15      Q.   Do you think that as of
16  1999, the year 2000, there was still
17  controversy about the issue of whether
18  progestins in combined hormone therapy
19  participated, in any way, in modifying or
20  altering the risk of breast cancer in the
21  women who took that drug?
22      A.   It's certainly clear that
23  prescribing physicians were not worried
24  enough about it to decrease their

Page 405

1  prescribing until the Women's Health
2  Initiative.
3          MR. BONNIN:  Objection, non
4  responsive.
5          MR. SCHACHTMAN:  Join in
6  speculation.
7  BY MR. SCHACHTMAN:
8      Q.   In -- we talked earlier
9  about how women were enrolled as early as
10  1991 or 1992 into the WHI, correct?
11      A.   Yes.
12      Q.   And randomized to either
13  drug or placebo?
14      A.   Right.
15      Q.   And the randomization --
16  enrollment and randomization continued up
17  into the mid 1990s, correct?
18      A.   Yes.
19      Q.   And that was all pursuant to
20  a protocol authorized by the National
21  Institutes of Health and the Food and
22  Drug Administration, correct?
23      A.   Correct.
24      Q.   And do you believe it was

102 (Pages 402 to 405)

Confidential - Subject to Protective Order

Page 406

1  below the standard of care for those
2  institutions to permit women to be
3  enrolled in a study where they were going
4  to be given combined estrogen and
5  progestins?
6      A.    In an organized study with a
7  protocol, it was probably debated as to
8  whether it was ethical, but I would come
9  down on the side that it was an ethical
10  study.
11      Q.   It was an ethical study?
12      A.   Yes.
13          MR. SCHACHTMAN:  That's all
14  I have for my Pennsylvania
15  deposition.  But if this were a
16  New Jersey deposition, I would
17  have more questions because I
18  wouldn't have a time limit.  But
19  thank you for answering my
20  questions tonight, Dr. Stolley.
21          THE WITNESS:  Thank you.
22          MS. FUJIMOTO:  No further
23  questions.
24          THE VIDEOGRAPHER:  One

Page 407

1      moment.  Here marks the end of
2      Volume 1, Tape No. 4 in the
3      deposition of Dr. Paul Stolley.
4      We're going off the record.  The
5      time is 7:52 p.m.
6
7          (Deposition concluded at
8  7:52 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 408

1          C E R T I F I C A T E
2
3      I, CONSTANCE E. PERKS, a Notary
Public and Certified Shorthand Reporter
4  of the State of New Jersey, do hereby
certify that prior to the commencement of
5  the examination, PAUL D. STOLLEY, M.D.,
M.P.H. was duly sworn by me to testify to
6  the truth, the whole truth and nothing
but the truth.
7
8
9
10      I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
11  testimony as taken stenographically by
and before me at the time, place and on
12  the date hereinbefore set forth, to the
best of my ability.
13
14
15
16      I DO FURTHER CERTIFY that I am
neither a relative nor employee nor
17  attorney nor counsel of any of the
parties to this action, and that I am
18  neither a relative nor employee of such
attorney or counsel, and that I am not
19  financially interested in the action.
20
21
22
_____
23  CONSTANCE E. PERKS, CSR, RPR
24

Page 409

1          - - - - - -
            E R R A T A
2          - - - - - -
3  PAGE  LINE  CHANGE
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Subject to Protective Order

Page 410

1   ACKNOWLEDGMENT OF DEPONENT
2
3   I,_____, do
    hereby certify that I have read the
    foregoing pages, 1 - 411, and that the
4   same is a correct transcription of the
    answers given by me to the questions
5   therein propounded, except for the
    corrections or changes in form or
6   substance, if any, noted in the attached
    Errata Sheet.
7
8
9
10  _____
11  PAUL D. STOLLEY, M.D., M.P.H.     DATE
12
13
14
15  Subscribed and sworn
    to before me this
16  _____ day of _____, 20_____.
17  My commission expires:_____
18
19  _____
    Notary Public
20
21
22
23
24

Page 411

1        LAWYER'S NOTES
2   PAGE  LINE
3   _____ _____ _____
4   _____ _____ _____
5   _____ _____ _____
6   _____ _____ _____
7   _____ _____ _____
8   _____ _____ _____
9   _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____

Golkow Technologies, Inc. - 1-877-370-DEPS