**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| | : | **MDL Docket No. 4:03CV1507 WRW** |
| | : | |
| **In re:** | : | |
| | : | *Pamela Kuhn v. Wyeth*, |
| **PREMPRO PRODUCTS LIABILITY** | : | **Case No. 6:04-cv-06042 WRW** |
| **LITIGATION** | : | |
| | : | *Shirley Davidson v. Wyeth*, |
| | : | **Case No. 6:05-cv-06074 WRW** |
| | : | |

**MEMORANDUM IN SUPPORT OF
WYETH'S MOTION TO PRECLUDE ANY EXPERT TESTIMONY
THAT PREMPRO USE INCREASES BREAST CANCER RISK
<u>WHEN TAKEN DAILY FOR THREE YEARS OR LESS</u>**

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ................................................................................ 1

STATEMENT OF FACTS ................................................................................... 4

    I.       THE INDIVIDUAL CASES SELECTED ........................................... 4

           A.     Pamela Kuhn ........................................................................ 5

           B.     Shirley Davidson .................................................................. 5

    II.      PROCEDURAL POSTURE OF THIS DAUBERT CHALLENGE ..................... 6

    III.    THE TOTALITY OF AVAILABLE DATA CONFIRMS THAT
           PREMPRO IS NOT ASSOCIATED WITH AN INCREASED RISK OF
           BREAST CANCER WHEN USED DAILY FOR THREE YEARS OR
           LESS ...................................................................................... 6

           A.     Prempro Is One of Many Different Types of Hormone Therapy ............. 6

           B.     Before the WHI Clinical Trial, the Medical Community Believed
                   That Prempro and Other Hormone Therapies Reduced
                   Cardiovascular Risk ............................................................. 8

           C.     WHI Showed That Prempro Is Associated With a Small Increased
                   Risk of Breast Cancer, But Only if Taken Long-Term ........................... 11

           D.     Following WHI, the Medical Community Acknowledged the
                   Weaknesses of Observational Study Data, Particularly in
                   Evaluating Hormone Therapy .................................................. 13

           E.     Today, It Is Generally Accepted That Prempro Is Not Associated
                   with an Increased Risk of Breast Cancer When Taken for Three
                   Years or Less ....................................................................... 20

           F.     Since This Litigation Began, Plaintiffs Have Relied on WHI, and
                   Their Experts Have Conceded That Prempro Is Not Associated
                   with an Increased Risk of Breast Cancer When Taken Daily for
                   Three Years or Less .............................................................. 22

ARGUMENT ............................................................................................... 24

CONCLUSION ............................................................................................ 29

# TABLE OF AUTHORITIES

**Page**

CASES

*Adams v. Cooper Indus. Inc.,*
  Civil Action No. 03-476-JBC, 2007 WL 2219212 (E.D. Ky. July 30, 2007) ........................26

*Allen v. Pa. Eng'g Corp.,*
  102 F.3d 194 (5th Cir. 1996) ...................................................................................................29

*Braun v. Lorillard Inc.,*
  84 F.3d 230 (7th Cir. 1996) .....................................................................................................29

*Cano v. Everest Minerals Corp.,*
  362 F. Supp. 2d 814 (W.D. Tex. 2005)....................................................................................28

*Cavallo v. Star Enter.,*
  892 F. Supp. 756 (E.D. Va. 1995) ...........................................................................................26

*Daubert v. Merrell Dow Pharms., Inc.,*
  509 U.S. 579 (1993)........................................................................................................ passim

*In re Bextra & Celebrex Mktg., Sales Practices & Prods. Liab. Litig.,*
  524 F. Supp. 2d 1166 (N.D. Cal. 2007) .......................................................................26, 27, 28

*In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.,*
  612 F. Supp. 2d 116 (D. Mass. 2009) ......................................................................................27

*In re Neurontin Mktg. & Sales Practices Litig.,*
  --- F. Supp. 2d ---, 2010 WL 4325225 (D. Mass. Nov. 3, 2010)..................................8, 16, 27

*In re Prempro Prods. Liab. Litig.,*
  MDL No. 4:03-cv-1507, 2010 WL 3447293 (E.D. Ark. Aug. 30, 2010)...................... passim

*In re Rezulin Prods. Liab. Litig.,*
  309 F. Supp. 2d 531 (S.D.N.Y. 2004)......................................................................................28

*In re Rezulin Prods. Liab. Litig.,*
  369 F. Supp. 2d 398 (S.D.N.Y. 2005)......................................................................................27

*In re Viagra Prods. Liab. Litig.,*
  572 F. Supp. 2d 1071 (D. Minn. 2008).....................................................................................27

*In re W.R. Grace & Co.,*
  355 B.R. 462 (Bankr. D. Del. 2006) ........................................................................................26

*McClain v. Metabolife Int'l, Inc.,*
  401 F.3d 1233 (11th Cir. 2005) .....................................................................................26, 29, 30

## TABLE OF AUTHORITIES
(continued)

**Page**

*Norris v. Baxter Healthcare Corp.*,
    397 F.3d 878 (10th Cir. 2005) ................................................................................28

*Pritchard v. Dow Agro Sciences,*
    705 F. Supp. 2d 471 (W.D. Pa. 2010)......................................................................28

*Wagner v. Hesston Corp.*
    450 F.3d 756 (8th Cir. 2006) ...................................................................................25

### OTHER AUTHORITIES

David L. Eaton, *Scientific Judgment and Toxic Torts—A Primer in Toxicology for Judges
    and Lawyers* J. L. & POL'Y 5 (2003) ......................................................................26

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2000) ............................................ passim

Fed. R. Evid. 702 ..............................................................................................................15, 25

## SUMMARY OF ARGUMENT

Wyeth submits this brief in support of its *Daubert* motion to exclude Plaintiffs' experts' opinions that Prempro increases the risk of breast cancer if taken daily for three years or less.

Prempro is FDA-approved as safe and effective for the treatment of menopausal symptoms.  In 1991, after a series of observational studies raised questions about the potential cardiovascular benefits and breast cancer risks of different hormone therapies, the National Institutes of Health ("NIH") started a series of the largest clinical trials ever conducted, the Women's Health Initiative ("WHI"), which one of Plaintiffs' expert called "the mother of all clinical trials."[1]  WHI consisted of two trials:  one studying Wyeth's combination hormone therapy medication, Prempro, and the other studying Wyeth's estrogen-only medication, Premarin.  The WHI investigators were able to assess patients' compliance with daily medication use and ensure that breast cancer screening was performed at regular intervals.  Consequently, the WHI trial would provide the most reliable evidence of the time-dependent relationship between Prempro use and breast cancer risk.

In 2002, when the results of WHI became available, they contradicted the pre-existing body of observational data with regard to cardiovascular benefit, and showed no increased risk of breast cancer with Premarin.  Although WHI showed that Prempro use was associated with a slightly increased risk of breast cancer, the increased risk was time-dependent and only manifested in women who took Prempro daily for *five years or more*.  For the first three years of use, the primary analysis showed that patients taking Prempro actually had *lower rates* of developing breast cancer than patients taking placebo.  The medical, scientific, and regulatory communities recognized the WHI results as definitive, and as more reliable than previous

---

[1]   Deposition of Graham Colditz, M.D., December 18, 2006, at 276:21-277:17 ("Colditz Dep.") (attached as Ex. 1).

