## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

| | | |
|---|---|---|
| **IN RE:** | : | **MDL DOCKET NO. 4:03-CV-1507-WRW** |
| | : | |
| **PREMPRO PRODUCTS LIABILTY** | : | |
| **LITIGATION** | : | **ALL CASES** |

### PLAINTIFFS' OPPOSITION TO

### WYETH'S MOTION TO PRECLUDE ANY EXPERT TESTIMONY
### THAT PREMPRO USE INCREASES BREAST CANCER RISK
### <u>WHEN TAKEN FOR ONLY THREE YEARS OR LESS</u>

# TABLE OF CONTENTS

Page

I.   INTRODUCTION .................................................................................................1

II.  BACKGROUND .................................................................................................2

   A. The History of Litigation Over Short-Term Use ....................................................... 2

   B. E+P Causes Breast Cancer by Promoting Existing Abnormal Cells to Divide and

      Grow. ..................................................................................................................... 4

      1. The overwhelming weight of the evidence proves that E+P causes breast cancer. ........... 4

      2. E+P causes breast cancer by promoting its development rather than initiating

         abnormal cells. .................................................................................................. 10

II.  ARGUMENT AND AUTHORITY ....................................................................15

   A. The Promotion Effect of E+P Can Occur Within in a Matter of Months. ........................... 20

   B. Epidemiological Studies, While Limited in Quantifying the Time Frame for Risk,

      Nonetheless Show Statistically Significant Association Between E+P and Breast

      Cancer after Short-Term Use. ......................................................................... 25

      1. The WHI study results support a short-term effect of E+P on breast cancer. ................ 27

      2. Multiple additional epidemiological studies establish the short-term effect of

         E+P on breast cancer. ....................................................................................... 38

         a. The Million Women Study ............................................................................. 38

         b. Other studies ......................................................................................... 43

   CONCLUSION .................................................................................................... 48

# TABLE OF AUTHORITIES

**Page**

**CASES**

Advanced Fiber Technologies Trust v. J & L Fiber Services, Inc.,
   No. 1:07-CV-1191, 2010 WL 1930569, at *6 (N.D.N.Y. May 11, 2010).................................. 37

Allen v. Pa. Eng. Corp.,
   102 F.3d 194, 187 (5th Cir. 1996) ...................................................................................... 18

Ambrosini v. Labarraque.,
   101 F.3d 129, 141 (D.C.Cir.1996)...................................................................................... 19

American Dental Ass'n v. Khorrami.,
   No. CV 02-3853-RSWL (RZx), 2006 WL 5105271, at *3 (C.D. Cal. June 9, 2006) .............. 18

Baker v. McCoy.,
   739 F.2d 381, 385 (8th Cir. 1984) ...................................................................................... 15

Beech Aircraft Corp. v. Rainey
   488 U.S., at 169, 109 S. Ct., at 450..................................................................................... 17

Blue Cross & Blue Shields of New Jersey, Inc. v. Philip Morris, Inc.,
   141 F. Supp. 2d 320, 325 (E.D.N.Y. 2001) ....................................................................... 16

Bonner v. ISP Techs., Inc.,
   259 F.3d 924, 929 (8th Cir. 2001) ...................................................................................... 17

Braun v. Lorillard Inc.,
   84 F.3d 230, 235 (7th Cir. 1996) ........................................................................................ 18

Campbell v. Metropolitan Property and Cas. Ins. Co.,
   239 F.3d 179, 186 (2d Cir. 2001)........................................................................................ 17

Certified Engineeing Copier Systems, Inc. v. National City Commercial Capital Co.,
   No. 2:07-CV-293 TS, 2009 WL 1324047 at *3 (D. Utah May 11, 2009)................................ 19

Daniel v. Wyeth ...............................................................................................23, 24, 45, 46

Daubert v. Merrell Dow Pharms., Inc.,
   509 U.S. 579, 587-88 (1993) ............................................................................................. 15

Frye v. United States
   293 F.1013, 1014 (D.D. Cir. 2923)...................................................................................... 17

*Henry v. Wyeth* ......................................................................................................................... 9

*Hill v. Wyeth.,*
    Case No. 05-546 ................................................................................................................ 2

*Kannankeril v. Terminix Int'l, Inc.,*
    128 F.3d 802, 806 (3d Cir. 1997) ................................................................................ 19

*Kendall v. Wyeth* ................................................................................................................... 5

*Komho Tire Co. v. Carmichael.,*
    526 U.S. 137, 141-42 (1999) ....................................................................................... 16

*Larson v. Kempker*
    414 F.3d 936, 941 (8th Cir. 2005) .............................................................................. 16

*Lauzon v. Senco Prods., Inc.,*
    270 F.3d 681, 686 (8th Cir. 2001) .............................................................................. 15

*Marvin Lumber & Cedar Co. v. PPG Indus., Inc.,*
    401 F.3d 901, 916 (8th Cir. 2005) .............................................................................. 16

*Mascarenas v. Cooper Tire & Rubber Co.* ........................................................................ 18

*McClain v. Metabolife Int'l, Inc.,*
    401 F.3d 1233, 1242 (11th Cir. 2005) ........................................................................ 18

*McCreary v. Wyeth* ............................................................................................................... 3

Nelson v. Wyeth ................................................................................................................... 46

*Reeves v. Wyeth* ................................................................................................................... 11

*Ruiz Troche v. Pepsi Cola of Puerto Rico Bottling Co.,*
    161 F.3d 77, 85 (1st Cir. 1998) .................................................................................. 19

*Scroggin v. Wyeth*
    Case No. 04-1169 ....................................................................... 5, 6, 11, 19, 28, 29

*Seikel v. Am. Med. Sec. Life Ins. Co.,*
    No. CIV-05-1403-T, 2007 WL 4864462, at *4 (W.D. Okla. May 11, 2007) .......................... 38

*Sorensen v. Shaklee Corp.,*
    31 F.3d 638, 648 (8th Cir. 1994) .............................................................................. 16

*Torkie-Tork v. Wyeth* .................................................................................................... 4, 10

*Trowbridge v. United States.,*
    No. CV 07-32-S-REB, 2009 WL1813760, at *3 ...................................................... 37

*United States v. Valencia.,*
    600 F.3d 389, 426 (5th Cir. 2010) ........................................................................ 37

*W.A. LLC v. Chubb Group of Ins.,*
    2007 WL 4365502, at *29-30 (S.D. Cal. Dec. 5, 2007) ......................................... 16

*Woodhouse v. Wyeth* ....................................................................................................... 3

# I.      INTRODUCTION

An arbitrary line in the sand for the amount of time it takes hormone therapy to cause breast cancer is a dichotomy without logic.  The mechanism by which hormone therapy causes breast cancer (promotion) does not segregate by time.  Combination hormone therapy (estrogen with progestin, or E+P) can cause breast cancer within a matter of months.  In fact, multiple epidemiological studies show an increased relative risk in just two years despite the fact that such studies can rarely accurately measure short-term effects.  The most highly powered studies show an effect within a year.  Whether 1 year or 10 years of E+P use is necessary to cause breast cancer depends upon the circumstances of each woman.

E+P causes breast cancer through promotion.  E+P does not initiate the first abnormal cell that ultimately becomes cancerous.  Rather, it provides the fuel that enables existing abnormal cells – which have sometimes advanced to nonmalignant benign lesions – to multiply and grow and ultimately become an invasive malignancy.  In some cases, E+P use begins when abnormal cells are in their formative stage.  In such circumstances, long-term E+P use may be required to cause the cells to develop into invasive cancer.  In other cases, E+P use begins when a woman has a lesion that is on the cusp of becoming malignant.  Just a short period of use causes the lesion to become cancerous.  After all, in the wake of findings from a seminal study on E+P and the risk of breast cancer, a leading researcher concluded: "The view that these drugs are safe for short periods of time is just not based on evidence or data."[1]

---

[1]      Ex. 96 - http://www.cancer.gov/clinicaltrials/results/summary/2010/whi-hrt-followup1010 (adapted from  the NCI Cancer Bulletin, vol. 7/no. 20, October 19, 2010).

In yet other cases, a woman has a tiny, occult cancer that has not yet been detected and would remain dormant or die without a source of hormones. E+P causes that occult malignancy to grow into a clinically significant malignancy. These biological phenomena are referred to in the literature as "late stage promotion." Cessation of E+P use, by contrast, causes the tumor to stop growing and even to shrink or disappear. Where a woman is on the pathway to cancer determines how long it will take E+P to cause cancer to develop. But in many cases, the duration of use necessary is minimal. Extensive cancer biology, epidemiological and ecological data confirms this.

## II.   BACKGROUND

### A.   The History of Litigation Over Short-Term Use

This Court has already denied a *Daubert* motion on short-term use. In August, 2007, in *Hill v. Wyeth* (a case originally set for trial in early 2008), Wyeth filed a motion very similar to the instant motion. It was entitled: "*Daubert* Motion to Exclude Testimony that Short-Term Use Can Cause Breast Cancer."[2] The difference is that the motion focused on use of less than five years. The parties collectively filed 18 briefs on the motion,[3] some before and some after a *Daubert* hearing was held.[4] Ultimately, the Court denied the motion.[5] So, now Wyeth has filed a motion focused on less than three years of use.

---

[2]     Document No. 81, *Helen Hill v. Wyeth*, Case No. 05-546 (hereafter "*Hill*") (Aug. 15, 2007).

[3]     Document Nos. 82, 153, 174, 301, 303, 331, 332, 355 (motion for leave to file granted—357), 356, 360, 363, 366, 369, 370, 378 (motion for leave to file granted—380), 379, 381, 382, *Hill*.

[4]     Docket Text Entries, *Hill* (Nov. 5, 6, 2007).

[5]     Order, Document 384, *Hill* (Aug. 7, 2008) at 2-3.

This Court is not alone in denying Wyeth's motion.  Every state court to have a short-term use case set for trial has denied Wyeth's expert challenges.  In 2006, the Nevada coordinating judge for all Reno hormone therapy cases denied Wyeth's expert challenges in *McCreary v. Wyeth*, a case where the plaintiff used E+P for 2 years, 9 months.[6]  The case settled shortly before opening statements.  In 2007, a short-term use case went to trial in Philadelphia state court. Mary Daniel developed breast cancer after one year of using E+P.  Wyeth challenged every causation expert designated by Mrs. Daniel on the basis of her short term E+P use.[7]  All expert challenges were denied after a full *Frye* hearing before the mass tort coordinating judge. The hearing involved extensive briefing and live expert witness testimony.[8]  The trial court similarly denied Wyeth's post-trial challenges to the plaintiff's causation evidence.[9]  In 2008, the *Woodhouse v. Wyeth* case was tried in Las Vegas, Nevada.  Annie Woodhouse took E+P for 1 year and 9 months.  Judge Bixler, coordinating judge for all Las Vegas hormone therapy cases,

---

[6]     Ex. 1 - Order by Judge Robert Perry re: expert challenges dated 9/27/06.

[7]     Ex. 2 - Wyeth's Motion to Exclude Naftalis, Peterson & Goldfarb, 7/5/06; Ex. 3 - Wyeth's Motion to Exclude Layfield, Schwarting & Waldron, 7/5/06; Ex. 4 - Wyeth's Motion to Exclude Austin, Colditz, Bundred & Jordan, 7/5/06.

[8]     Ex. 5 - Order, 8/16/06, denying Wyeth's Motion to Exclude Naftalis, Peterson & Goldfarb; Ex. 6 - Order, 8/16/06, denying Wyeth's Motion to Exclude Layfield, Schwarting & Waldron; Ex. 7 - Order, 8/16/06, denying Wyeth's Motion to Exclude Austin, Colditz, Bundred & Jordan.

