**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

| | |
|---|---|
| In re:<br><br>**PREMPRO PRODUCTS LIABILITY LITIGATION** | MDL Docket No. 4:03-cv-01507 WRW<br><br>*Pamela Kuhn v. Wyeth*<br>6:04-CV-06042-WRW<br><br>and<br><br>*Shirley Davidson v. Wyeth*<br>6:05-CV-06074-WRW |

**WYETH'S REPLY IN SUPPORT OF
MOTION TO PRECLUDE ANY EXPERT TESTIMONY
THAT PREMPRO USE INCREASES BREAST CANCER RISK
<u>WHEN TAKEN DAILY FOR THREE YEARS OR LESS</u>**

**INTRODUCTION**

*Daubert* requires that expert opinions be based on sound scientific evidence and reliable methodologies. In a prescription medication case, that means establishing the amount of medication needed to produce the alleged effect. The burden is on Plaintiffs to demonstrate that the causation testimony of their experts meets that standard. In response to Wyeth's motion, however, Plaintiffs filed a 48-page opposition that sheds no light on the methodological basis underlying their as-yet unidentified expert(s)' opinions.

Instead, Plaintiffs' counsel spends more time criticizing the reliability of the overwhelming scientific evidence showing an *absence* of a causal relationship between short-term Prempro use and breast cancer – including the definitive results of the Women's Health Initiative ("WHI") clinical trial – than on meeting their burden by demonstrating that any cogent methodology supports their experts' claims. Neither Plaintiffs' criticism of WHI, their reliance on a selective sample of irrelevant, unreliable, cherry-picked observational studies, nor their catch-all "promotion" theory can remedy the lack of consistent evidence showing that taking Prempro daily *for three years or less* increases the risk of breast cancer. Accordingly, the Court should exclude any expert testimony that using Prempro daily for three years or less can increase the risk of breast cancer.

**I.   PLAINTIFFS HAVE NOT MET THEIR BURDEN OF OFFERING A RELIABLE METHODOLOGY FOR DETERMINING THAT DAILY USE OF PREMPRO FOR THREE YEARS OR LESS INCREASES THE RISK OF BREAST CANCER.**

Plaintiffs bear the burden of proving that Prempro use *for the specific duration of Plaintiffs' use* can cause breast cancer and, as the proponent of that testimony, to proffer a reliable methodology for supporting that opinion. *See In re Prempro Prods. Liab. Litig.*, 2010 WL 3447293, at *2 (E.D. Ark. Aug. 30, 2010). Plaintiffs have done neither. In its opening brief, Wyeth emphasized that the procedural posture of its motion was unique because, at the time of

1

filing, Plaintiffs had not designated experts or disclosed the methodologies that will form the basis of those experts' short-term use opinions. Although Plaintiffs now have filed their opposition brief and the *Daubert* hearing is less than a week away, Plaintiffs still have not identified which experts will offer opinions on short-term use or explained the methodological basis for any experts' opinions. Consequently, the only proponent of Plaintiffs' causation testimony is Plaintiffs' own counsel – which is insufficient under *Daubert*. *See Rimbert v. Eli Lilly & Co.*, 2009 WL 2208570, at *17 (D.N.M. July 21, 2009).

## II. A *RELIABLE* DETERMINATION THAT SHORT-TERM PREMPRO USE INCREASES THE RISK OF BREAST CANCER REQUIRES DATA CONCERNING PREMPRO – NOT OTHER MEDICATIONS – THAT FINDS A CONSISTENT ASSOCIATION.

While Plaintiffs provide no explanation of their expert(s)' methodology and claim that epidemiological data is not required to establish causation, *see* Pls.' Opp'n at 26, their long-time experts disagree. Dr. Austin has explained that: (1) to demonstrate a causal relationship – an expert first must identify a valid epidemiologic association, for "without an association you don't have any basis for even suspecting that [Prempro] is a cause;"[1] and (2) evidence of a theoretical biological mechanism, such as Plaintiffs' "promotion" theory, has a very limited role in assessing causation and is only relevant after identifying a valid epidemiologic association.[2] Where epidemiological evidence is available, an expert may not ignore it and still render a reliable opinion under *Daubert*. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004) (excluding an expert who ignored directly relevant epidemiological data because "an expert may not 'pick and choose' from the scientific landscape"); *Norris v. Baxter*

---

[1] *Buxton v. Wyeth* Trial Tr., July 28, 2010 AM at 79:8-12 (Austin); *see also* Dep. of Donald Austin, July 1, 2010 ("Austin Dep.") at 61:22-62:2 (testifying that an expert must have advanced training in epidemiology to even offer an opinion on general causation).

