**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

| | | |
|---|---|---|
| **In re:** | : | |
| | : | **MDL Docket No. 4:03-cv-01507 WRW** |
| **PREMPRO PRODUCTS LIABILITY LITIGATION** | : | |
| | : | **ALL CASES** |
| | : | |

**MEMORANDUM IN SUPPORT OF WYETH'S MOTION TO EXCLUDE ANY EXPERT
TESTIMONY THAT PREMPRO CAN CAUSE LOBULAR BREAST CANCER WITH
APPROXIMATELY THREE YEARS OR LESS OF USE**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 5

I.      BACKGROUND FACTS REGARDING LOBULAR BREAST CANCER RISK
AND SHORT-TERM PREMPRO USE ................................................................. 5

      A.      Early Observational Studies Raised Questions About the Benefits and
Risks of HT ................................................................................................... 5

      B.      WHI Provides the Most Reliable Evidence to Evaluate the Time-
Dependent Risks of Prempro Use ............................................................... 5

      C.      WHI Showed No Increased Risk of Any Type of Breast Cancer in Women
Taking Prempro for Less than Four Years ................................................. 9

      D.      The Medical Community Accepted the WHI Results as Definitive,
Including the Data Showing No Increased Risk with Short-Term Prempro
Use .............................................................................................................. 10

      E.      Following WHI, the Medical Community Acknowledged the Weaknesses
of Observational Studies Involving HT ..................................................... 12

      F.      The PSC and Its Experts Also Have Accepted WHI's Findings ......... 13

      G.      WHI and a Consistent Body of Observational Studies Find No Evidence
That Short-Term Prempro Use Has a Different Effect on Lobular Breast
Cancer ........................................................................................................ 14

      H.      WHI and a Consistent Body of Observational Studies Provide No
Evidence That Short-Term Prempro Use Increases the Risk of Lobular
Breast Cancer. ........................................................................................... 16

II.      THE PSC'S EXPERTS ....................................................................................... 17

      A.      PSC Expert Background ............................................................................. 17

      B.      Undisputed Methodology ............................................................................ 23

      C.      The PSC's Experts' Analysis ..................................................................... 33

LEGAL ARGUMENT ......................................................................................... 43

I.      MANY OF THE PSC'S EXPERTS ARE UNQUALIFIED TO OFFER THE
CAUSATION OPINIONS THEY HAVE PUT FORTH HERE ..................................... 43

      A.      Dr. Beron Is Not Qualified to Testify About General Causation, and His
Opinions Are Cumulative. ........................................................................ 44

      B.      Dr. Michaels Is Not Qualified to Testify About General Causation .......... 45

      C.      Dr. Naftalis Is Not Qualified to Testify About General Causation ............ 46

II.      THE COURT SHOULD EXCLUDE ANY OPINION THAT PREMPRO
CAUSES LOBULAR BREAST CANCER WHEN TAKEN DAILY FOR
APPROXIMATELY THREE YEARS OR LESS ........................................................ 46

# TABLE OF CONTENTS

A.  The PSC's Experts Improperly Dismiss the "Gold Standard" Evidence from the WHI Clinical Trial ................................................................. 49

B.  The PSC's Experts Rely Almost Exclusively on a Collection of Epidemiologic Studies that Do Not Address the Relevant Causation Issue at Hand ......................................................................................................... 56

C.  Neither Chen 2002 Nor Calle 2009 Provide Reliable Evidence that Short-Term Prempro Use Is Capable of Causing Lobular Breast Cancer .................... 61

D.  The PSC's Experts Ignored and Dismissed Contrary Data in Reaching Their Causation Opinion .................................................................................. 68

E.  Studies Suggesting the Presence of a Biologically Plausible Mechanism Are Not a Reliable Basis to Establish Causation ................................................. 69

III.  THE PSC'S EXPERTS HAVE FAILED TO IDENTIFY ANY EPIDEMIOLOGIC STUDIES SHOWING THAT PREMPRO USE FOR TWO YEARS OR LESS INCREASES LOBULAR BREAST CANCER RISK .................... 71

CONCLUSION .................................................................................................................. 72

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Alexander v. Smith & Nephew, P.L.C.*,
　98 F. Supp. 2d 1310 (N.D. Okla. 2000)................................................................43

*Barber v. United Airlines, Inc.*,
　17 F. App'x 433 (7th Cir. 2001) ..........................................................................69

*Barrett v. Rhodia, Inc.*,
　606 F.3d 975 (8th Cir. 2010) ..........................................................................43, 44

*Daubert v. Merrell Dow Pharms., Inc.*,
　509 U.S. 579 (1993)....................................................................................... passim

*Fireman's Fund Ins. Co. v. Canon USA, Inc.*,
　394 F.3d 1054 (8th Cir. 2005) ....................................................................... passim

*Gen. Elec. Co. v. Joiner*,
　522 U.S. 136 (1997)..............................................................................63, 64, 67

*Gibson v. Mohawk Rubber Co.*,
　695 F.2d 1093 (8th Cir. 1982) ..............................................................................44

*Glastetter v. Novartis Pharms. Corp.*,
　252 F.3d 986 (8th Cir. 2001) ................................................................................59

*Haller v. AstraZeneca Pharms. LP*,
　598 F. Supp. 2d 1271 (M.D. Fla. 2009)................................................................43

*Happel v. Walmart Stores, Inc.*,
　602 F.3d 820 (7th Cir. 2010) ................................................................................67

*Huss v. Gayden*,
　571 F. 3d 442 (5th Cir. 2009) ...............................................................................67

*In re Prempro Prods. Liab. Litig.*,
　514 F.3d 825 (8th Cir. 2008) ................................................................................62

*In re Prempro Prods. Liab. Litig.*,
　738 F. Supp. 2d 887 (E.D. Ark. 2010)....................................................12, 48, 59

*In re Prempro Prods. Liab. Litig.*,
　765 F. Supp. 2d 1113 (W.D. Ark. 2011)....................................................... passim

*In re Viagra Prods. Liab. Lit.*,
　658 F. Supp. 2d 950 (D. Minn. 2009)............................................43, 44, 45, 46

*Junk v. Terminix Int'l Co.*,
 628 F.3d 439 (8th Cir. 2010) ...................................................................59, 60, 69

*Lust v. Merrell Dow Pharms., Inc.*,
 89 F.3d 594 (9th Cir. 1996) ...............................................................................68

*Norris v. Baxter Healthcare Corp.*,
 397 F.3d 878 (10th Cir. 2005) ............................................................................69

*Scroggin v. Wyeth*,
 586 F.3d 547 (8th Cir. 2009) .................................................................7, 13, 40

*Sutera v. Perrier Grp. of Am. Inc.*,
 986 F. Supp. 655 (D. Mass. 1997) ..........................................................43, 33, 45, 46

*Thorndike v. DaimlerChrysler Corp.*,
 266 F. Supp. 2d 172 (D. Me. 2003) ....................................................................45

*Tran v. Toyota Motor Corp.*,
 420 F.3d 1310 (11th Cir. 2005) ..........................................................................45

*Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*,
 254 F.3d 706 (8th Cir. 2001) .........................................................................43, 45


**STATUTES**

Fed. R. Evid. Rule 403...............................................................................................44, 45

Fed. R. Evid. Rule 702.........................................................................................44, 45, 46


**OTHER AUTHORITIES**

Federal Judicial Center, *Reference Manual on Scientific Evidenc*e  (3d ed. 2011) .............. passim

## PRELIMINARY STATEMENT

If the Court gets a déjà-vu feeling reading this brief, it is with good reason.  This time last year, the Court considered Wyeth's motion to exclude any testimony that Prempro use for about three years or less causes breast cancer.  After extensive briefing and two *Daubert* hearings, including nearly seven hours of live testimony from PSC expert Dr. Donald Austin, the Court granted Wyeth's motion.

The Court's analysis of the relevant scientific evidence, summarized in its 21-page Order, was comprehensive and exhaustive.  Consistent with the generally accepted position of the scientific community, the Court found that WHI is "the most significant and reliable study for considering the risk of breast cancer from Prempro."  *In re Prempro Prods. Liab. Litig.*, 765 F. Supp. 2d 1113, 1118 (W.D. Ark. 2011).  Despite Dr. Austin's attempts to criticize the WHI data, which he had relied on before Wyeth raised its short-term challenge, the Court further concluded that WHI provides "overwhelmingly reliable evidence" regarding the short-term risks of Prempro use.  *Id*. at 1119.  As the Court observed, WHI provides no evidence that short-term Prempro use increases the risk of any type of breast cancer.  The Court went on to conclude that neither the observational studies nor the "biological plausibility" theory relied on by Dr. Austin provide reliable evidence that short-term Prempro use can cause breast cancer.  *Id*. at 1126.

Based on the facts of the bellwether cases, the Court limited the scope of its Order to ductal breast cancer, observing that "there ***may be*** causation differences between lobular and ductal cancer."  *Id*. at 1115.  PSC counsel now embrace this distinction, going so far as attempting to reclassify breast cancers from ductal to lobular in their remand cases.[1]  But, during

---

[1]   For example, in *Scharff v. Wyeth*, the plaintiff took Prempro for approximately 15 months before being diagnosed with "ductal carcinoma" (*i.e.*, ductal breast cancer).  Expert Rep. of James Waldron, M.D., Ph.D., *Scharff v. Wyeth*, March 15, 2011 at ¶ 9 ("Waldron Rep.") (attached as Ex. 1); Medical Record, Kscharff-GRMC-MD-000095-96 (attached as Ex. 2).

the first short-term use proceeding, neither Dr. Austin nor PSC counsel suggested that lobular breast cancer should be treated separately for purposes of evaluating the short-term risks of Prempro.

So, here we are a year later once again addressing short-term use.  This time around, instead of one expert, the PSC has produced cloned arguments from seven (originally there were eight, until the PSC withdrew Dr. Graham Colditz), many of whom lack any expertise relevant to the causation issues here.  Instead of five observational studies, the PSC's experts now cite twenty-six.  Despite the barrage of new experts and studies, nothing has really changed.

***The Scientific Evidence Is Still the Same***.  The best and most reliable evidence regarding the relationship between short-term Prempro use and breast cancer risk still comes from WHI. WHI still shows no evidence that Prempro use for about three years or less increases the risk of any type of breast cancer, including lobular.  In fact, the WHI authors specifically state that they found "no evidence of a differential effect" in comparing ductal to lobular breast cancer.[2]

The observational data are consistent with WHI.  None of the observational studies found evidence that short-term Prempro use has a different effect on the risk of lobular compared to ductal breast cancer.  In fact, the PSC's own experts are not convinced that there is a meaningful difference.  At their recent depositions, Dr. Gadi testified that "lobular isn't terribly different

---

The PSC's pathologist, Dr. James Waldron, later reclassified the tumor as "tubulolobular carcinoma."  Waldron Rep. at ¶9.  When Wyeth requested the opportunity to test the tumor, Dr. Waldron claimed that he mailed the sample via FedEx, but the package was never received.  Expert Rep. of Mark Wick, M.D., *Scharff v. Wyeth*, Apr. 29, 2011 at 5 (attached as Ex. 3); Aff. of James Waldron, May 27, 2011 at ¶ 4 (attached as Ex. 4).  Dr. Waldron provided a FedEx reference number, but FedEx has no record of the shipment.  Dep. of James Waldron, M.D., Ph.D., *Scharff v. Wyeth*, April 18, 2011 at 12:9-19 (excerpts attached as Ex. 5); FedEx shipping label, Ex. 11 to Dep. of James Waldron (attached as Ex. 6).

[2]   Chlebowski et al., JAMA 2003;289:3243-52 ("Chlebowski 2003") at 3251 (attached as Ex. 7).

than ductal,"[3] and Dr. Ozer stated that he was "unimpressed by the distinction between ductal and lobular."[4]

Four out of six studies that specifically evaluated short-term use of Prempro and lobular breast cancer did not find evidence of an increased risk.  The two observational studies that did report a statistically significant difference have numerous methodological problems that are relevant to the short-term use issue here, including a very small sample size, incomplete assessment of exposure, and uncontrolled confounding and bias.

*The PSC's Experts' Unreliable Causation Methodology Is the Same*.  Despite a new regime of experts, the methodologic problems are the same.  The PSC's experts still try to discredit the "unfavorabl[e]" data from WHI.  *In re Prempro*, 765 F. Supp. 2d at 1117.  And they still rely on a cherry-picked collection of observational studies that do not reliably address Prempro and the relevant scientific issues.  Of the 26 epidemiologic studies cited by the PSC's experts, 24 do not evaluate the relationship between Prempro use for three years or less and lobular breast cancer risk; 17 of the studies do not evaluate lobular breast cancer at all.  Of the remaining nine, seven involve other hormone therapy formulations or do not reliably evaluate breast cancer risk at the relevant duration of use.  In fact, the only studies that report a statistically significant difference related to short-term use of Prempro and lobular breast cancer are two that were rejected as unreliable in the previous short-term use proceeding—Chen 2002 was rejected by Dr. Austin himself[5] and Calle 2009 was rejected by the Court.[6]  At the same

---

[3]   Dep. of Vijayakrishna K. Gadi, M.D., Nov. 1, 2011 ("Gadi Nov. 2011 Dep.") at 95:2-9 (attached as Ex. 8).

[4]   Dep. of Howard Ozer, M.D., Nov. 7, 2011 ("Ozer Nov. 2011 Dep.") at 213:15-214:2 (attached as Ex. 9).

[5]   *See* Decl. of Dr. Donald Austin, Nov. 28, 2010 at 2-3 ("Austin Nov. 28, 2010 Decl.") (attached as Ex. 10); MDL *Daubert* Hr'g Tr., Jan. 12, 2011 at 94:8-20 ("MDL *Daubert* Hr'g Tr.") (attached as Ex. 11).

time, the PSC's experts ignore all four observational studies that evaluate the relevant question and did not find a statistically significant increased risk.

**The Only Change Is Dr. Austin's Testimony**.  Perhaps the only thing that has changed is Dr. Austin's testimony.  Dr. Austin previously testified that the Chen 2002 study did not reliably evaluate the relationship between short-term Prempro use and the risk of breast cancer.  When asked at the *Daubert* hearing whether the study satisfied his reliability criteria, Dr. Austin stated "Well, I thought it did not."[7]  That was Dr. Austin's opinion when the focus of the hearing was on ductal breast cancer, and the Chen 2002 study did not support his causation opinion.  Now that the focus is on lobular breast cancer, and the Chen study reports a statistically significant result for that type of breast cancer, the Chen 2002 study has become a pillar of his opinion.

Last year, Dr Austin also claimed that the original publication of the Million Women Study (Beral 2003) provides strong evidence that short-term Prempro use can cause breast cancer.  This Court observed that "Dr. Austin relied most on the MWS to support his opinion regarding a causal relationship between Prempro and short-term use."  *In re Prempro*, 765 F. Supp. 2d at 1122.  Dr. Austin now admits that the study *does not inform the question* of whether short-term Prempro use is capable of causing any type of breast cancer.[8]  Similarly, although Dr. Austin relied on the French Teachers Study for his prior short-term use opinion, he now admits that the study was "not very good" for assessing the effects of Prempro use.[9]

---

[6]   *See In re Prempro*, 765 F. Supp. 2d at 1123 ("Yet, the study proves unreliable for analyzing short-term Prempro use.").

[7]   MDL *Daubert* Hr'g Tr. at 94:18-20.

[8]   Dep. of Donald Austin, M.D., M.P.H., Nov. 7, 2011 ("Austin Nov. 2011 Dep.") at 248:19-250:2; 253:5-9 (attached as Ex. 12).

[9]   *Id*. at 35:16-22, 39:10-14.

In sum, with the exception of Dr. Austin's testimony, not much else has changed since the last time this Court had a *Daubert* proceeding related to short-term use.  The PSC's experts still fail to come forward with any reliable evidence demonstrating that short-term Prempro use can cause any type of breast cancer, including lobular breast cancer.  For the same reasons that this Court rejected Dr. Austin's methods in the previous short-term use proceeding, the Court should reject the PSC's experts' cloned methods in this second proceeding.

## STATEMENT OF FACTS

I.    **BACKGROUND FACTS REGARDING LOBULAR BREAST CANCER RISK AND SHORT-TERM PREMPRO USE.**

A.    **Early Observational Studies Raised Questions About the Benefits and Risks of HT.**

In the early 1990s, the medical community raised questions about certain benefits and risks of HT medications.  The primary source of data came from observational studies, most of which showed that hormone therapy medications lowered the risk of heart attacks and strokes.  Some observational studies also suggested that many years of continuous use may increase the risk of breast cancer.

B.    **WHI Provides the Most Reliable Evidence to Evaluate the Time-Dependent Risks of Prempro Use.**

In 1991, the National Institutes of Health commenced a randomized controlled trial ("RCT")—the Women's Health Initiative ("WHI")—to answer some of the questions about the risks and benefits of Wyeth's HT medications.[10]  RCTs such as WHI are considered to be the "gold standard" of scientific evidence.  *See* Federal Judicial Center, *Reference Manual on*

---

[10]    NIH, *Questions and Answers About Estrogen-Plus-Progestin Hormone Therapy*; NIH, http://nhlbi.nih.gov/health/women/q_a.htm (last visited Dec. 21, 2011) ("NIH Q & A Website") (attached as Ex. 13).

*Scientific Evidenc*e 555 (3d ed. 2011) ("Ref. Man."). As PSC's expert Dr. Ozer testified, "the only way to establish cause and effect is in a clinical trial, a randomized clinical trial."[11]

WHI is the largest clinical trial ever conducted to evaluate Prempro and women's health issues.[12] The Prempro trial studied more than 16,000 women for more than five years.[13] Plaintiff's own experts concede that WHI was designed, in part, to quantify the relationship between exposure to Prempro and the occurrence of breast cancer.[14]

Because WHI investigators closely monitored the amount of Prempro dispensed to patients and ensured that breast cancer screening was performed at regular intervals, WHI provides very precise estimates of breast cancer risk in relation to the amount of Prempro taken over time.[15] During the trial, investigators met regularly with study participants to ensure that Prempro was being taken according to the study protocol and to identify any adverse events, including breast cancer. Study participants were required to bring their pill bottles to those meetings so that investigators could determine exactly how much medication was being taken by each participant.[16] Furthermore, all participants were carefully screened for breast cancer with annual mammograms and breast examinations.[17] The PSC's own experts acknowledge that these

---

[11]  Ozer Nov. 2011 Dep. at 119:13-120:2.