1

observational studies.  The National Cancer Institute ("NCI") called the WHI trials the best and

"most comprehensive" evidence on hormone therapy and breast cancer risk.[2]  The Plaintiffs'

Steering Committee repeatedly has relied on WHI as well; their Master Complaint describes

WHI as "one of the most definitive, far reaching clinical trials of women's health ever

undertaken."[3]

Consistent with the medical and scientific communities' general acceptance of WHI and

the totality of the observational study data, it is likewise accepted that Prempro is not associated

with an increased risk of breast cancer at durations of three years or less.  Prominent research and

advocacy organizations, such as the Dr. Susan Love Research Foundation, advise that the risk of

breast cancer for women taking hormone replacement therapy increases after the first five years

of use.  The American College of Obstetricians and Gynecologists advises its members that

hormone therapy "continues to be appropriate for short-term use without an apparent increase in

risk of breast cancer for *up to 4 years.*"[4]  Plaintiffs' general and specific causation experts have

conceded both in their publications, public statements, and depositions that Prempro is not

associated with an increased risk of breast cancer if used for a duration of three years.  For

example, Dr. Graham Colditz, one of Plaintiffs' primary general causation experts, has written

---

[2]   National Cancer Institute, Menopausal Hormone Replacement Therapy (HT) ("NCI Website") http://www.cancer.gov/cancertopics/menopausal-hormone-use (last visited Nov. 12, 2010) (attached as Ex. 2); http://www.cancer.gov/cancertopics/factsheet/risk/menopausal-hormones (last visited Nov. 12, 2010) (attached as Ex. 3).

[3]   MDL Master Complaint, Docket No. 4:03-CV-01507 WRW, Document No. 81, Jan. 7, 2004, ¶ 45 ("MDL Master Compl.") (attached as Ex. 4).

[4]   Boston University School of Medicine, ACOG Statement of WHI Report, http://www.bumc.bu.edu/sexualmedicine/physicianinformation/acog-statement-of-whi-report/ ("BU Website") (last visited Nov. 10, 2010) (emphasis added) (attached as Ex. 5).

that breast cancer "increased significantly only among women currently using hormone therapy who had used such therapy for *five or more years*."[5]

While Plaintiffs have not yet put forward any experts or methodologies to support an opinion on this issue, Wyeth anticipates that Plaintiffs' experts will attempt to do here what they tried in response to Wyeth's recent *Daubert* challenge regarding Premarin—that is, to disregard the primary analysis from the definitive "gold standard" WHI trial and to cherry pick the results of select studies or sub-analyses within studies in order to try to sustain their burden of proof—a tactic which this Court properly rejected. *See In re Prempro Prods. Liab. Litig.*, 2010 WL 3447293 at *5 (emphasizing an expert cannot ignore the generally accepted WHI clinical trial results in favor of less reliable data).

For example, Wyeth expects that Plaintiffs' experts will rely heavily on a European study known as the Million Women Study ("MWS").  That study suffers from numerous methodological flaws, however, including that it did not evaluate Prempro specifically and that it underestimated the length of time patients used the various hormone therapies before diagnosis. Indeed, the flaws in the study were so significant that, after the study results were published, numerous scientific articles, editorials and letters appeared in prominent peer-reviewed journals criticizing the study design and questioning the reliability of its results.  As one critic stated: "Because of its inherent weaknesses, we believe that the MWS should not be used as part of an evidence base for HRT and should be discounted by regulatory authorities."[6]

---

[5]   Colditz, et al., N. ENG. J. MED. 1995:332;1589-93 at 1591 (emphasis added) (attached as Ex. 6).

[6]   Stevenson, HUMAN REPRODUCTION, 2006;21:1668–1671 ("Stevenson 2006") at 1670 (attached as Ex. 7).

Under *Daubert*, Plaintiff carries the burden to establish the admissibility of any opinions related to duration of use.  Expert opinions must reflect sound science, and courtroom methodologies must be as intellectually rigorous as those used by clinical researchers who investigate the safety of medications outside the courtroom.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  When they are not, the public health consequences are enormous, as millions of patients may shift irrationally from a safe and effective medication to ones that are less safe and less effective.  The law instructs that jurors should not be permitted to reach conclusions that are contrary to the generally accepted consensus of the scientific community and beyond what the most reliable body of science allows.  "Law lags science; it does not lead it."  *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996).  In the face of the definitive data from WHI, the totality of relevant observational studies, the general consensus of the scientific community, and the experts' own admissions on this subject, Plaintiffs cannot meet this burden.  For these reasons, the Court should exclude any expert opinion that Prempro increases the risk of breast cancer if used daily for three years or less.

<u>**STATEMENT OF FACTS**</u>

**I.      THE INDIVIDUAL CASES SELECTED.**

The Court selected for trial two cases that allegedly involve short-term use.  The plaintiffs in those cases are Pamela Kuhn and Shirley Davidson.  There has been only limited discovery taken in the cases, and neither plaintiff has designated any case-specific experts.  In addition, no expert reports have been served which speak directly to the methodologies that Plaintiffs' experts will rely on to establish that Prempro use for less than three years increases the risk of breast cancer.  As a result, this motion is based mostly on the duration-related allegations contained in the respective Plaintiffs' complaints and fact sheets.

### A.    Pamela Kuhn.

According to Plaintiff Pamela Kuhn's fact sheet, she took Prempro for approximately

three years, from December 1998 to December 2001.[7]  In March 2002, she was diagnosed with

Stage 1 tubular carcinoma.[8]  After her diagnosis, Ms. Kuhn had a lumpectomy and was treated

with radiation therapy and tamoxifen.[9]  According to her medical records, Ms. Kuhn has multiple

risk factors for breast cancer including early menses, having her first child after the age of 30,

and not breastfeeding.[10]

### B.    Shirley Davidson.

Plaintiff Shirley Davidson alleges, and her pharmacy records confirm, that she took

Prempro for one year and 10 months, from July 1999 to April 2001, for the treatment of hot

flashes, night sweats and vaginal dryness.[11]  According to her fact sheet, in October 2002, Ms.

Davidson was diagnosed with invasive ductal carcinoma.[12]  Following her diagnosis, she had a

lumpectomy and was treated with radiation therapy and tamoxifen.[13]  Ms. Davidson also has

---

[7]    Lead Counsel Advised the Court: "According to Mr. Holt, Pamela Kuhn took Prempro from 1998-2001 (a few weeks over three years)."  E-mail from Zoe Littlepage to Matt Morgan (Nov. 5, 2010), Plaintiffs' Motion for Clarification, Exhibit 3 (attached as Ex. 8).  However, at her deposition, Ms. Kuhn alleged that she used Prempro for approximately four years. *See* Deposition of Pamela Kuhn, Dec. 7, 2005 at 126:25-127:5 (excerpts attached as Ex. 9).

[8]    Plaintiff Fact Sheet of Pamela Kuhn, June 15, 2005 ("Kuhn PFS") at 18 (attached as Ex. 10); Kuh06644-113185-138372500009 (attached as Ex. 11).

[9]    Kuhn PFS at 18; Kuh06644-113185-138372500013 (attached as Ex. 12).

[10]    Kuhn PFS at 8, 16, 24; Kuh06644-113185-138372500018 (attached as Ex. 13).

[11]    Plaintiff Fact Sheet of Shirley Davidson, September 18, 2007 ("Davidson PFS") at 34 (dates of use), 19 (menopausal symptoms) (attached as Ex. 14).

[12]    Davidson PFS at 26-27; SDavidson-APA-000002-03 (attached as Ex. 15).

[13]    Davidson PFS at 26-27.

multiple risk factors for breast cancer including early menses, not breastfeeding, obesity, a

family history of breast cancer (her sister), and a family history of other cancers.[14]

## II.     PROCEDURAL POSTURE OF THIS *DAUBERT* CHALLENGE.

On November 5, 2010, the Court issued an order setting a joint *Daubert* hearing on short-

term use, directing Wyeth to file a *Daubert* motion, and directing Plaintiffs to file a response.[15]

This creates a unique situation because Plaintiffs have not designated experts or disclosed the

methodologies that will be the basis of their experts' short-term use opinions in these cases.

Accordingly, while Wyeth submits this brief in support of its motion to preclude any expert

testimony that Prempro is associated with an increased risk of breast cancer when taken daily for

three years or less, Wyeth is unable to respond fully until such time that Plaintiffs disclose their

experts' specific methodologies related to this short-term use issue.[16]

## III.    THE TOTALITY OF AVAILABLE DATA CONFIRMS THAT PREMPRO IS NOT ASSOCIATED WITH AN INCREASED RISK OF BREAST CANCER WHEN USED DAILY FOR THREE YEARS OR LESS.