[9]     Ex. 8 - Order, 4/20/07, denying Wyeth's Motion for Post-trial Relief re Causation. (Note: After the trial judge died, Judge Tereschko, the former coordinating judge, granted Wyeth's motion for new trial and the case is currently on appeal.  But the rulings on the admissibility of expert testimony remain intact.).

denied Wyeth's pretrial expert challenges.[10]  In doing so, he held that Wyeth's objections were "fodder for cross-examination."[11]  The case settled after jury selection.

**B.     E+P Causes Breast Cancer by Promoting Existing Abnormal Cells to Divide and Grow.**

The mechanism by which E+P causes breast cancer – promotion – explains why the causative effect can be long-term or short-term.  E+P does not initiate the first abnormality in a cell that eventually grows into cancer.  Rather, E+P acts on already existing abnormal cells and causes them to divide and grow until they become a malignancy.  Whether E+P causes cancer in the short-term or long-term depends upon how far advanced a woman's benign lesion or occult cancer happens to be, among other factors.  Thus, acceptance of the general causative effect of E+P on breast cancer, and the promotion mechanism through which it occurs, is essential to an understanding of why short-term use causes breast cancer in some women.

**1.     The overwhelming weight of the evidence proves that E+P causes breast cancer.**

In fact, this is beyond dispute.  The only issue Wyeth now creates concerns how long it takes this causative effect to occur.  Every type of human study has confirmed the causal link, including clinical trials and myriad observational studies.  In fact, 45 epidemiological studies reported in peer-reviewed medical journals show a statistically significant relative risk ("RR") that exceeds 2.0 (i.e., more than a doubling of the risk) of breast cancer from ingestion of E+P.[12]

---

[10]     Ex. 9 - Wyeth's Motion to Exclude Certain Expert Testimony; 5/19/08 brief starting at p. 17; Ex. 10 - Trial transcript of Judge Bixler's rulings, 6/12/08, at p. 259-260.

[11]     Ex. 10 - Trial transcript of Judge Bixler's rulings, 6/12/08, at p. 259-260.

[12]     Ex. 11 - Wertheimer Expert Report, *Torkie-Tork v. Wyeth* ("Wertheimer Exp. Rpt") at 6 & n. 15 & Exh. 10 to the report.  Dr. Michael Wertheimer is Associate Professor of Surgery at Harvard Medical School and Associate Chief of the Department of Surgery at Cambridge

Yet, this Court has expressly recognized that a 2.0 relative risk is required only for specific causation, where no other types of evidence of specific causation are available.[13]  Plaintiffs need only show an association, that is, a relative risk above 1.0, to establish general causation.

Dr. Graham Colditz, a renowned epidemiologist, ardent researcher on E+P and breast cancer, former head of the Nurses' Health Study and former professor of medicine at Harvard Medical School has authored over 700 peer-reviewed journal articles.[14]  Dr. Colditz has testified that available epidemiological evidence has confirmed a casual relationship between E+P and breast cancer.[15]  He has testified unequivocally that the causal link is now generally accepted.[16]

Dr. Don Austin is a leading epidemiologist who has published extensively on cancer incidence, and who was a principal researcher uncovering the causal relationship between unopposed E (estrogen) and endometrial cancer.[17]  After reviewing a "sizable portion of the world literature," Dr. Austin testified that the epidemiological data establishes a causal

---

Hospital.  He is Director of the Cambridge Breast Center, which he founded.  Ex. 11 - Wertheimer Exp. Rpt at 1; Ex. 12 - Wertheimer Depo, *Torkie-Tork* at 26:15-27:24; 28:14-22. *See also* Ex. 13 - Trial Tr., *Kendall v. Wyeth*, 10/29/09, a.m. at 45:19-48:3; Ex. 113 *Epidemiology Studies that show at least a doubling of the relative risk with E+P,* attached as Ex. 113.  The articles revealing the results of each study are attached as Exhibits 113A- RR.

[13]     Joint Memorandum Order (Estrogen-Only *Daubert* Matter), Document No. 2388 (Aug. 30, 2010) at 10-11 n.3.

[14]     Ex. 14 - Colditz Depo. (12/18/06) at 16:24-20:3.

[15]     Ex 14 - Colditz Depo (12/18/06) at 73:19-74:5.

[16]     Ex. 14 - Colditz Depo (12/18/06) at 61:5-12.

[17]     Ex. 15 - Trial Tr., *Scroggin v. Wyeth*, 2/5/08 and 2/6/08 at 172:1-9; 179:4-180:10; 253:4-12.

relationship between E+P and breast cancer.[18]  He confirmed that there is no longer any serious

debate about the causative effect.[19]

The International Agency for Research on Cancer ("IARC") is the branch of the World

Health Organization charged with identifying cancer-causing agents in our environment.  IARC

now classifies E+P as a known carcinogen of the breast.[20]  Dr. Brian MacMahon is an

internationally recognized expert on breast cancer who chaired the epidemiology department at

the Harvard School of Public Health.  Dr. MacMahon has published that there are only three

known causes of breast cancer, one of which is hormone therapy use.[21]  Many other researchers

have similarly confirmed a causal relationship between E+P and breast cancer.[22]  As a research

group sponsored by the French Institute of Health & Medical Research put it: "the relationship

between postmenopausal hormone therapy (HT) use and breast cancer risk has been investigated

in many epidemiological studies whose results have led to the conclusion that estrogen-

progestagen menopausal  treatments (combined HTs [CHTs]) are carcinogenic to the human

---

[18]     Ex. 15 - Trial Tr., *Scroggin v. Wyeth* at 176:12-177:15; 214:11-21.

[19]     Ex. 15 - Trial Tr., *Scroggin v. Wyeth*  at 179:4-6.

[20]     Ex. 14 - Colditz Depo (12/18/06) at 64:8-18; 80:22-81:2; Ex. 16 – PX866B - Int'l
Agency for Rsch on Cancer, IARC MONOGRAPH NO. 2, *Combined Estrogen-Progestin
Menopausal Therapy* 03d draft, rev. 3.

[21]     Ex. 14 - Colditz Depo (12/18/06) at 61:16-62:16; Ex. 17 – PXML4196 - Brian
MacMahon, *Epidemiology and the causes of breast cancer*, Int. J. Cancer, 118, 2373-78 (2006).

[22]     Ex. 18 - Norton - PX 8078B - Norton at 33, 45 (WHI showed that as high as one third of
the breast cancers in postmenopausal women in the past were caused by E+P;  Ex. 19 - PX ML
2980 – Li at 44 (Results from the WHI confirm that E + P is causally related to breast cancer);
Ex. 20 – PX ML 5087 - Fournier at 1260 ( "The relationship between HT use and breast cancer
risk has been investigated in many epidemiological studies whose results have led to the
conclusion that estrogen-progestogen menopausal treatment is carcinogenic to the breast.").

breast."[23]  The scientific consensus includes the American Cancer Society[24] and the Susan B.

Komen Foundation.[25]

Focusing on the results from the Women's Health Initiative Study (WHI), multiple

researchers conclude there is a causal effect of E+P on breast cancer.  Dr. Christopher Li, an

epidemiologist at the Fred Hutchinson Cancer Institute (the facility that coordinated the WHI

study for the government) has published that results from the WHI indicate that E+P is "causally

related to breast cancer."[26]  Epidemiologists from Northwestern University agree that the WHI

data provides "strong confirmation that the association between combined hormone therapy and

breast cancer is causal."[27]  Drs. Peter Gann and Monica Morrow have acknowledged that "the

WHI trial of E+P is as close to definitive as can be expected" on this issue.[28]  Dr. Clifford Hudis,

chief of the breast cancer medicine service at Sloan Kettering,[29] states on that medical facility's

---

[23]     Ex. 20 - PX ML 5087 - Fournier, *Use of different postmenopausal hormone therapies and risk of histology- and hormone receptor-defined invasive breast cancer*, J. Clinical Oncology, 26(8): 1260-68 (March 2008) at 1260.

[24]     Ex. 21 - PX 980B at 7 (Use of combined E+P increases the risk of getting breast cancer. It may also increase the chances of dying from breast cancer.  This increase in risk can be seen with as little as 2 years of use).

[25]     Ex. 22 - PX 21090 at 2 (Estrogen plus progestin increases the risk of both developing and dying from breast cancer).

[26]     Ex.19 - PX ML 2980- Li, *Postmenopausal Hormone Therapy and the risk of breast cancer: the view of an epidemiologist*, Maturitas 49, 44-50 (2004) at 44.

[27]     Ex.23 - PX ML 6 - Gann, *Combined Hormone Therapy and Breast Cancer: A Single Edged Sword*, JAMA, Vol. 289, No. 24 (2003) at 3304.

[28]     Ex.23 - PX ML 6 - Gann, *Combined Hormone Therapy and Breast Cancer: A Single Edged Sword*, JAMA, Vol. 289, No. 24 (2003) at 3305.

[29]     Ex. 24 - PX 8078D (Biography of Dr. Clifford Hudis).

website that the WHI "confirmed in 2003 that we were causing some breast cancer."[30]   One of the lead investigators for the WHI study, Dr. Rowan Chlebowski, publicly declared that "in the last decade in which it was still widely used (1992--2002), long-term hormone therapy probably caused breast cancer in 200,000 women."[31]

Wyeth's expert witnesses concede that E+P generally increases the risk of developing breast cancer.   Dr. Shawna Willey, Wyeth's designated breast surgeon, admitted that E+P increases the risk of breast cancer generally.[32]   Dr. Mary Jane Minkin, one of Wyeth's Ob/Gyn experts in the litigation, explains on her website that "HRT causes breast cancer."[33]   So does Dr. Valerie Montgomery-Rice, an advocate for Wyeth outside of the litigation context[34] and a designated OB/Gyn expert witness for Wyeth in the litigation.[35]   She confirms on her website that "HRT is known to cause breast cancer."[36]

Today, even Wyeth admits in the current Prempro label that breast cancer is a "side effect" of combination hormone therapy.[37]   And Wyeth's experts have agreed that a side effect is

---

[30]      Ex. 25 - PX 8078A (Transcript of speech by Dr. Hudis on Sloan Kettering website) at 28.

[31]      Ex. 26 - PX 21094.

[32]      Ex. 27 - Deposition of Dr. Willey (7/18/10) at 51:9-12.

[33]      Ex. 28 - PX 21104 at 3.

[34]      Ex. 29 - PX 728B (Wyeth document showing Dr.  Montgomery-Rice as an advocate for Wyeth).

[35]      Ex. 30 - PX 20000A at 1 (Wyeth's designation of Valerie Montgomery-Rice, M.D. as a case-specific expert).

[36]      Ex. 31 - PX 20201 - Dr. Montgomery-Rice's Website at 2d page.

[37]      Ex. 32 - PX 862B at 2.

something "that we know that the drug causes and it causes it in a regular manner,"[38] or

"something that is expected to happen in a certain percentage of women taking the drug,"[39] or "a

bad thing that happens as a result of taking the drug,"[40] or an effect that "a certain percentage

will get …from taking the drug,"[41]

Just last month, a new article from the WHI investigators, published in JAMA, confirmed

that E+P increases the risk of death from breast cancer.[42]  In the current Prempro label, Wyeth

warns that the use of E+P can cause breast cancers that are "larger and diagnosed at a more

advanced stage."[43]

---

[38]     Ex. 33 - Trial testimony of Dr. Acs in *Henry v. Wyeth*, 8/11/10 at 78-79.

[39]     Ex. 34 - Trial testimony of Dr. Shawna Willey, Wyeth's oncology expert in *Henry v. Wyeth*, 8/5/10 PM at p. 36.

[40]     Ex. 33 - Trial testimony of Dr. Acs in *Henry v. Wyeth*, 8/11/10 at p.  78-79.

[41]     Ex. 35 - Trial testimony of Dr. Elizabeth Morris, Wyeth's radiology expert in *Henry v. Wyeth*, 8/16/10 at p.  77-78.