[2] Austin Dep. at 130:16-131:2; Rep. of Donald Austin, May 2006 ("Austin Rep.") at 1-2.

*Healthcare Corp.*, 397 F. 3d 878, 884 (10th Cir. 2005) (excluding experts who "ignored or discounted without explanation the many epidemiological studies which found no medically reliable link"); *id.* at 882 ("While the presence of epidemiology does not necessarily end the inquiry, where epidemiology is available, it cannot be ignored.").

To establish a causal association for short-term use, Dr. Austin has testified that one must look only at studies in which women were taking Prempro, not other forms of hormone therapy that are chemically unique and affect breast cancer risk differently.[3]  Furthermore, because breast cancer risk directly depends on the duration of Prempro use, only studies that specifically assess risk at the relevant duration can provide reliable evidence of an association.  As Dr. Austin explained:  "For the same reason that it is inappropriate to look at all different formulations . . . it is also inappropriate to look at all durations and lump them together."[4]  This Court, too, has previously recognized that "exposure to a substance must exceed a certain level before it manifests a risk of adverse health effects."  *In re Prempro*, 2010 WL 3447293, at *7 (citing REF. MAN. at 475).  Thus, the numerous studies cited by Plaintiffs that involve hormone therapy formulations other than Prempro or do not assess risk specifically in women on treatment for three years or less cannot provide a valid basis to opine that taking Prempro daily increases the risk of breast cancer within three years. (*See* sects. II.B and II.C., *infra*).

**III.   PLAINTIFFS HAVE NOT PUT FORWARD A RELIABLE BASIS FOR CONCLUDING THAT DAILY PREMPRO USE FOR THREE YEARS OR LESS INCREASES THE RISK OF BREAST CANCER.**

For three reasons, Plaintiffs' brief, despite its length, does not provide any reliable basis

---

[3]  *Scroggin v. Wyeth* Trial Tr., Feb. 6, 2008 at 322:1-323:3; Dep. of Donald Austin, Mar. 13, 2007 at 186:20-188:3; *Foust v. Wyeth* Trial Tr., Jan. 28, 2010 PM at 75:6-14, 97:20-98:2 (Austin); *see also In re Prempro*, 2010 WL 3447293, at *5 (Different formulations of hormone therapies have different effects on breast cancer.).

[4]  Dep. of Donald Austin, Mar. 13, 2007 at 208:13-20.

3

for concluding that taking Prempro daily for three years or less increases the risk of breast cancer. *First*, any opinion that such short use causes breast cancer is inconsistent with the definitive results of the WHI trial. While Plaintiffs now criticize WHI – despite years of relying on the WHI results in this litigation, and even though the issues they raise do not affect the WHI results with respect to short-term use – their experts agree that it remains the most reliable evidence regarding the association between short-term use of Prempro and an increased risk of breast cancer. *Second*, Plaintiffs ignore the great weight of relevant observational studies showing no increased risk of breast cancer with short-term use, and instead cherry-pick a selective fragment of the available data that involves hormone therapy formulations other than Prempro, a methodology this Court previously has rejected as unreliable. *Third*, Plaintiffs depend on ecological studies and their "promotion" theory, which their own experts regard as insufficient to establish causation.

      **A.**    **Plaintiffs' Experts Agree That WHI Provides the Best Evidence Regarding the Effect of Short-Term Prempro Use on Breast Cancer Risk.**

Plaintiffs do not dispute that WHI showed no increased risk of breast cancer for the first three years that women took Prempro and, for women who had not used Prempro before, no increased risk for more than *six* years. Both Dr. Austin and Dr. Graham Colditz have stated repeatedly that WHI established that short-term use of Prempro does not increase the risk of breast cancer. Dr. Austin testified that for the first three to four years of treatment, women treated with Prempro actually had a lower risk of breast cancer than women treated with placebo, while Dr. Colditz published that the increased breast cancer risk did not begin until women had been using Prempro for three years.[5] Outside of litigation, both experts have offered similar analyses – including Dr. Austin's presentation to the Susan G. Komen Foundation in which he

---

[5]  Austin Dep. at 109:15-19; Fletcher & Colditz, JAMA 2002;288:366-68 at 366.

noted that risk was not increased for the first four years.[6]  Dr. Colditz testified that "[s]hort-term use is safe in terms of breast cancer."[7]