[12]  Dep. of Graham Colditz, Dec. 18, 2006 ("Colditz Dec. 18, 2006 Dep.") at 276:21-277:17 (excerpts attached as Ex. 14).

[13]  Chlebowski 2003 at 3243.

[14]  Gadi Nov. 2011 Dep. at 39:18-40:8, 169:3-10; Dep. of Peter Gann, M.D., Sc.D., Oct. 28, 2011 ("Gann Oct. 2011 Dep.") at 270:14-17 (attached as Ex. 15); Colditz Dec. 18, 2006 Dep. at 277:19-278:20.

[15]  MDL *Daubert* Hr'g Tr. at 141:21-144:21.

[16]  Gadi Nov. 2011 Dep. at 41:12-42:21.

[17]  *Id.* at 42:22-43:11; Gann Oct. 2011 Dep. at 279:5-16; Austin Nov. 2011 Dep. at 178:5-178:16.

methods were "orders of magnitude more careful than most clinical trials"[18] and a "superior method for ascertaining exposure."[19]

As a result of the methods used to measure each patient's actual exposure to Prempro and the timing of adverse events, Dr. Austin admitted at the previous short-term use hearing that WHI researchers could do duration-related analyses that could not be done in observational studies:

> Q: And because the investigators in WHI carefully monitored patients' exposure to the study medication as well as the dates of diagnosis of breast cancer, they were able to do many analyses that one usually can't do in an observational study; is that right?
>
> A: That's true.[20]

These analyses include the creation of time-to-event curves that researchers rely on to evaluate the relationship between a particular duration of use and the occurrence of a particular adverse event.  Here is one example, which comes from the WHI publication that Dr. Austin relied on in *Scroggin* and the Eighth Circuit referenced in its *Scroggin* decision:[21]

---

[18]   Gadi Nov. 2011 Dep. at 43:18-45:11, 36:2-37:16.

[19]   Gann Oct. 2011 Dep. at 274:6-13.

[20]   MDL *Daubert* Hr'g Tr. at 142:25-143:5.

[21]   *See* Anderson et al., MATURITAS 2006;55-103 at 110 ("Anderson 2006") (attached as Ex. 16); *Scroggin v. Wyeth*, 586 F.3d 547, 561 (8th Cir. 2009).

**Figure 1**



In contrast to WHI, the majority of HT observational studies rely on data collected from large clinical or administrative databases and questionnaires.[22]   Frequently, these databases contain incomplete or even inaccurate data.[23]   Self-reported information from infrequent retrospective questionnaires is far less reliable than real-time information collected by doctors during a clinical trial.[24]   This is especially true of information regarding a patient's medication history, the accuracy of which often depends on a recollection of usage that took place years earlier and that can be influenced by whether or not the patient has been diagnosed with breast cancer.[25]   In addition, observational studies are not randomized like RCTs and therefore are

---

[22]   Gadi Nov. 2011 Dep. at 103:15-19; Ozer Nov. 2011 Dep. at 61:11-62:7, 76:14-77:1; Gann Oct. 2011 Dep. at 256:19-257:8.

[23]   *See* Stephen B. Hulley et al., *Designing Clinical Research* 195 (3d ed. 2007) (attached as Ex. 17); Gann Oct. 2011 Dep. at 273:6-13.

[24]   Gann Oct. 2011 Dep. at 271:5-272:2, 273:1-13; MDL *Daubert* Hr'g Tr. at 194:12-22; Ozer Nov. 2011 Dep. at 221:20-222:11.

[25]   Ozer Nov. 2011 Dep. at 39:24-40:11 ("[I]ndividuals will tend to remember things that they want to remember and tend to forget things that they don't."); Gann Oct. 2011 Dep. at 165:4-166:5, 143:19-145:1 (testifying that women who have breast cancer are more likely to recall having taken HT); Gadi Nov. 2011 Dep. at 64:3-16. ([T]here's going to be some bias

fraught with biases and confounding, which can affect the results.[26]   Because observational studies do not monitor patients as closely as clinical trials and do not randomize their subjects, WHI provides much more reliable data on the duration of exposure prior to a breast cancer diagnosis. [27]

### C.    WHI Showed No Increased Risk of Any Type of Breast Cancer in Women Taking Prempro for Less than Four Years.

The WHI results surprised many in the medical community because they contradicted observational data suggesting that Prempro reduces cardiovascular risk.[28]  WHI also showed that women taking Prempro had a slightly higher risk of being diagnosed with breast cancer, but only after taking Prempro every day for an average duration of 4.4 years.[29]   It is undisputed that women who took Prempro for slightly more than three years actually had *lower rates* of breast cancer than those receiving placebo.[30]

Following the release of these initial study results, the FDA asked Dr. Garnet Anderson, a principal investigator on WHI, to conduct an additional analysis of breast cancer risk in women who had used HT prior to their participation in WHI and those who had not.[31]   The FDA was "interested in the effects of the total duration of exposure."[32]

---

depending on how much she wants to deny or attribute that drug to that outcome.");  Austin Nov. 2011 Dep. at 269:19-270:23.

[26]   Gadi Nov. 2011 Dep. at 33:22-34:4; Austin Nov. 2011 Dep. at 147:3-147:25.

[27]   Gadi Nov. 2011 Dep. at 33:22-34:4; Gann Oct. 2011 Dep. at 270:18-271:4; Austin Nov. 2011 Dep. at 146:23-147:2, 182:25-183:5, 183:19-184:8.

[28]   Piantadosi, EPIDEMIOL. 2003;14:6-7 at 6 ("Piantadosi 2003") (attached as Ex. 18).

[29]   Trial Tr., *Woods v. Wyeth*, July 22, 2008 at 80:1-19 (excerpts attached as Ex. 19); Ozer Nov. 2011 Dep. at 148:4-10.

[30]   Dep. of Donald Austin, M.D., M.P.H., July 1, 2011 at 109:15-19 (excerpts attached as Ex. 20).

[31]   Dep. of Dr. Garnet Anderson, Oct. 27, 2005 at 15:7-21 (excerpts attached as Ex. 21).

[32]   *Id.*

Dr. Anderson's analysis confirmed that there is no evidence that taking Prempro every day for up to five years increased breast cancer risk.[33]  Indeed, in women with no prior use, the relative risk of breast cancer with an average of 4.4 years of use during the study was a non-significant 1.02.[34]  In addition, Dr. Anderson's analysis confirmed that the breast cancer rates actually were lower in the group of women who took Prempro for three to four years.[35]  Based on these results, she and the other authors found that "durations only slightly *longer* than those in the WHI trial are associated with increased risk of breast cancer."[36]

> **D.    The Medical Community Accepted the WHI Results as Definitive, Including the Data Showing No Increased Risk with Short-Term Prempro Use.**

The medical community endorsed the WHI results and agreed that Prempro does not increase breast cancer risk when taken for approximately three to four years.  To date, WHI has been cited in nearly 2,000 peer-reviewed articles and featured prominently in the medical recommendations issued by premier women's health organizations.[37]  The American College of Obstetricians and Gynecologists—the organization of doctors who most often prescribe Prempro—states:  "Hormone replacement therapy . . . continues to be appropriate for short-term

---

[33]   Anderson 2006 at 110; Austin Nov. 2011 Dep. at 191:7-12, 211:12-24.

[34]   Anderson 2006 at 106.

[35]   Trial Tr., *Woods v. Wyeth*, July 22, 2008 at 111:6-113:11; Anderson 2006 at 110; Austin Nov. 2011 Dep. at 191:7-12, 211:12-24.

[36]   Anderson 2006 at 104 (emphasis added).

[37]   A PubMed search for "Women's Health Initiative" identified 1,817 articles as of Dec. 21, 2011.

use without an apparent increase in risk of breast cancer for up to 4 years."[38]   Other prominent

organizations agree:

- <u>National Institutes of Health</u>: "There was no difference in the development of breast cancer during the first 4 years between women taking estrogen plus progestin and those taking placebo pills";[39]

- <u>American Society for Reproductive Medicine</u>: "[T]he risk of invasive breast cancer in any individual taking combined HT is 0.08% (less than 1%) per year, and the risk did not appear until after 4 years of use";[40]

- <u>National Cancer Institute</u>: "Short-term use of hormones for treatment of menopausal symptoms appears to confer little or no breast cancer risk";[41] and

- <u>North American Menopause Society</u>: "[S]horter term use of [HT] during perimenopause to relieve hot flashes and other menopause-related symptoms does not appear to increase breast cancer risk."[42]

Moreover, as this Court observed, "the Food and Drug Administration has accepted the WHI

results regarding short-term use."   *In re Prempro*, 765 F. Supp. 2d at 1118 (citing Prempro

Label).

      With respect to short-term use, none of these authoritative statements distinguish ductal

from lobular breast cancer.

---

[38]   Boston University School of Medicine, ACOG Statement of WHI Report, http://www.bumc.bu.edu/sexualmedicine/physicianinformation/acog-statement-of-whi-report/ (last visited Dec. 21, 2011) (attached as Ex. 22).

[39]   NIH Q & A Website.

[40]   American Society for Reproductive Medicine, ASRM Comments to Help Guide Physicians on Hormone Therapy and the Women's Health Initiative, http://www.smru.org/news/article.aspx?id=393 (last visited Dec. 21, 2011) (attached as Ex. 23).

[41]   National Cancer Institute, http://www.cancer.gov/cancertopics/pdq/genetics/breast-and-ovarian/HealthProfessional (last visited Dec. 21, 2011) (attached as Ex. 24).

[42]   North American Menopause Society, *Menopause Guidebook* 55 (2006), http://www.menopause.org/Portals/0/Content/PDF/MG4.pdf (last visited Dec. 21, 2011) (attached as Ex. 25).

**E.     Following WHI, the Medical Community Acknowledged the Weaknesses of Observational Studies Involving HT.**

The medical community recognized that observational data were not as reliable as data from WHI.  Drug safety experts and other leaders in the field stated that "[t]he WHI result requires that researchers and clinicians rethink their optimism about the lack of bias in observational inferences about treatment . . . . Observational studies are efficient and necessary, but they will sometimes prove unreliable."[43]  Dr. Kathleen Pritchard, a PSC expert in other pending *Daubert* proceedings, wrote an editorial entitled, "Should Observational Studies Be a Thing of the Past?," in which she noted that, in the context of HT and breast cancer, "observational data clearly have the potential to mislead us."[44]  The *New England Journal of Medicine* reported that "observational [] studies . . . have tremendous value for the generation of hypotheses but should not be used to justify broad-based pharmacologic interventions."[45]  Plaintiffs' expert in the first two MDL bellwether trials, David Sackett (whom plaintiffs described as the "father" of evidence-based medicine), echoed the same sentiment:  "[W]hen we talk about the hierarchy of evidence, the Women's Health Initiative trial trumps the observational studies."[46]

Accordingly, this Court recognized that RCTs, and specifically WHI, "are the 'best way to ensure that any observed difference between the two groups in an outcome is likely to be the result of exposure to the drug or medical treatment.'"  *In re Prempro*, 765 F. Supp. 2d at 1117-18; *In re Prempro Prods. Liab. Litig.*, 738 F. Supp. 2d 887, 891 (E.D. Ark. 2010).

---

[43]   Piantadosi 2003 at 6; *see also* Herrington & Howard, N. ENGL. J. MED. 2003;349:519-21 at 519 ("Herrington 2003") (attached as Ex. 26); Trial Tr. *Reeves v. Wyeth*, Aug. 29, 2006 at 1457:4-1458:6 (excerpts attached as Ex. 27).

[44]   Pritchard, J. NAT. CANCER INST. 2008;100(7):451-452 at 452 (attached as Ex. 28).

[45]   Herrington 2003 at 519.

F.      **The PSC and Its Experts Also Have Accepted WHI's Findings.**

The PSC and its experts have long relied on WHI data, describing the study as the "gold standard," the "mother of all clinical trials," "one of the most definitive, far reaching clinical trials of women's health ever undertaken," and "trump[ing] any observational studies."   *In re Prempro*, 765 F. Supp. 2d at 1116-17 (internal citations omitted).   The PSC's experts have told courts, including the Eighth Circuit in *Scroggin*, that Dr. Anderson's WHI analysis provides the best estimate of the relationship between Prempro and the risk of breast cancer.[47]

Outside of litigation, the PSC's experts also have relied on WHI's findings.   In 2008, Dr. Austin presented a comprehensive analysis of the data to the Susan G. Komen Breast Cancer Foundation.   Relying on WHI—without any criticisms of its methods or findings—Dr. Austin's analysis showed no evidence of an increased breast cancer risk until after women had been taking Prempro every day for approximately four years:[48]

---

[46]   Trial Tr. *Reeves v. Wyeth*, Aug. 29, 2006 at 1456:14-1457:2.

[47]   *Scroggin*, 586 F.3d at 561.

[48]   Trial Test. of Dr. Donald Austin, *Rivera Adams v. Wyeth*, Dec. 10, 2010 at 63:1-65:5 ("Austin *Rivera* Test.") (attached as Ex. 29); Susan G. Komen Presentation (attached as Ex. 30).

**Figure 2**



In his analysis of short-term risk, Dr. Austin did not make any distinction between ductal and lobular breast cancer.

> **G.    WHI and a Consistent Body of Observational Studies Find No Evidence That Short-Term Prempro Use Has a Different Effect on Lobular Breast Cancer.**

After studying more than 16,000 women for more than five years, WHI showed no difference in risk between ductal and lobular breast cancers.  WHI found that the risk of being diagnosed with lobular breast cancer was nearly identical to the risk of developing ductal breast cancer:  lobular (HR 1.31, CI 0.69-2.49), ductal (HR 1.27, CI 0.99-1.64).[49]  WHI researchers reported "*no evidence of a differential effect*" on lobular versus ductal breast cancers, adding that the "percentages and distribution of invasive ductal, invasive lobular, mixed ductal, and lobular

---

[49]    *See* Chlebowski 2003 at 3250, Tbl. 4; Expert Rep. of Kurt T. Barnhart, M.D., M.S.C.E, Dec. 21, 2011 ("Barnhart Rep.") at 8-9 (attached as Ex. 31).

as well as tubular carcinomas were similar in the estrogen plus progestin group vs. the placebo group."[50]

Consistent with WHI, none of the observational studies that analyze short-term Prempro use and compared the risks of ductal versus lobular breast cancer find a significant difference in risk.[51]  The six studies that analyze this issue are summarized below:

**Table 1**

| Study | Evidence of Greater Effect on Lobular with Short-Term Use? |
|---|---|
| Ursin 2002 | NO |
| Li 2003 | NO |
| Brinton 2008 | NO |
| Li 2008 | NO |
| Chen 2002 | NO |
| Calle 2009 | NO |

When comparing the risks among participants who used Prempro for three to five years, these studies report "little difference in hormone associations for ductal versus lobular tumors."[52]

---

[50]   Chlebowski 2003 at 3248, 3251 (emphasis added).

[51]   Ursin et al., J. CLIN. ONCOL. 2002;20:699-706 ("Ursin 2002") at 702 (attached as Ex. 32); Li et al., JAMA 2003;289:3254-63 ("Li 2003") at 3260 (attached as Ex. 33); Brinton et al., CANCER EPIDEMIOL. BIOMARKERS PREV. 2008;17:3150-60 ("Brinton 2008") at 3159 (attached as Ex. 34); Li et al., EPIDEMIOL. BIOMARKERS 2008;17:43-50 ("Li 2008") at 46 (attached as Ex. 35); Chen et al., JAMA 2002;287:734-41 ("Chen 2002") at 739 (attached as Ex. 36); Calle et al., CANCER 2009;115:936-45 at 942 (attached as Ex. 37).  Dr. Austin admitted that there was no difference in risk between lobular and ductal in Calle.  Austin Nov. 2011 Dep. at 241:25-242:25.

[52]   Brinton 2008 at 3159.

**H.      WHI and a Consistent Body of Observational Studies Provide No
         Evidence That Short-Term Prempro Use Increases the Risk of
         Lobular Breast Cancer.**

As discussed above, WHI did not find any evidence of an increased risk of any type of

breast cancer, whether ductal or lobular, in women who took Prempro for about three years or

less.  Consistent with the WHI results, four of the six observational studies that examine the risk

of lobular breast cancer with short-term Prempro use show no increased risk in women who took

Prempro at three years, and none show an increased risk of lobular cancer at two years:[53]

**Table 2**

| Study | Evidence of Increased Risk at 3 years or less? | Evidence of Increased Risk at 2 years or less? |
|---|---|---|
| Ursin 2002 | NO | NO |
| Li 2003 | NO | NO |
| Brinton 2008 | NO | NO |
| Li 2008 | NO | NO |
| Chen 2002 | Possible | N/A |
| Calle 2009 | Possible | NO |

The only two observational studies reporting a possible increased risk of lobular breast

cancer with Prempro use at three years are Calle (2009) and Chen (2002).  This Court already

found that Calle (2009) does not reliably evaluate the effects of short-term Prempro use.  *In re

Prempro*, 765 F. Supp. 2d at 1123.  With regard to the Chen 2002 study, Dr. Austin himself

rejected this study in the first short-term use proceeding and said that it is "not suitable for

---

[53]   Ursin 2002 at 701, Tbl. 2; Li 2003 at 3260, Tbl. 3; Brinton 2008 at 3157, Tbl. 5; Li 2008 at
       47, Tbl. 2; *see also* Barnhart Rep. at 12-15.

assessing short term use."[54]   As explained further below, these studies are equally unreliable in the current proceeding.[55]

## II.   THE PSC'S EXPERTS

The PSC designated seven experts:   (1) Dr. Donald Austin; (2) Dr. Phillip Beron; (3) Dr. Vijayakrishna Gadi; (4) Dr. Peter Gann; (5) Dr. Paul Michaels; (6) Dr. Elizabeth Naftalis; and (7) Dr. Howard Ozer.  The PSC also designated Dr. Graham Colditz, but withdrew him after again failing to make him available for deposition.   All seven experts offer the same recycled opinions.  They offer the same criticisms of WHI, selectively cite certain observational studies, ignore other observational studies, and put forward the same biological plausibility theories.