### A.     Prempro Is One of Many Different Types of Hormone Therapy.

There are many different types of hormone therapy.  As this Court recently recognized,

"[e]strogen is not itself a single substance, but rather a class of hormones; its major forms are

estriol, estrone, and estradiol.  The most potent is estradiol . . . ."  *In re Prempro Prods. Liab.*

*Litig.*, MDL No. 4:03-CV-1507-WRW, 2010 WL 3447293, *5 (E.D. Ark. Aug. 30, 2010).  Each

type of estrogen is a different chemical compound with a different chemical structure, and each

---

[14]   Davidson PFS at 11 (did not breast feed); 18 (early menses, obesity); 31 (sister had breast cancer).

[15]   Letter from Hon. Wm. R. Wilson, *In re Prempro*, 4:03-C-01507-WRW (Doc. No. 2435), November 5, 2010.

[16]   Wyeth reserves the right to disclose our own expert in response to what Plaintiffs disclose for the first time in their opposition to this motion.

affects the body differently.[17]  There are also many different types of progestagens, another class

of hormones that are combined with estrogens to form "combination" hormone therapy.[18]

Plaintiffs' expert Donald F. Austin, has testified that different hormone therapy formulations

have different effects.[19]

FDA has approved various forms of hormone therapy to treat the symptoms of

menopause, such as the loss of bone density, insomnia, hot flashes, and vaginal dryness.[20]

Hormone therapy includes more than 30 different products, which can be administered as pills,

skin patches, creams, vaginal inserts, and vaginal rings.[21]  There are two broad categories of

hormone therapy:  (1) estrogen-only and (2) combination, which includes both an estrogen and

progestagen component.  Even within these categories, there are many products with

---

[17]  Deposition of C. Marcelo Aldaz, M.D., Ph.D., July 23, 2010 ("Aldaz Dep.") at 43:13-44:11, 99:22-100:14 (attached as Ex. 16); Memorandum from Janet Woodcock, M.D., Director, Center for Drug Evaluation and Research to Douglas L. Sporn, Director, Office of Generic Drugs, May 5, 1997, at 3, 9-10 ("1997 FDA Mem.") ("Emerging scientific evidence demonstrates that all estrogens do not exert their effects in a uniform manner with respect to different target tissues. . . .  [O]ne estrogen can be more active than another in a specific tissue or organ such as breast, uterus, or bone.") (attached as Ex. 17); Deposition of Michael Wertheimer, M.D., Sept. 3, 2010 at 42:19-43:4 (attached as Ex. 18).

[18]  IAN S. FRASER, et al., ESTROGENS AND PROGESTOGENS IN CLINICAL PRACTICE 27-30 (2000) (attached as Ex. 19).

[19]  Deposition of Donald F. Austin M.D., M.P.H., Mar. 13, 2007 at 186:20-187:6 (testifying that different formulations have different effects) (excerpts attached as Ex. 20); see also Deposition of Donald F. Austin M.D., M.P.H., July 1, 2010 at 22:6-10; 48:5-14 (excerpts attached as Ex. 21); Report of Dr. Donald Austin, August 2007 Updated Causality Report at 24 ("[I]t is possible that estradiol and CEE have separate risk profiles and should be considered separately.") (attached as Ex. 22).

[20]  Menopause, National Institutes of Health, http://www.nichd.nih.gov/health/topics/menopause.cfm (last visited Nov. 12, 2010) (attached as Ex. 23).

[21]  See http://www.fda.gov/ForConsumers/ByAudience/ForWomen/ucm118627.htm ("FDA Website on Hormone Therapy") (last visited Nov. 12, 2010) (attached as Ex. 24); Aldaz Dep. at 75:3-21; 78:5-9.

considerable differences.  These products are made by different manufacturers, consist of

different estrogens and progestagens, and have different effects on the body.[22]

Prempro is one type of combination hormone therapy.  Its estrogen component consists of

conjugated equine estrogens or "CEE."[23]  As the Court acknowledged in its recent decision,

"[a]bout a third of CEE is estrone and less than 1% is estradiol."  *In re Prempro Prods. Liab.*

*Litig.*, 2010 WL 3447293 at *5.  Estradiol is the most potent estrogen.  *Id.*  The progestagen

component of Prempro is a synthetic hormone called medroxyprogesterone.[24]

### B.    Before the WHI Clinical Trial, the Medical Community Believed That Prempro and Other Hormone Therapies Reduced Cardiovascular Risk.

In 1995, FDA approved Prempro as safe and effective for the treatment of menopausal

symptoms.[25]  When Prempro came to market, the medical community believed that Prempro and

other forms of hormone therapy may reduce cardiovascular risk.[26]  This belief rested largely on

---

[22]   *See* FDA Website on Hormone Therapy; Aldaz Dep. at 70:13-15 (admitting that estrone, estradiol and estriol are different types of estrogen); *id.* at 70:20-71:10 (admitting that different estrogens play different roles in a woman's body); *id.* at 75:22-76:17 (admitting that estrogens differ in the way they are absorbed by the body); *see also id.* at 43:13-44:11, 99:3-20, 99:22-100:14; 1997 FDA Mem. at 9-10 (quoted *supra* note 17); O'Connell et al., J. CLIN. PHARMACOL. 1995;35:18S-24S at 19S (attached as Ex. 25); FDA, *Estrogen and Estrogen with Progestin Therapies for Postmenopausal Women*, http://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm135318.htm (last visited Nov. 12, 2010) (attached as Ex. 26).  These manufacturers are not a part of these *Daubert* proceedings.  *In re Prempro Prod. Liab. Litig.*, Hr'g Tr., Docket No. 4:03-CV-01507-WRW, May 19, 2010, at 6:12-13 ("[T]his calendar need only involve at this stage Wyeth.") (excerpts attached as Ex. 27); *id.* at 9:16-17 ("We're going to put the other defendants on the back burner at this time.").

[23]   Prempro Label, February 2010 ("Prempro Label") at 1 (attached as Ex. 28); 1997 FDA Mem. at 3.

[24]   Prempro Label at 1-3.

[25]   *Kuhn* Compl. ¶ 23 (attached as Ex. 29).

[26]   Deposition of Jasenka Demirovic, M.D., M.Sc., Ph.D., July 6, 2010 ("Demirovic Dep.") at 158:16-23, 161:9-17 (attached as Ex. 30); Stampfer & Colditz, PREVENTIVE MEDICINE

observational studies, the same type of studies that Plaintiffs' experts are expected to rely on here.[27]  Some earlier observational studies also suggested that various hormone therapies may increase the risk of breast cancer.  However, many of these observational studies did not study Prempro or Premarin specifically, and they were largely uncontrolled for numerous confounders, including differences in the frequency of mammography screening.[28]

Compared to clinical trials, observational studies are fraught with limitations.  Unlike clinical trials, the researcher in an observational study does not prospectively and randomly assign subjects to one of two groups receiving medication or placebo, does not direct how physicians prescribe the medication, does not control for pre-existing characteristics of the patients through randomization, and does not closely watch patients for any adverse health effects.[29]  Instead, the researcher typically collects patient information from large databases, such as insurance company databases, which may have incomplete data.[30]  This Court recognized these weaknesses in its recent *Daubert* decision:

> Unlike clinical studies, which are blinded and controlled,
> observational studies select patients from existing populations,
> based on whether or not they have or will be receiving treatment.
> Because this procedure lacks controls, observational studies are
> more susceptible to bias and other confounding factors, and so are
> less reliable than clinical studies, which are often referred to as the
> "gold standard."

---

1991;20:47-63) (attached as Ex. 31).

[27]   Hulley et al., JAMA 1998;280:605-13 at 605 (attached as Ex. 32).

[28]   Stefanick et al., JAMA 2006;295:1647-57 ("Stefanick 2006") at 1652 (attached as Ex. 33).

[29]   *See* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 339 (2d ed. 2000) ("REF. MAN.")
(excerpts attached as Ex. 34); Stephen B. Hulley et al., DESIGNING CLINICAL RESEARCH 195
(3d ed. 2007) ("DESIGNING CLINICAL RESEARCH") (excerpts attached as Ex. 35).