[42]     Ex. 36 - PX ML 6082- Chlebowksi, *Estrogen Plus Progestin and Breast Cancer Incidence and Mortality in Postmenopausal Women*, JAMA, Vol. 304, No. 15: 1684-1692 (Oct. 20, 2010) at p. 1685 (Almost double as many women died of breast cancer in the E+P group compared with the placebo group, HR=1.96 (95% CI, 1.00-4.04)).

[43]     Ex. 37 - PX 862C at 6.

## 2. E+P causes breast cancer by promoting its development rather than initiating abnormal cells.

E+P causes breast cancer through promotion.[44]  E+P promotes the growth of abnormal, benign cells into malignant tumors.[45]  E+P causes abnormal cells in the breast to proliferate and grow more rapidly than they would otherwise.[46]  Using layman's terminology, E+P is like fertilizer on plants, and is essential to the growth of hormone-sensitive breast cancer.[47]

Everyone has abnormal cells in the body at any given time.[48]  In fact, autopsy studies have shown that it is common for women who die of causes other than breast cancer to have benign abnormal cells as well as lesions in their breasts -- lesions that were unknown and undetected.[49]  Those lesions can grow into life-threatening tumors only under the right

---

[44]     Ex. 38 – PX 1766 – Weinberg at 452 (E+P is a human tumor promoters in the breast); Ex. 12 - Wertheimer Depo (*Torkie-Tork v. Wyeth*) at 136:3-12, 137:9-138:14; Ex. 11 - Wertheimer Rpt (*Torkie-Tork*) at 2, 4-5; Ex. 39 – Naftalis Expert Report at 17-18.  Dr. Naftalis specializes in the surgical evaluation and treatment of breast disease and breast cancer.  She has been certified by the American Board of Surgery, is a member of numerous breast health medical organizations and has been an associate professor in the Department of Surgery at the University of Texas Southwestern. Ex. 40 - *See* Naftalis CV; Ex. 41 - Naftalis Depo (5/31/07) at 12-13, 30-31.

[45]     Ex. 14 - Colditz Depo (12/18/06) at 43:6-14; 48:13-49:4.

[46]     Ex. 14 - Colditz Depo (12/18/06) at 42:4-43:5; 46:18-48:12; 58:9-59:2.

[47]     Ex. 14 - Colditz Depo (12/18/06) at 49:15-21; 59:12-61:4.

[48]     Ex. 14 - Colditz Depo (12/18/06) at 60:4-21.

[49]     Ex. 11 - Wertheimer Exp. Rpt at 4; Ex. 65 - Santen, Colditz, ESSS (2010) at S4 (the increase in breast cancer could occur through an effect on occult undiagnosed breast cancer); Ex. 89 - Bernstein (2009) at p.1.

conditions.[50]  Absent hormones, lesions that would have developed into hormone receptor-positive tumors will die or remain dormant.[51]

The scientific community now agrees that promotion is the mechanism by which E+P causes breast cancer.[52]  E+P promotes the growth of preexisting abnormal cells or lesions, and tiny, occult cancers that would have remained clinically insignificant otherwise, into cancer.[53]  Medical textbooks agree that E+P is a promoter of cancer in the breast.[54]  Materials created for lay patients carefully describe the difference between cancer initiators and cancer promoters and explain:

> Promoters or mitogens are substances that do not damage DNA, but which stimulate cells to multiply. For example, cancers that have estrogen receptors can be stimulated to grow faster when elevated levels of estrogen are present. Women taking hormone replacement therapy containing estrogen may develop a breast cancer caused by the hormones."[55]

As even Dr. James Pickar, Wyeth's executive in the science & research department assigned to the Prempro project admitted, Prempro makes cancer cells grow bigger and become "worse."[56]

---

[50]     Ex. 14 - Colditz Depo (12/18/06) at 60:11-61:4.

[51]     Ex. 14 - Colditz Depo (12/18/06) at 59:12-60:2; Ex. 108 - Cheblowski (2009) at 582 (withdrawal of E+P can lead to regression of pre-clinical cancers).

[52]     Ex. 38 – PX1766 - Weinberg; Ex. 42 - Austin Trial testimony at 25-30; Ex. 43 - Declaration of Dr. Suzanne Klimberg at 2.  Dr. Klimberg is a breast surgical oncologist and Professor of Surgery and Pathology and Director of the Breast Cancer Program at the University of Arkansas at Little Rock (Trial Testimony, *Reeves v. Wyeth* at 1479:19-1497:20.).

[53]     Ex. 14 - Colditz Depo (12/18/06) at 49:6-14; Ex. 15 - Trial Testimony of Dr. Don Austin, *Scroggin v.* Wyeth at 227:19-23; 279:7-14; Trial Testimony of Dr. Elizabeth Naftalis, Ex. 44 - *Scroggin v. Wyeth* at 937:16-25; 939:2-9; 975:12-24.

[54]     Ex.45 - PX 8080 - Weinberg, *The Biology of Cancer*.

[55]     Ex. 46 -PX ML 6093 - Lanfranchi, *Breast Cancer Risks and Prevention (*Fourth Edition).

[56]     Ex. 47 - Pickar Trial Testimony at 5-7; 44:7-45:3.

Dr. Michael Dey, former president of Wyeth's women's healthcare section, the division that oversees postmenopausal hormone therapy within Wyeth,[57] acknowledged that hormones are promoters of breast cancer and carcinogens that fuel the development of hormone receptor positive breast cancer.[58] Dr. Dey testified:

Q:      The potential of estrogens in general as promoters of breast cancer?

A:      Yes. As carcinogens, I believe that -- my belief is that they are a promoter, so...[59]

Q:      As a promoter of breast cancer, and if a drug is a promoter of breast cancer, is it a carcinogen?

A:      In the broad term, yes, it is considered a carcinogen.[60]

Q:      In other words, do you know whether estrogens currently are perceived to be initiators of cancer of the breast?

A:      I think the overwhelming data still indicate or suggest that estrogens are promoters. They stimulate growth, and that's true not just of cancer cells, but generally. I think the evidence that they are initiators, and there are some papers that suggest they are initiators, is pretty weak relative to the volume of data indicating that they are promoters.[61]

After the WHI study results were released, sales of E+P fell.  In lock-step, so too did the breast cancer rate of hormone receptor positive breast cancers in older women.  A number of research groups have analyzed this data – termed "ecological" data -- and concluded that the

---

[57]      Ex. 48 - Deposition of Michael Dey, 11/03/05, at p. 133:9-12 and p. 139:16-19.

[58]      Ex. 48 - Deposition of Michael Dey, 11/03/05, at p. 242:7-9 (Impact of hormones on "a tumor that has an estrogen receptor positive element to it.").

[59]      Ex. 48 - Dey, 11/03/05, at p. 238:16-20.

[60]      Ex. 48 - Dey, 11/03/05, at p. 239:6-10.

[61]      Ex. 48 - Dey, 11/03/05, at p. 241:7-19.

drop in breast cancer incidence was due to the reduced use of E+P.[62]   The National Cancer

Institute summarized this data showing the decrease in hormone dependent cancers in older

women as providing "additional support for the causal association between combined HT and the

risk of breast cancer."[63]

Notably, the most detailed data slide presented by Ravdin showed a marked decrease in

breast cancer rates within three months of the publicity surrounding the surprise abort of the

WHI Prempro trial.[64]   This is graphic, irrefutable evidence that in many women, stopping

Prempro stops the growth of microscopic tumors that would otherwise, still fueled by Prempro,

have developed into clinically detectible and life-threatening breast cancers.   And the hormone

effect is short-term, often occurring in just a few months.   Drs. Colditz and Austin have

confirmed that the promotion of tumors into manifest breast cancer can occur with months of

use.[65]

---

[62]      *See, for example,* Ex. 49 - PX ML 5838- Marshall, *Recent Breast Cancer Incidence
Trends According to Hormone Therapy use: The California Teacher's Study Cohort*, Breast
Cancer Research, (2010) at 11 ("Conclusions: Along with other studies showing similar
conclusions, our data provide further evidence that recent declines in invasive breast cancer
incidence in the US are explained predominantly by decreased HT use."); Ex. 50 - PX ML 4854
- Kerlikowske, *Declines in invasive breast cancer and use of postmenopausal hormone therapy I
a screening mammography population*, JNCI, Vol. 99, Issue 17 (2007) at 5 (decline in E+P use
contributed to the decline of breast cancer causing 17,500 fewer breast cancers each year); Ex.
51 - PX ML 4743 - Ravdin, *The Decrease in Breast Cancer Incidence in 2003 in the United
States.* N England J Med 2007, 356;16:1670-1674; Ex. 52 - PX ML 5500 - Banks, Canfell,
Recent declines in breast cancer incidence: *Mounting evidence that reduced use of menopausal
hormones is largely responsible*, Breast Cancer Research, Vol. 12: 103 (2010).

[63]      Ex. 53 - PX 8426C, National Cancer Institute at p. 4

[64]      Ex.54 – Dr. Ravdin's slides used at the 2006 San Antonio, Texas Brest Cancer
Conference at slide 4.

[65]      *See* text, *infra.*

Even Wyeth, on its website, confirms this connection[66] as do other international research groups.  In Germany, researchers from the Institute for Cancer Epidemiology at the University of Lubeck, have concluded that "the recent decline in breast cancer incidence following decreasing HT prescriptions suggests a causal relationship between the risk of breast cancer and HT in Germany."[67]

So accepted is the connection between E+P and breast cancer, that Dr. Larry Norton, the director of the Memorial Sloan Kettering Breast Center[68] spoke of it openly on a webcast video (designed for patient education) on the Sloan Kettering website.  As Dr. Norton calculated, "as high of a third of breast cancers in post menopausal women" in the past were "caused by hormone replacement therapy.  It was a terribly risky thing to do…"[69] As he discussed the drop in breast cancers after the WHI announcement, Dr. Norton stated, "There's no other way of explaining it.  There was no increase in mammography.  Nothing else could explain the data.  It was looked at extremely carefully by very -- by very good statisticians, so that's why I come up

---

[66]     Ex. 55 - PX 10555 (p. 1 -- " Fewer women are using HRT, which may explain why new cases of breast cancer among postmenopausal women have declined.."; p. 4 – "As further evidence of the association between HRT and breast cancer, a 2007 New England Journal of Medicine study noted that breast cancer rates have fallen as HRT use has declined. The decline in rates occurred among women over the age of 50 and was particularly associated with cancers that were estrogen receptor-positive. This type of cancer requires estrogen for growth. Experts think that postmenopausal women's discontinuation of estrogen-containing HRT may explain the decrease in rates of new cases of estrogen receptor-positive cancer.").

[67]     Ex. 56 - PX ML 5142 - Katalinic, *Trends in Hormone Therapy and Breast Cancer Incidence - Results from the German Network of Cancer Registries*, Pathobiology, Vol. 76, p.90 (2009) at 90.

[68]     Ex. 57 - PX 8078C (Biography of Dr. Larry Norton).

[69]     Ex. 18 - PX 8078B (Transcript of Dr. Norton's speech at http://www.mskcc.org/mskcc/html/44.cfm) at 33.

with the number. If half the women stopped and it lowers by 15 percent, that's why I say that maybe a third or 30 percent of the cancers are caused by hormone replacement therapy."[70]

## II.    ARGUMENT AND AUTHORITY

E+P causes hormone receptor-positive breast cancer in the short term when a woman taking the drug has an advanced lesion that is on the verge of becoming malignant.  Absent E+P, the lesion would remain dormant or disappear.  E+P also causes tiny, occult, hormone-dependent cancers to become clinically significant malignancies.  Absent the drugs, these tumors (if they are hormone-positive tumors) would have remained clinically insignificant or shriveled and died without a source of hormones.  Of course, whether a particular woman's cancer was caused by her three-years-or-less use of E+P depends upon the facts of an individual case.