Faced with the WHI findings, Plaintiffs now criticize WHI and dispute the accuracy of its results.  That opportunistic criticism rings hollow in light of the testimony of Drs. Austin and Colditz (cited above), which Plaintiffs ignore, and their further testimony that WHI is "the gold standard study" and the "top of the heap in terms of the hierarchy of evidence or reliability."[8] WHI has long been the linchpin of Plaintiffs' experts' general causation opinions.[9]  WHI is the "gold standard" study not just because Plaintiffs' experts say so, of course, but because it was conducted by one of the world's premier health research organizations, the National Institutes of Health, and is generally accepted as providing the "best evidence for [assessing] the risks and benefits of menopausal hormone replacement therapy."[10]  To date, WHI has been cited in more than a 1,000 peer-reviewed articles and features prominently in the medical recommendations issued by premier *women's* health organizations, including the National Cancer Institute, the American Society for Reproductive Medicine, the American College of Obstetricians and Gynecologists, and the North American Menopause Society.[11]

---

[6]  *Foust v. Wyeth* Trial Tr., Jan. 28, 2010 PM at 66:5-24; Wyeth's Br., App'x, Ex. 1.

[7]  Dep. of Graham Colditz, Dec. 30, 2006 ("Colditz Dep.") at 1004:24-1005:16.

[8]  *Nelson v. Wyeth* Trial Tr., Jan. 17, 2007 at 30:2-31:1 (Colditz); *Rowatt v. Wyeth* Trial Tr., Sept. 14, 2007 at 1202:11-17 (Austin); Dep. of Graham Colditz, Dec. 18, 2006 at 277:10-17.

[9]  *See, e.g.*, MDL Master Compl., Docket No. 4:03-CV-01507 WRW, Doc. No. 81, Jan. 7, 2004, ¶ 45; Pl.'s Opp'n to Wyeth's Mot. for Summ. J., *Mittelstadt v. Wyeth*, Docket No. 4:05-CV-1547, Document No. 9, Nov. 15, 2007 at 8 (calling WHI the "biggest bombshell in the history of hormone replacement therapy"); Pl.'s Opp'n to Defs.' Mot. for Summ. J. (Statute of Limitations), *Rush v. Wyeth*, Docket No. 4:03-CV-1507-WRW, Doc. No. 61, May 9, 2006 at 1, 18–19 (describing WHI as a "landmark, paradigm-shifting" study).

[10] National Cancer Institute, Menopausal Hormone Replacement Therapy, http://www.cancer.gov/cancertopics/causes/hormontherapy/menopausal-hormone-use (last visited Nov. 22, 2010).

[11] A PubMed search for "Women's Health Initiative" identified 1,253 articles as of Nov. 21, 2010.  *See* Wyeth's Br. at 21.

Nonetheless, Plaintiffs criticize WHI as methodologically flawed for two main reasons. First, they suggest that the results are unreliable because they are based on what is called the "intention to treat" analysis, which includes all women who started the study, including those who dropped out before the study ended. *See* Pls.' Opp'n at 27-30. But Dr. Austin has admitted that the "intention to treat" analysis is "a standard for clinical trials" and "is essential for coming to a causal conclusion."[12]  Furthermore, when the WHI results were adjusted for drop-out rates, *the results did not change*:  women who took Prempro daily for three years or less were still less likely to be diagnosed with breast cancer than those taking placebo.[13]  *See* Figure 1 *infra*.



To the extent drop-out rates make a study unreliable, the observational studies on which Plaintiffs rely, such as the Million Women's Study, suffer from the same problem.

Second, Plaintiffs suggest that WHI underestimates breast cancer risk because the majority of women in the trial were older and had started Prempro a number of years after

---

[12]  Austin Dep. at 107:5-108:13.

[13]  Austin Dep. at 109:20-110:14; *Foust v. Wyeth* Trial Tr., Jan. 28, 2010 at 85:22-87:5; Pls.' Ex. 59 ("Anderson") at 8, Fig. 1.

menopause. *See* Pls.' Opp'n at 30-32. Plaintiffs argue that women who had this "gap time" between menopause and starting Prempro should be excluded from the WHI results. Pls.' Opp'n at 32 (citing Prentice 2008). Plaintiffs, however, cannot pick and choose the data from WHI until they find results that comport with their legal theories.[14] That is not reliable by any methodology. Furthermore, even if the "gap time" hypothesis were relevant or reliable, the results of that exploratory analysis say nothing about risk at three years or less. Women who took Prempro for two years were ***less likely*** to be diagnosed with breast cancer than those on placebo.[15] While risk increased at some point after two years, the *post hoc* analysis did not specify whether the increased risk occurred at three, four, or five years of use. Indeed, the exploratory "gap time" analysis is consistent with the primary WHI results, which show ***lower*** risk in the first few years of Prempro use.