### A.   PSC Expert Background

#### 1.   Dr. Donald Austin (Epidemiologist)

Dr. Donald Austin is an epidemiologist, though he never has been a researcher in a RCT that was designed to evaluate the risks or benefits of a medication.[56]   He has not treated patients in more than 40 years.[57]   While he offers biological plausibility opinions, Dr. Austin concedes that he is not an expert in cell biology, that he has not studied the subject since graduate school, and that he does not know the mechanisms by which a cell becomes cancer.[58]

---

[54]   Austin Nov. 28, 2010 Decl. at 2-3.

[55]   *Infra* at Argument § II.C.

[56]   Austin *Rivera* Test. at 10:6-7, 59:22-25.

[57]   Austin Nov. 2011 Dep. at 101:20-23.

[58]   Trial Test. of Dr. Donald Austin, *Foust* v. *Wyeth*, Jan. 28, 2010 AM at 25:12-26:5 (excerpts attached as Ex. 38); Austin *Rivera* Test. at 17:5-25; Trial Test. of Dr. Donald Austin, *Rowatt* v. *Wyeth*, Sept. 14, 2007 at 1237:23-1238:17 (excerpts attached as Ex. 39); Trial Test. of Dr. Donald Austin, *Deutsch v. Wyeth,*, June 14, 2007 at 52:23-53:1 (excerpts attached as Ex. 40).

## 2.   Dr. Phillip Beron (Radiation Oncologist)

Dr. Beron is a radiation oncologist.[59]  While Dr. Beron markets himself on expert-for-hire websites as an expert in numerous fields (*e.g.*, asbestos, brain cancer, breast cancer), he admits that he is an only an expert in these fields to the extent they "pertain[] to the field of radiation oncology."[60]  He concedes that his expert report and opinions have nothing to do with radiation oncology, admitting that "the topic is not a radiation oncology topic" and that the studies he relies on "are not radiation oncology studies."[61]

Dr. Beron has no training in epidemiology or biostatistics.[62]  He cannot describe the difference between an "association" and "causation," and admits that he has no expertise determining whether an observed association is a cause-and-effect relationship:

> Q.   How does one go about determining whether an association is, in fact, a causal relationship?
>
> A.   I'm not an expert on how one goes about determining that, so I won't necessarily be opining on that.
>
> Q.   How would you do it?
>
> A.   I don't do it.  I'm not doing that as a living. I let—I let the experts take care of that in that exact instance.[63]

Dr. Beron also cannot define other basic epidemiological terms such as attributable risk, Type I error, sensitivity analysis, or multiple comparison problem.[64]  He does not know the difference

---

[59]  Decl. & Expert Rep. of Dr. Phillip J. Beron, Re: Short Term Use and Lobular Cancer, Oct. 17, 2011 ("Beron Rep.") at 1 (attached as Ex. 41).

[60]  Dep. of Dr. Philip Beron, Nov. 12, 2011 ("Beron Nov. 2011 Dep.") at 87:6-24, 82:10-83:16 (attached as Ex. 42).

[61]  *Id*. at 197:6-12.

[62]  *Id*. at 145:19:146:12.

[63]  *Id*. at 149:20-150:3, *see also id*. at 148:17-149:5.

[64]  *Id*. at 148:4-7, 150:11-18, 152:1-2, 237:14-20.

between confounding and bias.[65]   Apart from his analysis in this case, he never has attempted to evaluate the relationship between exposure to a medication and an adverse event.[66]

Dr. Beron also has no specialized training in biology, and he has not published, lectured, or taught any courses on the subject of cancer biology.[67]   He has never conducted basic science research involving breast cancer and hormones,[68] and has never published a scientific paper, lectured, or taught classes related to hormones.[69]   Central to this *Daubert* challenge, Dr. Beron is not familiar with the differences between ductal and lobular breast cancers.[70]

Dr. Beron reviewed the PSC's other experts' reports before he completed his own,[71] and merely regurgitated the opinions of the other experts.  With respect to Dr. Naftalis's report, he said:  "I incorporate her report into this one as if copied verbatim."[72]   When asked whether he was offering opinions that are any different from those already being offered by Dr. Naftalis, he said, "Not that I know of."[73]   Meanwhile, he did not even know Dr. Naftalis's area of expertise or anything about her professional background.[74]

---

[65]   *Id*. at 213:21-214:2, 225:21-25.

[66]   *Id*. at 100:9-14, 190:15-191:5.

[67]   *Id*. at 156:19-157:14.

[68]   *Id*. at 128:20-24.

[69]   *Id*. at 64:13-65:6.

[70]   *Id.* at 91:8-23.

[71]   *Id*. at 157:24-158:17.

[72]   Beron Rep. at 1.

[73]   Beron Nov. 2011 Dep. at 160:18-21.

[74]   *Id*. at 164:25-166:5.

### 3.        Dr. Vijayakrishna Gadi (Oncologist)

Dr. Vijayakrishna Gadi is an oncologist and basic science researcher.[75]   He is not an

epidemiologist and admits that he is not able to critically evaluate epidemiological studies.[76]   For

example, he cannot identify or evaluate the reliability of the statistical methods used to adjust for

confounders in epidemiological studies.[77]   Before being asked by the PSC to participate in this

*Daubert* proceeding, he had never analyzed whether a particular medication is capable of causing

a particular adverse event.[78]

### 4.        Dr. Peter Gann (Epidemiologist)

Dr. Peter Gann is an epidemiologist.   Outside of litigation, he has never evaluated the

safety or efficacy of hormone therapy, or the relationship between hormone therapy and breast

cancer.[79]   With respect to biological plausibility, Dr. Gann concedes that he is not an expert in

pathology, oncology, molecular biology, or genetics.[80]

### 5.        Dr. Paul Michaels (Pathologist)

Dr. Paul Michaels is a Las Vegas community pathologist who does not do research.[81]

Although, Dr. Michaels has testified in previous HT trials, his opinions were limited to

pathology or specific causation.   He has no formal training in epidemiology, and he admits that

he is not an expert in the methodologies of clinical research, how to calculate an odds ratio, or the

---

[75]   Expert Report of Dr. Vijayakrishna K. Gadi Re: Short Term HRT Use and Lobular Breast
Cancer, Oct. 17, 2011 ("Gadi Rep.") at 1 (attached as Ex. 44).

[76]   Dep. of Vijayakrishna K. Gadi, M.D., Ph.D., May 7, 2011 at 16:21-22 ("Gadi May 2011
Dep.") (attached as Ex. 44); Gadi Nov. 2011 Dep. at 28:2-9.

[77]   Gadi Nov. 2011 Dep. at 165:3-16.

[78]   *Id*. at 70:22-72:10.

[79]   Gann Oct. 2011 Dep. at 35:4-9.

[80]   *Id.* at 30:1-6, 32:20-33:4, 34:21-35:3.

techniques used to control for confounding in epidemiologic studies.[81]  Dr. Michaels also has no

professional experience evaluating the safety of medications.[82]

### 6.     Dr. Elizabeth Naftalis (Retired Breast Surgeon)

Dr. Elizabeth Naftalis is a retired breast surgeon who has not operated on a patient since

2004.[84]  While Dr. Naftalis has testified on the subject of specific causation, she has not been

qualified as a general causation expert.   When she testifies at trial, she opines on specific

causation and is paired with an actual epidemiologist like Dr. Austin.[85]  She lacks even a basic

understanding of epidemiology and statistics,[86] and is unable to define basic epidemiological

terms such as recall bias, odds ratio, and type I error.[87]  She also does not understand the concept

---

[81]   Dep. of Dr. Paul Michaels, *Torkie-Tork v. Wyeth*, July 7, 2010, ("Michaels *Torkie-Tork* Dep.") at 7:11-14, 21:15-19 (excerpts attached as Ex. 45)

[82]   Dep. of Dr. Paul Michaels, Oct. 23, 2011 ("Michaels Oct. 2011 Dep.") at 60:25-61:9, 58:1-6, 73:21-74:1 (attached as Ex. 46); Michaels *Torkie-Tork* Dep. at 74:7-9.

[83]   Supplemental Dep. of Dr. Paul Michaels, *Torkie-Tork v. Wyeth*, Sept. 25, 2010 at 17:17-19:1, 19:15-23, 74:10-75:8 (excerpts attached as Ex. 47); Michaels *Torkie-Tork* Dep. at 58:4-9, 74:10-75:19.

[84]   Decl. & Expert Rep. of Elizabeth Z. Naftalis, M.D., Oct. 11, 2011 ("Naftalis Rep.") at 1 (attached as Ex. 48); Dep. of Elizabeth Naftalis, M.D., *Esposito v. Wyeth*, June 19, 2008 at 16:15-17:3 (excerpts attached as Ex. 49); Trial Test. of Dr. Elizabeth Naftalis, *Mulderig v. Wyeth*, Nov. 17, 2011 A.M. at 47:19-24 (excerpts attached as Ex. 50).

[85]   Trial Test. of Dr. Elizabeth Naftalis, *Mulderig v. Wyeth*, Nov. 17, 2011 A.M. at 43:10-14; Trial Test. of Dr. Donald Austin, *Mulderig v. Wyeth*, Nov. 15, 2011 P.M. at 57:9-23 (excerpts attached as Ex. 51).

[86]   Dep. of Dr. Elizabeth Naftalis, Nov. 7, 2011 ("Naftalis Nov. 2011 Dep.") at 56:13-57:21, 92:16-92:21, 174:8-175:1 (attached as Ex. 52); *Frye* Hr'g Test. of Dr. Elizabeth Naftalis, *In re Hormone Therapy Litig.*, Jan. 19, 2010 at 181:12-182:18, 188:8-11 ("Naftalis Jan. 19, 2010 *Frye* Hr'g Test.") (excerpts attached as Ex. 53); Frye Hr'g Test of Dr. Elizabeth Naftalis, *Esposito v. Wyeth*, at 61:14-23 (excerpts attached as Ex. 54); Dep. of Dr. Elizabeth Naftalis, *Kaufman v. Wyeth*, Feb. 16, 2011 ("Naftalis *Kaufman* Dep.") at 97:15-98:13 (excerpts attached as Ex. 55).

[87]   Naftalis *Kaufman* Dep. at 101:9-11; Naftalis Nov. 2011 Dep. at 106:18-21; Naftalis Jan. 19, 2010 *Frye* Hr'g Test. at 184:10-187:24.

of statistical power[88] and cannot identify or describe methods used to control for confounding in epidemiological studies.[89]

Dr. Naftalis also admits that she is not an expert in drug safety.[90]   She never has participated in a study that evaluated the safety or efficacy of a medication, and no government agency, academic institution, or pharmaceutical company ever has sought her advice regarding the safety of any medication.[91]

With respect to biological plausibility, Dr. Naftalis is not a cell biologist, pathologist, or oncologist,[92] and concedes that she does not know the "details" surrounding the mechanism by which hormone therapy may affect cells.[93]   Important to this challenge, she does not know basic facts about lobular cancers, such as from what cells lobular cancers arise,[94] and she has never published a paper related to lobular breast cancer.[95]

### 7.   Dr. Howard Ozer (Oncologist)

Dr. Howard Ozer is a medical oncologist who specializes in leukemia and lymphoma, not breast cancer.[96]   He does not consider himself an authority on the subject of breast cancer and he

---

[88]   Naftalis Nov. 2011 Dep. at 166:4-12.

[89]   Naftalis *Kaufman* Dep. at 102:12-103:1.

[90]   Dep. of Dr. Elizabeth Naftalis, *Spinelli v. Wyeth*, Nov. 10, 2010 at 16:8-18:1 (excerpts attached as Ex. 56).

[91]   *Id*. at 16:14-18:10.

[92]   Dep. of Dr. Elizabeth Naftalis, *Baldonado v. Wyeth*, Aug. 12, 2011 at 15:9-14, 16:6-19 (excerpts attached as Ex. 57); Dep. of Dr. Elizabeth Naftalis, *LaPour v. Wyeth*, June 13, 2011 at 25:20-26:13 (excerpts attached as Ex. 58); Dep. of Dr. Elizabeth Naftalis, *Finn v. Wyeth*, June 18, 2010 ("Naftalis *Finn* Dep.") at 140:2-141:10 (excerpts attached as Ex. 59).

[93]   Naftalis *Finn* Dep. at 51:22-52:12, 71:19-72:10, 108:5-17.

[94]   *Compare* Naftalis Nov. 2011 Dep. at 28:4-9, 35:21-36:9 *with* Michaels Oct. 2011 Dep. at 164:9-13.

[95]   Naftalis Nov. 2011 Dep. at 51:9-52:16.

[96]   Ozer Nov. 2011 Dep. at 19:10-20:12.

has not had any formal training related to breast cancer.[97]   He also is not an expert in epidemiology or statistics,[98] conceding that he is not qualified to evaluate the statistical methods used to adjust for confounders in observational studies.[99]

### B.      Undisputed Methodology

The following methodological principles come entirely from the testimony of the PSC's own experts in this proceeding or from other undisputed sources.

#### 1.      Studies Must Assess the Relevant Formulation at the Relevant Duration.

When assessing the safety of a particular medication, the most relevant studies are those that evaluate the specific medication and the relevant dose at issue—not studies of other medications and other doses.[100]   This is because different medications have different effects at different doses.[101]

#### a)      Formulation

"Estrogen is not itself a single substance, but rather a class of hormones."  *In re Prempro*, 738 F. Supp. 2d at 893.  Each is a different molecular compound, with a different chemical structure, different pharmacokinetic profile, different absorption rate, different metabolization rate, different affinities for estrogen receptors, and different effects on the breast.[102]   Different estrogens also have different effects on the proliferation of breast tissue and on breast cancer

---

[97]   *Id.* at 30:8-10, 33:19-34:3, 24:19-27:1.

[98]   *Id.* at 10:7-11:2, 37:18-23

[99]   *Id.* at 180:12-180:22.

[100]   Gadi May 2011 Dep. at 189:17-20.

[101]   *Id*. at 143:3-10, 189:21-190:2.

[102]   *Id*. at 155:3-15, 156:8-15, 157:15-20; Gann Oct. 2011 Dep. at 94:2-95:19; Austin Nov. 2011 Dep. at 140:8-141:16.

risk.[103]  There also are many different types of progestins.  Like estrogens, different progestins

have different characteristics and different effects on the breast.[104]

Prempro is one type of combination hormone therapy medication, which consists of

conjugated equine estrogens ("CEE") and medroxyprogesterone acetate ("MPA").[105]  Other

formulations of hormone therapy medications, particularly those in Europe, consist of different

estrogen and progestin components.  Accordingly, different hormone therapy products have

different chemical structures, pharmacokinetic profiles, and effects on the body.[106]  Consistent

with leading researches in the field,[107] the PSC's experts acknowledge that different hormone

---

[103]  Austin Nov. 2011 Dep. at 140:25-141:16; Ozer Nov. 2011 Dep. at 130:17-19; Michaels Oct. 2011 Dep. at 114:10-13; Dep. of C. Marcelo Aldaz, M.D., Ph.D., July 23, 2010 ("Aldaz Dep.") at 43:5-16, 99:22-100:14 (excerpts attached as Ex. 60);

[104]  Trial Test. of Graham Colditz, *Nelson v. Wyeth*, Sept. 14, 2006 AM at 79:2-8 (excerpts attached as Ex. 61); Gadi May 2011 Dep. at 137:22-138:8, 140:12-14; Hunter, Colditz et al., CANCER EPIDEMIOL. BIOMARKERS PREV. 2010;19:2496-2502 at 2500 (attached as Ex. 62).

[105]  Prempro Label, May 2010 at 1 (attached as Ex. 63).

[106]  Gadi May 2011 Dep. at 194:16-195:14; Ozer Nov. 2011 Dep. at 134:16-135:5; *see also* Expert Rep. of Dr. Donald Austin re: Design Defect, Sept. 27, 2011 at 24 ("Austin OMP Rep.") (attached as Ex. 64).

[107]  Fournier et al., J. CLIN. ONCOL. 2008;26:1260-68 at 1260 ("Fournier 2008B") ("[Combination HT] is also not a single entity, since various doses, routes of administration, regimens and molecules used throughout the world may differentially affect breast cancer risk.") (attached as Ex. 65); Fournier et al., J. CLIN. ONCOL. 2009;27:5138-43 at 5142 ("Fournier 2009") ("[B]reast cancer risk may vary according to the characteristics [of the combination HT].") (attached as Ex. 66); Chlebowski 2003 at 3252 ("The WHI evaluated a single drug regimen, conjugated equine estrogens (0.625 mg/d) plus medroxyprogesterone acetate (2.5 mg/d), and therefore cannot inform questions regarding risk associated with other oral or topical menopausal hormone therapies."); Dinger et al., BMC WOMEN'S HEALTH 2006;6:1-13 (attached as Ex. 67); Brinton et al., BR. J. CANCER 1986;54:825-32 (attached as Ex. 68); Henrich et al., J. CLIN. EPIDEMIOL. 1998;51:1277-83 (attached as Ex. 69); Hulka et al., AM J. OBSTET. GYNECOL. 1982;143:638-44 (attached as Ex. 70); Bergkvist et al., N. ENGL. J. MED. 1989;321(5):293-97 (attached as Ex. 71); O'Connell et al., J. CLIN. PHARMACOL. 1995;35:18S-24S (attached as Ex. 72).

therapy formulations differ in terms of safety, efficacy, and breast cancer risk.[108]   In particular,

Dr. Austin and Dr. Gann have submitted other expert reports asserting design defect opinions

that are based on alleged formulation differences.[109]

The PSC's experts further concede that CEE, the estrogen in Prempro, actually protects

against breast cancer.[110]   Dr. Austin wrote in his design defect report that "It is accepted that

natural E2 [estradiol] has been found to be carcinogenic for the breast in humans, with higher

exposure to endogenous E2 associated with higher breast cancer risk.   It appears that exogenous

E2 has an identical effect, but that CEE, which contains a mixture of estrogenic compounds,

almost none of which is estradiol, and some of which may block estrogen receptors, has a slight

protective effect, at least in older menopausal women."[111]

For these reasons, the PSC's experts have testified that any analysis of a particular

medication needs to be based on data relating to that medication.[112]   Put another way, Prempro

---

[108]   Austin Nov. 2011 Dep. at 139:1-7; Trial Test. of Dr. Graham Colditz, *Nelson v. Wyeth*, Jan. 17, 2007 ("Colditz Jan. 17, 2007 Test.") at 57:10-15 (excerpts attached as Ex. 73); Beron Nov. 2011 Dep. at 252:1-11; Ozer Nov. 2011 Dep. at 135:6-8; Gadi May 2011 Dep. at 195:6-15; Dep. of Kathleen I. Pritchard, M.D., F.R.P.C., *Scharff v. Wyeth*, May 9, 2011 at 71:13-19 (excerpts attached as Ex. 74).