[30]   *See* REF. MAN. at 339-340.

*In re Prempro Prods. Liab. Litig.*, 2010 WL 3447293 at *2 (citing REF. MAN. ON SCIENTIFIC EVID. 338-39).

Bias and confounding are particularly significant factors when studying a multi-factorial disease (a disease with many known and unknown risk factors and causes) such as breast cancer. Factors such as a woman's age at menarche, age at menopause, age at first live birth, number of pregnancies, family history of breast cancer, body mass index, alcohol consumption, history of benign breast disease, use of oral contraceptives, and the use and frequency of mammography are potential confounders that may affect the reliability of results of a study assessing the relationship between Prempro use and breast cancer risk.[31]

Observational studies are inherently limited in their ability to control for these types of bias and confounding.[32]  As a result, the treatment and control groups can differ significantly with respect to important factors other than the one of primary interest.  Virtually all the observational studies conducted to assess the relationship between hormone therapy use and breast cancer risk rely on data collected from large clinical or administrative databases. Frequently, these databases contain incomplete or even inaccurate data.  Much of the information in the databases is obtained by sending periodic questionnaires to a group of study participants, asking for information about the participants' health status, type and duration of hormone therapy use, and other relevant history.  Self-reported information gathered from questionnaires is typically less complete and less reliable than data prospectively collected during a clinical trial.  This is especially true of data regarding the frequency, duration and type of hormone therapy use, the accuracy of which depends on an individual woman's recollection of her use of

---

[31]   Aldaz Dep. at 237:13-238:22; Demirovic Dep. at 175:21-180:6.

[32]   REF. MAN. at 93-95.

the relevant medication over a number of years prior to completing the questionnaire. Consequently, observational study authors often lack reliable data regarding pre-existing breast cancer risk factors, the type and duration of hormone therapy used, the frequency of breast cancer screening, and the timing of breast cancer development.  By contrast, randomized clinical trials are able to provide the most reliable data regarding:  (1) the actual dose and duration of a patient's exposure to a medication, and (2) the manifestation and exact timing of any adverse health effects.

### C.   WHI Showed That Prempro Is Associated With a Small Increased Risk of Breast Cancer, But Only if Taken Long-Term.

In 1991, due to the uncertainties in the observational study data, the National Institutes of Health sponsored the Women's Health Initiative ("WHI") clinical trial.  WHI actually involved two separate trials:  one of Prempro, and one of the estrogen-only medication Premarin.  WHI is one of the largest randomized controlled trials ever conducted.[33]  The Prempro portion of the trial studied more than 16,000 women for more than five years, with approximately half receiving Prempro and the other half receiving placebo.[34]  Because WHI was a prospective randomized clinical trial, the study investigators were regularly able to assess patients' compliance with daily medication use and ensure that breast cancer screening (via mammograms and clinical breast examinations) was performed at regular intervals.  Consequently, WHI data provides the most reliable estimate of cumulative exposure to Prempro and is less likely to be affected by detection bias and other data collection problems that are inherent in many observational studies.

---

[33]  Deposition of Michael Wertheimer, M.D., July 14, 2010, in *Torkie-Tork v. Wyeth* ("Wertheimer *Torkie-Tork* Dep.") at 140:19–141:3 (attached as Ex. 36); *In re Prempro Prods. Liab. Litig.*, 2010 WL 3447293 at * 2 (E.D. Ark. Aug. 30, 2010).

[34]  Chlebowski et al., JAMA 2003;289:3243–53 ("Chlebowski 2003") at 3244 (attached as Ex. 37).

The WHI results took many in the medical and scientific community by surprise.  WHI contradicted prior observational studies with regard to cardiovascular benefit, and WHI also showed no increased breast cancer risk with Premarin, which some observational studies had suggested.[35]   With regard to Prempro, WHI showed that patients taking Prempro had a slightly higher risk of being diagnosed with breast cancer, but the increased risk was time-dependent and only seen in women who took Prempro for a period of *five years or more*.[36]   Women who had not used hormone therapy prior to entering the study did not have an increased risk of breast cancer even after taking Prempro for more than six years.[37]   Plaintiffs' general causation expert, Dr. Austin, concedes that, for the first three years, women who took Prempro actually had *lower rates* of developing breast cancer.[38]   In other words, patients who took Prempro for three years or less actually were *less likely* to be diagnosed with breast cancer than those receiving placebo.[39]   *See* Figure 1, below.

---

[35]   Piantadosi, EPIDEMIOL. 2003;14:6-7 ("Piantadosi 2003") at 6 (attached as Ex. 38); Stefanick 2006 at 1657.

[36]   Wertheimer *Torkie-Tork* Dep. at 156:9-14; Chlebowski 2003 at 3248, tbl. 2; Austin Dep. at 109:15-19.

[37]   Austin Dep. at 112:12-18; Chlebowski 2003 at 3248, tbl. 2; *see also* Anderson et al., MATURITAS 2006;55:103-15 (attached as Ex. 39.

[38]   Austin Dep. at 109:15-19.

[39]   *See id.*; Chlebowski 2003 at 3248, tbl. 2.

**Figure 1**



**Invasive Breast Cancer in WHI Study**

D.   **Following WHI, the Medical Community Acknowledged the Weaknesses of Observational Study Data, Particularly in Evaluating Hormone Therapy.**

Following WHI, the medical community recognized that the observational data related to these medications were not as reliable as the data generated in WHI. This recognition caused drug safety experts and other leaders in the field to reiterate the limitations of observational studies: "The WHI result requires that researchers and clinicians rethink their optimism about the lack of bias in observational inferences about treatment . . . . Observational studies are efficient and necessary, but they will *sometimes prove unreliable*."[40] The NEW ENGLAND JOURNAL OF MEDICINE reported in the wake of WHI that "observational or mechanistic studies,

---

[40]   Piantadosi 2003 at 6-7 (emphasis added).

animal models, and basic research have tremendous value for the generation of hypotheses but *should not be used to justify broad-based pharmacologic interventions*."[41] Even as recently as last month, the JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION noted that WHI is "exhibit 1" on the weaknesses of observational studies in assessing causation:

> In the scientific community, the WHI results became "exhibit 1" for critics of observational studies, who argued that this latest upheaval of conventional medical knowledge proved (once again) that only *randomized studies can yield useful insights into cause and effect.*[42]

Plaintiffs' expert in the first two bellwether trials, David Sackett (whom Plaintiffs described as the "father" of evidence-based medicine), echoed this skepticism of observational studies: "[W]hen we talk about the hierarchy of evidence, the Women's Health Initiative trial trumps the observational studies and is sufficient in and of itself, in my professional opinion, to establish that relationship so that it trumps any observational studies."[43]

Even if one sets aside the inherent limitations of observational studies, the totality of observational data evaluating the time-dependent risks of Prempro does not support an association between short-term Prempro treatment and breast cancer. It is well-settled that replication and consistency across studies is required to reliably establish an increased risk. "The need to replicate research findings permeates most fields of science. . . . Consistency in these

---

[41]  Herrington & Howard, N. Engl. J. Med. 2003;349:519-21 at 519 (emphasis added) (attached as Ex. 40).

[42]  Bach, JAMA 2010;304:1719-20 at 1719 (attached as Ex. 41).

[43]  *Reeves v. Wyeth et al.*, Aug. 29, 2006, Trial Tr. at 1456:23-1457:2 (excerpts attached as Ex. 42); *see also Rush v. Wyeth et al.,* Feb. 5, 2007, Trial Tr. at 1748:10-12 ("[T]he most powerful information we could have about harm would come from a randomized trial.") (excerpts attached as Ex. 43).

findings is an important factor in making a judgment about causation."[44]  Here, consistent with the generally accepted results of WHI, nine of the eleven observational studies conducted in the United States (where a majority of women can be presumed to have been taking Prempro) and assessing short-term time-dependent effects of combination hormone therapy consistently found no significant increase in breast cancer risk in women taking Prempro for a period of three years or less.  Further, none of the eleven studies found a significant increase in breast cancer risk in women taking Prempro for a period of two years or less.  *See* Figure 2, below.