Whether an expert's testimony is relevant and reliable is within the district court's broad discretion.[71]  Rule 702 is a rule of "admissibility rather than exclusion."[72]  It "reflects an attempt to liberalize the rules governing the admissibility of expert testimony."[73]  The *Daubert* Court recognized that the federal rules seek to relax traditional barriers to opinion testimony.[74]

Expert testimony is admissible if it will assist the jury in understanding the evidence or determining a fact issue.[75]  Such testimony should be excluded "only if an expert's opinion is so

---

[70]    Ex. 18 - PX 8078B (Transcript of Dr. Norton's speech at http://www.mskcc.org/mskcc/html/44.cfm) at 45.

[71]    *Baker v. McCoy*, 739 F.2d 381, 385 (8th Cir. 1984) (*citing* FED. R. EVID. 702).

[72]    *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citation omitted).

[73]    *Id.* (citation omitted).

[74]    *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587-88 (1993) (*citing* FED. R. EVID. 401, 402, 702).

fundamentally unsupported that it can offer no assistance to the jury."[76]  The standard is flexible.[77]

An expert's factual errors do not warrant exclusion.[78]  Even "shaky" evidence is admissible.  Defendants are obliged to use cross-examination and contrary evidence to impugn questionable causation evidence.[79]  A conflict among expert opinions does not warrant exclusion.[80]  *Kumho Tire*, 526 U.S. at 153.

The Rules of Evidence (beyond those governing relevance and privilege) do not apply to the *Daubert* inquiry.[81]  The district court has "broad latitude" in deciding how to determine reliability.  *Komho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999)).  This Court may consider ordinarily inadmissible hearsay.  *Blue Cross & Blue Shields of New Jersey, Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 325 (E.D.N.Y. 2001).  The Court may also consider evidence the expert did not cite but which corroborates the expert's conclusions or assumptions.  *See 350 W.A. LLC v. Chubb Group of Ins.*, 2007 WL 4365502, at *29-30 (S.D. Cal. Dec. 5, 2007).

---

[75]     FED. R. EVID. 702.

[76]     *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005).

[77]     *Sorensen v. Shaklee Corp.*, 31 F.3d 638, 648 (8th Cir. 1994).

[78]     *See Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 916 (8th Cir. 2005).

[79]     *Daubert*, 509 U.S. at 589.

[80]     *Kumho Tire*, 526 U.S. at 153.

[81]     FED. R. EVID. 104(a); *Daubert*, 509 U.S. at 593 n. 10.

Wyeth asserts that plaintiffs' experts' conclusions should be viewed with skepticism because they deviate from the majority view on causation.[82]  Ignoring for a moment that Wyeth is flatly wrong factually,[83] both the Supreme Court and the Eighth Circuit have expressly held that the focus of the *Daubert* inquiry is the expert's methods and not his conclusions. *Daubert*, 509 U.S. at 595; *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001).

Furthermore, general acceptance has never been a prerequisite to admission under *Daubert.*  Indeed, it is not even a factor mentioned in the rules upon which *Daubert* derives. Wyeth's arguments are based on the obsolete standard in *Frye*.[84]  Exclusion is never warranted simply because the majority view is contrary to an expert's techniques, much less his opinions. In rejecting Wyeth's position (albeit when enunciated by a different litigant), the Supreme Court cited the text of Rule 702, which says nothing about general acceptance.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.[85]

The Court then held:

> Nothing in the text of this Rule establishes "general acceptance" as an absolute prerequisite to admissibility. Nor does respondent present any clear indication that Rule 702 or the Rules as a whole were intended to incorporate a "general acceptance" standard. The drafting history makes no mention of *Frye,* and a rigid "general acceptance" requirement would be at odds with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony." *Beech Aircraft Corp. v. Rainey,* 488 U.S., at 169, 109 S.Ct., at 450 (citing Rules 701 to 705). See also Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631 (1991)

---

[82]    Wyeth's Memo at 28-29.

[83]    *See* text, *infra*.

[84]    *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 2923),

[85]    *Daubert*, 509 U.S. at 588 (*quoting* Fed. R. Evid. 702).

("The Rules were designed to depend primarily upon lawyer-adversaries and sensible triers of fact to evaluate conflicts"). Given the Rules' permissive backdrop and their inclusion of a specific rule on expert testimony that does not mention "general acceptance," the assertion that the Rules somehow assimilated *Frye* is unconvincing. *Frye* made "general acceptance" the exclusive test for admitting expert scientific testimony. That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials.[86]

The cases cited by Wyeth do not support the company's position. Wyeth cites one case for the proposition that the experts' conclusions about three years use causing breast cancer should "properly [be viewed] with skepticism."[87] In reality, the court held nothing giving rise to such an inference. The court held that if an expert's methodology or techniques deviate from generally accepted principles, the testimony should be viewed with skepticism.[88] The same is true of the other cases Wyeth cites.[89] The experts' conclusions about whether short-term use of E+P causes breast cancer need not enjoy consensual support. Finally, the fact that different experts examine the same data but reach different conclusions does not warrant exclusion of either expert's testimony under *Daubert*. As one federal court noted:

> Plaintiff argues that because the weight of scientific authorities reaches a different conclusion than Defendant's experts, their testimony is inadmissible.
>
> But *Daubert* and Rule 702 make no such restriction. Under *Daubert*, the Court must consider whether the expert's methodology—not the conclusion—is scientifically valid.[90]

---

[86]     *Daubert*, 509 U.S. at 588-89.

[87]     Wyeth's Memo at 29 (*quoting McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005)).

[88]     *McClain*, 401 F.3d at 1242.

[89]     *Allen v. Pa. Eng. Corp.*, 102 F.3d 194, 187 5th Cir. 1996) (referring to expert's methodology departing from generally accepted principles) (*cited in* Wyeth Memo at 29); *Braun v. Lorillard Inc.*, 84 F.3d 230, 235 (7th Cir. 1996) (same) (*cited in* Wyeth Memo at 29).

[90]     *American Dental Ass'n v. Khorrami*, No. CV 02-3853-RSWL (RZx), 2006 WL 5105271, at *3 (C.D. Cal. June 9, 2006); *see also Mascarenas v. Cooper Tire & Rubber Co.*, 643 F. Supp.

*Daubert* requires consideration of all relevant scientific evidence, not a choosing between competing theories or different bodies of scientific evidence.[91]

Here, plaintiffs' experts, as the citations reveal, base their conclusions upon their review of the epidemiological evidence, the ecological evidence of trends in product ingestion and disease incidence and the biologic plausibility of E+P promoting breast cancer in the short term.[92]  Wyeth has previously acknowledged that consideration of ecological evidence with epidemiological evidence is appropriate in conducting a general causation analysis.[93]  The Manual on Scientific Evidence confirms that examination of epidemiology alone is insufficient. An expert must consider the biologic plausibility of a causal relationship in conjunction with studies.[94]  Wyeth relies exclusively on selected epidemiology and fails even to address the fuller

---

2d 1363, 1372 (S.D. Ga. 2009) ("Where experts might reasonably reach different conclusions based on the evidence, their opinions should be admitted into evidence.") (citation omitted); *Certified Engineering Copier Systems, Inc. v. National City Commercial Capital Co.*, No. 2:07-CV-293 TS, 2009 WL 1324047, at *3 (D. Utah May 11, 2009) ("when they arrive at different conclusions, *Daubert* does not require the Court to determine which the jury is more likely to believe").

[91]     *Ruiz Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (*citing Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994); ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.  It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.")  *Ambrosini v. Labarraque*, 101 F.3d 129, 141 (D.C.Cir.1996) ("The district court[ ] err[ed] ... [by] misconce[iving] of the limited 'gatekeeper' role envisioned in *Daubert*. By attempting to evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies, the district court conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder.").

[92]     *See* text, *infra*.

[93]     Memorandum in Support of *Daubert* Motion to Exclude Expert Testimony of Dr. Donald Austin, *Scroggin v. Wyeth*, Case No. 04-1169, Document 104 (Aug. 15, 2007) at 3-4.

[94]     Ex. 73 - Reference Manual on Scientific Evidence (2d ed. 2000) at 374-75.

body of epidemiological evidence, the science of cancer biology and the short-term nature of a promotion effect. By contrast, plaintiffs' experts explain why the E+P effect will definitely be short-term in some circumstances, even though epidemiological studies are rarely powerful enough to detect the quickest of those effects.

A.      **The Promotion Effect of E+P Can Occur Within in a Matter of Months.**

Cancer biology teaches that the promotion effect of hormones on cancer is rapid beginning with the endometrial cancer crisis of the 1970s. As sales of unopposed Premarin (E without P), rose, the incidence of endometrial cancer, a formerly rare disease, increased almost immediately. Follow-up studies showed that just six months of E-only use dramatically increased the relative risk of endometrial cancer.[95] By way of example, in one large study, less than one year of unopposed estrogen use created a whopping relative risk of endometrial cancer of 3.5, more than a tripling of the risk. And the finding was statistically significant. One-to-two years of use generated a statistically significant 7.1 relative risk.[96] Hormones can cause cancer in very short order.

The promotion effect leading to breast cancer is largely the same. In both contexts, hormones act on an abnormal cell or benign malignancy. Hormones interact with the cell through estrogen and progestin receptors, by which they signal the nucleus of the cell to divide. This is how abnormal cells and benign lesions become invasive malignancies.[97] This process

---

[95]      Ex. 97 – PXML4541 - McDonald TW, et al, *Exogenous estrogen and endometrial carcinoma: Case control and incidence study*, 1977; 127(6), 1977 Mar. 15; 127(6):572-80 at 573 table 1.

[96]      Ex. 98 – PXML4548 - Antunes CM, et al, New Eng. J. Med. 1979 Jan. 4; 300(1):9-13 at table 5.

[97]      *See, e.g.,* Ex. 99 - Depo of Don Austin (3/13/07) at 131-40, 165-75, 199-203.

can occur quickly in the breast cancer context as well.  In response to the question of how long

.promotion takes, Dr. Colditz answered: "Well, in general, this can be very short.  Endometrial

cancer, we have months.  Breast cancer, we have months to a couple of years sufficient to have

this impact."[98]  Dr. Colditz further testified:

> Q.    What timing -- what time would it take, and give us the low range and
>        give us the high range, to promote cells which are abnormal, but not
>        cancer and promote them into cancer in a woman taking E plus P?
>
> A:     When we look at the evidence from across the studies, it's clear that the
>        promotion effect can start to be detected in six to 12 months.  It can be
>        spread out to numerous years beyond that.  It's really going to depend on
>        where the abnormal cells are in the pathway to cancer.  They haven't got
>        the cancer, they get exposed to E plus P, and they get promoted to move
>        on down the cascade to invasive breast cancer.[99]

In other words, if the woman has just developed an abnormality in her cells, long-term

hormone exposure is likely necessary to cause cancer.

---

[98]    Ex. 14 - Colditz Depo at 54:7-18.

[99]    Ex. 100 - Colditz Depo (12/29/06) at  795:4-796:2.



But if the cellular abnormality developed long ago, and the woman has an advanced, though

benign, lesion or hyperplasia, E+P can cause cancer in a matter of months.



Dr. Austin concurred:

> Q.      So in terms of breast cancer, we're talking about a promoter effect.  Tell us the amount of time you would expect from the time the woman starts taking the E plus P therapy and when you can see a cancer caused by the promotion effect of those drug in a woman?
>
> A.      Well, there is going to be a bell-shaped curve for women.  If you put a thousand women on it, some will get it very quickly and some will not get it until two or three or four or five years later.  But you start seeing the effect almost immediately.
>
> Q.      Would that be within months, years, what?
>
> A.      Well, yes, as soon as the tumor is large enough to be picked up clinically.
>
> Q.      And would that be months?
>
> A.      Yes.[100]

As Dr. Peter Gann, a published author on hormone therapy and breast cancer, put it:

> Combined hormone replacement therapy in particular is what we might call a growth promoting agent….What that means is that in any group of women, any population of women who are exposed, there is a finite number of women, there is a finite possibility that a woman who has an incipient breast cancer that has almost reached the point where it can be diagnosed, and therefore, if you look at what I would consider the lead time between the onset of exposure and the diagnosis of an HRT-related case, theoretically it can be extremely short."[101]

Dr. Elizabeth Naftalis, a breast cancer surgeon, has testified that E+P can cause breast cancer within a year of use and described that "on the promotion end, you have a cell that is already susceptible.  In other words, a cell that's not quite right.  And then boom, the promoter comes in and causes that susceptible cell to turn into a cancer. And we know that that can actually happen in a very short period of time."[102]  As Dr. Naftalis explained, the rapid decline in

---

[100]     Ex. 101 - Austin Trial Testimony , *Daniel v. Wyeth* (1/16/07 PM) at p. 10:24-11:19; 52:17-53:15.