It is helpful to recall that what Plaintiffs' counsel and Plaintiffs' experts have said in every bellwether trial is that the WHI Data Safety and Monitoring Board ("DSMB") – an independent committee commissioned by the WHI investigators to closely monitor the safety of the medication during the trial and protect the participants from potential risks – stopped the trial when the breast cancer numbers set off "an alarm bell." The telling fact for present purposes is that the "alarm bell" did not sound until, as both Dr. Austin and Dr. Colditz testified, after patients had been taking Prempro every day for an "average duration of 4.4 years."[16]

---

[14] *See* REF. MAN. at 166 ("If a post hoc researcher compares enough variables between two treatment groups, some of the comparisons may appear nominally statistically significant by chance alone, when in fact no difference exists, known as a 'multiple comparison' problem."); Hennekens, JAMA 2009;302:2361-2362 at 2362 ("Analyses of subgroups defined *a posteriori* from information accumulated after randomization can only formulate data-derived hypotheses and cannot provide serious evidence for hypothesis testing.").

[15] Prentice, AM. J. EPIDEMIOL. 2008;167:1207-1216 at 6.

[16] *See Rivera-Adams* Compl. at ¶ 10; *Kuhn* Compl. at ¶¶ 25, 26, 46; *Woodhouse v. Wyeth* Trial Tr., July 22, 2008 AM at 35:24-36:10, 80:1-25 (Austin); Rep. of Graham Colditz, Feb. 6, 2006 at 1; Colditz Dep. at 938:18-939:4.

**B.     Plaintiffs Ignore the Great Weight of the Relevant Epidemiological Evidence and Instead Rely on a Selective Fragment of the Available Studies.**

Plaintiffs' analysis of the observational study data also is incomplete and unreliable. They cite no reliable data establishing a valid association between short-term Prempro use and an increased risk of breast cancer: indeed, they ignore that vast majority of relevant observational studies, including *nine* studies conducted in the United States that analyzed the time-dependent risks of Prempro (or in which it was at least possible that a majority of women were taking Prempro) which found no significant increase in breast cancer risk in women taking Prempro for three years or less. *See* Wyeth's Br. at 16, Fig. 2. That kind of cherry-picking methodology is not admissible under *Daubert*. *See In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert whose opinion relied on "cherry-picking observational studies that support his conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion"); *see also In re Prempro*, 2010 WL 3447293, at *3; *Norris*, 397 F.3d at 885; *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 851 (W.D. Tex. 2005).

Instead of analyzing the totality of the observational study data, Plaintiffs rely on a selective fragment of the available studies. *See* Pls.' Opp'n at 38-46. But even the six studies Plaintiffs cite do not provide a reliable basis for their expert(s)' opinion. *First*, the majority of women in both Fournier and the Million Women Study – which the medical and scientific communities criticized for its methodological flaws – did not take Prempro.[17] Dr. Austin has testified that he would not rely on such articles "for any part of his opinion" because different

---

[17]  Pls.' Ex. 86 ("Fournier") at 5; Pls.' Ex 72 ("MWS") at 423, Fig. 5.

forms of combination hormone therapy are different and "if you are interested in [w]hat formulation was causing harm, you would have to look at that formulation."[18]

*Second*, the other four studies Plaintiffs cite (Li, Saxena, Calle, and a Wyeth clinical trial) do not find that Prempro use increases beast cancer risk when used for three years or less. The Li study did not even evaluate the risk of breast cancer in women who took Prempro for three years or less, and the Wyeth clinical trial found no statistically significant association between Prempro use and breast cancer risk.[19] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145 (1997) (rejecting reliance on non-statistically significant results). In the Saxena study, the participants cumulative exposure to Prempro was based only on their self-reported use ***prior to*** entering the study, a methodological flaw which, Dr. Colditz admits, may significantly underestimate the actual duration of Prempro use.[20] Finally, the author of the Calle study stated that his paper "suggests that after starting estrogen plus progestin, you probably have two or three years where your **risk isn't elevated**."[21] *See Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 826 (7th Cir. 2010) ("It is axiomatic that causation testimony is inadmissible if an expert relies upon studies [or] publications, the authors of which were themselves unwilling to conclude that causation had been proven.") (citing *Huss v. Gayden*, 571 F. 3d 442, 459 (5th Cir. 2009)).

---

[18] *See* note 3 *supra*. Indeed, the authors of the Fournier study actually state that their results are not generalizable to the U.S. population because of formulation differences. *See* Fournier at 2; Pls.' Ex. 49 ("Bernstein") at 5118.