[109]   Austin OMP Rep. at 24; Amended Generic Rep. & Decl. of Peter H. Gann, M.D., Sc.D., March 14, 2011 at 14 ("Gann Rep.") (attached as Ex. 75).

[110]   Austin OMP Rep. at 24-25; Ozer Nov. 2011 Dep. at 225:8-226:22; Gadi May 2011 Dep. at 157:15-158:23, 282:13-15.   Up until March 2011, the PSC's experts continued to contend that CEE conferred an increased risk of breast cancer.

[111]   Austin OMP Rep. at 25.

[112]   Ozer Nov. 2011 Dep. at 161:4-7; Austin Nov. 2011 Dep. at 139:22-140:1; Dep. of Graham Colditz, M.D., Dec. 29, 2006 ("Colditz Dec. 29, 2006 Dep.") at 768:22-769:6 (excerpts attached as Ex. 76); Michaels Oct. 2011 Dep. at 146:7-23; Gadi. Nov. 2011 Dep. at 88:9-89:5; August 2007 Updated Causality Rep. of Donald Austin, M.D., M.P.H. ("Austin 2007 Causality Rep.") at 24 (attached as Ex. 77); Dep. of Donald Austin, M.D., M.P.H., *Brockert v. Wyeth*, March 13, 2007 at 208:13-209:5 ("Austin *Brockert* Dep.") (excerpts attached as Ex. 78); Trial Test. of Dr. Donald Austin, *Foust v. Wyeth*, Jan. 28, 2010, P.M. at 98:10–13 ("Austin *Foust* Test. PM") (excerpts attached as Ex. 79).

opinions should be based on Prempro data.[113]   This Court previously excluded Dr. Austin's short-term use testimony related to Prempro because he violated these principles and instead relied on studies involving European formulations.  *In re Prempro*, 765 F. Supp. 2d at 1126.

### b)   Duration

The PSC's experts also agree that duration of use "is essential when making a short-term use causation finding."  *Id.* at 1126.  Dr. Gadi explained that dose and duration are "probably the two most important things" to consider when determining whether an exposure caused a particular adverse event.[114]   That is because every association is based on a certain magnitude of exposure,[115] and some medications have no effect below a certain magnitude of exposure.[116]

The PSC's experts concede that the breast cancer risks associated with Prempro are dependent on the amount of Prempro that a patient takes over time.[117]   Thus, when evaluating causation at a specific duration of use, it is "inappropriate to look at all durations and lump them together" into one analysis.[118]   Specifically, when assessing risk with three years or less of use, it is inappropriate to rely on analyses that include patients taking Prempro for up to four or five years.[119]

---

[113]   Austin Nov. 2011 Dep. at 139:22-140:1; Ozer Nov. 2011 Dep. at 161:4-7; Michaels Oct. 2011 Dep. at 146:7-23.

[114]   Gadi Nov. 2011 Dep. at 68:7-10; *see also* Ozer Nov. 2011 Dep. at 43:2-5, 44:12-16; MDL *Daubert* Hr'g Tr. at 104:3-6.

[115]   Gann Oct. 2011 Dep. at 40:23-41:3; MDL *Daubert* Hr'g Tr. at 103:6-9; Austin *Rivera* Test. at 57:22–25.

[116]   Ozer Nov. 2011 Dep. at 44:17-45:4; Donald F. Austin, *Epidemiology for the Health Sciences* 60 (1974) (attached as Ex. 80).

[117]   Gann Oct. 2011 Dep. at 79:22-80:3; Austin *Rivera* Test. at 57:8–19; MDL *Daubert* Hr'g Tr. at 104:3-6; Austin *Foust* Test. PM at 48:23–25.

[118]   Austin *Brockert* Dep. at 208:13-209:5.

[119]   Gadi Nov. 2011 Dep. at 267:23-268:2; Gann Oct. 2011 Dep. at 175:7-178:3 (discussing the Daling study and stating that it would be improper to draw conclusions about risk at 3 years

In order to reliably evaluate the relationship between an adverse event and a particular duration of exposure, data must come from studies that "characterize the exposure very carefully and accurately,"[120] including exposures that occur both before and during the study period.[121] Studies that do not accurately measure duration of exposure do not provide reliable estimates of breast cancer risk at a given duration of use.[122]

This Court previously observed that reliably measuring duration of exposure is "essential when making short-term use causation findings," and concluded that studies that "did not reliably track duration of use," like the MWS (2003) or Calle (2009), do not provide reliable evidence regarding the relationship, if any, between short-term Prempro use and the risk of breast cancer. *In re Prempro*, 765 F. Supp. 2d at 1126.

### 2. A Valid Causation Analysis Starts With a Valid Association.

Before considering whether a cause-and-effect relationship exists, a researcher must first determine whether there is a valid epidemiological association.[123] A valid association is one that cannot be attributed to chance, bias, or confounding.[124] Only if a valid association is found can a researcher go on to assess other factors and determine whether there is a true cause-and-effect

---

from data evaluating risk in women taking hormone therapy for five years or less); Austin Nov. 2011 Dep. at 249:15-250:2 (acknowledging that data from the MWS which assessed breast cancer risk with Prempro use for a period of five years did not inform the question of whether there was increased risk with three years of use).

[120]  MDL *Daubert* Hr'g Tr. at 15:15-22; Gann Oct. 2011 Dep. at 80:21-81:13, 147:21-148:5.

[121]  Gann Oct. 2011 Dep. at 81:14-21, 84:12-20.

[122]  Austin Nov. 2011 Dep. at 119:1-8.

[123]  Austin 2007 Causality Rep. at 1 ("The first task is to determine whether or not there is an association to evaluate."); MDL *Daubert* Hr'g Tr. at 101:24-102:10; Gadi Nov. 2011 Dep. at 336:15-18 (agreeing that a cause and effect relationship is something that he would want to base on either clinical trial or observational study data).

relationship.[125]   Without evidence of a valid epidemiological association, there is no basis to conclude that a causal relationship exists.[126]   As Dr. Austin explained several years ago, "[y]ou can't say that there is an increased risk if you can't demonstrate it" in studies.[127]

*Chance and Statistical Significance.*   Statistical testing is used by epidemiologists to minimize the likelihood that an observed association is due to chance.[128]   Statistical significance is generally defined by a p-value of less than 0.05 and/or a confidence interval that does not cross 1.0.[129]   Results that are not statistically significant do not provide reliable information regarding the relationship between an exposure and an outcome.   For instance, outside of litigation, Dr. Gadi only relies on statistically significant results.[130]   According to Dr. Gadi, non-significant results are merely hypothesis generating.[131]   As this Court observed, "if an expert places undue emphasis on statistically insignificant evidence, it may indicate that the expert's methods are unreliable."   *In re Prempro*, 738 F. Supp. 2d at 892.

*The Multiple Comparison Problem.*   Special statistical methods are necessary where numerous statistical analyses (or "multiple comparisons") are performed in a single study.[132]   The standard threshold of significance is defined as a 5% likelihood that the observed association

---

[124]   Ref. Man. at 572 ("Three general categories of phenomena can result in an association found in a study to be erroneous: chance, bias, and confounding. Before any inferences about causation are drawn from a study, the possibility of these phenomena must be examined.").

[125]   Gann Oct. 2011 Dep. at 39:21-40:5; Ref. Man. at 597-599; MDL *Daubert* Hr'g Tr. at 101:24-102:10.

[126]   Austin 2007 Causality Rep. at 1; Gann Oct. 2011 Dep. at 38:9-40:5.

[127]   Trial Tr., *Woods v. Wyeth*, July 22, 2008 at 60:9–16.

[128]   Deposition of Dr. Graham Colditz, *In re Prempro Prod. Liab. Litig.*, May 2, 2006 ("Colditz Dep. May 2, 2006") at 161:8-162:22 (excerpts attached as Ex. 81).

[129]   Ref. Man. at 249-53.

[130]   Gadi Nov. 2011 Dep. at 188:23-189:16.

[131]   *Id.*

is a result of chance alone.[133]  When performing only a few statistical analyses, the 5% margin of

error is considered to be acceptably low.  However, when numerous analyses are performed in a

single study, the error rate greatly exceeds the standard threshold of 5%.[134]  This is referred to by

epidemiologists as the "multiple comparison problem."[135]  Methods exist to account for the

effects of multiple comparisons.  Studies that conduct numerous analyses, but do not attempt to

correct for the multiple comparisons, are much more likely to find statistically significant

associations that are due to the play of chance.[136]

> *Controlling for Confounding Factors*.  "When researchers find an association between

an agent and a disease, it is critical to determine whether the association is causal or the result of

confounding."[137]  "Confounding occurs when another causal factor (the confounder) confuses the

relationship between the agent of interest and outcome of interest."[138]  Unlike in RCTs where

study subjects are randomly assigned to treatment groups, confounding is a major concern in

---

[132]  Ref. Man. at 290.

[133]  Ref. Man. at 251.

[134]  Lawrence M. Friedman et al., *Fundamentals of Clinical Trials* 124 (3d ed. 1998) ("Friedman 1998") ("when multiple comparisons are made, the chance of finding a significant difference in one of the comparisons (when, in fact, no real difference exists between the groups) is greater than the stated significance level"); *id*. at 251 ("if 20 tests of significance are done within a trial, the chance of crossing the 5% significance level boundaries [] is, on the average, 35% . . . even 5 or 10 can lead to a misinterpretation of the trial results when the multiple testing issue is ignored") (attached as Ex. 82); Ref. Man. at 290.

[135]  Ref. Man. at 290.

[136]  Friedman 1998 at 124, 251; Ref. Man. at 290.

[137]  Ref. Man. at 591.

[138]  Ref. Man. at 591; Ozer Nov. 2011 Dep. at 59:20-60:2.

observational studies.[139]   Even "state of the art" observational studies cannot control for all potential sources of confounding—both known and unknown.[140]

Residual confounding is an even greater concern when the reported risk estimate is based on a very small sample size and/or is very small in magnitude (less than 2.0).[141]   Dr. Austin testified it would be "scientifically or judicially improper" to make any decision regarding causation based on a dataset that includes less than 20 to 30 cases.[142]   The PSC's experts concede that it can be difficult to determine whether a very small risk estimate in an observational study represents a real association or is simply the result of residual confounding.[143]

***Recall Bias, Misclassification Bias, and Other Forms of Bias.***   Bias is "anything that results in a systematic (nonrandom) error in a study result and thereby compromises its validity."[144]   In reviewing an epidemiological study, the epidemiologist must identify potential biases and analyze the amount or kind of error that might have been induced by the bias.[145]

One common example of bias in observational studies evaluating risk at a specific duration of use is recall bias.[146]   Recall bias occurs because "individuals with [a] disease (cases) tend to recall past exposures more readily than individuals with no disease (controls)."[147]   For example, women who are diagnosed with breast cancer are much more likely to remember taking

---

[139]   Ref. Man. at 592; Austin Nov. 2011 Dep. at 146:23-147:2.

[140]   Austin Nov. 2011 Dep. at 147:17-25; Austin 2007 Causality Rep. at 9.

[141]   Supplemental Report on Short-Term HRT and Lobular Breast Cancer, Donald Austin, MD, MPH, Oct. 17, 2011 at 9 ("Austin Rep.") (attached as Ex. 83).

[142]   Austin Dep. at 114:14-115:15.

[143]   Austin 2007 Causality Rep. at 9; Austin Nov. 2011 Dep. at 148:1-9.

[144]   Ref. Man. at 583.

[145]   Ref. Man. at 583, 591.

[146]   Ref. Man. at 585, 626.

[147]   Ref. Man. at 585; Michaels Nov. 2011 Dep. at 56:12-25.

HT medications than those who did not.[148]   Thus, exposure data obtained from self-reported questionnaires is likely to overestimate cumulative exposure in women who were diagnosed with breast cancer prior to completing the questionnaire and to underestimate exposure in those who were not.[149]   The effect of this recall bias is to overestimate the risk of breast cancer associated with the use of HT.[150]   For this reason, studies that rely on questionnaires to evaluate exposure are far less reliable than those, like WHI, that obtain exposure data from direct pill counts.[151]

Misclassification bias is another common problem that is inherent in observational studies.   "Misclassification bias is a form of information bias in which, because of problems with the information available, individuals in the study may be misclassified with regard to exposure status or disease status."[152]   For example, misclassification bias may be present in a study that does not have accurate data regarding the type and duration of hormone therapy use (exposure status) or breast cancer type (disease status).   Such studies do not provide reliable information about the relationship between short-term Prempro use and breast cancer risk.   This Court previously rejected Dr. Austin's reliance on the Calle study, in part, because he acknowledged that he could not "rule out the misclassification of exposure."   *In re Prempro*, 765 F. Supp. 2d at 1123-24.

---

[148]   *See* Ref. Man. at 585; Michaels Nov. 2011 Dep. at 56:12-25.

[149]   *See* Austin Nov. 2011 Dep. at 225:8-17; Gann Oct. 2011 Dep. at 165:18-166:5.

[150]   *See* Ref. Man. at 586.

[151]   Gann Oct. 2011 Dep. at 272:13-273:5, 143:19-145:7; Austin Nov. 2011 Dep. at 231:5-16; Gadi Nov. 2011 Dep. at 47:1-17.

[152]   Ref. Man. at 589.

3.      **An Association Must Appear Consistently Across the Relevant Studies.**

The presence of an association, even if valid, does not mean that a cause and effect relationship exists.[153]   As the Reference Manual explains, "[r]arely, if ever, does a single study conclusively demonstrate a cause-effect relationship.  It is important that an observational study be replicated in different populations and by different investigators before a causal relationship is accepted by epidemiologists and other scientists.  The need to replicate research findings permeates most fields of science."[154]

The PSC's experts agree.[155]  As Dr. Gann explained, a valid association in one study is "absolutely not" sufficient to conclude that there is a cause and effect relationship "because no single study is adequate for that purpose."[156]  Likewise, outside the litigation, Dr. Colditz has written that replication and consistency are necessary to establish that an observed statistical association represents a true effect in the human body:  "It is only when the evidence from a number of studies is compiled and seen to be consistent that one can reach firm conclusions about a given epidemiologic relationship."[157]

---

[153]  Ref. Man. at 552 ("[I]t should be emphasized that *an association is not equivalent to causation*.") (emphasis in original); *id* at 566 ("[A]n association does not necessarily mean that there is a cause-effect relationship."); *id* at 591.

[154]  Ref. Man. at 604.

[155]  Colditz Dec. 29, 2006 Dep. at 796:3-799:4; Dep. of Baljit Singh, M.D., May 8, 2011 at 38:18-39:15 (excerpts attached as Ex. 84); Gadi May 2011 Dep. at 120:14-121:21; Dep. of Kathleen I. Pritchard, April 26, 2011 at 22:24-23:8 ("Pritchard April 2011 Dep.") (excerpts attached as Ex. 85); Gann Oct. 2011 Dep. at 47:18-22; Ozer Nov. Dep. at 48:9-1, 254:10-16; Gadi May 2011 Dep. at 166:24-168:3.

[156]  Gann Oct. 2011 Dep. at 47:18-48:8.

[157]  Susan E. Hankinson, Graham A. Colditz et al., *Healthy Women, Healthy Lives* 504 (2001) (attached as Ex. 86).

The PSC's experts also acknowledge that cherry-picking statistical differences from one or two studies that support a position and ignoring other studies that do not support that position is scientifically invalid.[158]   By doing so, "you would be ignoring evidence that's potentially relevant."[159]   According to Dr. Colditz, scientific conclusions should be "based on the totality of the evidence, not picking out one statistical difference to use that as the sole source of evidence on the topic."[160]

### C.    The PSC's Experts' Analysis

The PSC's experts' analysis here is plagued with the same methodological problems as the short-term use analysis put forward last year by Dr. Austin.

### 1.    The PSC's Experts Dismiss the "Gold Standard" Evidence from the WHI Clinical Trial.

Although the PSC and their experts have long relied on WHI data, the PSC's experts now dismiss WHI as unreliable for purposes of evaluating the short-term effects of Prempro use. They raise the same "newfound criticism[s]" and reasons for rejecting the WHI data as Dr. Austin did last year, criticisms which this Court already heard and rejected as invalid.  *In re Prempro*, 765 F. Supp. 2d at 1118.

---

[158]  Pritchard April 2011 Dep. at 23:22-24:14; Colditz Jan. 17, 2007 Test. at 19:13-20:17; Gadi May 2011 Dep. at 205:15-206:7; Gann Dep. at 117:22-118:20.

[159]  Gann Oct. 2011 Dep. at 117:22-118:5.

[160]  Colditz Jan. 17, 2007 Test. at 19:13-20:17.

2.      **The PSC's Experts Rely on Data from Observational Studies
That Do Not Address the Relevant Causation Question.**

The PSC's experts rely on a collection of cherry-picked data from 26 observational studies, 24 of which do not address the relevant question here—whether Prempro use for about three years or less can cause lobular breast cancer.[161]  *See* Table 3, below.

### Table 3: Studies Cited By the PSC's Experts

| | Study | Evaluates Lobular Breast Cancer Risk with Prempro Use for About 3 Years or Less? |
|---|---|---|
| 1 | Bakken 2004 | No |
| 2 | Bakken 2011 | No |
| 3 | Beral 2011 (MWS) | No |
| 4 | Fournier 2008A | No |
| 5 | Fournier 2009 | No |
| 6 | Holmberg 2004/2008 | No |
| 7 | Hunt 1987 | No |
| 8 | Jernstrom 2003 | No |
| 9 | LaVecchia 1986 | No |
| 10 | Persson 1999 | No |
| 11 | Beral 2003 (MWS) | No |
| 12 | Collaborative Group 1997 | No |
| 13 | Kerlikowske 2010 | No |
| 14 | Schairer 1994 | No |
| 15 | Stanford 1995 | No |
| 16 | HERS Clinical Trial | No |
| 17 | Wyeth's "Pivotal" Trial | No |
| 18 | Fournier 2008B | No |
| 19 | Reeves 2006 (MWS) | No |
| 20 | Daling 2002 | No |
| 21 | Newcomb 2002 | No |
| 22 | Kotsopoulos 2010 | No |
| 23 | Li 2000 | No |
| 24 | Saxena 2010 | No |
| 25 | Chen 2002 | Yes |
| 26 | Calle 2009 | Yes |

---

[161]  The number represents the studies cited by the seven experts, the vast majority of which come from Dr. Naftalis, a breast surgeon with no experience in epidemiology.  Each of the seven experts cited a different set of studies.  None cited all 26.