These studies include publications from highly-respected national clinical data sets such as the National Cancer Institute's–American Cancer Society's Breast Cancer Detection Demonstration Project ("BCDDP")[45] and the National Institutes of Health's Women's Contraceptive and Reproductive Experiences Study ("CARE").[46]  Although a few European studies reported increased breast cancer risks with short-term use, those studies involve combination hormone therapy formulations that are chemically different from Prempro.  Because different combination hormone therapy formulations have unique efficacy and safety profiles, those studies cannot provide a reliable basis for evaluating the relationship between Prempro use and breast cancer risk.[47]

---

[44]   REF. MAN at 377; *see also* Deposition of Graham Colditz, M.D. Dec. 29, 2006 at 561:20-562:15 (attached as Ex. 44).

[45]   Schairer 2000; Schairer 1994.

[46]   Norman 2003; Weiss 2002.

[47]   *See In re Prempro Prods. Liab Litig.*, 2010 WL 3447293 at *5.

**FIGURE 2:  RISK OF BREAST CANCER IN POST-MENOPAUSAL WOMEN
WITH SHORT-TERM PREMPRO USE[48]**

| Data Set, Author | Significant Increased Risk at 3 yrs or less? | Significant Increased Risk at 2 yrs or less? | Use of Prempro |
|---|---|---|---|
| Multistate, Newcomb (1995) | NO | NO | Yes |
| Washington State, Stanford (1995) | NO | NO | Yes |
| BCDDP, Schairer (2000) | NO | NO | Yes |
| Group Health Cooperative, Chen (2002) | NO | NO | Yes |
| BCDDP, Schairer (1994) | NO | NO | Not specified, U.S. Study |
| CARE, Weiss (2002) | NO | NO | Not specified, U.S. Study |
| CARE, Norman (2003) | NO | NO | Not specified, U.S. Study |
| Black Women's Study, Rosenberg (2006) | NO | NO | Not specified, U.S. Study |
| Washington State, Li (2008) | NO | NO | Not specified, U.S. Study |
| Cancer Prevention Study, Calle (2009) | Yes | NO | Not specified, U.S. Study |
| California Teachers Study, Saxena (2010) | Yes | NO | Not specified, U.S. Study |

Wyeth anticipates that Plaintiffs' experts will rely heavily on a European study known as

the Million Women Study,[49] which suffers from a number of methodological flaws that render it

---

[48]   Newcomb et al., AM. J. EPIDEMIOL. 1995;142:788-95 (attached as Ex. 45); Stanford et al.,
JAMA 1995;274:137-42 (attached as Ex. 46); Schairer et al., JAMA 2000;283:185-91
("Schairer 2000") (attached as Ex. 47); Chen et al., JAMA 2002;287:734-741 (attached as
Ex. 48); Schairer et al., CANCER CAUSES AND CONTROL 1994;5:491-500 ("Schairer 1994")
(attached as Ex. 49); Weiss et al., OBSTET. GYNECOL. 2002;100:1148-58 ("Weiss 2002")
(attached as Ex. 50); Norman et al., CANCER CAUSES AND CONTROL 2003;14:933-43
("Norman 2003") (attached as Ex. 51); Rosenberg et al., ARCH. INTERN. MED. 2006;166:760-
765 (attached as Ex. 52); Li et al., CANCER EPIDEMIOL. BIOMARKERS PREV. 2008;17:43-50
(attached as Ex. 53); Calle et al., CANCER 2009;115:936-45 (attached as Ex. 54); Saxena et
al., CANCER EPIDEMIOL. BIOMARKERS PREV. 2010;19:OF1-13 (attached as Ex. 55).

unreliable.  First, more than 80% of the women in the Million Women Study were taking

combination hormone therapy formulations other than Prempro.[50]  Because the authors did not

provide an estimate of breast cancer risk for a period of three years or less in the subset of

women taking Prempro, the study does not provide a reliable basis for making any conclusion

regarding the safety of short-term Prempro use.

Second, the study design significantly underestimated the actual duration of hormone

therapy use.  In the Million Women Study, the duration of hormone therapy use was defined at

baseline (study entry) and did not account for hormone use from study entry until breast cancer

diagnosis.[51]  Thus, a woman who had used combination hormone therapy for one year prior to

entering the study, continued her treatment after entering the study, and developed breast cancer

three years later, would be considered by the authors to have been on therapy for one year, even

though her real treatment duration was four years.  Because the duration of hormone therapy use

was not accurately assessed in the study, no reliable conclusions can be made about the safety of

short-term use of *any* form of combination hormone therapy.  A number of articles and editorials

have made this very point:

- "Duration of HRT use [in MWS] was defined at study entry. Thus, use during prospective follow-up was not taken into account."[52]

- "The most obvious limitation in the design of the [Million Women Study] is that the exposure data were collected at the time the women were recruited to the study rather than when the cancer was diagnosed (or the study terminated)."[53]

---

[49]   Beral et al., LANCET 2003;362:419-27 ("Beral 2003") (attached as Ex. 56).

[50]   *See* Beral 2003 at 423, Fig. 5.

[51]   Beral 2003 at 426; Van Leeuwen and Rookus, LANCET 2003;362:1330 ("Van Leeuwen 2003") (attached as Ex. 57); Bliss and Gray, LANCET 2003;362:1328-29 ("Bliss 2003") (attached as Ex. 58).

[52]   Van Leeuwen 2003 at 1330.

- "[W]e are concerned that the study has over-estimated the risk of breast cancer associated with a short exposure to HRT."[54]

For this reason, one author has concluded that "with respect to the effect of taking HRT for short durations, the results of the WHI study seem more informative."[55]

Third, the Million Women Study had many other methodological flaws.  Indeed, after the study results were published, numerous scientific articles, editorials and letters appeared in prominent peer-reviewed journals criticizing the study design and questioning the reliability of its results.[56]  A small sample of some of those criticisms is listed below:

- "Because of its inherent weaknesses, we believe that the MWS should not be used as part of an evidence base for HRT and should be discounted by regulatory authorities."[57]

- "We have reviewed the methodology of the MWS.  It is our belief that the flaws in the design render the results largely uninterpretable because built in biases have affected risk estimates."[58]

- "[T]he observation that there is a statistical association detectable within a year of initiating HRT therapy that is not present within a year of cessation of treatment is biologically implausible.  Such an implausible finding should have

---

[53]   Farmer, *The Million Women Study – Is It Believable?*, CLIMACTERIC, 2005;8:210–213 at 210 (attached as Ex. 59).

[54]   Bliss 2003 at 1328.

[55]   Van Leeuwen 2003 at 1330.

[56]   Shapiro, *The Million Women Study: potential biases do not allow uncritical acceptance of the data*, CLIMACTERIC 2004;7:3-7 at 3 ("Shapiro 2004") (attached as Ex. 60); Farmer, *The Million Women Study – A Critique*, JOURNAL OF THE BRITISH MENOPAUSE SOCIETY 2004;S2:8-9 ("Farmer 2004") (attached as Ex. 61); Whitehead et al., *The Million Women Study:  A Critique*, ENDOCRINE 2004:24:187–93 ("Whitehead 2004") (attached as Ex. 62); Stevenson 2006; Van Leeuwen 2003; Bliss 2003.

[57]   Stevenson 2006 at 1670.

[58]   Whitehead 2004 at 187.

led to a careful re-appraisal of the authors' conclusion that the association is causal."[59]

- "[T]he short interval from recruitment [in MWS] to [breast cancer] diagnosis can only be explained if a substantial proportion of the breast cancers were already present, if as yet undiagnosed, at baseline."[60]

- "[M]ultiple errors on the scale identified in the MWS report must raise doubts about the care with which the study was conducted, and with which it was reviewed."[61]

Finally, as a number of independent experts have pointed out, the results of the MWS are "discordant" or inconsistent with data from the WHI clinical trial and the vast majority of observational studies.[62] Consistency of scientific evidence is a critical component of the causation analysis.[63] Results that are inconsistent with the majority of other scientific evidence must be interpreted with caution.[64]

Similarly, results of ecological studies[65] (such as studies reporting an association between hormone therapy prescription and breast cancer rates in the U.S. based on SEER data), while valuable for surveillance purposes, generally are incapable of controlling for bias and confounding and cannot offer reliable estimates of breast cancer risk regardless of duration.[66]

---

[59] Farmer 2004 at 9.