[101]     Ex. 102 - Deposition of Dr. Peter Gann (1/24/06) at 116.

[102]     Ex. 103 - Naftalis Trial Testimony, *Daniel v. Wyeth* (1/12/07AM) at 35:3-36:15.

breast cancer incidence (within six months) following the reduction in E+P use after the WHI, is strong de-challenge evidence that E+P's effect on the growth of breast cancer can be seen with less than a year of exposure to the drug.[103]   In her words, the "SEER data makes it that much clearer that within 6 to 18 months, that you can grow cancer." [104]  Dr. Naftalis then described the study by Dr. Ravdin showing a dramatic, almost immediate decline in breast cancer with declines in E+P use.[105]

Dr. Suzanne Klimberg, the head of breast surgery at University of Arkansas Little Rock, has testified that the promotion effect can be seen at two years.[106]

The fact that tumors immediately cease growing and actually regress within days of cessation of E+P is strong evidence that the hormone effects on growth are short-term.   Dr. David Rose, a Wyeth oncology expert, agrees that withdrawing hormones from hormone receptor-positive tumors causes the tumors to shrink "within days or weeks."[107]

A number of published studies confirm that removing hormones can rapidly halt the growth of a hormone receptor-positive cancer.  As Dr. Ravdin from MD Anderson explains, "stopping menopausal hormone therapy removes the fuel that is promoting the growth of some tumors. The growth of these tumors, preferentially ER-positive tumors may slow or stop entirely,

---

[103]   Ex. 104 - Naftalis Trial Testimony, *Daniel v. Wyeth* (1/12//07PM) at 8:21-9:25; 14:2-15:5.

[104]   *Id.* at 30:22-31:22.

[105]   Ex. 104 - Naftalis Trial Testimony, *Daniel v. Wyeth* (1/12/07PM) at 10.

[106]   Ex. 105 - Klimberg Depo (8/17/06) at p. 545.

[107]   Ex. 106 - Rose Testimony, *Daniel v. Wyeth* (1/23/07PM) at p. 34.

or the tumors may even regress.[108]  The WHI investigators have found that "the rapid decrease in breast cancers during the postintervention period suggests that withdrawal of E+P leads to a regression of preclinical cancers."[109]

As Dr. Clifford Hudis, Chief of Breast Cancer Medicine at Sloan Kettering described, if small breast cancers were "fueled to grow larger by the hormones, they might immediately stop growing and shrink when the estrogen was removed. We see exactly this when we treat advanced breast cancers with hormone blocking drugs. The cancers shrink" within weeks.[110]  They are highly susceptible to the effects of hormones.

**B.      Epidemiological Studies, While Limited in Quantifying the Time Frame for Risk, Nonetheless Show Statistically Significant Association Between E+P and Breast Cancer after Short-Term Use.**

The Women's Health Initiative, the Million Women Study and various other studies establish a short-term causal connection between E+P and breast cancer.  Some studies have not detected a short-term risk because they were not powerful enough to detect the risk.  Undeniably, the risk increases with each year of use, so the smallest number of cases of breast cancer will occur in the early years.  Many studies cannot accurately detect when that risk actually begins. The WHI study established the causal connection only when various limitations of the study were controlled for by the study's investigators several years after the initial study results were announcement.  It is thus not surprising that some studies do not show the risk.

---

[108]      Ex. 107 – PXML 4775 - Berry and Ravdin, *Breast Cancer Trends: A Marriage between Clinical Trial Evidence and Epidemiology*, JNCI, Vol. 99, Issue 15, (2007) at S47.

[109]      Ex. 108 – PXML 4881 - Cheblowski, *Breast Cancer after Use of Estrogen plus Progestin in Postmenopausal Women*, NEJM, Vol 360:6 (Feb. 2009) at p. 582.

[110]      Ex. 109 - PX 8078 - Dr. Hudis answers patient questions on Sloan Kettering website.

Wyeth's brief reads as though every aspect of a plaintiff's case must be established with epidemiological evidence.  And that is consistent with what Wyeth has said in its prior motions.  According to Wyeth, not only must epidemiology establish a causal relationship, it must establish that relationship for the particular subtype of breast cancer the plaintiff developed, the duration of time she used the product, the particular brand of hormone therapy she took, etc.  Aside from the fact that that there are never studies on every aspect of a causation case, and no study can be powerful enough to look at all details, no court has ever held that epidemiology is required to prove every characteristic of a plaintiff's case.[111]  Studies are not powerful enough to examine all details.  That is especially true of clinical trials.  As one textbook noted:

> The randomized clinical trial is considered the gold standard methodology to study the safety and efficacy of a drug.  However, trials are limited by the relatively small numbers of patients studied and the relatively short time period over which patients are observed….Thus, clinical trials are usually only large enough to detect events that occur relatively infrequently, and are generally inadequate to address all potential safety issues related to a particular drug.[112]

This is true of the Women's Health Initiative Prempro trial ("WHI"), the largest clinical trial involving women to date.  The WHI was large enough to sound the alarm when breast cancer rates exceeded a predetermined maximum acceptable rate.  But it was not powered enough to detect a risk in various subtypes of breast cancer.  As Dr. Christopher Li wrote:

> The WHI CHT [combination hormone therapy] trial did not find a difference in risk by histology, although the trial was underpowered to assess this relationship

---

[111]    In fact, federal courts interpreting *Daubert* have held that no epidemiology is required at all.  *In re Neurontin Marketing, Sales Practices, and Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 132 (D. Mass. 2009) (collecting cases).

[112]    Ex. 74 - Brian L. Strom, PHARMACOEPIDEMIOLOGY (John Wiley & Sons, Inc.: 3d ed. 2000) at 93.

given that it accrued only 38 ILC [invasive lobular carcinoma] cases and 23 IDLC [invasive ductal-lobular carcinoma] cases across both arms of the study.[113]

As shown below, until the WHI was adjusted for certain limitations, it was not powerful enough nor was it designed to detect a short-term risk.  Of course, Wyeth knows that for when Prempro was approved in late December 1994, Wyeth was cautioned by the FDA that breast cancer risk was the single most important safety risk with Prempro.  But according to the FDA, even the WHI (which had recently begun) was underpowered to specifically define the E+P/breast cancer risk. "It is doubtful that the WHI/RCT has sufficient statistical power to clearly define the relationship between HRT and breast cancer."[114]

But when all is said and done, a variety of epidemiological data, including subgroup analysis of the WHI clinical trial, show a substantial risk of breast cancer from short-term use of E+P.  The more highly powered the study, the early the risk materialized in study results.  This data combined with the scientific evidence of cancer biology and promotion jointly makes up the reliable scientific foundation for short term use causation.

      1.     **The WHI study results support a short-term effect of E+P on breast cancer.**

It is not in dispute that the WHI suffered from methodological deficiencies.  These deficits resulted in the original risk estimates being vastly understated.  When the WHI investigators controlled for these limitations, they discovered that the risk was much greater than previously believed, and became substantial at just two years of use.[115]

---

[113]    Ex. 110 - Christopher I. Li, *Relationship Between Menopausal Hormone Therapy and Risk of Ductal, Lobular, and Ductal-Lobular Breast Carcinomas*, Cancer Epidemiol Biomarkers Prev. 2008;17(1), Jan. 2008 at 43.

[114]    Ex. 111 - FDA Medical Officer Review of Prempro (Dec. 30, 1994), W-MDL-303-00083688 at 00083697.

[115]    Because all the limitations could not be accounted for, the actual risk begins much earlier. *See* text, *infra*.

As it has done since the inception of this litigation, Wyeth cites the <u>initial</u> WHI Prempro trial results, that is, the results announced in July, 2002 when the experimental branch of the study was terminated due to the high incidence of breast cancer.[116]   Wyeth does that because these results seemingly support Wyeth's position.   But those results are inherently incomplete and therefore flawed.   As plaintiffs have explained repeatedly, and the Eighth Circuit has acknowledged, the initial results were based on data from the entire "intent to treat" group, that is, all women assigned to take E+P throughout the study.[117]   But nearly half of those women declined to take the drug.   Indeed, there was a staggering 40 percent dropout rate of women in the E+P study group, thereby severely skewing the initial study results.[118]   The WHI investigators recognized that this resulted in a substantial underestimate of the breast cancer risk.[119]

Several years after the initial results, the WHI investigators sought to determine what effect this high dropout rate had on the breast cancer results of the study.   The group, led by Dr. Garnet Anderson, controlled as best they could for the high dropout rate in recalculating the data.[120]   When they did, they found that the initial results (upon which Wyeth's entire brief is based) substantially underestimated the risk.   In fact, they found more than a tripling of the risk

---

[116]     Wyeth Memorandum ("Wyeth Memo") at 12-13.

[117]     Ex. 15 - Austin Trial Testimony, *Scroggin v. Wyeth* at 195:22-197:20; 290:7-15.

[118]     Ex. 15 - Austin Trial Testimony, *Scroggin v. Wyeth* at 197:11-198:25.

[119]     Ex. 58 - Rowan T. Chlebowski, et al, *Influence of Estrogen Plus Progestin on Breast Cancer and Mammography in Health Postmenopausal Women: The Women's Health Initiative Randomized Trial*, JAMA.  2003; 289(24):3243-3253 at 3252.

[120]     Ex. 59 – PXML 3406 - Garnet L. Anderson, et al, *Prior hormone therapy and breast cancer risk in the Women's Health Initiative randomized trial of estrogen plus progestin*¸ MATURITAS 2006 at 9.

of breast cancer for women with prior use of E+P (use before the study began) – that is, more than a 3.0 relative risk.[121]  This is in sharp contrast to the 1.24 relative risk number that Wyeth and its experts repeatedly cite.

Analyzing women based on actual and prior E+P use, rather than by the "intent to treat" them, provides more accurate data.  Ordinarily, focusing solely on the "intent to treat" group would protect against bias creeping into the analysis.  But when dropout rates are of the magnitude they were in the WHI study, the "intent to treat" results have little meaning, hence individuals must be classified based on actual use.[122]

None of Wyeth's arguments, none of the expert testimony Wyeth cites and none of the organizations Wyeth quotes considered or integrated the subsequent analyses by the WHI investigators.  Various scientists and the Eighth Circuit in *Scroggin v. Wyeth* have now done this.

> The 1.24 relative risk was based on the "intent to treat" group, meaning the women who had signed up to participate in the study, but it did not account for those who had dropped out during the course of the study. According to the WHI, all of the women had been enrolled for 3.5 years, with an average enrollment of 5.2 years, and a maximum enrollment of 8.5 years. Forty-two percent of estrogen plus progestin users and thirty-eight percent of the placebo group ceased participating during the course of the study. The initial WHI results, however, calculated the relative risk as if these women had remained in the study.