[19] Pls.' Ex. 87 ("Li") at 2575; Pls.' Ex. 68 ("Ltr. to FDA") at 23 ("[T]here were no statistically significant differences in the incidence of breast cancer.").

[20] Pls.' Ex. 88 ("Saxena") at OF12; *see also* Dep. of Graham Colditz, Dec. 29, 2006 at 555:24-558:1.

[21] Doheny, Health Day, http://health.usnews.com/health-news/family-health/cancer/articles/2009/02/04/drop-in-breast-cancer-rates-due-to-drop-in-hrt-use.html (emphasis added) (last visited Nov. 21, 2010).

### C. Plaintiffs Rely On a Biological Mechanism Theory, Not Reliable Data.

Nearly a third of Plaintiffs' brief discusses a theoretical biological "promotion" mechanism, which they suggest supports the conclusion that short-term Prempro use can cause breast cancer. *See* Pls.' Opp'n at 4-14, 20-27. But neither their theory nor the ecological SEER data on which it is based are reliable evidence of causation, and they are contradicted by Plaintiffs' experts' testimony and the available scientific data. Dr. Austin has testified that *if* such a promotion effect existed, we would "start seeing the effect almost immediately" – within months.[22] But we do not see such an effect in any of the data. To the contrary, WHI shows that for the first three years, breast cancers were *less* frequent in women taking Prempro than in those taking placebo.[23] Dr. Austin also has stated that the ecological SEER data "would not, in themselves, [] constitute a sufficient basis upon which to make conclusions about causal associations" and instead only could confirm if a previously determined association were valid.[24] The SEER data give no insight into any risk of Prempro in particular, let alone at specific durations of Prempro use, and Dr. Austin testified that it would be "inappropriate" to rely solely on an analysis of the SEER data to conclude that short-term use of Prempro caused a woman's breast cancer.[25]

### CONCLUSION

For the foregoing reasons, the Court should preclude any expert testimony that Prempro use increases the risk of breast cancer when taken for three years or less.

---

[22] *See* Pls.' Opp. at 23.
[23] *See* Pls.' Ex. 58 ("Chlebowski") at 3247, Fig. 2; Anderson at 8, Fig. 1.
[24] Austin Rep. at 25; *see* Austin Dep. at 39:14-40:2.
[25] *Daniel v. Wyeth* Trial Tr., Jan. 16, 2007 PM at 25:4-26:18.

Respectfully submitted,

/s/ F. Lane Heard III
John W. Vardaman, Jr. (D.C. Bar #13391)
F. Lane Heard III (D.C. Bar #291724)

    WILLIAMS & CONNOLLY LLP
    725 12th Street, NW
    Washington, DC 20005-5901
    (202) 434-5000

Lyn P. Pruitt (Ark. Bar No. 84121)

    MITCHELL, WILLIAMS, SELIG,
    GATES & WOODYARD, PLLC
    425 West Capitol Avenue, Suite 1800
    Little Rock, AR 72201-3525
    (501) 688-8800
    *lpruitt@mwsgw.com*

Loren H. Brown

    DLA PIPER
    1251 Avenue of the Americas
    New York, NY  10020-1104
    (212) 335-4846
    Loren.brown@dlapiper.com

*Attorneys for Wyeth*

DATED: November 22, 2010

# CERTIFICATE OF SERVICE

      I hereby certify that on this 22nd day of November a true and correct copy of the foregoing Wyeth's Reply in Support of Motion to Preclude Any Expert Testimony that Prempro Use Increases Breast Cancer Risk When Taken Daily for Three Years or Less was electronically filed with the Clerk of Court using the CM/ECF system, and a true and correct copy was forwarded by e-mail to the parties listed on the attached Service List.

| | |
|---|---|
| Mr. Gary Holt<br>GARY EUBANKS & ASSOCIATES, LTD<br>708 West Second Street<br>P.O. Box 3887<br>Little Rock, Arkansas  72203-3887 | Ms. Zoe Littlepage<br>LITTLEPAGE BOOTH<br>2043A W. Main Street<br>Houston, TX  77098 |

Navan Ward , Jr
Roman A. Shaul
Ted G. Meadows
Russell T. Abney
Beasley Allen Crow Methvin Portis Miles P.C.
P. O. Box 4160
Montgomery, AL 36103
navan.ward@beasleyallen.com
roman.shaul@beasleyallen.com
ted.meadows@beasleyallen.com
russ.abney@beasleyallen.com

 

/s/     F. Lane Heard III
F. Lane Heard III

WILLIAMS & CONNOLLY LLP
725 12th Street, NW
Washington, DC 20005-5901
(202) 434-5000
*lheard@wc.com*