As was true of the five studies cited by Dr. Austin last year, none of these 26 studies provide reliable evidence regarding the relationship, if any, between short-term Prempro use and the risk of lobular breast cancer.

**Studies That Did Not Evaluate Lobular Breast Cancer**.  While this *Daubert* challenge is supposed to be related to lobular breast cancer, 17 of the 26 studies cited by the PSC's experts do not evaluate lobular breast cancer at all.[162]  (Nos. 1-17 above).  For this reason alone, they are not relevant to the *Daubert* question now before the Court.  Furthermore, all of those studies involve hormone formulations other than Prempro, did not evaluate the relevant duration of use, or did not find a statistically significant increased risk.[163]

---

[162]  None of the studies include any specific risk estimate for lobular breast cancer.  *See* the following studies and deposition testimony excerpts:  Bakken et al., INT. J. CANCER 2004;112:130-34 ("Bakken 2004") (attached as Ex. 87);  Bakken et al., INT. J. CANCER 2011;128:144-56 ("Bakken 2011") (attached as Ex. 88); Beral et al., J. NAT'L CANCER INST. 2011;103:1-10 ("Beral 2011") (attached as Ex. 89), Austin Nov. 2011 Dep. at 256:19-257:3 (discussing Beral 2011); Fournier et al., BREAST CANCER RES. TREAT. 2008;107:103-11 ("Fournier 2008A") (attached as Ex. 90); Fournier 2009, Beron Nov. 2011 Dep. at 246:15-21 (discussing Fournier 2009); Holmberg et al., LANCET 2004;363:453-55 ("Holmberg 2004") (attached as Ex. 91); Holmberg et al., J. NAT'L CANCER INST. 2008;100:475-82 ("Holmberg 2008") (attached as Ex. 92); Hunt et al., BR. J. OBSTET. GYNECOL. 1987;94:620-35 ("Hunt 1987") (attached as Ex. 93); Jernstrom et al., CANCER CAUSES AND CONTROL 2003;14:673-80 ("Jernstrom 2003") (attached as Ex. 94); LaVecchia et al., INT. J. CANCER 1986;38:853-58 ("LaVecchia 1986") (attached as Ex. 95); Persson et al., CANCER CAUSES AND CONTROL 1999;10:253-60 ("Persson 1999") (attached as Ex. 96), Austin Nov. 2011 Dep. at 220:3-11 (discussing Persson 1999); Beral et al., LANCET 2003;382:419-27 ("Beral 2003") (attached as Ex. 97); Collaborative Group, LANCET 1997;350:1047-59 ("Collaborative Group 1997") (attached as Ex. 98), Naftalis Nov. 2011 Dep. at 232:24-233:19 (discussing Collaborative Group 1997); Kerlikowske et al., J. CLIN. ONCOL. 2010;28 ("Kerlikowske 2010") (attached as Ex. 99); Schairer et al., CANCER CAUSES AND CONTROL 1994; 5:491-500 ("Schairer 1994") (attached as Ex. 101), Naftalis Nov. 2011 Dep. at 238:2-8 (discussing Schairer 1994); Stanford et al., JAMA 1995; 274:137-42 ("Stanford 1995") (attached as Ex. 101); Hulley et al., JAMA 2002;288:58-66 ("HERS Clinical Trial") (attached as Ex. 102), Naftalis Nov. 2011 Dep. at 224:6-11 (discussing HERS Clinical Trial); Response to FDA, Letter from Wyeth to Dr. Sobel, Dec. 15, 1994 ("Wyeth's Pivotal Trial") (attached as Ex. 103).

[163]  Other formulations:  Bakken 2004, Bakken 2011, Beral 2011, Fournier 2008A, Fournier 2009, Holmberg 2004/2008, Hunt 1987, Jernstrom 2003, LaVecchia 1986, and Persson 1999. *See* Barnhart Rep. at 19-20.  Other durations of use:  Beral 2003, Collaborative Group 1997,

***Studies That Involve Other Hormone Formulations***.  Of the nine studies that do address lobular breast cancer, two (Nos. 18-19 above) were conducted outside of the United States, one in England (Reeves 2006 reporting data from the Million Women Study) and one in France (Fournier 2008B reporting data from the French Teachers Study).[164]  Both studies involve different hormone formulations and provide no short-term analysis of Prempro.[165]  This Court previously rejected Dr. Austin's reliance on both the Million Women Study and the French Teachers Study because those "studies primarily involved drug combinations that were not Prempro."  *In re Prempro*, 765 F. Supp. 2d at 1126.

***Studies That Did Not Evaluate Risk at About Three Years or Less***.  Five of the nine studies (Nos. 20-24 above) did not provide estimates of breast cancer risk at the relevant duration of use (about three years or less).  The PSC's experts acknowledge that three studies (Daling 2002, Newcomb 2002, and Kotsopoulos 2010) only evaluated risk after five years of use.[166]  The other two studies (Li 2000 and Saxena 2010) did not have sufficient data to evaluate the relationship between duration of use and the diagnosis of breast cancer.  At the last *Daubert* hearing, Dr. Austin admitted that it was a mistake to include Li 2000 and Saxena 2010 in his

---

and Kerlikowske 2010.  *See* Barnhart Rep. at 20.  No statistically significant risk:  Schairer 1994, Stanford 1995, HERS Clinical Trial and Wyeth's "Pivotal" Trial.  *See* Barnhart Rep. at 20-22.

[164]  Reeves et al., LANCET 2006;7:910-18 at 910 ("Reeves 2006") (attached as Ex. 104); Fournier 2008B at 1260.

[165]  Gann Oct. 2011 Dep. at 239:11-240:14 (Reeves 2006); Fournier 2008B at 1261 ("Unopposed HT consisted almost exclusively in estradiol compounds (1.3% of women ever-used conjugated equine estrogens)"); Gann Oct. 2011 Dep. at 196:18-197:6 (Fournier 2008B).

[166]  Daling et al., CANCER 2002;95:2455-64 at 2462, Tbl. 3 ("Daling 2002") (attached as Ex. 105); Gann Oct. 2011 Dep. at 174:2-176:7 (discussing Daling 2002); Ozer Nov. 2011 Dep. at 232:16-233:16 (discussing Daling 2002); Newcomb et al., AM. J. EPIDEMIOL. 2002;11:593-600 at 596, Tbl. 3 ("Newcomb 2002") (attached as Ex. 106); Gann Oct. 2011 Dep. at 180:12-24 (discussing Newcomb 2002); Austin Nov. 2011 Dep. at 154:23-155:8 (discussing

short-term use report.[167]   In its short-term use Order, this Court considered and rejected both studies as an unreliable foundation to conclude that short-term use of Prempro increases the risk of ductal breast cancer.  *In re Prempro*, 765 F. Supp. 2d at 1120-21.

        **3.**        **The PSC's Experts Rely on Observational Studies That Have Significant Methodologic Limitations and Previously Were Rejected as Unreliable.**

The PSC's experts only indentified two studies showing statistically significant results,[168] both of which were rejected as methodologically unreliable in the previous short-term use hearing, one by PSC expert Dr. Austin (Chen 2002)[169] and the other by this Court (Calle 2009).[170]

---

Newcomb 2002); Kotsopoulos et al., BREAST CANCER RESEARCH 2010;12:R106 at 5, Tbl. 2 (attached as Ex. 107); Gadi Nov. 2011 Dep. at 246:2-5 (discussing Kotsopoulos 2010).

[167] Neither the Li 2000 not the Saxena 2010 studies assessed breast cancer risk in relation to a woman's actual duration of use and thus neither can provide reliable evidence about the short-term effects of Prempro use on lobular breast cancer risk.  As the authors explain, in the Li 2000 study, "the relation between duration of CHRT use and lobular and ductal breast carcinoma could not be assessed."  Li et al., CANCER 2000;88:2570-77 at 2574 ("Li 2000") (attached as Ex. 108).  This is the same Li 2000 study that Dr. Austin referenced in his original short-term use report and which he later admitted it was "an error" to include.  MDL *Daubert* Hr'g Tr. at 109:15-110:5; *In re Prempro*, 765 F. Supp. 2d at 1119.  The Saxena 2010 study assessed hormone therapy use only at baseline and did not account for duration of hormone therapy use during the study.  Saxena et al., CANCER EPIDEMIOL. BIOMARKERS PREV. 2010;19:OF1-13 at OF12 ("Saxena 2010") (attached as Ex. 109).  At the prior *Daubert* hearing on short-term use, Dr. Austin acknowledged that the study does not provide reliable evidence about the short-term effects of Prempro use and acknowledged that it was an error to include the study in his report.  MDL *Daubert* Hr'g Tr. at 110:14-111:16.  The Court found that Saxena's "duration assessments are not reliable."  *In re Prempro*, 765 F. Supp. 2d at 1119.

[168] Austin Nov. 2011 Dep. at 159:13-25; Gadi Nov. 2011 Dep. at 203:17-24 (identifying only Calle).

[169] *See* Austin Nov. 28, 2010 Decl. at 2-3; MDL *Daubert* Hr'g Tr. at 94:8-20.

[170] *See In re Prempro*, 765 F. Supp. 2d at 1123 ("Yet, the study proves unreliable for analyzing short-term Prempro use.").

***Chen 2002***.    While the Chen 2002 study reports an increased risk of lobular breast cancer in women taking combination HT for 13-38 months, the PSC's experts concede that the risk estimate was based on a very small sample size (only nine case of lobular breast cancer).[171] Further, they acknowledge that the researchers were not able to control for multiple potential sources of bias (including selection and misclassification bias)[172] and confounding (including history of breast biopsies, breastfeeding, physical activity, alcohol use, and breast density) in the study.[173]   Moreover, the study did not account for hormone therapy use during the year before breast cancer diagnosis, and therefore underestimated the actual duration of use for all study participants.[174]   Finally, the PSC's experts admit that the researchers did not perform adjustments that were needed to lower the error rate to an acceptable level and to account for the multiple statistical analyses conducted in the study.[175]

At the earlier short-term use hearing, Dr. Austin rejected the Chen study because it did not reliably evaluate the relationship between short-term Prempro use and breast cancer risk.[176] When asked at the *Daubert* hearing whether the study satisfied his own reliability criteria, he stated "Well, I thought it did not."[177]   At his recent deposition, Dr. Gann said that the Chen study

---

[171]  Austin Nov. 2011 Dep. at 163:1-6; Chen 2002 at 739, Tbl. 4.

[172]  Chen 2002 at 740.

[173]  Austin Nov. 2011 Dep. at 169:17-170:5 (breast density, alcohol use, breastfeeding, history of pervious breast biopsies); Chen 2002 at 740.

[174]  Chen 2002 at 734 (stating that the main outcome measured in the study was "[i]ncidence and type of breast cancer by duration of HRT use ***in the 5-year period ending 1 year before diagnosis***") (emphasis added); *see also* Barnhart Rep. at 16.

[175]  Austin Nov. 2011 Dep. at 173:6-8.

[176]  Austin Nov. 28, 2010 Decl. at 2-3.

[177]  MDL *Daubert* Hr'g Tr. at 94:18-20.

"would not be sufficient" evidence to conclude that short-term Prempro use increases lobular breast cancer risk.[178]

   ***Calle 2009***.  The risk estimates cited by the PSC's experts from Calle are also based on a very small number of cases of lobular breast cancer, likely no more than 10 to 15.[179]  Further, because the exposure data was collected from periodic self-reported questionnaires, the PSC's experts acknowledge that the duration of use reported in the study may be inaccurate,[180] and that the risk estimates are subject to both recall and misclassification bias.[181]  At the prior *Daubert* hearing, Dr. Austin testified that he could not "rule out the misclassification of exposure" in Calle.[182]  Moreover, the PSC's experts acknowledge that the Calle authors did not control for a number of potential confounding factors, including breast density, breastfeeding, and history of breast biopsies.[183]

   While the PSC's experts claim the Calle study confirms that taking short-term Prempro use can cause lobular breast cancer, Dr. Calle herself states that her study "suggests that after starting estrogen plus progestin, you probably have two or three years where your ***risk isn't elevated***."[184]

---

[178]  Gann Oct. 2011 Dep. at 154:19-23.

[179]  Austin Nov. 2011 Dep. at 265:10-266:11; Barnhart Rep. at 17.

[180]  Austin Nov. 2011 Dep. at 231:5-16.

[181]  Austin Nov. 2011 Dep. at 225:8-17, 228:18-229:17; Ozer Nov. 2011 Dep. at 221:15-19.

[182]  MDL *Daubert* Hr'g Tr. at 198:24-199:4; *In re Prempro*, 765 F. Supp. 2d at 1124.

[183]  Austin Nov. 2011 Dep. at 233:9-234:18 (breast density, breastfeeding, and history of previous breast biopsies); Calle 2009 at 938.

[184]  *See* Doheny, Health Day, http://health.usnews.com/health-news/family-health/cancer/articles/2009/02/04/drop-in-breast-cancer-rates-due-to-drop-in-hrt-use.html (emphasis added) (last visited Dec. 15, 2011) ("Doheny 2009") (attached as Ex. 110).

Because of problems related to the measurement and classification of exposure, this Court previously found that the Calle study was "unreliable for analyzing short-term Prempro use." *In re Prempro*, 765 F. Supp. 2d at 1123.

### 4. The PSC's Experts Ignore Observational Studies Reporting Contrary Results.

While they rely on a collection of studies that do not evaluate the relationship between short-term Prempro use and lobular breast cancer, the PSC's experts ignore four out of the six observational studies that do evaluate the relationship.[185]   All four—Ursin 2002, Li 2003, Brinton 2008, and Li 2008—find no significant association.[186]   The PSC's experts do not explain why these studies were omitted from their analyses.

### 5. The PSC's Experts Rely on "Biological Plausibility" Theories.

The PSC's experts also cite to a collection of animal, cellular, clinical, and ecologic studies to support their biological plausibility theory.   This Court previously rejected such "biological plausibility" evidence as unreliable for purposes of showing that Prempro use for about three years or less can cause breast cancer.   *In re Prempro*, 765 F. Supp. 2d at 1125. Indeed, the PSC's own experts concede that evidence of "biological plausibility" is an unreliable measure of causality.[187]

---

[185] Dr. Gann did mention the Li 2008 study once in passing but did not address the fact that it does not find a significant association between short-term Prempro use and lobular breast cancer.  Gann Rep. at 12 ("Several studies cited above (Chen 2002, Li 2008, Reeves 2006, Fournier 2008, Calle 2009) observed substantially greater risks for lobular cancers in association with hormone therapy, and CMHT in particular.").  Among the PSC's other experts, only Dr. Gadi discussed any of the four studies.  He only mentioned the Li 2008 study in passing, stating that it found a "marginally significant 50% increase in lobular breast cancer risk."  Gadi Rep. at 6.

[186] Ursin 2002 at 701, Tbl. 2; Li 2003 at 3260, Tbl. 3; Brinton 2008 at 3157, Tbl. 5; Li 2008 at 47, Tbl. 2; *see also* Barnhart Rep. at 12-15.

[187] MDL *Daubert* Hr'g Tr. at 202:16-24.

> **6.    The PSC's Experts Provide No Evidence That Short-Term Prempro Use Has a Different Effect on Lobular Breast Cancer.**

None of the PSC's experts conducted an analysis to evaluate whether, in fact, short-term use of Prempro has a different effect on the risk of lobular breast cancer. On the contrary, both Dr. Ozer and Dr. Gadi suggested that they were "unimpressed with the difference between ductal and lobular."[188]

> **7.    Dr. Austin Has Changed Key Aspects of His Prior Short-Term Use Testimony.**

Dr. Austin has changed his opinion on a number of critical topics related to the short-term use issue. Three examples illustrate the significant changes that have taken place since the short-term use *Daubert* hearing:

1.    At the prior *Daubert* hearing, Dr. Austin testified that the Chen 2002 study did not reliably evaluate the relationship between short-term Prempro use and breast cancer risk.[189] When asked by PSC counsel whether the study satisfied his own reliability criteria, he stated "Well, I thought it did not."[190] However, now that the focus is on lobular breast cancer and the study reports a statistically significant risk of lobular breast cancer, the Chen study has become one of the pillars of his causation theory.

2.    At the same hearing, Dr. Austin relied heavily on data from the original publication of the Million Women Study (Beral 2003).[191] In its short-term use Order, this Court observed that "Dr. Austin relied most on the MWS

---

[188]   Ozer Nov. 2011 Dep. at 213:15-214:2; Gadi Nov. 2011 Dep. at 95:1-9.

[189]   Austin Nov. 28, 2010 Decl. at 2-3.

[190]   MDL *Daubert* Hr'g Tr. at 94:18-20.

[191]   Austin Nov. 28, 2010 Decl. at 3.

to support his opinion regarding a causal relationship between Prempro and short-term use." *In re Prempro*, 765 F. Supp. 2d at 1122.  Dr. Austin now admits that the study ***does not inform the question*** of whether short-term Prempro use is capable of increasing the risk of any type of breast cancer:

> Q.   We'll absolutely talk – let's just do this one first.  Now, this study [Beral 2003] does not assess breast cancer risk at three years or less for Prempro. Correct?
>
> A.   Correct.
>
> Q.   There is no risk estimated in here for women taking CEE plus MPA at one year, two years, or three years.  Correct?
>
> A.   Correct.
>
> Q.   So to the extent that the question is about Prempro for three years or less, it doesn't inform that question?
>
> A.   Right.[192]
>
> ***
>
> Q.   So the 2003 article we're going to set aside, and we're going to say this one doesn't help us resolve the question that three years you'll ask for Prempro.  Correct?
>
> A.   With regard to three years, yes.[193]

3.   At the short-term use hearing, Dr. Austin also relied heavily on data from the French Teachers Study.[194]  But he now admits that the study was "not very good for assessing CEE and MPA [Prempro]"[195]—a conclusion consistent with this Court's finding.  *In re Prempro*, 765 F. Supp. 2d at 1121-22.

---

[192]   Austin Nov. 2011 Dep. 249:15-250:2.