[60] Shapiro 2004 at 5.

[61] *Id.* at 6.

[62] *Id.*; Van Leeuwen 2003.

[63] REF. MAN. 377-78.

[64] *Id.*

[65] An ecological study is the least reliable type of observational study. Ecological studies report associations based on observed rates of diseases in populations (*e.g.*, in a county, state or nation) rather than amongst a defined group of individuals. REF. MAN. 344-45.

[66] *See* REF. MAN. 344-45.

### E.   Today, It Is Generally Accepted That Prempro Is Not Associated with an Increased Risk of Breast Cancer When Taken for Three Years or Less.

Today, the medical and scientific communities generally accept WHI as the most reliable data to evaluate the benefits and risks of Prempro in post-menopausal women.[67]  S*ee also In re Prempro Prods. Liab. Litig.*, 2010 WL 3447293 at *5 (characterizing the results of the WHI clinical trial as "reliable and generally accepted.").  On the basis of WHI, it is likewise generally accepted that Prempro is not associated with an increased risk of breast cancer when used daily for durations such as three years or less.  Prominent medical, scientific, regulatory, and research organizations such as the National Institutes of Health ("NIH") and the National Cancer Institute all confirm that taking Prempro for a period of three years or less does not increase the risk of breast cancer.[68]  For example, the Mayo Clinic, the world's largest medical care provider, reports that WHI only raises concerns about the "*long-term treatment* with estrogen-progestin combinations."[69]  Likewise, prominent research and advocacy organizations, such as the Dr. Susan Love Research Foundation, advise that the risk of breast cancer for women taking hormone replacement therapy increases after the first five years of use.[70]  Set forth below are some other examples:

---

[67]   National Cancer Institute, Menopausal Hormone Replacement Therapy (HT), http://www.cancer.gov/cancertopics/causes/hormontherapy/menopausal-hormone-use (last visited Nov. 12, 2010) ("The best evidence for the risks and benefits of menopausal hormone replacement therapy comes from the Women's Health Initiative.").

[68]   *See* National Institutes of Health, http://www.nhlbi.nih.gov/health/women/q_a.htm ("NIH Website") (last visited Oct. 28, 2010) (attached as Ex. 63; National Cancer Institute, http://www.cancer.gov/cancertopics/pdq/genetics/breast-and-ovarian/HealthProfessional ("NCI Website II") (last visited Oct. 28, 2010) (attached as Ex 64).

[69]   Mayo Clinic, Breast Cancer Prevention: Lifestyle Factors that Can Reduce Risk, http://www.mayoclinic.com/health/breast-cancer-prevention/WO00091 (last visited Oct. 28, 2010) (emphasis added) (attached as Ex. 65).

[70]   Dr. Susan Love Research Foundation, Menopausal Hormone Therapy,

- National Institutes of Health: "There was no difference in the development of breast cancer during the *first 4 years* between women taking estrogen plus progestin and those taking placebo pills";[71]

- American Society for Reproductive Medicine:  "The risk of invasive breast cancer in any individual taking combined HT is 0.08% (less than 1%) per year, and the risk did not appear *until after 4 years of use*";[72]

- American College of Obstetricians and Gynecologists:  "Hormone replacement therapy for the treatment of acute menopausal symptoms, when indicated, continues to be appropriate for short-term use without an apparent increase in risk of breast cancer for *up to 4 years*";[73]

- National Cancer Institute: "*Short-term use* of hormones for treatment of menopausal symptoms appears to confer little or no breast cancer risk";[74]

- North American Menopause Society: "[S]*horter term use of [combination hormone therapy]* during perimenopause to relieve hot flashes and other menopause-related symptoms does not appear to increase breast cancer risk."[75]

In addition to these authoritative organizations, since publication of the WHI results, there are numerous articles in the peer-reviewed literature (some of which are co-authored by Plaintiffs' experts) reflecting the generally accepted view that Prempro is not associated with an increased risk of breast cancer if taken daily for three years or less.[76]

---

http://www.dslrf.org/mwh/content.asp?L2=1&L3=2&L4=1&SID=240 (last visited Oct. 28, 2010) (attached as Ex. 66).

[71]   NIH Website (emphasis added).

[72]   American Society for Reproductive Medicine, ASRM Comments to Help Guide Physicians on Hormone Therapy and the Women's Health Initiative, http://www.asrm.org/news/article.aspx?id=393 (last visited Nov. 10, 2010) (attached as Ex. 67).

[73]   BU Website.

[74]   NCI Website II (emphasis added).

[75]   NAMS Website at 55.

[76]   *See e.g.*, Stevenson, John C. and Malcom I. Whitehead, BMJ 2002;325:113-14 at 113 ("*Certainly the risk of breast cancer is not appreciably increased during the first four years*,

Finally, the FDA-approved label for Prempro reflects this position, as well.  The current Prempro label states that WHI is the "most important randomized clinical trial providing information about breast cancer in estrogen plus progestin users."[77]  The label also says that "[c]onsistent with the WHI clinical trials, observational studies have also reported an increased risk of breast cancer for estrogen plus progestin therapy . . . *after several years of use*. [78]

> **F.     Since This Litigation Began, Plaintiffs Have Relied on WHI, and Their Experts Have Conceded That Prempro Is Not Associated with an Increased Risk of Breast Cancer When Taken Daily for Three Years or Less.**

Since this litigation began, the Plaintiffs' Steering Committee has relied on the WHI clinical trial results.  The Master Complaint describes WHI as "one of the most definitive, far reaching clinical trials of women's health ever undertaken in the United States."[79]  The Master Complaint also cites WHI as definitive evidence of increased risk, saying that WHI "proved" that Prempro "dangerously increased women's risk of invasive breast cancer."[80]  Plaintiffs also have argued that the announcement of the WHI results constitutes the first time Plaintiffs had

---

[77]  so women wishing to take this therapy for the short term relief of menopausal symptoms should be reassured.") (emphasis added) (attached as Ex. 69).

[77]  Prempro Label at 5.

[78]  *Id.* (emphasis added)

[79]  MDL Master Compl. ¶ 45; *see also, e.g.*, Pl.'s Opp'n to Wyeth's Motion for Summ. J. re Statute of Limitations, *Mittelstadt v. Wyeth*, Docket No. 4:05-CV-1547, Document No. 9, Nov. 15, 2007, at 8 ("Mittelstadt SOL Opp'n") (calling WHI the "biggest bombshell in the history of hormone replacement therapy") (attached as Ex. 70); Pl.'s Opp'n to Defs.' Mot. for Summ. J. (Statute of Limitations), *Rush v. Wyeth*, Docket No. 4:03-CV-1507-WRW, Document No. 61, May 9, 2006, at 1, 18–19  (describing WHI as a "landmark, paradigm-shifting" study and declaring that "[t]he WHI announcement was the equivalent of the Loch Ness monster surfacing during daylight") (attached as Ex. 71); Reply/Resp. Br. of Pl./Appellant/Cross-Appellee Donna Scroggin, *Scroggin v. Wyeth*, Case Nos. 08-2555, 08-2711, and 08-2713, Feb. 9, 2009, at 77 (calling WHI "the granddaddy of all studies that turned the menopausal market on its head") (excerpts attached as Ex. 72).

[80]  MDL Master Compl. ¶ 5.

notice that Prempro increased the risk of breast cancer to avoid statute-of-limitations dismissals.[81]  For example, Plaintiff Pamela Kuhn relies on WHI in her complaint in an attempt to avoid the applicable statute of limitations.[82]  Likewise, Plaintiff in the *Rivera* case pending before Judge Fuste also relies on WHI in her complaint.[83]

Consistent with Plaintiffs' reliance on WHI, Plaintiffs' general and specific causation experts throughout this litigation repeatedly have stated that Prempro is not associated with an increased risk of breast cancer if taken daily for three years or less.