---

[121]    "Relative risk" refers to the ratio of increased incidence of an event among those exposed to the variable being studied to the incidence among those who are not exposed (Ginger Constantine Trial Testimony, *Scroggin v. Wyeth* (Ex. 60) at 1804:22-1905:6 -- Dr. Constantine was vice-president of Wyeth's women's health and bone repair clinical research division. (Constantine Trial Testimony, *Scroggin* (Ex. 60) at 1778:14-18).  The baseline risk is 1.0, hence a relative risk (RR) equal to or less than 1.0 means there was no greater incidence of the event among those exposed (Austin Trial Testimony, *Scroggin* (Ex. 15) at 235:15-21; Justin Victoria Trial Testimony, *Scroggin* (Ex. 61) at 474:4-7 -- Victoria was Wyeth's associate director of regulatory affairs.  (Victoria Trial Testimony, *Scroggin* (Ex. 61) at 417:24-418:23).  A 2.0 RR means a doubling of the risk (twice as much incidence) among those exposed whereas a 5.0 RR refers to five times greater risk (a 400 percent increase in incidence) among those exposed (Austin Trial Testimony, *Scroggin* (Ex. 15) at 204:6-12).

[122]    Ex. 62 - S. Shapiro, *Recent epidemiological evidence relevant to the clinical management of the menopause*, Climacteric 2007; 10(Supp. 2):2-15 at 6.

In 2006, Dr. Garnet Anderson, who had worked on the WHI study, published a report that accounted for these variables. When she accounted for confounding variables, the relative risk was 1.96. She found that women who had been taking hormone replacement therapy prior to commencement of the study had a relative risk of 2.78 and that women who were taking the medication for more than five years had a relative risk of 2.5. When Dr. Anderson analyzed only the women who remained in the study and adhered to the treatment, she found a relative risk of 3.56.[123]

Granted, the issue in *Scroggin* was not short-term use. But the point is that the court found the subsequent analysis by Dr. Anderson and his colleagues superior to the initial results reported when the study was terminated. Yet, all of Wyeth's arguments and evidence are based on the initial results and ignore subsequent data from WHI and other studies.

Another limitation of the WHI is that it studied older women, with the mean age of study participants being 63, an age that is more than a decade beyond when menopause typically begins and women usually begin taking E+P. When the data are adjusted for this feature, a substantial short-term effect is shown. Citing this difference between plaintiffs and WHI participants is not a criticism of the WHI, *per se*, because the study was designed to determine whether E and E+P convey cardiac benefits. The women most likely to experience heart problems are older women, hence the WHI focused on them, even though they are not the women most likely to be starting hormone therapy use.

Although many clinicians criticize the predominance of older women in the WHI studies, it is important to realize that these studies were not designed to examine the risks and benefits of HT use for symptomatic women in early menopause.[124]

---

[123]    *In re Prempro Prods. Liab. Litig.*, 586 F.3d 547, 560-61 (8th Cir. 2009), *cert. denied*, 130 S. Ct. 3467 (June 21, 2010).

[124]    Ex. 63 - Jan. L Shifren, et al, *Role of Hormone Therapy in the Management of Menopause*, Obstet Gyncecol 2010; 115:839-55 at 840.

Though studying older women may have produced important cardiovascular information, it resulted in questionable breast cancer statistics for newly menopausal women, the ones most often using hormone therapy.  The Endocrine Society is the world's oldest, largest and most active organization studying hormones and the clinical practice of endocrinology.  Founded in 1916, the organization has 14,000 members from over 100 countries.  The diverse membership represents the full range of disciplines associated with endocrinology, including medicine, molecular and cellular biology, biochemistry, physiology, genetics, immunology, education, industry and allied health fields.  Among Wyeth's designated experts who are members of the Endocrine Society are Dr. Rogerio Lobo and Dr. David Archer.  The Endocrine Society publishes four world-renowned medical journals and a monthly newsletter, holds scientific conferences, provides educational programs for physicians and issues clinical practice guidelines, among other things.[125]

Just this summer, the Endocrine Society published the most authoritative review of the published literature on hormone therapy and its risks and benefits to date.  The report has 25 authors, is 77 pages and contains 511 citations.  The report notes that one significant flaw of the WHI which prevented the study from accurately quantifying the breast cancer risk was the fact that study participants were much older than women just entering menopause, who constitute most of the plaintiffs in this litigation, and certainly the bulk of the short-term use plaintiffs.  Women just entering menopause are at a higher risk of developing breast cancer from E+P because their own hormones may have driven the growth of benign lesions that are on the cusp

---

[125]    Ex. 64 – PXML 6096 - http://www.endo-society.org/about/

of becoming cancer.[126]  Ten years after entering menopause, these lesions may have disappeared or regressed due to the absence of hormones in the woman's body.  "In contrast to the WHI, the majority of women in observational studies initiated HT at a younger age and within several years of menopause."[127]

In yet another subsequent reanalysis of the WHI clinical and observational data, the WHI investigators controlled for some of the gap time between onset of menopause and E+P use.[128] The results showed an increased risk within the first two years of use and substantial risk thereafter.  As WHI investigator, Dr. Ross L. Prentice wrote:

> Among adherent women who initiated E+P within 5 years of menopause, there was limited evidence for a hazard ratio increase within the first 2 years of use, whereas hazard ratios were substantially elevated after the first 2 years.[129]

In other words, when investigators were able to control (to some extent) for limitations or flaws of the WHI study, the onset of a breast cancer risk was consistently shown to begin earlier – before even two years of use.

Yet another problem with the WHI study is that it overtly discouraged women with significant menopausal symptoms from enrolling.  Potential participants had to go through a three-month wash-out period where they were on no hormones at all.[130]  Those reporting

---

[126]    Ex. 65 – PXML 6016B - Santen, R.J., et al, 2010, *Postmenopausal Hormone Therapy: An Endocrine Society Scientific Statement*, J. CLINICAL ENDOCRINOLOGY & METABOLISM 95, Supp. 1:S1-S66 (hereafter "Endocrine Society Statement") at S-2.

[127]    Ex. 63 - Shifren, *supra* at 847.

[128]    This analysis most closely accords with the plaintiffs in the February trial-set MDL cases. Both began E+P shortly after entering menopause.  (Pamela A. Kuhn's Fact Sheet (Ex. 75) at 16, 17, 26; Shirley Davidson's First Amended Fact Sheet (Ex.76) at 18, 19, 34).

[129]    Ex. 66 - PX ML 5167 - Prentice, *Estrogen Plus Progestin Therapy and Breast Cancer in Recently Postmenopausal Women*, Am. J. of Epidemiology (2008).

[130]    Ex. 58 - Chlebowski, 2003, *supra* at 3244.

moderate symptoms were then discouraged from participating in the study.[131]  Those reporting

severe symptoms were disqualified.[132]

These limitations of the WHI study mean the breast cancer numbers it provides are

unreliable.  The Endocrine Society concluded:

> Subsequent to its publication, controversy arose with respect to WHI's
> applicability to women just entering menopause.  The average age of participants
> was 63, and only 3.5% of the women were 50-54 yr old, the age when women
> usually make a decision regarding initiation of MHT [menopausal hormone
> therapy].  In addition, the WHI did not address the major indication for MHT use,
> relief of symptoms.[133]
>
> * * *
>
> "Data from the various Women's Health Initiative studies, which involved women
> with average age of 63, cannot be appropriately applied to calculate risks and
> benefits of MHT in women starting shortly after menopause."[134]

The three principal limitations of the WHI study – (1) enrollment of older women, (2) failure to

account for menopausal symptoms and (3) high dropout rates -- render the study insufficiently

powered to be considered a true randomized clinical trial.

> Women enrolled in the trial were not representative of the symptomatic
> perimenopausal women for whom MHT is generally prescribed.  Only 574 [of a
> total of 16,608 (3.5%)] were women in the 50- to 54-yr age group, with moderate
> to severe symptoms, typical of women normally presenting for consideration of
> MHT.  Thus, the overall results are not applicable to women in the 50- to 55-yr-
> old usual target age group, who tend to start their treatment soon after menopause
> if not perimenopausally.  By the end of the trial, 42% of the combined-hormone

---

[131]    Ex. 77 - Jennifer Hays, et al, *Effects of Estrogen Plus Progestin on Health-Related Quality of Life* 348(18) New Eng. J. Med. (May 8, 2003) at 1840.

[132]    Ex. 78 – PXML 2991 - Judith K. Ockene, *Symptom Experience after Discontinuing Use of Estrogen Plus Progestin*, 294(2) JAMA (July 13, 2005) at 184.

[133]    Ex. 65 - Endocrine Society Statement at S2.

[134]    *Id.* at S7.

users had stopped taking study drugs, as had 38% of the placebo group, an element ***reducing the power of the study as a true randomized trial***.[135]

* * *

The above considerations seriously undermine the use of the RCT [randomized control trial] data [of the WHI] to make valid estimates of risk in the applicable group of women (i.e. recently menopausal women who were not prior users).[136]

In fact, the limitations are so significant that recent analyses characterize the WHI as an inferior study in terms of quantifying risks.  The Endocrine Society concluded:

Evidence from the WHI trial is weighted less than that of a randomized controlled trial according to the GRADE system criteria because of mitigating factors: large dropout rate; lack of adequate representation of applicable group of women (i.e. those initiating therapy at the time of menopause); and modifying influence from prior hormone use. For this reason, many of the conclusions from the WHI are judged as level B evidence."[137]

In fact, the high age of the women studied, along with the study's high dropout rates, mean, in terms of breast cancer measurements, the WHI Prempro trial lost its status as a true randomized clinical trial.[138]

Wyeth and its experts have consistently and harshly criticized the WHI Prempro trial and its breast cancer findings on precisely the grounds plaintiffs cite here.  For instance, Wyeth's retained expert, Dr. William Creasman has claimed the study's breast cancer results should not be relied upon due to the WHI's methodological weaknesses.  Dr. Creasman is a professor in, and chair emeritus of, the Department of Obstetrics and Gynecology at the University of South Carolina.  Dr. Creasman reported that the higher age of enrollees and failure to enroll women

---

[135]     *Id.* at S21 (emphasis added).

[136]     *Id.*

[137]     *Id.* at S4.

[138]     *Id.* at S21.

with significant menopausal symptoms casts doubt upon whether the WHI breast cancer results can even be applied to plaintiffs.  Wyeth's expert stated in his report:

> In addition, the women enrolled in the [WHI] study were considerably older than those normally commencing hormone therapy.  In the United States, the average age of menopause is 51 years.  The average age of enrollment in the WHI study was 63.3 years, more than a decade later than the age at which most women begin hormone therapy….Moreover, unlike most women who initiate use of hormone therapy, most of the WHI participants were not experiencing significant menopausal symptoms.  All of this makes it difficult to apply the study results to the population of women for whom hormone therapy is usually prescribed.[139]

Wyeth expert, Dr. Raquel Arias is an OB/GYN and associate professor in the same field at the University of Southern California Medical School.  She has testified for Wyeth in several trials, including the *Reeves* trial before this Court.  Dr. Arias likewise found that the failure to study newly menopausal women, along with the failure to enroll women with symptoms, means the WHI study cannot be deemed definitive proof of the risks and benefits of E+P.  Indeed, she said the WHI's conclusions are questionable.[140]

Wyeth expert, Dr. Katrina Armstrong, a biostatistician, echoed these experts' criticisms of the WHI, emphasizing the study's focus on older women and failure to study women with significant menopausal symptoms.[141]

Pfizer's experts have been equally critical of the WHI.  Dr. Dan McGee, also a biostatistician, wrote in his expert report: "The [WHI] trial has been criticized on several fronts including un-blinding during the trial, the weighting of the cases, and the age of the cohort among others."[142]

---

[139]     Ex. 67 - Expert Report of Wyeth Expert, William T. Creasman, M.D. at 6-7.

[140]     Ex. 68 - Expert Rpt of Raquel D. Arias, M.D. at 28-30 ¶¶ 55-58.

[141]     Ex. 69 - Expert Rpt of Katrina Armstrong, M.D. at ¶¶ 9-10.

[142]     Ex. 70 - Expert Rpt of Dan McGee at ¶ 21.