[193]   Austin Nov. 2011 Dep. at 253:5-9.

[194]   MDL *Daubert* Hr'g Tr. at 36:9-37:3.

[195]   Austin Nov. 2011 Dep. 39:10-14.

## **LEGAL ARGUMENT**

I.     **MANY OF THE PSC'S EXPERTS ARE UNQUALIFIED TO OFFER THE CAUSATION OPINIONS THEY HAVE PUT FORTH HERE.**

Rule 702 requires that an expert be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. It is the "responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001). Even though an expert may be qualified in one area, "a district court must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise." *Id.* The failure to do so can be grounds for reversal. *Id.* (reversing and holding "the district court erred in allowing Dr. Curtis to testify beyond the scope of his expertise"); *see also Barrett v. Rhodia, Inc.*, 606 F.3d 975, 982 (8th Cir. 2010) (holding that a psychologist with no training or experience in toxicology was not qualified to offer expert testimony on toxicology).

Further, "merely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *In re Viagra Prods. Liab. Lit.*, 658 F. Supp. 2d 950, 961 (D. Minn. 2009). Diagnosing and treating a disease is "substantially different from the expertise required to assess its genesis to a reasonable degree of scientific certainty." *Sutera v. Perrier Grp. of Am. Inc.*, 986 F. Supp. 655, 667 (D. Mass. 1997) (finding oncologist with no expertise in epidemiology, toxicology, biostatistics or risk-assessment not qualified to offer causation opinion); *see also Haller v. AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1300 (M.D. Fla. 2009) (finding psychiatrist not qualified to opine on cause of diabetes); *Alexander v. Smith & Nephew, P.L.C.,* 98 F. Supp. 2d 1310, 1315 (N.D. Okla. 2000) (finding family practitioner not qualified to opine on cause of spine-related ailments).

Here, the PSC has named seven experts, many of whom offer opinions outside their areas of expertise.  Wyeth seeks to strike the testimony below.

>    A.    **Dr. Beron Is Not Qualified to Testify About General Causation, and His Opinions Are Cumulative.**

Dr. Beron, a radiation oncologist, is not qualified to offer his general causation opinion that Prempro can cause lobular breast cancer with three years or less of Prempro use.  Dr. Beron's report and opinion are based on his interpretation of epidemiology, drug safety and cancer biology—areas that "fall[] outside the realm of his expertise."  *In re Viagra*, 658 F. Supp. 2d at 960 (excluding epidemiologist from testifying to specific causation).  He does not have a degree in any of these areas, has not published in these areas and lacks basic understanding of the methods used by scientists in these areas.[196]  *See id.* at 961; *Sutera*, 986 F. Supp. at 667.  Aside from his expert report in this case, he "never before" even attempted to determine whether a medication causes an adverse event at a particular duration of exposure.[197]  *See Barrett*, 606 F.3d at 982 (excluding neuropsychotherapist who "had no training in toxicology and . . . had never before evaluated a patient exposed" to the chemical in question).  Indeed, Dr. Beron admits that his report and opinions have nothing to do with radiation oncology, the only area in which he is qualified to testify.[198]  Accordingly, the Court should exclude Dr. Beron as unqualified here.  *See* Fed. R. Evid. 702; *In re Viagra*, 658 F. Supp. 2d at 961; *Sutera*, 986 F. Supp. at 667.

In addition, Dr. Beron's proposed testimony is cumulative.  Under Fed. R. Evid. 403, district courts may exclude expert testimony that would be a "needless presentation of cumulative evidence."  *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1101 (8th Cir. 1982)

---

[196]  *See supra* at Statement of Fact § II.A.2.

[197]  *Id*.

[198]  *Id*.

(citing Fed. R. Evid. 403).  It is proper to exclude a duplicative expert when two experts rely "on the same medical evidence in forming their opinions," the duplicative expert simply refers to other experts, and the duplicative expert would not add "any different information."  *See Tran v. Toyota Motor Corp.*, 420 F.3d 1310, 1315-16 (11th Cir. 2005); *Thorndike v. DaimlerChrysler Corp.*, 266 F. Supp. 2d 172, 185 (D. Me. 2003) (excluding expert whose opinions "clearly f[e]ll into the territory of" other designated experts and simply referred the court to the other experts' testimony).

Like the experts in *Tran* and *Thorndike,* Dr. Beron merely recites the same points from the PSC's other experts and adopts Dr. Naftalis's report.[199]  Also, Dr. Beron's lack of qualifications in this area means that he brings nothing different to the table.  *See Tran*, 420 F.3d at 1315; *Thorndike*, 266 F. Supp. 2d at 185 (noting that the expert's opinions were not derived "from an independent application of his strain of expertise").  Accordingly, the Court should also strike Dr. Beron's report and opinion as cumulative under Rule 403.

## B.  Dr. Michaels Is Not Qualified to Testify About General Causation.

Dr. Paul Michaels, a Las Vegas community pathologist, is not qualified to testify about general causation.  While Dr. Michaels has testified in previous cases, his testimony was limited to pathology or specific causation.  In contrast, his general causation opinion here is based on his interpretation of epidemiological evidence, which is far outside his area of expertise.  *See In re Viagra,* 658 F. Supp. 2d at 961.  Dr. Michaels is not qualified to evaluate epidemiological evidence or the safety of medications.[200]  The Court should thus exclude his testimony on these subjects.  *See* Fed. R. Evid. 702; *Wheeling*, 254 F.3d at 715; *In re Viagra*, 658 F. Supp. 2d at 961; *Sutera*, 986 F. Supp. at 667.

---

[199]   Beron Rep. at 1.

### C.      Dr. Naftalis Is Not Qualified to Testify About General Causation.

Dr. Elizabeth Naftalis is not qualified to offer general causation opinions.  Although Dr.

Naftalis has testified about specific causation, she has not been qualified as a general causation

expert.  When she testifies at trial, she is paired with an epidemiologist like Dr. Austin because

she has no expertise to interpret epidemiological studies or the safety of medications.[201]   Dr.

Naftalis also is not qualified to interpret biological and pathological evidence.[202]   In particular,

she does not even know basic facts about lobular cancers.[203]   Because Dr. Naftalis's general

causation opinion is based entirely on evidence she is not qualified to interpret, her general

causation testimony should be excluded as a matter of law.  *See* Fed. R. Evid. 702; *In re Viagra*,

658 F. Supp. 2d at 961; *Sutera*, 986 F. Supp. at 667.

## II.     THE COURT SHOULD EXCLUDE ANY OPINION THAT PREMPRO CAUSES LOBULAR BREAST CANCER WHEN TAKEN DAILY FOR APPROXIMATELY THREE YEARS OR LESS.

The PSC's experts acknowledge that any causation opinion must be predicated on

epidemiologic evidence showing a consistent association between short-term Prempro use and an

increased risk of lobular breast cancer.[204]   But they fail to provide reliable evidence to satisfy

their own methodological standards.

As discussed above, consistent data from the WHI clinical trial and four out of six U.S.

observational studies (in which the majority of women were likely taking Prempro) shows that

Prempro use for about three years or less is not associated with an increased risk of lobular breast

---

[200]   *See supra* at Statement of Facts § II.A.5.

[201]   *See supra* at Statement of Facts § II.A.6

[202]   *Id.*

[203]   *Id.*

[204]   *See supra* at Statement of Facts § II.B.2.

cancer.[205]  These data are congruent with what this Court described in its short-term use Order as "overwhelmingly reliable evidence" that short-term Prempro use does not increase breast cancer risk.  *In re Prempro*, 765 F. Supp. 2d at 1119.

The PSC's experts have not come forward with any reliable evidence to suggest that the outcome here should be any different.  As a threshold matter, the PSC's experts fail to provide any reliable evidence that short-term use of Prempro has a different effect on the risk of lobular breast cancer.  As discussed above, none of the epidemiologic studies that evaluated the relationship between short-term Prempro use and both lobular and ductal breast cancer found a statistically significant difference in risk.[206]  In WHI, the risk of being diagnosed with lobular breast cancer, after an average of 4.4 years of daily use, was nearly identical to the risk of developing ductal breast cancer (lobular HR 1.31, 95% CI 0.69-2.49; ductal HR 1.27, 95% CI 0.99-1.96).[207]  In fact, the WHI authors state that they found "no evidence of a differential effect" on lobular versus ductal breast cancer.[208]

The PSC's own experts agree.  Dr. Gadi testified that "lobular isn't terribly different than ductal."[209]  Dr. Ozer stated that he was "unimpressed by the distinction between ductal and lobular."[210]  Because the PSC's experts have not come forward with reliable evidence showing that short-term Prempro use has a different effect on lobular breast cancer, there is no basis to depart from the Court's earlier ruling.

---

[205]  *See supra* at Statement of Facts § I.H.

[206]  *See supra* at Statement of Facts § I.G.

[207]  *Id.*

[208]  *Id.*

[209]  Gadi Nov. 2011 Dep. at 95:2-9.

[210]  Ozer Nov. 2011 Dep. at 213:15-214:2.

Furthermore, the PSC's experts' causation opinions are not based on a reliable analysis. Rather than focus on studies that evaluate the relationship, if any, between short-term Prempro use and the risk of lobular breast cancer, the PSC's experts cherry-pick data from a collection of epidemiologic studies, the vast majority of which do not evaluate lobular breast cancer risk, do not evaluate Prempro, do not assess risk at the relevant duration, and/or do not find a statistically significant association. In fact, there are only two studies that show a statistically significant increased risk of lobular breast cancer, and both were rejected as methodologically unreliable in the previous short-term use hearing—one by PSC expert Dr. Austin (Chen 2002)[211] and the other by this Court (Calle 2009).[212] Further, the PSC's experts do not identify any studies showing an increased risk of lobular breast cancer with Prempro use for two years or less.

The PSC's experts also ignore or dismiss all study results that are inconsistent with their causation opinions, including the "gold standard" data from the WHI clinical trial and four out of six U.S. observational studies that do not find a statistically significant association between short-term Prempro use and the risk of lobular breast cancer. Ignoring contrary data is a hallmark of an unreliable methodology under *Daubert*. As this Court has noted, "select[ing] study data that best support[s] [an expert's] opinion, while downplaying contrary findings or conclusions . . . significantly undermine[s] the reliability of [the] proposed testimony." *In re Prempro*, 738 F. Supp. 2d at 892.

Finally, the PSC's experts' reliance on a biological plausibility theory does not provide a reliable basis for their causation opinions. First, evidence of biological plausibility is only relevant if reliable evidence of a valid epidemiologic association exists. Here, the PSC's experts

---

[211] *See* Austin Nov. 28, 2010 Decl. at 2-3; MDL *Daubert* Hr'g Tr., Jan. 12, 2011 at 94:8-20.

[212] *See In re Prempro*, 765 F. Supp. 2d at 1123 ("Yet, the study proves unreliable for analyzing short-term Prempro use.").

have not identified such evidence.  Further, the PSC's experts concede that biological plausibility is unreliable and insufficient to establish a cause-and-effect relationship.

> **A.     The PSC's Experts Improperly Dismiss the "Gold Standard" Evidence from the WHI Clinical Trial.**

WHI has long been the PSC's "evidentiary keystone in this litigation."[213]  *In re Prempro*, 765 F. Supp. 2d at 1116.  For years before Wyeth raised the short-term use *Daubert* challenge, the PSC told courts and juries across the country that WHI is the "gold standard," the "mother of all clinical trials," "one of the most definitive, far reaching clinical trials of women's health ever undertaken," and "trump[s] any observational studies."  *Id.* at 1116-17.  The PSC's experts relied on WHI and testified that WHI provides the most reliable estimate of breast cancer risk with Prempro use.[214]  In *Scroggin*, Dr. Austin described the Anderson analysis of the WHI data as the best estimate of breast cancer risk with Prempro use.  *See Scroggin*, 586 F.3d at 561.  Dr. Austin even acknowledged that WHI is a good study to look at to evaluate the relationship between breast cancer risk and duration of use.[215]  Outside of litigation, the PSC's experts lauded the study and relied on its results to evaluate short-term use.[216]  To this day, the PSC's experts recognize that WHI employed the most reliable methods to evaluate the relationship between

---

[213]   *See, e.g.*, MDL Master Compl., Docket No. 4:03-CV-01507 WRW, Doc. No. 81, Jan. 7, 2004, ¶ 45; Pl.'s Opp'n to Wyeth's Mot. for Summ. J., *Mittelstadt v. Wyeth*, Docket No. 4:05-CV-1547, Document No. 9, Nov. 15, 2007 at 8 (calling WHI the "biggest bombshell in the history of hormone replacement therapy"); Pl.'s Opp'n to Defs.' Mot. for Summ. J. (Statute of Limitations), *Rush v. Wyeth*, Docket No. 4:03-CV-1507-WRW, Doc. No. 61, May 9, 2006 at 1, 18–19 (describing WHI as a "landmark, paradigm-shifting" study).

[214]   *See supra* at Statement of Facts § I.F.

[215]   MDL *Daubert* Hr'g Tr. at 145:17-146:8.

[216]   *See supra* at I.F.

Prempro exposure and breast cancer risk,[217] that the WHI data is far less likely to be affected by confounding or bias,[218] and that RCTs like WHI provide the most reliable data regarding the safety and efficacy of a medication.[219]

But, now, when the relevant WHI data are no longer favorable to the PSC's position, their experts have changed their tune. What used to be the most reliable source of data is now described as severely flawed and no better than an observational study.[220] Dr. Austin now claims that observational studies provide the most reliable analysis of the relationship between exposure and risk.[221] This "sudden reversal" calls into question the reliability of both the PSC's experts' methods and their analysis. *Fireman's Fund Ins. Co. v. Canon USA, Inc.*, 394 F.3d 1054, 1059 (8th Cir. 2005). To use this Court's own words, these "newfound criticism[s]" are not scientifically valid. *In re Prempro*, 765 F. Supp. 2d at 1118.

> **1.    The PSC's Experts Concede that WHI Did Not Find Evidence of an Increased Risk of Any Type of Breast Cancer with Short-Term Prempro Use.**

The PSC's experts acknowledge that WHI did not find evidence that short-term Prempro use increases the risk of any type of breast cancer.[222] It is undisputed that a statistically

---

[217] Gann Oct. 2011 Dep. at 276:15-277:8 (stating that WHI is the best design for assessing cumulative exposure for the duration at issue here); Austin Nov. 2011 Dep. at 183:19-25; Gadi Nov. 2011 Dep. at 46:2-47:17.

[218] Gann Oct. 2011 Dep. at 270:18-271:4; Austin Nov. 2011 Dep. at 146:23-147:2, 178:10-20; Ozer Nov. 2011 Dep. at 57:19-58:23

[219] Gadi Nov. 2011 Dep. at 32:8-15; Ozer Nov. 2011 Dep. at 57:19-58:23.

[220] Austin Rep. at 8 (discussing the "'perfect storm' of limitations that affected the usefulness of the results of the WHI"); Austin Nov. 2011 Dep. at 175:5-176:6 (offering for the first time his opinion that WHI is no more reliable than an observational study).

[221] Austin Nov. 2011 Dep. at 118:8-25.

[222] *Id*. at 174:17-175:4 ("A. So let's take that piece by piece. You would agree that WHI did not find a statistically significant increase risk of any type of breast cancer in women who took Prempro for one year or less. Right? A. Yes, and I stated that in my report. Q. And you also

significant increased breast cancer risk was not seen until women took Prempro every day for an average of 4.4 years.[223]   For the first three to four years of daily use, breast cancer rates were lower in women taking Prempro than in those receiving placebo.[224]   *See In re Prempro*, 765 F. Supp. 2d at 1117.   And for women who had not taken hormone therapy prior to enrolling in WHI—the group of women for whom the exposure reported in WHI reflected their actual duration of hormone therapy use[225]—no increased risk was seen at any point during the trial (RR 1.02).[226]   Based on these data, the WHI authors ultimately concluded that, an increased risk of breast cancer begins with durations of use slightly longer than those in the trial (that is after more than five years of daily use).[227]

Furthermore, the PSC's experts acknowledge that WHI did not find evidence that Prempro use, at any duration, increases the risk of lobular breast cancer.[228]   In fact, the relative risks are virtually identical for ductal and lobular breast cancer.[229]   Thus, the best and most reliable data provides no evidence of an increased risk of lobular breast cancer with short-term Prempro use.

---

agree that WHI did not find a statistically significant increase risk of any type of breast cancer in women who took Prempro for two years or less?  A. Yes.  Q.  And the same is true for three years or less?  A. Yes."); Ozer Nov. 2011 Dep. at 17:8-14.

[223]  *See supra* at Statement of Facts § I.C.

[224]  *Id.*

[225]  Austin Nov. 2011 Dep. at 196:19-197:6.  Dr. Gadi testified that if you wanted to know the real effect of taking Prempro for three years, he would screen out prior users from the WHI population because their duration of use may have been underestimated.  Gadi Nov. 2011 Dep. at 120:1-12.

[226]  *See supra* at Statement of Facts § I.C.

[227]  *Id.*

[228]  Austin Nov. 2011 Dep. at 187:3-13.

[229]  Gadi Nov. 2011 Dep. at 154:7-10; Michaels Oct. 2011 Dep. at 43:19-44:3; Austin Nov. 2011 Dep. at 188:13-23; Barnhart Rep. at 8-9.

2.    **The PSC's Experts' Reasons for Dismissing WHI Are Not Persuasive.**

Faced with this "unfavorabl[e]" data,[230] the PSC's experts offer a panoply of reasons for dismissing the results of WHI.  None is persuasive or supported by reliable data.  As stated above, this Court already has heard and rejected virtually all of these recycled criticisms:  "Dr. Austin had the burden, under *Daubert*, to present reliable science to support his conclusions regarding the unreliability of the WHI study.  He has not met this burden.  The Court finds the Plaintiffs' current criticisms of WHI unsupported."[231]  *See In re Prempro*, 765 F. Supp. 2d at 1118 (rejecting Dr. Austin's power and drop-out rate arguments).

*Power*.  One of the main criticisms raised by the PSC's experts is that WHI lacked sufficient power to evaluate the short-term risks of lobular breast cancer, meaning that there were not enough breast cancer cases in the trial.  This argument fails for at least two reasons.  First, the PSC's experts rely on analyses from the Chen and Calle studies that have less power than WHI for evaluating the effect of short-term Prempro use on lobular cancer.[232]  Second, Dr. Austin admitted that there is no evidence to suggest that more power would change the short-term risk estimates.[233]  In fact, he acknowledged that the most likely result would be a statistically significant reduction of risk for the first three years of use.[234]

*Drop Outs*.  The PSC's experts contend that the WHI results underestimate the risk of breast cancer because 40% of the women in the trial dropped out before the end of the study.