Dr. Graham Colditz:  Dr. Colditz is one of Plaintiffs' leading general causation experts, and he has appeared for Plaintiffs in numerous trials.  Outside of litigation, Dr. Colditz has written that "the increased breast cancer risk did not begin *until 3 years*."[84]

Dr. Donald Austin:  Dr. Austin is another of Plaintiffs' leading experts on general causation, and he has also appeared on behalf of Plaintiffs in multiple trials.  While speaking on this topic outside the litigation, Dr. Austin prepared and used a demonstrative slide indicating that Prempro is not associated with any increased risk if used *for less than four years*.  (*See* App.,

---

[81]  *See, e.g.*, *Mittelstadt* SOL Opp'n at 8 ("Plaintiff could not know the cause of her cancer or maintain a suit before WHI."); *id.* at 21 ("Awareness was impossible before learning of the WHI results."); Pl.'s Opp'n to Wyeth's Mot. for Summ. J. re Statute of Limitations, *Hill v. Wyeth*, Docket No. 4:03-cv-1507-WRW, Document No. 139, Aug. 29, 2007, at 1 (excerpts attached as Ex. 73); Pls.' Proposal for MDL-1507 Resolution, Docket No. 4:03-CV-1507-WRW, Document No. 1765, May 19, 2008, at 1 (noting that July 2008 marked the six-year anniversary of the announcement of the termination of the WHI study) (attached as Ex. 74).

[82]  *Kuhn* Compl. ¶ 31 (attached as Ex. 75); *see also Davidson* Compl. ¶¶ 40-50 (describing the WHI study and its results) (attached as Ex. 76).

[83]  *Rivera* Compl. ¶¶ 1-14 (attached as Ex. 77).

[84]  Fletcher & Colditz, JAMA 2002;288:366-68 at 366 (attached as Ex. 78).

Ex. A.)  He also confirmed that the WHI data indicate that women who take Prempro for *less than three years* are less likely to be diagnosed with breast cancer than those receiving placebo.[85]

Dr. Michael Wertheimer:  Dr. Wertheimer is one of Plaintiffs' specific causation experts in *Rivera*.  At deposition, he confirmed that "gold standard" data from WHI, the largest randomized controlled trial ever conducted, indicates that Prempro use for a period of *less than five years* does not increase breast cancer risk.[86]

## ARGUMENT

**THE COURT SHOULD PRECLUDE PLAINTIFFS' EXPERTS FROM OFFERING TESTIMONY THAT PREMPRO INCREASES BREAST CANCER RISK WHEN TAKEN FOR THREE YEARS OR LESS.**

Under *Daubert*, this Court must fulfill a vital "gatekeeping role" that requires it to determine "whether the reasoning or methodology underlying the [expert] testimony is scientifically valid and . . . whether that reasoning and methodology properly can be applied to the facts in issue."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993).  Rule 702 requires an expert's opinion to be:  (1) based upon sufficient facts or data; (2) the product of reliable methods; and (3) the result of an application of sound principles and methods reliably to the facts of the case.  *Id.*  The Court, as gatekeepers, must separate out "legitimate scientific inquiry from subjective speculation."  *In re Prempro Prods. Liab. Litig*, 2010 WL 3447293 at *1. While Plaintiffs have yet to put forward experts, it is their burden to prove the admissibility of any opinions on this issue.  *See id.* at *2; *Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006).

---

[85]  *Foust v. Wyeth*, Jan. 28, 2010 PM, Trial Tr. at 66:18-67:13 (excerpts attached as Ex. 79); *see also id.* at 67:14-69:9 (discussing his slide indicating that data from the Kerlikowske study showed that women who took HT for less than five years were less likely to be diagnosed with breast cancer than those not on HT); Austin Dep. at 109:15-19.

[86]  Wertheimer *Torkie-Tork* Dep. at 140:19–141:3, 156:9-14.

Under *Daubert* and Rule 702, it is not enough for an expert to opine that a medication

causes injury at some unknown dose or after some unknown duration.  The amount of exposure

(dose and duration) is critical.  As set forth in the REFERENCE MANUAL ON SCIENTIFIC EVIDENCE,

"[A]ll chemical agents are intrinsically hazardous—whether they cause harm is only a question

of dose.  Even water, if consumed in large quantities, can be toxic."  REF. MAN. at 403.[87]  The

amount of exposure is therefore "the single most important factor to consider in evaluating

whether an alleged exposure caused a specific adverse effect."  *McClain v Metabolife Int'l, Inc.*,

401 F.3d 1233, 1242 (11th Cir.); *see also In re Prempro Prods. Liab. Litig.*, 2010 WL 3447293

at *7 ("[E]xposure to a substance must exceed a certain level before it manifests a risk of adverse

health effects."); *In re Bextra and Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, 524 F.

Supp. 2d 1166, 1174 (N.D. Cal. 2007) ("The Court finds that dose matters.").

In order to offer a reliable causation opinion, Plaintiffs' experts "must demonstrate 'the

levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual

level of exposure to the defendant's toxic substance.'"  *McClain*, 401 F.3d at 1241.  Put another

way, Plaintiff's experts must provide reliable, scientific evidence that taking Prempro for a

period of three years or less is a sufficient exposure to increase the risk of developing breast

cancer.  The failure to meet this burden is fatal.  *See Cavallo v. Star Enter.*, 892 F. Supp. 756,

758-63 (E.D. Va. 1995) (holding that the reliability of an expert's opinion was undermined by

---

[87]  *See also id.* at 390, 419; David L. Eaton, *Scientific Judgment and Toxic Torts—A Primer in Toxicology for Judges and Lawyers*, 12 J. L. & POL'Y 5, 11 (2003) (citing Curtis D. Klaassen ed., CASARETT AND DOULL'S TOXICOLOGY: THE BASIC SCIENCE OF POISONS, Chs. 1, 4 (McGraw Hill 6th ed. 2001)) (attached as Ex. 80) ("Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect."); *id.* at 15 (noting that most substances do not have an effect below a certain dose or duration of use); *Adams v. Cooper Indus. Inc.*, Civil Action No. 03-476-JBC, 2007 WL 2219212 at *4 (E.D. Ky. July 30, 2007) (citing *Eaton*); *In re W.R. Grace & Co.*, 355 B.R. 462, 486 n.99 (Bankr. D. Del. 2006).

evidence indicating that no ill effects would be expected from exposure for the duration and at the concentration alleged in the case).

Here, for the following reasons, Plaintiffs cannot meet their burden, and the Court should preclude Plaintiffs' experts from offering testimony that Prempro use increases breast cancer risk when taken for three years or less. First, the generally accepted, definitive clinical trial data from the WHI clinical trial, one of the largest randomized controlled trial ever conducted, confirms that Prempro use for three years or less is not associated with an increased risk of breast cancer. Indeed, women who took Prempro for three years or less were actually *less likely* to be diagnosed with breast cancer than those receiving placebo. *See* Fig. 1, *infra*. Plaintiff's experts cannot reliably ignore this "gold standard" evidence. *See In re Prempro Prods. Liab. Litig.*, 2010 WL 3447293 at *5 (emphasizing an expert cannot *ignore* the generally accepted WHI clinical trial results in favor of less reliable data); REF. MAN. at 338-39; *In re Neurontin Mktg. and Sales Practices Litig.*, ___ F. Supp. 2d ___, 2010 WL 4325225 at *33 (D. Mass. Nov. 3, 2010) ("Experts must accord appropriate weights to different levels of evidence, i.e. a randomized, controlled trial, as the "gold standard" of evidence, must be accorded greater weight than observational, non-controlled studies"); *In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 125 (D. Mass. 2009); *In re Viagra Prods. Liab. Litig.*, 572 F. Supp. 2d 1071, 1078 (D. Minn. 2008) (*citing In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 406 (S.D.N.Y. 2005) ("*In re Rezulin II*")); *In re Bextra*, 524 F. Supp. 2d at 1173.