Pfizer expert, Dr. Michelle Warren, an OB/GYN and professor of medicine at Columbia University, cites these flaws and others and concludes:

> Certain limitations of the WHI study design and methods have caused members of the medical community to question some of its findings and to doubt whether its results can be applied to the population of newly menopausal women.[143]

The bottom line?  When the WHI is being used against defendants, it is a terribly flawed study upon which no one should rely.  When the WHI offers (now defunct) statistics that support the defendants, it becomes the definitive study on the issue.  Of course, this is academic because, when the WHI investigators controlled (as much as they could) for the methodological flaws outlined above, the study showed a risk before two years use and a definite statistical risk at two years.

Wyeth claims that plaintiffs and their experts have relied upon the WHI Prempro trial in the past and therefore cannot disclaim the study now.[144]  It appears Wyeth may be implying estoppel of some sort, though there is no mention of estoppel in Wyeth's brief, much less any citation to case law applying the doctrine in this context.  In any event, Wyeth's argument is simplistic at best and arguably disingenuous.  To be sure, plaintiffs with trial-set cases and their experts have claimed (accurately) that the WHI's detection of a breast cancer risk is substantial evidence of general causation because of the respect that clinical trials engender.  But those plaintiffs have also consistently argued that the WHI was unable to quantify the actual risk accurately.  The WHI study must be understood with its scientific limitations in mind, as they have been documented in the scientific literature.

---

[143]     Ex. 71 - Expert Rpt of Michelle P. Warren, M.D. at ¶ 15.

[144]     Wyeth Memo at 22-23.

Since the first *Daubert* hearing in the first bellwether trial back in June, 2006, plaintiffs have argued that the initial WHI results were flawed, dramatically underestimating the breast cancer risk. Those plaintiffs made some of the same arguments that are made here. And they made them in every MDL trial to date.[145] After all, the Eighth Circuit did not pull its discussion of dropout rates and Dr. Anderson's subsequent analysis controlling for this factor out of thin air. Plaintiffs have consistently maintained that WHI was a study capable of detecting, but not accurately quantifying, the breast cancer risk.

Furthermore, the <u>PSC</u> has never taken any position on E+P causation. Every causation motion to date has been filed in individual cases. The lawyers representing the plaintiffs in trial-set cases were advocating on behalf of those plaintiffs only and not the broader group of plaintiffs. Moreover, plaintiffs dispute Wyeth's claims of inconsistency. But if Wyeth believes the expert positions expressed in the testimony cited in this motion are inconsistent with other statements the experts have made, Wyeth can explore the purported inconsistencies on cross-examination. However, under *Daubert*, Wyeth is not entitled to wholesale exclusion on this basis.[146]

---

[145]    Plaintiffs' general causation experts have consistently testified to these flaws in the WHI study. For instance, Dr. Austin has noted the flaws and discussed how re-calculations of study results based on the flaws show substantially higher risk figures (E.g., Ex. 15 - Austin *Scroggin* Trial Testimony at 195:22-198:25; 202:11-203:9).

[146]    *United States v. Valencia*, 600 F.3d 389, 426 (5th Cir. 2010) (affirming denial of *Daubert* motion and finding "defendants could highlight any inconsistencies [in the expert's analysis] on cross-examination"), *cert. denied*, No. 10-78, 2010 WL 2771432 (S. Ct. Oct. 4, 2010); *Campbell v. Metropolitan Property and Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) ("gaps or inconsistencies [in expert reasoning]…go to the weight of the evidence, not its admissibility"); *Advanced Fiber Technologies Trust v. J & L Fiber Services, Inc.*, No. 1:07-CV-1191, 2010 WL 1930569, at *6 (N.D.N.Y. May 11, 2010) ("Any perceived inconsistencies [in expert testimony] should be addressed through cross-examination"); *Trowbridge v. United States*, No. CV 07-32-S-REB, 2009 WL1813760, at *3 (D. Idaho June 25, 2009) ("any inconsistencies in Dr. Hall's deposition testimony provide fodder for the Government's cross-examination of Dr. Hall at

If anyone is estopped by its previous positions on the WHI, it is Wyeth.  Because the WHI shows a general causal link to breast cancer, Wyeth and its experts have consistently and strongly criticized the WHI, calling its breast cancer findings unreliable.  Wyeth's experts have gone so far as to say the study should not be relied upon.  Only now, when Wyeth erroneously believes the study helps the company in this litigation, does Wyeth suddenly embrace the WHI, despite the company's repeated attacks on the study in the past.

**2.      Multiple additional epidemiological studies establish the short-term effect of E+P on breast cancer.**

There are multiple studies, in addition to the WHI, that support causation with short-term use.  They are discussed below.

**a.      The Million Women Study**

Despite Wyeth's protestations to the contrary, the Million Women Study ("MWS") provides the most comprehensive and complete data on the risks and benefits of E+P use.  And unlike the WHI study, which was limited to 16,000 women, had a 40% dropout rate, failed to recruit newly menopausal women and failed to study women with significant symptoms, the MWS involved over one million women who voluntarily used or declined to use E+P, thereby avoiding the dropout rate problem.  It also studied newly menopausal women with symptoms. The number of study participants alone was more than 62 times the number of enrollees in the WHI study – a 6,250 percent difference.  This gave the MWS the power needed to measure rarer

---

trial"); *Seikel v. Am. Med. Sec. Life Ins. Co.*, No. CIV-05-1403-T, 2007 WL 4864462, at *4 (W.D. Okla. May 11, 2007) ("inconsistencies and weaknesses in an expert's opinion are proper subjects for cross-examination").

events, like the effects of short-term use.  Even Wyeth has acknowledged that the enrollment of

the MWS gave it the power to measure even small changes in risk.[147]

The MWS found a doubling of the risk (2.0 relative risk) after an average use of 2.6

years.[148]  As significantly, the study found a statistically significant relative risk of 1.45 within

the first year of use.[149]  Because of the significant number of women studied, the MWS was able

to identify a risk in the short-term that other studies, including the WHI, were not powered

enough to quantify accurately (though subsequent analysis of the WHI data revealed that the risk

began before two years use).

Wyeth criticizes the MWS on two erroneous grounds.  First, Wyeth notes that the MWS

looked at multiple E+P combinations and not just the combination of (a) conjugated equine

estrogen ("CEE") (estrogen derived from the urine of pregnant mares), the active estrogen

ingredient in Wyeth's Premarin and Prempro products and (b) medroxyprogesterone acetate

("MPA"), the synthetic progestin in Provera and Prempro.  Thus, Wyeth says the overall results

lack relevance.[150]  This argument is blatantly without merit, as Wyeth executives' past

statements reveal.  In the very article discussing their study results, the MWS investigators note

that they calculated the breast cancer risk for every type of E+P product separately, including

CEE + MPA.  The study found virtually no difference in the breast cancer risk among the

---

[147]     Ex. 79 - DURO J046---3347

[148]     Ex. 72 – PXML 79 - Million Women Study Collaborators, Beral, *Breast cancer and hormone-replacement therapy in the Million Women Study*, Lancet, Vol. 362: 419 (2003), (hereafter "Beral") at 419.  "Oestrogens" and "progestagens" are the British words for "estrogens" and "progestins."

[149]     *Id.* at 422 figure 3.

[150]     Wyeth Memo at 17.

combinations, including Wyeth's combination.[151]  "Results varied little between specific

oestrogens and progestagens or their doses."  A table is provided showing the similarities among

the drugs.[152]

> Other than the substantial difference between the effects of oestrogen-only and
> oestrogen-progestagen combinations, these results suggest no large variations
> between the effects of specific oestrogens (equine oestrogen and oestradiol) or
> between specific progestagens (medroxyprogesterone acetate, norgestrel, and
> norethisterone).  They also suggest that results on the risk of breast cancer for the
> specific constituents used in the Women's Health Initiative trial do not differ
> materially do not differ material from the results on the risk of breast cancer for
> other oestrogen-progestagen combinations.[153]

Wyeth knows this because it used the MWS study to report that there are no differences

in risks between CEE + MPA and other formulations.  There was no data on other formulations

in the WHI so Wyeth convinced the FDA to allow Wyeth to make this statement in post-WHI

labels:

> In the absence of comparable data, these risks should be assumed to be similar for
> other doses of CE and MPA and other combinations and dosage forms of estrogen
> and progestin.[154]

Wyeth then used the MWS data showing essentially no difference in the breast cancer risk of

CEE + MPA and other combinations of E+P in Wyeth's promotional information to doctors.

Wyeth officially approved citation to the MWS by its sales representatives to show there was a

similar or "class effect" to all estrogens with progestins.[155]  This is yet another example of

Wyeth's real world positions differing dramatically from its litigation stance.

---

[151]      Ex. 72 - Beral, *supra* at 422-23 & figure 5.

[152]      *Id.* at 422-23 figure 5.

[153]      *Id.* at 426.

[154]      Ex. 80 - Label at 3 (highlighting added).

[155]      Ex. 81 - MARRA209-013808

Wyeth next argues that the MWS considered use at baseline rather than adding use that may have occurred during the study period. But this ignores the fact that the average time between baseline and diagnosis was just over one year.[156] Thus, at most, some of the women may have had an additional year use of E+P, meaning the finding of a statistically significant risk for less than a year use becomes less than two years use. And that assumes every current user continued to use the drug throughout the study and no non-user took up the drug. In reality, there would have been current users who stopped taking the drug and non-users who began taking it. So, the difference in use leading to the risk statistics is substantially less than one year. The MWS investigators explained:

> The incident breast cancers were diagnosed on average 1.2 years after recruitment, and some women would have changed their use of HRT during that period. Results from a survey of a random sample of 12 221 study participants, done an average of 28 years after the recording of baseline information, showed that 78% of the current users at baseline were still using HRT, that 81% of past users were still past users, and that 89% of the never users were still never users. Among current users at baseline, the total duration of use of HRT at the time of diagnosis of breast cancer would be slightly longer than that recorded at baseline. However, any resultant underestimation of total duration of use of HRT would he counteracted, to some extent, by the fact that during follow-up some current users would have become past users and that some never users would have become current users.[157]

These are the only two criticisms Wyeth has. The first is flatly wrong and the second, at most, caused an insignificant underestimate of use. This is in sharp contrast to the flaws with the WHI that are real and recognized by both sides' experts. Though Wyeth cannot isolate any other purported deficiency of the MWS, it cites several individuals saying the study must be flawed.[158]

---

[156]   Ex. 72 - Beral, *supra* at 421.

[157]   *Id.* at 426.

[158]   Wyeth Memo at 18-19.

But not one of those individuals identifies any flaw in the quotations provided. That is because the individuals did not find any other flaws. As the quotations indicate, the experts simply concluded the study must be flawed because the short-term figures it presents seem implausible to these individuals. In other words, they discounted the study simply because they disagreed with its results.

Extolment of the MWS comes from opposite ends of the spectrum. Scientists laud the study's comprehensiveness. As Dr. Chlebowski, one of the WHI investigators, wrote:

> Additional information confirming and extending many of the major WHI findings regarding the association of menopausal hormones and breast cancer comes from the Million Women Study. This extremely innovative observational study linked UK mammography centers with cancer and death registries, resulting in the remarkable entry of 1,084,110 women aged 50 to 64 years and observation of 9364 breast cancers.[159]

He went on to say the combination of the WHI and the MWS data "provide compelling evidence regarding HT use and the increased risk of developing life-threatening breast cancer."[160] Dr. Cheblowski, unlike the Wyeth brief, properly integrates meaningful data from available studies rather than viewing any study as perfect or flawed.

Praise for the MWS also comes from Wyeth. Wyeth was thrilled by data from the MWS showing a decrease in bone fractures among women using E+P. Wyeth sent a voice mail to its entire sales force discussing this finding. In discussing the comprehensive methodology of the WMS in that voice mail, Dr. Eileen Helzner, of the Global Medical Affairs Department of Wyeth, stated:

> More than one million women in the United Kingdom were recruited into the Million Women Study between 1996 and 2001, and beginning in 1999, a follow-

---

[159]     Ex. 82 – PXML 1064 - Geller & Chlebowski, *HT and Breast Cancer Risk*, Sexuality, Reproduction & Menopause 1(1) (Oct. 2003) at 7.