---

[230]  *In re Prempro*, 765 F. Supp. 2d at 1117.

[231]  *See also* Austin Nov. 28, 2010 Decl. at 4-5 (raising the "gap time," drop-out rate", delay in diagnosis, and menopausal symptom arguments).

[232]  *See supra* at Statement of Facts § II.C.3; Chlebowski 2003 at 3250, Tbl. 4.

[233]  Austin Nov. 2011 Dep. at 201:7-19.

[234]  *Id*. at 201:20-202:10.

First, the drop out rate at three years was approximately 23%, not 40%.[235]   Second, when the WHI results were adjusted for drop-out rates, ***the results did not change***:  women who took Prempro daily for about three years or less were still less likely to be diagnosed with breast cancer than those taking placebo.[236]  *See* Figure 3, *infra*.

**Figure 3**



*Age*.  The PSC's experts allege that WHI underestimated breast cancer risk because the majority of women in the study were older, a group they contend are relatively resistant to the effects of Prempro.  However, when the WHI authors evaluated the effect of age on breast cancer risk in women taking Prempro, they did not find evidence that older women were at lower risk.[237]  Contrary to the PSC's experts' hypothesis, the *highest* risk was seen in the women in the oldest age group, 70-79.[238]

---

[235]  MDL *Daubert* Hr'g Tr. at 157:18-158:9; Rossouw et al., JAMA 2002;288:321-33 at 326, Fig. 2 (attached as Ex. 111).

[236]  Austin Nov. 2011 Dep. at 210:1-211:24; Gann Oct. 2011 Dep. at 297:14-298:14; Austin *Foust* Test. PM at 85:22-87:5; Anderson 2006 at 110, Fig. 1.

[237]  Austin Nov. 2011 Dep. at 204:6-12.

[238]  *Id*. at 204:13-15.

***Gap time***.   Another criticism raised by the PSC's experts is that WHI underestimated the breast cancer risk because the majority of women in the study did not begin taking Prempro until well after menopause.   The PSC's experts contend that women who start treatment a number of years after menopause are relatively resistant to the breast cancer risks of hormone therapy.[239] This theory has been dubbed the "gap time" hypothesis, referring to the gap between menopause and the start of hormone therapy.     Whether this hypothesis is correct remains to be determined.[240]

The WHI researchers specifically evaluated this hypothesis, however, and did not find a statistically significant difference in breast cancer risk between women who started hormone therapy at menopause and those who only started treatment a number of years later.[241]   Even after adjusting for "gap time," WHI did not provide any evidence that Prempro use for three years or less increases the risk of any type of breast cancer.[242]

***BMI***.   The PSC's experts suggest that WHI underestimated the breast cancer risk because the majority of women in the trial were obese and thus relatively resistant to the effects of hormone therapy.   The WHI researchers evaluated the effect of BMI on breast cancer risk and

---

[239]   Austin Rep. at 12.

[240]   Gadi Nov. 2011 Dep. at 316:10-14 ("Q. The gap time issue is a hypothesis though, right? Do you agree? A. Sure, it could be a hypothesis.   Q. It hasn't been proven?   A. No one has designed a study to prove that yet, right."); Austin Dep. Nov. 2011 at 207:7-11 ("The WHI authors do not ever say in any of their publications that—and I'm going to refer to this as the gap time—the gap time theory has been proven, do they? A. I don't know that anybody has said that."); Ozer Dep. Nov. 2011 at 249:9-17.

[241]   Chlebowski et al., JAMA 2010;304:1684-92 at 1688 ("Chlebowski 2010") (attached as Ex. 112).

[242]   Austin Nov. 2011 Dep. at 213:22-214:1 ("Q. So the gap time analysis from WHI does not provide evidence that taking Prempro for three years or less increases breast cancer risk.   Correct?   A.   Correct."); Ozer Nov. 2011 Dep. at 302:17-303:6.

found no statistically significant differences across different BMI groups.[243]   Again, this finding

is inconsistent with the PSC's experts' theory.

*Delay in Diagnosis*.   The PSC's experts contend that Prempro use impairs

mammographic detection of breast cancer by increasing breast density.   Put another way, they

suggest that Prempro increases breast density to such a degree that it prevents accurate

interpretation of mammograms and delays breast cancer diagnosis.   Again, this is a hypothesis

that has yet to be proven and is not generally accepted by the scientific community.[244]

Furthermore, the WHI investigators specifically tested the theory and, although they

found that Prempro use has a modest effect on breast density,[245] they also found that the increase

in breast density did not have a meaningful effect on mammographic sensitivity or accuracy in

the first three years.[246]  In fact, mammographic accuracy in Prempro users was ~99% for the first

three years of use, virtually identical to that for women randomized to treatment with placebo.[247]

*Menopausal Symptoms*.   The PSC's experts contend that WHI underestimated breast

cancer risk because the investigators excluded women with severe menopausal symptoms from

the trial.   They allege that women with menopausal symptoms are estrogen deficient and thus

"more susceptibl[e] to the effects of HRT."[248]   The PSC's experts' theory, has no reliable

scientific support.   First, the first and only study to evaluate the relationship between menopausal

---

[243]  Austin Nov. 2011 Dep. at 216:3-12.

[244]  *See* Chlebowski 2003 at 3250 (discussing the "hypothesis" that estrogen and progesterone "delays breast cancer diagnosis"); Barnhart Rep. at 33-34.

[245]  McTiernan et al., J. NAT'L CANCER INST. 2005;97:1366–76 at 1371, Tbl. 2 (6% increase in breast density) ("McTiernan 2005") (attached as Ex. 113).

[246]  Chlebowski et al., ARCH. INT. MED. 2008;168:370-77 at 374, Tbl. 2 ("Chlebowski 2008") (attached as Ex. 114); Barnhart Rep. at 34.

[247]  Chlebowski 2008 at 374, Tbl. 2.

[248]  Austin Rep. at 12.

symptoms and breast cancer risk (a study published in 2011) found that hormone therapy use has *no effect* on breast cancer risk in symptomatic women.[249]  Second, an analysis of the WHI data was done to determine whether Prempro use has a greater effect on breast cancer risk in women with lower natural estrogen levels (those the PSC's experts suggest would have menopausal symptoms).[250]  The researchers found no evidence to support that conclusion.[251]  Even PSC expert Dr. Ozer acknowledges that the effect of Prempro on breast cancer risk does not depend on a woman's estrogen level.[252]

In sum, the PSC's experts' numerous reasons for dismissing the WHI data are neither supported by the evidence nor accepted by the scientific community as a whole.  Even after accounting for the "limitations" identified by the PSC's experts, WHI provides no evidence that short-term Prempro use increases the risk of lobular breast cancer.  The PSC's experts' attempt to dismiss WHI based on a growing collection of unproven and unsupported criticisms is nothing more than a litigation-driven effort to preserve every case in the docket.  A methodology that discredits the same data that it embraced for years is not a reliable methodology under *Daubert*.

### B.   The PSC's Experts Rely Almost Exclusively on a Collection of Epidemiologic Studies that Do Not Address the Relevant Causation Issue at Hand.

Having rejected WHI as unreliable, the PSC's seven experts rely instead on a collection of cherry-picked data from 26 epidemiologic studies, 24 of which do not even analyze the

---

[249] Huang et al., CANCER EPIDEMIOL. BIOMARKERS PREV. 2011;20:379-88 at 386, Tbl. 4 ("Huang 2011") (attached as Ex. 115).  Risk of lobular breast cancer in women with menopausal symptoms was 0.6 for women who had never used HT and 0.4 in current E+P users.

[250] Deposition of Steven R. Cummings, M.D., *LaFerrara v. Wyeth*, June 11, 2010, at 125:20-126:7 ("Cummings Dep.") (excerpts attached as Ex. 116).

[251] Cummings Dep. at 127:8-17.

[252] Ozer Nov. 2011 Dep. at 308:20-309:10.

relevant question at hand—whether Prempro use for a period of about three years or less is capable of causing lobular breast cancer.  Those 24 studies do not evaluate lobular breast cancer risk, involve hormone formulations other than Prempro, do not assess risk at the relevant duration of use, and/or do not find a statistically significant association.  Only two of the studies actually evaluated the relationship between Prempro use for about three years or less and lobular breast cancer risk (Chen 2002 and Calle 2009).  With respect to the duration issue here, those studies have significant methodologic limitations and therefore were rejected as unreliable in the prior short-term use hearing.

### 1.    Studies Not Evaluating Lobular Breast Cancer Risk.

This *Daubert* challenge focuses on lobular breast cancer.  As discussed above, the PSC's experts have failed to come forward with reliable evidence to demonstrate that short-term use of Prempro increases the risk of lobular breast cancer.

The vast majority of studies cited by the PSC's experts (17 of 26) contain no analysis of lobular breast cancer.[253]   *See* Table 4, below.  Furthermore, every one of those studies involves either a different hormone formulation, a different duration of use, or does not find a statistically significant increased risk at the relevant duration.[254]   As a group, those studies do not provide relevant evidence regarding the relationship between Prempro use for about three years or less and the risk of lobular breast cancer.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993).

---

[253] *See supra* at Statement of Facts § II.C.2.

[254] *Id.*

**Table 4: Studies Not Evaluating Lobular Breast Cancer**

| Study | | Evaluates Lobular Breast Cancer? |
|---|---|---|
| 1 | Bakken 2004 | No |
| 2 | Bakken 2011 | No |
| 3 | Beral 2011 (MWS) | No |
| 4 | Fournier 2008A | No |
| 5 | Fournier 2009 | No |
| 6 | Holmberg 2004/2008 | No |
| 7 | Hunt 1987 | No |
| 8 | Jernstrom 2003 | No |
| 9 | LaVecchia 1986 | No |
| 10 | Persson 1999 | No |
| 11 | Beral 2003 (MWS) | No |
| 12 | Collaborative Group 1997 | No |
| 13 | Kerlikowske 2010 | No |
| 14 | Schairer 1994 | No |
| 15 | Stanford 1995 | No |
| 16 | HERS Clinical Trial | No |
| 17 | Wyeth's "Pivotal" Trial | No |

2.      **Studies Involving Other Hormone Therapy Formulations.**

Two of the remaining nine studies were conducted in Europe and did not evaluate the relationship between Prempro use at any duration and the risk of any type of breast cancer.[255] The Fournier 2008B article reports data from the French Teachers Study, and the Reeves 2006 article reports data from the Million Women Study, conducted in England.[256]  *See* Table 5, below.

**Table 5: Studies Not Evaluating Prempro**

| Study | | Evaluates Prempro? |
|---|---|---|
| 18 | Fournier 2008B | No |
| 19 | Reeves 2006 (MWS) | No |

---

[255] *Id.*

[256] *Id.*

Because "[e]ven minor deviations in molecular structure can radically change a particular substance's properties and propensities," these studies also do not provide reliable information about the relationship, if any, between Prempro use for three years or less and the risk of lobular breast cancer. *In re Prempro*, 738 F. Supp. 2d at 893 (citing *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 990 (8th Cir. 2001)).  This Court previously rejected as unreliable Dr. Austin's reliance on both the Million Women Study and the French Teachers Study because those "studies primarily involved drug combinations that were not Prempro." *In re Prempro*, 765 F. Supp. 2d at 1126.

The PSC's experts acknowledge that different hormone therapy formulations have different effects on breast cancer risk.[257]  For this reason, the PSC's experts have testified that any causation analysis needs to be based on the specific formulation in question,[258] and that it is improper to rely on European studies to evaluate the breast cancer risk associated with Prempro.[259]

In relying on data from European studies that did not evaluate Prempro, the PSC's experts have abandoned their own methodology, thereby further calling into question the reliability of their causation analysis. *See Fireman's Fund*, 394 at 1059; *Junk v. Terminix Int'l Co.*, 628 F.3d 439, 448 (8th Cir. 2010) (affirming exclusion where expert "fail[ed] to follow his own general practice").

---

[257] *See supra* at Statement of Facts § II.B.1.a.

[258] *Id.*

[259] MDL *Daubert* Hr'g Tr. at 126:24-127:4.

### 3. Studies Not Evaluating Breast Cancer Risk at About Three Years of Use or Less.

The specific question before the Court here is whether Prempro use for a period of about three years or less is capable of causing lobular breast cancer.  Such a question is distinct from whether Prempro use for a longer duration increases a woman's risk of being diagnosed with lobular breast cancer.  *See In re Prempro*, 765 F. Supp. 2d at 1122 (stating that "[t]he MWS conducted a separate assessment of Prempro at the five year mark, and showed an increased risk of breast cancer for Prempro users, but the issue before the Court involves usages of around three years or fewer; the MWS did not separately assess Prempro for three years or fewer").  Indeed, the PSC's own experts have testified repeatedly that the breast cancer risk associated with Prempro is dependent on the amount of medication that a patient takes over time.[260]

Because the breast cancer risk associated with Prempro is dependent on the duration of use, the PSC's experts concede that it would be improper to base short-term use opinions on studies that involve longer durations of use or that do not reliably measure the duration of use both before and during the study.[261]   Nonetheless, the PSC's experts ignored their own methodology and rely on a number of studies that did not evaluate the relevant duration of use. *See Fireman's Fund*, 394 at 1059; *Junk*, 628 F.3d at 448.

Of the remaining seven studies cited by the PSC's experts, five do not provide reliable estimates of risk at the relevant duration of use.  Three only evaluate breast cancer risk at five

---

[260] *See supra* at Statement of Facts § II.B.1.b.

[261] *Id.*; Gann Oct. 2011 Dep. at 175:7-178:3 (discussing the Daling study and stating that it would be improper to draw conclusions about risk at 3 years from data evaluating risk in women taking hormone therapy for five years or less); Austin Nov. 2011 Dep. at 249:15-250:2 (acknowledging that data from the MWS which assessed breast cancer risk with Prempro use for a period of five years did not inform the question of whether there was increased risk with three years of use).

years of use,[262] and two others (Li 2000 and Saxena 2010) do not have sufficient data to reliably evaluate the relationship between duration of use and breast cancer risk.[263]  *See* Table 6, below.

**Table 6: Studies Not Evaluating Risk at Abut 3 Years Use**

| Study | | Evaluates Risk at About 3 Years or Less? |
|---|---|---|
| 20 | Daling 2002 | No |
| 21 | Newcomb 2002 | No |
| 22 | Kotsopoulos 2010 | No |
| 23 | Li 2000 | No |
| 24 | Saxena 2010 | No |

**C.    Neither Chen 2002 Nor Calle 2009 Provide Reliable Evidence that Short-Term Prempro Use Is Capable of Causing Lobular Breast Cancer.**

As the PSC's experts concede, the only epidemiologic studies that report an increased risk of lobular breast cancer in women taking Prempro for about three years or less are Chen 2002 and Calle 2009.[264]  As discussed in detail below, neither study provides reliable evidence that short-term Prempro use is capable of causing lobular breast cancer.

**1.    Chen 2002**

The Chen 2002 study is a case-control study that was conducted in Washington State.[265] At the prior short-term use hearing, PSC expert Dr. Austin rejected the Chen study because it did not reliably evaluate the relationship between short-term Prempro use and breast cancer risk.[266] That was the case when the focus of the hearing was on ductal (not lobular) breast cancer, and

---

[262]  *See supra* at Statement of Facts § II.C.2.

[263]  *Id.*

[264]  Austin Nov. 2011 Dep. at 159:13-25; Gadi Nov. 2011 Dep. at 203:17-24 (identifying only Calle).

[265]  Chen 2002 at 734.

[266]  Austin Nov. 28, 2010 Decl. at 2-3.

the Chen study did not support Dr. Austin's opinion.[267]  Now that the focus has shifted to lobular

breast cancer and the study reports a statistically significant result for lobular breast cancer, the

Chen study has become one of the pillars of the PSC's causation theory.  *See In re Prempro*

*Prods. Liab. Litig.*, 514 F.3d 825, 833 (8th Cir. 2008) (finding unreliable reliance on a study Dr.

Austin "previously testified . . . could not be used to prove causation").  As the Eighth Circuit

recognizes, such a change in methodology "seriously undermine[s] the reliability" of the PSC's

experts' opinions.  *Fireman's Fund*, 394 F.3d at 1059.

Furthermore, while the Chen study did find an increased risk of lobular breast cancer in

women taking combination hormone therapy for 13-38 months, the odds ratio reported in the

study is based on a very small sample size—a total of only nine lobular breast cancer cases.[268]  A

risk estimate from an observational study based on only nine cases is unstable, meaning that it is

impossible to know the true magnitude of the association, or even if the association is real.  PSC

expert Dr. Gann explained that risk estimates based on a small sample size are inherently "less

reliable or precise" and are more susceptible to the effects of bias or confounding.[269]  PSC expert

Dr. Austin testified that, in a small observational study, it may not be possible to distinguish

between a true association and one that is a result of confounding or bias.[270]  Indeed, Dr. Austin

stated that it would be "scientifically or judicially improper" to make any decision regarding

causation based on an observational dataset that includes less than 20 to 30 cases.[271]  Relying on

---

[267]  Chen 2002 at 737, Tbl. 2 (breast cancer generally with 13-38 months use) *see id.* at 739, Tbl. 4 (nonlobular breast cancer with 13-38 months use).

[268]  Austin Nov. 2011 Dep. at 163:1-6; Chen 2002 at 739, Tbl. 4.

[269]  Gann Oct. 2011 Dep. at 128:13-129:9.

[270]  Austin Nov. 2011 Dep. at 148:1-9.

[271]  Austin Nov. 2011 Dep. at 114:14-115:15.

data the expert himself describes as unreliable is inconsistent with the "intellectual rigor" required under *Daubert*.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 152 (1997).