Second, the totality of relevant observational data is in accord with the WHI results – that there is no increased risk with three years or less of Prempro use.[88] (*See* Appendix B.) To be

---

[88] As discussed above, different hormone therapy products are different and an expert may not summarily attribute the effects of one substance to another. *In re Prempro Prods. Liab Litig.*, 2010 WL 3447293 at *5; Deposition of Donald Austin M.D., M.P.H., March 13, 2007

reliable, an expert's opinion must consider the totality of available evidence and cannot pick and

choose only the scant data that support their opinion while neglecting to consider or explain

contrary evidence.  *In re Prempro Prods. Liab. Litig.*, 2010 WL 3447293 at *3; *Pritchard v. Dow

Agro Sciences*, 705 F. Supp. 2d 471, 484-85, 489 (W.D. Pa. 2010); *Norris v. Baxter Healthcare

Crop.*, 397 F.3d 878, 885 (10th Cir. 2005); *In re Bextra*, 524 F. Supp. 2d at 1176; *Cano v.

Everest Mineral Corp.*, 362 F. Supp. 2d 814, 850-51 (W.D. Tex. 2005); *In re Rezulin Prods.

Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004 ("In re Rezulin I").  Plaintiffs' general

causation expert, Dr. Colditz, conceded this in deposition:

> Q.    And it's important to look at that context and the overall body of scientific
>       evidence when you are looking both at potential risks as well as potential
>       benefits?
>
> A.    Correct.
>
> Q.    And it would not be a valid scientific method to look only at evidence that
>       supports a single interpretation when you're aware that there are contrary
>       interpretations, correct?
>
> A.    Correct.[89]

Wyeth expects that Plaintiffs will attempt to rely on select observational studies, like the

Million Women Study, to argue that Prempro increases the risk of breast cancer at durations of

less than three years.  But this Court has already rejected Plaintiffs' attempt to rely on the Million

Women Study in its recent Premarin ruling, and it should do so here for many of the same

reasons.  *See In re Prempro Prods. Liab. Litig.*, 2010 WL 3447293 at *3.  The Million Women

Study was conducted in Europe, where different formulations of hormone therapy are more

---

at 208:13-20 ("[I]t is inappropriate to use all different formulations").  Therefore only studies
involving Prempro could form the basis of a reliable opinion here.  *In re Prempro Prods.
Liab Litig.*, 2010 WL 3447293 at *5.

[89]   Deposition of Graham Colditz, M.D., May 2, 2006 at 276:3-15 (excerpts attached as Ex. 81).

prevalent than Prempro.[90]  More significantly, the Million Women Study has been soundly

criticized by numerous authors.[91]  Due to its many flaws, the results of Million Women Study are

not generally accepted in the medical and scientific communities, and any effort by Plaintiffs'

experts to disregard WHI and the totality of relevant, concordant observational study data in

favor of this one study should be rejected as a matter of law.  *In re Prempro Prods. Liab. Litig.*,

2010 WL 3447293 at *5, 8 (excluding plaintiff's epidemiology expert, in part, because her

analysis "of the observational studies cannot overcome the reliable and generally accepted

findings of the WHI clinical study.").  Further, when the Million Women's Study is properly

considered with the totality of the available Prempro data, the evidence consistently shows no

increased risk when Prempro is taken daily for three years or less.

        Third, based on the totality of evidence available today (clinical trial and observational

data), the consensus in the medical and scientific communities is that short-term Prempro use

(three years or less of use) does not increase a woman's risk of developing breast cancer.  As

discussed above, prominent medical, scientific, regulatory and research organizations such as the

Mayo Clinic, National Institutes of Health, National Cancer Institute, North American

Menopause Society, American Society for Reproductive Medicine, and American College of

Obstetricians and Gynecologists generally accept the results of WHI as definitive and maintain

that Prempro is not associated with an increased risk of breast cancer when taken daily for three

years or less.  *See In re Prempro Prods. Liab. Litig.*, 2010 WL 3447293 at *3 (finding statements

by similar organizations established the general acceptance of the idea that Premarin does not

cause breast cancer).  As a result, any opinion that Prempro increased Plaintiffs' breast cancer

---

[90]    *See* Beral 2003 at 419.

[91]    Bliss 2003; Van Leeuwen 2003; Shapiro 2004; Whitehead 2004.

risk after three years or less of use is inconsistent with the consensus position of the medical and scientific community, and, as such, should "properly [be viewed] with skepticism." *McClain*, 401 F.3d at 1251; *see also Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 197 n.4 (5th Cir. 1996) (quoting in part *Braun v. Lorillard Inc.*, 84 F.3d 230 (7th Cir. 1996) ("Courts should particularly pay close attention when expert witnesses depart from generally accepted scientific methodologies; if an expert "embark[s] upon a sea of scientific uncertainty, the court may appropriately insist that he ground his departure in demonstrable and scrupulous adherence to the scientist's creed of meticulous and objective inquiry.")).

Fourth, Plaintiffs' own experts concede that Prempro is not associated with an increased risk of breast cancer if used short term. *See* Section II.F. *infra.*  These admissions underscore the fact that there is no reliable scientific evidence that Prempro is associated with an increase in the risk of breast cancer if taken daily for three years or less. *See McClain*, 401 F.3d at 1251 (finding no reliable scientific evidence to support expert opinion).

Accordingly, based on the definitive WHI clinical trial, the concordant body of relevant observational study data, the general consensus of the medical and scientific communities, and Plaintiffs' experts' own admissions, the Court should preclude Plaintiffs from putting forward any expert to testify that Prempro increases the risk of breast cancer at three years or less of use.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should preclude any expert testimony that Prempro use increases breast cancer risk when taken for three years or less.

Respectfully submitted,


/s/ F. Lane Heard III
John W. Vardaman, Jr. (D.C. Bar #13391)
F. Lane Heard III (D.C. Bar #291724)

> WILLIAMS & CONNOLLY LLP
> 725 12th Street, NW
> Washington, DC 20005-5901
> (202) 434-5000

Lyn P. Pruitt (Ark. Bar No. 84121)

> MITCHELL, WILLIAMS, SELIG,
> GATES & WOODYARD, PLLC
> 425 West Capitol Avenue, Suite 1800
> Little Rock, AR 72201-3525
> (501) 688-8800
> *lpruitt@mwsgw.com*

Loren H. Brown

> DLA PIPER
> 1251 Avenue of the Americas
> New York, NY  10020-1104
> (212) 335-4846
> Loren.brown@dlapiper.com

*Attorneys for Wyeth*

DATED: November 12, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of November a true and correct copy of the

foregoing Memorandum in Support of Wyeth's Motion to Preclude Any Expert Testimony that

Prempro Use Increases Breast Cancer Risk When Taken Daily for Three Years or Less was

electronically filed with the Clerk of Court using the CM/ECF system, and a true and correct

copy was forwarded by e-mail to the parties listed on the attached Service List.

Mr. Gary Holt                                  Ms. Zoe Littlepage
GARY EUBANKS & ASSOCIATES, LTD                 LITTLEPAGE BOOTH
708 West Second Street                         2043A W. Main Street
P.O. Box 3887                                  Houston, TX  77098
Little Rock, Arkansas  72203-3887

Navan Ward , Jr
Roman A. Shaul
Ted G. Meadows
Russell T. Abney
Beasley Allen Crow Methvin Portis Miles P.C.
P. O. Box 4160
Montgomery, AL 36103
navan.ward@beasleyallen.com
roman.shaul@beasleyallen.com
ted.meadows@beasleyallen.com
russ.abney@beasleyallen.com

                                   /s/      F. Lane Heard III
                                   F. Lane Heard III

                                     WILLIAMS & CONNOLLY LLP
                                     725 12th Street, NW
                                     Washington, DC 20005-5901
                                     (202) 434-5000
                                     *lheard@wc.com*

**APPENDIX**

**EXHIBIT A: DR. AUSTIN'S LECTURE SLIDE**