[160]     *Id.* at 8.

up questionnaire has been mailed to study participants 2 to 3 years after their initial recruitment.  The report in this week's *JAMA* is based on the completed questionnaires from 138,737 women age 50 to 69 years with an average follow-up period of 2.8 years per woman.[161]

The Endocrine Society scientific paper cited the findings of the Million Women Study repeatedly, with nary a criticism, much less a claim that the study's results are unreliable.[162] This is in sharp contrast to the organization's position on the WHI.

No study is perfect.  Each has its warts.  But the MWS is a highly cited study with its results and methodology peer review published by the top medical journals in the world (including the Journal of the American Medical Association and The Lancet, the British equivalent of JAMA).  Moreover, the particular indictments Wyeth makes are simply wrong. For the reasons given, the MWS short-term use figures for the breast cancer risk of E+P are informative and reliably used in the field, along with other scientific evidence, to understand the cancer causing effects of E+P.  Granted, this is largely academic because subsequent analyses of the WHI data support a short-term effect as well.

### b.    Other studies

A variety of studies confirm the MWS results and latest data from the WHI.  Dr. Eugenia Calle reported the results of an American Cancer Society cohort study of nearly 68,000 women

---

[161]    Ex. 83 - PX8621 - Of course, the voice mail makes the usual disclaimer about not using the information for detailing because preventing fractures is an off-label benefit Wyeth was prohibited from promoting.  If Wyeth truly did not intend for detailers to use the information with doctors, one must wonder why this voice mail message to all of them was necessary.  But that issue is for another day.  *See also* Ex. 84 - PX10438 - (letter from Global Medical Communications Department confirming the voice mail).

[162]    Ex. 65 - Endocrine Society Statement at S18 & tables 5, 6.

that showed a statistically significant increased risk of breast cancer from E+P use within 2 to 3 years of use.[163]

Studies also show increased risk at less than two years. A French research group showed a statistically significant doubling in risk among newly menopausal women who used E+P for 2 years or less compared with never users.[164]   As Dr. Leslie Bernstein, from the Division of Cancer Etiology at the City of Hope Comprehensive Cancer Center in Duarte, California explains, women who initiated combination hormone therapy "close to menopause had, approximately, a 50% increased breast cancer risk relative to nonusers, even when they had used this regimen for 2 years or less."  She described this "immediate 50% increase in breast cancer risk observed within the first 2 years of use" as "alarming."[165]

Similarly, the researchers from the Fred Hutchinson Cancer Research Center, the coordinating center for the WHI study, found that women who currently used E+P for more than 6 months had a 2.6 relative risk of developing lobular cancer, a particularly hormone-sensitive

---

[163]    Ex. 85 – PXML 5011 - Eugenia E. Calle, *Postmenopausal Hormone Use and Breast Cancer Associations Differ by Hormone Regimen and Histologic Subtype*, Cancer, p. 936 (March 1, 2009) at 336.

[164]    Ex. 86 – PXML 5147 - Fournier, *Estrogen-Progestagen Menopausal Hormone Therapy and Breast Cancer: Does Delay From Menopause Onset to Treatment Initiation Influence Risks?*, J. Clin. Oncol., Vol.  27 (2009), at p. 4 (Table 3) and p. 5  (Table 3: Use of E+P for less than 2 years with gap time of less than 3 years, RR = 1.89 (1.93 to 2.34 confidence interval); p. 5: For women who initiated E+P within 5 years of menopause, the HR estimate in the WHI was 1.32 during the first 2 years of treatment, but this estimate, based on only seven participants with breast cancer was imprecise. "With more than 100 participants diagnosed with breast cancer among those using E+MHT (containing progestagens other than progesterone or dydrogesterone) for 2 years or less, we found a significant doubling in risk when E+P began within 3 years of menopause compared with never users.").

[165]    Ex. 89 – PXML 6092 - Bernstein, *Combined Hormone Therapy at Menopause and Breast Cancer: A Warning-Short-Term Use Increases Risk*, J Clin Oncol, Vol. 27 (2009) at p. 2.

type of breast cancer from which many MDL plaintiffs suffer.[166]  The California Teacher's Study produced results showing a statistically significant increased risk for women who used E+P less than 2 years.[167]

Wyeth's own Prempro clinical trial (called the "Pivotal Trial") provides additional scientific evidence that E+P can cause new breast cancers to develop within a year.  To secure approval of Prempro, Wyeth conducted a clinical trial in human patients using Prempro. For the study, volunteers were given a first mammogram to screen for breast cancer.   Only if the mammogram was "clean," meaning it showed no breast cancer, were the volunteers allowed to enter the study.   Each volunteer took E+P for one year, then had a second mammogram.[168]  Wyeth contends, through its executive, Justin Victoria, that this study was a randomized clinical trial, a "good size, good long pivotal trial"[169] and a "very robust test of the product combination."[170]  Dr. Michael Dey, Wyeth's president, claimed that this type of study is the best kind of clinical trial and the "best of the different kinds of trials or studies."[171]   Dr. Ginger

---

[166]    Ex. 87 – PXML 0049 - Li, (American Association of Clinical Endocrinologists), *Hormone replacement therapy in relation to risk of lobular and ductal breast carcinoma in middle-aged women*, Cancer. Vol. 88(11):2570-7 (2000) at p. 2574,  Table 3 (For current use of E+P for more than 6 months; Invasive lobular = OR = 2.6 (1.0-4.6).

[167]    Ex. 88 – PXML 6062 - Saxena, *Menopausal Hormone Therapy and Subsequent Risk of Specific Invasive Breast Cancer Subtypes in the California Teachers Study*, Cancer Epidemiol Biomarkers Prey; 19(9) (September 2010), at p. OF6, Table 3 (Relative Risk of 1.18  for less than 2 years of use (confidence interval of 1.05-1.32)).

[168]    Ex. 90 - Trial testimony of Justin Victoria in *Daniel v. Wyeth*, 1/22/07 PM at p. 38:22-44:4.

[169]    Ex. 91 - Trial testimony of Justin Victoria in *Daniel v. Wyeth*, 1/22/07 AM at p. 34:19-24.

[170]    Ex. 91 - Trial testimony of Justin Victoria in *Daniel v. Wyeth*, 1/22/07 AM at p. 35:10-12.

[171]    Ex. 92 - Trial testimony of Dr. Michael Dey in *Daniel v. Wyeth*, 1/9/07 AM at p. 74:12-75:2.  Plaintiff takes issue with the claim that a one-year study of few participants constitutes the

Constantine, Wyeth's Vice President of Medical Affairs acknowledged that breast cancer risk for E+P (Prempro) could be determined in either a one-year (Prempro Pivotal Trial) or two-year (HOPE Study) trial.[172]   Wyeth's about-face from its executives' admissions is what should be estopped.

At the conclusion of this one-year randomized clinical trial, five of the E+P users had developed new breast cancers.  Wyeth sent this data to the FDA. The FDA analyzed that data and concluded that this study showed that five <u>new</u> cases of breast cancer <u>developed</u> in the E+P users after just one year of use.[173]   Wyeth also did a causality assessment (a process whereby Wyeth seeks to determine whether there is a relationship between the drug and the injury) on the breast cancers in the E+P group and concluded that one of them was "possibly" caused by the drug after only one year of use.[174]   So while Wyeth contests any relationship between breast cancer and short term use of Prempro inside the courtroom, outside the courtroom, its safety physicians have assessed that Prempro can cause breast cancer in as little as a year.

As Dr. Chlebowski, lead investigator for the WHI study, published last month, "from a breast cancer perspective, a safe interval for combined hormone therapy use cannot be reliably defined," yet Wyeth asks this Court to define one without scientific support.[175]

---

"best" or even a "robust" study, but the bottom line, as shown below, is that even this limited study revealed a breast cancer risk within a year.

[172]   Ex. 112 - Trial testimony of Dr. Ginger Constantine in Nelson v. Wyeth (2/8/07 AM) at 55-61, 139-40.

[173]   Ex. 90 - Trial testimony of Justin Victoria in *Daniel v. Wyeth*, 1/22/07 PM at p. 38:22-44:4.

[174]   Ex. 93 - PX 285A at p. 4 (see Patient 30155-019).

[175]   Ex. 36 - PX ML 6082- Chlebowksi, *Estrogen Plus Progestin and Breast Cancer Incidence and Mortality in Postmenopausal Women*, JAMA, Vol. 304, No. 15: 1684-1692 (Oct. 20, 2010) at p. 1690.

Wyeth notes that certain organizations have claimed that short-term use does not cause breast cancer.[176]  But the surrounding context of each quotation Wyeth provides establishes that the organization's positions were based solely on the <u>initial</u> results of the WHI Prempro trial, which were flawed.  Subsequent analyses of the data have rejected those results.  Furthermore, Wyeth ignores that some of the most prominent cancer organizations acknowledge the short-term causal connection.  The most prominent, the American Cancer Society, states on its website:

> Using combined hormone therapy after menopause increases the risk of getting breast cancer.  It may also increase the chances of dying from breast cancer.  This increase in risk can be seen with as little as 2 years of use.[177]

The Susan G. Komen Foundation website states: "For each year that a woman takes estrogen plus progestin, her risk of breast cancer goes up slightly."[178]  And the National Cancer Institute, an organization Wyeth cites, recently placed an article on its website quoting Dr. Peter B. Bach, of the Memorial Sloan-Kettering Cancer Center of New York, as saying: "The view that these drugs are safe for short periods of time is just not based on evidence or data."[179]  There is certainly not a consensus against the effects of short-term use.  Moreover, as the Supreme Court and many others have held, "general acceptance" is not required by *Daubert* or Rule 702.

---

[176]     Wyeth Memo at 20-21.

[177]     Ex. 94 – PX8426C - http://www.cancer.org/Cancer/BreastCancer/DetailedGuide/breast-cancer-risk-factors

[178]     Ex. 95 – PX21090 - http://ww5.komen.org/BreastCancer/PostmenopausalHormoneUse.html

[179]     Ex. 96 – PX8426D - http://www.cancer.gov/clinicaltrials/results/summary/2010/whi-hrt-followup1010 (adapted from  the NCI Cancer Bulletin, vol. 7/no. 20, October 19, 2010).

**CONCLUSION**

Under *Daubert,* it is clear that both the relevant scientific evidence including cancer biology and promotion, as well as epidemiological and ecological evidence, support causation with short-term use.  To the extent Wyeth argues different studies and different experts disagree, that is a matter for cross examination, not *Daubert*.  For all the reasons stated above, plaintiffs respectfully request that Wyeth's motion be denied.  Plaintiffs further request all other relief to which they are entitled.

Dated this 19th day of November, 2010.

Respectfully submitted,

/s/ Zoe Littlepage
Zoe Littlepage, #12896
Littlepage Booth
2043 A West Main
Houston, Texas 77098
Telephone: 713-529-8000
Facsimile:  713-529-8044
**zoe@littlepagebooth.com**

PLAINTIFFS' LEAD COUNSEL

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of November 2010, a true and correct copy of the

foregoing document was electronically filed with the Clerk of Court using the CM/ECF system,

and a true and correct copy was forwarded by e-mail to the following parties:


F. Lane Heard, III:   lheard@wc.com
Williams & Connolly LLP
725 12th Street, NW
Washington, DC 20005

Jay Phillip Mayesh:   maoedar@kayescholer.com
Kaye Scholer
425 Park Avenue
New York, NY 10022

Lyn Peeples Pruitt:   lpruitt@mwsgw.com
Mitchell Williams Selig Gates & Woodyard, PLLC
425 West Capitol Avenue, Suite 1800
Little Rock, AR 72201



                                        /s/ Zoe Littlepage
                                        Zoe Littlepage