Moreover, the study did not account for hormone therapy use during the year prior to breast cancer diagnosis.  As the authors explain, the main outcome measured in the study was "[i]ncidence and type of breast cancer by duration of HRT ***use in the 5-year period ending 1 year before diagnosis***."[272]  Data on hormone therapy use in the last year was not collected and not considered as part of the analysis.  Consequently, the duration of use reported in the study underestimates the actual duration of use by up to a year for all study participants.  As this Court stated in its prior short-term use Order, a study that does not accurately characterize exposure cannot provide reliable information about the short-term risks of Prempro use.  *In re Prempro*, 765 F. Supp. 2d at 1124 (discussing the Calle study).  Taking into account the last year of use prior to diagnosis, the odds ratio reported for 13-38 months of hormone therapy use actually reflects use of about 25-50 months, a duration of use up to 14 months longer than that at issue here.[273]

The authors of the Chen study also acknowledge numerous other limitations of their data.  These include a number of potential types of bias—including selection and misclassification bias—as well as multiple potential confounders.[274]  The PSC's experts concede that the authors were not able to control for potential confounders, including history of breast biopsies, breast feeding, physical activity, alcohol use, and breast density.[275]  While Dr. Austin concedes that

---

[272]  Chen 2002 at 734 (emphasis added); Barnhart Rep. at 16.

[273]  Barnhart Rep. at 16.

[274]  Chen 2002 at 740.

[275]  Austin Nov. 2011 Dep. at 169:17-170:5 (breast density, alcohol use, breastfeeding, history of pervious breast biopsies); Chen 2002 at 740.

those confounders may have affected the results of the study,[276] none of the PSC's experts explained how they accounted for these potential confounders or sources of bias. *See In re Prempro*, 765 F. Supp. 2d at 1123 (rejecting Dr. Austin's reliance on the Million Women Study in part because the study "did not control for potential confounders, which, according to Dr. Austin, would affect the accuracy of the results"); Ref. Man. 591 ("To make a judgment about causation, a knowledgeable expert must consider the possibility of confounding factors."); *see also Joiner*, 522 U.S. at 146-47 (finding that a study that failed to control for other factors that may have caused plaintiff's cancer did not reliably support the expert's opinion). As this Court recognized, observational studies such as Chen "are indisputably more susceptible to bias and other confounding factors, and are less reliable than clinical studies, like WHI." *In re Prempro*, 765 F. Supp. 2d at 1119.

Finally, the Chen study includes more than one hundred individual statistical analyses.[277] As discussed above, when many statistical comparisons are performed in a study, the error rate rises far beyond the conventional threshold of 5%.[278] This is referred to by epidemiologists as a multiple comparison problem. Although statistical methods exist to correct for this problem (such as the Bonferroni correction), the study authors did not use any of those methods.[279] None of the PSC's experts explained how they accounted for an inflated error rate that is due to effects of multiple comparisons. Dr. Gann acknowledged that the Chen study "would not be sufficient" evidence to conclude that short-term Prempro use increases lobular breast cancer risk.[280]

---

[276]   Austin Nov. 2011 Dep. at 171:12-17.

[277]   *See* Chen 2002 *generally*.

[278]   *See supra* at Statement of Facts § II.B.2.

[279]   Austin Nov. 2011 Dep. at 173:6-8.

[280]   Gann Oct. 2011 Dep. at 154:19-23.

For all of these reasons, the Chen study does not provide reliable evidence regarding the relationship, if any, between short-term Prempro use and lobular breast cancer risk.

##    2.    Calle 2009

This Court previously found that the Calle study was "unreliable for analyzing short-term Prempro use" because of potential problems with misclassification and the measurement of exposure to hormone therapy.  *In re Prempro*, 765 F. Supp. 2d at 1123-24.  The Calle study is no more reliable now.

First, data on hormone therapy use was collected by means of questionnaires completed by the study participants at study entry and then at several intervals during follow up.[281]  Study participants were asked to recall the duration, dose, and type of hormone therapy they used over a period of years prior to completing the questionnaire.  The PSC's experts concede that exposure data collected from questionnaires is far less reliable than that obtained from direct pill counts, such as those performed in WHI.[282]  They also acknowledge that such data may be inaccurate[283] and subject to both recall and misclassification bias.[284]  At the prior *Daubert* hearing on short-term use, Dr. Austin testified that he could not "rule out the misclassification of exposure" in Calle.[285]  Neither Dr. Austin nor any of the other PSC experts offered any explanation for how they accounted for these potential sources of bias.  Furthermore, the PSC's experts admit that they did not even fully understand how exposure data was collected

---

[281]  Austin Nov. 2011 Dep. at 223:18-224:10.

[282]  Gann Oct. 2010 Dep. at 272:13-273:5, 143:19-145:7; Austin Nov. 2011 Dep. at 231:5-16; Gadi Nov. 2011 Dep. at 47:1-17.

[283]  Austin Nov. 2011 Dep. at 231:5-16.

[284]  Austin Nov. 2011 Dep. at 225:8-17; 228:18-229:17; Ozer Nov. 2011 Dep. at 221:15-19.

[285]  MDL *Daubert* Hr'g Tr. at 198:24-199:4; *In re Prempro*, 765 F. Supp. 2d at 1123-24.

throughout the study,[286] and conced that exposure data was not collected at all during portions of it.[287]   A study that does not reliably measure exposure is not a reliable basis for an opinion that focuses on a specific magnitude of exposure.   *See In re Prempro*, 765 F. Supp. 2d at 1124.

Second, as was the case with the Chen study, the risk estimate cited by the PSC's experts is based on a very small number of cases (likely no more than 10 to 15),[288] a number that would be "scientifically or judicially improper" to rely on in forming a causation opinion.[289]   For the reasons discussed above, risk estimates based on such a small number of cases are inherently unreliable and thus do not provide a sufficient basis to establish the presence of a cause-and-effect relationship.   That is especially true where, as here, the study authors had to exclude a far larger number of cases from the analysis (75) because of missing data.[290]   There is no way to know how excluding those 75 cancers may have affected the results of the study.

Third, although an association was reported between short-term Prempro use and breast cancer risk in the study, the magnitude of the association was very small (less than 2.0).[291]   As Dr. Austin explained, for risk estimates of this size, residual confounding "is of concern," meaning that the reported association may be a result of variables unrelated to Prempro.[292]   The PSC's experts concede that a number of potential sources of confounding were not adjusted for

---

[286]   Austin Nov. 2011 Dep. at 243:1-244:9.

[287]   Gann Oct. 2011 Dep. at 261:12-262:1.

[288]   Austin Nov. 2011 Dep. at 265:10-266:11; Barnhart Rep. at 17.

[289]   Austin Nov. 2011 Dep. at 114:14-115:15.

[290]   Calle 2009 at 938.

[291]   Calle 2009 at 942 (RR 1.95); Austin Nov. 2011 Dep. at 142:17-22 (acknowledging that risk estimates below 2.0 are very small).

[292]   Austin 2007 Causality Rep. at 9.

in the study, including breast density, breastfeeding, and history of breast biopsies.[293]   But they

provide no explanation for how they accounted for the effect of those confounders.  *See* Ref.

Man. at 591; *see also Joiner*, 522 U.S. at 146-47.

Finally, while the PSC's experts contend that the Calle study confirms that Prempro use

for three years or less is capable of causing lobular breast cancer, Dr. Calle states that her study

"suggests that after starting estrogen plus progestin, you probably have two or three years where

your ***risk isn't elevated***."[294]   "It is axiomatic that causation testimony is inadmissible if an expert

relies upon studies [or] publications, the authors of which were themselves unwilling to conclude

that causation had been proven."  *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 826 (7th Cir.

2010) (citing *Huss v. Gayden*, 571 F. 3d 442, 459 (5th Cir. 2009)); *see also Joiner*, 522 U.S. at

145 (rejecting expert's claim that was not supported by the study authors).

In sum, 24 of the 26 epidemiologic studies cited by the PSC's experts did not evaluate the

relationship between short-term Prempro use and lobular breast cancer risk.  The remaining two

studies—Chen 2002 and Calle 2009—have significant methodological limitations that prevent

drawing reliable conclusions regarding the short-term risks of Prempro.  While these studies may

help to formulate a hypothesis, they are "not a sufficient basis for the experts' opinions."  *Joiner*,

522 U.S. at 145.  That is especially true in the face of contrary data from WHI and four other

observational studies, which evaluated the short-term risks of Prempro use and did not find a

significant association.  "With no studies to reliably support [their] position, along with a failed

effort to discredit WHI results, [the PSC's experts'] opinion[s] on short-term use causation are

---

[293]   Austin Nov. 2011 Dep. at 233:9-234:18 (breast density, breastfeeding, and history of
        previous breast biopsies); Calle 2009 at 938.

[294]   *See* Doheny 2009.

not sufficiently reliable to be admissible under *Daubert*."  *In re Prempro*, 765 F. Supp. 2d at 1126.

> D.     **The PSC's Experts Ignored and Dismissed Contrary Data in Reaching Their Causation Opinion.**

The PSC's experts agree that a researcher may not "'pick and chose' [sic] from the scientific landscape and present the Court with what he believes the final picture looks like." *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 596 (9th Cir. 1996).  Dr. Gann testified that limiting an analysis to studies that support one conclusion while ignoring contrary evidence would be a scientifically bad thing to do.[295]  Dr. Ozer stated that "one needs to discuss all the studies and show that there are both supportive studies and explain why the non-supportive studies are non-supportive."[296]

Again, the PSC's experts violate their own methodological standards.  *See Fireman's Fund*, 394 at 1059; *Junk*, 628 F.3d at 448.  First, as discussed above, the PSC's experts dismiss the results of WHI, which the PSC and its experts relied on for years, and which show no evidence that short-term Prempro use increases the risk of lobular breast cancer.  Second, the PSC's experts ignored four of the six observational studies that evaluated the issue that is the subject of this motion.  None of those studies found a significant association between short-term Prempro use and lobular breast cancer.[297]  *See* Table 7, below.

---

[295]  Gann Oct. 2011 Dep. at 117:22-118:20.

[296]  Ozer Nov. 2011 Dep. at 57:2-9.

[297]  *See supra* at Statement of Facts § I.H.

**Table 7: Prempro Studies Showing No Statistically Significant Risk at 3 Years Use**

| Study | Evaluates Lobular? | Evaluates Prempro? | Evaluates Risk at About 3 Years or Less? | Evidence of Increased Risk? |
|---|---|---|---|---|
| Ursin 2002 | Yes | Yes | Yes | No |
| Li 2003 | Yes | Yes | Yes | No |
| Brinton 2008 | Yes | Yes | Yes | No |
| Li 2008 | Yes | Yes | Yes | No |

The PSC's experts' failure to address the findings of those four studies further undermines the reliability of their opinions.  An expert cannot "ignore[] or discount[] without explanation the contrary epidemiological studies." *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 885 (10th Cir. 2005).  Such a "[s]elective use of facts fails to satisfy the scientific method and *Daubert*." *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001).

**E.      Studies Suggesting the Presence of a Biologically Plausible Mechanism Are Not a Reliable Basis to Establish Causation.**

The PSC's experts also rely on a collection of data from animal, cellular, clinical, and ecological studies to support their theory of biological plausibility.  This same type of evidence was rejected in the prior short-term use proceeding.  *In re Prempro*, 765 F. Supp. 2d at 1125.  This evidence is no more reliable here.

First, the PSC's experts admit that the vast majority of the studies do not specifically evaluate the effects of Prempro.[298]  As such, they cannot provide reliable evidence regarding the relationship between short-term use of Prempro and the occurrence of lobular breast cancer.

Second, PSC expert Dr. Gann concedes that these types of studies are not designed or intended to answer the specific question at issue here—whether Prempro use for three years or

---

[298] *See e.g.*, Gann Oct. 2011 Dep. at 111:21-113:9; Ozer Nov. 2011 Dep. at 251:5-15.

less can cause lobular breast cancer.[299]   Rather, these studies allow scientists to postulate a potential biological mechanism by which short-term Prempro use may at some point increase the risk of lobular breast cancer.[300]   But, as both Dr. Gann and Dr. Austin acknowledge, a potential biological mechanism alone does not establish the presence of a cause-and-effect relationship.[301] Evidence of a potential biological mechanism must be coupled with reliable data from epidemiologic studies that consistently demonstrate a statistical association.[302]   As Dr. Austin explained, "actual results trump an understanding of what scientists currently think ought to be."[303]   Here, the most reliable clinical data (WHI) contradicts the PSC's biological plausibility theory, showing that for about the first three years, breast cancer rates were lower in women taking Prempro than in those taking placebo.[304]

Finally, Dr. Austin concedes that biological plausibility evidence is an unreliable measure of causality.[305]   He has described biological plausibility as the "weakest and most treacherous" causation factor,[306] noting that it is "based on other science as we currently understand it," not necessarily as it is.[307]   Because "our knowledge of biological mechanisms is constantly changing,

---

[299]   Gann Oct. 2011 Dep. at 113:10-116:6.   Dr. Gadi also concedes that none of these studies provide direct evidence that Prempro use increases breast cancer risk with three years or less of use.   Gadi Nov. 2011 Dep. at 299:17-23.

[300]   Gann Oct. 2011 Dep. at 109:19-23.

[301]   MDL *Daubert* Hr'g Tr. at 205:7-206:9; Gann Oct. 2011 Dep. at 111:12-20; Ozer Nov. 2011 Dep. 52:13-53:13.

[302]   Gann Oct. 2011 Dep. at 116:3-11.

[303]   Austin Rep. at 14.

[304]   MDL *Daubert* Hr'g Tr. at 152:22-153:12; Chlebowski 2003 at 3247, Fig. 2; Anderson 2006 at 110, Fig. 1.

[305]   MDL *Daubert* Hr'g Tr. at 202:16-24.

[306]   Austin 2007 Causality Rep. at 12.

[307]   Austin Rep. at 13.

including throwing out old concepts previously accepted as fact,"[308] Dr. Austin further stated that he has a "general negative opinion" of such evidence.[309]   In sum, "if you rely on [biological plausibility] to tip the scales in favor or against an interpretation of epidemiologic finding, you run the risk of being wrong."[310]

## III.   THE PSC'S EXPERTS HAVE FAILED TO IDENTIFY ANY EPIDEMIOLOGIC STUDIES SHOWING THAT PREMPRO USE FOR TWO YEARS OR LESS INCREASES LOBULAR BREAST CANCER RISK.

The PSC's experts have not identified any studies showing that Prempro use for two years or less increases the risk of lobular breast cancer.[311]   Furthermore, Dr. Austin admitted that he was not even sure if it was biologically plausible that Prempro use for two years or less could cause a breast cancer to develop.[312]   Accordingly, even if there is reliable evidence that Prempro use for three years is capable of causing lobular breast cancer—which Wyeth disputes—there is no evidence that use for a shorter duration can cause lobular breast cancer.

---

[308]   Austin 2007 Causality Rep. at 12.

[309]   Austin Rep. at 13.

[310]   MDL *Daubert* Hr'g Tr. at 205:7-206:9.

[311]   *See* Austin Nov. 2011 Dep. at 218:22-219:10, 151:15-21; Gadi Nov. 2011 Dep. at 288:17-23. Dr. Ozer testified that the only studies that reported a statistically significant increased risk of lobular breast cancer with Prempro use for two years or less were Calle and Bakken.  Ozer Nov. 2011 Dep. at 42:18-43:1.  As discussed above, neither study did so.  Calle actually found that women taking Prempro for less than two years had a lower risk of lobular breast cancer.  *Id.* at 212:16-213:3.  The two Bakken studies (Dr. Ozer did not specify which he was referring to) did not specifically study lobular breast cancer and did not involve Prempro. *See supra* at Statement of Facts § II.C.2.

[312]   Austin Nov. 2011 Dep. at 20:9-21:15.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should preclude any expert testimony that Prempro use increases the risk of lobular breast cancer when taken for about three years or less.


Dated: December 23, 2011                              Respectfully submitted,


                                                      /s/ F. Lane Heard III
                                                      F. Lane Heard III (D.C. Bar #291724)

                                                           WILLIAMS & CONNOLLY LLP
                                                           725 12th Street, NW
                                                           Washington, DC 20005-5901
                                                           (202) 434-5000

                                                      Lyn P. Pruitt (Bar No. 84121)

                                                           MITCHELL, WILLIAMS, SELIG,
                                                           GATES & WOODYARD, PLLC
                                                           425 West Capitol Avenue, Suite 1800
                                                           Little Rock, AR 72201-3525
                                                           (501) 688-8800
                                                           lpruitt@mwsgw.com

                                                      Loren H. Brown (NY Bar No. 2533529)

                                                           DLA PIPER LLP US
                                                           1251 Avenue of the Americas, 45th Fl.
                                                           New York, NY 10020-1104
                                                           (212) 335-4846
                                                           loren.brown@dlapiper.com

                                                      *Attorneys for Wyeth.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of December 2011 a true and correct copy of the foregoing Memorandum in Support of Wyeth's Motion to Exclude Any Expert Testimony That Prempro Can Cause Lobular Breast Cancer with Approximately Three Years or Less of Use was filed with the Clerk of Court using the CM/ECF system.   I certify that service will be accomplished by the CM/ECF system on all participants that are registered CM/ECF users in this case and electronically mailed to the parties listed below.

Mr. Richard Lewis
HAUSFELD LLP
rlewis@hausfeldllp.com

Mr. Shawn Khorrami
KHORRAMI POLLARD & ABIR, LLP
skhorrami@kpalawyers.com

Mr. Christopher T. Kirchmer
PROVOST UMPHREY
ckirchmer@provostumphrey.com

Mr. Ted Meadows
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
ted.meadows@beasleyallen.com

Ms. Ellen Presby
MILLER WEISBROD
epresby@millerweisbrod.com

Mr. Gary Holt
GARY EUBANKS & ASSOCIATES, LTD
holtg@garyholtlaw.com

Mr. Tobias L. Millrood
POGUST BRASLOW MILLROOD
tmillrood@pbmattorneys.com

Mr. Erik B. Walker
HISSEY, KIENTZ & HERRON, P.L.L.C.
erik@hkhlaw.com

Mr. Mike Williams
WILLIAMS DAILEY O'LEARY CRAINE
AND LOVE, P.C.
mwilliams@wdolaw.com

Mr. Ralph M. Cloar Jr.
ralph.cloar@cloarlawfirm.com

Mr. Irwin B. Levin
COHEN & MALAD, LLP
ilevin@cohenandmalad.com

Ms. Zoe Littlepage
LITTLEPAGE BOOTH
zoe@littlepagebooth.com

/s/      F. Lane Heard III
F. Lane Heard III
   WILLIAMS & CONNOLLY LLP
   725 12th Street, NW
   Washington, DC 20005-5901
   (202) 434-5000
   *lheard@wc.com*